# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD. AND H. LUNDBECK A/S, | |
| Plaintiffs, | |
| v. | C.A. No. 19-1938-LPS (consolidated) |
| ZENARA PHARMA PRIVATE LTD., ET AL., | |
| Defendants. | |

## <u>JOINT CLAIM CONSTRUCTION BRIEF</u>

# TABLE OF CONTENTS

I.  Introduction ............................................................................................................. 1

    A.  Plaintiffs' Opening Introductory Remarks ............................................. 1

    B.  Defendants' Opening Introductory Remarks .......................................... 2

II.  The Disclosure and Claims of the '419 Patent .................................................... 5

    A.  Plaintiffs' Position ................................................................................... 5

    B.  Defendants' Position ................................................................................ 5

III.  Legal Standards .................................................................................................... 9

    A.  Plaintiffs' Legal Standards ...................................................................... 9

        1.  Principles of Claim Construction .............................................. 9

        2.  Indefiniteness .......................................................................... 10

    B.  Defendants' Legal Standards ................................................................. 10

        1.  Principles of Claim Construction ............................................ 10

        2.  Indefiniteness .......................................................................... 11

IV.  Disputed Construction ........................................................................................ 13

    A.  Plaintiffs' Opening Position .................................................................. 14

        1.  Plaintiffs' Construction Is Supported by the Plain Language of the Claims ............................................................................ 14

        2.  The Specification Confirms Plaintiffs' Proposed Construction ............... 15

        3.  Plaintiffs' Construction Is Consistent with the Prosecution History ........ 16

        4.  Defendants' Position Is Unsupported ...................................... 18

        5.  Conclusion .............................................................................. 19

    B.  Defendants' Answering Position ........................................................... 19

        1.  There is No Guidance Provided by the Intrinsic Evidence as to a Non-Zero Amount of PEG That May Be Present in the Coating ............. 19

a)      The Specification Does Not Provide Guidance as to a Non-Zero Amount of PEG That May Be Present in the Coating ........ 20

b)      The Prosecution History Does Not Provide Guidance as to a Non-Zero Amount of PEG That May Be Present in the Coating .................................................................................... 25

2.      A POSA Would Not Have Reasonable Certainty as to How Much PEG May Be Present in a Coating to Satisfy the "substantially … not contain[ing]" PEG Limitation ............................................ 28

3.      Indefiniteness May Be Addressed at the Claim Construction Stage ........ 30

4.      Plaintiffs' Non-Construction Is Meritless ................................. 31

5.      Conclusion .............................................................. 33

C.   Plaintiffs' Reply Position ...................................................... 33

1.      Introduction ........................................................... 33

2.      The Intrinsic Record Makes Clear that "Substantially Does Not Contain Polyethylene Glycol" Is Definite ............................... 34

a)      Defendants' Expert Admits that the Plain and Ordinary Meaning of the Claimed Phrase Permits a Non-Zero Amount of PEG ........................................................ 34

b)      The Specification Provides Objective Guidance to Determine Whether an Amount of PEG Falls Within the Scope of "Substantially Does Not Contain" ................................ 36

c)      The Prosecution File History Confirms the Definiteness of the Plain and Ordinary Meaning .................................... 42

d)      "Substantially Does Not Contain Polyethylene Glycol" Is Definite .............................................................. 45

3.      There Has Been No Disclaimer of Any Specific Amount of PEG ........... 45

4.      Defendants' Indefiniteness Challenge Is Premature and Contravenes This Court's Order ....................................... 50

5.      Conclusion .............................................................. 51

D.   Defendants' Sur-Reply Position .......................................... 51

1.      Introduction ........................................................... 51

2.     The PEG Limitation Is Indefinite ............................................................ 52

    a)    Plaintiffs' Construction Eviscerates the PEG Limitation and Confirms Indefiniteness .................................................................... 52

    b)    The Intrinsic Evidence Does Not Provide Objective Guidance as to the Scope of the PEG Limitation ........................ 54

        (1)    Plaintiffs' Singular Focus on Photostability Ignores Storage Stability ................................................................ 54

        (2)    The Intrinsic Evidence Fails to Provide Objective Guidance on the Relationship between PEG and Photostability ........................................................................ 55

        (3)    Plaintiffs Still Fail to Identify the Unidentified "Impurity" ...................................................................... 57

    c)    Indefiniteness Is Appropriately Addressed at the Claim Construction Stage ........................................................................ 58

3.     The PEG Limitation Excludes Amounts of PEG in the Coating of ~5.7% w/w or Greater and Certainly 10% w/w or Greater ...................... 59

    a)    10% PEG by Weight .................................................................... 59

    b)    ~5.7% PEG by Weight .................................................................. 60

    c)    No Conflict with Indefiniteness .................................................... 61

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Adapt Pharma Operations Ltd. v. Teva Pharms USA, Inc.*,
    C.A. No. 16-7721, 2019 WL 1789463 (D.N.J. Apr. 24, 2019) ........................................18, 50

*Alcon Research, Ltd. v. Barr Labs. Inc.*,
    C.A. No. 09-0318, 2011 WL 3901878 (D. Del. Sept. 6, 2011) ...........................................18

*Andersen Corp. v. Fiber Composites*,
    474 F.3d 1361 (Fed. Cir. 2007).........................................................................................60

*BASF Corp. v. Johnson Matthey Inc.*,
    875 F.3d 1360 (Fed. Cir. 2017).........................................................................................10

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018).........................................................................................11

*Bushnell Hawthorne LLC v Cisco Sys. Inc.*,
    813 F. App'x 522 (Fed. Cir. 2020) ...................................................................................31

*Cordis Corp. v. Medtronic Ave, Inc.*,
    339 F.3d 1352 (Fed. Cir. 2003).........................................................................................48

*Core Wireless Licensing S.A.R.L. v. Apple Inc.*,
    C.A. No. 15-5008, 2016 WL 3124614 (N.D. Cal. Jun. 3, 2016).....................................13, 42

*Dow Chem. Co. v. Nova Chems. Corp.*,
    803 F. 3d. 620 (Fed. Cir. 2015).........................................................................................11

*Ecolab, Inc. v. FMC Corp.*,
    569 F.3d 1335 (Fed. Cir. 2009).........................................................................................47

*Effective Exploration, LLC v. Bluestone Nat. Res. II, LLC*,
    C.A. No. 16-607, 2017 WL 3193322 (E.D. Tex. July 27, 2017)......................................13, 42

*Elm 3DS Innovations, LLC v. Samsung Elecs. Co.*,
    C.A. No. 14-1430-LPS, 2020 WL 1850657 (D. Del. Apr. 13, 2020)...................10, 29, 39, 50

*Enzo Biochem, Inc. v. Applera Corp.*,
    599 F.3d 1325 (Fed. Cir. 2010).........................................................................15, 29, 39

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
    815 F.3d 1314 (Fed. Cir. 2016).................................................................................. 10-11, 32

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC,*
    879 F.3d 1332 (Fed. Cir. 2018).................................................................................10, 29, 39

*Fairfield Indus., Inc. v. Wireless Seismic, Inc.,*
    C.A. No. 14-2972, 2015 WL 1034275 (S.D. Tex. Mar. 10, 2015)....................................13, 42

*Fiber, LLC v. Ciena Corp.,*
    C.A. No. 13-840, 2017 WL 3896443 (D. Colo. Sep. 6, 2017) ..........................................13, 42

*Forest Labs., Inc. v. Teva Pharms. USA Inc.,*
    C.A. No. 14-121-LPS, 2016 WL 54910 (D. Del. Jan. 5, 2016).........................................18, 35

*Fresenius Kabi USA, LLC v. Fera Pharms., LLC,*
    C.A. No. 15-3654-KM-MAH, 2016 WL 5109142 (D.N.J. Sept. 20, 2016) ..........................50

*Galderma Labs., L.P. v. Sun Pharm. Industs. Ltd.,*
    16-1003-LPS, 2017 WL 5592278 (D. Del. Nov. 21, 2017).........................................47, 49, 50

*GE Lighting Solutions, LLC v. Lights of Am., Inc.,*
    663 F. App'x 938 (Fed. Cir. 2016) ................................................................. *passim*

*Geodynamics, Inc. v. Dynaenergetics US, Inc.,*
    C.A. No. 15-1546, 2016 WL 6217181 (E.D. Tex. Oct. 25, 2016) ....................................13, 42

*Huber Engineered Woods LLC v. Louisiana-Pacific Corp.,*
    C.A. No. 19-342, 2020 WL 5132922 (D. Del. Aug. 31, 2020) ........................................31, 58

*HZNP Meds. LLC v. Actavis Labs. UT Inc.,*
    940 F.3d 680 (Fed. Cir. 2019)......................................................................................30, 31

*IMS Tech., Inc. v. Haas Automation, Inc.,*
    206 F.3d 1422 (Fed. Cir. 2000).........................................................................................47

*HIP, Inc. v. Hormel Foods Corp.,*
    C.A. No. 18-615, 2019 WL 2579266 (D. Del. June 24, 2019)...............................................30

*Interval Licensing LLC v. AOL, Inc.,*
    766 F.3d 1364 (Fed. Cir. 2014).........................................................................................11

*In re Mobile Telecomms. Techs., LLC,*
    265 F. Supp. 3d 265 (D. Del. 2017)............................................................... *passim*

*N. Telecom, Inc. v. Datapoint Corp.,*
    908 F.2d 931, 939 (Fed. Cir. 1990) ...................................................................................45

*N. Telecom. Ltd. v. Samsung Elecs. Co.,*
    215 F.3d 1281 (Fed. Cir. 2000).....................................................................................47, 49

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
　　572 U.S. 898 (2014)..................................................................................10, 11, 30

*Omega Eng'g, Inc. v. Raytek Corp.*,
　　334 F.3d 1314 (Fed. Cir. 2003)................................................................14, 47

*Persion Pharms. LLC v. Alvogen Malta Operations Ltd.*,
　　945 F.3d 1184 (Fed. Cir. 2019).......................................................................61

*Pfizer Inc. v. Teva Pharms. USA, Inc.*,
　　555 F. App'x 961 (Fed. Cir. 2014) .........................................................35, 49

*Phillips v. AWH Corp.*,
　　415 F.3d 1303 (Fed. Cir. 2005) (en banc)...................................................*passim*

*Praxair, Inc. v. ATMI, Inc.*,
　　543 F.3d 1306 (Fed. Cir. 2008)......................................................................30

*Princeton Digital Image Corp. v. Amazon.com, Inc.*,
　　C.A. No. 13-237, 2019 WL 351258 (D. Del. Jan. 29, 2019)....................................31

*Samsung Elecs. Co. v. Elm 3DS Innovations, LLC*,
　　925 F.3d 1373 (Fed. Cir. 2019).................................................................. 29-30

*Shire ViroPharma Inc. v. CSL Behring LLC*,
　　No. 17-414, 2019 WL 6118253 (D. Del. 2019)..........................................48, 49

*Teva Pharms USA v. Sandoz Inc.*,
　　789 F.3d 1335 (Fed. Cir. 2015)......................................................................11

*Thorner v. Sony Comput. Ent. Am. LLC*,
　　669 F.3d 1362 (Fed. Cir. 2012).......................................................................9

*Tinnus Enters., LLC v. Telebrands Corp.*,
　　733 F. App'x 1011 (Fed. Cir. 2018) ...........................................................*passim*

*Tinnus Enters., LLC v. Telebrands Corp.*,
　　846 F.3d 1190 (Fed. Cir. 2017)................................................................38, 45

*Unwired Planet, LLC v. Apple Inc.*,
　　829 F.3d 1353 (Fed. Cir. 2016)......................................................................14

*Välinge Innovation AB v. Halstead New England Corp.*,
　　C.A. No. 16-1082, 2018 WL 2108199 (D. Del. May 7, 2018)..............................31

*Vitronics Corp. v. Conceptronic, Inc.*,
　　90 F.3d 1576 (Fed. Cir. 1996)................................................................ 9-10, 15

*Wasica Finance GmbH v. Continental Auto. Sys.*,
    853 F.3d 1272 (Fed. Cir. 2017)..............................................................................52

**Federal Statutes**

35 U.S.C. § 282(a) ...................................................................................................10

I.    **INTRODUCTION**

A.    **Plaintiffs' Opening Introductory Remarks**

This consolidated litigation arises under the Hatch-Waxman Act and involves Plaintiffs' REXULTI® (brexpiprazole) product, a novel atypical antipsychotic for the treatment of major depressive disorder and schizophrenia, and certain patents relating to this product:  U.S. Patent Nos. 7,888,362 (reissued as U.S. Reissue Patent No. RE48,059), 8,349,840, 8,618,109, 9,839,637 and 10,307,419 ("the '419 patent").      Defendants—eighteen generic pharmaceutical manufacturers—seek FDA approval to market generic versions of REXULTI® before the expiration of these patents.  These patents are directed to brexpiprazole, the novel active ingredient in REXULTI®, as well as pharmaceutical compositions and methods of use.

Plaintiffs informed Defendants that no terms of the asserted patent claims require any special construction because they all have their plain and ordinary meanings to one of ordinary skill in the art.  Appx0137-38 (Letter dated Jan. 29, 2021).  Defendants, however, argued that two terms require construction.  Appx0139-49 (Defendants' Proposed Terms and Constructions).  But Defendants only proposed a construction for one of those two terms—"hydroxypropyl cellulose." For the other—the phrase "coating substantially does not contain polyethylene glycol"— Defendants did not actually provide a construction and instead alleged without any support that this phrase is indefinite.

Plaintiffs have no objection to Defendants' proposed construction of "hydroxypropyl cellulose" as meaning "a derivative of cellulose including hydroxypropoxyl groups by about 50 to 85%" because it is consistent with its plain and ordinary meaning.  Appx0008 ('419 patent at 5:34-36).  Thus, there is no dispute as to this term.

The only disputed phrase comes from the '419 patent.  On February 18, 2021, the parties submitted their Joint Claim Construction Chart setting forth their respective positions as follows (D.I. 49):

| Disputed Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction[1] |
|---|---|---|
| "coating substantially does not contain polyethylene glycol"<br><br>'419 patent, claims 1-7 | The phrase "coating substantially does not contain polyethylene glycol" has its plain and ordinary meaning under *Phillips*, whichmeans "polyethylene glycol is substantially not contained in the coating."  Not indefinite. | Indefinite. |

Plaintiffs' proposed construction is consistent with the phrase's plain and ordinary meaning and finds support in the intrinsic record.  Defendants, on the other hand, have declined to offer a construction and allege instead that the disputed term is indefinite, prematurely seeking to summarily resolve their invalidity challenge at the claim construction stage without a fully developed record.  This is improper, especially in light of the Court's indication that such summary judgment attacks are not appropriate, if ever, until after the close of fact discovery.  D.I. 34 at ¶ 16. Regardless, Defendants' allegation of indefiniteness is without merit and conflicts with the intrinsic record.  Plaintiffs therefore respectfully request that this Court adopt Plaintiffs' proposed construction.

## B.    Defendants' Opening Introductory Remarks

The '419 patent was granted only after Plaintiff Otsuka assured the Patent Office that its alleged invention was a tablet that did not have polyethylene glycol ("PEG") in its coating. Although Otsuka disclosed in its application examples of tablet coatings both with and without

---

[1] Defendant Teva Pharmaceuticals USA, Inc. has represented that it "takes no position on claim construction and will accept the construction as construed by the Court."  D.I. 49 at 3.

PEG, it ultimately secured allowance by convincing the examiner, as stated in the '419 patent, that, "when polyethylene glycol (macrogol) ***exists in the coating layer***, the obtained tablet tends to have reduced photostability and storage stability."   Appx0008 ('419 patent at 6:46-49) (emphasis added).)  During prosecution, Otsuka faced prior-art tablets with certain amounts of PEG in the coating, and so was forced to distinguish its claims over such tablets and accept that every issued claim of the '419 patent requires a tablet with a coating that "substantially does not contain polyethylene glycol."  Appx0013 (*id.* at 15:29-16:65 (claims 1, 6); *see infra* § IV.B.1.b).)  This limitation, hereafter referred to as "the PEG limitation," is at the heart of this claim construction dispute.

When viewed in the context of the specification and file history of the '419 patent, the PEG limitation does not inform a person of ordinary skill in the art ("POSA") with reasonable certainty as to its scope.   Even Otsuka's supposedly "plain and ordinary meaning" construction and accompanying brief fails to add any clarity.  Contrary to what it argued during prosecution, Otsuka now argues that it intended to claim a tablet with a coating that "may include some" PEG, "as long as it is substantially not contained in the coating to an extent that adversely impacts the advantageous properties of the tablets, including photostability."   JCCB at 14.[2]  However, the intrinsic evidence provides no guidance or objective boundary as to what amount of PEG qualifies as "substantially not contained" in the coating, so as not to adversely impact tablet properties.  And a POSA would have understood that any potential impact of PEG on, e.g., tablet stability, depended on specific factors about the tablets themselves, such that a POSA cannot apply any generally accepted plain and ordinary meaning to the PEG limitation.

When standing before the Patent Office, Otsuka also did not suggest its invention might

---

[2] "JCCB" refers to this Joint Claim Construction Brief.

actually include tablets where PEG exists in the coating.  Had Otsuka done so, the examiner could have examined, and the public could have been put on notice of, such a claim scope.  As explained herein, Otsuka failed to provide any meaningful guidance to a POSA as to the metes and bounds of the '419 patent claims and, more particularly, the amount of PEG (assuming any) that a tablet coating may contain and still meet the PEG limitation.  The claims of the '419 patent are therefore indefinite, and it is appropriate for the Court to make such a determination at this stage.

Should the Court choose to defer a decision on indefiniteness or believe the PEG limitation is not indefinite, Plaintiffs' proposed "plain and ordinary meaning" construction still should be rejected.  Plaintiffs' construction simply rearranges the claim language without addressing the substantive dispute—the scope of "substantially does not contain" in the context of the PEG limitation.  Plaintiffs' construction at minimum leaves unaddressed that the '419 patent specification criticizes tablets where PEG "exists" in a coating, and also surrenders tablets with coatings having as much as 10% w/w or more PEG from coverage by the PEG limitation.  Otsuka also fails to address that the prosecution history disclaimed coverage of any tablet coatings having 5.7% w/w or more PEG to obtain allowance of the '419 patent claims.

Defendants[3] submit herewith the declaration of Dr. Reza Fassihi, an experienced pharmaceutical formulator, who opines that the intrinsic evidence fails to provide any direction or guidance on the amount of PEG that may be present in the claimed coating while still meeting the PEG limitation.  *See generally* Appx0156-223 ("Fassihi Op. Decl.").  Dr. Fassihi also opines that, setting uncertainty in the scope of the PEG limitation aside, a POSA would understand from the intrinsic evidence that it cannot in any event cover coatings having at least 5.7% w/w or more

---

[3]  Defendants Alembic Pharmaceuticals Ltd., Alembic Pharmaceuticals Inc., Amneal Pharmaceuticals LLC, Amneal Pharmaceuticals Company GmbH, Raks Pharma Pvt. Ltd., and Teva Pharmaceuticals USA, Inc. take no position on claim construction.

PEG, regardless of the impact of PEG on tablet properties. *Id.*

## II.     THE DISCLOSURE AND CLAIMS OF THE '419 PATENT

### A.     Plaintiffs' Position

The '419 patent is directed to tablets comprising brexpiprazole that have "excellent disintegration ability, storage stability, and high photostability, so that [they] can be effectively used in the medical field." Appx0007 ('419 patent at 3:9-11); *see also* Appx0003 (*id.* at Abstract), Appx0006 (*id.* at 1:44-47 ), Appx0013 (*id.* at 15:23-27).   Plaintiffs have asserted at least independent claims 1 and 6 of the '419 patent against all eighteen Defendants.

Claim 1 of the '419 patent, which is an exemplary independent claim, is reproduced below with the disputed term in bold and underlined:

> 1. A tablet comprising 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof as an active ingredient, an excipient (a), a binder (b), a disintegrant (c), a lubricant (d), and a coating, wherein the uncoated tablet comprises:
>
> 0.05 to 25% by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof,
>
> 10 to 98.5% by weight of the excipient (a), which is at least one member selected from the group consisting of lactose, corn starch, and microcrystalline cellulose;
>
> 0.1 to 20% by weight of the binder (b), which is hydroxypropyl cellulose;
>
> 1 to 25% by weight of the disintegrant (c), which is at least one member selected from the group consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch; and
>
> 0.1 to 10% by weight of the lubricant (d), which is magnesium stearate;
>
> the tablet further comprising a coating layer on the surface thereof, wherein said coating comprises hydroxypropyl methylcellulose, talc, and a colorant (e), the colorant (e) is present in an amount ranging from 0.1 to 50% by weight of the coating and comprises iron oxide and titanium oxide, and **the coating substantially does not contain polyethylene glycol**.

### B.     Defendants' Position

Each asserted claim of the '419 patent recites or incorporates by claim dependency the PEG limitation, i.e., "the coating [layer/mixture] substantially does not contain polyethylene

glycol."  The '419 patent specification only once mentions PEG being "substantially not" present in a coating, as follows:

> Among these, a combination of hydroxypropyl methyl cellulose (hypromellose), talc, and titanium oxide, which are components for coating agent, is preferable.  It should be noted that, when polyethylene glycol (macrogol) exists in the coating layer, the obtained tablet tends to have reduced photostability and storage stability.  Therefore, it is more preferable if polyethylene glycol (macrogol) is substantially not contained.

Appx0008 ('419 patent at 6:44-51).  Thus, according to the specification, the purpose of a coating that substantially does not contain PEG is to preserve the photostability and storage stability of the tablet.  But the above-quoted portion of the specification teaches that ***any*** *amount* of PEG is problematic, stating that when PEG simply "***exists*** in the coating layer" of a tablet, its photostability and storage stability is reduced.

Moreover, the only disclosed "object" of the '419 patent is "to provide a tablet comprising Compound (I) or a salt thereof as an active ingredient and having excellent disintegration ability, storage stability, and high photostability."  Appx0006 (*id.* at 1:44-47); *accord* Appx0013 (*id.* at 15:23-25).  The specification, however, provides no guidance regarding the degree of disintegration ability, storage stability, or photostability that is "excellent" or "high," and provides no calculus or other directions for determining what non-zero amount of PEG is permitted in a tablet coating while maintaining the desired object of the invention.

Instead, the '419 patent only provides certain specific examples of coated tablets, which exemplary tablets contain either 10% w/w PEG in their coatings or no PEG in their coatings whatsoever (i.e., 0% w/w).  Appx0011-13 (*id.* at 12:4-16:20) (describing 24 coated compositions, with 17 compositions containing no PEG and 7 compositions containing 10% w/w PEG by weight of coating); Appx0167-69 (Fassihi Op. Decl., ¶ 26).  The '419 patent discloses no example or other embodiment of a tablet containing any intermediate amount of PEG in the tablet coating between

10% w/w and 0% w/w.   Appx0167-69 (Fassihi Op. Decl., ¶ 26).   Table 3 of the '419 patent

discloses Examples 2-1, 2-2, and 2-3, each of which contains 10% w/w PEG in the tablet coating.

Appx 0011 ('419 patent at 12:12-28.)   Table 7, reproduced below, discloses Examples 3-2 through

3-9:

TABLE 7

| | Example No. | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3-2 | 3-3 | 3-4 | 3-5 | 3-6 | 3-7 | 3-8 | 3-9 |
| Uncoated tablet Weight of uncoated tablet (mg) Coating layer (mg) | | | | Example 3-1 90.0 | | | | |
| Hypromellose | 1.8 | 2.1 | 1.8 | 2.1 | 1.8 | 2.1 | 1.8 | 2.1 |
| Macrogol 6000 | 0.3 | — | 0.3 | — | 0.3 | — | 0.3 | — |
| Talc | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| Titanium oxide | 0.6 | 0.6 | 0.54 | 0.54 | 0.54 | 0.54 | 0.54 | 0.54 |
| red ferric oxide | — | — | 0.06 | 0.06 | — | — | — | — |
| Yellow ferric pride | — | — | — | — | 0.06 | 0.06 | — | — |
| Food blue No. 2 Aluminum lake (3-5%) | — | — | — | — | — | — | 0.06 | 0.06 |
| Weight of coat layer (mg) | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| Weight of coated tablet (mg) | 93.0 | 93.0 | 93.0 | 93.0 | 93.0 | 93.0 | 93.0 | 93.0 |

Appx0012 (*id.* at 14:1-24) (highlighting added).)   These eight examples either contain 10% w/w

PEG (macrogol 6000) in the coating layer or have coating in which PEG does not exist.   *Id.*;

Appx0167-69 (Fassihi Op. Decl., ¶ 26).   Here, Examples 3-2, 3-4, 3-6, and 3-8 contain 10% w/w

PEG in the coating, while corresponding Examples 3-3, 3-5, 3-7, and 3-9, respectively, contain no

PEG.   Appx0012 ('419 patent at 14:1-24) (also disclosing Example 3-1 with no coating);

Appx0167-69 (Fassihi Op. Decl., ¶ 26).[4]

The '419 patent also describes photostability and storage stability testing for the coated tablets in Examples 3-2 to 3-9 (containing either 0% w/w PEG or 10% w/w PEG in the coating), as well as for coated tablets from Examples 2-1 to 2-3 and uncoated tablets from Examples 1-1 to 1-3 and 3-1.   Appx0012 ('419 patent at 13:1-22 (Table 5), 14:37-51 (Table 8, below)).   In describing the results of these tests, which analyzed the amount of an **_unidentified_** impurity to assess stability, the '419 patent states:

> Furthermore, a stability test was performed for the uncoated tablets produced in Example 3-1 and the coated tablets produced in Examples 3-2 to 3-9 under the storage conditions of light irradiation (visible light: total illuminance of $1.8 \times 10^6$ lux·hr; ultraviolet light: total intensity of 300 W·hr/m$^2$) and an open system at 40° C/75% RH (three months, six months), i.e., conditions as or more severe as those of Examples 1-1 to 1-3 and Examples 2-1 to 2-3.  The contents of impurity after the storage in each condition were measured.  Table 8 shows the results.
>
> ….

**[Table 8]**

| | Example No. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 3-1 | 3-2 | 3-3 | 3-4 | 3-5 | 3-6 | 3-7 | 3-8 | 3-9 |
| | (Content of Impurity: %, n = 1) | | | | | | | | |
| Initial | 0.687 | 0.772 | 0.773 | 0.683 | 0.713 | 0.677 | 0.805 | 0.951 | 0.909 |
| Light irradiation | 4.142 | 2.069 | 1.469 | 1.401 | 0.676 | 1.493 | 0.675 | 2.573 | 1.186 |
| 40° C./ 75% RH - 3 months | 0.980 | 1.820 | 0.900 | 1.613 | 1.093 | 1.483 | 1.112 | 2.055 | 1.393 |
| 40° C./ 75% RH - 6 months | 1.140 | 2.264 | 1.672 | 2.232 | 1.232 | 1.766 | 1.247 | 2.130 | 1.783 |

---

[4] Also notable is that only Examples 3-4 to 3-7 contain both titanium oxide and iron oxide (red ferric oxide or yellow ferric oxide) as required by all '419 patent claims.  Appx0012 ('419 patent at 14:1-24), Appx0013 (_id._ at 16:29-17:65) (see independent claims 1, 6).)

Appx0012 (*id.* at 14:25-52) (examples having coatings without PEG highlighted).)  As further stated, "no increase in impurity was observed in the tablets of Examples 3-5 and 3-7 [containing 0% w/w PEG (macrogol)], even after the light irradiation." *Id.*  On the contrary, all tablets containing PEG in their coatings, i.e., 10% w/w PEG as in Examples 3-2, 3-4, 3-6 and 3-8, had higher levels of the ***unidentified*** impurity after either light irradiation or storage than their corresponding tablets not containing PEG, i.e., 0% w/w as in Examples 3-3, 3-5, 3-7 and 3-9, respectively.[5]  These experiments support the general premise explained in the '419 patent, as discussed above, that "when polyethylene glycol (macrogol) ***exists*** in the coating layer, the obtained tablet tends to have reduced photostability and storage stability." Appx0008 (*id.* at 6:46-49) (emphasis added); *see also* Appx0012 (*id.* at 14:36-52 (Table 8)).

## III.   LEGAL STANDARDS

### A.   Plaintiffs' Legal Standards

#### 1.   Principles of Claim Construction

When construing claims, the words of a patent "are generally given their ordinary and customary meaning," which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," when read in the context of the patent and prosecution history.  *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal quotation marks and citations omitted); *see also Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365-67 (Fed. Cir. 2012).  Construction of claims is informed by "intrinsic evidence of the record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83

---

[5] Table 9 of the '419 patent describes 13 additional tablets, identified as Examples 4-1 through 4-13, each of which has a coating containing HPMC, talc, titanium oxide, and iron oxide, but not containing any PEG.  The '419 patent provides no stability data for these examples.  Appx0012-13 (*id.* at Table 9 (cols. 13-16)).

(Fed. Cir. 1996).  Indeed, "intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."  *Id.*

### 2.    Indefiniteness

Although Defendants' indefiniteness challenge is premature, a claim is indefinite only if "in light of the specification and prosecution history, [it fails to] inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909-11 (2014).  When examining terms of degree, such as "substantially," the Federal Circuit has explained that "no . . . numerical precision is required when using such terms of degree. . . .  All that is required is some standard for measuring the term of degree."  *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1346 (Fed. Cir. 2018). Indeed, both the Federal Circuit and this Court have been explicit that "relative terms such as 'substantially' do not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim[s]."  *Tinnus Enters., LLC v. Telebrands Corp.*, 733 F. App'x 1011, 1018 (Fed. Cir. 2018) (internal quotations and citation omitted); *see also   Elm 3DS Innovations, LLC v. Samsung Elecs. Co.*, C.A. No. 14-1430-LPS, 2020 WL 1850657, at * 6 (D. Del. Apr. 13, 2020) ("Terms of degree, such as 'substantially'. . . are not inherently indefinite."). Issued patents are presumed valid and a party seeking to prove indefiniteness must do so by clear and convincing evidence.  35 U.S.C. § 282(a); *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

### B.    Defendants' Legal Standards

### 1.    Principles of Claim Construction

The Federal Circuit has held that "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) (quoting *O2 Micro*

*Int'l, Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008)).  Thus, "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* (quoting *O2 Micro*, 52 F.3d at 1361) (alteration original).

### 2.    Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901 (2014).  To be definite, "[t]he claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1364 (Fed. Cir. 2018) ("Our case law is clear that the objective boundaries requirement applies to terms of degree.").  "[A] patent must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open to them." *Nautilus*, 572 U.S. at 909 (quotation marks omitted; second alteration original).  Patent claims may not create a "zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." *Id.* at 909-10 (quotation marks omitted).  Unless the intrinsic evidence provides the guidance required to properly assess infringement, such as how to measure whether a claim element is met, the scope of a claim has not been set forth with reasonable certainty and is invalid as indefinite.  *See e.g.,* *Dow Chem. Co. v. Nova Chems. Corp.*, 803 F. 3d. 620, 633-35 (Fed. Cir. 2015); *see also Teva Pharms USA v. Sandoz Inc.*, 789 F.3d 1335, 1344-45 (Fed. Cir. 2015).

"Although 'terms of degree are [not] inherently indefinite,' the patent must provide 'some standard for measuring that degree' such that the claim language 'provide[s] enough certainty to

one of skill in the art when read in the context of the invention.'" *GE Lighting Solutions, LLC v. Lights of Am., Inc.*, 663 F. App'x. 938, 940 (Fed. Cir. 2016) (alternations in original) (quoting *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015)). "And so for the asserted claims to be definite, the patent must provide that additional information in the form of 'objective boundaries.'" *Id.*[6]

The term "substantially" is consistently characterized by courts as a term of degree, and numerous courts have found claim limitations containing the term "substantially" indefinite. For example, in *In re Mobile Telecomms. Techs., LLC*, the defendants argued that the specification failed to provide any standard or objective boundary for the terms "substantially not represented" and "substantially the same information." 265 F. Supp. 3d 454, 473-74 (D. Del. 2017). The plaintiff responded that "'substantially' is 'commonly used in many patents' and, here is used in accordance with its plain and ordinary meaning to account for small technical variations and imperfections." *Id.* at 474. This Court sided with the defendants: "Because 'substantially' is a term of degree, the patent must provide some standard of measuring that degree such that the claim language provides enough certainty to one of skill in the art when read in context of the invention. Here, however, … the specification provides no such guidance with respect to delineating the bounds of 'substantially the same information' or 'substantially not represented.'" *Id.* (internal quotation marks omitted) (quoting *GE Lighting*, 663 F. App'x. at 940).

Numerous other cases have found claim limitations containing the term "substantially"

---

[6] In *GE Lighting*, the Federal Circuit held a claim term relating to an "elongated" core to be indefinite because "an ordinarily skilled artisan cannot, without additional information, differentiate an 'elongated' core from a 'non-elongated' core." 663 F. App'x at 940. The court explained that "at best, a skilled artisan would know from the prosecution history only that the elongated cores cannot be 'disk or plate shaped' or 'generally planar.' Those general descriptions hardly provide the necessary 'objective boundaries' about the length or shape of an 'elongated' core." *Id.* at 941 (citations omitted).

indefinite where the intrinsic evidence failed to delineate the metes and bounds of the claim limitation. *See, e.g., Fiber, LLC v. Ciena Corp.*, C.A. No. 13-840, 2017 WL 3896443, at *12-13 (D. Colo. Sep. 6, 2017) (finding "substantially a complete set" indefinite); *Effective Exploration, LLC v. Bluestone Nat. Res. II, LLC*, C.A. No. 16-607, 2017 WL 3193322, at *22 (E.D. Tex. July 27, 2017) (finding "extend in substantially opposite directions" indefinite); *Geodynamics, Inc. v. Dynaenergetics US, Inc.*, C.A. No. 15-1546, 2016 WL 6217181, at *15-16 (E.D. Tex. Oct. 25, 2016) (finding "substantially equal" indefinite and noting that the portion of the specification relied on by plaintiff introduced further ambiguity and uncertainty); *Core Wireless Licensing S.A.R.L. v. Apple Inc.*, C.A. No. 15-5008, 2016 WL 3124614, at *12 (N.D. Cal. Jun. 3, 2016) (finding "substantially impair the quality of the user information" indefinite); *Fairfield Indus., Inc. v. Wireless Seismic, Inc.*, C.A. No. 14-2972, 2015 WL 1034275, at *16 (S.D. Tex. Mar. 10, 2015) (finding "substantially prevent communication interference" indefinite).

## IV.    DISPUTED CONSTRUCTION

| Disputed Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction[7] |
|---|---|---|
| "coating substantially does not contain polyethylene glycol"<br><br>'419 patent, claims 1-7 | The phrase "coating substantially does not contain "polyethylene glycol" has its plain and ordinary meaning under *Phillips*, which means "polyethylene glycol is substantially not contained in the coating."  Not indefinite. | Indefinite. |

---

[7] As noted above, Defendant Teva Pharmaceuticals USA, Inc. has represented that it "takes no position on claim construction and will accept the construction as construed by the Court."  D.I. 49 at 3.

### A.      Plaintiffs' Opening Position

Plaintiffs' proposed plain and ordinary meaning for "coating substantially does not contain polyethylene glycol" is supported by the claims, specification and prosecution history.

### 1.      Plaintiffs' Construction Is Supported by the Plain Language of the Claims

The claimed tablet of the '419 patent includes a coating that "substantially does not contain polyethylene glycol."  Appx0013 ('419 patent, claim 1).  This claim language alone is clear, and a person of ordinary skill would understand that the claimed tablets have a coating layer that may not contain any polyethylene glycol ("PEG") or may include some, as long as it is substantially not contained in the coating to an extent that adversely impacts the advantageous properties of the tablets, including photostability.  *See, e.g.*, Appx0007 ('419 patent at 3:9-11); *see also* Appx0008 ('419 patent at 6:37-51).

The plain language of other claims confirms that claim 1 permits the presence of PEG in the coating layer.  Claim 4, for example, explicitly recites that "the tablet does not contain povidone or crospovidone," without the use of "substantially."  Appx0013 ('419 patent at claim 4).  This demonstrates that the patentee knew how to claim a tablet without a certain component but chose not to do so for PEG.  *See Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358-59 (Fed. Cir. 2016) (refusing to construe claim narrowly, noting that in other claims the patentee had expressly claimed that narrow limitation).  Thus, here, where patentee did not act as its own lexicographer or disavow the full scope of "substantially does not contain," the plain and ordinary meaning should control.  *Id.* at 1358; *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) ("We indulge a heavy presumption that claim terms carry their full ordinary and customary meaning unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution.") (internal quotation and citation omitted).

Consequently, in the context of the '419 patent claims, the phrase "substantially" refers to how much PEG may (or may not) be present in the coating layer, and a person of ordinary skill in the art would understand what level falls within the scope of the claims.  *See Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1333-34 (Fed. Cir. 2010) (finding the phrase "not interfering substantially" to "denote[] language of magnitude because it purports to describe *how much* interference can occur during hybridization, i.e., an insubstantial amount of interference.") (emphasis in original).

### 2.   The Specification Confirms Plaintiffs' Proposed Construction

The specification provides ample support for Plaintiffs' proposed construction.  *Vitronics*, 90 F.3d at 1582 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.").  The specification discloses that the coating layer may comprise a plasticizer, such as PEG (also identified as macrogol).  Appx0008 ('419 patent at 6:28-43).  The specification also indicates that the coating may contain no PEG.  *Id*.  In another embodiment, the tablets may comprise a coating where PEG may be present but "is substantially not contained" in the coating.  Appx0008 ('419 patent at 6:32-51).  The clear and express language of the claims, which comes directly from the specification, covers the latter two embodiments.  *Id*.

The "substantially does not contain" PEG limitation achieves the stated object of the invention to provide tablets with excellent properties, including photostability.  Appx0006 ('419 patent at 1:44-47), Appx0007 ('419 patent at 3:9-11), Appx0013 ('419 patent at 15:23-27 ).  With these properties, the claimed tablets are "highly usable in the medical field."  Appx0013 ('419 patent at 15:23-26).  For example, the inventor found that an increased "photostability can be attained by applying a coating layer containing a colorant."  Appx0006 ('419 patent at 1:60-62); Appx0008 ('419 patent at 6:52-54) ("[B]y coloring the coating layer, photostability can be

supplied to the coated tablet."); *see also* Appx0008 ('419 patent at 6:28-31) ("A coated tablet (film-coated tablet) provided with a coating layer is preferable to achieve long-term storage stability and prevent degradation due to light or the like.").

The inventor also found that "when polyethylene glycol (macrogol) exists in the coating layer, the obtained tablet tends to have reduced photostability and storge stability." Appx0008 ('419 patent at 6:46-51). Given this tendency—but *not* absolute result—the patentee chose language to capture the advantageous use of PEG as a plasticizer without its potential detrimental effect on stability, including photostability. Specifically, the specification states that "it is more preferable if polyethylene glycol (macrogol) is substantially not contained" in the coating. Appx0008 ('419 patent at 6:49-51).

The specification—the single best guide to a claim term's meaning—thus supports Plaintiffs' construction. It uses the very same language that is found in the claims. And it provides additional guidance to show that "substantially does not contain" permits no PEG or an amount of PEG in the coating that will not adversely affect the photostability of the tablet. As a consequence, the plain and ordinary meaning should prevail.

### 3. Plaintiffs' Construction Is Consistent with the Prosecution History

Statements made during the prosecution of the '419 patent confirm Plaintiffs' proposed construction and demonstrate that the Examiner understood the phrase. *Phillips*, 415 F.3d at 1317 ("In addition to consulting the specification, we have held that a court 'should also consider the patent's prosecution history . . . .'") (citation omitted). Throughout prosecution, Applicant repeatedly emphasized the photostability of the claimed tablets that possess both (1) a coating having the colorants iron oxide and titanium oxide and also (2) does not substantially contain PEG.

For example, Applicant emphasized that the combination of the claimed colorants and the fact that PEG was substantially not contained in the coating resulted in "excellent photostability."

Appx0077-78 (Apr. 3, 2018 Amendment and Response at 6-7) ("Applicant has determined that when the coating layer contains iron oxide and titanium dioxide, and substantially does not contain polyethylene glycol . . . the increase in impurity content is suppressed even after light irradiation, and the tablet has excellent photostability.").  According to the Applicant, "there is no teaching in any of the references (including BELL) of enhancing the photostability of the recited tablets by employing a coating layer that contains iron oxide and titanium dioxide and that substantially does not contain polyethylene glycol."  Appx0078 (*id.* at 7).  In response to a later Office Action, Applicant again distinguished the claimed tablets, which substantially do not contain PEG but attained photostability, with those of the cited prior art references.  Appx0113 (Jan. 16, 2019 Amendment and Response at 12) ("[B]oth Yamashita and Guitard teach coatings **with** [PEG] and fail to recognize the unpredictability of a coating layer that 'substantially does not contain [PEG]' to result in 'no increase in impurity.'") (emphasis in original).

The prosecution history also demonstrates that the Examiner understood the plain and ordinary meaning of this claim limitation.  After Applicant introduced the "substantially does not contain polyethylene glycol" claim language, the Examiner searched for prior art that both specifically excluded PEG and also left open the possibility that it could be present in the coating. *See* Appx0154-55 (EAST Search History dated July 9, 2018) (*compare* L6-L14 *with* L2-L5).  This demonstrates that the Examiner understood the claims were not limited to only situations where there is no PEG in the coating.  In addition, the Examiner proposed an Examiner's amendment that modified claim 1 to recite "and substantially contains no polyethylene glycol."  Appx0121-22 (Notice of Allowability at 2-3).  In response, Applicant filed an Amendment After Allowance to revert to the original claim language, i.e., "the coating substantially does not contain polyethylene glycol."  Appx0128 (Apr. 12, 2019, Amendment After Allowance at 2).  The Examiner entered

Applicant's amendment, acknowledging that there had been no change in claim scope and no need for additional searching as Applicant had asserted.  Appx0132 (*id.* at 6); *see also* Appx0135-36 (Apr. 22, 2019 Response to Rule 312 Communication at 2-3).  As a result, the Examiner clearly understood Applicant's chosen claim language.

Plaintiffs' proposed construction is thus consistent with Applicant's statements throughout prosecution and should be adopted.

### 4.      Defendants' Position Is Unsupported

Defendants fail to proffer any construction for the "substantially does not contain" limitation, and instead argue this term is indefinite.  Defendants' tactical approach is nothing more than an improper attempt for an early validity ruling.   Courts generally disfavor addressing indefiniteness as part of claim construction or often conclude that the patent challenger failed to meet the "high" burden of indefiniteness at such an early stage.  *Adapt Pharma Operations Ltd. v. Teva Pharms USA, Inc.*, C.A. No. 16-7721, 2019 WL 1789463, at *4 (D.N.J. Apr. 24, 2019) (declining to rule on indefiniteness at claim construction, explaining "[i]t is not uncommon for courts to defer ruling on an indefiniteness challenge at the claims construction stage where such a ruling would be better suited for trial.") (citing *Alcon Research, Ltd. v. Barr Labs. Inc.*, C.A. No. 09-0318, 2011 WL 3901878, at *16 (D. Del. Sept. 6, 2011)); *Forest Labs., Inc. v. Teva Pharms. USA Inc.*, C.A. No. 14-121-LPS, 2016 WL 54910, at *6 (D. Del. Jan. 5, 2016) ("Thus, the Court may conclude that this term is indefinite only if the record contains clear and convincing evidence that 'substantially' would not inform a POSA with 'reasonably certainty' as to the claim's meaning.").  Here, the Court has already indicated that summary judgment attacks will not be permitted at this stage, and that even after the close of fact discovery, a party wishing to move for summary judgment will first have to seek and obtain leave of court.  D.I. 28 at 20:1-22:20.  Moreover, any such challenge would include full summary judgment briefing, and Defendants

should not be allowed to bypass a full vetting of indefiniteness under the guise of claim construction.  Plaintiffs thus urge the Court to adopt Plaintiffs' construction and reserve issues of validity for trial on a fully developed record.

### 5.    Conclusion

For at least the reasons discussed above, Plaintiffs respectfully request that this Court adopt Plaintiffs' proposed claim construction.

### B.    Defendants' Answering Position

#### 1.    There is No Guidance Provided by the Intrinsic Evidence as to a Non-Zero Amount of PEG That May Be Present in the Coating

The '419 patent claims, specification, and file history do not provide any guidance to a POSA on the amount of PEG that may be present in the claimed coating (comprising hydroxypropyl methylcellulose, talc, and a colorant comprising iron oxide and titanium oxide) to qualify as a coating that "substantially does not contain polyethylene glycol."  Plaintiffs fail to demonstrate any objective guideposts in the intrinsic evidence for measuring the scope of "substantially."  Instead, Plaintiffs inject further ambiguity into the PEG limitation, arguing that "substantially not contained in the coating" means not contained "to an extent that *adversely* impacts the *advantageous* properties of the tablets, including photostability."  (JCCB at 14 (emphasis added).)   These additional subjective terms of degree—"adversely" and "advantageous"—do not provide a POSA with an objective standard to evaluate the term "substantially."

Moreover, Plaintiffs do not elucidate the scope of "advantageous properties" beyond "including" photostability.  As these properties are purportedly relevant to whether a coating substantially does not contain PEG, it is necessary for a POSA to know what they are, and Plaintiffs' construction only obfuscates.  To the extent Plaintiffs intend to suggest that the

advantageous properties are limited to tablets exhibiting "*excellent* disintegration ability, storage stability, and *high* photostability, so that [they] can be effectively used in the medical field," (JCCB at 5, 15 (citing Appx0007 ('419 patent at 3:9-11) (emphasis added)), these attributes are still ambiguous.  For example, nothing in the intrinsic record clarifies how to determine whether disintegration ability or storage stability are *excellent* or whether photostability is *high*.  Accordingly, the intrinsic evidence fails to provide an objective standard for determining whether a tablet coating "substantially does not contain [PEG]" as is required by the PEG limitation.

> a)      **The Specification Does Not Provide Guidance as to a Non-Zero Amount of PEG That May Be Present in the Coating**

The '419 patent specification only once mentions a coating "substantially" not containing PEG: "when polyethylene glycol (macrogol) exists in the coating layer, the obtained tablet tends to have reduced photostability and storage stability," and, "[t]herefore, it is more preferable if polyethylene glycol (macrogol) is substantially not contained."  Appx0008 ('419 patent at 6:44-51).  There is no further discussion in the '419 patent specification (or the claims themselves) to clarify the meaning of "substantially," including a specific amount or range of amounts of PEG that may be included in the claimed coating such that it still meets the PEG limitation.  Instead, the '419 patent only describes specific tablet compositions having coatings that either contain 10% w/w PEG in the coating or do not contain any PEG at all, with no amounts exemplified in between.  (*See supra* § II.B.)  The specification explicitly criticizes examples where PEG exists in a tablet coating.  Appx0008 ('419 patent at 6:44-51).  It then provides examples of tablets with coatings containing 10% w/w PEG that resulted in decreased stability as compared to the PEG-free examples.  While it is clear that tablets with as much as 10% w/w PEG *cannot* be within the scope of the claims, there is *no guidance* whatsoever on what coatings containing a non-zero amount of PEG *would (or even could) qualify* as a coating "substantially … not contain[ing] [PEG]."  *Id.*;

Appx0176-77, Appx0182 (Fassihi Op. Decl., ¶¶ 43, 52).   The PEG limitation therefore has no plain and ordinary meaning in the context of the '419 patent claims and specification.

Not only does the specification fail to inform the POSA as to the amount of PEG allowed for a coating to "substantially … not contain" PEG according to the PEG limitation, it also fails to provide the requisite guidance for connecting the amount of PEG in a coating with an assessment of whether a given tablet has "excellent … storage stability" or "high photostability" according to the object of the invention (*supra* § II.B).   *See* Appx0008 ('419 patent, at 6:44-51), Appx0007 (*id.* at 3:9-12); Appx0176-77, Appx0182-83 (Fassihi Op. Decl, ¶¶ 43, 52-54).   Instead, the specification offers a vague description of the increase in the amount of an ***unidentified*** impurity in exemplary tablets after light irradiation and under storage conditions.   Appx0176-77 (Fassihi Op. Decl., ¶¶ 26-28, 43).   And, in those experiments, only tablets where PEG did not exist in any amount, i.e., Examples 3-5 and 3-7, are said to show "no increase in impurity."   Appx0012 ('419 patent at 14:25-52).   But this description does not provide any objective guidance or instructions about the dividing line between what constitutes excellent storage stability and/or high photostability and what does not, including how the amount of the unidentified impurity may be used in that assessment.   A POSA therefore cannot know with reasonable certainty whether any tablet containing PEG actually provides "excellent … storage stability" or "high photostability."   A POSA thus cannot know what amount of PEG would qualify a coating as "substantially … not contain[ing]" PEG, as required by the PEG limitation.

Moreover, the examples from the specification fail to direct a POSA on how the results of stability testing can be used to illuminate the metes and bounds of the PEG limitation.   Indeed, the stability testing disclosed in the specification was performed under various different conditions, including light irradiation without any mention of exposure time, storage at 40° C in a closed

system for one or three months, or storage at 40° C and 75% relative humidity (RH) in an open

system for three or six months.  Appx0011-0012 ('419 patent at 12:53-67, 14:25-36).  But the

specification does not explain which of these conditions to use to determine "excellent … storage

stability" or "high photostability."

Moreover, the only stability studies on a tablet composition falling within the scope of the

'419 claims (Example 3-5 and 3-7, which do not contain any PEG) are described as follows:

> Furthermore, a stability test was performed for the uncoated
> tablets produced in Example 3-1 and the coated tablets produced in
> Examples 3-2 to 3-9 under the storage conditions of light irradiation
> (visible light: total illuminance of $1.8 \times 10^6$ lux·hr; ultraviolet light:
> total intensity of 300 W·hr/m$^2$) and an open system at 40° C./75%
> RH (three months, six months), i.e., conditions as or more severe as
> those of Examples 1-1 to 1-3 and Examples 2-1 to 2-3.

Appx0012 (*id.* at 14:25-36).  Again, these limited directions do not provide the time period for

light irradiation before the tablets are assayed for the unidentified impurity, or explain what amount

of that impurity is required for photostability to be considered "high."  On the other hand, the

storage stability studies indicate that samples may be stored at 40° C for 1 or 3 months (closed

system), or 40° C and 75% RH for 3 or 6 months, before assessing the unidentified impurity, but

the specification does not explain which of these conditions to use to assess whether storage

stability is "excellent," or explain what impurity amounts qualify a tablet as having such stability.

In the absence of such guidance, a POSA has no reasonable metric available for determining

whether a tablet composition meets the goals raised by Otsuka, or determining the amounts of PEG

in a coating that would provide a tablet with properties such as the desired storage stability or

photostability.

Adding further uncertainty to the scope of the PEG limitation is the fact that the

specification discloses that other, non-PEG coating ingredients required by the '419 patent claims

may also improve stability of the coated tablets.  For example, the '419 patent teaches that

colorants, such as iron oxides, improve photostability:

> Furthermore, with regard to the coated tablet, **by coloring the coating layer, photostability can be supplied to the coated tablet**. Therefore, a colorant (e) is preferably added to the coating agent for coating the tablet.
>
> Examples of colorants (e) include: iron oxides such as red ferric oxide, yellow ferric oxide, and black iron oxide; titanium oxide; beta-carotene; food blue No. 2; food blue No. 2 aluminium lake; and riboflavin.
>
> Among these, containing an iron oxide is more preferable from a standpoint of not only adding a color to the tablet but also further improving photostability of the tablet.

Appx0008 (*id.* at 6:53-63) (emphasis added) (disclosing iron oxides disclosed as preferred colorants for improving photostability); *see also* Appx0013 (*id.* at claims 1-7) (requiring that the coated tablets include a colorant, which may be present in amounts of up to 50% by weight of the coating mixture).  There is no direction or guidance as to any interplay between colorants and PEG (or their amounts) in relation to the alleged object of the invention to "provide tablets with excellent properties" or provide tablets having desirable—but unspecified—levels of disintegration ability, storage stability, or photostability.

A POSA cannot determine from the specification what level of PEG qualifies a coating as one that "substantially does not contain [PEG]" or even how to measure whether a given tablet achieves the alleged "excellent properties" based on a low amount of PEG in a coating.  A POSA would also not understand from the '419 patent how to provide "excellent" disintegration ability and storage stability and "high" photostability based on a low amount of PEG in a coating.  Appx0176-77, Appx0184 (Fassihi Op. Decl., ¶¶ 43, 57).  And the specification also does not explain how a POSA can determine whether these alleged properties are present, e.g., based on the amount of unidentified impurity, so as to inform the POSA on the upper limit of PEG allowed by the PEG limitation.   The '419 patent only generally states that, when PEG **exists** in a coating, the

"obtained tablet tends to have reduced photostability and storage stability," and does not meet the object of the invention.  Appx0008 ('419 patent at 6:46-49).  And while the specification speaks to PEG *existing* or *not existing* in a tablet coating, it fails to distinguish between a tablet coating that "contains" PEG and one that "substantially does not."  The specification also fails to explain how the amount of an unidentified impurity arising during stability studies can be used to delineate between "excellent" or "high" stability and some lesser degree of stability, and how any amount of PEG is associated with these desired properties.  Instead, the POSA would understand the specification to distinguish only between coatings that contain (specifically) 10% w/w PEG (Examples 3-4 and 3-6) and those that contain no PEG whatsoever (Examples 3-5 and 3-7).  Appx0176-77 (Fassihi Op. Decl., ¶ 43).

In other words, a POSA would understand from the specification that tablets having PEG existing in their coating "tend to have reduced photostability and storage stability" and are therefore (presumably) outside of the PEG limitation and, consequently, the '419 patent claims. The POSA is then provided with actual examples where 10% w/w PEG in a coating certainly did not meet the object of the invention and so cannot be within the scope of the claims, when analyzed under Otsuka's rationale or otherwise.  The only examples provided of coated tablet that may, for the sake of argument, possibly meet the object of the invention alleged by Otsuka are those containing no PEG (0% w/w).  *See* Appx0008 ('419 patent at 6:46-49); Appx0183 (Fassihi Op. Decl., ¶ 54).  There is simply no way for a POSA to determine the amount above 0% w/w PEG that might qualify as meeting the PEG limitation.  At best, the POSA would conclude from the specification that coatings having 0% w/w PEG meet the disputed limitation, whereas coatings containing any amount of PEG (i.e., coatings in which PEG *exists*, including in amounts of 10% w/w or more) do not.  But the line between PEG being "contained" (i.e., existing) or "substantially

… not contain[ed]" in the coating remains completely unclear.   Appx0167-69, Appx0183-84 (Fassihi Op. Decl., ¶¶ 26, 54, 57).

**b)**      **The Prosecution History Does Not Provide Guidance as to a Non-Zero Amount of PEG That May Be Present in the Coating**

The claims as originally filed in the application that issued as the '419 patent did not require the PEG limitation.  Appx0050-52 (9/22/2017 Application, at 33-35).  Instead, the PEG limitation was added during prosecution to overcome a prior-art rejection.  The examiner rejected the original claims as obvious based in part on the Yamashita[8] and Guitard references.  *See generally* Appx0055-67 (Nov. 3, 2017 Office Action).  Yamashita discloses a tablet coating containing ~5.7% w/w PEG:

> The obtained tablet was coated with a film using a film coating agent made up of 10 g of TC-5 (trade name, product of Shin-Etsu Chemical Co., Ltd., hydroxypropyl methylcellulose), 3 g of polyethylene glycol 6000, 40 g of castor oil and an appropriate amount of ethanol to produce a film coated tablet of the above composition.

Appx0271 ('362 patent at 89:39-44; Appx0181 (Fassihi Op. Decl., ¶ 49).  Yamashita relates to heterocyclic compounds for central-nervous-system disorders, including brexpiprazole, the active ingredient of the claimed formulations of the '419 patent, and is therefore particularly pertinent here.  Appx0182 (Fassihi Op. Decl,, ¶ 51).

In response to the examiner's obviousness rejection, the applicant amended the pending independent claims to recite "the coating layer substantially does not contain polyethylene glycol" (pending claim 1; issued claim 1) and "the coating mixture substantially does not contain polyethylene glycol" (pending claim 8; issued claim 6).  Appx0080-82 (Apr. 3, 2018 Amendment, at 2-4).  The applicant then argued that these amendments distinguished the claims over the prior

---

[8] Yamashita (U.S. Patent No. 7,888,362) is assigned to Plaintiff Otsuka, and it, and/or its reissue (U.S. Patent No. RE48,059), is asserted against Defendants in the present litigation.

art, stating in part:

> Applicant has determined that **when the coating layer** contains iron oxide and titanium dioxide, and **substantially does not contain polyethylene glycol** (suggested by both YAMASHITA and GUITARD), the *increase in impurity content is suppressed* even after light irradiation, and the tablet has excellent photostability. Such effects have been verified by *Examples 3-5 and 3-7*, as shown in Table 8 of the present specification. *In contrast, the tablets of Example 3-4 and 3-6*, **which contain polyethylene glycol (macrogol)***, the impurity content is increased (stability is lower).* Neither YAMASHITA nor GUITARD describe or suggest these features, nor is the resultant increase in stability predictable from these documents, alone or in combination. Accordingly, for all the reasons discussed above, this rejection should be withdrawn.

> … The Examiner apparently relies on BELL as teaching conventional methods for producing coated tablets, but there is no teaching in any of the references (including BELL) of enhancing the photostability of the recited tablets by employing a coating layer that contains iron oxide and titanium dioxide and that substantially does not contain polyethylene glycol. These are features and effects not predictable from the documents relied on. In fact, none of the prior art even appears to be concerned with the problem of photostability.

Appx0078-79 (*id.* at 7-8) (emphasis added) (citing specification for PEG coatings of Examples 3-4 and 3-6 leading to increased impurity).)

After a further rejection, the applicant again relied on the PEG limitation in its arguments to distinguish the prior art, stating in part:

> For example, *Applicant's Examples No. 3-5 and 3-7, particularly Table 7, of the present specification show that tablets coated in a coating liquid that* **"substantially does not contain polyethylene glycol"** *(referred to as Macrogol 6000 in Table 7) unexpectedly have "no increase in impurity, even after light irradiation." Applicant's Specification at [0201]. Comparatively, the coatings used in Examples No. 3-4 and 3-6* **contain polyethylene glycol** *and have increased impurity, which leads to reduced photostability and storage stability. Id.* at [0067]. In contrast, neither Yamashita nor Guitard teaches that a coating layer that "substantially does not contain polyethylene glycol" results in "no increase in impurity." This effect is not predictable from the cited prior art.

> That is, Guitard teaches that high stability may be obtained, but does not attribute this high stability to "a coating layer [that] substantially does not contain polyethlene glycol"  Guitard at [0004], [0078], and [0081].  Guitard further allows for "a coating comprising . . . polyoxyethleyene glycol, e.g., PEG 6000 or PEG 8000." *Id.* at [0077].  This is consistent with Yamashita; Yamashita uses "a film coating agent made up of," *inter alia, "*3 g of polyethylene glycol 6000." Yamashita at Col. 89, ll. 34.44. … ***Here, both Yamashita and Guitard teach coatings with polyethylene glycol and fail to recognize the unpredictability of a coating layer that "substantially does not contain polyethylene glycol" to result in "no increase in impurity."***

Appx0112-13 (Jan. 16, 2019 Amendment, at 11-12) (emphasis added) (citing specification for

PEG coatings of Examples 3-4 and 3-6 leading to decreased photostability and storage stability).

Therefore, the applicant included the PEG limitation to overcome the prior-art rejections

over compositions that contain PEG, such as those with coatings containing ~5.7% w/w PEG as

disclosed in Yamashita.  *See* Appx0078-79 (Apr. 3, 2018 Amendment, at 7-8); Appx 0112-13 (Jan.

16, 2019 Amendment, at 11-12).  Moreover, the applicant associated the claim limitation "coating

[…] substantially does not contain PEG" ***only*** with Examples 3-5 and 3-7, which do not contain

***any*** PEG (0% w/w), and distinguished those tablets from Examples 3-4 and 3-6, which were said

***to contain*** PEG (and contain PEG in their coatings in the amount of 10% w/w).  *See* Appx0078-79

(Apr. 3, 2018 Amendment, at 7-8); Appx0112-13 (Jan. 16, 2019 Amendment, at 11-12); Appx0012

('419 patent at 14:1-24 (Table 7)).  Thus, a POSA would have understood from the file history that

the applicant considered coatings containing 10% w/w PEG (*see* Examples 3-4 and 3-6) and ~5.7

w/w PEG (Yamashita) as containing sufficient PEG so as to be outside the scope of the PEG

limitation—and, thus, that the applicant disclaimed tablets with such coatings.  Appx0177-84

(Fassihi Op. Decl., ¶¶ 44-51, 55-56).  But these arguments still do not inform a POSA as to what

lower amounts of PEG in a coating would qualify a coating as "substantially … not contain[ing]

PEG" as required by the claims.  *Id.*  Other than certainly not containing more than ~5.7% w/w

PEG, the public is left to guess how far above zero the weight percentage of PEG may be in the coating of the claimed tablet.

> **2.      A POSA Would Not Have Reasonable Certainty as to How Much PEG May Be Present in a Coating to Satisfy the "substantially … not contain[ing]" PEG Limitation**

The intrinsic evidence to the '419 patent fails to provide an objective standard for determining whether a coating "substantially does not contain PEG."  The specification discloses only two levels of PEG in coatings: 0% and 10% w/w.  Appx0167-69 (Fassihi Op. Decl., ¶ 26).  Coatings that ***do not contain*** PEG (0% w/w PEG) are said to avoid "increase in impurity" after light irradiation or storage, whereas coatings that ***contain*** PEG (10% w/w PEG) are said to have increased impurity after light irradiation or storage.  Appx0176 (*id.* ¶ 42).  But the specification provides no guidance as to what amount of PEG would be permissible for a coating to qualify as "substantially …  not contain[ing] [PEG]," e.g., what amount between 0% w/w and 10% w/w, or as to what impurity level is required to distinguish between coatings that "contain" PEG and those that "substantially do not."

During prosecution, upon adding the PEG limitation, the applicant distinguished the 0% w/w and 10% w/w coatings, on the basis that the latter had decreased photostability and storage stability.  But this intrinsic evidence provides no guidance whatsoever on the intended scope of the PEG limitation, including what amounts below, e.g., ~5.7% w/w in Yamashita, might qualify as being within the scope of the claims in view of the PEG limitation.  Appx0183-84 (*id.* ¶ 56).  Thus, while the PEG limitation most certainly ***excludes*** PEG amounts of ~5.7% w/w and more based on positions taken during prosecution, a POSA is simply provided with no means for establishing the amounts of PEG that ***do qualify*** a coating as "substantially … not contain[ing] [PEG]."  Appx0184 (*id.* ¶ 57).

Indeed, neither the '419 patent nor its prosecution history indicate what test conditions are suitable for making this determination or what amount of the unidentified impurity is acceptable after light irradiation or storage under stress conditions to qualify a tablet as having "excellent" storage stability or "high" photostability.  Appx0176-77 (*id.* ¶ 43).  Quite simply, the intrinsic record "provides no such guidance with respect to delineating the bounds of" the PEG limitation from tablets that the applicant considered to definitively ***contain*** PEG, such as those having ~5.7% w/w PEG from Yamashita and 10% w/w PEG in the '419 patent examples.  Appx0184 (*id.* ¶ 57); *see GE Lighting*, 663 F. App'x at 940; *In re Mobile*, 265 F. Supp. 3d at 474.

Plaintiffs' cases are readily distinguishable.  In those cases, the claims, specification, and/or file history provided the guidance that is lacking here.  In *Enzo Biochem, Inc. v. Applera Corp.*, which preceded the Supreme Court's *Nautilus* decision, the patent disclosure provided a "general guideline" and the claims, disclosure, and prosecution history provided multiple examples meeting the disputed claim term.  599 F.3d at 1333-35 (holding "not substantially interfering" was not indefinite because the dependent claims, specification, and prosecution history all provided multiple examples of suitable linkage groups, and the specification provided criteria for selecting such groups).  In *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, the claims and specification provided a reasonably certain guide against which "elongated and substantially straight" was to be judged.  879 F.3d at 1345-47.  In *Tinnus Enterprises, LLC v. Telebrands Corp*, surrounding claim language and the specification provided an objective boundary for the "substantially" language.  733 F. App'x at 1018.  Finally, in *Elm 3DS Innovations, LLC, v. Samsung Elecs. Co.*, the Federal Circuit had previously construed the claim term at issue, and determining whether a substrate is rigid, bent, or broken is a simple, objective task.  2020 WL 1850657 at *7.  Further, as evaluated by the Federal Circuit, the intrinsic evidence in *Elm 3DS*

provided specific requirements for substantial flexibility. *Samsung Elecs. Co. v. Elm 3DS Innovations, LLC*, 925 F.3d 1373, 1378-80 (Fed. Cir. 2019).  Unlike these cases, the intrinsic evidence here provides just a single example of a coating falling within the scope of the disputed claim limitation (0% w/w PEG) and does not provide any examples containing a non-zero amount of PEG that fall within the scope of the disputed claim limitation.  Moreover, the vague advantages of the claimed invention (e.g., "excellent," "high," reduction in unspecified impurity after not-fully-specified testing conditions), do not provide a POSA with objective boundaries by which to measure the scope the disputed claim limitation.

Because the intrinsic evidence here fails to provide reasonable certainty as to the meaning of the PEG limitation, i.e., the amount of PEG that can be in the coating with the coating still being "substantially free" from PEG, and because Plaintiffs' proposal introduces further ambiguity by citing to unnamed "advantageous" properties of the tablets, the PEG limitation is indefinite. Appx0182-86 (Fassihi Op. Decl., ¶¶ 52-62).

### 3.  Indefiniteness May Be Addressed at the Claim Construction Stage

Indefiniteness and claim construction are intertwined.  "General principles of claim construction apply to indefiniteness allegations." *HZNP Meds. LLC v. Actavis Labs. UT Inc.*, 940 F.3d 680, 688 (Fed. Cir. 2019) (citing *Biosig*, 783 F.3d at 1377–78).  "Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008), *abrogated on other grounds by Nautilus*, 572 U.S. at 901, *quoted in HIP, Inc. v. Hormel Foods Corp.*, C.A. No. 18-615, 2019 WL 2579266, at *2 (D. Del. June 24, 2019).  Claim construction proceedings afford "ample notice and opportunity to present evidence" and fully develop the record for indefiniteness determinations. *HZNP*, 940 F.3d at 685 (refuting patentee's argument that it had been prevented from fully

developing the record).

Accordingly, the Federal Circuit has approved indefiniteness determinations during *Markman* proceedings.  *See HZNP*, 940 F.3d at 685, 688 (affirming district court's holding of indefiniteness and noting that the district court issued its indefiniteness decision in its *Markman* order); *Bushnell Hawthorne LLC v Cisco Sys. Inc.*, 813 F. App'x 522, 524-27 (Fed. Cir. 2020) (same).   Similarly, this Court has addressed indefiniteness at the claim construction stage.  *See, e.g.*, *Huber Engineered Woods LLC v. Louisiana-Pacific Corp.*, C.A. No. 19-342, 2020 WL 5132922, at *8-9 (D. Del. Aug. 31, 2020) (finding claim limitation indefinite at the claim construction stage); *Princeton Digital Image Corp. v. Amazon.com, Inc.*, C.A. No. 13-237, 2019 WL 351258, at *9 (D. Del. Jan. 29, 2019) (same); *Välinge Innovation AB v. Halstead New England Corp.*, C.A. No. 16-1082, 2018 WL 2108199, at *3-4 (D. Del. May 7, 2018) (same). Moreover, Plaintiffs provide no reason why the record before the Court is insufficient to address indefiniteness of the PEG limitation at this stage.

### 4.     Plaintiffs' Non-Construction Is Meritless

As their proposed construction, Plaintiffs only rearrange the claim language, purporting to rely on the "plain and ordinary meaning" of the PEG limitation.   But Plaintiffs' proposed construction does not incorporate any standard by which the "plain and ordinary meaning" of the PEG limitation can be determined.  Plaintiffs' "plain and ordinary meaning" does not even attempt to provide any "objective boundaries" for the PEG limitation that allow a POSA to "differentiate" between a coating that contains PEG from one "substantially" not containing PEG.  *See GE Lighting*, 663 F. App'x at 940.  Even apart from their proposed non-construction, Plaintiffs do not identify anything in the intrinsic record that supposedly provides the "standard for measuring that degree."  *See id.*  Indeed, in *In re Mobile*, this Court rejected Plaintiffs' very argument.  The patentee there argued that "substantially" is "'commonly used in many patents' and, here is used

in accordance with its plain and ordinary meaning to account for small technical variations and imperfections." *In re Mobile*, 265 F. Supp. 3d at 474.  This Court held that is not enough; the specification must provide "guidance with respect to delineating the bounds" of the "substantially" terms.  *Id.*  Plaintiffs' attempt to rely on an unspecified, unexplained "plain and ordinary meaning" only confirms indefiniteness.

Indefiniteness aside, construing the term to have an unexplained "plain and ordinary meaning" is inappropriate in this case because it fails to resolve certain of the parties' fundamental disputes, namely, that the patentee surrendered and disclaimed—through the use of the PEG limitation—any tablets having coatings with ~5.7% w/w or more PEG (as disclosed by Yamashita), as well as tablets having coatings with 10% w/w or more PEG (as disclosed in the '419 specification).  *See Eon Corp.*, 814 F.3d at 1318 ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when … reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." (internal quotation marks omitted).).  Plaintiffs' construction punts these issues, and Plaintiffs' brief is equally silent on the question.  Plaintiffs should (at a minimum) be held to their surrender of claim scope.

That the PEG limitation at minimum should not cover ~5.7% w/w or more PEG is confirmed by the problems with PEG known to a POSA and admitted to exist by Otsuka itself in the '419 patent and throughout its prosecution before the USPTO.  A POSA would understand the '419 patent's desire for a "coating [that] substantially does not contain polyethylene glycol" and the associated discussion of storage stability and photostability to indicate that PEG causes stability issues when included into tablet coatings, whether arising from PEG impurities from degradation or otherwise.  Appx0185-86 (Fassihi Op. Decl., ¶ 61).  In view of the unpredictability of the effect of impurities in a particular formulation, and the danger of even trace amounts of impurities,

especially in formulations, like those of the '419 patent, containing low levels of API, the solution would have been to avoid the use of PEG completely. *Id.* Thus, absent some particular guidance from the intrinsic evidence, which only distinguishes coatings that contain PEG (i.e., in which PEG exists) from those that do not contain PEG, the knowledge of a POSA would, if anything, have led a POSA to conclude that "substantially does not contain" allows for, at most, only trivial amounts of PEG.[9] *Id.*

### 5. Conclusion

Because the PEG limitation present in all claims of the '419 patent fails to inform a POSA with reasonably certainty as to how much PEG (if any) can be present in a tablet coating, the PEG limitation is indefinite. Regardless, under no circumstances can the PEG limitation encompass coatings having ~5.7% or more w/w PEG.

### C. Plaintiffs' Reply Position

### 1. Introduction

Defendants' assertions of indefiniteness are an improper and premature attempt to summarily resolve validity at the claim construction stage. While Plaintiffs continue to believe that this issue should be decided on a fully developed record after fact and expert discovery, the intrinsic record shows that a POSA would understand with reasonable certainty that the claimed coating layer may contain PEG—in any amount—as long as the photostability of the tablet is maintained.

Defendants also offer a belated construction that seeks to limit the amount of PEG to no more than ~5.7%, or certainly no more than 10%, in the tablet coating layer based on alleged

---

[9] Indeed, the term "substantially does not contain PEG" is more closely related to the term "does not contain" than the term "contain," which further supports that the amount of PEG allowed by the '419 patent claims is much closer to 0% w/w than to any amounts that qualify coatings containing PEG, such as 10% w/w and ~5.7% w/w.

prosecution history disclaimer.  But no specific amount of PEG was clearly and unmistakably disclaimed.

Plaintiffs' straightforward and definite construction is supported directly by the claims, specification, and prosecution history and is further confirmed by the accompanying declaration of Dr. Robert O. Williams III—an expert with over 30 years of academic and real-world pharmaceutical formulation experience.  *See generally* Appx0313-0417 ("Williams Decl.").

### 2.    The Intrinsic Record Makes Clear that "Substantially Does Not Contain Polyethylene Glycol" Is Definite

The claims, specification, and prosecution history inform a POSA with reasonable certainty as to the scope of the plain and ordinary meaning of the disputed phrase.  From the intrinsic record, a POSA would understand that "substantially does not contain polyethylene glycol"[10] permits PEG in the claimed coating layer, as long as the photostability of the resulting tablet is maintained.  The specification provides objective guideposts to determine a tablet's photostability and whether PEG in the coating layer will be tolerated.  And the prosecution history confirms these objective measures.  Defendants' assertions to the contrary are without merit.

### a)    Defendants' Expert Admits that the Plain and Ordinary Meaning of the Claimed Phrase Permits a Non-Zero Amount of PEG

The claims themselves provide guidance as to the metes and bounds of "substantially does not contain polyethylene glycol."  Certain claim elements in the '419 patent require specific amounts of a claimed substance while no such restriction is placed on the amount of PEG.  For example, claim 1 recites a tablet coating layer that contains "an amount ranging from 0.1 to 50% by weight" of a colorant.  Appx0013 ('419 patent, claim 1).  Rather than similarly reciting a

---

[10] As set forth in Appx0418-19, the language of claim 1 of the '419 patent was corrected by a Certificate of Correction on October 22, 2019.

specific amount for PEG, the claims instead state that the coating "substantially does not contain" it.  Appx0013 ('419 patent, claim 1).  This distinction among claim elements demonstrates that the Patentee did not wish to be bound by a specific amount of PEG in the coating layer.  Appx0323-24 (Williams Decl., ¶¶ 29-32).

Moreover, claim 4, which depends from claim 1, uses the phrase "does *not* contain" when referring to two other components, povidone and crospovidone.  Appx0013 ('419 patent, claim 4). The Patentee thus crafted the claims to intentionally exclude certain pharmaceutical excipients from the tablets of claim 4 but chose not to be as restrictive for PEG.  *Forest Labs.*, 2016 WL 54910 at *7-*8 (applying claim differentiation and refusing to narrowly construe claim term, finding "when the applicants wanted to limit this term . . . they knew how to do so."); *Pfizer Inc. v. Teva Pharms. USA, Inc*., 555 F. App'x 961, 965-66 (Fed. Cir. 2014) ("[T]he patentee's use of the prefix in the tables demonstrates that it knew how to specify the racemic [compound] as distinguished from the compound and generally chose not to do so.").

While Defendants make no effort to examine the disputed phrase in the context of the claims (*see* JCCB at 19-20), their expert Dr. Fassihi admits that "does not contain" is different than "substantially does not contain."  Appx0177-79 (Fassihi Op. Decl., ¶ 44); *see Phillips*., 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms.").  As a result, from the claims alone, a POSA would understand that the claimed coating layer may contain either no PEG or some non-zero amount of PEG.[11]

---

[11] While Defendants incorrectly limit the scope of the disputed phrase, Defendants agree that a coating that does not contain PEG meets the disputed limitation.  JCCB at 24; *See* Appx0423-24 (E-mail from K. Canfield dated Feb. 16, 2021 at 3-4) ("[T]he term 'substantially does not contain PEG' cannot include any measurable amount of PEG in the coating.").

**b)     The Specification Provides Objective Guidance to Determine
Whether an Amount of PEG Falls Within the Scope of
"Substantially Does Not Contain"**

From the specification, a POSA would understand with reasonable certainty that

"substantially does not contain polyethylene glycol" allows for PEG in the claimed tablet coating

layer as long as the photostability of the tablet is maintained.  As an initial matter, the '419 patent

specifically indicates that the inventive coatings may contain additives, including PEG as a

plasticizer.  Appx0008 ('419 patent,  at 6:28-41); Appx0322 (Williams Decl., ¶ 25); JCCB at 15.

The specification also directly ties the presence of PEG in the coating to the resulting tablet's

photostability.  Appx0008 ('419 patent at 6:46-51), Appx0012 (*id.* at 14:35-36); Appx0321-22

(Williams Decl., ¶¶ 23-25); JCCB at 15-16.  Defendants and their expert agree.  JCCB at 5-6;

Appx0166-67 (Fassihi Op. Decl., ¶ 24).  The specification also provides working examples that

demonstrate how to make a pharmaceutical tablet according to the claims and assess its

photostability. *See* Appx0012 ('419 patent at 13:26-14:52); Appx0325-29 (Williams Decl., ¶¶ 34-

42).  Defendants and their expert agree.  JCCB at 6-9; Appx0169-71 (Fassihi Op. Decl., ¶¶ 27-28).

Defendants' unsupported arguments that the disputed phrase is indefinite or limited to specific

amount of PEG are therefore without merit.

The disputed phrase, "substantially does not contain polyethylene glycol," is taken directly

from the specification.  Appx0008 ('419 patent at 6:46-51); Appx0324-25 (Williams Decl., ¶ 33);

JCCB at 15-16.  The '419 patent states that when PEG is present in the coating layer, the resulting

tablet "*tends* to have reduced photostability and storage stability" and as a result "it is more

preferable if [PEG] is substantially not contained." Appx0008 ('419 patent at 6:46-51) (emphasis

added); Appx0322, Appx0324-25 (Williams Decl., ¶¶ 25, 32-33); JCCB at 16.  The '419 patent

also indicates that photostability can be supplied by including colorants in the coating layer.

Appx0008 ('419 patent at 6:52-55); Appx0324-25 (Williams Decl., ¶ 33);  JCCB at 15-16.  Dr.

Williams explains that a POSA would understand that although the presence of PEG in a tablet's coating layer tends to reduce photostability, this depends on other factors. Appx0324-25 (Williams Decl., ¶ 33). Not all tablets that contain PEG in the coating layer will exhibit reduced photostability, especially if they also contain colorants. Appx0324-25 (Williams Decl., ¶ 33). From this disclosure, a POSA would understand that the presence of PEG in the coating layer and photostability are linked. As mentioned, Defendants agree. JCCB at 5-6.

The specification also provides objective guidance to assess whether the PEG in the coating layer results in reduced photostability. The patent includes working examples that serve as a guide to evaluate whether PEG will be tolerated. Appx0012 ('419 patent at 13:26-14:52); Appx0325-29 (Williams Decl., ¶¶ 34-42). In Examples 3-2 to 3-9, tablets with different coating layers were prepared. Appx0012 ('419 patent at 13:49-14:52), Appx0325-26 (Williams Decl., ¶ 34). The initial impurity level of each tablet was reported. Appx0012 ('419 patent at 14:37-43); Appx0326-28 (Williams Decl., ¶¶ 36, 39-40). The photostability of the tablets was then analyzed by subjecting the tablets to light irradiation conditions disclosed in the specification and consistent with relevant guidelines in the field. Appx0012 ('419 patent at 14:25-33); Appx0325-29 (Williams Decl., ¶¶ 34-42). The impurity level following exposure to light was then measured to determine what, if any, effect the coating had on the tablet's impurity level under photostability testing conditions. Appx0012 ('419 patent, col. 14:25-52); Appx0325-29 (Williams Decl., ¶¶ 34-42).

For Examples 3-5 and 3-7, which contain the claimed colorants and no PEG, "[n]o increase in impurity was observed" after photostability testing compared to the initial impurity level. Appx0012 ('419 patent at 14:25-35); Appx0325-27 (Williams Decl., ¶¶ 34-37); Appx0077-78 (Amendment and Response dated Apr. 3, 2018 at 6-7); Appx0112-13 (Amendment and Response dated Jan. 16, 2019 at 11-12). In contrast, the tablets of Examples 3-4 and 3-6 that contained the

claimed colorants and also included 10% PEG by weight of the coating showed an increase in impurity after photostability testing, meaning the photostability was lower.  Appx0012 ('419 patent at 14:37-52); Appx0327 (Williams Decl., ¶ 38); Appx0077-78 (Amendment and Response dated Apr. 3, 2018 at 6-7); Appx0112-13 (Amendment and Response dated Jan. 16, 2019 at 11-12).  From these examples, a POSA would know how to prepare tablets with varying amounts of PEG in the coating layer and test them to determine whether the PEG content in a particular formulation would result in a tablet with reduced photostability or not as measured by the change from the initial impurity level.  Appx0329 (Williams Decl., ¶ 42).

The Federal Circuit has found that claims with "substantially" are definite where, as here, the specification directly tied the claimed phrase to a particular function and provided objective boundaries for determining the limits of that function.  *Tinnus Enters., LLC v. Telebrands Corp*., 733 F. App'x at 1018-1022 (reversing PTAB's finding that claims were indefinite); *see also Tinnus Enters., LLC v. Telebrands Corp*., 846 F.3d 1190, 1205-06 (Fed. Cir. 2017) (affirming district court decision that defendant's indefiniteness challenge failed to raise a substantial question of validity at the preliminary injunction phase).  The claim at issue in *Tinnus* related to a device that filled multiple water balloons simultaneously and secured them by shaking once "substantially filled."  *Tinnus*, 733 F. App'x at 1012-13.  Pointing to guidance from the specification, the Court reasoned that "substantially filled" did not refer to any specific *amount* of liquid in the claimed container but rather was "directly related to the ability to shake and detach the container."  *Id*. at 1018-19.  The Court also concluded that the specification's description of releasing the balloons by shaking once "substantially filled" was "precise enough to afford clear notice of what is claimed, [and] thereby 'apprise the public of what is still open to them.'"  *Id*. at 1019 (quotation omitted).  The result should be no different here where the specification does not place a specific

limit on the amount of PEG that may be present but instead defines its permissible presence by an amount that does not reduce the photostability of the resulting tablet when present in a coating that also contains the claimed colorants.  *See also Exmark Mfg.*, 879 F.3d at 1332 (Fed. Cir. 2018) (holding the claim term "elongated and substantially straight" was not indefinite because, in part, "[t]he function of the elongated and substantially straight baffle portions provides further guidance regarding the scope of the claim language"); *Enzo Biochem*, 599 F.3d at 1333-34 (holding the claim term "not interfering substantially" was not indefinite because the intrinsic record provided guidance to a POSA to determine functionally whether the linkage would interfere "substantially"); *Elm 3DS Innovations,* 2020 WL 1850657 at *6 (holding the claim term "substantially flexible terms" was not indefinite because the intrinsic evidence provided functional discussion that would allow a POSA to discern the claim scope with reasonable certainty). Contrary to Defendants' assertions, Plaintiffs' cited cases are analogous to the issue at hand because the specification of the '419 patent *does* provide objective guidance regarding the scope of "substantially" as used in the claims.  *See* JCCB at 29-30.

Further, Defendants' assertions of ambiguity are without merit.  First, Defendants assert that the Patentee was required to provide guidance of "high" photostability.  JCCB at 20-22.  While that was one of the goals of the invention disclosed in the '419 patent, the express guidance for PEG refers to avoiding a reduction in photostability.  Appx0008 ('419 patent at 6:46-51); Appx0324-25 (Williams Decl., ¶ 33); JCCB at 15-16.  And the claims do not require an optimum level of photostability.  Nevertheless, a tablet that maintains its original impurity level after light irradiation would have been understood to exhibit desirable—or high—photostability.  Appx0012 ('419 patent at 14:35-36); Appx0326-27 (Williams Decl., ¶¶ 36-37); JCCB at 15-16; Appx0077-

78 (Amendment and Response dated Apr. 3, 2018 at 6-7); Appx0112-13 (Amendment and Response dated Jan. 16, 2019 at 11-12).

Second, Defendants narrowly focus on just the PEG in the coating but ignore that the claims are directed to a coating layer that contains *both* colorants and substantially does not contain PEG. Appx0013 ('419 patent, claim 1); *infra* § IV.C.2.c. These components function together to promote photostability. Appx0008 ('419 patent at 6:46-55); *see also* Appx0012 (*id*. at 13:49-14:52) (Examples 3-2 and 3-3 (showing increase in impurity in tablets with no iron oxide, one of the claimed colorants)). And a POSA would understand how to assess whether a tablet with the claimed colorants and PEG lead to reduced photostability or not.[12]

Third, Defendants' contentions that the photostability testing conditions are unclear are incorrect. *See* JCCB at 21-22. The patent provides specific illumination conditions, which are consistent with relevant guidelines. Appx0011 ('419 patent at 12:59-61); Appx0012 (*id*. at 14:27-30); Appx0431-45 (FDA Guidance for Industry, Q1B Photostability Testing of New Drug Substances and Products dated November 1996 (herein "FDA Guidance")); Appx0446-58 (ICH Harmonised Tripartite Guideline, Stability Testing: Photostability Testing of New Drug Substances and Products Q1B, November 6, 1996 (herein "ICH Guidance")); Appx0328 (Williams Decl., ¶ 41). The time period for the illumination is dictated by the illumination capacity of the light source. Appx0438 (FDA Guidance at 4); Appx0452 (ICH Guidance at 2). There is no ambiguity.

---

[12] Defendants wrongly assert that disintegration is tied to PEG and/or the colorants. *E.g*., JCCB at 23-24. It should be noted that the '419 patent ties disintegration to the uncoated tablet, and *photostability*—not storage stability—to a coating layer that contains a colorant. Appx0006 ('419 patent at 1:52-62).

And fourth, Defendants appear to suggest that the impurity level in the '419 patent is "unidentified" and not linked to photostability.  *E.g.*, JCCB at 23-24.  Defendants overlook, however, that the focus of photostability testing is to assess chemical degradants and not, for example, process impurities.  Appx0328 (Williams Decl., ¶ 41); *see also* Appx0325-29 (Williams Decl., ¶¶ 34-42).  The '419 patent also provides the "initial" impurity level to act as a comparator.  Appx0012 ('419 patent at 14:37-43); Appx0326-28 (Williams Decl., ¶¶ 36, 39-40).  A POSA would understand the impurity level of chemical degradants was obtained by standard analytical techniques and would further be able to assess any difference in the impurity level after photostability testing.  Appx0328-29 (Williams Decl., ¶¶ 41-42).  Defendants' argument thus falls flat.

Moreover, Defendants' cited cases are distinguishable.  JCCB at 11-13.  For example, *In re Mobile Telecommunications Technologies, LLC*, involved interpretation of the use of "substantially" when the specification did not refer to "substantially" with respect to the disputed phrase, the patent provided no guidance for measuring the recited parameter, and the patentee's argument against finding indefiniteness was merely that "'substantially' is commonly used in many patents."  265 F. Supp. at 473-74.  Similarly, in *GE Lighting Solutions, LLC v. Lights of America, Inc.*, claims directed to an "elongated" core were found indefinite where the Patentee's own expert admitted a POSA would not be able to determine what constituted an "elongated" core and the term "'elongated' appeared nowhere in the specification."  663 F. App'x at 940-41.  In contrast to both *In re Mobile* and *GE Lighting*, the disputed claim phrase at issue here is taken directly from the specification, the specification ties the phrase to its function, the intrinsic record provides guidance for determining the extent of this function and Dr. Williams has confirmed that

Plaintiffs' proposed construction is consistent with how a POSA would understand the meaning of the disputed phrase.

Defendants' additional cited cases where "substantially" was found to be indefinite are also distinguishable as each involved an instance where "substantially" was used only in the claims, and/or the intrinsic record provided no guidance for measuring the limitation. *See* JCCB at 12-13 (citing *Fiber, LLC v. Ciena Corp.*, C.A. No. 13-840-PAB-KLM, 2017 WL 3896443, at *12-13 (D. Colo. Sept. 6, 2017) (disputed term only found in the claims, not the intrinsic record); *Effective Exploration*, 2017 WL 3193322 at *22-23 (finding term indefinite because intrinsic record did not provide guidance to measure "substantially different directions" and different measurement techniques could lead to different results); *Geodynamics*, 2016 WL 6217181 at *14-*16 (finding "substantially equal" indefinite where the specification did not mention that term and instead only recited "equal"); *Core Wireless Licensing*, 2016 WL 3124614 at *12 (finding "substantially impair" indefinite where intrinsic record contained ambiguous disclosures regarding scope of invention); *Fairfield Indus.*, 2015 WL 1034275 at *14-*16 (rejecting argument that "substantially" can be used to merely account for natural variation when intrinsic record provided contrary evidence).

Here, the specification not only uses the same language that is found in the claims, it also provides objective guideposts for a POSA to determine whether the presence of PEG in the coating layer would affect the tablet's photostability. Plaintiffs' proposed construction—firmly grounded in the specification—is thus definite and should be adopted.

### c)   The Prosecution File History Confirms the Definiteness of the Plain and Ordinary Meaning

The prosecution file history solidifies the plain and ordinary meaning of the disputed claim phrase and its definiteness. *See* Appx0329 (Williams Decl., ¶ 43).

While the "substantially does not contain" language was not part of the original claims, the claims were amended early in prosecution to include it *and* a colorant. Appx0050-51 (Specification at 33-34); Appx0080-82 (Amendment and Response dated Apr. 3, 2018 at 2-4); Appx0329-30 (Williams Decl., ¶ 44). When that amendment was added, the Applicant identified the portions of the specification that explain the potential of PEG to reduce photostability (Appx0008 ('419 patent at 6:46-51)) *and* the ability of a colorant to enhance it as support for the amendments (Appx0008 ('419 patent at 6:52-55)). Appx0076 (Amendment and Response dated Apr. 3, 2019 at 5) (citing to Appx0029 (Specification at 12)); Appx0329-31 (Williams Decl., ¶¶ 44-46). As Defendants' expert notes, "the claims were plainly not amended to require that the coating 'does not contain PEG.'" Appx0177-78 (Fassihi Op. Decl., ¶ 44). The record demonstrates that the Examiner understood this because his search included tablets that both excluded PEG and allowed for tablets that contained it. Appx0154-55 (EAST Search History dated July 9, 2018) (*compare* L6-L14, *with* L2-L5); Appx0331 (Williams Decl., ¶¶ 47). The Examiner also searched for tablets with "improved or increased" photostability, showing that the Examiner understood the claimed tablets had desirable photostability. Appx0154 (EAST Search History dated July 9, 2018) (searches L9-L14).

The Applicant repeatedly emphasized this property of the claimed tablet throughout prosecution. For example, when the claims were first amended to include a coating layer, the Applicant explained that the combination of claimed colorants and the fact that PEG was substantially not contained in the coating layer led to "excellent photostability," which was not taught by any of the prior art references. Appx0077-78 (Apr. 3, 2018 Amendment and Response at 6-7) ("Applicant has determined that when the coating layer contains iron oxide and titanium dioxide, and substantially does not contain polyethylene glycol . . . the increase in impurity content

is suppressed even after light irradiation, and the tablet has excellent photostability."); *see also* Appx0078 (*id.* at 7) ("[T]here is no teaching in any of the references (including BELL) of enhancing the photostability of the recited tablets by employing a coating layer that contains iron oxide and titanium dioxide and that substantially does not contain polyethylene glycol."); Appx0329-31 (Williams Decl., ¶¶ 44-46).  The Applicant also remarked that it had been "determined that when the coating layer contains iron oxide and titanium dioxide, and substantially does not contain polyethylene glycol (suggested by both YAMASHITA and GUITARD), the increase in impurity content is suppressed even after light irradiation, and the tablet has excellent photostability."  Appx0078 (Apr. 3, 2018 Amendment and Response at 7); Appx0330 (Williams Decl., ¶ 45).  The Applicant reiterated this argument, reaffirming that tablets that did not result in an increase in impurity were desirable.  Appx0112-13 (Amendment and Response dated Jan. 16, 2019 at 11-12); Appx0330 (Williams Decl., ¶ 45).

This record makes clear that the Applicant intended to permit some PEG in the coating layer, as long as it did not lead to a reduction in photostability, and that the Examiner understood the scope of that phrase.  Appx0330-31 (Williams Decl., ¶¶ 46-47).  Indeed, at the close of prosecution, the Examiner proposed an Examiner's amendment that modified claim 1 to recite "and substantially contains no polyethylene glycol."  Appx0121-22 (Notice of Allowability at 2-3); Appx0331 (Williams Decl., ¶ 48).  In response, the Applicant filed a paper to revert to the original claim language, i.e., "the coating substantially does not contain polyethylene glycol."  Appx0128 (Amendment After Allowance dated Apr. 12, 2019 at 2); Appx0331 (Williams Decl., ¶ 48).  The Examiner expressly authorized that amendment, further confirming the definiteness of the disputed term.  Appx0132 (Amendment After Allowance dated Apr. 12, 2019 at 6); Appx0331 (Williams Decl., ¶ 48); *see also* Appx0135-36 (Response to Rule 312 Communication dated Apr. 22, 2019

at 2-3); *Tinnus Enters.*, 733 F. App'x at 1020 ("[W]e presume that an examiner would not introduce an indefinite term into a claim when he/she chooses to amend the claim for the very purpose of putting the application in a condition for allowance.") (citing *N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990)).

### d)    "Substantially Does Not Contain Polyethylene Glycol" Is Definite

As detailed above, Defendants fail to meet the high burden of proving—by clear and convincing evidence—that "substantially does not contain polyethylene glycol" is indefinite. Indeed, on similar facts and when faced with a lower standard, the Federal Circuit refused to find the use of "substantially" indefinite. *Tinnus*, 846 F.3d at 1205-06 (noting that burden of proof at preliminary injunction stage is "lower than what is required to prove invalidity at trial" (quotation omitted)). Here, the intrinsic record directly ties the level of PEG in the coating layer to a potential reduction in photostability. Appx0008 ('419 patent at 6:46-51 ), Appx0012 (*id.* at 14:25-52 ). Moreover, as Dr. Williams confirmed, the intrinsic record provides the tools for a POSA to prepare tablets with PEG and colorants in the coating layer and objectively assess whether the resulting tablets exhibit a reduction in photostability. Appx0323, Appx0331 (Williams Decl., ¶¶ 28, 49). If not, the amount of PEG in the coating layer falls within the scope of "substantially does not contain polyethylene glycol." These objective guideposts permit a POSA to understand the claim scope with reasonable certainty.

### 3.    There Has Been No Disclaimer of Any Specific Amount of PEG

Defendants' own arguments further undermine their contentions of indefiniteness. While Defendants complain of "uncertainty" and "no guidance," they nevertheless assert that "under no circumstances can the PEG limitation encompass coatings having ~5.7% or more w/w PEG." JCCB at 33; *see also id.* at 25, 27-29. Defendants' assertions of prosecution history disclaimer are

nothing but a belated construction that they affirmatively refused to provide to the Court when preparing the Joint Claim Construction Chart.  D.I. 49.  Moreover, Defendants improperly import limitations into the disputed phrase that are not present in the patent specification.  Regardless, no amount of PEG has been disclaimed where there is no reduction in the photostability of the resulting tablet.

As an initial matter, during the preparation of the Joint Claim Construction Chart (D.I. 49), Defendants' representative stated the following:

> Regarding "coating substantially does not contain polyethylene glycol," as explained on our call, defendants' invalidity contentions explain, for example, that the '419 patent specification provides no guidance regarding how much PEG could be present with the coating still being considered "substantially" free of polyethylene glycol. Indeed, examples in the '419 patent include a formulation that does contain 0% w/w of the coating PEG, which was contrasted with a formulation that contained 10% w/w of the coating PEG (which the applicant disclaimed).  It is defendants' position that, based on the intrinsic record, the term "substantially does not contain PEG" cannot include any measurable amount of PEG in the coating, and most certainly cannot further be read to permit an amount of PEG greater than or equal to 10% w/w of the coating.  Regardless, the '419 patent specification itself provides no guidance as to what amount (if any) of PEG between 0-10% w/w of the coating would be "substantially free" of PEG.  Thus, the term is indefinite.

Appx0424 (E-mail from K. Canfield dated Feb. 16, 2021 at 4).

Understanding Defendants to be placing limits on the disputed term, Plaintiffs noted that they would include the following in the Joint Claim Construction Chart for Defendants: "Indefinite.  Cannot include any measurable amount of PEG in the coating, and most certainly cannot further be read to permit an amount of PEG greater than or equal to 10% w/w of the coating."  Appx0422-23 (E-mail from E. Sommers dated Feb. 17, 2021 at 2-3).

Rather than provide this construction or "additional explanation" to the Court, Defendants instead said that it "need not go into the chart." Appx0421 (E-mail from K. Canfield dated Feb. 17, 2021 at 1).

Defendants now attempt to bring this construction in through the backdoor of prosecution history disclaimer. There has been, however, no such disclaimer.

The standard for prosecution history disclaimer is high. *See Galderma Labs., L.P. v. Sun Pharm. Industs. Ltd.*, 16-1003-LPS, 2017 WL 5592278 at *3-*4 (D. Del. Nov. 21, 2017) (holding prosecution history statements did "not meet the 'high' and 'demanding' standard for disclaimer"). It occurs only when the patent applicant makes a clear and unmistakable disavowal of claim scope during prosecution. *Omega Eng'g*, 334 F.3d at 1323, 1326. Only statements that show "reasonable clarity and deliberateness" will function as a prosecution history disclaimer. *N. Telecom. Ltd. v. Samsung Elecs. Co*., 215 F.3d 1281, 1294-95 (Fed. Cir. 2000). Prosecution disclaimer does not apply to statements that are ambiguous or "amenable to multiple reasonable interpretations." *Omega Eng'g*, 334 F.3d at 1324. Furthermore, allegedly disavowing statements must be considered in light of the entire prosecution history and cannot be taken out of context. *Ecolab, Inc. v. FMC Corp*., 569 F.3d 1335, 1342 (Fed. Cir. 2009). Courts have refused to give weight to statements that appear in isolation to disclaim subject matter if the totality of the circumstances suggest otherwise. *IMS Tech., Inc. v. Haas Automation, Inc*., 206 F.3d 1422, 1433-34 (Fed. Cir. 2000) (indicating that isolated statements regarding the undesirability of M and G code when considered in light of the entire prosecution history did not eliminate M and G code as part of the term "data block").

Throughout prosecution, the Applicant consistently argued that the claimed coating layer comprising iron oxide and titanium oxide and that substantially does not contain PEG resulted in

tablets that had desirable photostability.  Specifically, the Applicant generally asserted that "the increase in impurity content is suppressed even after light irradiation, and the tablet has excellent photostability." Appx0077-78 (Amendment and Response dated Apr. 3, 2018 at 6-7).   The Applicant noted that this general effect of the claimed tablet had been "verified" by exemplary embodiments, Examples 3-5 and 3-7 (discussed above). *Id*.  Notably, the Applicant did not argue that only those examples fell within the scope of the claims.  The Applicant similarly did not argue that the cited art, including Yamashita, had too much PEG.  Rather, the Applicant repeatedly stated that "neither Yamashita nor Guitard teaches that a coating layer that 'substantially does not contain polyethylene glycol' results in 'no increase in impurity,'" and that the "effect is not predictable from the cited prior art." Appx0112-13 (Amendment and Response dated Jan. 16, 2019 at 11-12); *see also* Appx0077-78 (Amendment and Response dated Apr. 3, 2018 at 6-7).  The Applicant further stated that "there is no teaching in any of the references (including BELL) of enhancing the photostability of the recited tablets by employing a coating layer that contains iron oxide and titanium dioxide and that substantially does not contain polyethylene glycol."  Appx0078 (Amendment and Response dated Apr. 3, 2018 at 7); *see also* Appx0113 (Amendment and Response dated Jan. 16, 2019 at 12).  The record thus reflects that, if anything, the Applicant distinguished the cited art on the basis of the photostability of the claimed tablet that resulted from both the colorants and the PEG limitation, and not on the basis of any specific amount of PEG alone.  There is thus no clear and unmistakable disavowal.  *Cordis Corp. v. Medtronic Ave, Inc.*, 339 F.3d 1352, 1359-60 (Fed. Cir. 2003) (finding no disavowal of claim scope where prior art was distinguished on other grounds); *see also Shire ViroPharma Inc. v. CSL Behring LLC*, No. 17-414, 2019 WL 6118253 at *11-*12 (D. Del. 2019) (holding no "clear and unmistakable" disavowal as

to claim scope because "Plaintiff simply described for the PTO certain difficulties with subcutaneous products" regardless of the form of the pharmaceutical composition).

Defendants' arguments regarding disclaimer also impermissibly fail to address the full scope of the prosecution history.  In particular, the Applicant distinguished the claimed invention from Yamashita on multiple additional grounds beyond just unpredicted photostability.  For example, the Applicant also pointed to differences in the uncoated tablet.  Appx0077 (Amendment and Response dated Apr. 3, 2018 at 6); Appx0103 (Amendment and Response dated Jan. 16, 2019 at 2); ) Appx0108 (*id.* at 7), Appx0110 (*id.* at 9); *see also* Appx0332 (Williams Decl., ¶¶ 50-52).  When read in the full context of the prosecution history, the Applicant's statements do not rise to the level of clarity and particularity required to constitute a disclaimer since the Applicant refers to multiple differences between its inventive tablets and those of Yamashita.  *See N. Telecom. Ltd.*, 215 F.3d at 1294-95.

Finally, statements regarding Examples 3-4 and 3-6 are not a disclaimer of any and all formulations containing PEG in the coating layer that otherwise did not exhibit a reduction in photostability.  *See* JCCB at 28-29.  Here, as discussed above, the '419 patent clearly conveys to a POSA that PEG in the coating *may*—but does not *always*—affect the resulting tablet's photostability.  The Patentee was not required to provide working examples for all embodiments falling within the scope of the claims.  *See Pfizer*, 555 F. App'x at 965-66 (finding no disclaimer when specification only reported results limited to a racemate); *see also Galderma Labs.*, 2017 WL 5592278 at *4 (holding that although the patentee made statements to distinguish the prior art, "at no point did the patent owner clearly and unambiguously disclaim all embodiments" within the scope of the plain and ordinary meaning); *Shire ViroPharma*, 2019 WL 6118253 at *13-*14 (holding prosecution history statements related to specific embodiments of the claim scope only

did not function as a disclaimer).  Again, these statements do not rise to the level of clear and

unmistakable disavowal, especially since the '419 patent acknowledges that other components,

such as colorants, also affect the photostability.  *See Galderma Labs*., 2017 WL 5592279 at *3-*4.

For any one of these reasons, Defendants' belated attempt to put a numerical limit on the

claims—when they first argue that it is impossible to do so—should be rejected.

### 4.      Defendants' Indefiniteness Challenge Is Premature and Contravenes This Court's Order

As detailed above, "substantially does not contain polyethylene glycol," is definite.

Nevertheless, Defendants' indefiniteness challenge seeks an early validity ruling on an incomplete

record.  Fact discovery is ongoing; no depositions have yet occurred and expert discovery is not

scheduled to begin until later this year.  Given the early stage of this proceeding, including the

limited discovery to date, the factual questions at play and the high burden of establishing

indefiniteness, Plaintiffs urge this Court to at least defer ruling on indefiniteness until the record

is more fully developed.  *Elm 3DS Innovations*, 2020 WL 1850657 at *8-*9 ("Defendants have

not proven by clear and convincing evidence that Terms 4 and 5, . . . are indefinite.  [T]he Court

cannot determine at this stage of the case whether Terms 4 and 5 render the claims invalid as

indefinite.  Defendants will have an opportunity to renew their indefiniteness argument at the

summary judgment stage (and, if necessary, at trial)."); *Adapt*,  2019 WL 1789463 at *4 (declining

to rule on indefiniteness at claim construction stage); *Fresenius Kabi USA, LLC v. Fera Pharms.,

LLC*, C.A. No. 15-3654-KM-MAH, 2016 WL 5109142, at *9 (D.N.J. Sept. 20, 2016) ("Courts in

this Circuit routinely decline to address indefiniteness arguments in claim construction because

they are potentially dispositive, require a high burden of proof, and may more profitably be

considered in connection with patent validity.  I, too, find it prudent to defer this indefiniteness

argument." (citations omitted)).

Defendants have also failed to explain why their indefiniteness argument does not contravene this Court's directive that summary judgment attacks require leave of court and will not be permitted until after the close of fact discovery.  D.I. 28 at 20:1-22:20.  On this basis alone, Defendants' indefiniteness challenge is premature and should be considered, if at all, on a complete record at trial.

### 5.   Conclusion

For at least the reasons discussed above as well as those set forth in Plaintiffs' Opening Brief, Plaintiffs respectfully request that this Court adopt Plaintiffs' proposed claim construction.

### D.   Defendants' Sur-Reply Position

#### 1.   Introduction

***The PEG limitation is indefinite.***  Plaintiffs' reply brief confirms indefiniteness.  For the first time, they explain that their construction of the PEG limitation, which requires that the coating "substantially not contain PEG," permits PEG "***in any amount***" as long as tablet photostability "is maintained."  JCCB at 33 (emphasis added).  This flies in the face of the claim language, creating confusion, not certainty.  Plaintiffs allege photostability depends on more than the presence of PEG in the coating but fail to explain how the intrinsic evidence provides objective guidance as to how and what amounts of PEG (or any other factors) influence photostability.  And they ignore the intrinsic evidence's tying of PEG to storage stability, not even alleging the intrinsic evidence provides guidance as to that relationship.

***The applicant disclaimed coatings with more than ~5.7% w/w PEG (prosecution history) and more than 10% w/w PEG (specification and prosecution history)***.  Plaintiffs muddy the intrinsic evidence by arguing the presence of PEG is just one contributor to the level of photostability.  JCCB at 36-37, 40, 47-49.  Even if true, that does not undo the PEG-based disclaimers.

Defendants submit herewith the Surreply Declaration of Reza Fassihi, Ph.D. Appx0459-76 ("Fassihi Reply Decl.").

### 2. The PEG Limitation Is Indefinite

#### a) Plaintiffs' Construction Eviscerates the PEG Limitation and Confirms Indefiniteness

In their reply, Plaintiffs provide a new proposed construction: "the claimed coating layer may contain PEG—*in any amount*—as long as the photostability of the tablet is maintained." JCCB at 33 (emphasis added). Plaintiffs' new construction confirms indefiniteness.

First, Plaintiffs' construction contravenes a POSA's understanding of the PEG limitation. A formulation cannot both *include* PEG in "*any amount*" and also "substantially *not include*" PEG. So long as photostability "is maintained" (itself indefinite), Plaintiffs' construction would encompass, e.g., a coating containing 0.1% colorant; any non-zero amounts of hydroxypropyl methylcellulose and talc; and *any* non-zero amount of PEG, e.g., *greater than 50% or even greater than 90%*. *See* App0013 ('419 patent at 15:48-53, 16:53-59 (claims 1, 6))[13]. No plausible interpretation of "substantially does not contain" PEG would encompass a coating with more than 50%—or 90%—PEG, yet Plaintiffs' construction permits just that. *See Wasica Finance GmbH v. Continental Auto. Sys.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.") App0464-67 (Fassihi Reply Decl., ¶¶ 10-15).

Second, if the applicant had intended to limit the claims to a specific level of photostability irrespective of the amount of PEG, there would have been no reason to mention PEG in the claims. According to Plaintiffs, the claims encompass coatings containing no PEG or "*any amount*" of PEG as long as photostability properties are met, and "the Patentee did not wish to be bound by a

---

[13] The Certificate of Correction appearing in Appx0418-19 is irrelevant to the parties' dispute.

specific amount of PEG in the coating layer." JCCB at 33, 35. If so, why mention PEG, and not photostability, in the claims? Because the applicant chose to limit the **amount** of PEG. That limitation must be given meaning. *Tinnus Enterprises v. Telebrands Corp.* (cited by JCCB at 38) is distinguishable: there, the surrounding claim language and the specification provided a definite bound on the claim term "substantially filled" containers by coupling it with the claim language "overcomes the connecting force and causes the containers to detach." 733 F. App'x at 1018-19 (rubber balloons are filled with water until they detach from the hollow tubes through which they are filled with water because the balloons become too heavy). Here, neither the claims nor specification puts a definite bound on the PEG limitation. And while causing containers to detach is a yes-no question, "maintain[ing]" photostability is not, as addressed next.

Third, Plaintiffs' requirement that "photostability of the tablet [be] **maintained**" (JCCB at 33 (emphasis added)) is indefinite because the intrinsic evidence provides no guidance as to what it means for photostability to be "maintained." And there is no industry standard, as confirmed by Plaintiffs' cited guidance documents: "Acceptable change is change within limits justified by the applicant." Appx0436 (FDA Guidance at 2); Appx0451 (ICH Guidance at 1). Neither the '419 patent nor its prosecution history indicates what level of change is acceptable, let alone provides justification. Appx0467-68 (Fassihi Reply Decl., ¶¶ 15-20).

Plaintiffs attempt to justify their construction by distinguishing irrelevant claim elements, which state that another compound is "not contain[ed]," rather than "substantially" not contained. JCCB at 35. Because Defendants do not contend that the PEG limitation means **no** PEG may be present in the coating, Plaintiffs are responding to a strawman. Even a trivial amount of povidone or crospovidone would contravene a requirement that a tablet "does not contain" such ingredient. Appx0465-66 (Fassihi Reply Decl., ¶ 13). For the PEG limitation, however, a coating may contain

PEG if it "substantially does not contain" PEG.  *Id.*  But the intrinsic evidence fails to explain how much PEG is "substantial"; nor would a POSA understand that limit with reasonable certainty. Appx0467-68 (*id.* ¶¶ 15-20).

      **b)**      **The Intrinsic Evidence Does Not Provide Objective Guidance as to the Scope of the PEG Limitation**

      **(1)**      **Plaintiffs' Singular Focus on Photostability Ignores Storage Stability**

As Plaintiffs state repeatedly, their construction is meant to tie the PEG limitation solely to the maintenance of photostability.  *E.g.*, JCCB at 33 ("may contain PEG—in any amount—as long as the photostability of the tablet is maintained"), 34 ("specification provides objective guideposts to determine a tablet's photostability and whether PEG in the coating layer will be tolerated"), 36-37, 38 ("a POSA would know how to prepare tablets with varying amounts of PEG in the coating layer and test them to determine whether the PEG content in a particular formulation would result in a tablet with reduced photostability or not"), 39 ("the express guidance for PEG refers to avoiding a reduction in photostability").  But Plaintiffs' explanation of their construction ignores that the specification also ties PEG to reduced ***storage stability***—"[i]t should be noted that, when polyethylene glycol (macrogol) exists in the coating layer, the obtained tablet tends to have reduced photostability and storage stability"—something Plaintiffs and their expert admit. Appx0008 ('419 patent at 6:46-49), *cited in* JCCB at 36; Appx0322 (Williams Decl ¶ 25); Appx0469 (Fassihi Reply Decl., ¶ 21).  As Defendants previously explained, and Plaintiffs' expert agrees, "excellent" storage stability and "high" photostability are both goals of the '419 patent. JCCB at 6; Appx0321 (Williams Decl., ¶¶ 23-24); Appx0469 (Fassihi Reply Decl., ¶ 21).  During prosecution, the applicant reinforced the relationship of PEG to storage stability as well as photostability: "Comparatively, the coatings used in Examples No. 3-4 and 3-6 contain [PEG] and have increased impurity, which leads to reduced photostability ***and storage stability***."  JCCB at

59-60 (quoting Appx0112-13 (Jan. 16, 2019 Amendment at 11-12)) (emphasis added).

Therefore, there is no basis to tie the PEG limitation to photostability but not storage stability. And Plaintiffs do not even attempt to explain how the intrinsic evidence provides objective guidance as to the connection between PEG in the coating and storage stability, or to the amount of PEG that would be acceptable based on achieving some acceptable level of storage stability. As Defendants explained, the intrinsic evidence fails to do so. JCCB at 19-30.

> ### (2)   The Intrinsic Evidence Fails to Provide Objective Guidance on the Relationship between PEG and Photostability

Plaintiffs make vague assertions about a relationship between photostability, colorant, and PEG (*e.g.*, JCCB at 36-37) but fail to provide specifics or even a guiding principle for determining the acceptable level of photostability, or the level of PEG (or PEG-plus-colorant) associated with such acceptable level of photostability. Plaintiffs state: "Dr. Williams explains that a POSA would understand that although the presence of PEG in a tablet's coating layer tends to reduce photostability, this depends on other factors." JCCB at 36-37 (citing Appx0324-25 (Williams Decl, ¶ 33), which refers to colorant but not other factors). What other factors? Plaintiffs only identify the presence of "colorant." *Id.* But all they can say there is that "[n]ot all tablets that contain PEG in the coating layer will exhibit reduced photostability, especially if they also contain colorants." (*Id.*) This vague relationship between PEG and colorant in the coating, and tablet photostability, influenced by other factors, fails to provide reasonable certainty as to how much PEG is permitted.[14]

---

[14] The intrinsic evidence, which is limited, is equally vague. While acknowledging that colorants affect photostability (Appx0008 ('419 patent at 6:52-55)), and claiming a tablet having colorants comprising 0.1 to 50% by weight of the coating (Appx0013 (*id.* at claims 1, 6)), the '419 patent does not offer any explanation of the relationship between the amount of PEG and the amount of

Other statements of Plaintiffs further muddle matters.  Plaintiffs state:

> Defendants assert that the Patentee was required to provide guidance of "high" photostability.  While that was one of the goals of the invention disclosed in the '419 patent, the express guidance for PEG refers to avoiding a reduction in photostability.  And the claims do not require an optimum level of photostability.  Nevertheless, a tablet that maintains its original impurity level after light irradiation would have been understood to exhibit desirable—or high— photostability.

JCCB at 39 (citations omitted).  How much of a "reduction" is necessary for there to be a "reduction in photostability"?  How is such a "reduction" to be measured?  Comparing photostability testing results of the unidentified purity on similar tablets, differing in whether PEG is in the coating?  The specification provides only a single such comparison, 0% PEG versus 10% w/w PEG in the coating, leading a POSA to conclude that the latter must be excluded from the claims—yet Plaintiffs mysteriously dispute this.  *See infra* § IV.D.2.a).  How much of a change in the level of the undisclosed impurity is acceptable for the level of impurity to be considered "maintain[ed]"?  The intrinsic evidence is silent.  Appx0467-68 (Fassihi Reply Decl., ¶¶ 15-20).  Plaintiffs offer no clarification.[15]

Plaintiffs contend that "[t]he patent provides specific illumination conditions, which are consistent with relevant guidelines."  JCCB at 40 (citing Appx0431-45 (FDA Guidance) and Appx0446-58 (ICH Guidance)).  But being "consistent" is not enough.  Appx0468 (Fassihi Reply Decl., ¶ 19).  The Guidelines provide options, and the specification fails to identify those selected.

---

colorant that would allow a POSA to ascertain whether the coating "substantially does not contain" PEG.  Moreover, the claim uses the broad "comprising" transitional phrase, which allows for unnamed components in an unspecified amount with no additional guidance.  Together, this shows that the PEG limitation is indefinite.

[15] Indeed, in the quoted passage from their reply, Plaintiffs only create more confusion by distinguishing "high" photostability from "avoiding a reduction in photostability" and then connecting "maintain[ing] its original impurity level" to "high" photostability.

For example, the Guidelines provide a selection of light sources that may be used (Appx0438 (FDA Guidance at 4); Appx0452 (ICH Guidance at 2)), but the specification does not provide such information. Appx0468 (Fassihi Reply Decl., ¶ 19).  The specification also does not explain how temperature was controlled during light irradiation or whether a "dark control" was used.  *See* Appx0438 (FDA Guidance at 4); Appx0452 (ICH Guidance at 2); Appx0468 (Fassihi Reply Decl., ¶ 19).  A POSA would need this information to perform the tests of the specification.  Appx0468 (Fassihi Reply Decl., ¶ 19).

Finally, Plaintiffs' argument from *Tinnus*, that the examiner would not have "authorized" applicant's amendment if it were indefinite, fails.  JCCB at 44-45.  In *Tinnus*, the examiner ***introduced*** the language at issue ***and explained its meaning***.  733 F. App'x at 1019-20.  Here, ***applicant*** introduced the PEG limitation and did not provide a meaning, instead using the new limitation to distinguish a reference disclosing a coating containing ~5.7% w/w PEG.  (*See infra* § IV.D.3.b).)

### (3)    Plaintiffs Still Fail to Identify the Unidentified "Impurity"

Plaintiffs' attempted rebuttal (JCCB at 41) to Defendants' recognition that the intrinsic evidence refers to an unidentified "impurity" misses the point.  Defendants' argument is not that "the impurity level in the '419 patent is … not linked to photostability" but that the impurity is unidentified, making it impossible for a POSA to understand and repeat the patent's photostability tests.  Just as the applicant failed to identify the impurity, Plaintiffs fail to do so in their reply, stating only that, for photostability testing, the impurity is somehow tied to "chemical degradants" not "process impurities."  *Id.*  But Plaintiffs' guidance documents state that samples should be examined for "degradants by a method suitably validated for products likely to arise from photochemical degradation processes."  Appx0442 (FDA Guidance at 8); Appx456 (ICH

Guidance at 6).  A POSA would understand this refers to specific "products likely to arise" from degradation of the compound at issue, and that the method must be validated for those specific degradation products (impurities).  Appx0470 (Fassihi Reply Decl., ¶ 24).  Thus, test results for an "impurity" are meaningful only if that impurity is identified.  *Id*.  Plaintiffs suggest that "standard analytical techniques" can be used "to assess any difference in the impurity level after photostability testing" (JCCB at 41), but this is impossible if the impurity is unknown, and the test method has not been validated for the impurity at issue.  Appx0470 (Fassihi Reply Decl., ¶ 25).

Finally, while wrongly suggesting Defendants fail to recognize that the unidentified impurity is "linked to photostability," Plaintiffs ignore that the specification equally connects the unidentified impurity with storage stability.  *E.g.*, JCCB at 7-9, 21; *supra* § IV.D.2.b).(1).

### c)      Indefiniteness Is Appropriately Addressed at the Claim Construction Stage

Defendants cited cases from the Federal Circuit and this Court explaining the interrelationship between claim construction and indefiniteness, and the appropriateness of addressing indefiniteness during claim construction.  JCCB at 30-31.  Defendants are not "contravene[ing]" (JCCB at 50-51) the scheduling order in this case by following this practice. For example, in *Huber Engineered Woods LLC v. Louisiana-Pacific Corp.*, 2020 WL 5132922 at *8-9, *cited by* JCCB at 31, this Court held claim limitations indefinite during claim construction even though the scheduling order there (Appx0488 at ¶ 17) required leave, not sought, for early summary judgment motions.  Plaintiffs note that fact discovery is ongoing (JCCB at 50) but fail to explain how fact discovery could inform this indefiniteness determination.  Moreover, Plaintiffs allege that "expert discovery is not scheduled to begin until later this year."  *Id.*  That is wrong. Expert discovery on Defendants' indefiniteness contention has occurred as both sides have submitted expert declarations addressing indefiniteness.

3.      **The PEG Limitation Excludes Amounts of PEG in the Coating of ~5.7% w/w or Greater and Certainly 10% w/w or Greater**

a)      **10% PEG by Weight**

Plaintiffs concede that, for "Examples 3-5 and 3-7, which contain the claimed colorants and no PEG, '[no] increase in impurity was observed' after photostability testing," whereas "the tablets of Examples 3-4 and 3-6 that contained the claimed colorants and also included 10% PEG by weight of the coating showed an increase in impurity after photostability testing, meaning the photostability was lower."  JCCB at 37-38 (quoting Appx0012 ('419 patent at 14:25-35)).  Thus, colorants were present in the coatings in both example sets, with the distinguishing factor being the lack of PEG or presence of 10% w/w PEG.  The tablets with PEG-free coatings showed no increase in impurity; the tablets with 10%-w/w-PEG coatings showed an increase in impurity.  Thus, even according to Plaintiffs' view of the PEG limitation as requiring that "photostability of the tablet [be] maintained" (JCCB at 33), the specification excludes 10%-w/w-PEG coatings from the PEG limitation.  Appx0471 (Fassihi Reply Decl., ¶ 27).  Plaintiffs' attempt to distract from the clear PEG-based distinction by focusing on colorants is just that (JCCB at 36-38)—a distraction.  Appx0470-72 (Fassihi Reply Decl. ¶¶ 26-29).

With respect to the prosecution history, Plaintiffs again distract with the colorant.  *E.g.*, JCCB at 43 ("claims were amended early in prosecution to include [the PEG limitation] *and* a colorant").  But the applicant explicitly distinguished the examples based on PEG, not colorant:

> For example, Applicant's ***Examples No. 3-5 and 3-7,*** particularly Table 7, of the present specification show that tablets coated in a coating liquid that ***"substantially does not contain polyethylene glycol"*** (referred to as Macrogol 6000 in Table 7) unexpectedly have "no increase in impurity, even after light irradiation." Applicant's Specification at [0201]. Comparatively, the ***coatings used in Examples No. 3-4 and 3-6 contain polyethylene glycol and have increased impurity***, which leads to reduced photostability and storage stability.

Appx0112-13 (Jan. 16, 2019 Amendment at 11-12) (emphasis added), *quoted in* JCCB at 26-27; *accord* Appx0078-79 (Apr. 3, 2018 Amendment at 7-8), *quoted in* JCCB at 26.  In the just-quoted applicant statement, the applicant said nothing about colorant, instead distinguishing the examples based on the presence (or lack thereof) of PEG in the coating.  Appx0472-73 (Fassihi Reply Decl., ¶¶ 30-31).

### b)      ~5.7% PEG by Weight

Plaintiffs attempt to recast the applicant's distinguishing of Yamashita as relating to something other than the amount of PEG present in the Yamashita coating (i.e., ~5.7% w/w). JCCB at 49.  Not so.  The applicant distinguished Yamashita multiple times based on its disclosure of a coating substantially containing PEG.  *See* JCCB at 25-27.  For example, the applicant stated:

> Guitard further allows for "a coating comprising … polyoxyethleyene glycol, e.g., PEG 6000 or PEG 8000."  This is consistent with Yamashita; ***Yamashita uses "a film coating agent made up of,"*** *inter alia,* ***"3 g of polyethylene glycol 6000."***  Here, both ***Yamashita*** and Guitard ***teach coatings with polyethylene glycol*** and fail to recognize the unpredictability of a coating layer that "substantially does not contain polyethylene glycol" to result in "no increase in impurity."

Appx0112-13 (Jan. 16, 2019 Amendment at 11-12) (emphasis added, citations omitted), *quoted at* JCCB at 27.  Even if "the Applicant distinguished the claimed invention from Yamashita on multiple additional grounds beyond just unpredicted photostability" (JCCB at 49), the applicant distinguished Yamashita's coating as "made up of" PEG in contrast to the claimed coating that "substantially does not contain" PEG.  Appx0474 (Fassihi Reply Decl., ¶ 34).  This disclaimer holds.  *See, e.g.*, *Andersen Corp. v. Fiber Composites*, 474 F.3d 1361, 1374 (Fed. Cir. 2007) ("[A]n applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well.").

Plaintiffs allege the applicant "did not argue that the cited art, including Yamashita, had too much PEG." JCCB at 48. The applicant's statement belies Plaintiffs' position. Plaintiffs attempt to thread the needle by casting the distinction as relating to the supposedly unpredictable *effects* of the coating substantially lacking PEG, as opposed to the coating's substantially lacking PEG. However, the claim element being distinguished—the PEG limitation—says nothing about functionality, let alone photostability, but merely recites that the coating "substantially does not contain" PEG. Appx0474 (Fassihi Reply Decl., ¶ 34). And the applicant contrasted the "3 g of [PEG]" in Yamashita's coating with the claimed coating layer that "substantially does not contain" PEG. Appx0112-13 (Jan. 16, 2019 Amendment at 11-12) (emphasis added); Appx0474 (Fassihi Reply Decl., ¶ 34). Indeed, if Yamashita disclosed a coating that substantially did not contain PEG, the alleged discovery of an inherent benefit of such a coating would not confer patentability on the otherwise obvious claims. *See Persion Pharms. LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184, 1190 (Fed. Cir. 2019).

### c)   No Conflict with Indefiniteness

There is no conflict between indefiniteness and Defendants' position that the PEG limitation cannot include coatings with more than ~5.7% (or 10%) w/w PEG. The uncertainty is "what amounts below, e.g., ~5.7% w/w …, might qualify as being within the scope of the claims." JCCB at 28. Even if the Court agrees that the applicant surrendered coatings having more than ~5.7% (or 10%) w/w PEG, the PEG limitation would still be indefinite.[16]

---

[16] Defendants are not providing a "belated construction" or trying to bring a "construction in through the backdoor of prosecution history disclaimer." *Contra* JCCB at 33, 46-47. Defendants' position is that the PEG limitation is indefinite: while the intrinsic evidence excludes amounts of PEG greater than ~5.7% or 10% w/w, it provides insufficient guidance as to the permitted amount. There was no reason to provide more explanation in the Joint Chart. Regardless, given the exchanges between counsel cited by Plaintiffs, any failure to include more was harmless.

Dated: June 3, 2021

ASHBY & GEDDES

/s/ *Steven J. Balick*

_____

Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

*Of Counsel:*

James B. Monroe
Denise Main
Erin M. Sommers
C. Collette Corser
Tyler B. Latcham
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4431
(202) 408-4000

*Attorneys for Plaintiffs Otsuka
Pharmaceutical Co., Ltd. and H. Lundbeck
A/S*

Morris James LLP

  */s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (#3726)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801-1494
(302) 888.6800
kdorsney@morrisjames.com

OF COUNSEL:
Timothy H. Kratz
George J. Barry III
Kratz & Barry LLP
1050 Crown Pointe Parkway, Suite 500
Atlanta, GA 30338
Tkratz@kratzandbarry.com
Gbarry@kratzandbarry.com

*Attorneys for Defendants*
*Aurobindo Pharma LTD. and*
*Aurobindo Pharma USA, Inc.*

Morris James LLP

  */s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (#3726)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com

OF COUNSEL:
Dmitry V. Shelhoff
Kenneth S. Canfield
Edward D. Pergament
Pergament & Cepeda LLP
25A Hanover Road, Suite 104
Florham Park, NJ 07932
(973) 998-7722
dshelhoff@pergamentcepeda.com
kcanfield@pergamentcepeda.com
epergament@pergamentcepeda.com

*Attorneys for Defendants*
*Zenara Pharma Private Ltd. and*
*Biophore India Pharmaceuticals Private Ltd.*

Abrams & Bayliss LLP

  /s/ John M. Seaman
John M. Seaman (#3868)
April M. Kirby (#6152)
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807
(302) 778-1000 phone
(302) 778-1001 facsimile
seaman@abramsbayliss.com
akirby@abramsbayliss.com

OF COUNSEL:
A. Neal Seth
Teresa M. Summers
Alexander B. Owczarczak
WILEY
1776 K Street, NW
Washington, DC 20036
(202) 719-7000 phone
(202) 719-7049 facsimile
nseth@wiley.law
tsummers@wiley.law
aowczarczak@wiley.law

*Attorneys for Defendants*
*Accord Healthcare Inc.,*
*MSN Laboratories Pvt. Ltd., and*
*MSN Pharmaceuticals Inc.*

Phillips McLaughlin & Hall, P.A.

  /s/ David A. Bilson
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
1200 North Broom Street
Wilmington, DE  19806-4204
Telephone:  (302) 655-4200
Facsimile:  (302) 655-4210
jcp@pmhdelaw.com
dab@pmhdelaw.com

OF COUNSEL:
William R. Zimmerman
Andrea L. Cheek
Aryeh N. Feinstein
Knobbe, Martens, Olson & Bear, LLP
1717 Pennsylvania Ave. N.W., Ste. 900
Washington D.C. 20006
Tel: (202) 640-6400
Fax: (202) 640-6401
Bill.Zimmerman@knobbe.com
Andrea.Cheek@knobbe.com
Ari.Feinstein@knobbe.com

Carol Pitzel Cruz
Knobbe, Martens, Olson & Bear, LLP
925 Fourth Avenue, Suite 2500
Seattle, WA 98104
Tel:  (206) 405-2000
Fax:  (206) 405-2001
Carol.Pitzel.Cruz@knobbe.com

*Attorneys for Defendants*
*Lupin Limited and*
*Lupin Pharmaceuticals, Inc.*

Young Conaway Stargatt & Taylor, LLP

Heyman Enerio Gattuso & Hirzel LLP

  _/s/ Anne Shea Gaza_____
Anne Shea Gaza (#4093)
Robert M. Vrana (#5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
agaza@ycst.com
rvrana@ycst.com

OF COUNSEL:
Kent M. Walker
Mary E. LaFleur
Brinks Gilson & Lione
455 North Cityfront Plaza Drive, Suite 3600
Chicago, Illinois 60611-5599
(312) 321-4200
kwalker@brinksgilson.com
mlafleur@brinksgilson.com

*Attorneys for Defendants*
*Amneal Pharmaceuticals LLC,*
*Amneal  Pharmaceuticals  Company  GmbH*
*and Raks Pharma Pvt. Ltd.*

  _/s/ Dominick T. Gattuso_____
Dominick T. Gattuso (#3630)
300 Delaware Avenue
Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law

OF COUNSEL:
William A. Rakoczy
Amy D. Brody
Lauren M. Lesko
Rakoczy Molino Mazzochi Siwik LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60654
(312) 527-2157
wrakoczy@rmmslegal.com
abrody@rmmslegal.com
llesko@rmmslegal.com

*Attorneys for Defendant*
*Alkem Laboratories Ltd.*

Young Conaway Stargatt & Taylor, LLP

  /s/ *Anne Shea Gaza*         
Anne Shea Gaza (#4093)
Robert M. Vrana (#5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

OF COUNSEL:
Mark H. Remus
Laura A. Lydigsen
Alexis S. White
Brinks Gilson & Lione
455 North Cityfront Plaza Drive, Suite 3600
Chicago, Illinois 60611-5599
(312) 321-4200
mremus@brinksgilson.com
llydigsen@brinksgilson.com
awhite@brinksgilson.com

*Attorneys for Defendant Sandoz Inc.*

Young Conaway Stargatt & Taylor, LLP

  /s/ *Beth A. Swadley*         
Pilar G. Kraman (#5199)
Beth A. Swadley (#6331)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
bswadley@ycst.com

OF COUNSEL:
Michael J. Gaertner
Myoka Kim Goodin
Wasim K. Bleibel
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0700
mgaertner@lockelord.com
mkgoodin@lockelord.com
wbleibel@lockelord.com

Zhibin Li
Locke Lord LLP
Brookfield Place
200 Vesey Street
New York, New York 10281
(212) 415-8600
Zhibin.Li@lockelord.com

*Attorneys for Defendants*
*Zydus Pharmaceuticals (USA) Inc.*
*and Cadila Healthcare Limited*

Richards, Layton & Finger, P.A.

  /s/ Renée Mosley Delcollo
Kelly E. Farnan (#4395)
Renée Mosley Delcollo (#6442)
One Rodney Square
920 N. King St
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
delcollo@rlf.com

OF COUNSEL:
B. Jefferson Boggs
MERCHANT & GOULD PC
1900 Duke Street, Suite 600
Alexandria, Virginia 22314
(703) 684-2500
jbogg@merchantgould.com

OF COUNSEL:
Christopher J. Sorenson
Karen L. Beckman
Merchant & Gould PC
150 South Fifth Street, Suite 2200
Minneapolis, Minnesota 55402
(612) 332-5300
csorenson@merchantgould.com
rhughey@merchantgould.com
kbeckman@merchantgould.com

Andrew O. Larsen
Merchant & Gould PC
767 Third Avenue, Suite 23C
New York, NY 10017
(212) 223-6520
alarsen@merchantgould.com

*Attorneys for Unichem Laboratories Limited*

Morris James LLP

  /s/ Kenneth L. Dorsney
Kenneth L. Dorsney (#3726)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com

OF COUNSEL:
Dmitry V. Shelhoff
Kenneth S. Canfield
Edward D. Pergament
Pergament & Cepeda LLP
25A Hanover Road, Suite 104
Florham Park, NJ 07932
(973) 998-7722
dshellhoff@pergamentcepeda.com
kcanfield@ pergamentcepeda.com
epergament@pergamentcepeda.com

*Attorneys for Defendants*
*Hetero USA, Inc., Hetero Drugs, Ltd.,*
*Hetero Labs, Ltd., Unit-V, Hetero Labs, Ltd.,*
*and Honour Lab Ltd.*


Morris James LLP

  /s/ Kenneth L. Dorsney
Kenneth L. Dorsney (#3726)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com

OF COUNSEL:
Devan V. Padmanabhan
Sri K. Sankaran
Padmanabhan & Dawson, P.L.L.C.
45 South 7th Street
Suite 2315
Minneapolis, Minnesota 55402
Telephone:  (612) 444-3377
Facsimile:  (612) 444-3195
devan@paddalawgroup.com
sri@paddalawgroup.com

*Attorneys for Defendants*
*Macleods Pharmaceuticals Ltd. and Macleods*
*Pharma USA, Inc.*

Stamoulis & Weinblatt LLC

  _/s/ Stamatios Stamoulis_
Stamatios Stamoulis (#4606)
800 N. West Street – 3rd Floor
Wilmington, DE 19801
(302) 999-1540
stamoulis@swdelaw.com

OF COUNSEL:
Ronald M. Daignault (*pro hac vice*)
Richard Juang (*pro hac vice*)
Daignault Iyer
8200 Greensboro Drive, Suite 900
Mclean, VA 22102
rdaignault@daignaultiyer.com
rjuang@daignaultiyer.com

*Attorneys for Defendants*
*Ajanta Pharma Ltd. and*
*Optimus Pharma Pvt. Ltd.*

Stamoulis & Weinblatt LLC

  _/s/ Stamatios Stamoulis_
Stamatios Stamoulis (#4606)
800 N. West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540 – Ext.1
stamoulis@swdelaw.com

OF COUNSEL:
Shashank Upadhye (*pro hac vice*)
Yixin Tang (*pro hac vice*)
Brent Batzer (*pro hac vice*)
Upadhye Tang LLP
135 S. LaSalle St., Suite 1930
Chicago, IL 60606
Tel: 312.598.2610
shashank@ipfdalaw.com

*Attorneys for Prinston Pharmaceutical Inc.*

Cozen O'Connor

Shaw Keller LLP

  /s/ Thomas J. Francella, Jr.
Thomas J. Francella, Jr. (#3835)
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2023
Email: tfrancella@cozen.com

OF COUNSEL:
W. Blake Coblentz (*pro hac vice*)
Barry P. Golob (*pro hac vice*)
Aaron S. Lukas (*pro hac vice*)
Kerry B. McTigue (*pro hac vice*)
Cozen O'Connor
1200 Nineteenth Street, N.W.
Washington, DC  20036
(202) 912-4800
wcoblentz@cozen.com
bgolob@cozen.com
alukas@cozen.com
kmctigue@cozen.com

*Attorneys for Defendants*
*Apotex Inc., Apotex Corp.,*
*Apotex Pharmachem Inc.,*
*and Signa S.A. de C.V.*

/s/ Nathan R. Hoeschen
John W. Shaw (#3362)
Karen E. Keller (#4489)
Nathan R. Hoeschen (#6232)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com

OF COUNSEL:
Elizabeth J. Holland
Naomi L. Birbach
James P. Breen
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 459-7230
EHolland@goodwinlaw.com
NBirbach@goodwinlaw.com
JamesBreen@goodwinlaw.com

Srikanth K. Reddy
Emily L. Rapalino
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
SReddy@goodwinlaw.com
ERapalino@goodwinlaw.com

*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

Potter Anderson & Corroon LLP

  /s/ Bindu A. Palapura
David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6092
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

OF COUNSEL:
Dennies Varughese, Pharm.D.
Robert W. Stout
STERNE, KESSLER, GOLDSTEIN & FOX
P.L.L.C.
1100 New York Avenue, N.W.
Washington, DC 20005
(202) 371-2600
davarughese@sternekessler.com
rstout@sternekessler.com

*Attorneys for Defendants*
*Alembic Pharmaceuticals Ltd. and*
*Alembic Pharmaceuticals, Inc.*

{01693679;v1 }                                        71