# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

OTSUKA PHARMACEUTICAL CO., LTD.
AND H. LUNDBECK A/S,

          Plaintiffs,

v.

ZENARA PHARMA PRIVATE LTD. ET
AL.,

          Defendants.



C.A. No. 19-1938-LPS (Consolidated)

**REDACTED PUBLIC VERSION**

## PROPOSED FINAL PRETRIAL ORDER-PATENT

(Volume I of II)
(Exhibits 1-9)

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD. and H. LUNDBECK A/S, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 19-cv-1938-LPS |
| v. | ) ) | (consolidated) |
| ZENARA PHARMA PRIVATE LTD., et al. | ) ) | ████████████ |
| Defendants. | ) ) | |

**JOINT STATEMENT OF UNCONTESTED FACTS**

## EXHIBIT 1

### I.     Parties

#### A.     Plaintiffs

1.     Otsuka Pharmaceutical Co., Ltd. ("Otsuka") is a corporation organized and existing under the laws of Japan with its corporate headquarters at 2-9 Kanda Tsukasa-machi, Chiyoda-ku, Tokyo, 101-8535, Japan.  (C.A. No. 19-cv-01938-LPS, D.I. 1 ("Zenara Complaint") at ¶ 2.)

2.     H. Lundbeck A/S ("Lundbeck") is a corporation organized and existing under the laws of Denmark, with a place of business at Ottiliavej 9, DK-2500 Valby, Denmark.  (*Id.* at ¶ 3.)

3.     Otsuka and Lundbeck are collectively referred to as "Plaintiffs."

4.     Plaintiffs are engaged in the business of researching, developing and bringing to market innovative pharmaceutical products.  (*Id*. at ¶ 4.)

#### B.     Defendants

5.     Apotex Inc. is a corporation organized under the laws of Canada and its principal place of business is located at 150 Signet Drive, Toronto, Ontario M9L 1T9, Canada.  (C.A. No. 19-cv-02006-LPS, D.I. 11 ("Apotex Answer") at ¶ 5.)

6.     Apotex Corp. is a corporation organized under the laws of the state of Delaware and Apotex's principal place of business is located at 2400 North Commerce Parkway, Suite 400, Weston, Florida 33326.  (*Id.* at ¶ 6.)

7.     Apotex Pharmachem Inc. is a corporation organized under the laws of Canada with a principal place of business at 11, 34, 50 Spalding Drive, Brantford, Ontario, Canada N3T 6B8.  (*Id*. at ¶ 7.)

8.     Signa S.A. de C.V. is a corporation organized under the laws of Mexico with a principal place of business at Av. Industria Automotriz No. 301, Zona Industrial Toluca, Estado de Mexico C.P. 50071.  (*Id*. at ¶ 8.)

2

**EXHIBIT 1**

9.  Apotex Inc., Apotex Corp., Apotex Pharmachem Inc. and Signa S.A. de C.V. are collectively referred to as "Apotex."

10.  MSN Laboratories Pvt. Ltd. is organized under the laws of India has a principal place of business located at MSN House, Plot No: C-24, Industrial Estate, Sanathnagar, Hyderabad – 18 Telangana, India.  (C.A. No. 19-cv-02009-LPS, D.I. 9 ("MSN Answer") at ¶ 5.)

11.  MSN Pharmaceuticals Inc. is a corporation organized under the laws of Delaware and its principal place of business is located at 20 Duke Road, Piscataway, NJ 08854.  (*Id*. at ¶ 6.)

12.  MSN Pharmaceuticals Inc. is a wholly owned subsidiary of MSN Laboratories Pvt. Ltd.  (*Id*.)

13.  MSN Laboratories Pvt. Ltd. and MSN Pharmaceuticals Inc. are collectively referred to as "MSN."

14.  Optimus Pharma Pvt. Ltd. ("Optimus") is an Indian Corporation having its principal place of business at 2nd Floor, Sy No. 37/A & 37/P, Plot No. 6P, Signature Towers, Kothaguda, Kondapur, Hyderabad 500 084, Telangana, India.  (C.A. No. 19-cv-02008-LPS, D.I. 7 ("Optimus Answer") at ¶ 5.)

15.  Zenara Pharma Private Ltd. is a corporation organized under the laws of India and its principal place of business is located at Plot No. 83/B, 84 & 87-96, Phase III, IDA Cherlapally, Hyderabad 500051, India.  (Zenara Complaint at ¶ 5; C.A. No. 19-cv-01938-LPS, D.I. 8 ("Zenara Answer") at ¶ 5.)

16.  Biophore India Pharmaceuticals Private Ltd. is a corporation organized under the laws of India and its principal place of business is located at Plot No. 92, 1-98/2/92, Kavuri Hills, Phase II, Jubilee Hills, Hyderabad, 500033, India.  (Zenara Complaint at ¶ 7; Zenara Answer at ¶ 7.)

**EXHIBIT 1**

17.     Zenara Pharma Private Ltd. is a wholly owned subsidiary of Biophore India Pharmaceuticals Private Ltd.  (Zenara Complaint at ¶ 6; Zenara Answer at ¶ 6.)

18.     Zenara Pharma Private Ltd. and Biophore India Pharmaceuticals Private Ltd. are collectively referred to as "Zenara."

19.     Apotex, MSN, Optimus and Zenara are collectively referred to as "Defendants."

**II.     REXULTI®**

20.     Otsuka holds an FDA-approved New Drug Application ("NDA"), No. 205422, for REXULTI® (brexpiprazole) tablets in 0.25, 0.5, 1, 2, 3 and 4 mg dosage forms.

21.     On July 10, 2015, the FDA approved REXULTI® (brexpiprazole) tablets, pursuant to NDA No. 205422, for the adjunctive treatment of major depressive disorder (or "MDD") and the treatment of schizophrenia.

22.     On December 27, 2021 the FDA approved REXULTI® (brexpiprazole) tablets pursuant to NDA No. 205422 for the treatment of schizophrenia in pediatric patients, ages 13 to 17 years.

23.     Brexpiprazole,         7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one,  is the active pharmaceutical ingredient in Plaintiffs' REXULTI® product.  The chemical structure is:



24.     The current drug label for Rexulti® states, under the heading "INDICATIONS AND USAGE," that "REXULTI is indicated for: Adjunctive treatment of major depressive disorder (MDD) in adults.  Treatment of schizophrenia in adults and pediatric patients ages 13

**EXHIBIT 1**

years and older."

25.     Under the heading "DOSAGE AND ADMINISTRATION" for "Adjunctive

Treatment of Major Depressive Disorder (Adults)," the current drug label for Rexulti® states:

> The recommended starting dosage for REXULTI as adjunctive treatment of MDD in adults is 0.5 mg or 1 mg once daily, taken orally with or without food [see Clinical Pharmacology (12.3)].
>
> Titrate to 1 mg once daily, then up to the target dosage of 2 mg once daily. Dosage increases should occur at weekly intervals based on the patient's clinical response and tolerability. The maximum recommended daily dosage is 3 mg. Periodically reassess to determine the continued need and appropriate dosage for treatment.

26.     Under the heading "DOSAGE AND ADMINISTRATION" for "Treatment of

Schizophrenia (Adults and Pediatric Patients 13 to 17 Years)," the current drug label for Rexulti®

states:

> Adults
>
> The recommended starting dosage for REXULTI for the treatment of schizophrenia in adults is 1 mg once daily on Days 1 to 4, taken orally with or without food [see Clinical Pharmacology (12.3)]. Titrate to 2 mg once daily on Day 5 through Day 7, then to 4 mg on Day 8 based on the patient's clinical response and tolerability. The recommended target REXULTI dosage is 2 mg to 4 mg once daily. The maximum recommended daily dosage is 4 mg.
>
> Pediatric Patients (13 to 17 years of age)
>
> The recommended starting dosage for REXULTI for the treatment of schizophrenia in pediatric patients 13 to 17 years of age is 0.5 mg once daily on Days 1 to 4, taken orally with or without food [see Clinical Pharmacology (12.3)]. Titrate to 1 mg once daily on Day 5 through Day 7, then to 2 mg on Day 8 based on

5

EXHIBIT 1

the patient's clinical response and tolerability. Weekly dose increases can be made in 1 mg increments. The recommended target REXULTI dosage is 2 mg to 4 mg once daily. The maximum recommended daily dosage is 4 mg.

## III.   Asserted Patents

### A.    United States Reissue Patent No. RE48,059

27.     United States Patent No. 7,888,362 ("the '362 patent"), entitled "Piperazine-Substituted Benzothiophenes for Treatment of Mental Disorders," issued on February 15, 2011.

28.     The '362 patent was filed on April 12, 2006, as U.S. Patent Application No. 11/659,005 ("the '005 application").  The '005 application is a national stage application of PCT Application No. PCT/JP2006/308162 ("the '162 PCT application"), filed on April 12, 2006. The '162 PCT application claims the benefit of priority to foreign application JP 2005-116698, filed on April 14, 2005.

29.     The '362 Patent reissued on June 23, 2020, as United States Reissue Patent No. RE48,059 ("the RE'059 patent"), entitled "Piperazine-Substituted Benzothiophenes for Treatment of Mental Disorders."

30.     The application leading to the RE'059 patent was filed on November 16, 2017, as U.S. Patent Reissue Application No. 15/815,650 ("the '650 application").

31.     The RE'059 patent expires on December 23, 2028.

32.     Otsuka owns the RE'059 patent and Lundbeck is the holder of an exclusive license to the RE'059 patent.  (C.A. No. 20-cv-01599-LPS, D.I. 1 ("Zenara Reissue Complaint") at ¶¶ 3, 23.)

33.     The RE'059 patent is listed in the Orange Book in connection with NDA No. 205422 for REXULTI® (brexpiprazole) tablets.  (*Id.* at ¶ 26.)

**EXHIBIT 1**

34.   Plaintiffs have asserted that each of defendants MSN, Optimus and Zenara infringe

at least one of the following claims of the RE'059 patent:

| Claim 1 |
| --- |
| 1. A heterocyclic compound represented by the formula (1):<br><br><br><br>[wherein ring Q represented by<br><br><br><br>represents –NH–CH$_2$–, –N=CH–, –CH$_2$–NH– or –CH=N–;<br><br>and the carbon-carbon bond ----- between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond);<br><br>the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, a saturated 3- to 8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group;<br><br>R$_2$ represents a hydrogen atom or a lower alkyl group; and<br>A represents –O–A$_1$– (wherein A$_1$ represents an alkylene group which may be substituted with a hydroxy group (wherein one oxygen atom may replace a carbon of the alkylene chain) or a lower alkenylene group) or a lower alkylene group; |

**EXHIBIT 1**

provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:

 and 

(wherein the carbon-carbon bond ----- represents a single bond or a double bond)] or a salt thereof.

| Claim 2 |
| --- |

2. The heterocyclic compound of the formula (1) according to claim 1, wherein the ring Q represents a bicyclic group selected from the group consisting of:



(wherein the carbon-carbon bond ----- between the 3-position and 4- position of the bicyclic heterocyclic skeleton represents a single bond or a double bond);

the ring Q may have 1 to 3 substituents selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, a phenyl group, a phenyl lower alkyl group, a naphthyl lower alkyl group, a phenyl lower alkoxy group, a naphthyl lower alkoxy group, a benzoyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cyclo C3-C8 alkyl group, a cyclo C3-C8 alkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group and a

**EXHIBIT 1**

saturated 5- to 6-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group; and

A represents $-O-A_1-$ (wherein $A_1$ represents a $C_1$-$C_6$ alkylene group which may be substituted with a hydroxy group (wherein one oxygen atom may replace a carbon of the alkylene chain)), or a salt thereof.

| Claim 3 |
| --- |

3. The heterocyclic compound of the formula (1) according to claim 2, wherein the ring Q represents a bicyclic group selected from the group consisting of:



the ring Q may have 1 to 3 substituents selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, a phenyl group, a phenyl lower alkyl group, a naphthyl lower alkyl group, a phenyl lower alkoxy group, a naphthyl lower alkoxy group, a benzoyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cyclo C3-C8 alkyl group, a cyclo C3-C8 alkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a phenyl group, a thienyl group and a pyrrolidinyl lower alkyl group; and

A represents $-O-A_1-$ (wherein $A_1$ represents a $C_1$-$C_6$ alkylene group which may be substituted with a hydroxy group (wherein one oxygen atom may replace a carbon of the alkylene chain)), or a salt thereof.

**EXHIBIT 1**

| Claim 7 |
|---|
| 7. The heterocyclic compound of the formula (1) according to claim 3 selected from the group consisting of:<br><br>(1)      7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one,<br>. . .<br>or a salt thereof. |

| Claim 9 |
|---|
| 9. A process for producing a heterocyclic compound represented by the formula (1):<br><br><br><br>[wherein ring Q represented by<br><br><br><br>represents –NH–CH$_2$–, –N=CH–, –CH$_2$–NH– or –CH=N–; and<br><br>the carbon-carbon bond ----- between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond);<br><br>the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, a saturated 3- to 8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group; |

10

**EXHIBIT 1**

$R_2$ represents a hydrogen atom or a lower alkyl group; and

A represents $-O-A_1-$ (wherein $A_1$ represents an alkylene group which may be substituted with a hydroxy group (wherein one oxygen atom may replace a carbon of the alkylene chain) or a lower alkenylene group) or a lower alkylene group; provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:

 and 

(wherein the carbon-carbon bond ----- represents a single bond or a double bond)] or a salt thereof,
characterized by comprising a reaction of a compound represented by the formula:



(wherein the ring Q and A are the same as defined above, and $X_1$ represents a halogen atom or a group which causes a substitution reaction the same as in a halogen atom) or a salt thereof with a compound represented by the formula:



(wherein $R_2$ is the same as defined above) or a salt thereof.

| Claim 12 |
|---|
| *12. The heterocyclic compound according to claim 7, which is 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof.* |

| Claim 13 |
|---|
| *13. The heterocyclic compound according to claim 12, which is 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one.* |

**EXHIBIT 1**

| Claim 14 |
|---|
| *14. The process according to claim 9, wherein the process produces 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof.* |
| **Claim 15** |
| *15. The process according to claim 14, wherein the process produces 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one.* |

### B.      United States Patent No. 8,349,840

35.      United States Patent No. 8,349,840 ("the '840 patent"), entitled "Piperazine-Substituted Benzothiophenes for Treatment of Mental Disorders," issued on January 8, 2013.

36.      The '840 patent was filed on December 16, 2010, as U.S. Patent Application No. 12/970,690 ("the '690 application").   The '690 application is a continuation of the '005 application, which is the national stage entry of the '162 PCT application filed on April 12, 2006 (now the RE'059 patent).  The '162 PCT application claims the benefit of priority to foreign application JP 2005-116698, filed on April 14, 2005.

37.      The '840 patent expires on April 12, 2026.

38.      Otsuka owns the '840 patent and Lundbeck is the holder of an exclusive license to the '840 patent.  (Zenara Complaint at ¶¶ 3, 27.)

39.      The '840 patent is listed in the Orange Book in connection with NDA No. 205422 for REXULTI® (brexpiprazole) tablets.  (Zenara Complaint at ¶ 29.)

40.      Plaintiffs have asserted that defendants MSN, Optimus and Zenara infringe the following claims of the '840 patent:

**EXHIBIT 1**

| Claim 1 |
| --- |
| 1. A pharmaceutical composition comprising a heterocyclic compound of the formula (1) or a salt thereof as an active pharmaceutical ingredient and a pharmaceutically acceptable carrier: |



(1)

wherein ring Q represented by

represents

wherein

represents –NH–CH$_2$–, –N=CH–, –CH$_2$–NH– or –CH=N–; and

the carbon-carbon bond ----- between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond;

the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which

13

**EXHIBIT 1**

may have a lower alkyl group, a thienyl group, a saturated 3- to 8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group;

$R_2$ represents a hydrogen atom or a lower alkyl group; and

A represents –O–$A_1$– (wherein $A_1$ represents an alkylene group which may be substituted with a hydroxy group (wherein one oxygen atom may replace a carbon of the alkylene chain) or a lower alkenylene group) or a lower alkylene group;

provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:



and

wherein the carbon-carbon-bond ----- represents a single bond or a double bond.

| Claim 2 |
| --- |

2. A pharmaceutical composition comprising a heterocyclic compound or a salt thereof selected from the group of:
(1)    7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one,
 . . .
or a salt thereof, as an active pharmaceutical ingredient and a pharmaceutically acceptable carrier.

| Claim 4 |
| --- |

4. A method for treating a central nervous system disorder selected from depression, endogenous depression, major depression, melancholy and refractory depression comprising administering a heterocyclic compound represented by the formula (1) or a salt thereof in a human or animal:



(1)

wherein ring Q represented by

14

**EXHIBIT 1**



represents

wherein

represents –NH–CH₂–, –N=CH–, –CH₂–NH– or –CH=N–; and

the carbon-carbon bond ▬▬▬ between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond;

the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, a saturated 3- to 8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group;

$R_2$ represents a hydrogen atom or a lower alkyl group; and

A represents –O–$A_1$– (wherein $A_1$ represents an alkylene group which may be substituted with a hydroxy group (wherein one oxygen atom may replace a carbon of the alkylene chain) or a lower alkenylene group) or a lower alkylene group;

**EXHIBIT 1**

provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:



wherein the carbon-carbon-bond $-----$ represents a single bond or a double bond.

| Claim 5 |
|---|
| 5. The method according to claim 4, wherein the heterocyclic compound or a salt thereof is selected from the group of: (1) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one, <br> . . . <br> or a salt thereof. |

### C.     United States Patent No. 8,618,109

41.     United States Patent No. 8,618,109 ("the '109 patent"), entitled "Piperazine-Substituted Benzothiophenes for Treatment of Mental Disorders," issued on December 31, 2013.

42.     The '109 patent was filed on November 28, 2011, as U.S. Patent Application No. 13/688,108 ("the '108 application").  The '108 application is a continuation of the '690 application filed December 16, 2010 (now the '840 patent).  The '690 application is a continuation of the '005 application, which is the national stage entry of the '162 PCT application, filed on April 12, 2006 (now the RE'059 patent).  The '162 PCT application claims priority to foreign application JP 2005-116698, filed on April 14, 2005.

43.     The '109 patent expires on April 12, 2026.

44.     Otsuka owns the '109 patent and Lundbeck is the holder of an exclusive license to the '109 patent.  (Zenara Complaint, ¶¶ 3, 31.)

45.     The '109 patent is listed in the Orange Book in connection with NDA No. 205422

16

**EXHIBIT 1**

for REXULTI® (brexpiprazole) tablets. (Zenara Complaint at ¶ 33.)

46. Plaintiffs have asserted that defendants MSN, Optimus and Zenara infringe the following claims of the '109 patent:

| Claim 1 |
|---|
| 1. A method for treating schizophrenia comprising administering a heterocyclic compound represented by the formula (I) or a salt thereof to a human or animal:<br><br>wherein ring Q represented by<br><br>represents<br><br>wherein<br><br>represents $-NH-CH_2-$, $-N=CH-$, $-CH_2-NH-$ or $-CH=N-$; and<br><br>the carbon-carbon bond ---- between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond;<br><br>the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower |

17

**EXHIBIT 1**

alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, a saturated 3- to 8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group;

$R_2$ represents a hydrogen atom or a lower alkyl group; and

A represents $-O-A_1-$ (wherein $A_1$ represents an alkylene group which may be substituted with a hydroxy group (wherein one oxygen atom may replace a carbon of the alkylene chain) or a lower alkenylene group) or a lower alkylene group;

provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:



and

wherein the carbon-carbon-bond $-----$ represents a single bond or a double bond.

**Claim 2**

2. The method according to claim 1, wherein the heterocyclic compound of the formula (I) is selected from the group of: (1) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one,

. . .

or a salt thereof.

**D.    United States Patent No. 9,839,637**

47.    United States Patent No. 9,839,637 ("the '637 patent"), entitled "Piperazine-Substituted Benzothiophenes for Treatment of Mental Disorders," issued on December 12, 2017.

48.    The '637 patent was filed on September 6, 2017, as U.S. Patent Application No. 15/697,196 ("the '196 application"). The '196 application is a continuation of U.S. Patent

**EXHIBIT 1**

Application No. 15/585,098 ("the '098 application") filed May 2, 2017.  The '098 application is a

continuation of U.S. Patent Application No. 15/267,025 (the '025 application"), filed September

15, 2016   The '025 application is a continuation of U.S. Patent Application No. 14/928,972 ("the

'972 application"), filed October 30, 2015 (now U.S. Patent No. 9,480,686).  The '972 application

is a division of U.S. Patent Application No. 14/089,504 ("the '504 application"), filed November

25, 2013 (now U.S. Patent No. 9,206,167).   The '504 application is a division of the '108

application, filed November 28, 2012 (now the '109 patent).  The '108 application is a continuation

of the '690 application, filed December 16, 2010 (now the '840 patent).  The '690 application is a

continuation of the '005 application, which is the national stage entry of the '162 PCT application,

filed on April 12, 2006, (now the RE'059 patent).  The '162 PCT application claims priority to

foreign application JP 2005-116698, filed on April 14, 2005.

49.     The '637 patent expires on April 12, 2026.

50.     Otsuka owns the '637 patent and Lundbeck is the holder of an exclusive license to

the '637 patent.  (Zenara Complaint at ¶¶ 3, 35.)

51.     The '637 patent is listed in the Orange Book in connection with NDA No. 205422

for REXULTI® (brexpiprazole) tablets.  (Zenara Complaint at ¶ 37.)

52.     Plaintiffs have asserted that defendants MSN, Optimus and Zenara infringe the

following claims of the '637 patent:

| Claim 1 | |
|---|---|
| 1. A pharmaceutical composition comprising a heterocyclic compound or a salt thereof represented by formula (1): | |

**EXHIBIT 1**



wherein ring Q is a bicyclic group selected from the group consisting of:



wherein the ring Q may have 1 to 3 substituents selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, a phenyl group, a phenyl lower alkyl group, a naphthyl lower alkyl group, a phenyl lower alkoxy group, a naphthyl lower alkoxy group, a benzoyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cyclo $C_3$-$C_8$ alkyl group, a cyclo $C_3$-$C_8$ alkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, and a pyrrolidinyl lower alkyl group;

$R_2$ represents a hydrogen atom or a lower alkyl group; and

A represents –O–$A_1$–, wherein $A_1$ is a $C_1$-$C_6$ alkylene group; and a pharmaceutically acceptable carrier.

| **Claim 3** |
|---|
| 3.    A    pharmaceutical    composition    comprising    7-[4-(4-benzo[b]thiophen-4-ylpiperazin-1-yl)butoxy]-1H-quinolin-2-one and a pharmaceutically acceptable carrier. |
| **Claim 4** |
| 4. The pharmaceutical composition according to claim 3, wherein the    7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one is present in the pharmaceutical composition in an amount ranging from 1% to 70% by weight. |

**EXHIBIT 1**

| Claim 5 |
|---|
| 5. The pharmaceutical composition according to claim 3, wherein the 7-[4-(4- benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one is present in the pharmaceutical composition in an amount ranging from 1% to 30% by weight. |
| **Claim 6** |
| 6. The pharmaceutical composition according to claim 3, wherein the composition contains from 1 mg to 200 mg of 7-[4-(4-benzo[b]thiophen-4-    yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one. |
| **Claim 7** |
| 7. The pharmaceutical composition according to claim 3, wherein the composition contains about 1 mg of 7-[4-(4-benzo[b]thiophen-4-ylpiperazin-1-yl)butoxy]-1H-quinolin-2-one. |
| **Claim 8** |
| 8. The pharmaceutical composition according to claim 6, wherein the pharmaceutical composition is in the form of a tablet. |
| **Claim 9** |
| 9. A method for treating major depression comprising administering a pharmaceutical composition according to claim 3. |
| **Claim 10** |
| 10. A method for treating schizophrenia comprising administering a pharmaceutical composition according to claim 3. |

**E.    United States Patent No. 10,307,419**

53.    United States Patent No. 10,307,419 ("the '419 patent"), entitled "Tablet comprising  7-[4-(4-benzo[b]thiopen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof," issued on June 4, 2019.

54.    The '419 patent was filed on September 22, 2017, as U.S. Patent Application No. 15/713,427 ("the '427 application"). The '427 application is a continuation of U.S. Patent Application No. 15/444,113 ("the '113 application"), filed on February 27, 2017 (now abandoned). The '113 application is a continuation of U.S. Patent Application No. 15/019,874 ("the '874 application"), filed on February 9, 2016 (now abandoned).  The '874 application claims the

**EXHIBIT 1**

benefit of PCT Application No. PCT/JP2012/076415 ("the '415 PCT application"), filed on

October 12, 2012 (now abandoned).  The '415 PCT application claims the benefit of priority to

foreign application JP 2011-227057 on October 14, 2011.

  55. The '419 patent expires on October 12, 2032.

  56. Otsuka owns the '419 patent and Lundbeck is the holder of an exclusive license to

the '419 patent.  (Zenara Complaint at ¶¶ 3, 39.)

  57. The '419 patent is listed in the Orange Book in connection with NDA No. 205422

for REXULTI® (brexpiprazole) tablets.  (Zenara Complaint at ¶ 41.)

  58. Plaintiffs assert that each of the Defendants infringes one or more of the following

claims of the '419 patent with respect to at least five of the six dosage strengths of each of

Defendants' generic brexpiprazole tablet products as described in Defendants' ANDAs based on

the information they have provided during the course of this litigation:

| Claim 1 |
|---|
| 1. A tablet comprising 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof as an active ingredient, an excipient (a), a binder (b), a disintegrant (c), a lubricant (d), and a coating, wherein the uncoated tablet comprises:<br><br>0.05 to 25% by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof,<br><br>10 to 98.5% by weight of the excipient (a), which is at least one member selected from the group consisting of lactose, corn starch, and microcrystalline cellulose;<br><br>0.1 to 20% by weight of the binder (b), which is hydroxypropyl cellulose;<br><br>1 to 25% by weight of the disintegrant (c), which is at least one member selected from the group consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch; and |

**EXHIBIT 1**

0.1 to 10% by weight of the lubricant (d), which is magnesium stearate;

wherein said coating comprises hydroxypropyl methylcellulose, talc, and a colorant (e), the colorant (e) is present in an amount ranging from 0.1 to 50% by weight of the coating and comprises iron oxide and titanium oxide, and the coating substantially does not contain polyethylene glycol.

| Claim 2 |
|---|

2. The tablet according to claim 1, wherein per 1 part by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof, the tablet comprises:

1 to 2000 parts by weight of the excipient (a);
0.01 to 100 parts by weight of the binder (b);
0.1 to 500 parts by weight of the disintegrant (c); and
0.01 to 50 parts by weight of the lubricant (d).

| Claim 3 |
|---|

3. The tablet according to claim 1, which is obtained by forming, into a tablet, a granulated substance obtained through wet granulation.

| Claim 4 |
|---|

4. The tablet according to claim 1, wherein the tablet does not contain povidone or crospovidone.

| Claim 5 |
|---|

5. The tablet according to claim 1, wherein the excipient (a) is lactose, corn starch, and microcrystalline cellulose; and the disintegrant (c) is low-substituted hydroxypropyl cellulose.

| Claim 6 |
|---|

6. A method for producing a tablet, the method comprising the steps of:

(1) granulating a mixture containing 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof, an excipient (a), a binder (b), and a disintegrant (c), and further mixing thereto a lubricant (d); and

(2) forming the obtained mixture into a tablet form; and

(3) mixing a coating agent, a colorant (e), and a liquid medium to obtain a coating mixture, and coating the surface of the tablet form using the coating mixture to form the tablet,

wherein the tablet comprises:

0.05 to 25% by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-

**EXHIBIT 1**

yl)butoxy]-1H-quinolin-2-one or a salt thereof,

10 to 98.5% by weight of the excipient (a), which is at least one member selected from the group consisting of lactose, corn starch, and microcrystalline cellulose;

0.1 to 20% by weight of the binder (b), which is hydroxypropyl cellulose;

1 to 25% by weight of the disintegrant (e), which is at least one member selected from the group consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch; and

0.1 to 10% by weight of the lubricant (d), which is magnesium stearate;

the tablet further comprising a coating layer on the surface thereof,

wherein said coating agent comprises hydroxypropyl methyl cellulose and talc, the colorant (e) is present in an amount ranging from 0.1 to 50% by weight of the coating mixture and comprises iron oxide and titanium oxide, and

the coating mixture substantially does not contain polyethylene glycol.

| Claim 7 |
| --- |
| 7. The method for producing the tablet according to claim 6, wherein the excipient (a) is lactose , corn starch, and microcrystalline cellulose; and the disintegrant (c) is low substituted hydroxypropyl cellulose. |

**EXHIBIT 1**

59.     Each asserted claim of the RE'059, '840, '109 and '637 patents encompasses brexpiprazole, a composition comprising brexpiprazole or a method of treatment comprising administering brexpiprazole.  Brexpiprazole has a chemical name 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one and the following structure:



IV.          **Litigation Proceedings**

60.     Plaintiffs filed suit against all Defendants for all patents for which each defendant provided the Food and Drug Administration ("FDA") a Paragraph IV certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV).  (C.A. No. 19-cv-02006, D.I. 1 ("Apotex Complaint"); C.A. No. 19-cv-02009, D.I. 1 ("MSN Complaint"); C.A. No. 19-cv-02008, D.I. 1 ("Optimus Complaint"); C.A. No. 19-cv-01938, D.I. 1 ("Zenara Complaint" or the "Brexpiprazole Consolidated Action") (collectively, the "Component Complaints").)

61.     During the course of this litigation, the '362 patent reissued as the RE'059 patent, all Defendants except Apotex provided the FDA Paragraph IV certifications for the RE'059 patent pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) and Plaintiffs filed suit against all Defendants except for Apotex for infringement of the claims of the RE'059 patent.  (C.A. No. 20-cv-01428, D.I. 1 ("MSN Reissue Complaint"); C.A. No. 20-cv-01332, D.I. 1 ("Optimus Reissue Complaint"); C.A.

**EXHIBIT 1**

No. 20-cv-01599, D.I. 1 ("Zenara Reissue Complaint") (collectively, the "Reissue Complaints").)

62.     All parties to the Reissue Complaints have entered stipulations dismissing counts relating to the '362 patent and consolidating the claims of the Reissue Complaints with the Brexpiprazole Consolidated Action.  (C.A. No. 20-cv-01428, D.I. 15 (MSN); C.A. No. 20-cv-01332, D.I. 12 (Optimus); C.A. No. 20-cv-01599, D.I. 11 (Zenara).)

63.     Cases against multiple parties have been terminated from this consolidated litigation.  These include: Accord Healthcare Inc. ("Accord"), Ajanta Pharma Ltd. ("Ajanta"), Alembic Pharmaceuticals Ltd. and Alembic Pharmaceuticals, Inc. (collectively "Alembic"), Alkem Laboratories Ltd. ("Alkem"), Amneal Pharmaceuticals  LLC, Amneal  Pharmaceuticals Company  GmbH and Raks Pharma Pvt. Ltd. (collectively "Amneal"), Aurobindo Pharma Ltd. and Aurobindo Pharma USA ("Aurobindo"), Hetero Labs Ltd., Hetero Labs Ltd. Unit-V, Hetero USA, Inc. Hetero Drugs Ltd. and Honour Lab Ltd. (collectively "Hetero"), Lupin Limited and Lupin Pharmaceuticals, Inc. (collectively, "Lupin"), Macleods Pharmaceuticals Ltd. and Macleods Pharma USA, Inc. (collectively, "Macleods"), Prinston Pharmaceutical Inc. ("Prinston"), Sandoz Inc. ("Sandoz"), Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. (collectively "Teva") and Zydus Pharmaceuticals USA Inc. and Zydus Lifesciences Limited (collectively, "Zydus").  (*See* Accord, C.A. Nos. 19-cv-01987, 20-cv-01287, D.I. 441 (D. Del.) (consolidated), C.A. No. 19-cv-01072, D.I. 10 (M.D.N.C.) and C.A. No. 20-cv-00878, D.I. 12 (M.D.N.C.); Ajanta, C.A. Nos. 19-cv-01939, 20-cv-01335 and D.I. 530 (D. Del.) (consolidated); Alembic, C.A. Nos. 19-cv-02007, 20-cv-01365 and D.I. 510 (D. Del.) (consolidated); Alkem, C.A. Nos. 19-cv-01964, 20-cv-01286 and D.I. 518 (D. Del) (consolidated); Amneal, C.A. Nos. 19-cv-01952, 20-cv-01297 and D.I. 553 (D. Del.) (consolidated); Aurobindo, C.A. Nos. 19-cv-01965, 20-cv-01581 and D.I. 567 (D. Del.) (consolidated); Hetero, C.A. Nos. 19-cv-01954, 20-cv-01531

26

**EXHIBIT 1**

and D.I. 502 (D. Del.) (consolidated); Lupin Limited, C.A. Nos. 19-cv-01988, 20-cv-01296 and

D.I. 540 (D. Del.) (consolidated); Macleods, C.A. Nos. 19-cv-02065, 21-cv-00316 and D.I. 525

(D. Del.) (consolidated); Prinston, C.A. Nos. 19-cv-01956, 20-cv-01502 and D.I. 570 (D. Del.)

(consolidated); Sandoz., C.A. Nos. 19-cv-02080, 21-cv-00580, D.I. 564 (D. Del.) (consolidated),

C.A. No. 22-cv-00591, D.I. 11 (D. Del.) and C.A. No. 19-cv-03112, D.I. 11 (D. Colo.); Teva, C.A.

Nos. 19-cv-01955, 20-cv-01423, D.I. 464 (D. Del.) (consolidated) and C.A. No. 22-cv-00221, D.I.

10 (D. Del.); and Zydus, C.A. Nos. 19-cv-02024, 20-cv-01763, D.I. 559 (D. Del.) (consolidated),

C.A. No. 19-cv-19394, D.I. 13 (D.N.J.) and C.A. No. 20-cv-20269, D.I. 8 (D.N.J.).)

    64.    Additional cases against Unichem Laboratories Ltd. ("Unichem") were also

terminated following Unichem's conversion of its Paragraph IV certifications as to the asserted

patents to Paragraph III certifications under 21 U.S.C. § 355(j)(2)(A)(vii)(III).  C.A. Nos. 19-cv-

1977 and 20-cv-1295; C.A. No. 19-cv-1938, DI 362 (consolidated).

    65.    The Court ordered the following claim construction for the '419 patent on July 27,

2021:

| Claim Term | Ordered Construction |
|---|---|
| "hydroxypropyl cellulose"<br><br>Appears in claims 1 and 15 of the '419 patent. | "a derivative of cellulose including hydroxypropoxyl groups by about 50 to 85%." |

(C.A. No. 19-1938, D.I. 126.)

## V.    Defendants' Generic Brexpiprazole Tablet Products

    66.    The generic brexpiprazole tablet products that are the subject of Apotex's, MSN's,

Optimus's and Zenara's ANDAs each include brexpiprazole as the active ingredient.

    67.    Plaintiffs have asserted that Optimus literally infringes claims 1, 2, 3, 7, 9, 12, 13,

14 and 15 of the RE'059 patent.

**EXHIBIT 1**

68.     Plaintiffs have asserted that MSN and Zenara each literally infringes claims 1, 2, 3, 7, 12 and 13 of the RE'059 patent.

69.     Plaintiffs have asserted that MSN, Optimus and Zenara each literally infringes claims 1, 2, 4 and 5 of the '840 patent.

70.     Plaintiffs have asserted that MSN, Optimus and Zenara each literally infringes claims 1 and 2 of the '109 patent.

71.     Plaintiffs have asserted that MSN, Optimus and Zenara each literally infringes claims 1, 3, 4, 5, 6, 7, 8, 9 and 10 of the '637 patent.

### A.     Apotex

72.     Apotex filed ANDA No. 213731 ("Apotex's ANDA") seeking approval to engage in the commercial manufacture, use, offer for sale, sale or importation in the United States of brexpiprazole tablets, 0.25, 0.5, 1, 2 and 3 mg ("Apotex's generic brexpiprazole tablet products") before the expiration of the '419 patent.  (Apotex Complaint at ¶ 38; Apotex Answer at ¶ 38.)

73.     In connection with the filing of its ANDA, Apotex submitted a Paragraph IV certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV), alleging that the claims of the '419 patent are invalid, unenforceable and/or would not be infringed by Apotex's generic brexpiprazole tablet products.  (Apotex Complaint at ¶¶ 1, 39; Apotex Answer at ¶¶ 1, 39.)

74.     Plaintiffs received a letter dated September 16, 2019, sent by Apotex providing written notice of its ANDA certification informing Plaintiffs that Apotex sought approval to engage in the commercial manufacture, use, offer for sale, sale or importation in the United States of Apotex's generic brexpiprazole tablet products before the expiration of the '419 patent. (Apotex Complaint at ¶ 40; Apotex Answer at ¶ 40.)

75.     The active pharmaceutical ingredient in Apotex's generic brexpiprazole tablet

**EXHIBIT 1**

products is brexpiprazole.  (Singh Ex. 2 at APO-BREX000358.)

76.     Signa S.A. de C.V is the manufacturer of the brexpiprazole drug substance contained in Apotex's generic brexpiprazole tablet products.  (*Id*. at APO-BREX000360.)

77.     Plaintiffs have asserted that Apotex infringes claims 1, 2, 4 and 6 of the '419 patent.

78.     ████████████████████████████████████████████████████

████████████████████████████████████

### B.     MSN

79.     MSN filed ANDA No. 213740 ("MSN's ANDA") seeking approval to engage in the commercial manufacture, use or sale in the United States of brexpiprazole tablets, 0.25, 0.5, 1, 2, 3 and 4 mg ("MSN's generic brexpiprazole tablet products") before the expiration of the asserted patents.  (MSN Complaint at ¶ 50; MSN Answer at ¶ 50; MSN Reissue Complaint at ¶ 35; MSN Reissue Answer at ¶ 35.)

80.     In connection with the filing of its ANDA, MSN submitted a Paragraph IV certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV), alleging that the claims of the asserted patents are invalid and/or unenforceable and/or would not be infringed by MSN's generic brexpiprazole tablet products.  (MSN Complaint at ¶¶ 1, 51; MSN Answer at ¶¶ 1, 51; MSN Reissue Complaint at ¶ 36; MSN Reissue Answer at ¶ 36.)

81.     Plaintiffs received letters dated September 12, 2019 and September 9, 2020 sent by MSN providing written notice of its ANDA certification informing Plaintiffs that MSN sought approval to engage in the commercial manufacture, use or sale of MSN's generic brexpiprazole tablet products before the expiration of the asserted patents.  (MSN Complaint at ¶¶ 1, 52; MSN Answer at ¶¶ 1, 52; MSN Reissue Complaint at ¶ 40; MSN Reissue Answer at ¶ 40.)

82.     ██ ██ ████ ████ ██████ ████ ████ ███ █ ██████ ██ ██ ███

**EXHIBIT 1**

███████████████████████████████████████████████

████████████████████████████

83.   ████████████████████████████████████████

████████████████████████████████████████

**C.   Optimus**

84.   Optimus filed ANDA No. 213758 ("Optimus's ANDA") seeking approval to engage in the commercial manufacture, use or sale in the United States of brexpiprazole tablets, 0.25, 0.5, 1, 2, 3 and 4 mg ("Optimus's generic brexpiprazole tablet products") before the expiration of the asserted patents.  (Optimus Complaint at ¶ 37; Optimus Answer at ¶ 37; Optimus Reissue Complaint at ¶ 22; Optimus Reissue Answer at ¶ 22.)

85.   In connection with the filing of its ANDA, Optimus submitted a Paragraph IV certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV), alleging that the claims of the asserted patents are invalid, unenforceable and/or would not be infringed by Optimus's generic brexpiprazole tablet products.  (Optimus Complaint at ¶¶ 1, 38; Optimus Answer at ¶¶ 1, 38; Optimus Reissue Complaint at ¶ 23; Optimus Reissue Answer at ¶ 23.)

86.   Plaintiffs received a letter dated September 16, 2019 and August 17, 2020, sent by Optimus providing written notice of its ANDA certification informing Plaintiffs that Optimus sought approval to engage in the commercial manufacture, use or sale of Optimus's generic brexpiprazole tablet products before the expiration of the asserted patents.  (Optimus Complaint at ¶¶ 1, 39 Optimus Answer at ¶¶ 1, 39; Optimus Reissue Complaint at ¶ 27; Optimus Reissue Answer at ¶ 27.)

87.   ████████████████████████████████████████

████  ██  ███████  ███████  ████████  ██████  ██████   (Chowdary Ex. 9 at

30

**EXHIBIT 1**

OPTIBREX_000766-67.)

88.     The active pharmaceutical ingredient in Optimus's generic brexpiprazole tablet products is brexpiprazole.  (Chowdary Ex. 2 at OPTIBREX_000546-48.)

89.     Plaintiffs have asserted that Optimus infringes claims 1, 2, 3, 4, 5, 6 and 7 of the '419 patent.

90.     ████████████████████████████████████

███████████████████████████████████ █ ████████████████████

██████████████████████████

**D.     Zenara**

91.     Zenara filed ANDA No. 213477 ("Zenara's ANDA") seeking approval to engage in the commercial manufacture, use or sale in the United States of brexpiprazole tablets, 0.25, 0.5, 1, 2, 3 and 4 mg ("Zenara's generic brexpiprazole tablet products") before the expiration of the asserted patents.  (Zenara Complaint at ¶ 42; Zenara Answer at ¶ 42; Zenara Reissue Complaint at ¶ 27; Zenara Reissue Answer at ¶ 27.)

92.     In connection with the filing of its ANDA, Zenara submitted a Paragraph IV certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV), alleging that the claims of the asserted patents are invalid, unenforceable and/or would not be infringed by Zenara's generic brexpiprazole tablet products.  (Zenara Complaint at ¶¶ 1, 43; Zenara Answer at ¶¶ 1, 43; Zenara Reissue Complaint at ¶ 28; Zenara Reissue Answer at ¶ 29.)

93.     Plaintiffs received letters dated August 30, 2019 and October 13, 2020, sent by Zenara providing written notice of its ANDA certification informing Plaintiffs that Zenara sought approval to engage in the commercial manufacture, use or sale of Zenara's generic brexpiprazole tablet products before the expiration of the asserted patents.  (Zenara Complaint at ¶¶ 1, 44; Zenara

31

**EXHIBIT 1**

Answer at ¶¶ 1, 44; Zenara Reissue Complaint at ¶ 32; Zenara Reissue Answer at ¶ 32.)

94.     Zenara has stipulated that Zenara's generic brexpiprazole tablet products as described in ANDA No. 213669 infringe claims 1, 2, 3, 7, 12 and 13 of RE'059 patent; claims 1, 2, 4 and 5 of the '840 patent; claims 1 and 2 of the '109 patent and claims 1, 3, 4, 5, 6, 7, 8, 9 and 10 of the '637 patent.  *See* DI 413.

95.     Biophore India Pharmaceuticals Pvt. Ltd. is the manufacturer of the brexpiprazole drug substance contained in Zenara's generic brexpiprazole tablet products.  (Kumar Ex. 2 at ZEN110313; Murugan Ex. 2 at ZEN021703; *see also* Murugan Tr. at 35:11-36:1)

96.     The active pharmaceutical ingredient in Zenara's generic brexpiprazole tablet products is brexpiprazole.  (Kumar Ex. 2 at ZEN110295-97.)

97.     Plaintiffs have asserted that Zenara's 0.25, 0.5, 1, 2, and 3 mg generic brexpiprazole tablet products, but not Zenara's 4 mg generic brexpiprazole tablet product, infringe claims 1, 2, 3 and 6 of the '419 patent.

98.     Plaintiffs do not assert that Zenara's 4 mg generic brexpiprazole tablet product infringes any claim of the '419 patent.

99.     Zenara admits that the manufacture, use, offer for sale, or sale within the United States, or importation into the United States of its generic brexpiprazole tablet products will directly infringe, contribute to the infringement of and/or induce the infringement of each of the following claims of the asserted patents:

- RE'059 patent, claims 1, 2, 3, 7, 12 and 13;

- the '840 patent, claims 1, 2, 4 and 5;

- the '109 patent, claims 1 and 2;

- the '637 patent, claims 1, 3, 4, 5, 6, 7, 8, 9 and 10.

32

**EXHIBIT 1**

D.I. 413, ¶ 1.



**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD. and H. LUNDBECK A/S, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 19-cv-1938-LPS |
| v. | ) ) | (consolidated) |
| ZENARA PHARMA PRIVATE LTD., et al. | ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' STATEMENT OF CONTESTED
FACTS REGARDING INFRINGEMENT**

## EXHIBIT 2

## Table of Contents

I.    General Background and Terminology.................................................................... 1

    A.    Schizophrenia............................................................................................ 1

    B.    Major Depressive Disorder ...................................................................... 2

    C.    General Prescribing Practices ................................................................. 3

    D.    Drug Formulation.................................................................................... 4

II.    The Asserted Patents ........................................................................................ 11

    A.    Plaintiffs' REXULTI® Product Is an Embodiment of the Asserted Claims ......... 13

        1.    Brexpiprazole compound and composition claims ................................... 13

        2.    Method of treatment claims ...................................................................... 20

III.    Level of Ordinary Skill in the Art...................................................................... 20

    A.    Pharmaceutical Composition and Formulation Related Subject Matter............... 20

    B.    Treatment Related Subject Matter ...................................................... 20

## EXHIBIT 2

1.　　Pursuant to Local Rule 16(c)(4), Plaintiffs identify the following issues of fact that remain to be litigated and summarize what they intend to prove to support their claims and defenses.  The following statements are not exhaustive, and Plaintiffs reserve the right to prove any matters identified in its pleadings, interrogatory responses, and/or expert reports.

2.　　Plaintiffs reserve the right to modify or amend this Statement to the extent necessary to reflect any future rulings by the Court and to supplement or amend this Statement to respond to any new issues that Defendants may raise.  To the extent Plaintiffs' Statement of Issues of Law, which is submitted as Exhibit 6, contains issues of fact, those issues are incorporated herein by reference.  Moreover, if any issue of fact identified below should properly be considered an issue of law, then such statement shall be considered a part of Plaintiffs' Statement of Issues of Law.

3.　　All statements in Plaintiffs' contested facts are based on documents produced by Defendants to date.

4.　　Plaintiffs' citations to the record are exemplary, and Plaintiffs reserve the right to introduce additional evidence in support of the facts set forth below.  Plaintiffs further reserve the right to introduce evidence pertaining to any fact set forth in Defendants' Statement of Contested Facts, pertaining to any fact relating to the legal issues set forth in the parties' Statements of Legal Issues, or pertaining to any fact newly-raised at trial by Defendants.

## I.　　GENERAL BACKGROUND AND TERMINOLOGY

### A.　　Schizophrenia

5.　　 Schizophrenia is a severely debilitating mental illness. It is considered the most serious mental disorder and is also somewhat common, affecting approximately 1% of the population.

**Exhibit 2**

6.     People who suffer from schizophrenia exhibit a variety of different symptoms that may be generally classified into three categories.  The first category consists of the "positive" symptoms of schizophrenia, which include hallucinations, delusions and thought disorders.  The second category consists of "negative" symptoms, which include a loss of the ability to function socially, blunted affect (the loss of the ability to fully experience emotions), emotional withdrawal, reduced ability to experience pleasure and other diminutions in normal functions.  The third category consists of "cognitive deficits," which include failure of memory and ability to maintain attention.

**B.     Major Depressive Disorder**

7.     Major depressive disorder is a common and serious medical illness that negatively affects how an individual feels, the way they think and how they act.  Symptoms of major depressive disorder include feelings of sadness and/or a loss of interest in activities once enjoyed.  It can lead to a variety of emotional and physical problems and can decrease an individual's ability to function at work and at home.

8.     Symptoms of depressive disorders can vary from mild to severe and can include:

- Feeling sad or having a depressed mood

- Loss of interest or pleasure in activities once enjoyed

- Changes in appetite — weight loss or gain unrelated to dieting

- Trouble sleeping or sleeping too much

- Loss of energy or increased fatigue

- Increase in purposeless physical activity (e.g., inability to sit still, pacing, handwringing) or slowed movements or speech (these actions must be severe enough to be observable by others)

**Exhibit 2**

- Feeling worthless or guilty

- Difficulty thinking, concentrating or making decisions

- Thoughts of death or suicide

9. Symptoms must last at least two weeks and must represent a change in the previous level of functioning for a diagnosis of major depressive disorder.

10. Major depressive disorder affects about 7.8% of the U.S. population over age 18, according to the National Institute of Mental Health. Depression also affects older adults, teens and children, but frequently goes undiagnosed and untreated in these populations.

**C.    General Prescribing Practices**

11. In the United States, the FDA approves pioneer drugs after deeming them safe and efficacious based on extensive clinical trials. After receiving FDA approval, prescription drugs are sold with FDA-approved package inserts identifying indications that the FDA has deemed the drug to be safe and efficacious to treat.

12. "Administering" a drug is accomplished in several ways. For example, the act of a physician prescribing a drug to a patient constitutes "administering" a drug to a patient. In addition, when a healthcare provider (e.g., a physician, nurse practitioner or physician assistant) prescribes, gives or actually doses a drug to a patient, the healthcare provider has "administered" the drug. The concept of "administering" a drug also encompasses a patient administering the drug to himself or herself after it has been prescribed by the heath care clinician.

13. In the course of administering drugs to patients, the common practice of physicians is to discuss with patients the safety and efficacy profile of the drug as described in the FDA-approved labeling, commonly known as the package insert, accompanying the drug.

**Exhibit 2**

14.     In the course of administering REXULTI®, it is particularly important to discuss with the patient the safety and efficacy of REXULTI®, including clinical pharmacology, contraindications, warnings, precautions, adverse events, drug interactions and dosage and administration, as described in the REXULTI® label.  Therefore, healthcare providers and patients will administer drugs predominantly according to the product label.

### D.     Drug Formulation

15.     Pharmaceutical formulation is a difficult endeavor.  It requires selection, research and development of the active pharmaceutical ingredient and numerous pharmaceutical excipients to determine, among other things, the appropriate solubility and dissolution that will provide good bioavailability and therapeutic efficacy.  (*See* PTX0363, Pharmaceutical Dosage Forms: Tablets, Volume 1 78-79 (Herbert A. Lieberman, et al. eds., 2nd Ed. 1989) (stating after a formulator understands preformulation information about the active ingredient, "[t]he question then . . . is to select excipient materials that will be both chemically and physically compatible with the drug"); *see also generally* PTX0363, Pharmaceutical Dosage Forms at Chapter 1 (discussing preformulation testing and analysis required for drug formulation, including evaluating solubility, dissolution, stability, purity, parameters affecting absorption, particle size, shape and surface area and other relevant chemical and physical properties).)

16.     Moreover, drug formulation is often difficult and unpredictable because excipients may interact with one another and the active pharmaceutical ingredient, impacting the functions of the formulation.  (*See* PTX0363, Pharmaceutical Dosage Forms at 76 ("The correct selection and balance of excipient materials for each active ingredient or ingredient combination in a tablet formulation to achieve the desired response (i.e., production of a safe, effective, and highly reliable product) is not in practice a simple goal to achieve.").)  The manufacturing technique and delivery form also often affect the functions of the formulation.  (*See* PTX0364, Lachman/Lieberman's The

**Exhibit 2**

Theory and Practice of Industrial Pharmacy 443, 866 (Roop K. Khar et al. eds., 4th Ed. 2016)

(explaining the drug formulation and manufacturing process affect disintegration and dissolution)

(hereinafter "Industrial Pharmacy").)   Accordingly, developing a successful pharmaceutical

formulation is a difficult, labor-intensive task.

17.     The function of each excipient depends on the specific amounts and grades of the

excipients in the formulation, the combination and interactions of the excipients and the specific

manufacturing techniques used to formulate the drug product.  (*See* PTX0365, Handbook of

Pharmaceutical Excipients at Preface (Raymond C. Rowe, et al. eds., 5th Ed. 2006) ("Indeed, the

properties of the final dosage form (i.e. its bioavailability and stability) are, for the most part,

highly dependent on the excipients chosen, their concentration and interaction with both the active

compound and each other.") (hereinafter "Handbook"); PTX0364, Industrial Pharmacy at 867

("Excipients are not inactive and have substantial impact on the manufacture and quality, safety,

and efficacy of the drug substance(s) in a dosage form.").)  Most pharmaceutical excipients are

available in many different types, grades and varieties, which often vary in physical and chemical

properties. (*See* PTX0364, Industrial Pharmacy at 866 (stating "pharmaceutical excipients offer a

wide range of properties to influence many characteristics of a pharmaceutical product, thereby

achieving the optimal therapeutic efficacy").)  A person of ordinary skill in the art ("POSA") must

therefore analyze the pharmaceutical formulation as a whole, each individual type and grade of

excipient, the amounts and proportions of the excipients in the formulation, the interactions of the

excipients with each other and the active pharmaceutical ingredient and the specific manufacturing

techniques used to manufacture the drug product, in order to understand the function(s) each

excipient may perform in the drug product.

**Exhibit 2**

18.     For example, methylcellulose and hydroxypropyl methylcellulose ("HPMC") are available in several grades that vary in properties.  (*See* PTX0366*,* Dupont, Methocel[TM], https://www.pharma.dupont.com/pharmaceutical-brands/methocel.html (stating the Methocel[TM] product encompasses both methylcellulose and HPMC "each available in different grades to address a wide range of applications including tablet coatings, granulation, controlled release, drug layering, vegetarian hard-shell capsules and amorphous drug stabilization"); *see also* PTX0363, Pharmaceutical Dosage Forms at 165 (stating that methylcellulose "offers considerable latitude in binding strength because of the range of viscosity grades available").)  Hypromellose 2910, for example, is available in different grades with viscosities ranging from 3 to 10,000 mPa*s. PTX0366*,* Dupont, Methocel[TM], https://www.pharma.dupont.com/pharmaceutical-brands/methocel.html.  Polyvinyl alcohol is similarly available in several grades with varying properties and may function as a binder, film coating agent, thickener, gel patch, emulsifier or OD film substrate.   (*See* PTX0367*,* Mitsubishi Chemical, Gohsenol[TM] EG, https://www.m-chemical.co.jp/en/products/departments/mcc/healthcare/product/1205874_8006.html.)

19.     Additionally, the method of manufacturing impacts the excipient and tablet functions.  For example, wet granulation is "considered superior" for achieving higher dissolution rates, and "the use of hydrophilic filler and diluents such as starch, lactose and microcrystalline cellulose tends to improve the dissolution of the active ingredients."  (PTX0364, Industrial Pharmacy at 452.)

20.     For cornstarch, the Handbook of Pharmaceutical Excipients has two separate starch entries, including various grades and types of cornstarch.  (*See* PTX0365, Handbook at 725-33 (listing starch and starch, pregelatinized as two separate categories of starch).)  Starch functions as a glidant, a tablet and capsule diluent, a tablet and capsule disintegrant and/or a tablet binder.

Exhibit 2

(PTX0365, Handbook at 725; *see also* PTX0364, Industrial Pharmacy at 1038; PTX0363, Pharmaceutical Dosage Forms at 99, 107-09; *see also* Byrn Tr, at 205:13-208:18 (explaining the Colorcon Starch 1500® brochure shows  "it can be both a binder and a disintegrant") and PTX0397, Byrn Ex. 22, Colorcon Starch 1500® Brochure (advertising "In wet granulation applications, Starch 1500® exhibits dual functionality as both binder and disintegrant due to partial cold water solubility exhibited by the fully gelatinized portion.").)  The molecular weight, empirical formula, structural formula and typical properties of starch also vary, resulting in different functions in pharmaceutical formulations.   (*See* PTX0365, Handbook at 725-26; *see also* PTX0363, Pharmaceutical Dosage Forms at 99 (explaining that initial moisture level of starch can impact tablet function).)  Pregelatinized starch functions as a tablet and capsule diluent, a tablet and capsule disintegrant and/or a tablet binder, and this function depends on, among other things, the grade and concentration of pregelatinized starch in the formulation.  (PTX0365, Handbook at 731, Table 1; *see also* PTX0364, Industrial Pharmacy at 908.)

21.    The Handbook also provides three separate entries for various forms of lactose. (PTX0365, Handbook at 385-98 (listing lactose, anhydrous; lactose, monohydrate and lactose, spray-dried).)  Anhydrous lactose functions as a binding agent, a directly compressible tablet excipient, a lyophilization aid and/or a tablet and capsule filler.  (PTX0365, Handbook at 385.) Several different brands provide different versions of commercially available anhydrous lactose that vary in the amounts and proportions of β-lactose and α-lactose.  (PTX0365, Handbook at 385.) Lactose Monohydrate is available in a wide variety of forms and functions as a binding agent, a diluent for dry-powder inhalers, a tablet binder and/or a tablet and capsule diluent.  (PTX0365, Handbook at 389; *see also* PTX0363, Pharmaceutical Dosage Forms at 157-58.)  Spray-dried lactose functions as a binding agent, a directly compressible tablet excipient, a tablet and capsule

**Exhibit 2**

diluent and/or a tablet and capsule filler. (PTX0365, Handbook at 396; *see also* PTX0364, Industrial Pharmacy at 262; PTX0363, Pharmaceutical Dosage Forms at 205-06.)

22.     The Handbook also has two entries for microcrystalline cellulose ("MCC") and silicified MCC. (PTX0365, Handbook at 132-135, 139-141.) Like the other excipients discussed in this section, MCC has multiple functions, including as a binder, an adsorbent, a suspending agent, a tablet and capsule diluent and/or a tablet disintegrant, and its function depends on, among other things, the concentration of MCC in the pharmaceutical formulation. (PTX0365, Handbook at 132, Table 1; *see also* PTX0364, Industrial Pharmacy at 908; PTX0363, Pharmaceutical Dosage Forms at 210-213, 227.) Silicified MCC "is a synergistic, intimate physical mixture of . . . [MCC] and colloidal silicon dioxide." (PTX0365, Handbook at 139; *see also* PTX0365, Handbook at 140-41.)

23.     Colloidal silicon dioxide also has a wide variety of potential functions depending on grade and concentration, including functioning as an adsorbent, an anticaking agent, an emulsion stabilizer, a glidant, a suspending agent, a tablet disintegrant, a thermal stabilizer and/or a viscosity-increasing agent. (PTX0365, Handbook at 188, Table 1; *see also* PTX0365, Handbook at 189-91.) Colloidal silicon dioxide is available in different grades with varying properties, including, pH, density, moisture content, particle size distribution and specific surface area. (PTX0365, Handbook at 188-91; *see also* PTX0364, Industrial Pharmacy at 605.)

24.     Low-substituted hydroxypropyl cellulose ("L-HPC") functions as a disintegrant and/or a binder when used in wet granulation and can be used to formulate rapidly disintegrating tablets through direct compression methods. (PTX0365, Handbook at 341; *see also* PTX0365, Handbook at 342-43; PTX0364, Industrial Pharmacy at 908 (discussing L-HPC in a "Multifunctional Excipients" section); PTX0363, Pharmaceutical Dosage Forms at 107-08.) L-

Exhibit 2

HPC is available in "a number of grades that have different particle sizes and substitution levels." (PTX0365, Handbook at 341-42 (identifying seven different L-HPC grades and explaining the various functions of these different grades in pharmaceutical formulations).)

25.     Croscarmellose sodium functions as a disintegrant for capsules, tablets and granules and may be used in direct compression and wet granulation.  (PTX0365, Handbook at 211.)  Croscarmellose sodium is available from different manufacturers with different chemical and physical characteristics, including particle size distribution.  (*See* PTX0365, Handbook at 212; *see also* PTX0364, Industrial Pharmacy at 605.)

26.     Magnesium stearate mainly functions as a lubricant in capsule and tablet manufacture but is also used in barrier creams.  (*See* PTX0365, Handbook at 430.)  Magnesium stearate is "practically insoluble in . . . water" and "may retard the dissolution of a drug from a solid dosage form."  (PTX0365, Handbook at 430-31; *see also* PTX0364, Industrial Pharmacy at 454.)

27.     Stearic acid may also function as a lubricant.  (PTX0365, Handbook at 737.)  It is mainly a tablet and capsule lubricant but may also have properties as a binder, a coating when used in combination with shellac, a sustained-release drug carrier, an emulsifying and solubilizing agent in topical formulations and/or a hardening agent in glycerin suppositories.  (PTX0365, Handbook at 737; *see also* PTX0363, Pharmaceutical Dosage Forms at 169.)  Stearic acid is also hydrophobic.  (PTX0364, Industrial Pharmacy at 454-55.)  Different grades of stearic acid have different chemical and physical properties, including freezing point.  (PTX0365, Handbook at 737-39.)

28.     Povidone is a synthetic polymer with differing degrees of polymerization, resulting in different molecular weights.  (PTX0365, Handbook at 611.)  Povidone has a variety of functions in pharmaceutical formulations, including as a disintegrant, a binder in wet-granulation, a

**Exhibit 2**

solubilizer in oral and parenteral formulation, a dissolution-enhancer for poorly soluble drugs, a coating agent and/or a suspending, stabilizing or viscosity-increasing agent in topical and oral suspensions and solutions.  (PTX0365, Handbook at 611; *see also* PTX0363, Pharmaceutical Dosage Forms at 110.)  Povidone is hygroscopic and different grades of povidone have different properties, including flowability, particle size and viscosity.  (PTX0365, Handbook at 612; *see also* PTX0365, Handbook at 613-16; PTX0364, Industrial Pharmacy at 604.)  Crospovidone is a tablet disintegrant and dissolution agent and can be used in direct compression and wet and dry granulation.  (PTX0365, Handbook at 214; *see also* PTX0363, Pharmaceutical Dosage Forms at 228.)  The particle size of crospovidone can influence disintegration of certain tablets, and crospovidone has been used as a solubility-enhancing agent to increase dissolution rate.  (PTX0365, Handbook at 214)  Crospovidone is available in a variety of different commercial grades with varying properties, including density and specific surface area.  (PTX0365, Handbook at 214)  Povidone and crospovidone may cause hydrolysis of sensitive drugs due to moisture.  (PTX0364, Industrial Pharmacy at 604; PTX0365, Handbook at 215, 612.)

29.     Polyethylene glycol ("PEG") is available in many different grades with varying molecular weights and may function as a binder, plasticizer, solvent, tablet and capsule lubricant, ointment base and/or suppository base.  (PTX0365, Handbook at 545; *see also* PTX0364, Industrial Pharmacy at 452, 905; PTX0363, Pharmaceutical Dosage Forms at 167, 173, 548-49.)  PEG is available in both solid and liquid grades and certain grades of PEG may function as suspending agents or to adjust viscosity and consistency of other suspending vehicles and may also be used as an emulsion stabilizer in conjunction with other emulsifiers.  (PTX0365, Handbook at 545-46.)  In solid-dosage forms, high-molecular-weight PEG can enhance effectiveness of tablet binders or impart plasticity to granules.  (PTX0365, Handbook at 545-46.)  PEG may also be used

10

Exhibit 2

to enhance solubility or dissolution of poorly soluble compounds and is also used in film coatings, as a lubricant and as a controlled-release agent.  (PTX0365, Handbook at 546.)

30.     Colorants and coating agents similarly come in many varying grades and can impact the functions of pharmaceutical formulations.  For example, Hypromellose is commonly used as a film-coating agent but also has binding properties and may impact drug release rates in certain formulations.  (PTX0365, Handbook at 346-49; *see also* PTX0364, Industrial Pharmacy at 904.)  The Handbook identifies 15 different grades of Hypromellose with varying viscosities.  (PTX0365, Handbook at 348.)  Talc is used in coatings but may also function as an anticaking agent, a glidant, a tablet and capsule diluent and a tablet and capsule lubricant.  (PTX0365, Handbook at 767; *see also* PTX0363, Pharmaceutical Dosage Forms at 171.)  Talc is hydrophobic, which may result in reduction of a drug formulation's wettability, prolongation of its disintegration time and decrease in the rate of dissolution.  (PTX0364, Industrial Pharmacy at 454-55.)  PEG and polyvinyl alcohol are also used in film coatings but have the additional functions discussed above.

31.     Given the wide variety in types and grades of excipients, their interactions with other excipients and the active ingredient in the drug product and the impact of the manufacturing technique on the excipient function, a POSA must carefully evaluate each excipient in a drug formulation to understand the function(s) of the excipients in any given formulation.

## II.    THE ASSERTED PATENTS

32.     United States Patent No. 10,307,419 ("the '419 patent") relates to pharmaceutical tablets that contain brexpiprazole as an active pharmaceutical ingredient.  (PTX0383, '419 Patent at 1:15-17 (BREX02073634).)  One of the stated goals is to provide tablets that have "excellent disintegration ability, storage stability, and high photostability, so that [they] can be effectively used in the medical field."  (PTX0383, '419 Patent at 3:9-11 (BREX02073635); *see also* PTX0383, '419 Patent at Abstract (BREX02073631), 1:44-47 (BREX02073634), 15:23-27

11

**Exhibit 2**

(BREX02073641).)   The '419 patent further describes how "productivity and disintegration ability" can be achieved with the disclosed formulations.   (PTX0383, at 7:33-34 (BREX02073637).)

33.   The '419 patent states that "intensive research" was conducted.  (PTX0383, at 1:52-62 (BREX02073634).)   The patent discloses uncoated tablets having a combination of "an excipient (a), a binder (b), a disintegrant (c), and a lubricant (d)" that achieve the desired properties. (PTX0383, at 3:65-67 (BREX02073635).)  The patent further identifies a range of substances that can play these enumerated roles in the inventive formulation and further identifies preferred choices.  (PTX0383, at 4:1-6:15 (BREX02073635-36).)  Among other things, the patent discloses that the inventive uncoated tablet "exhibits excellent disintegration ability and storage stability." (PTX0383, at 1:52-59 (BREX02073634).)

34.   The '419 patent further teaches, however that coated tablets are more advantageous because "[a] coated tablet (film-coated tablet) provided with a coating layer is preferable to achieve long-term storage stability and prevent degradation due to light or the like."  (PTX0383, at 6:28-31, (BREX02073636).)  As the patent explains, "higher photostability can be attained by applying a coating layer containing a colorant."  (PTX0383, at 1:60-62 (BREX02073634).)  The disclosed film-coating may include additives, such as a plasticizer, including polyethylene glycol ("PEG"), also known  as macrogol.  (PTX0383, at 6:32-41 (BREX02073636).)  The patent notes, however, that "when polyethylene glycol (macrogol) exists in the coating layer, the obtained tablet tends to have  reduced photostability and storage stability."   (PTX0383, at 6:46-49 (BREX02073636).) Thus, "it is more preferable if polyethylene glycol (macrogol) is substantially not contained." (PTX0383, at 6:49-51 (BREX02073636).)  A POSA reading this would understand that PEG may potentially lead to a less stable tablet under storage and light irradiation conditions.  Plaintiffs'

**Exhibit 2**

REXULTI® product is an embodiment of the asserted claims of the United States Reissue Patent No. RE48,059 ("the RE'059 patent") and United States Patent Nos. 8,349,840 ("the '840 patent"), 8,618,109 ("the '109 patent"), '637 and '419 patents.

### A.   Plaintiffs' REXULTI® Product Is an Embodiment of the Asserted Claims

35.     Plaintiffs' REXULTI® product is an embodiment of the asserted claims of the United States Reissue Patent No. RE48,059 ("the RE'059 patent") and United States Patent Nos. 8,349,840 ("the '840 patent"), 8,618,109 ("the '109 patent"), 9,839,637 ("the '637 patent") and '419 patents.

36.     Throughout this litigation, Defendants' have not disputed and/or provided any purported expert opinions opposing the fact that Plaintiffs' REXULTI® product is an embodiment of the asserted claims.  Still, Defendants refused to agree to the uncontested fact that Plaintiffs' REXULTI® product is an embodiment of the asserted claims of the RE'059 patent and the '840, '109, '637 and '419 patents.  Accordingly, Plaintiffs provide their support for this fact below.

### 1.   Brexpiprazole compound and composition claims

37.     ████████████████████████████████ ██ ████████

████████████████████████████████ ██ ████████

13

**Exhibit 2**





**Exhibit 2**



**Exhibit 2**



**Exhibit 2**



**Exhibit 2**



43.     Accordingly, and based on the foregoing, the 0.25, 0.5, 1, 2 and 3 mg strengths of the REXULTI® formulation are embodiments of the asserted claims 1, 2, 3, 5, 6 and 7 of the '419 patent.  Additionally, and also based on the foregoing, the 0.25, 0.5, 1, 2, 3 and 4 mg strengths of the REXULTI® formulation are embodiments of asserted claims 1, 2, 3, 7, 12 and 13 of RE'059, claims 1 and 2 of the '840 patent and claims 1 and 3 the '637 patent, the 1, 2, 3 and 4 mg strengths of the REXULTI® formulation are embodiments of asserted claims 4, 5, 6 and 8 of the '637 patent, and the 1 mg strength of the REXULTI® formulation is an embodiment of asserted claim 7 of the '637 patent.

Exhibit 2

2.      **Method of treatment claims**

44.     The product labeling for Otsuka's REXULTI® product indicates that the active ingredient is brexpiprazole and further includes the following approved indications:

**1    INDICATIONS AND USAGE**

REXULTI is indicated for:
- Adjunctive treatment of major depressive disorder (MDD) in adults.
- Treatment of schizophrenia in adults and pediatric patients ages 13 years and older

(PTX0966, BREX02074171.)

45.     Accordingly, Plaintiffs' REXULTI® product, used according to its approved uses, meets all elements of asserted claims 4 and 5 of the '840 patent, asserted claims 1 and 2 of the '109 patent and asserted claims 9 and 10 of the '637 patent.

## III.    LEVEL OF ORDINARY SKILL IN THE ART

### A.      Pharmaceutical Composition and Formulation Related Subject Matter

46.     The person of ordinary skill in the art ("POSA") to whom all of the pharmaceutical composition and formulation subject matter in the Patents-In-Suit are addressed would have an advanced degree in chemistry, pharmacy, engineering or a related field, with 2-3 years of pharmaceutical formulation experience.  Alternatively, a POSA in this field would have an undergraduate degree in chemistry, pharmacy, engineering or a related field with 5-10 years of pharmaceutical formulation experience.  A POSA in this field often works with others, including, for example, medicinal chemists, analytical chemists and others, in developing and analyzing pharmaceutical products.

### B.      Treatment Related Subject Matter

47.     The POSA to whom all of the treatment related subject matter would have a medical degree and specialty training in psychiatry, with several years of treating patients suffering from

20

**Exhibit 2**

central nervous system-related disorders, or would have a medical degree or Ph.D. in a relevant science, such as neuropsychopharmacology, and several years of experience in researching antipsychotic/antidepressant drugs.

**EXHIBIT 2(A)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD. and H. LUNDBECK A/S, ) ) ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 19-cv-1938-LPS |
| v. ) | (consolidated) |
| ) | |
| ZENARA PHARMA PRIVATE LTD., et al. ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PLAINTIFFS' STATEMENT OF CONTESTED
FACTS REGARDING INFRINGEMENT
APPENDIX A (APOTEX)**

# Exhibit 2A

## Filed Under Seal

**EXHIBIT 2(B)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD. and H. LUNDBECK A/S, <br><br> Plaintiffs, <br><br> v. <br><br> ZENARA PHARMA PRIVATE LTD., et al. <br><br> Defendants. | Civil Action No. 19-cv-1938-LPS (consolidated) |

**PLAINTIFFS' STATEMENT OF CONTESTED
FACTS REGARDING INFRINGEMENT
APPENDIX B (MSN)**

# Exhibit 2B

## Filed Under Seal

**EXHIBIT 2(C)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD. and H. LUNDBECK A/S, <br><br> Plaintiffs, <br><br> v. <br><br> ZENARA PHARMA PRIVATE LTD., et al. <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 19-cv-1938-LPS <br> ) (consolidated) <br> ) <br> ) <br> ) <br> ) <br> ) |

**PLAINTIFFS' STATEMENT OF CONTESTED
FACTS REGARDING INFRINGEMENT
APPENDIX C (OPTIMUS)**

**EXHIBIT 2(C)**

**Table of Contents**

I.  Optimus's Generic Brexpiprazole Products Infringe the Asserted Claims of the
    '419 Patent ................................................................................................................ 1

    A.  Development of Optimus's Generic Brexpiprazole Tablet Products ..................... 1

    B.  The Contents and Method of Manufacturing Optimus's Generic
    Brexpiprazole Tablet Products................................................................................. 9

    C.  The Properties of Optimus's Generic Brexpiprazole Tablet Products................. 15

    D.  Optimus's Generic Brexpiprazole Tablet Products and Their Intended Use........ 17

    E.  Optimus's Generic Brexpiprazole Tablet Products Meet all Elements of
    the Asserted Claims of the RE'059 Patent............................................................. 17

        1.  Claim 1 ...................................................................................................... 18

        2.  Claim 2 ...................................................................................................... 18

        3.  Claim 3 ...................................................................................................... 18

        4.  Claim 7 ...................................................................................................... 18

        5.  Claim 9 ...................................................................................................... 19

        6.  Claim 12 .................................................................................................... 19

        7.  Claim 13 .................................................................................................... 20

        8.  Claim 14 .................................................................................................... 20

        9.  Claim 15 .................................................................................................... 20

    F.  Optimus's Generic Brexpiprazole Tablet Products Meet all Elements of
    the Asserted Claims of the '637 Patent.................................................................. 21

        1.  Claim 1 ...................................................................................................... 21

        2.  Claim 3 ...................................................................................................... 22

        3.  Claim 4 ...................................................................................................... 22

        4.  Claim 5 ...................................................................................................... 22

        5.  Claim 6 ...................................................................................................... 23

        6.  Claim 7 ...................................................................................................... 23

## EXHIBIT 2(C)

7. Claim 8 ........................................................................................................ 24

8. Claim 9 ........................................................................................................ 24

9. Claim 10 ...................................................................................................... 24

G. Optimus's Generic Brexpiprazole Tablet Products Meet all Elements of the Asserted Claims of the '840 Patent ............................................................. 25

1. Claim 1 ........................................................................................................ 25

2. Claim 2 ........................................................................................................ 25

3. Claim 4 ........................................................................................................ 26

4. Claim 5 ........................................................................................................ 26

H. Optimus's Generic Brexpiprazole Tablet Products Meet all Limitations of the Asserted Claims 1 and 2 of the '109 Patent ...................................... 27

1. Claim 1 ........................................................................................................ 27

2. Claim 2 ........................................................................................................ 27

I. Optimus's Generic Brexpiprazole Tablet Products Meet all Elements of the Asserted Claims of the '419 Patent ............................................................. 28

1. Claim 1 ........................................................................................................ 28

2. Claim 2 ........................................................................................................ 33

3. Claim 3 ........................................................................................................ 35

4. Claim 4 ........................................................................................................ 35

5. Claim 5 ........................................................................................................ 36

6. Claim 6 ........................................................................................................ 36

7. Claim 7 ........................................................................................................ 38

**EXHIBIT 2(C)**

I.     **OPTIMUS'S GENERIC BREXPIPRAZOLE PRODUCTS INFRINGE THE ASSERTED CLAIMS OF THE '419 PATENT**

1.      Plaintiffs will demonstrate in the present litigation that Optimus Pharma Pvt. Ltd.'s ("Optimus's") generic brexpiprazole tablet products infringe claims 1, 2, 3, 7, 9, 12, 13, 14 and 15 of U.S. Reissue Patent No. RE48'059 ("the RE'059 patent").

2.      Plaintiffs will demonstrate in the present litigation that Optimus's generic brexpiprazole tablet products infringe claims 1, 3, 4, 5, 6, 7, 8, 9 and 10 of U.S. Patent No. 9,839,637 ("the '637 patent").

3.      Plaintiffs will demonstrate in the present litigation that Optimus's generic brexpiprazole tablet products infringe claims 1 and 2 of U.S. Patent No. 8,618,109 ("the '109 patent").

4.      Plaintiffs will demonstrate in the present litigation that Optimus's generic brexpiprazole tablet products infringe claims 1, 2, 4 and 5 of U.S. Patent No. 8,349,840 ("the '840 patent").

5.      Plaintiffs will demonstrate in the present litigation that Optimus's generic brexpiprazole tablet products infringe claims 1, 2, 3, 4, 5, 6 and 7 of U.S. Patent No. 10,307,419 ("the '419 patent").

   **A.     Development of Optimus's Generic Brexpiprazole Tablet Products**

6.      Optimus describes the development of its generic brexpiprazole tablet products in its Pharmaceutical Development Report, submitted as part of its ANDA.  (*See* Chowdary Tr. at 78:4-7 (confirming that the Product Development Report, PTX0137, Chowdary Ex. 3, accurately describes Optimus's development of its generic brexpiprazole tablet products).)   The Pharmaceutical Development Report indicates that the ███████████████████████  for Optimus's generic brexpiprazole tablet products ████████████████████████████

**EXHIBIT 2(C)**



(PTX0137, Chowdary Ex. 3 at OPTIBREX_001312.)   Consistent with this description, the Pharmaceutical Development Report includes an analysis of the REXULTI® product, detailed This section discusses the drug release characteristics of REXULTI®, including disintegration and dissolution profiles of the various tablet strengths.  (PTX0137, Chowdary Ex. 3 at OPTIBREX_001319-20.)

7.    This section further discusses the physical and chemical characteristics of REXULTI® and the active ingredient included in the REXULTI® tablet formulation:

**EXHIBIT 2(C)**

Table 3. Physicochemical characterization of REXULTI® (Brexpiprazole) Tablets.

| Parameter | Results | | | | | |
|---|---|---|---|---|---|---|
| Strength | 0.25 mg | 0.5 mg | 1 mg | 2 mg | 3 mg | 4 mg |
| Brand Name | Rexulti® | Rexulti® | Rexulti® | Rexulti® | Rexulti® | Rexulti® |
| Batch / Lot Number | BJS03418B | BKS01418A | BLS03218A | BMS03718A | BNS04618A | BPS02118A |
| Expiry date | Feb/2021 | Feb/2021 | May/2021 | May/2021 | Dec/2020 | Dec/2020 |
| Label claim | Each tablet contains 0.25mg of Brexpiprazole | Each tablet contains 0.5mg of Brexpiprazole | Each tablet contains 1mg of Brexpiprazole | Each tablet contains 2mg of Brexpiprazole | Each tablet contains 3mg of Brexpiprazole | Each tablet contains 4mg of Brexpiprazole |
| NDC Code | 59148-035-13 | 59148-036-13 | 59148-037-13 | 59148-038-13 | 59148-039-13 | 59148-040-13 |
| Manufactured by | Otsuka Pharmaceutical Co., Ltd., Tokyo, 101-8535 Japan | | | | | |
| Description | Light brown; round; shallow convex; bevel-edged marked with "BRX" and "0.25" one side and plain on other side | Light orange Round; shallow convex; bevel-edged marked with "BRX" and "0.5" one side and plain on other side | Light yellow Round; shallow convex; bevel-edged marked with "BRX" and "1" one side and plain on other side | Light green Round; shallow convex; bevel-edged marked with "BRX" and "2" one side and plain on other side | Light purple Round; shallow convex; bevel-edged marked with "BRX" and "3" one side and plain on other side | White Round; shallow convex; bevel-edged marked with "BRX" and "4" one side and plain on other side |
| Average weight (mg) | 94.40 | 94.30 | 94.10 | 93.55 | 93.58 | 94.12 |
| Diameter (mm) | 6.02 | 6.03 | 6.02 | 6.02 | 6.03 | 6.02 |
| Thickness (mm) | 2.84-2.86 | 2.80-2.82 | 2.80-2.81 | 2.76-2.79 | 2.79-2.80 | 2.79-2.81 |
| Hardness (kP) | 5.19 | 5.75 | 6.14 | 6.68 | 5.95 | 6.55 |
| Disintegration time (min:sec) | 1:01 | 1:05 | 1:16 | 1:30 | 1:03 | 1:13 |
| Coating | Film coating | | | | | |

**EXHIBIT 2(C)**



| Parameter | Results | | | | | |
|---|---|---|---|---|---|---|
| Strength | 0.25 mg | 0.5 mg | 1 mg | 2 mg | 3 mg | 4 mg |
| Brand Name | Rexulti® | Rexulti® | Rexulti® | Rexulti® | Rexulti® | Rexulti® |
| **Dissolution in 900 mL of 0.05M Acetate buffer with Paddle at 50 RPM** | | | | | | |
| %Dissolution at 30 minutes | Min:87%<br>Max:92%<br>**Mean :89%**<br>%RSD:2.4% | Min:92%<br>Max:94%<br>**Mean :93%**<br>%RSD:0.8% | Min:89%<br>Max:95%<br>**Mean :92%**<br>%RSD:2.7% | Min:88%<br>Max:91%<br>**Mean :89%**<br>%RSD:1.2% | Min:92%<br>Max:95%<br>**Mean :93%**<br>%RSD:1.3% | Min:93%<br>Max:95%<br>**Mean :94%**<br>%RSD:0.8% |
| Assay (% w/w of label claim) | 102.1 | 101.1 | 101.6 | 101.0 | 101.5 | 100.0 |
| **Organic Impurities** | | | | | | |
| BXP N-Oxide impurity (% w/w) | 0.06 | 0.03 | 0.01 | 0.003 | ND | ND |
| Any unspecified impurity (% w/w) | 0.05 | 0.05 | 0.05 | 0.04 | 0.03 | 0.03 |
| Total impurities (% w/w) | 0.40 | 0.22 | 0.17 | 0.11 | 0.11 | 0.09 |

ND – Not detected

(PTX0137, Chowdary Ex. 3 at OPTIBREX_001319-20.)

8. In Section 1.2.5, Composition, the Pharmaceutical Development Report states that the composition of Optimus's generic brexpiprazole tablet products were ███████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████

9. The Product Development Report provides a comparison of excipients in Optimus's generic brexpiprazole tablet products and REXULTI®:

**EXHIBIT 2(C)**



(PTX0137, Chowdary Ex. 3 at OPTIBREX_001327.)  It also provides the following excipient

justification:

**EXHIBIT 2(C)**



(PTX0137, Chowdary Ex. 3 at OPTIBREX_001328.)

     10.    The Pharmaceutical Development Report further describes ▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

     11.    The Pharmaceutical Development Report ▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**EXHIBIT 2(C)**



12.     The Product Development Report further states, ███████████████

███████████████████████████████████████ ████████████

██████████████████████████████████ (PTX0137, Chowdary

Ex. 3 at OPTIBREX_001328.)  It also states that ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██ █ ████████ (Brexpiprazole)   Tablets.    (PTX0137,   Chowdary   Ex.   3   at

OPTIBREX_001347-48.)

13.     Optimus's Quality Overall Summary reports on the final formulation and

manufacturing method, further discussed below, and also provides the following comparison of

the components of REXULTI® to Optimus's generic brexpiprazole formulation, noting their

similarity:

**EXHIBIT 2(C)**



(PTX0136, Chowdary Ex. 2 at OPTIBREX_000552-53.)  It also provides a comparative analysis

for the test product and RLD:

Table 10. Comparative analysis of test product and RLD



| Parameter | Test Product (Batch Number.:1812120A) | Reference Product (Lot Number.: BMS03718A) |
|---|---|---|
| AR Number | QCMS190127 | QCMS190089 |
| Strength | 2 mg | 2 mg |
| Description | Round, light green colour film coated tablet engraved with "2" on one side and plain on other side. | Light green round, shallow convex, bevel-edged tablets engraved with "BRX" on one side and "2" on the other side. |
| Identification by HPLC | The retention time of the major peak in the chromatogram of test preparation is correspond to that in the chromatogram of standard preparation as obtained under assay by HPLC method. | |
| Assay (% w/w) | 100.5% | 101.0% |
| Dissolution in OGD (% Drug released) | | |
| 10 minutes | 77 | 76 |
| 15 minutes | 86 | 87 |
| 20 minutes | 89 | 91 |
| 30 minutes | 92 | 95 |
| 45 minutes | 92 | 95 |



Figure 1. Comparative dissolution profile of test and reference product on OGD media

(PTX0136, Chowdary Ex. 2 at OPTIBREX_000553.)

EXHIBIT 2(C)

**B.** **The Contents and Method of Manufacturing Optimus's Generic Brexpiprazole Tablet Products**

14.     The contents of Optimus's generic brexpiprazole tablet products are described in the ANDA documents.  The following chart in Optimus's Quality Overall Summary, submitted in its ANDA, describes the contents of the tablet cores:



**EXHIBIT 2(C)**



(*See* PTX0136, Chowdary Ex. 2 at OPTIBREX_000546-48.)  And the following charts describe

the components of the tablet coatings:

**EXHIBIT 2(C)**



**EXHIBIT 2(C)**



**EXHIBIT 2(C)**

15.     These charts identify nominal functions of the excipients, but Optimus's regulatory submissions report that each of these components may impact the dissolution and/or disintegration of the tablet product and also impacts other properties of the finished tablet dosage form.

16.     Optimus's generic brexpiprazole tablet products are manufactured by employing a wet granulation method to produce granules that are compressed to form the uncoated tablet cores, which are subsequently coated.  This process is described in Optimus's regulatory submissions as follows:

13

**EXHIBIT 2(C)**

Figure 14. The unit operations in the drug product manufacturing process:



**EXHIBIT 2(C)**



**C.    The Properties of Optimus's Generic Brexpiprazole Tablet Products**

17.    Both Optimus's regulatory submissions and Optimus's corporate witness confirm that Optimus's generic brexpiprazole tablet products are pharmaceutically equivalent to

15

**EXHIBIT 2(C)**

REXULTI®, are bioequivalent to REXULTI®, and possess dissolution and disintegration profiles similar to those of REXULTI®.  Specifically, the Product Development Report confirms that the following formulation attributes were studied to develop a generic product with acceptable dissolution and disintegration times, based on the REXULTI® dissolution and disintegration times. (PTX0137, Chowdary Ex. 3 at OPTIBREX_001401.)  Mr. Chowdary also verified that Optimus's generic brexpiprazole tablet products "are bio-equivalent to REXULTI[®]."  (Chowdary Tr. at 150:21-151:1.)  Moreover, Optimus ensured that the formulation variables did not negatively impact dissolution and disintegration of the generic brexpiprazole tablet products and therefore that the quality product attributes did not differ substantially from the reference drug product, REXULTI®.   (PTX0137,  Chowdary  Ex.  3  at  OPTIBREX_001401.)    Optimus's  generic brexpiprazole tablet products are also shelf stable and photostable.  Optimus, for example, studied the stability of all strengths and samples it studied for "stability at accelerated condition . . . for a period of 6 months."  (PTX0137, Chowdary Ex. 3 at OPTIBERX_001375-78.)  And Optimus completed an 18-month long-term stability study that was submitted as part of its ANDA, and Optimus's corporate witness confirmed that Optimus's generic brexpiprazole tablet products are stable and that Optimus is also completing 24-month and 36-month stability studies.  (*See generally* PTX0139, Chowdary Ex. 5; *see also* Chowdary Tr. at 91:7-95:14.)

18. Finally, Optimus's generic brexpiprazole tablet products were designed to have sufficient hardness, uniformity of distribution and non-friability.  (PTX0137, Chowdary Ex. 3 at OPTIBREX_001331-32.)

19. The proposed product label for the generic brexpiprazole tablet products that are the subject of Optimus's ANDA state that its generic brexpiprazole tablet products are indicated for the treatment of schizophrenia and for the adjunctive treatment of major depressive disorder.

**EXHIBIT 2(C)**

  **D.**   **Optimus's Generic Brexpiprazole Tablet Products and Their Intended Use**

  20.   Optimus's proposed package insert is substantially identical to the REXULTI®

package insert. (*See* PTX0141, Chowdary Ex. 7 at OptimusBrex2_00075671-701; *see also*

PTX0377, Highlights of Prescribing Information at OPTIBREX_000100-132.)  Among other

things, Optimus's proposed package insert indicates that Optimus seeks approval of its generic

brexpiprazole tablet products for the treatment of schizophrenia and as an adjunctive treatment for

major depressive disorder:

**1  INDICATIONS AND USAGE**

Brexpiprazole tablets are indicated for:

- Adjunctive treatment of major depressive disorder (MDD) *[see Clinical Studies (14.1)]*.
- Treatment of schizophrenia *[see Clinical Studies (14.2)]*.

(*See* PTX0141, Chowdary Ex. 7 at OptimusBrex2_00075672.)

  21.   Optimus, by distributing its generic brexpiprazole tablet product with the proposed

label, will knowingly encourage, recommend, and promote, and thus induce, infringement of the

asserted method claims of the '840, '109 and '637 patents by healthcare providers and/or patients.

Optimus's ANDA product is a material part of the claimed methods and does not have substantial

non-infringing uses.  Moreover, Optimus has knowledge of the patents in suit.

  **E.**   **Optimus's Generic Brexpiprazole Tablet Products Meet all Elements of the Asserted Claims of the RE'059 Patent**

  22.   Optimus's 0.25, 0.5, 1, 2, 3 and 4 mg generic brexpiprazole tablet products that are

the subject of ANDA No. 213758 meet every limitation of claims 1, 2, 3, 7, 9, 12, 13, 14 and 15

of the RE'059 patent.

  23.   Throughout this litigation, Optimus has not disputed and/or provided purported

expert opinions involving any alleged noninfringement the RE'059 patent.  Still, Optimus refused

17

<u>EXHIBIT 2(C)</u>

to agree to the uncontested fact that Optimus has infringed the asserted claims of the RE'059 patent.  Accordingly, Plaintiffs provide their support for these facts below.

        **1.**      **Claim 1**

24.     The heterocyclic compounds described in claim 1 include brexpiprazole and Optimus's generic brexpiprazole tablet products contain brexpiprazole.  Thus, Optimus's generic brexpiprazole tablet products infringe claim 1 of the RE'059 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

        **2.**      **Claim 2**

25.     The heterocyclic compounds described in claim 2 include brexpiprazole and Optimus's generic brexpiprazole tablet products contain brexpiprazole.  Thus, Optimus's generic brexpiprazole tablet products infringe claim 2 of the RE'059 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

        **3.**      **Claim 3**

26.     The heterocyclic compounds described in claim 3 include brexpiprazole and Optimus's generic brexpiprazole tablet products contain brexpiprazole.  Thus, Optimus's generic brexpiprazole tablet products infringe claim 3 of the RE'059 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

        **4.**      **Claim 7**

27.     Brexpiprazole is 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-IH-quinolin-2-one, and Optimus's generic brexpiprazole tablet products contain brexpiprazole.  Thus, Optimus's generic brexpiprazole tablet products infringe claim 7 of the RE'059 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

**EXHIBIT 2(C)**

5.      **Claim 9**

28.      Optimus did not produce documents detailing the route of synthesis used in the manufacture of the brexpiprazole active pharmaceutical ingredient contained in its generic brexpiprazole tablet products. ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████     ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████      Accordingly, the route of synthesis used in the manufacture of the active pharmaceutical ingredient contained in Optimus's generic brexpiprazole tablet products meets each and every element of claim 9 of the RE'059 patent.  Further, the brexpiprazole active pharmaceutical ingredient is not materially changed when incorporated into Optimus's generic brexpiprazole tablet products; nor is it a trivial or nonessential component of Optimus's generic brexpiprazole tablet products.  Thus, Optimus's generic brexpiprazole tablet products infringe claim 9 of the RE'059 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

6.      **Claim 12**

29.      Brexpiprazole      is      7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-IH-quinolin-2-one, and Optimus's generic brexpiprazole tablet products contain brexpiprazole.  Thus,

**EXHIBIT 2(C)**

Optimus's generic brexpiprazole tablet products infringe claim 12 of the RE'059 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

### 7.      Claim 13

30.      Brexpiprazole       is       7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-IH-quinolin-2-one, and Optimus's generic brexpiprazole tablet products contain brexpiprazole.  Thus, Optimus's generic brexpiprazole tablet products infringe claim 13 of the RE'059 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

### 8.      Claim 14

31.      Brexpiprazole       is       7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one, and Optimus's generic brexpiprazole tablet products contain brexpiprazole that is manufactured according to claim 9, that is not materially changed by subsequent processes, and that is not a trivial or nonessential component of Optimus's generic brexpiprazole tablet products.  Thus, Optimus's generic brexpiprazole tablet products infringe claim 14 of the RE'059 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

### 9.      Claim 15

32.      Brexpiprazole       is       7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one, and Optimus's generic brexpiprazole tablet products contain brexpiprazole that is manufactured according to claim 9, that is not materially changed by subsequent processes, and that is not a trivial or nonessential component of Optimus's generic brexpiprazole tablet products.  Thus, Optimus's generic brexpiprazole tablet products infringe claim 15 of the RE'059 patent.

EXHIBIT 2(C)

Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

> **F.    Optimus's Generic Brexpiprazole Tablet Products Meet all Elements of the Asserted Claims of the '637 Patent**

33.    Optimus's 0.25, 0.5, 1, 2, 3 and 4 mg generic brexpiprazole tablet products that are the subject of ANDA No. 213758 meet every limitation of claims 1, 3, 4, 5, 6, 7, 8, 9 and 10 of the '637 patent.

34.    Throughout this litigation, Optimus has not disputed and/or provided purported expert opinions involving any alleged noninfringement the '637 patent.  Still, Optimus refused to agree to the uncontested fact that Optimus has infringed the asserted claims of the '637 patent. Accordingly, Plaintiffs provide their support for these facts below.

> **1.    Claim 1**

35.    The heterocyclic compounds described in claim 1 include brexpiprazole. Optimus's generic brexpiprazole tablet products include brexpiprazole as the active ingredient.

36.    Claim 1 also requires a "pharmaceutically acceptable carrier."  The excipients used in Optimus's generic brexpiprazole tablet products, including at least the specific grades of lactose, corn starch, microcrystalline cellulose, hydroxypropyl methylcellulose and low-substituted hydroxypropyl cellulose, are pharmaceutically acceptable carriers.  Thus, Optimus's generic brexpiprazole tablet products meet all of the limitations of claim 1 and thus infringe claim 1 of the '637 patent.

37.    Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

**EXHIBIT 2(C)**

2.     **Claim 3**

38.     Claim 3 requires "[a] pharmaceutical composition comprising 7-[4-(4-benzo[b] thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one and a pharmaceutically acceptable carrier." Brexpiprazole is 7-[4-(4-benzo[b] thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one and Optimus's generic brexpiprazole tablet products contain brexpiprazole and a pharmaceutically acceptable carrier.  Thus, Optimus's generic brexpiprazole tablet products infringe claim 3 of the '637 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

3.     **Claim 4**

39.     Claim 4 depends from claim 3, and thus includes all of the elements of that claim, but further requires that "the 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one is present in the pharmaceutical composition in an amount ranging from 1% to 70% by weight." The 1, 2, 3 and 4 mg strengths of Optimus's generic brexpiprazole tablet products contain 1.1%, 2.2%, 3.2% and 4.3% brexpiprazole.  Accordingly, these strengths meet the percentage weight requirements of claim 4.  These tablet strengths also meet the remaining elements of claim 4.  Thus, 1, 2, 3 and 4 mg strengths of Optimus's generic brexpiprazole tablet products infringe claim 4 of the '637 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

4.     **Claim 5**

40.     Claim 5 depends from claim 3, and thus includes all of the elements of that claim, but further requires that the 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one is present in the pharmaceutical composition in an amount ranging from 1% to 30% by weight. The 1, 2, 3 and 4 mg strengths of Optimus's generic brexpiprazole tablet products contain 1.1%, 2.2%, 3.2% and 4.3% brexpiprazole.  Accordingly, these strengths meet the percentage weight

22

<u>**EXHIBIT 2(C)**</u>

requirements of claim 5.  These tablet strengths also meet the remaining elements of claim 4.  Thus, the 1, 2, 3 and 4 mg strengths of Optimus's generic brexpiprazole tablet products infringe claim 5 of the '637 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

### 5.    Claim 6

41.    Claim 6 depends from claim 3, and thus includes all of the elements of that claim, but further requires that the 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one is present in the pharmaceutical composition in an amount ranging from 1 to 200 mg.  The 1, 2, 3 and 4 mg strengths of Optimus's generic brexpiprazole tablet products contain 1, 2, 3 and 4 mg of brexpiprazole, respectively.  Accordingly, these strengths meet the weight requirements of claim 6.  These tablet strengths also meet the remaining elements of claim 6.  Thus, the 1, 2, 3 and 4 mg strengths of Optimus's generic brexpiprazole tablet products infringe claim 6 of the '637 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

### 6.    Claim 7

42.    Claim 7 depends from claim 3, and thus includes all of the elements of that claim, but further requires that the 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one is present in the pharmaceutical composition in an amount of about 1 mg.  The 1 mg strength of Optimus's generic brexpiprazole tablet products contains 1 mg of brexpiprazole.  Accordingly, this strength meets the weight requirements of claim 7.  This tablet strength also meets the remaining elements of claim 7.  Thus, the 1 mg strength of Optimus's generic brexpiprazole tablet products infringes claim 7 of the '637 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

EXHIBIT 2(C)

### 7.   Claim 8

43.   Claim 8 depends from claim 6, and thus includes all of the elements of that claim, but further requires that the pharmaceutical composition is in the form of a tablet.  The 1, 2, 3 and 4 mg strengths of Optimus's generic brexpiprazole tablet products are tablets.  Accordingly, these strengths meet this element of claim 8.  These tablet strengths also meet the remaining elements of claim 6.  Thus, the 1, 2, 3 and 4 mg strengths of Optimus's generic brexpiprazole tablet products infringe claim 8 of the '637 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

### 8.   Claim 9

44.   The indication in Optimus's proposed package insert "major depressive disorder" is "major depression" as referenced in claim 9.  Moreover, "7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one" described in claim 3, from which claim 9 depends, is brexpiprazole.  Optimus's generic brexpiprazole tablet products, if approved and marketed, will be prescribed by healthcare providers and used by patients as an adjunctive treatment for major depressive disorder thereby infringing claim 9 of the '637 patent, and Optimus will induce and contribute to that infringement of claim 9 of the '637 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

### 9.   Claim 10

45.   The indication in Optimus's proposed package insert "Treatment of Schizophrenia" is the same as the "method for treating schizophrenia" referenced in claim 10. Moreover, "7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one" described in claim 3, from which claim 10 depends, is brexpiprazole.  Optimus's generic brexpiprazole tablet products, if approved and marketed, will be prescribed by healthcare providers and used by patients in treating schizophrenia thereby infringing claim 10 of the '637 patent, and Optimus will induce and

EXHIBIT 2(C)

contribute to that infringement of claim 10 of the '637 patent. Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

### G. Optimus's Generic Brexpiprazole Tablet Products Meet all Elements of the Asserted Claims of the '840 Patent

46.     Optimus's 0.25, 0.5, 1, 2, 3 and 4 mg generic brexpiprazole tablet products that are the subject of ANDA No. 213758 meet every limitation of claims 1, 2, 4 and 5 of the '840 patent.

47.     Throughout this litigation, Optimus has not disputed and/or provided purported expert opinions involving any alleged noninfringement the '840 patent. Still, Optimus refused to agree to the uncontested fact that Optimus has infringed the asserted claims of the '840 patent. Accordingly, Plaintiffs provide their support for these facts below.

#### 1.     Claim 1

48.     The heterocyclic compounds described in claim 1 include brexpiprazole. Optimus's generic brexpiprazole tablet products contain brexpiprazole as the active ingredient.

49.     Claim 1 also requires a "pharmaceutically acceptable carrier." The excipients used in Optimus's generic brexpiprazole tablet products, including at least the specific grades of lactose monohydrate, corn starch, microcrystalline cellulose, hydroxypropyl methyl cellulose and low-substituted hydroxypropyl cellulose, are pharmaceutically acceptable carriers. Thus, Optimus's generic brexpiprazole tablet products meet all of the limitations of claim 1 and thus infringe claim 1 of the '840 patent.

50.     Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

#### 2.     Claim 2

51.     Independent claim 2 of the '840 patent claims "[a] pharmaceutical composition comprising a heterocyclic compound or a salt thereof selected from the group of . . . 7-[4-(4-

**EXHIBIT 2(C)**

benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one. . . or a salt thereof, as an active ingredient and a pharmaceutically acceptable carrier. Brexpiprazole is 7-[4-(4-benzo[b] thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one and Optimus's generic brexpiprazole tablet products contain brexpiprazole and a pharmaceutically acceptable carrier.   Thus, Optimus's generic brexpiprazole tablet products infringe claim 2 of the '840 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

### 3.      Claim 4

52.      Claim 4, which recites major depression, encompasses the adjunctive treatment for MDD expressly listed in Optimus's proposed package insert.   Moreover, Optimus's generic brexpiprazole tablet products, if approved and marketed, will be prescribed by healthcare providers and used by patients as an adjunctive treatment for major depressive disorder thereby infringing claim 4 of the '840 patent, and that Optimus will induce and contribute to that infringement of claim 4 of the '840 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

### 4.      Claim 5

53.      Optimus's generic brexpiprazole tablet products, used according to Optimus's proposed package insert, meet all of the claim elements of asserted claim 5 of the '840 patent. Optimus's generic brexpiprazole tablet products, if approved and marketed, will be prescribed by healthcare providers and used by patients as an adjunctive treatment for major depressive disorder thereby infringing claim 4 of the '840 patent (the claim from which claim 5 depends), and that Optimus will induce and contribute to that infringement of claim 4 of the '840 patent.  Moreover, "7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one" is brexpiprazole and that Optimus's generic brexpiprazole tablet products contain brexpiprazole.  Thus, Optimus's generic brexpiprazole tablet products, if approved and marketed, will be prescribed by healthcare

26

<u>EXHIBIT 2(C)</u>

providers and used by patients as an adjunctive treatment for major depressive disorder thereby infringing claim 5 of the '840 patent, and that Optimus will induce and contribute to that infringement of claim 5 of the '840 patent. Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

### H. Optimus's Generic Brexpiprazole Tablet Products Meet all Limitations of the Asserted Claims 1 and 2 of the '109 Patent

54. Optimus's generic brexpiprazole tablet products that are the subject of ANDA No. 213758 meet every limitation of claim 1 and 2 of the '109 patent.

55. Throughout this litigation, Optimus has not disputed and/or provided purported expert opinions involving any alleged noninfringement the '109 patent. Still, Optimus refused to agree to the uncontested fact that Optimus has infringed the asserted claims of the '109 patent. Accordingly, Plaintiffs provide their support for these facts below.

#### 1. Claim 1

56. The indication in Optimus's proposed package insert "Treatment of Schizophrenia" is the same as the "method for treating schizophrenia" referenced in claim 1. Moreover, Optimus's generic brexpiprazole tablet products, if approved and marketed, will be prescribed by healthcare providers and used by patients in treating schizophrenia thereby infringing claim 1 of the '109 patent, and that Optimus will induce and contribute to that infringement of claim 1 of the '109 patent. Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

#### 2. Claim 2

57. Claim 2 references the method described in claim 1 and the indication in Optimus's proposed package insert "Treatment of Schizophrenia" is the same as the method of treatment descried in claim 1. Moreover, "7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-

EXHIBIT 2(C)

quinolin-2-one" described in claim 2 is brexpiprazole.  Accordingly, Optimus's generic brexpiprazole tablet products, if approved and marketed, will be prescribed by healthcare providers and used by patients in treating schizophrenia thereby infringing claim 2 of the '109 patent, and that Optimus will induce and contribute to that infringement of claim 2 of the '109 patent.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim.

## I.    Optimus's Generic Brexpiprazole Tablet Products Meet all Elements of the Asserted Claims of the '419 Patent

58.    Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products that are the subject of ANDA No. 213758 meet every limitation of claims 1, 2, 3, 4, 5, 6 and 7 of the '419 patent.

59.    Throughout this litigation, Optimus has only disputed and/or provided purported expert opinions involving any alleged noninfringement of the binder (b) element of claim 1.  At no point in this litigation has Optimus disputed or provided any purported expert opinions involving any alleged noninfringement of any other elements of these claims.  Still, Optimus refused to agree to the uncontested fact that Optimus has only disputed any alleged noninfringement of the binder (b) element of claim 1.  Accordingly, Plaintiffs provide their support for these facts below.

### 1.    Claim 1

60.    Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products literally meet the "A tablet comprising 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one … as an active ingredient … wherein the uncoated tablet comprises 0.05 to 25% by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one" limitation.  Optimus's generic brexpiprazole tablet products contain 0.25, 0.5, 1, 2 and 3 mg of

<u>EXHIBIT 2(C)</u>

brexpiprazole, respectively, and each uncoated tablet weighs 90 mg.  (*See* PTX0136, Chowdary

Ex. 2 at OPTIBREX_000546-47.)  The brexpiprazole thus amounts to 0.28%, 0.56 %, 1.11%,

2.22% and 3.33%, respectively, of the total weight of the uncoated tablets, all of which fall within

the claimed range of 0.05 to 25% of the uncoated tablet.  Optimus has not disputed nor provided

any purported expert opinion regarding any alleged noninfringement of this claim element.

61.     Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products literally

meet the excipient (a) limitation. ██████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

**EXHIBIT 2(C)**



62.

Any differences between how the Optimus formulation and the claimed formulation binds together the components of the formulation are insubstantial, and the binding of components has substantially the same function in the formulation to hold the components of the granules and tablet together, in substantially the same way by causing the components to adhere together, to obtain the same result of a tablet with appropriate integrity and dissolution and disintegration characteristics that are comparable to an embodiment of the '419 patent claims, REXULTI®.

**EXHIBIT 2(C)**

63.     The '419 patent specification does not disclose the specific grade of hydroxypropyl methylcellulose, in conjunction with the other excipients, ███████████████████████████ ████████████████ and manufactured using the process described in Optimus's ANDA.

64.     Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products literally meet the disintegrant (c) limitation.  Optimus's generic brexpiprazole tablet products ███████ ██████████████████████████████████████████████████████████ ███████  For Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products, the amount of ████████████████████████████████████████████████████ ██████████████████████████  Thus, Optimus's 0.25, 0.5, 1, 2, and 3 mg generic brexpiprazole tablet products fall within the claimed range of 1 to 25% and meet the above claim limitation.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim element.

65.     Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products literally meet the lubricant (d) limitation.  ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████  Thus, Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products fall within the claimed range of 0.1 to 10% and meet the above claim limitation. Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim element.

66.     Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products include a coating on the outer surface of the tablet and therefore, Optimus's 0.25, 0.5, 1, 2 and 3 mg generic

<u>**EXHIBIT 2(C)**</u>

brexpiprazole tablet products literally meet "the tablet further comprising a coating layer on the surface thereof" limitation.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim element.

67.     Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products literally meet the "wherein said coating comprises hydroxypropyl methylcellulose" limitation.  ████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████  Thus, Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products meet this element.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim element.

68.     Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products literally meet the "wherein said coating comprises … talc" limitation.  ███████████████

█████████████████████████████████████████████████████████

███████████████████████  Thus, Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products meet this element.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim element.

69.     Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products literally meet the "wherein said coating comprises … a colorant (e) . . . the colorant (e) is present in an amount ranging from 0.1 to 50% by weight of the coating and comprises iron oxide and titanium oxide" imitation.  ██████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

**EXHIBIT 2(C)**

████████████████████████████████  For the Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products, the recited grades of iron oxide and titanium oxide are present in a combined amount of 0.60 mg, which amounts to 20.00% of the total weight of the coating.  Thus, Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products meet this element.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim element.

70.    Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products literally meet "the coating substantially does not contain polyethylene glycol" limitation.  The coating of Optimus's generic brexpiprazole tablet products does not contain any polyethylene glycol.  Thus, Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products meet this element. Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim element.

**2.**    Claim 2

71.    Claim 2 depends from claim 1, and thus includes all of the elements of that claim, but further requires a specific weight relationship between the amount of brexpiprazole active ingredient in the formulation and the excipient (a), binder (b), disintegrant (c) and lubricant (d). Optimus's generic brexpiprazole tablet products meet all of the elements of claim 1.  As further described below, Optimus's generic brexpiprazole tablet products meet the additional elements recited in claim 2.

72.    Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products contain 0.25 mg, 0.5 mg, 1 mg, 2 mg and 3 mg of the brexpiprazole active ingredient, which may also be described as 7-[4-( 4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinoline-2-one.  Claim 2 requires "1 to 2000 parts by weight excipient (a)" wherein the tablet includes "1 part by weight of 7-[4-( 4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinoline-2-one  or  a  salt  thereof."

33

**EXHIBIT 2(C)**

Thus, claim 2 requires that excipient (a) be present in the amount of 0.25 to 500 mg for the 0.25 mg

tablet, 0.5 to 1000 mg for the 0.5 mg tablet, 1 to 2000 mg for the 1 mg tablet, 2 to 4000 mg for the

2 mg tablet and 3 to 6000 mg for the 3 mg tablet. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ Thus, they meet this element of claim 2.  Moreover, even if, for example, the corn starch

is not considered an excipient (a), the lactose and/or microcrystalline cellulose satisfy this element.

73.    Claim 2 further requires "0.01 to 100 parts by weight binder (b)" wherein the tablet

includes "1 part by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-lH-quinoline-

2-one or a salt thereof."  Thus, claim 2 requires that the binder (b) be present in the amount of

0.0025 to 25 mg for the 0.25 mg tablet, 0.005 to 50 mg for the 0.5 mg tablet, 0.01 to 100 mg for

the 1 mg tablet, 0.02 to 200 mg for the 2 mg tablet and 0.03 to 300 mg for the 3 mg tablet.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Thus, Optimus's 0.25, 0.5, 1,

2 and 3 mg generic brexpiprazole tablet products meet this element of claim 2.

74.    Claim 2 further requires "0.1 to 500 parts by weight of the disintegrant (c)" wherein

the tablet includes "1 part by weight of 7-[4-( 4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-lH-

quinoline-2-one or a salt thereof."  Thus, claim 2 requires that the disintegrant (c) be present in the

amount of 0.025 to 125 mg for the 0.25 mg tablet, 0.05 to 250 mg for the 0.5 mg tablet, 0.1 to 500

mg for the 1 mg tablet, 0.2 to 1000 mg for the 2 mg tablet and 0.3 to 1500 mg for the 3 mg tablet.

**EXHIBIT 2(C)**

████████████████████████████████████████████████████████████

████████████████████████████████████████████

75.     Claim 2 further requires "0.01 to 50 parts by weight of the lubricant (d)" wherein the tablet includes "1 part by weight of 7-[4-( 4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-lH-quinoline-2-one or a salt thereof."  Thus, claim 2 requires that the lubricant (d) be present in the amount of 0.0025 to 12.5 mg for the 0.25 mg tablet, 0.005 to 25 mg for the 0.5 mg tablet, 0.01 to 50 mg for the 1 mg tablet, 0.02 to 100 mg for the 2 mg tablet and 0.03 to 150 mg for the 3 mg tablet. ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

76.     Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim beyond its dependence on claim 1.

### 3.     Claim 3

77.     Claim 3 depends from claim 1, and thus includes all of the elements of that claim, but further requires that the claimed tablet "is obtained by forming, into a tablet, a granulated substance obtained through wet granulation."  Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products meet all of the elements of claim 1. █████████████████████████

██████████████████████████████████████████████████████████

███████████████████     █████, Optimus's generic brexpiprazole tablet products meet the additional elements recited in claim 3.

78.     Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim beyond its dependence on claim 1.

### 4.     Claim 4

79.     Claim 4 depends from claim 1, and thus includes all of the elements of that claim, but further requires that the claimed tablet "does not contain povidone or crospovidone."

**EXHIBIT 2(C)**

Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products meet all of the elements of claim 1.  Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products do not contain povidone or crospovidone and thus they meet this additional element of claim 4.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim beyond its dependence on claim 1.

     **5.**     **Claim 5**

    80.     Claim 5 depends from claim 1, and thus includes all of the elements of that claim, but further requires "the excipient (a) is lactose, corn starch, and microcrystalline cellulose, and the disintegrant (c) is low-substituted hydroxypropyl cellulose."  Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products meet all of the elements of claim 1.  ████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████ Thus, Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products meet these additional elements of claim 5.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim beyond its dependence on claim 1.

     **6.**     **Claim 6**

    81. ████████████████████████████████

████████████████████████████████████

████████████████████████ █ ██████ ██

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

36

**EXHIBIT 2(C)**

███████████████████████████████████████████████████████████

█████████████████████████████████████████. Thus, this process satisfies the element

of claim 6 of "granulating a mixture containing 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-

yl)butoxy]-lH-quinolin-2-one or a salt thereof, an excipient (a), a binder (b), and a disintegrant (c),

and further mixing thereto a lubricant (d)."

      82.    ███████████████████████████████████████████

███████████████████████████████████████████████████████████

████████  Thus, Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products meet this

element of claim 6.

      83.    ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████  These are colorants as required by claim 6 and thus Optimus's

0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products meet these elements of claim 6.

      84.    The remaining elements of claim 6 are similar to those of claim 1, except that the

percentage weights of the excipient (a), binder (b), disintegrant (c) and lubricant (d) are measured

based on the weight of the coated tablet. ████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

**EXHIBIT 2(C)**

███████████████████████████████████████████████████████

████████████████████████████████████    Thus, Optimus's 0.25, 0.5, 1, 2 and 3 mg

generic brexpiprazole tablet products meet these elements of claim 6.

85.    Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim beyond the binder (b) element, which is also recited in claim 1.

### 7.    Claim 7

86.    Claim 7 depends from claim 6, and thus includes all of the elements of that claim, but further requires "the excipient (a) is lactose, corn starch, and microcrystalline cellulose, and the disintegrant (c) is low-substituted hydroxypropyl cellulose."  Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products meet all of the elements of claim 6.  ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Thus, Optimus's 0.25, 0.5, 1, 2 and 3 mg generic brexpiprazole tablet products meet these additional elements of claim 7.  Optimus has not disputed nor provided any purported expert opinion regarding any alleged noninfringement of this claim beyond its dependence on claim 6.

**EXHIBIT 2(D)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD. and H. LUNDBECK A/S, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 19-cv-1938-LPS (consolidated) |
| v. | ) ) ) | |
| ZENARA PHARMA PRIVATE LTD., et al. | ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' STATEMENT OF CONTESTED
FACTS REGARDING INFRINGEMENT
APPENDIX D (ZENARA)**

# Exhibit 2D

## Filed Under Seal

## JOINT PRETRIAL ORDER EXHIBIT 3:

## DEFENDANTS' STATEMENT OF CONTESTED ISSUES OF FACT
## (NONINFRINGEMENT)

Pursuant to Local Rule 16.3(c)(4) and (9), Defendants Apotex Inc., Apotex Corp., Apotex

PharmaChem Inc. and Signa S.A. de C.V. ("Apotex"), Zenara Pharma Private Ltd. and Biophore

India Pharmaceuticals Private Ltd., ("Biophore"), MSN Laboratories Private Ltd. and MSN

Pharmaceuticals Inc. ("MSN"), and Optimus Pharma Pvt. Ltd. ("Optimus") (collectively,

"Defendants") identify the following issues of fact that remain to be litigated:

## I.      INTRODUCTION

1.      Defendants' identification of facts is based on Defendants' claims and current

understanding of Plaintiffs' claims in the proceedings in this action to date.  If Plaintiffs seek to

introduce different arguments, Defendants reserve the right to supplement this statement.  To the

extent the Court determines that any of the below issues are more appropriately considered an

issue of law, Defendants incorporate such issues by reference into their Statement of Issues of

Law.

2.      By including a fact herein, Defendants do not assume the burden of proof or

production with regard to that fact.  Nor do Defendants concede that any genuine factual dispute

exists as to any of the issues listed below.  Defendants reserve the right to revise this statement in

light of the Court's rulings, in response to Plaintiff's positions, or as otherwise may be appropriate.

The following statements are not exhaustive, and Defendants reserve the right to prove any matters

identified in their pleadings, contentions, interrogatory responses, and/or expert reports.

Defendants also intend to offer evidence as to the issues of fact and issues of law identified in this

pretrial order.  Defendants further intend to offer evidence to rebut evidence offered by Plaintiff

and to argue that Plaintiff is precluded from offering evidence in support of theories and claims

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

not adequately disclosed in accordance with the scheduling order.  Defendants incorporate by reference their expert reports in support of any proof to be presented by expert testimony.

## II.    DEFENDANTS DO NOT INFRINGE ANY CLAIM OF THE '419 PATENT

### A.    The Uncoated Tablet of Each Defendant Does Not Contain One or More Elements of the Claims Literally or Under the Doctrine of Equivalents

3.    Defendants' ANDA products do not literally infringe any claim of the '419 patent. For each of Defendants' ANDA products, the uncoated tablet (i.e., tablet core) does not contain one or more ingredients that are required by the claims of the '419 patent.  In particular, each of Defendants' tablet cores is missing one or more of the specific binder, disintegrant(s), and/or lubricant that is required by the claims of the '419 patent.

4.    Plaintiffs' expert on infringement Dr. Byrn does not opine that any Defendant's ANDA product literally infringes any claim of the '419 patent.

5.    When a recited ingredient is absent in an accused product, Plaintiffs' expert searches for ingredients in that ANDA product that are, in his opinion, "equivalent" to the missing ingredient that is required by the '419 patent claims.  Plaintiffs' expert is incorrect.

6.    First, many of these proposed alternative binders, disintegrants, and lubricants Plaintiffs' expert identified in Defendants' ANDA products are disclosed in the '419 patent for the same purpose, but not claimed.  The "disclosure-dedication" rule prevents application of the DOE to encompass disclosed, but unclaimed, alternatives to claim elements.  That is, such disclosed, but unclaimed, alternatives are dedicated to the public.  Thus, such disclosed but unclaimed binders, disintegrants, and lubricants cannot be equivalent to the claimed binder, disintegrant, and lubricant, respectively.

7.    Second, certain proposed alternative binders, disintegrants, and lubricants are recited in separate limitations of the asserted claims.  In these instances, Plaintiffs' expert relies on

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

the same ingredient(s) to satisfy the binder, disintegrant, or lubricant claim limitation and at least one other claim limitation, which effectively eliminates the binder, disintegrant, or lubricant claim limitation.

8.     Relatedly, the sheer number of ingredients and combinations of ingredients that Plaintiffs' expert says are equivalent to the "binder (b), which is hydroxyproyl celluslose" limitation identified in the asserted claims effectively eliminates that limitation and renders it completely meaningless.

9.     Third, Plaintiffs' expert ignores the amounts of the claimed binder, disintegrants, and lubricant required by the claims, often relying on amounts of ingredient(s) allegedly equivalent to the claimed binder, disintegrants, and lubricant far outside the claimed weight percentage of the binder, disintegrants, and lubricant.

10.     Fourth, Plaintiffs' expert alleges that many excipients, including cellulose derivatives, are equivalent to the claimed hydroxypropyl cellulose binder.  However, in order to overcome a rejection during prosecution before the United States Patent Office, the '419 patent applicant cancelled claims that did not recite any specific excipients and claims that recited any "cellulose derivative" binder in favor of narrower claims reciting only "hydroxypropyl cellulose" as the claimed binder.

11.     Similarly, Plaintiffs' expert alleges that many excipients, including cellulose derivatives and starch derivatives, are equivalent to the disintegrants recited in the asserted claims. However, in order to overcome a rejection during prosecution before the United States Patent Office, the '419 patent applicant cancelled claims that did not recite any specific excipients and claims that recited any "cellulose derivative or starch derivatives" disintegrant in favor of narrower

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

claims reciting only "low-substituted hydroxypropyl cellulose, croscarmellose sodium, or sodium carboxymethyl starch" as the claimed disintegrant.

12.     Prosecution history estoppel prevents application of the DOE to any binders or disintegrants that were surrendered during prosecution as a result of this amendment and related arguments made during prosecution to overcome a rejection of the pending claims.  Prosecution history estoppel applies as to several Defendants' formulations.

13.     Fifth, Plaintiffs' expert failed to demonstrate that the accused alternatives are equivalent to the associated claim elements in the required amounts under either the "function-way-result" test or "insubstantial differences" test.

### i.     Technical Background

14.     Pharmaceutical dosage forms consist of an active pharmaceutical ingredient, in this case, brexpiprazole, and inactive ingredients known as excipients.  Tablet formulations consist of an active pharmaceutical ingredient and excipients compressed together, in some cases with a coating.

15.     The '419 patent discloses that applicant's goal in designing the claimed formulations was "to provide a tablet comprising [brexpiprazole] . . . as an active ingredient and having excellent disintegration ability, storage stability, and high photostability." ('419 patent at 1:44-47.)  As discussed below, the named inventor of the '419 patent purported to accomplish this goal using a specific combination of pharmaceutical excipients.

16.     In particular, and as discussed in greater detail below, the applicant purportedly found that hydroxypropyl cellulose provided unexpected results when used as a binder for solid oral dosage forms that contain brexpiprazole.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

17.    The tablet formulations disclosed in the '419 patent are prepared by a wet granulation process in which HPC is dissolved in water and sprayed onto a mixture of dry ingredients that includes brexpiprazole, lactose, corn starch, and microcrystalline cellulose.  There are no examples in the '419 patent that prepare brexpiprazole using a dry granulation or direct compression process.

18.    Direct compression processes have been well-known in the pharmaceutical industry for over 50 years, and involve the mixing of dry excipients, optional processing to control for uniformity of particle size, followed by compression of the dry mixture into tablets.  While HPC can be used as a binder in tablets prepared by dry granulation processes, it is more commonly employed in the manner described in the '419 patent as a wet granulation binder.

19.    The other components of the tablet core disclosed in the examples and required by the claims of the '419 patent as "an excipient (a)" are lactose, corn starch, and microcrystalline cellulose. Each of these excipients was well-known and widely used in tablet formulations as diluents or fillers.

20.    Traditional tablet disintegrants include corn starch and alginic acid.  However, they must be used at comparatively high levels (upwards of 10% w/w and very often 20% w/w or greater). The superdisintegrants were developed in the 1960s and later. They are much more effective, requiring typically less than 5% w/w for tablet formulation. Examples of superdisintegrants include sodium starch glycolate (or sodium carboxymethyl starch), croscarmellose sodium and crospovidone.

21.    Lubricants are generally used in the formulation of tablets to reduce friction during manufacture and to improve granule flowability.  The claimed lubricant, magnesium stearate, is widely used in tablet formulations as a lubricant.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

22.     FDA does not require Defendants' generic drug products to contain the same pharmaceutical excipients as Otsuka's Rexulti® drug product.

### ii.     The '419 Patent

#### a.     Claims

23.     The '419 patent has 7 claims.  Claims 1 and 6 are independent claims, and each claim recites the following three claim elements in "the uncoated tablet":

- **The "HPC binder" element**: "0.1 to 20% by weight of the binder (b), which is hydroxypropyl cellulose" (highlighted in blue in claim listing below);

- **The "specific disintegrant" element**: "1 to 25% by weight of the disintegrant (c), which is at least one member selected from the group consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch" (highlighted in green in claim listing below); and

- **The "magnesium stearate lubricant" element**: "0.1 to 10% by weight of the lubricant (d), which is magnesium stearate" (highlighted in pink in claim listing below).

24.     Plaintiffs assert all 7 claims of the '419 patent in this case (although not every claim is asserted against each Defendant).  These claims are set forth in full here (with the highlighting of the three elements identified above added):

> 1. A tablet comprising 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof as an active ingredient, an excipient (a), a binder (b), a disintegrant (c), a lubricant (d), and a coating, wherein the uncoated tablet comprises:
>
> 0.05 to 25% by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof,
>
> 10 to 98.5% by weight of the excipient (a), which is at least one member selected from the group consisting of lactose, corn

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

starch, and microcrystalline cellulose;

0.1 to 20% by weight of the binder (b), which is hydroxypropyl cellulose;

1 to 25% by weight of the disintegrant (c), which is at least one member selected from the group consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch; and

0.1 to 10% by weight of the lubricant (d), which is magnesium stearate;

the tablet further comprising a coating layer on the surface thereof, wherein said coating comprises hydroxypropyl methylcellulose, talc, and a colorant (e), the colorant (e) is present in an amount ranging from 0.1 to 50% by weight of the coating and comprises iron oxide and titanium oxide, and the coating substantially does not contain polyethylene glycol.

2. The tablet according to claim 1, wherein per 1 part by weight of        7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof, the tablet comprises:

1 to 2000 parts by weight of the excipient (a);

0.01 to 100 parts by weight of the binder (b);

0.1 to 500 parts by weight of the disintegrant (c); and

0.01 to 50 parts by weight of the lubricant (d).

3. The tablet according to claim 1, which is obtained by forming into a tablet, a granulated substance obtained through wet granulation.

4. The tablet according to claim 1, wherein the tablet does not contain povidone or crospovidone.

5. The tablet according to claim 1, wherein the excipient (a) is lactose, corn starch, and microcrystalline cellulose; and the disintegrant (c) is low-substituted hydroxypropyl cellulose.

6. A method for producing a tablet, the method comprising the steps of:

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

(1) granulating a mixture containing 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof, an excipient (a), a binder (b), and a disintegrant (c), and further mixing thereto a lubricant (d); and

(2) forming the obtained mixture into a tablet form; and

(3) mixing a coating agent, a colorant (e), and a liquid medium to obtain a coating mixture, and coating the surface of the tablet form using the coating mixture to form the tablet,

wherein the tablet comprises:

0.05 to 25% by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof,

10 to 98.5% by weight of the excipient (a), which is at least one member selected from the group consisting of lactose, corn starch, and microcrystalline cellulose;

0.1 to 20% by weight of the binder (b), which is hydroxypropyl cellulose;

1 to 25% by weight of the disintegrant (c), which is at least one member selected from the group consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch; and

0.1 to 10% by weight of the lubricant (d), which is magnesium stearate;

the tablet further comprising a coating layer on the surface thereof,

wherein said coating agent comprises hydroxypropyl methyl cellulose and talc, the colorant (e) is present in an amount ranging from 0.1 to 50% by weight of the coating mixture and comprises iron oxide and titanium oxide, and

the coating mixture substantially does not contain polyethylene glycol.

7. The method for producing the tablet according to claim 6, wherein the excipient (a) is lactose, corn starch, and microcrystalline cellulose; and the disintegrant (c) is low-substituted hydroxypropyl

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

cellulose.

25.    Plaintiffs' expert does not dispute that at least one of these three elements is literally missing from each of Defendant's ANDA Products.  For such missing elements, Plaintiffs' expert relies solely on the doctrine of equivalents ("DOE").  Because each Defendant's ANDA Product does not contain at least one of these elements or its equivalent, none of Defendant's ANDA Products literally infringe any claim of the '419 patent.

### b.    Specification

26.    The specification discloses that "[t]he tablet of the present invention preferably comprises additives such as an excipient (a), a binder (b), a disintegrant (c), and a lubricant (d)." (*Id*. col. 3:65-67.)  The specification discloses various alternatives for each of these "additives."

### 1.    Excipient (a)

27.    Although the claims are limited to "excipient (a), which is at least one member selected from the group consisting of lactose, corn starch, and microcrystalline cellulose," the specification discloses various alternatives for "excipient (a)":

> Examples of excipients (a) include, for example, sugar such as fructose, white soft sugar, sucrose, powdered sucrose, lactose, powdered hydrogenated maltose starch syrup, and maltose; sugar alcohols such as D-mannitol, D-sorbitol, xylitol, erythritol, maltitol; starch such as wheat starch, corn starch, and potato starch; starch derivatives such as dextrin, beta-cyclodextrin; cellulose or ca [sic] derivative thereof such as microcrystalline cellulose, powdered cellulose, ethyl cellulose, carboxymethyl cellulose (carmellose), sodium carboxymethyl cellulose (carmellose sodium), and microcrystalline cellulose/carmellose sodium; silicic acid or a salt thereof such as light anhydrous silicic acid, hydrated silicon dioxide, silicon dioxide, calcium silicate, magnesium silicate, and magnesium aluminometasilicate; kaolin; titanium oxide; magnesium oxide; talc; precipitated calcium carbonate; anhydrous dibasic calcium phosphate.
>
> These excipients (a) may be used singly or in a combination of two or more.  Among these, sugar, a sugar alcohol, starch, and

- 9 -

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

> cellulose are preferable, and lactose, microcrystalline cellulose and
> corn starch are more preferable.

The '419 patent discloses "excipient (a)" as a separate claim element from the "binder (b)."

28.     Further, the '419 patent does not teach or disclose that the materials described as suitable for use as "excipient (a)" can also function as a binder in the claimed formulations.  Rather, only five (5) materials are disclosed as both an "excipient (a)" and "binder (b)," which are:

- White soft sugar;

- Sucrose;

- Cellulose or a derivative thereof such as microcrystalline cellulose;

- Ethyl cellulose; and

- Sodium carboxymethylcellulose (carmellose sodium).

Where an "excipient (a)" can also function as a "binder (b)," the applicant specifically disclosed this information.

29.     Finally, both lactose and corn starch are disclosed (in combination with microcrystalline cellulose) as preferred materials for "excipient (a)."  Neither lactose nor corn starch (alone or in combination with microcrystalline cellulose) is disclosed as functioning as a "binder (b)."

## 2.     Disclosed Binders

30.     With respect to binders, the specification discloses the following alternatives. Certain alternative binders that Plaintiffs' expert opines are equivalent to HPC are highlighted in blue:

> Examples of the binder (b) include sucrose; white soft sugar; pregelatinized starch; partially pregelatinized starch; cellulose or a derivative thereof such as microcrystalline cellulose, methyl cellulose, ethyl cellulose, sodium carboxymethyl cellulose (carmellose sodium), hydroxyethyl cellulose, hydroxyethyl methyl

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

cellulose, hydroxypropyl cellulose, low-substituted hydroxypropyl cellulose, hydroxypropyl methyl cellulose (hypromelloses such as hypromellose 2208, hypromellose 2906, and hypromellose 2910), other polysaccharides such as acacia, powdered acacia, agar, powdered agar, guar gum, tragacanth, powdered tragacanth, pullulan, and pectin; acrylic acid based polymer such as methacrylic acid copolymer L, methacrylic acid copolymer LD, methacrylic acid copolymer S, ethyl acrylate-methyl methacrylate copolymer dispersion, aminoalkyl methacrylate copolymer E, and aminoalkyl methacrylate copolymer RS; sodium alginate; purified gelatin; hydrolyzed gelatin powder; carboxyvinyl polymer; copolyvidone; povidone; polyvinyl alcohol.  These binders (b) may be used singly or in a combination of two or more.  Among these, a cellulose derivative is preferable, and hydroxypropyl cellulose is more preferable. It should be noted that, when povidone is contained as a binder (b), the obtained tablet tends to have reduced photostability and storage stability.  Therefore, it is more preferable if this component is substantially not contained.

31.    The '419 patent points out that the binder (b) alternatives can be "used singly or in a combination of two or more."

32.    A person of ordinary skill in the art ("POSA") would understand that the specification places no restriction on the grades or amounts of these alternative binders, although it does state a preferred range of amounts, and that preferred range is reflected in the claims.

### 3.    Disclosed Disintegrants

33.    With respect to alternative disintegrants, the specification discloses as alternatives to the claimed specific disintegrants the following ingredients (highlighted in green) that Plaintiffs' expert accuses as being equivalent to the claimed specific disintegrants:

Examples of disintegrants (c) include starch or a derivative thereof such as wheat starch, corn starch, potato starch, partially pregelatinized starch, sodium carboxymethyl starch, and hydroxypropyl starch; cellulose or a derivative thereof such as microcrystalline cellulose, carboxymethyl cellulose (carmellose), calcium carboxymethyl cellulose (carmellose calcium), croscarmellose sodium, and low-substituted hydroxypropyl cellulose; crospovidone; alginic acid; and bentonite. These disintegrants (c) may be used singly or in a combination of two or

- 11 -

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

> more.  Among these, starch or a derivative thereof, and cellulose or a derivative thereof are preferable, and sodium carboxymethyl starch, carmellose calcium, croscarmellose sodium and low-substituted hydroxypropyl cellulose are more preferable.  It should be noted that, when crospovidone is contained, the obtained tablet tends to have reduced photostability and storage stability.  Therefore, it is more preferable if this component is substantially not contained.

The alleged alternative disintegrants accused by Plaintiffs' expert are all identified along with the claimed disintegrants as examples of "disintegrants (c)."

34.    The '419 patent points out that the disintegrant (c) alternatives can be "used singly or in a combination of two or more."

35.    A POSA would understand that the patent specification places no restriction on the grades or amounts of these alternative distintegrants, although it does state a preferred range of amounts, and that preferred range is reflected in the claims.  A POSA would understand the patent disclosure to cover any amounts of the alternative disintegrants that could work in a tablet formulation under normal circumstances.

### 4.    Disclosed Lubricants

36.    With respect to alternative lubricants, the specification discloses as alternatives to the claimed magnesium stearate lubricant the following ingredients (highlighted in magenta) that Plaintiffs' expert accuses as being equivalent to the claimed magnesium stearate lubricant:

> Examples of lubricants (d) include stearic acid or a salt thereof such as stearic acid, aluminum stearate, calcium stearate, and magnesium stearate; carnauba wax; glycerol ester of fatty acid; hydrogenated oil; yellow beeswax; white beeswax; talc; sodium stearyl fumarate; and polyethylene glycol (macrogols such as macrogol 400, macrogol 600, macrogol 1500, macrogol 4000, and macrogol 6000). These lubricants (d) may be used singly or in a combination of two or more.  Among these, stearate, sucrose ester of fatty acid, and hydrogenated oil are preferable, and magnesium stearate is more preferable.

- 12 -

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

The alleged alternative lubricants accused by Plaintiffs' expert are all identified along with the claimed lubricants as examples of "lubricants (d)."

37.     The '419 patent points out that the lubricant (d) alternatives can be "used singly or in a combination of two or more."

38.     A POSA would understand that the patent specification places no restriction on the grades or amounts of these alternative lubricants, although it does state a preferred range of amounts, and that preferred range is reflected in the claims.  A POSA would understand the patent disclosure to cover any amounts of the alternative lubricants that could work in a tablet formulation under normal circumstances.

### c.      File History

39.     The application that led to the issuance of the '419 patent (15/713,427) was filed on September 22, 2017.  The '427 application claims priority to a string of three continuation applications:  No. 15/444,113, filed on Feb. 27, 2017, No. 15/019,874, filed on Feb. 9, 2016, and No. 14/351,325 (the '325 application), filed on October 12, 2012. ('419 patent, at cover, fields (22) and (63).)

40.     As originally filed, Claims 1 and 2 of the '325 application broadly covered a tablet that does not require a binder (Claim 1) or that requires a binder that is a "cellulose derivative." (Claim 2):

> [Claim 1] A tablet comprising 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof as an active ingredient.
>
> [Claim 2] The tablet according to claim 1, further comprising:
> an excipient (a), a binder (b), a disintegrant (c) and a lubricant (d),
> wherein the excipient (a) is at least one member selected from the group consisting of sugars, sugar alcohols, starches, and celluloses;
> the binder (b) is a cellulose derivative;
> the disintegrant(c) is at least one member selected from the group consisting of cellulose derivatives and starch derivatives; and

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

the lubricant (d) is magnesium stearate.

41.     The Examiner rejected claims 1 and 2 in an Office Action mailed on February 3, 2015.  In relevant part, the Examiner rejected these claims as unpatentable over U.S. Patents 7,888,362 ("Yamashita") and 6,562,375 because Yamashita disclosed the "generic categories" of a binder, a disintegrant and a lubricant.  In particular, Yamashita disclosed "[c]ellulose derivatives such as methylcellulose and carboxymethylcellulose . . . as examples of binders" and "[s]tarch and dried starch . . . as examples of disintegrating agents."

42.     In response to this rejection, the applicant cancelled claims 1 and 2 in favor of substantially narrower claims.  Specifically, after cancelling claims 1 and 2, the independent claims were:  Claim 3 (amended to be in independent form), which recited hydroxypropyl cellulose as the only claimed binder and which recited low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch as the only claimed disintegrants, and withdrawn claim 10, which applicant amended to narrow the claimed binder from "a cellulose derivative" to "hydroxypropyl cellulose" and the claimed disintegrants from "cellulose derivatives and starch derivatives" to "low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch."

43.     The applicant further emphasized, "[t]here are unexpected benefits from the claims [sic] composition with hydroxypropyl cellulose as the binder."  The applicant reiterated this argument during prosecution of the '419 patent.

44.     Applicant's claim amendments carried over into subsequent prosecution.  In responding to rejections from the Examiner, the applicant continued to focus on the properties conferred by an HPC binder.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

45.    With respect to the '113 application, the Examiner again rejected the pending claims, but applicant abandoned the application without responding to the rejection.  Applicant re-filed the same set of claims yet again in the '427 application (September 22, 2017 Application), which eventually resulted in the '419 patent, and applicant relied upon the specific HPC claim element to argue the patentability of the claimed tablet and method.

46.    After the August 3, 2015 amendment in the '325 application, every claim in the series of applications that eventually resulted in the '419 patent was limited to a tablet with an HPC binder and with a disintegrant that is low-substituted hydroxypropyl cellulose, croscarmellose sodium, or sodium carboxymethyl starch, and applicant repeatedly relied on the HPC binder element to argue for the patentability of those claims.

47.    A POSA reading these exchanges between the applicant and the Patent Office would understand that the applicant narrowed the claims to obtain allowance.

48.    The applicant cancelled and/or amended the broader claims that did not require a binder or that recited "binder (b) is a cellulose derivative" and opted to seek allowance of claims limited to "hydroxypropyl cellulose" (HPC) as binder (b).  The applicant also cancelled and/or amended the broader claims that did not require a disintegrant or that required a disintegrant that is a "cellulose derivative[]" or "starch derivative[]" and opted to seek allowance of claims limited to low-substituted hydroxypropyl cellulose, croscarmellose sodium, or sodium carboxymethyl starch as disintegrant (c).

49.    A POSA would understand that in making these claim cancellations and/or amendments, the applicant had surrendered coverage of any tablets, or methods of making a tablet, that do not include an HPC binder or a disintegrant that is low-substituted hydroxypropyl cellulose, croscarmellose sodium, or sodium carboxymethyl starch.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

### iii.    Defendants' Products Do Not Infringe the '419 Patent Under the DOE

#### 1.    Disclosure-Dedication Rule Precludes Application of the DOE to Accused Alternative Binders

50.    Regarding the "HPC binder" claim element, the '419 patent claims recite "binder (b), which is hydroxypropyl cellulose."  Plaintiffs' expert identifies various non-HPC ingredients in Defendants' ANDA products ("the First-Identified Ingredients") as equivalent to the claimed HPC binder and opines that such alternative ingredient(s), "in conjunction with" other often-unnamed ingredients, are "equivalent" to recited binder (b) in the '419 patent claims.[1]

51.    Starting with Plaintiffs' expert's First-Identified Binder alternatives, a POSA would recognize that many are disclosed as binders in the '419 patent specification but not claimed.  In particular, such First-Identified Binder alternative binders include: cellulose derivatives, such as methyl cellulose, hydroxypropyl methylcellulose (hypromellose), and microcrystalline cellulose; pregelatinized starch; and povidone.  Each of these alternatives, alone and in combination with each other, is disclosed in the '419 patent specification but not claimed, and is disclosed in the amount of the claimed binder.

52.    Other named "in conjunction with" ingredients include, among others, lactose monohydrate or corn starch.  Lactose and corn starch are disclosed in the specification, *and* recited in the asserted claims, as alternatives that may be used as "excipient (a)."  The '419 patent specification discloses combinations of an alternative unclaimed binder and a disclosed (claimed or unclaimed) excipient (a).  The specification discloses combinations of any "excipient (a)," "binder (b)," and other ingredients, but these combinations are not claimed. A POSA reading the

---

[1] "First-Identified Ingredient(s)" refer to the ingredient(s) before the "in conjunction with."  In many cases, the "First-Identified Ingredient(s)" is (are) the only named ingredient(s), and all of the "in conjunction with" ingredients are unnamed.  In other cases, Plaintiffs' expert does name certain "in conjunction with" ingredients.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

'419 patent specification can readily identify a potential combination of a disclosed alternative binder (e.g., HPMC) with a disclosed "excipient (a)" (e.g., lactose monohydrate or corn starch).

53.     Plaintiffs' expert makes a general statement that "the specific amounts and grades of the excipients in the formulation" would make a difference in the ingredients' function.  He also opines that "the combination and interactions of the excipients" could affect their function.  He then points to "the specific manufacturing techniques used to formulate the drug product" as important to ascertaining the function of an ingredient in that drug product.

54.     However, Plaintiffs' expert does not explain how the "combination and interactions" of any specific ingredients in Defendants' ANDA products and/or the "specific manufacturing techniques used to formulate" Defendants' ANDA products render any of the ingredients in Defendants' ANDA products equivalent to an HPC binder.

55.     The '419 patent's disclosure of alternative binders is not restricted to specific grades or amounts of those disclosed alternatives.  Nor is it limited to the use of the alternatives in formulations manufactured by any particular techniques.  As such, a POSA reading the disclosure of alternative binders would understand the disclosure to cover all grades of the disclosed alternatives, in any amount, in tablets manufactured by any known technique (such as wet granulation or direct compression), known to use such binders.

56.     There is no indication to the public that the patentees were trying to exclude certain grades or amounts of a disclosed binder or tablets made with certain manufacturing techniques from this disclosure.  These ingredients were all well-known and widely used in the art at the time the '419 patent application was filed.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

57.     When the patentee mentions specific product names or grades in the '419 patent, the language is exemplary, inclusive, and not restrictive ("hypromelloses such as hypromellose 2208, hypromellose 2906, and hypromellose 2910").

58.     Therefore, the '419 patent specification disclosed a number of binders including any grade, in any acceptable amount, and in tablets made with techniques known to use such binders.  And, as discussed above the, the disclosure also includes combinations of the disclosed binders.

59.     Plaintiffs' expert also appears to opine that the manufacturing process can change the function of any particular ingredients and impacts the DOE analysis on the "binder (b)" element.  However, he does not identify anything about the specific manufacturing processes used by Defendants that might make the ingredients used in Defendants' ANDA products equivalents to the claimed ingredients.

60.     Various alternative ingredients accused by Plaintiffs' expert as being equivalent to the claimed HPC binder are disclosed as binders but not claimed in the '419 patent.  Moreover, combinations of such disclosed alternative binders, including along with one or more ingredients disclosed as "excipient (a)," were also disclosed in the '419 patent, but not claimed.  Plaintiffs' expert also makes vague references to "manufacturing process" in his attempted DOE analysis, but the dedication of alternative binders (and related combinations) to the public did not depend on manufacturing process.

61.     Therefore, Plaintiffs' expert's binder DOE analyses is barred.

## 2.     DOE Cannot Be Used to Effectively Eliminate the Claimed HPC Binder

62.     In certain instances, Plaintiffs' expert's First-Identified Ingredient, which he alleges to be equivalent to HPC as a binder, is recited in a separate claim limitation.  For example, the

- 18 -

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

claims recite an "excipient (a)" which is at least one member selected from "lactose, corn starch, and microcrystalline cellulose." To the extent Plaintiffs' expert accuses lactose, corn starch, and/or microcrystalline cellulose of satisfying both the "excipient (a)" claim limitation and also the "binder (b)" claim limitation (as an alleged equivalent to HPC), Plaintiffs' expert effectively eliminates the "binder (b)" claim limitation from the claim.

63.     The inventors claimed a specific formulation that includes one or more of the "excipient (a)" options and also contains a separate "binder (b)." Application of the DOE must be on an element-by-element basis and the DOE cannot apply so broadly as to effectively eliminate a claim element in its entirety. Plaintiffs' expert effectively eliminates the "binder (b)" claim limitation in the instances where he accuses ingredients separately claimed as "excipient (a)" as allegedly being equivalent to the claimed "binder (b)."

64.     Defendants and their experts disagree with Plaintiffs' expert's conclusion that core tablet formulations from 13 different defendants having a large variety of combinations of ingredients are equivalent to the claimed HPC, namely: methyl cellulose and pregelatinized starch; Hypromellose and pregelatinized starch; methyl cellulose in conjunction with other ingredients; pregelatinized starch in conjunction with microcrystalline cellulose and lactose monohydrate; microcrystalline cellulose in conjunction with corn starch; hydroxypropyl methylcellulose; hydroxypropyl methylcellulose in conjunction with lactose monohydrate, corn starch, microcrystalline cellulose; hydroxypropyl methylcellulose in conjunction with other unnamed ingredients; povidone in conjunction with partially pregelatinized maize starch; microcrystalline cellulose; lactose monohydrate in conjunction with other ingredients including corn starch and purified water. A POSA could not conclude that such a wide swath of ingredients and

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

combinations are equivalent to the claimed binder without ignoring entirely that the binder expressly required HPC.

### 3. Prosecution-History Estoppel Precludes Application of the DOE to the Accused Alternative Binders

65.     During the prosecution of patent applications leading to the '419 patent, the applicant initially included claims that did not require a binder and claims that recited a "cellulose derivative" as binder (b), but those claims were rejected by the Patent Office.  As a result, the applicant cancelled and/or amended the claims so that every claim in the '419 patent requires HPC as a binder.

66.     A POSA would understand based on the applicant's claim amendments alone or in conjunction with applicant's arguments regarding unexpected benefits of HPC as a binder in the claimed formulation, that the applicant surrendered all formulations lacking HPC as a binder.

67.     A POSA would also understand that MCC (including Avicel), HPMC (including Methocel), and methyl cellulose are all cellulose derivatives, and, further, that these cellulose derivatives are not HPC.

68.     Therefore, a POSA would understand that the applicant surrendered all of these alternative cellulose derivatives as being equivalent to the claimed HPC binder.

69.     To summarize, the '419 patent discloses to the public many alternative binders that could be used in a tablet, "singly or in a combination," and in the presence of other ingredients such as lactose or corn starch.  The patentees did not claim a tablet using these non-HPC alternative binders as "binder (b)."  Furthermore, during prosecution the applicant narrowed the claim scope (and made clarifying statements about the amendment), and gave up the scope between formulations lacking HPC a binder and formulations including HPC as a binder.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

4.     **Disclosure-Dedication Rule Precludes Application of the DOE to Accused Alternative Disintegrants**

70.     Regarding the "specific disintegrant" element, the '419 patent claims recite "disintegrant (c), which is at least one member selected from the group consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch. Plaintiffs' expert identifies various non-recited ingredients in Defendants' ANDA products as equivalent to the claimed disintegrants and opines that such alternative ingredient(s), in "conjunction" with other often-unidentified ingredients are "equivalent" to the recited disintegrant (c) in the '419 patent claims.

71.     Starting with Plaintiffs' expert's First-Identified disintegrant alternatives, a POSA would recognize that they are disclosed in the '419 patent as alternative disintegrants.  In particular, such First-Identified disintegrants alternatives include: wheat starch, corn starch, potato starch, partially pregelatinized starch, and microcrystalline cellulose.  As shown above, each of these alternatives is disclosed in the patent specification as an unclaimed alternative disintegrant to the claimed disintegrants.

72.     Plaintiffs' expert makes a general statement that "the specific amounts and grades of the excipients in the formulation" would make a difference in the excipients' function.  He also opines that "the combination and interactions of the excipients" could affect their function.  He then points to "the specific manufacturing techniques used to formulate the drug product" as important to ascertaining the function of an ingredient in that drug product.  Plaintiffs' expert does not explain how the "combination and interactions" of any specific ingredients in Defendants' ANDA products and/or the "specific manufacturing techniques used to formulate" Defendants' ANDA products render any of the ingredients in Defendants' ANDA products equivalent to a low-

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

substituted hydroxypropyl cellulose, croscarmellose sodium, or sodium carboxymethyl starch disintegrant.

73.     The '419 patent's disclosure of alternative disintegrants is not restricted to specific grades or amounts of those disclosed alternatives.  Nor is it limited to the use the alternatives in formulations manufactured by any particular techniques.  A POSA reading the disclosure of alternative disintegrants would understand the disclosure to cover all the grades of the disclosed alternatives (e.g., all the grades of starch of various origins, pregelatinized starch, or MCC), in any amount, in tablets manufactured by any known technique (such as wet granulation or direct compression), known to use such disintegrants.  There is no indication to the public that the patentee was trying to exclude certain grades or amounts of a disclosed disintegrant or tablets made with certain manufacturing techniques from this disclosure.  These excipients were all well-known and widely used in the art at the time the '419 patent application was filed.

74.     When the patentee mentions specific product names or grades in the '419 patent, the language is exemplary, inclusive, and not restrictive.  Therefore, a fair reading of the '419 patent specification is that the disclosed disintegrants include any grade, in any acceptable amount, and in tablets made with techniques known to use such disintegrants.  And, as discussed above, the disclosure also includes combinations of the disclosed disintegrants.

75.     Plaintiffs' expert opined that the manufacturing process can change the function of any particular ingredient and impacts the DOE analysis on the "disintegrant (c)" element.  However, he does not identify anything about the specific manufacturing processes used by Defendants that might make the ingredients used in Defendants' ANDA products equivalents to the claimed ingredients.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

76.     To summarize, various alternative ingredients accused by Plaintiffs' expert as being equivalent to the claimed disintegrants are disclosed as alternative disintegrants, but not claimed, in the '419 patent.  Moreover, combinations of such disclosed alternative disintegrants, including along with one or more ingredients disclosed as "excipient (a)" or "binder (b)," were also disclosed in the '419 patent, but not claimed.   Plaintiffs' expert also makes vague references to "manufacturing process" in his attempted DOE analysis, but the dedication of alternative disintegrants (and related combinations) to the public did not depend on manufacturing process. Therefore, Plaintiffs' expert's binder DOE analyses should be barred.

### 5.     DOE Cannot Be Used to Effectively Eliminate the Claimed Disintegrants

77.     In certain instances, Plaintiffs' expert's First-Identified Ingredient, which he alleges to be equivalent to the claimed disintegrants, is recited in a separate claim limitation.  For example, the claims recite an "excipient (a)" which is at least one member selected from "lactose, corn starch, and microcrystalline cellulose."  To the extent Plaintiffs' expert accuses lactose, corn starch, and/or microcrystalline cellulose of satisfying both the "excipient (a)" claim limitation and also the "disintegrant (c)" claim limitation (as an alleged equivalent to the claimed disintegrants), Plaintiffs' expert effectively eliminates the "disintegrant (c)" claim limitation from the claim.

78.     The inventors claimed a specific formulation that includes one or more of the "excipient (a)" options and also contains a separate "disintegrant (c)."  Application of the DOE must be on an element-by-element basis and the DOE cannot apply so broadly as to effectively eliminate a claim element in its entirety.  Plaintiffs' expert effectively eliminates the "disintegrant (c)" claim limitation in the instances where he accuses ingredients separately claimed as "excipient (a)" as allegedly being equivalent to the claimed "disintegrant (c)."

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

### 6. Prosecution-History Estoppel Precludes Application of the DOE to the Accused Alternative Disintegrants

79.     During the prosecution of patent applications leading to the '419 patent, the applicant initially included claims that did not require a disintegrant and claims that recited a "cellulose derivative[]" or "starch derivative[]" as disintegrant (c), but those claims were rejected by the Patent Office.  As a result, the applicant cancelled and/or amended the claims so that every claim in the '419 patent requires low-substituted hydroxypropyl cellulose, croscarmellose sodium, or sodium carboxymethyl starch as a disintegrant.

80.     A POSA would understand that the applicant's claim amendments resulted in surrender of all formulations lacking low-substituted hydroxypropyl cellulose, croscarmellose sodium, or sodium carboxymethyl starch as a disintegrant.  Therefore, a POSA would understand that the applicant surrendered all of these alternative cellulose derivatives or starch derivatives as being equivalent to the claimed low-substituted hydroxypropyl cellulose, croscarmellose sodium, or sodium carboxymethyl starch disintegrant.

81.     To summarize, the '419 patent discloses to the public many alternative disintegrants that could be used in a tablet, "singly or in a combination," and in the presence of other excipients such as lactose or corn starch.  The patentees did not claim a tablet using these alternative disintegrants as "disintegrant (c)."  Furthermore, during prosecution the applicant narrowed the claim scope, and gave up the scope between formulations lacking low-substituted hydroxypropyl cellulose, croscarmellose sodium, or sodium carboxymethyl starch as a disintegrant and formulations including low-substituted hydroxypropyl cellulose, croscarmellose sodium, or sodium carboxymethyl starch as a disintegrant.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

### 7.    The DOE Cannot Be Used to Encompass the Accused Alternative Lubricants.

82.    Regarding the "magnesium stearate lubricant" element, the '419 patent specification recites "stearic acid" or its salt, and "sodium stearyl fumarate," as "examples of lubricants (d)." Plaintiffs' expert identifies various non-recited ingredients in Defendants' ANDA products as equivalent to the claimed, specific, lubricant magnesium stearate and opines that such alternative ingredient(s), in "conjunction" with other often-unidentified ingredients, are "equivalent" to the recited lubricant (d) in the '419 patent claims.

83.    Starting with the First-Identified Lubricants, sodium stearyl fumarate and stearic acid, a POSA would recognize that both are disclosed in the '419 patent as alternative lubricants. As shown in above, each of these alternatives is disclosed in the patent specification as an unclaimed alternative lubricant to the claimed lubricant magnesium stearate, and in the same amounts as the claimed lubricant.

84.    The only named "in conjunction with" ingredient alleged to be part of an alternative lubricant is low-substituted hydroxypropyl cellulose. However, low-substituted hydroxypropyl cellulose, as a general matter, is not a lubricant but, rather, as the '419 patent itself recognizes, a binder or disintegrant. The specification thus confirms to the POSA that the inventor did *not* intend for LS-HPC to be deemed a lubricant.

85.    The '419 patent's disclosure of alternative lubricants is not restricted to specific grades or amounts of those disclosed alternatives (although the preferred amounts of the alternatives are the amount of lubricant listed in the independent claims). Nor is it limited to the use the alternatives in formulations manufactured by any particular techniques. A POSA reading the disclosure of alternative lubricants would understand the disclosure to cover all the usual grades of such alternatives (e.g., all the usual grades of stearic acid including some proportion of

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

palmitic acid, and sodium stearyl fumarate), in any amount a POSA would understand to be useable in a tablet formulation (preferably in the amount listed in the claims), and in tablets manufactured by any known technique (such as wet granulation or direct compression), known to use such alternatives as lubricants.

86.     There is no indication to the public that the patentees were trying to exclude certain grades or amounts of a disclosed lubricant or tablets made with certain manufacturing techniques from this disclosure.  These ingredients were all well-known and widely used in the art at the time the '419 patent application was filed.

87.     Further regarding manufacturing processes, a POSA reading the '419 patent specification would have had knowledge of all the usual manufacturing processes, and the disclosure of lubricants in the specification indicates to a POSA that such lubricants could be used in these known processes in the normal manner.  The patent specification disclosure precludes Plaintiffs' expert from discussing in unsubstantiated generalities that a Defendant's manufacturing process, which was a known process in the art, could somehow remove a disclosed alternative lubricant from such disclosure.

88.     To summarize, the First-Identified alternative ingredients accused by Plaintiffs' expert as being equivalent to the claimed lubricant magnesium stearate are disclosed as alternatives lubricants, but not claimed, in the '419 patent.  Plaintiffs' expert also makes vague references to "manufacturing process" in his attempted DOE analysis, but the dedication of alternative lubricants (and related combinations) to the public did not depend on the manufacturing process.  Moreover, the normal tablet manufacturing process is necessarily part of the '419 patent disclosure, and also not claimed.  Therefore, Plaintiffs' expert's lubricant DOE analyses should be barred.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

### 8. The Claimed Weight Ratios Are Meaningful Claim Limitations That Cannot be Ignored

89.    In addition to reciting specific excipients for the binder, disintegrant, and lubricant claim limitations, the asserted claims also recite specific weight ratios of the claimed binder, disintegrant, and lubricant in the uncoated tablet.  Specifically, the HPC binder must be 0.1 to 20% by weight of the uncoated tablet, the disintegrant (low-substituted HPC, croscarmellose sodium, and sodium carboxymethyl starch) must be 1 to 25% by weight of the uncoated tablet, and the magnesium stearate lubricant must be 0.1 to 10% by weight of the uncoated tablet.

90.    Plaintiffs' expert fails to explain how the alleged equivalents fall within these claimed weight ratio ranges of the expressly claimed ingredients.  Moreover, to the extent Plaintiffs' expert accuses the First-Identified Ingredient(s) in conjunction with all other inactive tablet core ingredients as allegedly being equivalent to the claimed weight ratio for the claimed binder, disintegrant, and lubricant, such an allegation is non-sensical.  Plaintiffs' expert does not explain, for example, how all of the inactive ingredients within the uncoated tablet (which combine to be over 90% of the weight of the uncoated tablet) could be considered equivalent to a binder that is 0.1 to 20% by weight of the uncoated tablet.

### 9. The Accused Alternatives Are Not Equivalent to the Claimed Ingredients

91.    Plaintiffs' expert did not perform a proper DOE analysis on any of the missing elements.

92.    Plaintiffs' expert does not sufficiently identify what he considers to be the "equivalent" alternative ingredients in the accused products.

93.    Plaintiffs' expert fails to make a comparison of a specific alternative ingredient in an accused product to a claimed element, to show functional equivalency of these elements.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



96.     The alternative ingredients Plaintiffs' expert points to are not equivalent to the claimed binders, disintegrants, or lubricant.

97.     For example, regarding binders, HPC is a binder for the wet granulation process. If HPC is used at 20% (which is allowed by the '419 patent claims) in a direct compression manufacturing process, it would probably form a hydrogel once the tablet is ingested by a patient, which would hinder the release of the brexpiprazole API.

98.     In contrast, a particular grade of pregelatinized starch used by Defendants may not be present in sufficient amounts or soluble enough to function in a similar way to HPC.  Lactose monohydrate and MCC are not typically used as binders in a wet granulation process.  There is also a difference in effect between fully pregelatinized starch and partially pregelatinized starch, and both are different than HPC in terms of the nature of the solution, etc.

99.     Regarding disintegrants, the '419 patent claims recite three excipients that people of skill in the art refer to as "super-disintegrants," namely, low-substituted HPC, croscarmellose sodium, and sodium carboxymethyl starch.  However, corn starch, which Plaintiffs' expert opines

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

as an equivalent to the claimed disintegrants, is not a super-disintegrant.  Crospovidone is a super-disintegrant, but it functions differently from the claimed disintegrants.

100.    Regarding lubricants, unlike magnesium stearate, sodium stearyl fumarate is not hydrophobic (but not water soluble at room temperature). Plaintiffs' expert also seemingly opined that low substituted HPC could somehow function as a lubricant.  Low-substituted HPC is not a lubricant.

### 10.    Conclusion

101.    Plaintiffs' expert did not offer any scientifically sound opinion to show the infringement of any asserted claim.

102.    The attempt by Plaintiffs' expert to invoke the DOE is not allowed under the disclosure-dedication rule because the purported equivalents were disclosed in the specification of the '419 patent for the same purpose, but they were not claimed.

103.    The attempt by Plaintiffs' expert to invoke the DOE is not allowed under the law to the extent Plaintiffs' expert effectively eliminates claim limitations by relying on ingredients recited in separate claim limitations as alleged equivalents to the binder, disintegrant, or lubricant claim limitations; the extent he effectively eliminates the binder limitation by opining that such a broad swath of binders and combinations of ingredients are equivalent to the claimed HPC; and the extent where prosecution history estoppel applies.

104.    Consequently, none of the Defendants infringe any asserted claim of the '419 patent under the DOE.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

iv.     **Defendant-Specific Non-Infringement**

1.     **Biophore**



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



- 35 -

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



### 2.      Optimus

124.      Optimus's ANDA Products (the 4 mg dosage strength not accused of infringement)

have the following ingredients in the following amounts:

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



         **(1)**    **Optimus's ANDA Products Do Not Literally Infringe**

125.    Independent claims 1 and 6 of the '419 patent recite a "binder (b) … 0.1 to 20% by weight of the binder (b), which is hydroxypropyl cellulose" (emphasis added).  Dependent claims 2 and 3 depend from claim 1 and therefore incorporate this limitation.  Thus, all asserted claims require a "binder (b) … 0.1 to 20% by weight of the binder (b), which is hydroxypropyl cellulose."  Optimus's ANDA Products do not include hydroxypropyl cellulose, and, thus, do not infringe the asserted claims literally.

         **(2)**    **Optimus's ANDA Products Do Not Infringe Under the Doctrine of Equivalents**

126.    Plaintiff's expert appears to recognize this fact because his report is silent on the issue of literal infringement.

127.    Plaintiff's expert's identification of the ingredients in Optimus's ANDA Products alleged to be equivalent to the claimed HPC binder is vague and ambiguous.  It is unclear whether

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

Plaintiff's expert identifies ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

128.    As explained above, the '419 patent discloses, but does not claim, "hydroxypropyl methyl cellulose (hypromelloses such as hypromellose 2208, hypromellose 2906, and hypromellose 2910)" as alternative binders to the claimed HPC binder. ████████████████

████████████████████████████████████████████████████ In addition, during prosecution, the applicant amended the claims from reciting every "cellulose derivative" as binder to reciting only HPC as a binder.  Thus, the applicant surrendered non-HPC cellulose derivatives, such as HPMC.

129.    In addition, Plaintiff's expert's function-way-result and insubstantial-difference analyses are deficient.  ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ This is relevant, for example, because the particular grade of HPC (e.g., molecular weight or viscosity) will affect its properties and function, but Plaintiff's expert completely omitted these considerations.

130.    ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

131.   

132.

133.   Likewise,

134.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



135.

3.      Apotex

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



- 45 -

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



- 46 -

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY





HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



164.    Thus, Apotex's ANDA products do not contain the claimed HPC binder, literally

or under the DOE.

**4.    MSN**

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY





HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



- 105 -

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

OTSUKA  PHARMACEUTICAL  CO.,  LTD.
AND H. LUNDBECK A/S,

        Plaintiffs,

    v.

ZENARA PHARMA PRIVATE LTD., et al.,

        Defendants.

C.A. No.:  19-1938-(LPS) (consolidated)


**EXHIBIT 4**

**DEFENDANTS' STATEMENT OF ISSUES OF FACT**
**THAT REMAIN TO BE LITIGATED (INVALIDITY)**

## <u>TABLE OF CONTENTS</u>

Facts Related to the Compound Patents..................................................................................1

I.    Technical Background of the Compound Patents.................................................................1

    A.    Terminology.................................................................................................1

    B.    Structures of Selected Compounds ..............................................................1

    C.    Relevant Chemical Substructures ...............................................................2

    D.    Discussion ..................................................................................................3

        1.    Medicinal Chemist's Role in Identifying a Starting Compound ...............8

        2.    Identifying Portions of Molecules Suitable for Modification.....................9

        3.    Bioisosterism.....................................................................................10

        4.    Active Metabolites .............................................................................10

        5.    Multitarget Focus ...............................................................................10

    E.    Schizophrenia............................................................................................10

    F.    Physiology of Schizophrenia and Depression..............................................12

        1.    Dopamine...........................................................................................12

        2.    Serotonin ...........................................................................................13

        3.    Antipsychotics ...................................................................................14

II.    Level of Ordinary Skill in the Art ...................................................................................19

III.    Scope and Content of the Prior Art ..................................................................................20

    A.    Identification of Prior-Art Patents and Publications ....................................20

        1.    Patent Literature (Issued Patents and Published Applications) .................20

        2.    Non-Patent Literature..........................................................................21

    B.    Brief Description of Prior-Art Patents and Publications...............................23

        1.    Patent Literature.................................................................................23

            a.    '246 patent .......................................................... 23

            b.    '254 patent .......................................................... 26

            c.    '306 publication .................................................. 28

            d.    '416 patent .......................................................... 29

            e.    '528 patent .......................................................... 30

            f.    WO '215.............................................................. 33

            g.    WO '682.............................................................. 41

h.    WO '864.......................................................................... 44

2.    Non-Patent Literature............................................................46

    a.    Abilify PI ................................................................. 46

    b.    Davies 2004 .............................................................. 48

    c.    Fura 2004 ................................................................. 49

    d.    Kubo 2005................................................................. 50

    e.    Kuipers 1995 ............................................................ 52

    f.    Lowe 1991 ................................................................ 55

    g.    Oshiro 1998............................................................... 58

    h.    Patani 1996............................................................... 64

    i.    Thornber 1978 .......................................................... 65

IV.    A POSA Would Have Been Motivated at the Time of the Alleged Invention to Modify Aripiprazole or Dehydroaripiprazole ...................................................................66

A.    Aripiprazole and Dehydroaripiprazole Were Lead Compounds at the Time of the Alleged Invention...............................................................66

1.    Aripiprazole ...........................................................................66

    a.    A POSA Would Have Investigated Aripiprazole Because It Was a Leading Treatment for Schizophrenia at the Time of the Alleged Invention ....................................................................... 67

    b.    Aripiprazole Was a More Favorable Lead Compound Over Other Candidates ................................................................ 70

2.    Dehydroaripiprazole ..............................................................73

B.    The Prior Art Motivated a POSA to Make Targeted Modifications to Aripiprazole and Dehydroaripiprazole at the Time of the Alleged Invention ...........................81

1.    The Prior Art Taught a POSA to Optimize the Activity of Aripiprazole and/or Dehydroaripiprazole with Respect to Specific Receptor Targets...81

2.    The Prior Art Taught a POSA Where to Modify Aripiprazole and/or Dehydroaripiprazole ............................................................89

3.    The Prior Art Taught a POSA to Replace the 2,3-Dichlorophenyl Substituent of Aripiprazole/Dehydroaripiprazole with a 4-Benzothiophene Substituent........................................................96

    a.    WO '215 Taught a POSA to Replace the 2,3-Dichlorophenyl Substituent of Aripiprazole/Dehydroaripiprazole with a 4-Benzothiophene Substituent........................................... 96

    b.    The History of Benzothiophene Compounds Taught a POSA to Replace the 2,3-Dichlorophenyl Substituent of

Aripiprazole/Dehydroaripiprazole with a 4-Benzothiophene Substituent...................................................................................... 106

4.      The Prior Art Motivated a POSA to Add a 3,4-Double Bond to the Dihydrocarbostyril Ring of Aripiprazole or Dihydrobrexpiprazole ........111

5.      Reasonable Expectation of Success in Making an Improved Antipsychotic ....................................................................................................118

V.      Prior-Art Combinations Directing a POSA to Make the Modification(s) to Aripiprazole or Dehydroaripiprazole ...........................................................................119

A.      Aripiprazole as Lead Compound ....................................................121

1.      Aripiprazole in View of WO '215 and, optionally, Oshiro 1998 ...........121

a.      Replacing 2,3-dichlorophenyl with a 4-benzothiophene ............ 122

b.      Adding the double-bond to aripiprazole's dihydrocarbostyril ring ...................................................................................... 124

2.      Aripiprazole in View of the '528 Patent and WO '215 ..........................125

3.      Aripiprazole in View of '306 Publication and Oshiro 1998 ...................126

a.      Replacing 2,3-dichlorophenyl with a 4-benzothiophene ............ 126

b.      Adding the double-bond to aripiprazole's dihydrocarbostyril ring ...................................................................................... 127

4.      Aripiprazole in View of POSA's Knowledge of Benzothiophenes and Active Metabolites .....................................................................128

B.      Dehydroaripiprazole as Lead Compound ..........................................129

C.      Pharmaceutical Compositions Comprising Brexpiprazole ..................130

D.      Methods of Treatment Using Brexpiprazole.....................................130

VI.     The Patents-in-Suit.....................................................................................131

A.      The RE'059 Patent .......................................................................131

1.      The Claims .........................................................................132

2.      The Specification .................................................................139

B.      The '840 Patent ...........................................................................143

1.      The Claims .........................................................................143

2.      The Specification .................................................................148

C.      The '109 Patent ...........................................................................149

1.      The Claims .........................................................................149

2.      The Specification .................................................................151

D.      The '637 Patent ...........................................................................151

        1.      The Claims ................................................................................152

        2.      The Specification ......................................................................154

VII.    Obviousness of the RE'059 Patent (Claims 1-3, 7, 9, 12-15)....................154

        A.      Compound Claims 1-3, 7, 12, 13 ..........................................154

                1.      Claim 1 ..........................................................................155

                2.      Claim 2 ..........................................................................156

                3.      Claim 3 ..........................................................................157

                4.      Claim 7 ..........................................................................158

                5.      Claim 12 ........................................................................159

                6.      Claim 13 ........................................................................159

        B.      Process Claims 9, 14, and 15 ................................................159

                1.      Claim 9 ..........................................................................160

                        a.      '528 Patent .......................................................162

                        b.      WO '215 ...........................................................163

                        c.      Oshiro 1998 .....................................................166

                2.      Claims 14 and 15 ..........................................................167

VIII.   Obviousness of the '840 Patent (Claims 1, 2, 4, 5).................................168

        A.      Composition Claims 1, 2..........................................................168

                1.      Claim 1 ..........................................................................169

                2.      Claim 2 ..........................................................................169

        B.      Method of Treatment Claims 4, 5 ..........................................170

                1.      Claim 4 ..........................................................................170

                2.      Claim 5 ..........................................................................171

IX.     Obviousness of the '109 Patent (Claims 1, 2).......................................171

X.      Obviousness of the '637 Patent (Claims 1, 3-10) ..................................172

        A.      Composition Claims 1, 3-8 .....................................................172

                1.      Claim 1 ..........................................................................173

                2.      Claim 3 ..........................................................................173

                3.      Claim 4 ..........................................................................174

                4.      Claim 5 ..........................................................................175

                5.      Claim 6 ..........................................................................175

6. Claim 7 .................................................................................................176

7. Claim 8 .................................................................................................177

B. Method of Treatment Claims 9, 10 ................................................................177

XI. There Is No Objective Evidence Demonstrating the Non-Obviousness of brexpiprazole
.................................................................................................................................178

A. There is No Nexus .........................................................................................178

B. Failure of Others and Unpredictability in the Art ...........................................178

C. Long-Felt but Unmet Need ............................................................................180

D. Unexpected Results and Industry Praise .........................................................182

1. Cognitive Effects and Functioning .......................................................183

2. "Brightening" .....................................................................................183

3. Side Effects ........................................................................................184

4. Real World Implications ......................................................................184

E. Copying .........................................................................................................184

F. Commercial Success ......................................................................................185

1. Marketing ..........................................................................................185

2. Detailing and sampling. .......................................................................186

3. Direct To Consumer Marketing ...........................................................186

4. Share Of Voice ...................................................................................187

5. Pricing and Copays .............................................................................188

6. Attribution..........................................................................................189

7. Alleged Marketplace Success ..............................................................191

XII. The Specification Does Not Support the FUll Scope of Claims 4 and 5 of the '804 Patent,
Claims 1 and 2 of the '109 Patent, and Claim 7 of the '637 Patent..................................192

A. The Specification of the '840 and '109 Patents Includes Limited *In Vivo* and *In
Vitro* Data, and No Clinical Data ....................................................................192

1. Pharmacological Test 1 .......................................................................192

a. Dopamine $D_2$ receptor binding assay (in vitro) .........................192

b. Serotonin $5-HT_{2A}$ receptor binding assay (in vitro)...................193

c. Adrenaline $\alpha 1$ receptor binding assay (in vitro) ........................194

2. Pharmacological Test 2 (In Vitro) .......................................................194

3. Pharmacological Test 3 (In Vivo).........................................................194

4. Pharmacological Test 4 (In Vivo).........................................................194

5.      Pharmacological Test 5 (In Vivo)................................................195

6.      Pharmacological Test 6 (In Vitro) .............................................195

B.      The Claims Are Not Supported by the Specification..........................195

1.      Claims 4 and 5 of the '840 Patent Are Invalid for Lack of Written Description ............................................................................196

2.      Claim 1 of the '109 Patent Is Invalid for Lack of Written Description ...197

3.      Claims 1 and 2 of the '109 Patent Are Invalid for Lack of Enablement .198

4.      Claim 7 of the '637 Patent Is Invalid for Lack of Written Description ...198

Facts Related to the '419 Patent...................................................................200

I.      The level of ordinary skill in the art for the '419 patent....................................200

II.      Claims 1-7 of the '419 patent Are invalid ...........................................................200

A.      Claims 1-7 of the '419 Patent Are Invalid as Indefinite ......................................200

1.      The Specification Does Not Inform a POSA of the Claim Scope With Reasonable Certainty ...............................................................201

2.      The Prosecution History Does Not Inform the POSA of the Scope of the Claim with Reasonable Certainty ..........................................207

B.      Claims 1-7 of the '419 Patent are Invalid as Lacking Written Description.........209

## FACTS RELATED TO THE COMPOUND PATENTS

I.      **TECHNICAL BACKGROUND OF THE COMPOUND PATENTS**

    A.      **Terminology**

        1.      The following table summarizes common terminology in the art:

| Term | Explanation |
|---|---|
| 5-HT | 5-hydroxytryptamine or serotonin |
| 5-HT receptor | 5-hydroxytryptamine receptors or serotonin receptor |
| 5-HT$_{[\#][X]}$ receptor | [#][X]-subtype of the 5-HT receptor (e.g., 5-HT$_{1A}$, 5-HT$_{2A}$) |
| CNS | central nervous system |
| D$_{[\#]}$ receptor | [#]-subtype of the dopamine receptor (e.g., D$_2$) |
| DA | dopamine or 3,4-**d**ihydr**oxyp**henethyl**amine** |
| EC50 | concentration of agonist required to reach 50% of the maximum response possible for that receptor |
| EPS | extrapyramidal side effects |
| IC50 | concentration of antagonist required to reduce the activity of the targeted receptor by 50% |
| Ki | measure of binding affinity of a compound to a receptor |
| GPCR | G-protein coupled receptor |
| [Q]SAR | [quantitative] structure activity relationship |

    B.      **Structures of Selected Compounds**

        2.      The following table summarizes the common name, chemical name, and chemical

structure of several relevant compounds:

| Compound Name | Chemical Structure |
|---|---|
| aripiprazole<br><br>7-[4-[4-(2,3dichlorophenyl)-1-piperazinyl]butoxy]-3,4-dihydrocarbostyril |  |
| dehydroaripiprazole<br><br>7-(4-(4-(2,3-dichlorophenyl)piperazin-1-yl)butoxy)quinolin-2(1H)-one |  |

| Compound Name | Chemical Structure |
|---|---|
| WO '215 compound A28'<br><br>7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)-butoxy]-3,4-dihydro-1H-[1,8]naphthyridin-2-one |  |
| WO '215 compound B25'<br><br>7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)-butoxy]-1H-[1,8]naphthyridin-2-one |  |

### C.   Relevant Chemical Substructures

3.   The following table provides known relevant chemical substructures:

| Substructure Name | Chemical Structure |
|---|---|
| (1-benzothiophen-4-yl)piperazin |  |
| benzothiophen or benzo[b]thiophen |  |
| dihydro-1H-[1,8]naphthyridin-2-one |  |
| naphthyridin-2-one, [1,8]naphthyridin-2(1H)-one, or 1H-[1,8]naphthyridin-2-one |  |

| Substructure Name | Chemical Structure |
|---|---|
| piperazin or piperazine | |
| 1H-quinolin-2-one, quinolin-2-one, quinolinone, or carbostyril | |
| dihydrocarbostyril or 3,4-dihydroquinolin-2(1H)-one | |
| thiophen or thiophenes | |

### D. **Discussion**

4.     The most common approach to drug discovery involves the identification of targeted properties and selection of a starting compound that has some of the properties deemed to be desirable in the targeted drug.  The selection of the targeted properties for the new drug includes pharmacological, physiological, and medical considerations.  Such a selection generally will be performed in consultation with biological scientists, pharmacologists, and/or medical doctors.  These targeted properties differ according to the specific project but very commonly involve achieving certain pharmacological action at a desirable biochemical target, such as a drug receptor.  Examples of drug-receptor classes include G-protein coupled receptors (GPCRs), which include the dopamine and serotonin receptors and encompass subtypes of distinct structures that have specific pharmacological properties.  Thus, it is often the case that a medicinal chemist is given a goal, such as a targeted receptor profile, from another specialist.  A suitable starting point may be

a molecule called a "hit" or "lead" compound, and may, depending on the circumstances, be identified by a medicinal chemist, biological scientist, pharmacologist, or medical doctor or some combination thereof.

5.     Given the targeted properties and starting point, the medicinal chemist's role is to design and synthesize molecules to be assessed for their suitability for clinical advancement.  In particular, a medicinal chemist identifies modifications to the lead compound that would be expected to lead to the targeted properties and synthesizes molecules that include such modifications.

6.     With the assistance of pharmacologists or other biological scientists, molecules prepared by medicinal chemists are characterized according to their biological properties. Such experiments may include determination of "affinity," i.e., how well the molecules bind to their receptor target (often expressed as a Ki value).  In addition to affinity, molecules are characterized according to how they interact with a receptor target, e.g., whether they act to activate, block, or dampen the receptor's function (i.e., whether the molecules are functioning as agonists, antagonists, or partial agonists, respectively).  The potencies of agonists or partial agonists are usually expressed as EC50 values, which represent the concentration of agonist required to reach 50% of the maximum response possible for that receptor.  Partial agonists are molecules that can activate a receptor but do not cause it to reach maximal possible efficacy.  The potencies of antagonists are usually expressed by IC50 values, which commonly represent the concentration of antagonist required to reduce the activity of the targeted receptor by 50%.  Usually, Ki values, which express the affinity of the compound to its receptor target, are also reported.  The intrinsic activity of a drug is the maximum efficacy of a drug when compared to a full agonist in the same pharmacological class acting at the same receptor.  Intrinsic activity is usually expressed as a

percentage, with partial agonists having an intrinsic activity of greater than 0% but less than 100%.

7.      A medicinal chemist seeks to create a drug candidate that has suitable biological and chemical properties for a drug in the area of interest.  This often begins with the identification of a lead compound that has some of the desired properties needed for the ultimate drug but that requires improvement in one or more parameter, such as potency, selectivity, or safety.  The medicinal chemist then systematically modifies the structure of the lead compound to create related molecules, or "analogs," which are subjected to biological testing.  As part of this process, the medicinal chemist correlates the chemical structures of experimental molecules with their biological activity and, in so doing, identifies "structure-activity relationships" (SARs) for the chemical class.  A medicinal chemist can also rely on previously recognized SARs.  In most examples related to drug discovery, SAR analyses consider the different components of a molecule's structure, e.g., the specific atoms that make it up and how they are organized ("functional groups"), how the different components of the molecule are attached to one another, and how they are organized in three-dimensional space ("stereochemistry").

8.      A medicinal chemist understands that a molecule's biological activity generally arises from its ability to bind to a target, such as a receptor or an enzyme, and interact with that target in a manner that changes the target's function in a useful way.  A given molecule's ability to act as a drug depends on numerous structural features and physical properties of the molecule, including how its atoms are connected and arranged in space, its molecular weight, its electronic properties, its solubility in biological media, and others.  Medicinal chemists may seek to incorporate into molecules considered in drug development work structural features that appear in successful drugs or previously reported drug candidates.  Such features may be ascertained, e.g., from the patent or scientific literature (including public presentations).

9.      In the course of optimizing a lead molecule, medicinal chemists generally use established strategies for modifying particular structural features.  Examples of such strategies include modifying alkyl chains by changing their length or introducing branching, replacing an aromatic ring by other substituted aromatic rings (including heterocycles), changing ring size, or modifying the molecule's stereochemistry.  As most biologically active molecules have moderately to highly complex structures, it is common to explore structural changes in different parts of the lead molecule.  This may be done by changing one part of the molecular structure without altering the rest of the molecule while independently doing the same at other parts of the molecule.  When preferences at different parts of the molecule are ascertained, they are then often combined into follow-up analogs that incorporate multiple aspects of SAR.

10.     In addition, medicinal chemists may seek to create analogs by using established strategies for exchanging one functional group for another.  For example, parts of molecules that have similar chemical or physical features and that may be exchanged in one biologically active molecule to produce another molecule having roughly similar biological activity are called "bioisosteres."  Thus, two molecules that differ only by a replacement of one portion of each molecule with a known bioisostere would reasonably be expected to have similar biological properties.  Suggestions for bioisostere replacements may be ascertained, e.g., from the patent or scientific literature (including public presentations).

11.     Drug discovery is generally carried out iteratively, with rounds of design, testing, and synthesizing molecules being followed by pharmacological or biological evaluation of the molecules being made.  This process ends when one or more molecules deemed suitable for preclinical evaluation has been identified or when the project is abandoned.

12.     When successful, the above process of drug discovery provides one or more

molecules that undergo advanced preclinical evaluation.  This phase of research is often referred to as "drug development" and may include studies on formulation, metabolism, and efficacy in animals.  Molecules that successfully complete preclinical formulation may be advanced to human clinical trials and, ultimately, be submitted for approval for use in the clinic.  In general, if a preclinical candidate has a similar chemical structure to that of a known drug, it is reasonable to expect that it can be formulated in a similar way, and used to treat similar conditions, to the known drug.

13.     A medicinal chemist would have had an understanding of how a drug-discovery team operates and the team's goals and expectations for compounds identified by the medicinal chemist.  For example, a medicinal chemist would have understood that, when the drug-discovery task is to improve upon an existing compound, the expectation would be that a newly discovered compound would be able to be formulated in a similar manner, and used to treat similar conditions, to the old drug.

14.     A medicinal chemist does not require certainty.  The medicinal chemist regularly makes analogs with a reasonable expectation that such analogs will have desired properties.  The medicinal chemist may make multiple analogs in any drug-discovery project with a reasonable expectation that each of those analogs would meet the goals of the project.

15.     The medicinal chemist is aware of relevant general medicinal chemistry practices as well as the art relating to the class of compounds of interest.  Based on the art relating to the compounds of interest, and along with a pharmacologist, clinician, and/or other team members, the medicinal chemist can identify one or more lead compounds.  Based on both the general principles and the more focused prior art, the medicinal chemist is able to propose modifications to the lead compound or compounds.  It is unnecessary to have a perfect understanding of the

complex pharmacology of a lead compound and perfect predictability of the impact of proposed modifications in order to suggest particular modifications—a reasonable expectation of the impact of the proposed modification would suffice.  That is because the medicinal chemist would rely on ordinary skill and creativity, the existing literature, common sense, and collaborations with one or more members of a team of experienced professionals in the relevant fields, and would propose and try various targeted modifications in a particular drug-discovery project to arrive at a compound or compounds with improved pharmacological profiles.

### 1.      Medicinal Chemist's Role in Identifying a Starting Compound

16.     In drug-discovery projects, a medicinal chemist is part of a team that includes professionals with experience in chemistry, pharmacy, medicine, and pharmacology.  In an industrial setting, broad project selection (e.g., to seek an antipsychotic agent) is usually based on perceived medical need and business concerns, while the choice of specific pharmacological characteristics of the proposed drug (e.g., selection of receptor targets and desired activity) is driven by skilled pharmacologists and/or physician-scientists.  At this stage, a medicinal chemist generally participates in decisions pertaining to the discovery or selection of a lead compound for study and optimization.  In this context, the medicinal chemist's expertise most comes into play in assessing the suitability of candidate molecules for preliminary pharmacological evaluation, which includes but is not limited to characteristics like synthetic accessibility, potential for analog generation, and likeliness to be developed as a drug.

17.     In selecting a lead compound, a POSA may well choose to start from the active ingredient in a preferred treatment or the latest in the evolution of treatments known to address the larger medical question of the project, thus avoiding the lengthy and uncertain process of discovering a new lead compound through screening or other methods.

18.     The selection of a suitable lead compound does not require a perfect or complete

understanding of how that lead compound works (which may not be available even for established drugs). To the extent that a prior art compound has a pharmacological particularly complex profile, but one that is believed to be favorable, the complexity of the profile would provide a POSA with a reason to start with that compound as a lead compound. As applied to the present case, Davies 2004 notes that, due to aripiprazole's complex pharmacological profile, "it will be difficult to replicate its actions via the sort of large-scale random screening approaches currently in vogue in pharmaceutical companies." (Davies 2004 at 333.) Because of this very complexity, a POSA would have chosen to focus on aripiprazole as a lead molecule.

### 2.      Identifying Portions of Molecules Suitable for Modification

19.      It is generally accepted that some parts of a lead compound are often more suitable for modification than other parts. A POSA would use available knowledge about how changing parts of the lead compound affects its pharmacological behavior in selecting which parts of the lead are ripe for modification. In optimization studies, it is common for a POSA to replace components of a molecule with substituents that have appeared in other molecules in prior art studies while seeking to produce new molecules to study.

20.      Biological actions of a molecule arise from the molecule as a whole. Despite this, it is understood that systematically changing portions of a molecule and comparing the properties of the new molecule with the old one is the most practical way to seek new molecules with desired properties. This process is intrinsic to the development of structural–activity relationships and a fundamental tenet of medicinal chemistry.

21.      Molecular changes often result in property changes that can be correlated, expected, or understood from fundamental chemical principles, the knowledge of a POSA, and/or pertinent art from the same field, and some modifications may be obvious for a POSA to make in the course of a drug discovery effort.

22.     In considering modifications to a lead compound, a POSA would not have limited themselves to considering structural features present in only FDA-approved compounds.

### 3.     Bioisosterism

23.     Substituting one functional group for another is a fundamental feature of the concept of bioisosterism, which has been an established technique in medicinal chemistry for decades.  It was standard practice before 2005, in 2005, and still is today.  Although a given bioisosteric replacement in one compound may not necessarily result in a new compound with identical properties, the biological properties are more often than not expected to be similar, making such a replacement an obvious strategy to apply when a lead compound with generally appropriate biological properties is available.  It is a standard medicinal chemistry tool precisely because it has been historically successful.

### 4.     Active Metabolites

24.     It was known at the time of the alleged invention that active metabolites should be considered as potential new drug candidates or lead compounds for further modification. (*E.g.*, Fura 2004 at 4348 ("Active metabolites may show superior pharmacology, pharmacokinetics, and safety profiles in comparison to their parent molecules, and the inherent benefits that metabolites often display make their study a worthwhile endeavor.").)

### 5.     Multitarget Focus

25.     The alleged complexity of the receptor activity of aripiprazole makes it more likely that a POSA would have started with aripiprazole or its known active metabolite, dehydroaripiprazole, because aripiprazole was already shown to have suitable polypharmacology in addition to being a clinically successful drug.

### E.     Schizophrenia

26.     Schizophrenia is a chronic illness characterized by perturbations in cognition,

affect, and behavior, all of which have a bizarre aspect.  More specifically, schizophrenia is characterized by the appearance of positive symptoms (*e.g.*, delusions, hallucinations, disorganized speech, or grossly disorganized or catatonic behavior), but may involve a variety of negative symptoms (*e.g.*, lack of emotional expression, decreased speech, social withdrawal, inability to feel pleasure, or lack of motivation).

27.     The *American Psychiatric Association's Diagnostic and Statistical Manual (DSM)*, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 297-323 (American Psychiatric Association, 4th ed. text revision ed. 2000) ("DSM-IV-TR") sets forth six criteria for schizophrenia:

- First, a diagnosis of schizophrenia requires that the individual must be experiencing two or more of the following symptoms for a significant portion of time during a 1-month period (or less if successfully treated): delusions, hallucinations, disorganized speech (*e.g.*, frequent derailment or incoherence), grossly disorganized or catatonic behavior, and/or negative symptoms (*e.g.*, lack of emotional expression, decreased speech, social withdrawal, inability to feel pleasure, or lack of motivation).  However, only one of these symptoms is required for a diagnosis of schizophrenia if the delusions are bizarre, if the hallucinations consist of a voice keeping up a running commentary on the person's behavior or thoughts, or if the hallucinations consist of two or more voices conversing with each other.

- Second, a diagnosis of schizophrenia requires social or occupational dysfunction.  In other words, for a significant portion of the time since the onset of the disturbance, one or more major areas of functioning such as work, interpersonal relations, or self-care are markedly below the level achieved prior to the onset.

- Third, a diagnosis of schizophrenia requires continuous signs of the disturbance persisting for at least 6 months, and this 6-month period must include a month of symptoms set forth in the first criterion.

- Fourth, a diagnosis of schizophrenia requires schizoaffective disorder and mood disorder with psychotic features to first be ruled out.

- Fifth, a diagnosis of schizophrenia requires the disturbance to not be a result of substance abuse or another medical condition.

- Sixth, a diagnosis of schizophrenia requires prominent delusions or hallucinations present for at least a month, if the individual has a history of autistic disorder or another pervasive development disorder.

28.     Schizophrenia is caused by an excessive amount of dopamine activity in the central nervous system ("CNS").

**F.     Physiology of Schizophrenia and Depression**

29.     Many biological functions in the human body are controlled by chemical signals. These chemical signals are received and transmitted by receptors.  The activity of a receptor can be controlled with chemicals that bind to the receptor and cause a biological response, including decreasing or increasing the activity of the receptor.  Chemicals that bind to a receptor can be endogenous (*i.e.*, naturally occurring) or exogenous (*e.g.*, pharmaceuticals).

30.     Some diseases are the result of flawed chemical signaling in a patient.  A receptor may be under-stimulated and not provide a sufficient chemical signal or the receptor may be over-stimulated and cause too strong of a signal.  Because of this, receptors play an important role in pharmacology.  Receptor activity can be modulated through the use of molecules that bind to the receptor.  Pharmaceuticals can be used to target particular receptors and improve their signaling by increasing or decreasing the activity of that particular receptor.  This is particularly true with respect to pharmaceuticals that are intended to treat CNS conditions such as schizophrenia and depression.

31.     An agonist is a molecule that activates a receptor and causes an enhanced biological response.  An antagonist is a molecule that binds to a receptor, but does not activate the receptor. Instead, it blocks or slows the receptor from providing a biological response.  A partial agonist is a molecule that only partially activates the receptor compared to a full agonist.

**1.     Dopamine**

32.     Dopamine is a neurotransmitter in the brain that controls a variety of functions

including locomotor activity, cognition, emotion, positive reinforcement, food intake, and endocrine regulation.  Dopamine plays an important role in the pathophysiology of schizophrenia, Parkinson's disease, and Tourette's syndrome.

Dopamine is released in the brain via dopamine receptors ($D_1$ to $D_5$), which are grouped into two families—the $D_1$ family ($D_1$ and $D_5$) and the $D_2$ family ($D_2$, $D_3$, and $D_4$).  With respect to schizophrenia and treatments of schizophrenia, there has been a focus, in the context of dopamine receptors, on activity at the $D_2$ family of receptors.

Increased dopamine agonism at the $D_2$ receptor may result in psychosis, including auditory and visual hallucinations.

Increased dopamine antagonism at the $D_2$ receptor may result in extrapyramidal motor side effects ("EPS"), including parkinsonism (tremor, slow movement, impaired speech, muscle stiffness), bradykinesia/akinesia (slow movement), akathisia (agitation, distress, restlessness), dystonia (involuntary muscle contractions causing repetitive or twisting movements), and tardive dyskinesia (involuntary movements such as grimacing, eye blinking, jerking extremities, and sticking out tongue).

## 2.    Serotonin

33.    Serotonin or 5-hydroxytryptamine ("5-HT") is a neurotransmitter in the CNS that plays a major role in psychiatric and nonpsychiatric states.  Specifically, serotonin plays an important role in the physiology of depression, anxiety, aggression, pain, sleep, appetite, and migraines.  Serotonin is released in the brain via serotonin receptors.

34.    Increased serotonin agonism at the $5\text{-}HT_{1A}$ receptor may result in decreased anxiety, decreased depressive symptoms, and improvement in negative symptoms of schizophrenia (which include, *e.g.*, lack of emotional expression, decreased speech, social

withdrawal, inability to feel pleasure, or lack of motivation).

35.     Increased serotonin antagonism at the 5-HT$_{2A}$ receptor may result in decreased EPS and improvement in negative symptoms of schizophrenia.

### 3.     Antipsychotics

36.     The pharmaceutical treatment of schizophrenia began in the 1950s with the introduction of so-called first-generation "typical" antipsychotics, including chlorpromazine, haloperidol, and fluphenazine.

37.     Typical antipsychotics function by antagonism (or blocking) of D$_2$ receptors in the brain, which results in a reduction of dopaminergic function.  Because schizophrenia results from an over-abundance of dopamine, blocking the D$_2$ receptor, thereby reducing the amount of dopaminergic function in a patient, improves the positive symptoms of schizophrenia.

38.     In 2004, it was known that the typical antipsychotics are effective in treating the positive symptoms of schizophrenia (such as hallucination, delusion, agitation), but are less effective in treating the negative symptoms (such as blunted affect, emotional withdrawal, apathy).  Also, typical antipsychotics tend to cause EPS, including parkinsonism, acute dystonias, and tardive dyskinesia.  Given these limitations, there was an interest in developing antipsychotics for the treatment of schizophrenia that resulted in fewer or lessened side effects.

39.     The pharmacological basis of antipsychotic efficacy and drug-induced EPS (*e.g.*, parkinsonism) is antagonism of the dopamine D$_2$ receptor.  The parkinsonian effects of typical antipsychotic drugs were originally believed to be an unavoidable side-effect of antipsychotic efficacy.  However, this belief was incorrect and it was known by 2004 that EPS is not tied to antipsychotic efficacy, and the main objective in the search for novel antipsychotic drugs was the reduction or elimination of these side-effects.  This led to the concept of "atypicality," which is used to indicate drugs that demonstrated substantial separation between their antipsychotic action

and their ability to induce EPS.

40.     In the 1980s and 1990s, the treatment of schizophrenia advanced with the introduction of "second-generation" or "atypical" antipsychotics, including clozapine, risperidone, olanzapine, quetiapine, and ziprasidone.   Like typical antipsychotics, atypical antipsychotics function by antagonism (or blocking) of $D_2$ receptors in the brain; however, some of the atypical nature of the compounds is due to blocking of the serotonin 5-$HT_{2A}$ receptors.   Some atypicals are also partial agonists at the 5-$HT_{1A}$ receptors.

41.     As a result of their activity at the serotonin receptors, the atypical antipsychotics introduced in the 1980s and 1990s were found to improve EPS and negative symptoms of schizophrenia, in addition to improvement in depression, anxiety, and negative cognitive symptoms.   Unfortunately, some atypical antipsychotics cause weight gain, sedation, hyperglycemia (high blood sugar), and increased cholesterol and triglycerides, so there remained an interest in developing antipsychotic drugs for the treatment of schizophrenia with fewer side effects.

42.     In 2002, aripiprazole (Abilify®) was approved by the FDA for the treatment of schizophrenia and was described as the first of a so-called third-generation of antipsychotics.

43.     The Abilify® prescribing information ("Abilify PI") states that aripiprazole "exhibits high affinity for dopamine $D_2$ and $D_3$, serotonin 5-$HT_{1A}$ and 5-$HT_{2A}$ receptors ($K_i$ values[1]

---

[1] $K_i$ is referred to as "the inhibition constant."   $K_i$ reflects the binding affinity of a substance.   In this report, $K_i$ reflects the binding affinity of a substance to a receptor.   If the $K_i$ is smaller, this means the binding affinity is greater and that a smaller amount of the substance is needed in order to inhibit the activity of the receptor.   Plaintiffs contend that $K_i$ of a ligand alone provides no information regarding what that functional effect may be.   Not so.   The $K_i$ provides information regarding the binding affinity of a substance and a compound with low or no binding affinity is unlikely to have a meaningful functional effect.   It is also worth noting that the specifications of the Compound Patents include $K_i$ data.   (*See, e.g.*, the RE'059 Patent at Table 22.)   If the $K_i$ values provide "no information" about the functional effect of a compound, as Plaintiffs suggest, then

of 0.34, 0.8, 1.7, and 3.4 nM, respectively), moderate affinity for dopamine $D_4$, serotonin 5-$HT_{2C}$ and 5-$HT_7$, alpha$_1$-adrenergic and histamine $H_1$ receptors ($K_i$ values of 44, 15, 39, 57, and 61 nM, respectively), and moderate affinity for the serotonin reuptake site ($K_i$=98 nM)." (*Abilify Tablets Prescribing Information*, Food & Drug Admin. 1-37, at 1 (Sept. 29, 2004) ("Abilify PI").)[2]  The Abilify PI further states that "the efficacy of aripiprazole is mediated through a combination of partial agonist activity at $D_2$ and 5-$HT_{1A}$ receptors and antagonist activity at 5-$HT_{2A}$ receptors." (*Id.* at 1-2.)

44.     Aripiprazole was found to be effective at treating the positive and negative symptoms of schizophrenia and had a superior side-effect profile, including relatively little impact on weight gain, sedation, serum prolactin elevation, or QT prolongation.  Aripiprazole also was found to have a lower potential for EPS compared with the conventional antipsychotic drugs at the time (such as the typical antipsychotic haloperidol) and some atypical antipsychotic drugs at the time (such as those with dopamine receptor occupancies higher than 80%).

45.     Aripiprazole has a proposed mechanism of action distinct from other antipsychotics drugs based on its partial agonist activity at the dopamine $D_2$ and serotonin 5-$HT_{1A}$ receptors and its antagonist activity at the serotonin 5-$HT_{2A}$ receptors.

46.     Aripiprazole binds to the $D_2$ receptor in a manner that is neither too antagonizing (like a typical antipsychotic drug, *i.e.*, a $D_2$ antagonist) nor too stimulating (like dopamine itself,

---

those $K_i$ values do not support the alleged written description of the asserted claims.

[2] Various earlier versions of the Abilify PI exist (available at https://www.accessdata.fda.gov/ scripts/cder/daf/index.cfm?event=overview.process&ApplNo=021436, last accessed January 13, 2022) and contain essentially the same information.  Defendants reserve the right to rely on any of those.

*i.e.*, a $D_2$ full agonist).  Rather, as shown below, aripiprazole is known to act as an antagonist at high dopaminergic concentrations (but not to the extent of the typical antipsychotic drug haloperidol), and an agonist at low dopaminergic concentrations (but not to the extent of dopamine).



(Green, *Focus on Aripiprazole*, 20 Curr. Med. Res. Opin. 207-13, at 208 (Figure 3) (2004).)

47. Aripiprazole's ability to stabilize the dopamine system is caused by the partial agonist properties at the $D_2$ receptors.  Dopamine system stabilizers ("DSS"), including aripiprazole, are partial agonists and were deemed "Goldilocks" antipsychotics because they found "a desirable position between too much and too little dopamine receptor stimulation."  Davies 2004 describes aripiprazole's "Dopamine (DA) Receptor Activity" as follows:

> Functionally, aripiprazole has demonstrated both agonist and antagonist properties at the $D_2$ receptor, which fits a partial agonist pharmacologic profile.  While aripiprazole has high affinity for $D_2$ receptors, it has low intrinsic efficacy.  Aripiprazole has been touted as a "dopamine system stabilizer" because *in vivo* studies demonstrate that it reduces dopamine release via presynaptic agonism to behave as a functional antagonist of some postsynaptic $D_2$- receptors and as an agonist at others.

(Davies et al., *Aripiprazole: A Novel Atypical Antipsychotic Drug with a Uniquely Robust Pharmacology*, 10 CNS Drug Reviews 317-36, at 319 (2004) ("Davies 2004") (citations

omitted).)  DSSs, including aripiprazole, partially activate dopamine receptor output and cause a stabilizing balance between stimulation and blockade of D₂ receptors.  That is, at low dopamine levels, DSSs will stimulate dopamine receptors, and at high dopamine levels, DSSs will inhibit dopamine receptors.

48.    This results in a decrease in the positive symptoms of schizophrenia without the production of EPS, as demonstrated in the figure below.



(Stahl, *Dopamine System Stabilizers, Aripiprazole and the Next Generation of Antipsychotics, Part*

*2, Illustrating Their Mechanism of Action*, 62 J. CLIN. PSYCHOLOGY 923-24, at 924 (2001) ("Stahl 2001 II").)

49.     Because of this "Goldilocks" activity, aripiprazole was found to be superior to other antipsychotics in treating schizophrenia, as it reduced positive symptoms and improved negative and depressive symptoms.  Moreover, aripiprazole had an improved side-effect profile for some patients (*e.g.*, minimal weight gain, minimal sedation, and minimal hyperglycemia).

As discussed further below, while aripiprazole had advantages relative to typical antipsychotics and other atypical antipsychotics, there were still several negative side effects.  Common side effects for aripiprazole included akathisia,[3] agitation, anxiety, insomnia, and nausea.

## II.     LEVEL OF ORDINARY SKILL IN THE ART

50.     The specifications of the Compound Patents generally relate to antipsychotic compounds, particularly the chemical structure and receptor profile thereof.  With respect to the medicinal chemistry aspect of the art: (1) at least named inventor Dr. Yamashita has a Ph.D. (and am unaware of the educational background of the remaining inventors); (2) the types of problems encountered in the art involve determining what modifications to make to molecules at the atomic level; (3) solutions to the problems involve determining which modifications to make and confirming with biological testing that the molecules have the desired properties; (4) although molecules may be made quickly for screening purposes, identifying a molecule that is later confirmed to have the desired properties can be a lengthy process, with many projects lasting months or years; (5) the technology is complex; and (6) as a result, almost all involved in

---

[3] Akathisia is a state of agitation, distress, and restlessness that is a side-effect of antipsychotic and antidepressant drugs.

developing compounds have a Ph.D. in either medicinal or organic chemistry.

51.     A POSA with respect to the Compound Patents would have worked in conjunction with other individuals, the group of which collectively would have had experience in the fields of medicine, medicinal chemistry, organic chemistry, and pharmacology, among others.  The POSA would have understood that drug development is generally a multidisciplinary effort and would have drawn upon not only his or her own skills but also taken advantage of specialized skills of others.  More specifically, a POSA in the field of the Compound Patents, as of alleged invention date, would have possessed: (i) an advanced degree, such as an M.S. or doctorate, in one or more of the fields of chemistry, pharmacy, medicine, or pharmacology; and (ii) several years of experience in his or her pertinent field, with correspondingly more experience if the advanced degree is not a doctorate.  This POSA would have had access to and/or consulted with, as needed, one or more members of a team of experienced professionals in the relevant fields in order to solve a particular problem.  For example, although a medicinal chemist would generally have an understanding of pharmacology, when faced with a particular drug-discovery project, the medicinal chemist collaborates with and learns from the pharmacologist or medical doctor more details about the pharmacology at issue

## III.    SCOPE AND CONTENT OF THE PRIOR ART

52.     The priority date, including the 35 U.S.C. § 102(b) date, for the Compound Patents is no earlier than April 14, 2005.  The references identified in the tables below are all prior art under § 102(b).

### A.      Identification of Prior-Art Patents and Publications

#### 1.      Patent Literature (Issued Patents and Published Applications)

| Abbreviation | Patent/Pub. No. | Issue/Pub. Date | (First) Inventor | Bates |
|---|---|---|---|---|
| '246 patent | 5,436,246 | 7/25/1995 | Bernotas | JGD_Brex 003471-505 |

| Abbreviation | Patent/Pub. No. | Issue/Pub. Date | (First) Inventor | Bates |
|---|---|---|---|---|
| '254 patent | 4,847,254 | 7/11/1989 | Boegesoe | JGD_Brex 005047-60 |
| '306 publication | 2003/0050306 | 3/13/2003 | Ruhland | JGD_Brex 005223-46 |
| '416 patent | 4,734,416 | 3/29/1988 | Banno | JGD_Brex 003407-50 |
| '528 patent | 5,006,528 | 4/9/1991 | Oshiro | JGD_Brex 003451-70 |
| WO '215 | WO 2005/019215 | 3/3/2005 | Clark | JGD_Brex 003595-953 |
| WO '682 | WO 2004/105682 | 12/9/2004 | Kikuchi | JGD_Brex 003954-4034 |
| WO '864 | WO 2004/026864 | 4/1/2004 | Andreana | JGD_Brex 004154-311 |

2.      Non-Patent Literature

| Abbr. | (First) Author | Title | Pub. Date | Source | Bates |
|---|---|---|---|---|---|
| Abilify PI | | Abilify Tablets Prescribing Information | 9/29/2004 | FDA | JDG_Brex 000435-71 |
| Davies 2004 | Davies | Aripiprazole: A Novel Atypical Antipsychotic Drug with a Uniquely Robust Pharmacology | 2004 | CNS Drug Reviews, 10:317-36 (2004) | JDG_Brex 001100-19 |
| Fura 2004 | Fura | Discovering Drugs through Biological Transformation: Role of Pharmacologically Active Metabolites in Drug Discovery | 2004 | 47 J. Med. Chem. 4339-51 (2004) | JDG_Brex 001134-46 |
| Kubo 2005 | Kubo | Influence of itraconazole coadministration and CYP2D6 genotype on the pharmacokinetics of the new | Feb. 2005 | 20 Drug Metab Pharmacokinet. 1, 55-64 (Feb. 2005) | JDG_Brex 004613-22 |

| Abbr. | (First) Author | Title | Pub. Date | Source | Bates |
|---|---|---|---|---|---|
| | | antipsychotic ARIPIPRAZOLE | | | |
| Kuipers 1995 | Kuipers | N4-Unsubstituted N1-Arylpiperazines as High-Affinity 5-HT1A Receptor Ligands | 1995 | J. Med. Chem., 38, 1942-54 (1995) | JDG_Brex 002176-88 |
| Lowe 1991 | Lowe | 1-Naphthylpiperazine Derivatives as Potential Atypical Antipsychotic Agents | 1991 | 34 J. Medicinal Chemistry 1860 (1991) | JDG_Brex 002311-17 |
| Oshiro 1998 | Oshiro | Novel Antipsychotic Agents with Dopamine Autoreceptor Agonist Properties: Synthesis and Pharmacology of 7-[4-(4-Phenyl-1-piperazinyl)butoxy]-3,4-dihydro-2(1H)-quinolinone Derivatives | 1998 | J. Med. Chem., 41(5):658-67 (1998) | JDG_Brex 002413-22 |
| Patani 1996 | Patani | Bioisosterism: A Rational Approach in Drug Design | 1996 | 96 Chem. Rev. 3147, 3158-59 (1996) | JDG_Brex 002447-76 |
| Thornber 1978 | Thornber | Isosterism and Molecular Modification in Drug Design | 1978 | 7 Chemical Soc'y Revs. 563 (1978) | JDG_Brex 003105-23 |

B. **Brief Description of Prior-Art Patents and Publications**

1. **Patent Literature**

a. <u>'246 patent</u>

53. The '246 patent, titled "Serotonin Receptor Agents," "is directed to a new class of serotonin $5HT_{1A}$ and $5HT_{1D}$ receptor agents, both agonists and antagonists, their use in the treatment of anxiety, depression, migraine, stroke, angina and hypertension as well as pharmaceutical and diagnostic compositions containing them." ('246 patent at 1:8-13.) The '246 patent discloses that "specific $5-HT_2$ receptor antagonists are available already." (*Id.* at 60:42-49.) The '246 patent's compounds are described by Formula I:



Formula I

with various limitations on the labeled substituents. (*Id.* at 14-49.) The '246 patent discloses that "[t]hese benzothiophene derivatives mimic or block the effects of serotonin at the $5HT_{1A}$ ... receptors. They are useful in the treatment of anxiety[] [and] depression …." (*Id.* at 1:50-54.) The '246 patent further states that "the compounds of Formula I are serotonin $5HT_{1A}$ agonists." (*Id.* at 58:5-6.)

54. "All of the compounds of Formula I contain a benzothiophene ring which may be optionally substituted as indicated by the R and Y substituents." (*Id.* at 3:16-20.) The '246 patent provides about 50 examples of the compounds of Formula I (*id.* at 3:38-5:2), including the following, which have low nanomolar and sub-nanomolar "affinity" for the $5-HT_{1A}$ receptor.

EXAMPLE 9          EXAMPLE 10          EXAMPLE 15



EXAMPLE 21          EXAMPLE 23



Example 29          Example 31



(The '246 patent reports the following data as "IC$_{50}$ … (5HT$_{1A}$ Binding Affinity)": 0.5 nM (Example 9); 1 nM (Example 10); 1.8 nM (Example 15); 2 nM (Example 21); 3 nM (Example 23); 4 nM (Example 29); 1 nM (Example 31).)  According to the '246 patent, these compounds "slow the firing of neurons in the dorsal raphe nucleus which contains one of the highest densities of 5HT$_{1A}$ receptors in the CNS.  Inhibition of cell firing results in a reduction in the amount of serotonin released in the brain regions receiving input from the dorsal raphe, thereby altering serotonin tone in the system." (*Id.* at 57:24-31.)

24

55.     In addition, Formula I substituents Y, R, and X may be chosen from, among others, hydrogen, and $R_1$ may be chosen from among others, $C_{1-6}$ alkyl, e.g., butyl ($C_4$), or phenylalkyl, e.g., phenylbutyl.  (*Id.* at 1:31-39.)  These selections (with $R_1$ as phenylbutyl) yield the following compound:



56.     The '246 patent reports "that buspirone, a partial $5HT_{1A}$ agonist, was useful in the treatment of depression."  (*Id.* at 57:49-51.)  The '246 patent further discloses that "[s]ince the compounds of the instant invention are $5HT_{1A}$ receptor agents, they will be useful in the treatment of depression."  (*Id.* at 57:52-54.)  A POSA of medicinal chemistry would note that this patent teaches that molecules related to that drawn in the previous paragraph may bind to the $5HT_{1A}$ receptor.

57.     Both Dr. Ward and Dr. Roth agree that the '246 patent discloses compounds that are serotonin $5HT_{1A}$ receptor agonists or antagonists that are effective in the treatment of anxiety and depression.  Yet, both Dr. Ward and Dr. Roth emphasize that the '246 patent does not indicate that any of its compounds have antipsychotic activity.  But given the prior art as a whole, a POSA would have understood that the lead compound, aripiprazole, was reported to have serotonin $5HT_{1A}$ partial agonist activity.  (Davies 2004 at 322.)

58.     Both Dr. Ward and Dr. Roth criticize that none of the forty-six specific examples of benzothiophene compounds in the '246 patent is unsubstituted.  But Dr. Ward and Dr. Roth ignore that almost all SAR studies start with unsubstituted structures.  Based on the '246 patent's disclosure of an SAR study evaluating forty-six specific benzothiophene compounds, a POSA

would have understood the importance of benzothiophene compounds as constituents of serotonin $5HT_{1A}$ binding agents.  In developing a new antipsychotic molecule targeting those receptors (among others), a POSA would have tried unsubstituted-benzothiophene compounds before substituted benzothiophene compounds.

59.     Both Dr. Ward and Dr. Roth contend that the majority of the compounds exemplified in the '246 patent possess a two-carbon alkyl linker and not a four-carbon chain. Unlike Dr. Ward and Dr. Roth, a POSA would not have ignored the '246 patent's disclosure that $R_1$ can be $C_{1-6}$ alkyl ('246 patent at Abstract), and Oshiro 1998's specific disclosure that "a superiority of butoxy side chain to propoxy and pentoxy side chains in producing potent DA antagonist activity in the 3,4-dihydro-2(1H)-quinolinone series"—the series of aripiprazole that a POSA would have chosen as a lead compound (Oshiro 1998 at 660).

60.     Dr. Roth also highlights that none of the compounds disclosed in the '246 patent (and some other references) has ever received FDA approval.  That is irrelevant, because a POSA would not be guided only by FDA approved compounds when considering modifications to an already-identified lead compound.  Instead, a POSA would review the references in the relevant art as whole while considering modifications to a lead compound.

b.     '254 patent

61.     The '254 patent is titled "CNS Affecting 5-Oxy-3-Aminomethyl-Dihydro-Benzofurans and Benzothiophenes" and relates to their use in methods for treating schizophrenia, Parkinson's disease, depression, anxiety, migraine and senile dementia.  ('254 patent at Abstract.) According to the patent's background, "[d]amping of dopamine (DA) overactivity is an important principle in the treatment of various CNS-disorders such as schizophrenia and dyskinesia."  (*Id.* at 1:6-12.)  One method for inhibiting DA function is to "stimulate presynaptic DA-receptors (DA

26

autoreceptors) which inhibit DA-cell firing." (*Id.* at 1:13-15.)

62.    The '254 patent discloses compounds having the general formula I (below), which are "effective at presynaptic DA receptors, or both at pre- and postsynaptic DA receptors, indicating usefulness in the treatment in disorders of the central nervous system (CNS) such as schizophrenia." (*Id.* at 1:26-41, 2:4-8.)



The '254 patent exemplifies a number of compounds of Formula I that contain a benzothiophene core, including:

5-Nitro-N,N-dipropyl-3-benzothiophencarboxamide (Example 19):



5-Amino-N,N-dipropyl-3-benzothiophencarboxamide (Example 20):



(*Id.* at Examples 19-20.)

c.    '306 publication

63.    The '306 publication discloses heteroaryl derivatives potently binding to the 5-
$HT_{1A}$ receptor, compositions that contain these compounds, and the use of these compounds to
treat certain psychiatric and neurological disorders.  ('306 publication at [0002].)  The '306
publication further teaches that the disclosed compounds are "considered to be particularly useful
for the treatment of depression and psychosis."  (*Id.*)  In addition, the '306 publication discloses
that 5-$HT_{1A}$ antagonists may be useful in the treatment of schizophrenia.  (*Id.* at [0006].)

64.    The '306 publication discloses compounds with following general structures:



wherein X is —O—, —S—, or —$CR^4R^5$—; and Y is —$CR^6R^7$—, —$CR^6R^7$—$CR^8R^9$—, or —
$CR^6$═$CR^7$—; or X and Y together form a group —$CR^4$═$CR^5$—, or —$CR^4$═$CR^5$—$CR^6R^7$—; Z is
—O—, or —S—; W is N, C, or CH; n is 2, 3, 4, 5, 6, 7, 8, 9 or 10; m is 2 or 3; A is O or S.  (*Id.*
at [0017]-[0026].)

65.    The '306 publication discloses a benzo[b]thiophene moiety—wherein $R^1$, $R^2$ and
$R^3$ are hydrogens, X and Y together is -$CH_2$═$CH_2$-, and Z is S, as depicted below:



(*Id.* at [0262]-[0498] (disclosing, among others, compounds 2e, 5ad, 5ao, 5bt, and 5ci).)

28

66.     The '306 publication evaluates the pharmacological activity of the above benzo[b]thiophene moiety against other groups and discloses testing results showing that compounds with a benzo[b]thiophene moiety show desired affinity for the 5-HT$_{1A}$ receptors.  (*Id.* at [0499]-[0514], [0506] Table 1 (disclosing, among others, compounds 2e and 5ci).)

67.     The '306 publication also discloses a pharmaceutical composition comprising a compound as an active ingredient or a pharmaceutically acceptable salt thereof and at least one pharmaceutically acceptable carrier or diluent.  (*Id.* at [0175], [0517], claim 14.)  It also discloses that the pharmaceutical composition may be in the form of a tablet.  (*Id.* at [0516], [0517].)

68.     The '306 publication further discloses a method for treating a disorder or disease of an animal by administering to the animal a therapeutically effective amount of one of the disclosed compounds or a pharmaceutically acceptable acid addition salt of the compound.  (*Id.* at [0179], claim 15.)

69.     The '306 publication discloses a total daily dose usually in the range of about 0.05 to 500 mg and most preferably about 0.1 to 50 mg of the active compound.  (*Id.* at [0518].)

70.     The '306 publication supports a POSA's understanding that benzothiophene is one viable substituent that can be used to modify a lead compound with a reasonable expectation of success to arrive at a compound with desired 5-HT$_{1A}$ partial agonist activity.

### d.     '416 patent

71.     The '416 patent teaches the preparation of pharmaceutically useful carbostyril derivatives that are antihistamic agents or central nervous controlling agents.  ('416 patent at Abstract.)  The '416 patent discloses a number of compounds having the following general structure:



wherein the carbon-carbon bond at the 3,4 position is either a single or double bond.   The

compounds are disclosed as having central nervous controlling activity, such as antischizophrenia

activity.   For all of the respective compounds disclosed, the specification of the '416 patent

provides examples of both a single and double bond at the 3,4 position.

72.   The '416 patent also discloses that "the present compounds are particularly useful

as … anti-manic depressive psychosis drugs." ('416 patent at 2:61-63.)

e.   '528 patent

73.   The '528 patent is titled "Carbostyril Derivatives" and is directed to a genus of

compounds of Formula (1) (reproduced below), pharmaceutical compositions containing such

compounds, and the use of such compounds in the treatment of schizophrenia.   ('528 patent at

Abstract, 1:5-12, 2:30-3:25.)

74.     The Background of the '528 patent discusses a number of drugs having the activity for blocking the neurotransmission of the dopaminergic receptor in the central nervous system, including chlorpromazine, haloperidol and sulpiride, which were "widely used for the purpose of improving so-called positive symptoms in the acute period of schizophrenia such as hallucinations, delusions and excitations."  (*Id.* at 1:23-33.)  These drugs, however, were considered as "not effective for improving so-called … negative symptoms … observed in the chronic period of schizophrenia such as apathy, emotional depression, [and] hypopsychosis" and also gave "side-effects such as akasthisia, dystonia, Parkinsonism dyskinesia and late dyskinesia … caused by blocking the neurotransmission of dopaminergic receptor in the striate body."  (*Id.* at 1:34-43.)

75.     The Background further explains that the "inventors have made an extensive study for the purpose of developing drugs for treating schizophrenia, which would not only be effective for improving the negative symptoms, but also effective for improving the positive symptoms … with less side-effects as compared with those shown by drugs known in the prior art."  (*Id.* at 1:51-60.)

76.     The '528 patent states that the carbostyril derivatives of Formula (1) (above), possess "strong activity for blocking the neurotransmission effect of dopaminergic receptor."  (*Id.* at 1:57-60.)  The '528 patent teaches that the biological activity of the core structure can be optimized by modifying the substituents at the 2,3-phenyl positions and disclosed tests of

31

pharmacologic activity of thirteen test compounds having different substituents at the 2,3-phenyl positions, including the later-named compounds aripiprazole (Example 1/Test Compound 1) and dehydroaripiprazole (Example 10/Test Compound 10). (*Id.* at Tables 2-3.) The '528 patent reports that the pharmacological activity of the compounds varied based on the substituents at the 2 and 3 phenyl positions. (*Id.* at Table 3 (disclosing the anti-apomorphine and anti-epinephrine activity for 13 compounds).)

77. The '528 patent discloses Reaction Formula-1 (*see* below; '528 patent at cols. 3-4), which was specifically used to prepare aripiprazole in Example 1 ('528 patent at cols. 10-12 (suspension of 47 g of 7-(4-bromobutoxy)-3,4-dihydrocarbostyril, 35 g of sodium iodide with 600 ml of acetonitrile was refluxed for 30 minutes; to this suspension was added 40 g of 1-(2,3-dichlorophenyl)piperazine)).



Reaction Formula-1

In compound (4), R is an aromatic ring, and, in compound (3), the carbon-carbon bond between the 3- and 4-positions in the carbostyril skeleton may be a double bond, and $X^1$ is a halogen atom or a group which can carry out a substitution reaction similar to a halogen atom. (*Id.* at 3:44-4:6.)

78.     The '528 patent is directed to carbostyril derivatives for treating schizophrenia and discloses both aripiprazole and dehydroaripiprazole, the latter of which contains a double bond between the 3- and 4-positions in the carbostyril skeleton.  As such, a POSA reviewing the '528 patent would have considered compounds containing a double bond at the carbon-carbon bond between the 3- and 4-positions in the carbostyril skeleton.s

        f.    <u>WO '215</u>

79.     WO '215 discloses "[1,8]naphthyridin-2-ones and related compounds, methods of making such compounds, pharmaceutical compositions containing them, and their use for the treatment of schizophrenia and other central nervous system (CNS)" disorders or conditions.  (WO '215 at 1:6-9.)   "The [1,8]naphthyridin-2-ones and related compounds of [WO '215] bind to dopamine $D_2$ receptors.  Some exhibit activity as partial agonists of $D_2$ receptors, while others exhibit activity as antagonists of such receptors."  (*Id.* at 1:10-11.)  WO '215 "also relates to a method of treating a disorder or condition selected from the group consisting of single episodic or recurrent major depressive disorders, … bipolar disorders or manic depression, … schizophrenia and other psychotic disorders," and others "in a mammal, including a human, comprising administering to a mammal in need of such treatment an amount of a compound of the formula **1**, or a pharmaceutically acceptable salt thereof, that is effective in treating such disorder or condition."  (*Id.* at 3:27-5:2.)  WO '215 "also relates to a pharmaceutical composition for treating [such a] disorder or condition …, the pharmaceutical composition comprising an amount of a compound of the formula **1**, or a pharmaceutically acceptable salt thereof, that is effective in treating such disorder or condition, and a pharmaceutically acceptable carrier."  (*Id.* at 5:3-7.)

80.     WO '215 discloses compounds, which are described as partial agonists of $D_2$ receptors, with the following general structure (formula **1**):

wherein G is



|  (i)  |  (ii)  |

wherein, among others, A may be –(CH$_2$)$_m$CH$_2$-, wherein m is an integer from 2 to 5; D may be N; Z and Q are independently N, C, or CH, provided that at least one of Z and Q is N; -X—Y- may be –CH$_2$-CH$_2$- or –CH=CH-; ring AA may be an unsaturated 5-membered carbocyclic ring wherein one of the carbon atoms of said ring that is not shared with the benzo ring of group (ii) can be replaced with a sulfur atom; R$^1$ may be nitrogen; and R$^4$, R$^5$, R$^6$, R$^7$, R$^{11}$, R$^{12}$, R$^{13}$, and R$^{14}$ may be hydrogen.  (*Id.* at 1:23-3:20.)  Preferred compounds of Formula 1 include where G represents one of the following groups, which includes a 4-benzothiophene substituent:

34



(*Id.* at 8:14-17.)  Other preferred compounds are those where G is a naphthyl group or a 2,3-dichlorophenyl group.  (*Id.* at 8:17-9:3.)  Replacing the naphthyl group with a benzothiophene is a classic bioisosteric replacement.  (Patani 1996 at 3158; Thornber 1978 at 564, Table 1.)  Of these preferred compounds, WO '215 specifically exemplifies, among others, Examples A1, B1, A28', and B25'.

81.  **Example A1**,   7-{4-[4-(2,3-Dichloro-phenyl)-piperazin-1-yl]-butoxy}-3,4-dihydro-1H-[1,8]naphthyridin-2-one, has the following structure:

(*Id.* at 87:1-89:20.)  Example A1 is identical to aripiprazole but for the addition in Example A1 of a second nitrogen atom in the carbostyril-derived ring system to provide a 3,4-dihydro-1H-[1,8]naphthyridin-2-one instead of a 3,4-dihydrocarbostyril as in aripiprazole.  Such an N-to-CH (e.g., naphthyridine-to-carbostyril) substitution is a common, classical, bioisosteric substitution.  (*See* Patani 1996 at 3159; Thornber 1978 at 564, Table 1.)

35

82. **Example B1**, 7-{4-[4-(2,3-Dichloro-phenyl)-piperazin-1-yl]-butoxy}-1H-[1,8]naphthyridin-2-one, has the following structure:



(*Id.* at 157:32-150:10.) Example B1 is identical to dehydroaripiprazole but for the addition in Example B2 of a second nitrogen atom in the carbostyril-derived ring system to provide a 1H-[1,8]naphthyridin-2-one instead of a quinolin-2(1H)-one (i.e., a carbostyril) as in dehydroaripiprazole. Such an N-to-CH (e.g., naphthyridine-to-carbostyril) substitution is a common, classical, bioisosteric substitution. (*See* Patani 1996 at 3159; Thornber 1978 at 564, Table 1.)

83. **Example A28'**, 7-[4-(4-(Benzo[b]thiophen-4-yl-piperazin-1-yl)-butoxy]-3,4-dihydro-1H-[1,8]naphthyridin-2-one, has the following chemical structure:



(*Id.* at 294:28-34.) Example A28' is identical to Example A1 but for Example A28' having a benzo[b]thiophenyl attached to the piperazine instead of a 2,3-dichloro-phenyl as in Example A1.

84. **Example B25'**, 7-[4-(4-Benzo[b]thiophen-4-yl-piperazin-1-yl)-butoxy]-1H-[1,8] naphthyridine-2-one, has the following structure:

(*Id.* at 316:25-29.)  Example B25' is identical to Example B1 but for Example B25' having a

benzo[b]thiophenyl attached to the piperazin instead of a 2,3-dichloro-phenyl as in Example B1.

85.     Claim 8 of WO '215 (*id.* at 346:12-348:8) recites twenty-nine specific compounds,

including Example A1 (*id.* at 347:3-4), Example B1 (*id.* at 347:5-6), and Example A28' (*id.* at

347:25-26).

86.     The naphthyridine-2-ones disclosed in WO '215 and depicted above are the

nitrogen-containing analogues for the quinoline-2-ones disclosed in Oshiro 1998, including

aripiprazole and dehydroaripiprazole.  In particular, WO '215's Example A1 is an analogue of

aripiprazole, and WO '215's Example B1 is an analogue of dehydroaripiprazole.  As stated above,

such an N-to-CH (e.g., naphthyridine-to-carbostyril) substitution is a common, classical,

bioisosteric substitution.  (*See* Patani 1996 at 3159; Thornber 1978 at 564, Table 1.)

87.     WO '215 discloses a dopamine $D_2$ receptor binding assay used to measure the

binding affinity of its compounds.  (*Id.* at 72:6-29.)  It reports:

> Title compounds of the Examples, below, were tested using
> the above assay, in which specific binding determined in the
> presence of 1 mM haloperidol 25 was 95%.  All of the title
> compounds exhibited Ki values less than or equal to 75 nM (see
> Tables 1 and 2, below).  Preferred embodiments of compounds of
> the present invention preferably exhibit Ki values of no more than
> 100 nM, more preferably no more than 50 nM, even more preferably
> no more than 25 nM, most preferably no more than 10 nM.

(*Id.* at 72:25-29.)  Examples A1, B1, A28', and B25' all meet the Ki "most preferably no more

than 10 nM" criterion.  (*Id.* at 73-86 (Tables 1-2).)

88.     WO '215 also discloses a [$^3$H]thymidine uptake assay for $D_2$ intrinsic activity.  (*Id.* at 72:30-73:24).  It discloses that in the assay, "[t]est compounds are compared to 1 μm Quinprol [sic] (full DA agonist), which was classified as 100% intrinsic activity."  (*Id.* at 73:16-17.) Compounds of the present invention preferably exhibit at least 1% to up to 90% intrinsic activity, more preferably [sic] at least 10% to up to 90% activity, more preferably at least 10% to up to 80% activity, more preferably at least 20% to up to 60% intrinsic acitivity [sic], even more preferably at least 30% to up to 50% intrinsic activity."  Examples A25' and B28' are reported as displaying 21% $D_2$ intrinsic activity in this assay.  (*Id.* at 82-86 (Table 2, Example A28', Example B25').)

89.     Thus, WO '215 reports on the affinity of the above-depicted preferred compounds for the $D_2$ receptor as well as their intrinsic activity for that receptor.  The following table summarizes the affinity (Ki) and intrinsic activity for the $D_2$ receptor for Examples A1, B1, A28', and B25':

| Example No. | $D_2$ Ki (nM) | $D_2$ Intrinsic Activity (%) |
|---|---|---|
| A1 | 1.0 | 30 |
| B1 | 1.0 | 19 |
| A28' | 0.3 | 21 |
| B25' | 1.0 | 21 |

(*Id.* at 73-86 (Tables 1-2).)  Thus, WO '215 shows that replacement of the 2,3-dichlorophenyl moiety with a thiophene ring to provide a 4-benzothiophene group attached to piperazine generally maintains $D_2$ potency as a partial agonist.

90.     WO '215 discloses a method of synthesizing compound 1A using Scheme B:

-continued

4

L – OMs, OTs, Br, Cl



1A

(*Id.* at 51:1-15.)  Scheme B illustrates a reaction of a compound of Formula 4 (a carbostyril moiety having a double bond between the 3- and 4-positions in the carbostyril skeleton, an –alkoxy group substituted at the 7-position of the carbostyril, and a leaving group L, such as halogen atom or a group which causes a substitution reaction, located at the terminus of the –alkoxy group) with a G-substituted piperazine compound (wherein D can be nitrogen) in the presence of a base to yield the desired compound of formula 1A.  For example, compound A85 is prepared via Scheme B using the following starting materials:

Compound A85

(*Id.* at 145:30-147:30 (structures drawn).)

91.    In addition, WO '215 discloses a pharmaceutical composition comprising a compound as an active ingredient or a pharmaceutically acceptable salt thereof and at least one pharmaceutically acceptable carrier or diluent.  (*Id.* at 1:6-9, 69:13-26, claim 9.)  WO '215 also discloses that the pharmaceutical composition may be in the form of a tablet and that, "[i]n general, the weight ratio of the novel compounds of this invention to the pharmaceutically acceptable carrier will be in the range from about 1:6 to about 2:1, and preferably from about 1:4 to about 1:1" (i.e., the active ingredient will be in the range of about 14% to about 67%, preferably about 20% to about 50%, of the tablet).  (*Id.* at 69:13-34.)

92.    Dr. Ward and Dr. Roth opine that WO '215 discloses that the bicyclic ring includes Z and Q, provided that at least one of Z and Q is N, and, therefore, the ring cannot be a carbostyril ring.  Dr. Ward and Dr. Roth ignore that a POSA would have understood that the bicyclic ring in WO '215 encompasses [1,8]naphthyridine-2-one, which is a close bioisostere of a carbostyril ring.  Indeed, a carbostyril differs from a napthyridin-2-one by a simple bioisosteric substitution of N-to-CH, which is a common, classical, bioisosteric substitution.  (*See* Patani 1996 at 3159; Thornber

40

1978 at 564, Table 1.)

93.     Dr. Ward and Dr. Roth also ignore that WO '215 clearly teaches that replacing 2,3-dichloro-phenyl with benzo[b]thiophenyl can lead to a compound with improved affinity (Ki) and comparable intrinsic activity for the $D_2$ receptor.  Dr. Ward and Dr. Roth overplay the number of substitutions that a POSA would have considered based on WO '215.  A POSA starting with aripiprazole/dehydroaripipraozle, having a 2,3-dichlorophenyl substituent, as the lead compound would have been motivated by the disclosures in WO '215 with a reasonable expectation of success to modify the 2,3-dichloro-phenyl to 4-benzothiophene for further improvement.  The 4-benzothiophene substituent would have been one of a group of four alternative substituent classes to aripiprazole/dehydroaripipraozle's 2,3-dichlorophenyl.

94.     A POSA, looking to modify the 2,3-dichlorophenyl substituent of aripiprazole, would have identified WO '215 because WO '215 discloses compounds very similar to aripiprazole, having both 2,3-dichlorophenyl substituents and alternatives thereto, for the treatment of schizophrenia.  And more importantly, WO '215 discloses a replacement, benzo[b]thiophenyl, for the 2,3-dichloro-phenyl substituent, to arrive at compounds with improved $D_2$ affinity.

g.     WO '682

95.     WO '682 describes a pharmaceutical composition that "comprises a carbostyril derivative which is a dopamine-serotonin system stabilizer and a mood stabilizer in a pharmaceutically acceptable carrier.  The carbostyril derivative may be aripiprazole or a metabolite thereof."  (WO '682 at Abstract.)  WO '682 explains that "[a] preferred carbostyril derivative of the present invention that is a dopamine-serotonin system stabilizer is aripiprazole or a metabolite thereof."  (*Id*. at 5:4-7.)  WO '682 further teaches that "[a]nother preferred carbostyril derivative of the present invention that is a dopamine-serotonin system stabilizer is a metabolite of

aripiprazole called dehydroaripiprazole, also known as OPC-14857." (*Id*. at 5:8-11.)  WO '682 repeats the preference for dehydroaripiprazole throughout its disclosure.  (*E.g.*, *id*. at 31:3-5.)

96.    WO '682 describes compositions containing dehydroaripiprazole as possessing "excellent efficacy" with "fewer side-effects and an excellent safety profile." (*Id.* at 31:27-32:3.) WO '682 also teaches that "the pharmaceutical composition of the present invention is effective on schizophrenia and other psychotic disorders," including "depressive disorders such as major depressive disorder, endogenous depression, melancholia, depression in combination with psychotic episodes, refractory depression," and others.  (*Id.* at 39:14-40:13; *see also* at 4:16-24, 32:4-33:4, 38:25-39:13.)  WO '682 further discloses that "[a]ripiprazole possesses 5-HT$_{1A}$ receptor agonist activity, and is known as a useful compound for treating types of depression and refractory depression, such as endogenous depression, major depression, melancholia and the like." (*Id.* at 5:24-28; *accord id.* at 18:15-19.)

97.    WO '682 provides numerous formulations for the oral administration of dehydroaripiprazole, including tablets containing dehydroaripiprazole along with pharmaceutical excipients.  (*Id.* at 56-60 (Formulation Sample Examples 11-20 and 22).)   For example, Formulation Sample 17 contains 5 mg dehydroaripiprazole in a 450 mg tablet (i.e., about 1.1% active ingredient by weight).  (*Id.* at 58.)  WO '682 also describes doubled-blind, randomized, placebo-controlled trials to evaluate the efficacy of the co-administration of dehydroaripiprazole, with certain other agents, in treating certain neurological disorders.  (*Id.* at 64-65 (Example 6), 67-68 (Example 8).)

98.    A POSA would have understood WO '682, a published Otsuka international patent application, to be differentiating dehydroaripiprazole from the other metabolites.  For example, WO '682 discloses:

42

> Metabolic derivatives of aripiprazole include but are not limited to dehydroaripiprazole, also called OPC-14857.   Other metabolic derivatives of aripiprazole include but are not limited to the chemical structures shown in Figure 8 as OPC-14857, OPC-14858, DM-1458, DM-1451, DM-1452, DM-1454 and DCPP.

(WO '682 at 15:16-21.)  There are two points worth noting here: first, dehydroaripiprazole is the only compound having an "OPC-" prefix, which would have informed a POSA that Otsuka was working with or developing this compound; and, second, throughout WO '682, dehydroaripiprazole is either the first metabolite being mentioned (*see, e.g.*, WO '682 at 5:15, 6:13, 8:6, 10:7, 15:20) or, more importantly, the only metabolite being mentioned (*see, e.g.*, *id.* at 1:14 (disclosing dehydroaripiprazole specifically in the Field of the Invention), 5:8-11 (disclosing dehydroaripiprazole as "[a]other preferred carbostyril derivative"), 31:3-5 ("Dehydroaripiprazole (also called OPC-14857 in Figure 8) is a preferred metabolite of aripiprazole."), 31:5-27 (disclosing specific combinations with dehydroaripiprazole).)

99.    WO '682 presents pharmacological information for dehydroaripiprazole.  Two clinical study Examples from WO '682 used dehydroaripiprazole and obtained favorable results. (*See* WO '682 at Examples 6 ("[T]he addition of dehydroaripiprazole provided superior efficacy in the treatment of manic and mixed bipolar episodes."), 8 ("The results indicate that dehydroaripiprazole in combination with DVP is more effective for the treatment of adolescent bipolar mania than DVP alone.").)  A POSA would have understood in reviewing WO '682 that aripiprazole was the only other compound for which similar clinical studies were conducted, and that had similar clinical outcomes.   (*See* WO '682 at Examples 5 ("6-week double—blind, randomized, placebo-controlled trial is conducted to determine the efficacy of combined therapy with aripiprazole") vs. 6 (6-week double—blind, randomized, placebo-controlled trial is conducted to determine the efficacy of combined therapy with dehydroaripiprazole"), and 7 ("randomized, double-blind, placebo-controlled study examines the efficacy and tolerability of

aripiprazole in combination") vs. 8 ("randomized, double-blind, placebo-controlled study examines the efficacy and tolerability of dehydroaripiprazole in combination").  These clinical study outcomes support that, in addition to aripiprazole, a POSA would have also selected dehydroaripiprazole as a lead compound.

> h.   <u>WO '864</u>

100.   WO '864 discloses "heterocyclic substituted piperazines, pharmaceutical compositions containing them and their use for the treatment of schizophrenia and other central nervous system (CNS) [disorders]."  (WO '864 at 1:6-8.)  WO '864 reports that "[t]he heterocyclic substituted piperazine derivatives of this invention exhibit activity as antagonists of dopamine D2 receptors and of serotonin 2A (5HT2A) receptors."  (*Id.* at 1:9-11).  Compounds disclosed are of the following formula **1**:



**1**

wherein, among others, X may be sulfur; Y may be CH; Z may be nitrogen; A may be $-(CH_2)_mCH_2-$; m may be an integer from one to four (e.g., m=3); $R^1$, $R^2$, $R^3$, $R^4$, and $R^9$ may be hydrogen; and $W^2$—$W^1$ may be a carbon bond that may be unsaturated.  (*Id.* at 2:1-4:15.)  These selections make some of the simplest versions of the compound disclosed by WO '864.  One such compound,    6-[2-(4-benzo[b]thiophen-3-yl-piperazin-yl)-ethyl]-4*S*-methyl-3,4-dihydro-1H-quinolin-2-one, is disclosed as a particular example of the invention.  (*Id.* at 76:13-31 (Example 45).)  This compound has the following structure:

44

**Example 45**

While Example 45 has a $C_2H_4$ linker in the middle, the general structure above also permits $C_4H_8$.

101.   WO '864 discloses that "[a]ll of the title compounds of the examples were tested and at least one stereoisomer of each such compound exhibited a binding affinity for the D2 receptor, measured as percent inhibition at a concentration of 0.1 μm, of no less than 14% and up to 100%." (*Id.* at 34:8-11.)

102.   With respect to "Serotonin 2A Binding," "All of the title compounds of Examples 1 – 36 exhibited Ki values less than or equal to 1 uM.  The title compound of Example 8 exhibited a Ki of 5 nM.  The title compound of Example 31 exhibited a Ki of 2 nM.  The title compound of Example 23 exhibited a Ki of 1 nM." (*Id.* at 35:19-23.)  A POSA interested in 5-HT$_{2A}$ antagonism would have been motivated to explore other compounds of WO '864, including those of the form of Example 45 and with a $C_4H_8$ linker.

103.   WO '864 further discloses that the compounds it teaches are useful for schizophrenia, major depressive disorders, and various other psychiatric conditions.  According to WO '864 the disclosed compounds may be used to treat a disorder as follows:

> A more specific embodiment of this invention relates to the above method wherein the disorder or condition that is being treated is selected from major depression, single episode depression, recurrent depression, child abuse induced depression, postpartum depression, dysthymia, cyclothymia and bipolar disorder.
>
> Another more specific embodiment of this invention relates to the above method wherein the disorder or condition that is being treated

> is selected from schizophrenia, schizoaffective disorder, delusional disorder, substance-induced psychotic disorder, brief psychotic disorder, shared psychotic disorder, psychotic disorder due to a general medical condition, and schizophreniform disorder.

(*Id.* at 14:3-13.)

### 2. Non-Patent Literature

#### a. Abilify PI

104. Abilify PI is the September 2004 version of the prescribing information for Abilify, the Plaintiffs' FDA-approved aripiprazole drug product. Abilify PI discloses that aripiprazole, "a psychotropic drug that is available as tablets for oral administration," has the following structure:



(Abilify PI at 1.)   According to Abilify PI, aripiprazole is indicated for the treatment of schizophrenia and bipolar disorder. (*Id.* at 10.)  Abilify PI discloses aripiprazole tablets in 5 mg, 10 mg, 15 mg, 20 mg, and 30 mg strengths.  (*Id.* at 1.)

105. According to Abilify PI, aripiprazole exhibits affinity for the dopamine $D_2$ and serotonin 5-HT$_{1A}$ and 5-HT$_{2A}$ receptors ($K_i$ values of 0.34, 1.7, and 3.4 nM, respectively), and functions as a partial agonist at the $D_2$ and 5-HT$_{1A}$ receptors and an antagonist at the 5-HT$_{2A}$ receptor.  (*Id.* at 1-2.)  Abilify PI also discloses:

> ABILIFY activity is presumably primarily due to the parent drug, aripiprazole, and to a lesser extent, to its major metabolite, dehydro-aripiprazole, which has been shown to have affinities for $D_2$ receptors similar to the parent drug and represents 40% of the parent drug exposure in plasma.  The mean elimination half-lives are about 75 hours and 94 hours for aripiprazole and dehydro-aripiprazole, respectively. Steady-state concentrations are attained within 14 days of dosing for both active moieties.

(*Id.* at 2.)

106.    Aripiprazole is metabolized primarily by CYP2D6 and CYP3A4 enzymes.  (*Id.* at 3, 5.)  Co-administration of quinidine, "a potent inhibitor of CYP2D6, increased the AUC [area under the curve] of aripiprazole by 112% but decreased the AUC of its active metabolite, dehydroaripiprazole, by 35%.  Aripiprazole dose should be reduced to one-half of its normal dose when concomitant administration of quinidine with aripiprazole occurs."  (*Id.* at 17.)  In other words, aripiprazole may be associated with certain effects related to CYP2D6 metabolism, while dehydroaripiprazole may not be.

107.    According to Abilify PI, aripiprazole use is associated with several conditions, including Neuroleptic Malignant Syndrome, tardive dyskinesia, hyperglycemia, diabetes mellitus, orthostatic hypotension, seizure, somnolence and dysphagia.  (*Id.* at 10-15.)  Abilify PI also identifies a number of frequently reported adverse events.  (*Id.* at 29-31.)  Frequent adverse events relating to the nervous system observed during the premarketing evaluation of aripiprazole included, e.g., nervousness, hostility, confusion, paranoid reaction, and suicidal thought.  (*Id.* at 30.)  In addition, during clinical trials, a significant percentage of patients experienced akathisia as a side-effect to aripiprazole treatment.  (*Id.* at 26.)

108.    Abilify PI discloses oral tablets containing 5, 10, 15, 20, or 30 mg of aripiprazole along with various excipients, i.e., lactose monohydrate, cornstarch, microcrystalline cellulose, hydroxypropyl cellulose, magnesium stearate, and colorants, including ferric oxide (yellow or red) and FD&C Blue No. 2 Aluminum Lake.  (*Id.* at 1.)

109.    A POSA reviewing Abilify PI 2004 would have understood that dehydroaripiprazole is aripiprazole's "major metabolite" and that it is also useful in treating schizophrenia.  Based on this, a POSA would have identified dehydroaripiprazole (as well as

aripiprazole) as a lead compound.

        b.    <u>Davies 2004</u>

110.    Davies 2004 discloses that

> In November, 2002, aripiprazole (Abilify®), was approved by the U.S. FDA and introduced for the treatment of schizophrenia. Aripiprazole has been described as "the first next generation atypical antipsychotic" because of its unique pharmacologic profile, which includes a lower $5\text{-}HT_{2A}/D_2$ affinity ratio and a different side effect profile from all other atypical antipsychotic drugs. Additionally, recent pharmacologic evidence indicates that aripiprazole represents a "magic shotgun," being functionally selective at multiple biogenic amine receptors.

(Davies 2004 at 318 (citations omitted).)  Davies 2004 reports from the literature an average Ki

for aripiprazole at $D_2$ receptors of 1.64 nM (*id.* at 323) and further reports the following:

> Data from binding studies consistently indicate that aripiprazole has a high affinity for dopamine $D_2$ (15,49,54,80) and $D_3$ (15,54,80) receptors … . Lawler et al. (54) reported aripiprazole's high affinity for $D_2$-like dopamine receptors in rat striatum ($K_i$= 4.7 nM) and in Chinese Hamster Ovary (CHO) cells lines, each transfected with the $D_{2S}$ and $D_{2L}$ isoforms of the human dopamine receptor ($K_i$s < 1.0 nM).  Burris et al. (15) reported a somewhat higher affinity ($K_i$= 0.34 nM) for human cloned $D_2$ receptors, while Shapiro et al. (80) reported that aripiprazole had similar affinity at the human $D_{2L}$ ($K_i$= 0.74 nM) … .

(*Id.* at 319.)  Davis 2004 reports from the literature average Ki values for aripiprazole of 5.59 nM

at $5\text{-}HT_{1A}$ and 8.7 nM and 35 nM at $5\text{-}HT_{1B}$.  (*Id.* at 323.)

111.    Davies 2004 further discloses:

> Clinically, atypical antipsychotic drugs have been found to be effective in the treatment of positive as well as negative symptoms of schizophrenia. While originally tested in "treatment-resistant" patients, atypical antipsychotic drugs are now being used in patients throughout the course of schizophrenia.  While their use is associated with less extrapyramidal syndrome (EPS) and prolactin level elevation than that of the typical antipsychotic drugs, some atypical antipsychotics cause weight gain and QT prolongation (delayed cardiac depolarization which can cause dysrhythmias and possible ventricular fibrillation).

(*Id.* (citations omitted).)

112.   Davies 2004 discloses aripiprazole having the following structure



(*Id.* at 319.)

113.   Davies 2004 discloses that "[a]ripiprazole is, thus, usually taken orally in tablet form once a day."  (*Id.* at 325.)  Davies 2004 discloses a study wherein "[a]ripiprazole was administered orally once per day in the morning to the subjects at 30 mg (n = 4), 10 mg (n = 2), 2 mg (n = 3), 1 mg (n = 3), and 0.5 mg (n = 3) doses."  (*Id.* at 321.)  Davies 2004 further discloses "a pilot study aimed at evaluating the pharmacokinetics, safety and optimal dosing regimen of aripiprazole in children and adolescents" wherein the "'revised' dosing strategy was based on weight: 1 mg/day for <25 kg; 2 mg/day for 25-50 kg; 5 mg/day for 50-70 kg, and 10 mg/day for >70 kg.  Steady-state aripiprazole concentrations were attained within 14 days in both children and adolescents."  (*Id.* at 327.)

114.   Dr. Ward and Dr. Roth note that Davies 2004 discloses that it will be difficult to replicate aripiprazole's pharmacological actions via a large-scale random screening approach. Based on this, a POSA looking to develop an effective treatment for schizophrenia would have been even more motivated to choose aripiprazole as a lead compound, and would have tried small and conservative changes, such as changes taught by WO '215, e.g., replacing the 2,3-dichlorophenyl substituent with benzo[b]thiophenyl substituent.

c.   Fura 2004

115.   Fura 2004 discusses the importance of using active metabolites as part of the drug design process and reviews experimental observations that can trigger the search for active

metabolites.  Fura 2004 also discusses methodological advances in the detection, generation, and structural characterization of active metabolites.  Fura 2004 emphasizes, "[a]ctive metabolites may show superior pharmacology, pharmacokinetics, and safety profiles in comparison to their parent molecules, and the inherent benefits that metabolites often display make their study a worthwhile endeavor."  (Fura 2004 at 4348.)  Fura 2004 further explains, "[a]n active metabolite can serve as a modified lead compound around which new structure-activity relationships can be investigated during the lead optimization stage of drug discovery."  (*Id.* at 4342.)  Consequently, Fura 2004 teaches, "the discovery of drugs through biological transformation can be an integral part of the drug discovery process and it may therefore be beneficial to have a process in place to screen drug candidates in search of active metabolites."  (*Id.* at 4348).

116.    Dr. Ward and Dr. Roth do not dispute that a POSA would have understood from Fura 2004 that an active metabolite can serve as a modified lead compound around which new structure-activity relationships can be investigated.  Fura 2004's statement, quoted by Dr. Ward and Dr. Roth, that "[i]t is also often difficult or impossible to predict a priori whether a certain compound could form a pharmacologically active metabolite" does not apply here.  Here, a POSA looking at the prior art as a whole as of the relevant (April 2005) time period would have known the active metabolite of aripiprazole—dehydroaripiprazole—as it had been disclosed in other prior art.  (*E.g.*, WO '682; Abilify PI; Kubo 2005.)

d.    Kubo 2005

117.    Kubo 2005 notes that "[t]he results of in vitro studies indicated that ARIPIPRAZOLE, a newly developed antipsychotic, is mainly metabolized by the human cytochrome P450 isozymes CYP3A4 and CYP2D6."  (Kubo 2005 at Abstract.)

118.    Kubo 2005 discloses the structure of aripiprazole and its main metabolite as the

following:



**Fig. 1.** Chemical structures of ARIPIPRAZOLE and its main metabolite OPC-14857.

119.    Kubo 2005 further notes that "the pharmacokinetics of OPC-14857 (chemical structure shown in Fig. 1), which is the main metabolite of ARIPIPRAZOLE in humans, were also evaluated, since the results of pharmacological studies indicated that OPC-14857 has pharmacological activity equivalent to that of ARIPIPRAZOLE and the results of preclinical studies indicated that CYP3A4 is involved in the production and elimination of OPC-14857." (*Id.* at 56.)

120.    Dr. Ward and Dr. Roth do not dispute that Kubo 2005, which has Otsuka coauthors, discloses that dehydroaripiprazole has pharmacological activity similar to that of aripiprazole. Kubo 2005 states:

> In addition, the pharmacokinetics of OPC-14857 (chemical structure shown in **Fig. 1),** which is the main metabolite of ARIPIPRAZOLE in humans, were also evaluated, since the results of pharmacological studies indicated that OPC-14857 has pharmacological activity equivalent to that of ARIPIPRAZOLE … .

(Kubo 2005 at 56.)    The fact that dehydroaripiprazole and aripiprazole have similar pharmacological activity would have provided motivation for a POSA to either (1) select

51

dehydroaripiprazole as a lead compound, or (2) replace the single bond in aripiprazole with a double bond as part of a routine modification. Kubo 2005 evaluated both dehydroaripiprazole and aripiprazole in the plasma, because both compounds are active.

e.     Kuipers 1995

121.    Kuipers 1995 investigated 5-HT$_{1A}$ affinity for a series of compounds and suggests that substitution with an annelated ring at the 2,3-positions of an arylpiperazine moiety is favorable for affinity and discloses investigating such a substitution with a thiophene moiety. (Kuipers 1995 at Abstract, 1946.) Kuipers 1995 found that "[s]ubstitution with annelated rings at the 2,3-positions was highly favorable for all investigated compounds, with the exception of a pyrrole ring." (*Id.*) And based on testing, Kuipers 1995 was "able to rationalize the 5-HT$_{1A}$ SAR existing N-phenylpiperazines, as well as a series of newly synthesized bicyclic heteroarylpiperazines, in terms of receptor-ligand interactions. Several of these N$^4$-unsubstituted compounds had affinities in the low-nanomolar range." (*Id.*)

122.    Kuipers 1995 further noted that "Most of the target compounds are either commercially available (6-9 and 17) or known in the literature (10, 11, 13-16, 18…)." (Kuipers 1995 at 1943.) Importantly many of these targets shared the following back bones:

**Figure 1.** Structures of 5-HT$_{1A}$ receptor ligands.



And "Introduction of a double bond in compound 11, yielding compound 12, increases 5-HT$_{1A}$ receptor affinity by a factor 3.3. Addition of an extra methyl group in the structure of compound 12 (yielding 13) increases affinity even further, possibly via a lipophilic interaction with the receptor. This compound (13) is 100 times more potent than 1-phenylpiperazine (6) itself.

52

Replacement of the dioxine ring in 12 with other aromatic rings like furan (14) or thiophene (15) has little influence on 5-HT$_{1A}$ receptor affinity."  (Kuipers 1995 at 1946.)



(*Id.* (structures drawn).)  Kuipers 1995 further disclosed K$_i$ for these compounds:

**Table 2.** $K_i$ Values for the Displacement of [$^3$H]-2-(Di-$n$-propylamino)-8-hydroxytetralin (**2**) from Central 5-HT$_{1A}$ Recognition Sites in Rat Frontal Cortex Homogenates with $N^4$-Unsubstituted 2-, 3-, and 4-Substituted $N^1$-Phenylpiperazines

| R | no. | $K_i \pm$ SEM (nM)[a] | | | (n=) |
|---|---|---|---|---|---|
| H | 6 | 500 | ± | 20 | (3) |
| 2-OCH$_3$ | 7 | 170 | ± | 20 | (3) |
| 3-OCH$_3$ | 8 | 320 | ± | 40 | (4) |
| 4-OCH$_3$ | 9 | 20,000 | ± | 5,000 | (2) |
| 2,3-OCH$_3$ | 10 | 1,000 | ± | 100 | (4) |
|  | 11 | 40 | ± | 5 | (5) |
|  | 12 | 12 | ± | 3 | (3) |
|  | 13 | 5.2 | ± | 1.2 | (3) |
|  | 14 | 13 | ± | 2 | (3) |
|  | 15 | 9.9 | | | (1) |
|  | 16 | 200 | ± | 10 | (3) |
|  | 17 | 18 | ± | 2 | (3) |
|  | 18 | 84 | ± | 11 | (3) |

[a] $K_i$ Values are based on $n$ determinations, each using four to six concentrations in triplicate.

123.   As can be seen in the table above, compound 15, with the benzothiophene

substituent on the piperazine, has high affinity at 5-HT$_{1A}$ receptors compared to other compounds. In addition, a POSA would understand that, with respect to 5-HT$_{1A}$ affinity, fused piperazine substituents (compounds 11-18) generally had much stronger affinity than unfused substituents (compounds 6-10).

124.    Kuipers 1995 teaches that (1) piperazines containing fused aromatic rings have much stronger binding affinity at 5-HT$_{1A}$ receptors than unfused substituents, (2) a double bond in the fused ring increases 5-HT$_{1A}$ receptor binding affinity, and (3) there are minor differences in 5-HT$_{1A}$ receptor binding affinity among piperazines containing benzo[*b*][1,4]dioxin, benzofuran, and benzothiophene substituents.

f.    Lowe 1991

125.    Lowe 1991 discloses, *inter alia*, that "[m]any strategies have been attempted in the search for so-called 'atypical' antipsychotic agents, operationally defined as those that do not possess the liability for causing extrapyramidal side effects (EPS) in the clinic." (Lowe 1991 at 1860).    The authors report a strategy to develop such agents, with the starting point "1-naphthylpiperazine, a compound with a pharmacological activity profile at serotonergic receptors, 5-HT$_{1a}$ agonist activity coupled with 5-HT$_2$ antagonism, similar to that of buspirone." (*Id.*).    The authors acknowledge that 1-naphthylpiperazine "does not possess intrinsic dopaminergic antagonism," but that it "is more amenable than buspirone to the structural variation necessary for incorporation of this activity." (*Id.*).    Further, the authors stated their strategy "was aided by recent advances in the structural characterization of dopaminergic and serotonergic receptors showing that they are both members of the G protein coupled receptor superfamily," and that this knowledge "was expected to help in design of ligands that would bind to both these receptors." (*Id.*)

126.    Lowe 1991 discloses the following with respect to the approach to the design of the disclosed series of 1-naphthylpiperazine compounds:

The strategy selected to achieve incorporation of the requisite dopamine-blocking activity into the 1-naphthylpiperazine nucleus is based on ideas promulgated some time ago … . [It] involves modification of the structure of a receptor agonist, in this case dopamine, with a large lipophilic group on the amino position, which binds to the accessory binding site adjacent to the agonist binding site and transforms the agonist into an antagonist.  With 1-naphthylpiperazine as the lipophilic group connected to a basic amine, the modification shown in Scheme III can be envisaged.

**Scheme III**



Dopamine, agonist                Dopamine antagonist

(*Id.* at 1861).  In addition, Lowe 1991 explains that "[w]ith the naphthylpiperazine moiety bound at the accessory binding site, an appropriate hydrogen-bonding group could be held by a phenethyl side chain so as to reach these serine residues, as shown in the depiction of the $D_2$ receptor in Scheme IV." (*Id.*).  Scheme IV presented by Lowe 1991 is shown below:

Scheme IV.  Model of $D_2$ Receptor, Based on Studies of the $\beta$-Adrenergic Receptor, Showing Proposed Agonist and Antagonist Binding Used in Receptor Antagonist Design



(*Id.* at 1862).  Lowe 1991 states that "[t]here is considerable literature precedent for molecules of type **4** and type **8** as ligands for the dopamine $D_2$ receptor, which suggests that the interactions we envisaged are reasonable." (*Id.* at 1861).  Lowe 1991 presents the 1-naphthylene series in Table I (the table presents IC50 values for $D_2$ and 5-HT$_{1A}$ receptor binding as nM concentrations):

**Table I.** In Vitro Characterization of 1-Naphthylpiperazine Derivatives



| CPD | | X | | Y | $D_2^a$ | $\alpha^b$ | $5\text{-}HT_{1a}^c$ | $5\text{-}HT_2^d$ |
|---|---|---|---|---|---|---|---|---|
| 4a | | | –HNCOO– | | 44 | 45 ± 8 | 6.2 | 10 |
| 4b | | | –HNCOCH$_2$– | | 38 ± 11 | 24 ± 18 | 4.87 ± 0.6 | 20 ± 2 |
| 4c | | | –HNCOS– | | 112 | 24 | 2.2 | 50 |
| 4d | | | –HNCOC(CH$_3$)$_2$– | | 86 | 40 | 6.9 | 11.8 |
| 4e | | | –(C$_2$H$_5$)NCOCH$_2$– | | 81.2 | 248 | 2.9 | ND$^e$ |
| | R | | | Z | | | | |
| 8a | H | | | NH$_2$ | 72 ± 13 | 135 | 11 | 385 |
| 8b | CH$_3$ | | | NH$_2$ | 159 | 234 | ND | ND |
| 8c | H | | | NHCH$_3$ | 155 | 252 | ND | ND |
| 8d | H | | | OH | 80 ± 37 | 65 ± 10 | ND | 249 |
| 8e | H | | | CH$_3$ | 108 | 166 | ND | ND |
| 11 | | | | | 83 | 105 ± 26 | ND | 237 |
| 1-naphthylpiperazine | | | | | >1000 | ND | ND | 62 |
| haloperidol | | | | | 3.1 ± 0.6 | 19 | >1000 | 56 ± 10 |
| clozapine | | | | | 172 ± 31 | 17 ± 1 | 600 | 24 ± 2 |

$^a$ Binding to the D$_2$ receptor in rat brain, using [$^3$H]NPA as ligand, given in nM units. IC$_{50}$ values were determined from dose–response curves of three log concentrations of the test compounds, each concentration in triplicate. Mean ± standard deviation for three separate determinations was obtained for 4b, 8a, 8d, haloperidol, and clozapine. $^b$ Binding to the $\alpha$ receptor in rat brain, using [$^3$H]prazosin as ligand, given in nM units. IC$_{50}$ values were determined from dose–response curves of three log concentrations of the test compounds, each concentration in triplicate. Mean ± standard deviation for three separate determinations was obtained for 4a, 4b, 8d, 11, and clozapine. $^c$ Binding to the 5HT$_{1a}$ receptor in rat brain, using [$^3$H]-8-hydroxy-2-(di-$n$-propylamine)tetralin as ligand, given in nM units, or as a percent inhibition of binding at 100 nM concentration of test compound. IC$_{50}$ values were determined from dose–response curves of three log concentrations of the test compounds, each concentration in triplicate. Mean ± standard deviation for three separate determinations was obtained for 4b. $^d$ Binding to the 5-HT$_2$ receptor in rat brain, using [$^3$H]ketanserin as ligand, given in nM units, or as a percent inhibition of binding at 100 nM concentration of test compound. IC$_{50}$ values were determined from dose–response curves of three log concentrations of the test compounds, each concentration in triplicate. Mean ± standard deviation for three separate determinations was obtained for 4b, haloperidol, and clozapine. $^e$ ND, not determined.

(*Id.* at 1862).  Compound **4b** has the following structure:



Lowe 1991 concludes that compound **4b** "retain[s] the serotonergic profile of the parent compound, 1-naphthylpiperazine, while adding potent D$_2$ receptor blockade," thereby "achiev[ing] in vivo activity consistent with antipsychotic efficacy and, at the same time, a low probability of causing [extrapyramidal side effects]."  (*Id.* at 1863).  Due to this combination of activities, a POSA interested in 5-HT$_{2A}$ antagonism would have been motivated to explore other compounds of Lowe 1991, including those containing fused bicyclic aromatic moieties attached to a piperazinyl substituent.

127.     Replacing the naphthyl group on the left side of compound **4b** with a benzothiophene would be a classic bioisosteric replacement.  (*See* Patani 1996 at 3158; Thornber 1978 at 564, Table 1.)

g.     Oshiro 1998

128.     Oshiro 1998 discloses that the "dopamine hypothesis of schizophrenia" posits "a functional hyperactivity of the dopamine (DA) neuronal systems of the brain is involved as a major aspect of the disease."  (Oshiro 1998 at 658.)  "All clinically available antipsychotic agents inhibit DA neurotransmission by blocking the postsynaptic DA receptors."  (*Id.*).  Oshiro 1998 also discloses that "DA antagonism is also responsible for the most serious side effects of these agents," including extrapyramidal syndrome, tardive dyskinesia, and hyperprolactinemia.  (*Id.*)  Oshiro 1998 notes that "[r]educing dopaminergic neurotransmission via stimulation of the DA autoreceptors has become of interest in the search for effective therapeutic agents that lack the side effects of available antipsychotic agents."  (*Id.*).  Oshiro 1998 reports that, previously, OPC-4392 "was found to be an agonist of the DA autoreceptors and a weak antagonist of the postsynaptic DA D$_2$ receptors."  (*Id.*)  The structure of OPC-4392 (compound 1) is depicted below:



OPC-4392 (1)

Oshiro 1998 discloses the synthesis of a series of compounds "with a variety of modifications of compound 1 and examined the postsynaptic DA receptor antagonist activity."  (*Id.* at 659.)

129.     Oshiro 1998 seeks to investigate "a more effective agent for treating both negative and positive symptoms in schizophrenia and with less side effects than the standard agents."  (*Id.* at 658.)  Oshiro 1998 discloses that "[t]o develop a novel antipsychotic agent which is an agonist of dopamine (DA) autoreceptors and an antagonist of postsynaptic DA receptors, a series of 7-[4-

58

[4-(substituted phenyl)-1-piperazinyl]butoxy]-3,4-dihydro-2(1H)-quinolinones was synthesized and their dual activities were examined." (*Id.*) In particular, Oshiro 1998 discloses the synthesis of a series of compounds with a variety of modifications of the compound depicted below as well as the structure-activity relationships (SAR) of those compounds:



(*Id.* at 659, 661, Table 1.)

130.    Oshiro 1998 studied the post-synaptic "DA antagonist" activity of various compounds. Oshiro 1998 teaches that "[r]eplacement of the side chain … from propoxy to butoxy increased the potency of the resulting compound," but that "with a pentoxy side chain the activity was much reduced." (*Id.* at 660.) Oshiro 1998 discloses "a superiority of butoxy side chain to propoxy and pentoxy side chains in producing potent DA antagonist activity in the 3,4-dihydro-2(1H)-quinolinone series." (*Id.*)

131.    In addition, Oshiro 1998 teaches that the substitution position of the alkoxy group, -$(CH_2)_n$-O-, affects the potency of the compound with respect to post-synaptic DA antagonism and discloses that "[c]hange in the 4-[4-(2,3-dichlorophenyl)-1-piperazinyl]butoxy side chain from the 7-position [] to the 5-, 6-, and 8-positions in the 3,4-dihydro-2(1H)-quinolinone nucleus produced [certain identified] inactive compounds." (*Id.* at 661.)

132.    Oshiro 1998 also reports that "substituents in the phenyl piperazinyl moiety are required in order to display [post-synaptic DA antagonistic] activity in this series of compounds." (*Id.*) Further, they inform that replacement "at the 3-position on the phenylpiperazinyl moiety … with a more bulky bromine substituent … retained the potency, but replacement with a smaller

fluorine substituent … reduced the potency." (*Id.*)  Also, "[t]he compounds that possess more electron-donating substituents … showed much lower potency." (*Id.*)  According to Oshiro 1998, compounds with one chloro substituent demonstrated reduced potency compared with those with two chloro substituents on the phenylpiperazinyl moiety. (*Id.*)

133.   Oshiro 1998 teaches that "the 2(1*H*)-quinolinone derivatives … were equipotent to their corresponding 3,4-dihydro-2(1*H*)-quinolinone analogues" with respect to post-synaptic "DA antagonist activity." (*Id.* at 661, 662, Table 2.)

134.   Oshiro 1998 further teaches that altering the R substituent on the aromatic ring in the phenylpiperazinyl moiety alters the potency of the compound. (*Id.* at 659, 661, Table 1.) Oshiro 1998 discloses that "the 2,3-dichloro analogue … is best in the compounds with two or more substituents on the aromatic ring." (*Id*. at 662.)

135.   In summary, Oshiro 1998 noted:

> In the structure-activity relationships, the structural requirements for the postsynaptic DA receptor antagonist activity found in this series are as follows: (1) In the (phenylpiperazinyl)alkoxy side chain, the butoxy side chain is preferred to the propoxy and pentoxy side chains. (2) One or two substituents on the aromatic ring in the phenylpiperazinyl moiety are necessary; the 2-ethoxy analogue 48 is best in the compounds with one substituent on the aromatic ring, and the 2,3-dichloro analogue 28 is best in the compounds with two or more substituents on the aromatic ring. (3) The substituted (phenylpiperazinyl)butoxy side chain at the 7-position in the 3,4-dihydro-2(1H)-quinolinone nucleus is essential for activity. (4) The 3,4-dihydro-2(1H)-quinolinone and 2(1H)-quinolinone derivatives with the same (phenylpiperazinyl)butoxy moiety are equipotent to each other.

(*Id.* at 661-62.)

136.   As an example of point (4), through SAR studies, Oshiro 1998 discloses that 7-[4-[4-(2,3-dichlorophenyl)-1-piperazinyl]-butoxy]-3,4-dihydro-2(1*H*)-quinolinone  (compound  28, aripiprazole) is equipotent to its analogue 7-[4-[4-(2,3-dichlorophenyl)-1-piperazinyl]-butoxy]-

2(1*H*)-quinolinone (compound 54, dehydroaripiprazole) with respect to post-synaptic DA antagonism. (*Id.* at 661, 662.)

137.   Oshiro 1998 also reports the results of assays conducted to assess potential adverse effects of the synthesized compounds. (*Id.* at 663.) Oshiro 1998 states that two compounds tested, **28** and **48**, "induced catalepsy but with 10 and 20 times higher $ED_{50}$ values ... suggesting their lower propensity to induce [extrapyramidal syndrome] than the typical antipsychotic agent examined." (*Id.*)   Additional data provided shows that among others, compound **28** is a "$D_2$ receptor antagonist[] and DA autoreceptor agonist[]." (*Id.*)   In addition, "[c]ompound **28**, which possesses the (2,3-dichlorophenyl)piperazinyl moiety, was the most potent of the compounds tested in rats." (*Id.*)   Comparison of data regarding compound **28** with that for compound **1** "suggested that the methyl substituent in the phenylpiperazinyl moiety is more vulnerable to a first-pass metabolism in rats than the chloro substituent in the phenylpiperazinyl moiety in those compounds," and on the basis of this conclusion, "compound **28** was selected for further examination of its clinical potential as an antipsychotic agent." (*Id.*)   Oshiro 1998 states that compound "**28** was confirmed in mice and rats to have these dual activities and a low potential to induce the [extrapyramidal syndrome]." (*Id.*)   Oshiro 1998 further discloses that compound **28** "acts as an agonist at DA autoreceptors and as an antagonist at postsynaptic DA receptors," and that compound "28 may be a potent and effective agent for treatment of both the negative and positive symptoms in schizophrenia with less adverse effects than clinically available agents." (*Id.* at 664.)   "Compound **28** was selected as a candidate for clinical evaluations in schizophrenic patients." (*Id.* at 663; *see also id.* at 664 ("Clinical trials with **28** (aripiprazole, OPC-14597) are currently in progressed [sic] in Japan and the United States.").)   Compound 28 is disclosed as having the following structure:

(*Id.* at 661 (Table 1).)

138.    Oshiro 1998 discloses schemes for preparing its target compounds, 7-[4-(4-phenyl-1-piperazinyl)butoxy]-3,4-dihydro-2(1H)-quinolinone  derivatives  and  their  2(1H)-quinolinone analogues, including aripiprazole (compound 28) and dehydroaripiprazole (compound 54).



(*Id.* at 659-60.)  Compound 28 prepared using Scheme 1 is aripiprazole, which uses 2,3-dichloro phenyl piperazine and 3,4-dihydro carbostyril as starting materials.  (*Id.* at 661.)

139.    Dr. Ward and Dr. Roth note that none of the compounds in Oshiro 1998 is "a biaryl, let alone a benzothiophene, moiety."  This reflects the relatively modest exploration that Oshiro 1998 reports for the critical phenyl group in the compounds reported: only 11 different aromatic substituents (including H) arranged in a total of 39 different ways.  Of these, only 17 are 2,3-disubstituted aryl groups.  That fact would motivate a POSA to evaluate other substituted aromatic

groups, including "biaryl[s]" (fused aryls) and benzothiophene, in view of at least the teachings of Kuipers 1995 and WO '215.

140.    Dr. Ward and Dr. Roth state that Oshiro 1998 reported that "dehydroaripiprazole, which is compound **54**, had no DA autoreceptor agonist activity."  This observation fails to mention the critical point that Oshiro 1998 provides explicit data for four pairs of dehydro/dihydro analogs, which include one dehydro compound with improved DA autoreceptor agonist activity compared to its dihydro analogue (Oshiro at 663 ("2(1H)-quinolinone **55** showed higher activity than the 3,4-dihydro-2(1H)-quinolinone **27** with the same (2,3-dimethylphenyl)piperazinyl moiety as **1**")).  Moreover, the DA autoreceptor agonist activity of dehydro compound **55** was greater than that of aripiprazole **28** (3.9 μmol/kg for **55** vs. 5.1 μmol/kg for **28**).  These data clearly show that the effect of the presence or absence of a 3,4-double bond on DA autoreceptor agonist activity depends on the identity of the aromatic ring substituent(s) in the molecule.  Dr. Ward's and Dr. Roth's comments about Oshiro 1998 ignore that a POSA would have known that dehydroaripiprazole is another preferred carbostyril derivative in addition to aripiprazole, based on later Otsuka publications (*see* WO '682; Kubo 2005; Abilify PI).

**Data from Oshiro re double-bond pharmacology**



| Compound | Ar | 3,4-Double bond | DA receptor antagonist [a] | DA autoreceptor agonist activity [a] |
|---|---|---|---|---|
| **13** | 2-Me, 3-Cl | No | 2.8 (1.2-8.9) | 3.5 (1.4–7.2) |
| **52** | | Yes | 2.8 (1.9-5.1) | 20.1 (11.2-94.4) |
| **27** | 2,3-Me$_2$ | No | 3.4 (2.5-4.4) | 9.1 (3.7–84.7) |
| **55** | | Yes | 3.4 (2.4-4.4) | 3.9 (0.7–18.6) |
| **28** | 2,3-Cl$_2$ | No | 0.6 (0.5-0.8) | 5.1 (1.3–29.2) |
| **54** | | Yes | 0.9 (0.5-1.2) | >22 |

| 48 | 2-OEt | No | 0.2 (0.1-0.4) | 0.65 (0.20–11.5) |
| 56 | | Yes | 0.24 (0.14-0.34) | >20 |

[a] 95% confidence limits shown in parentheses.

Finally, Oshiro 1998's starting compound, compound **1** (OPC-4392), contains the 3,4-double bond in the carbostyril skeleton and a 2,3-substituted (2-3, dimethyl) arylpiperazine, although it contains a 3-carbon linker.  (Oshiro 1998 at 661 (Table 1).)  The activity reported for this compound is 41.3 for the DA receptor antagonist assay and 3.5 for the DA autoreceptor agonist assay.  (*See id.* at 661-62 (Tables 1, 3).)  This is another example showing that a compound with a 3,4-double bond can have strong DA autoreceptor agonist activity.  Compound **55**, which has the 3,4-double bond and 2,3-dimethyl arylpiperazine, but Oshiro 1998's preferred 4-carbon linker, has similar DA autoreceptor agonist activity to compound **1** but greater than 10-fold increased DA receptor antagonist activity.  (*See id.* at 662 (Table 3).)

> h.    Patani 1996

141.    Patani 1996 provides an overview of the use of bioisosterism in drug design.  Patani 1996 discloses that "[b]ioisosterism represents one approach used by the medicinal chemist for the rational modification of lead compounds into safer more clinically effective agents."  (Patani 1996 at 3147.)  Patani 1996 discloses swapping CH groups and nitrogen atoms as a "classical" replacement: "A classical trivalent bioisosteric replacement is —CH= with —N=.  This replacement has been widely used in the drug discovery process and has been further discussed among the ring equivalent class of classical bioisosteres."  (*Id.* at 3156.)

142.    Patani 1996 discloses the historical use of ring equivalent bioisosteres.  (*Id.* at 3158-59.) Patani 1996 discloses that "[c]lassical isosteric substitutions when applied within ring systems result in different hetero-cyclic analogues which can be effective bioisosteres.  The use of the classical bioisosteres benzene, thiophene, and pyridine resulted in analogues with retention of biological activity within different series of pharmacological agents."  (*Id.* at 3158.)  In the context

of ring substitution, Patani 1996 again discloses swapping CH groups and nitrogen atoms: "The trivalent substitution of —CH= with —N= is commonly used in modern drug design." (*Id.* at 3159.)

i.   <u>Thornber 1978</u>

143.   Thornber 1978 discloses the term "bioisostere" as referring to "groups or molecules which have chemical and physical similarities producing broadly similar biological properties." (*Id.*) According to Thornber 1978, "[t]he 'classical' isosteres as defined by Burger and Korolkovas are given in Table 1." (*Id.* at 564.)  Table 1 is presented below:



(*Id.*)  Thus, for example, a benzene ring and thiophen ring are "classical" bioisosteres.  (*Id.*)

144.   Thornber 1978 states that "[i]n the process of developing a lead compound, an antagonist to a known agonist, or an anti-metabolite from a known substrate, a large number of systematic molecular modifications will be made."  (*Id.* at 565.)  Thornber 1978 notes that "[c]ompletely identical properties are rarely sought," but "[w]hat we are more likely to be seeking is a subtle change in the molecule which will leave some properties the same and some different in order to improve potency, selectivity, absorption, duration, and toxicity." (*Id.* at 566.)  Thornber

1978 notes that lipophilicity may be important to a molecule's pharmacokinetics by affecting absorption, transport, and excretion. (*Id.* at 565-66.)

145. Patani 1996 and Thornber 1978 generally discuss bioisosterism. By 2005, medicinal chemists had been taking advantage of bioisosterism for decades. Thornber's 1978 publication date confirms this. There is nothing unique about antipsychotics that would have caused a POSA to abandon bioisosterism as a way to propose modifications to compounds for consideration.

## IV. A POSA WOULD HAVE BEEN MOTIVATED AT THE TIME OF THE ALLEGED INVENTION TO MODIFY ARIPIPRAZOLE OR DEHYDROARIPIPRAZOLE

### A. Aripiprazole and Dehydroaripiprazole Were Lead Compounds at the Time of the Alleged Invention

#### 1. Aripiprazole

146. Aripiprazole was considered a leading schizophrenia treatment at the time of the alleged invention; however, there was a desire to reduce the side effects associated with aripiprazole, including EPS-related events such as akathisia and tremor, as well as agitation, anxiety, nausea, and insomnia.

147. The success of aripiprazole in the clinic and marketplace, in connection with the emerging, if incomplete, understanding of its pharmacological profile in 2005, would have provided strong motivation for a POSA to concur with its selection as a lead compound for seeking a new antipsychotic compound. The suitability of the aripiprazole structure for chemical modification, combined with the limited number of reported analogues (especially at the substituted phenylpiperazine portion of the molecule), would have provided a POSA with the reasonable expectation of discovering a comparable or better agent through ordinary medicinal chemistry studies. The complexity of the pharmacology of aripiprazole would have provided

further motivation for a POSA to seek a new antipsychotic agent using aripiprazole as a lead compound.

148.    A POSA would have recognized that, as of April 12, 2005, aripiprazole was considered to be the leading first-line antipsychotic therapy.  "Aripiprazole had been described as 'the first next generation atypical antipsychotic' because of its unique pharmacologic profile." (Davies 2004 at 318.)  Thus, a POSA would have understood that aripiprazole was not simply one compound among various other atypical antipsychotics listed, but it was considered to be on its own as a "next generation atypical antipsychotic[]."  Aripiprazole's uniqueness would have directed a POSA to aripiprazole as a lead compound over previous-generation atypical antipsychotics.

<p style="margin-left:2em">a.    <u>A POSA Would Have Investigated Aripiprazole Because It Was a Leading Treatment for Schizophrenia at the Time of the Alleged Invention</u></p>

149.    By 2004, atypical antipsychotic drugs were viewed as a substantial improvement over typical antipsychotics with respect to the treatment of schizophrenia and related disorders. Within the class of atypical antipsychotic drugs, aripiprazole possessed a novel and unexpectedly robust pharmacology with a distinct receptor binding profile as compared to other approved atypical antipsychotics in 2004 (*e.g.*, clozapine, olanzapine, quetiapine, risperidone, and ziprasidone).

150.    Aripiprazole was viewed as a leading treatment option for schizophrenia in 2004. No other antipsychotic compound possessed the pharmacological properties of aripiprazole and it was viewed as the first approved dopamine system stabilizer.  Aripiprazole was unique among antipsychotic drugs because it provided partial agonist activity toward both the $D_2$ and $5\text{-HT}_{1A}$ receptors.

151.    Because of its unique pharmacology, and its improved efficacy and tolerability over

other approved antipsychotics, a POSA would have selected aripiprazole as a starting point (*i.e.*, a "lead compound") for further optimization efforts directed to the development of improved atypical antipsychotic drugs.

152.    While aripiprazole was considered a leading schizophrenia treatment by 2004, there were still several concerns with aripiprazole.  Aripiprazole was associated with EPS-related adverse events such as akathisia and tremor.  (Abilify PI at 26 (higher akathisia-related events for aripiprazole-treated patients with 15% for aripiprazole vs. 4% for placebo), 28 (higher incidence of tremor for aripiprazole-treated patients with 9% for aripiprazole vs. 1% for placebo); *see also* Raj et al., *Aripiprazole Induced Severe Parkinsonian Symptoms*, 46 INDIAN J. PSYCHIATRY 174-75 (2004) (disclosing a case study where a patient developed severe parkinsonian symptoms, including "marked rigidity, resting tremors, slurred speech which was almost incomprehensible, significant hypokinesia, short sluggish gait, drooling of saliva, difficulty in maintaining straight posture & marked incapacitation" after receiving 20 mg of aripiprazole per day as treatment for schizophrenia and concluding that one "ha[s] still to go a long way in search of an ideal antipsychotic").)  Aripiprazole had also been known to be associated with cardiovascular side effects.  Other adverse events included agitation, anxiety, nausea, and insomnia, which were said to be predicated on its degree of partial agonism at the $D_2$ receptor.  Thus, in 2004, a POSA would have recognized that aripiprazole could be improved upon, and would have been motivated to modify its chemical structure so as to improve these side effects.

153.    Plaintiffs appear to suggest that a POSA would have sought to identify a compound that addresses every known symptom of schizophrenia.  However, improvements in therapy typically happen incrementally and success is defined by improving one (or more) aspect at a time; success does not require solving all known problems at once.  Indeed, the prior art recognized that

it was unlikely that a single treatment would target psychotic, negative, and cognitive symptoms. Therefore, a POSA would not have expected to find a single antipsychotic that improved every symptom of schizophrenia, including cognitive symptoms, but instead would have sought to make incremental improvements in one more aspects of efficacy, safety, and/or side effects.

154.    Plaintiffs also set the bar too high when assessing "success" in the context of the asserted claims.  Plaintiffs discuss the unpredictability of developing antipsychotics that are superior to existing treatments and the difficulty of obtaining FDA approval.  Yet none of the asserted claims set forth a specific level of safety or efficacy, require the claimed compounds to be superior to existing compounds, or require the claimed compounds to be FDA approved.

155.    Plaintiffs also refer to the large number of "failures" in pharmaceutical development; however, those failures could have resulted from any number of reasons, none of which relate to the scope of the asserted claims.  Such reasons include, but are not limited to: (a) the compounds were safe and efficacious, but were not superior to existing treatments and therefore unlikely to be commercially successful, (b) the compounds were developed in the course of academic research and they were never intended to be commercialized, (c) a lack of financial resources for the company or university developing the compounds, or (d) the compounds were dropped in favor of other, more favorable compounds.

156.    To the extent that Plaintiffs suggest that the goal of a POSA at the time of the alleged invention was to find a single treatment that solved every known problem with existing treatments for schizophrenia, Defendants disagree.  As explained above, at the time of the alleged invention a POSA would have sought to develop an antipsychotic that is effective at treating schizophrenia with an improved side effect profile.  There were several side effects associated with each of the known antipsychotics at the time of the alleged invention, and improving any one of

those side effects would have been desirable to patients and physicians.  Since aripiprazole was considered a leading schizophrenia treatment by 2004—and because of its unique pharmacology and its improved efficacy and tolerability over other approved antipsychotics—a POSA would have selected aripiprazole as a lead compound for investigation.

157.   In sum, in 2004, a POSA would have recognized that aripiprazole could be improved upon, and would have been motivated to modify its chemical structure.  Specifically, a POSA would seek to reduce the EPS and other side effects associated with aripiprazole, and a POSA would have had a reasonable expectation of success that by modifying aripiprazole these negative side effects may be improved.

b.   <u>Aripiprazole Was a More Favorable Lead Compound Over Other Candidates</u>

158.   Plaintiffs do not provide any reason why a POSA would <u>not</u> have chosen aripiprazole as a lead compound.  Rather, they merely contend that there were other candidates.  However, Plaintiffs do not provide any evidence that a POSA would have actually chosen a compound other than aripiprazole as a lead compound.

159.   Plaintiffs contend that "by the early 2000s various atypical antipsychotics were known to be effective at treating schizophrenia and <u>could have served</u> as starting points for further development," including clozapine, risperidone, quetiapine, olanzapine, ziprasidone, zotepine, iloperidone and lurasidone.  However, Plaintiffs do not state that any of those compounds would have <u>actually served</u> as a starting point for further development.  None of those compounds would have served as a starting point for further development because each of those antipsychotics had substantial drawbacks relative to aripiprazole.  For example, as noted in the prior art, unlike risperidone, olanzapine or typical antipsychotics, the efficacy of aripiprazole is not generally associated with EPS, sedation, weight gain, elevations in serum prolactin or cardiovascular side-

effects.   These favorable antipsychotic properties, and a different mechanism of action that includes 5-HT$_{2A}$ receptor antagonism and partial agonism at 5-HT$_{1A}$ receptors, distinguish aripiprazole from other atypical agents.   Following is a summary of the drawbacks for each compound identified by Plaintiffs and the reasons why these compounds would not have served as a lead compound for a POSA at the time of the alleged invention:

- clozapine: higher risk of certain adverse effects, such as diabetes, weight gain, agranulocytosis, and seizures;

- risperidone: higher risk of certain adverse effects, such as diabetes, weight gain, EPS, and elevated prolactin;

- quetiapine: higher risk of certain adverse effects, such as diabetes, weight gain, and sedation;

- olanzapine:  higher risk of certain adverse effects, such as diabetes, weight gain, and sedation;

- ziprasidone: higher risk of certain adverse effects, such as QTc interval prolongation;

- zotepine:  not approved for use in the United States, and also higher risk of certain adverse effects, such as weight gain, EPS, and sedation;

- iloperidone:  not available on the market until 2009, and higher risk of certain adverse effects, such as diabetes, weight gain, and QTc interval prolongation;

- lurasidone:  not available on the market until 2010, and higher risk of certain adverse effects, such as EPS.

160.    Plaintiffs specifically discuss ziprasidone as exhibiting the desired pharmacological profile and being another potential lead compound over aripiprazole.  However, a POSA would

not have turned to ziprasidone as a lead compound because of the high risk of QTc interval prolongation that was known at the relevant time period to be associated with ziprasidone.  Not all side effects are created equal—QTc interval prolongation is a very serious side effect that may cause heart arrhythmia, which is potentially fatal.  Thus, a POSA would have instead turned to a lead compound with less serious side effects, such as aripiprazole.

161.    Plaintiffs cite to literature that refers to clozapine as a "gold standard" antipsychotic.  However, this is true only with respect to the use of clozapine as a second or third-line treatment for treatment-resistant schizophrenia.  Clozapine is not commonly prescribed as a first-line antipsychotic drug because of the significant risks associated with clozapine, such as agranulocytosis.  For this reason, patients taking clozapine need to have their absolute neutrophil count (ANC) monitored on a regular basis.  A POSA at the relevant time would have been aware of this risk and would not have turned to clozapine as a potential lead compound.  Instead, a POSA would have turned to aripiprazole because it was the gold standard first-line antipsychotic drug for the treatment of schizophrenia at the time of the alleged invention.

162.    Even if there were lead compounds other than aripiprazole (and dehydroaripiprazole, *see infra*) at the time of the alleged invention, that does not change the fact that, at the very least, aripiprazole was also a lead compound.  Plaintiffs do not identify any reasons why aripiprazole would not have been a lead compound at the time of the alleged invention.

163.    Given all of this information pointing at aripiprazole as a lead compound at the time of the alleged invention, it is not surprising that Otsuka—just as any POSA would have done—focused on aripiprazole as a lead compound when developing brexpiprazole in order to come up with a "second-generation molecule."  Moreover, the motivation to improve the side effect profile of aripiprazole came from clinical data and feedback from psychiatrists.

164.    Plaintiffs ignore the fact that at the time of the alleged invention aripiprazole was one of the most, if not the most, commonly prescribed antipsychotic for the treatment of schizophrenia.  In 2005, for example, Abilify had U.S. sales of nearly $1 billion.  Given the tremendous popularity of aripiprazole in 2005 amongst physicians and patients, aripiprazole was an obvious starting point for a next-generation product.

165.    Aripiprazole is widely acknowledged as having a unique pharmacological profile because it is a partial agonist at the $D_2$ receptor.  In 2005, aripiprazole was the only $D_2$ partial agonist that had been approved by a regulatory agency for the treatment of schizophrenia.  Thus, if a POSA wanted to optimize the serotonergic activity of a partial $D_2$ agonist, aripiprazole was not just a lead compound, it was the only compound in this category.

### 2.    Dehydroaripiprazole

166.    Aripiprazole's active metabolite, dehydroaripiprazole (e.g., as disclosed in Abilify PI), would have also been a lead compound for further development and optimization.  It was known at the time of the alleged invention that active metabolites should be considered as a source of potential new drug candidates.  (*E.g.*, Fura 2004 at 4348 ("Active metabolites may show superior pharmacology, pharmacokinetics, and safety profiles in comparison to their parent molecules, and the inherent benefits that metabolites often display make their study a worthwhile endeavor.").)

167.    Given that a POSA would have considered aripiprazole to be a starting point for developing an improved antipsychotic, a POSA also would have also considered dehydroaripiprazole, a known major active metabolite of aripiprazole, as a strong candidate for a starting point.  Even if it were in principle "difficult or impossible to predict a priori whether a certain compound could form a pharmacologically active metabolite" (Fura 2004 at 4339), that statement would be irrelevant here, where it was already known in the prior art that

73

dehydroaripiprazole was an active metabolite of aripiprazole.  (*E.g.*, Abilify PI; WO '682; Kubo 2005 (Fig. 1 of Kubo 2005 at 56 describes dehydroaripiprazole as aripiprazole's "main metabolite").)  Similarly irrelevant are any concept that metabolites can have the same activity as the parent compound, be inactive, counter the parent drug itself, or possess critical toxicities, and any examples of "active metabolites leading to failures in drug development," given what a POSA would have known at the relevant April 2005 time frame about dehydroaripiprazole.

168.    With respect to dehydroaripiprazole's longer half-life as compared to aripiprazole, a POSA undertaking the project of a developing an improved antipsychotic compared to aripiprazole or dehydroaripiprazole would, at minimum, desire the new drug to have its beneficial effects outweigh any side effects and be motivated to modify those leads to achieve such effects. In this case, a lengthier active period, or a lengthier half-life, would, on the whole, be beneficial.

169.    Kubo 2005, which, like Oshiro 1998, had an Otsuka author, as well as Abilify PI, taught that dehydroaripiprazole is an active metabolite of aripiprazole.  Based on these more recent references, any statements in Oshiro 1998 would not have led a POSA away from dehydroaripiprazole, but, instead, a POSA would have considered dehydroaripiprazole as a promising lead compound.

170.    In 2004, it was also known that dehydroaripiprazole could be used to treat schizophrenia and other psychotic disorders.  WO '682 repeats a preference for dehydroaripiprazole in particular throughout its disclosure (WO '682 at 5:8-11, 31:3-5), provides numerous formulations for the oral administration of dehydroaripiprazole (*id.* at 56-60), and describes clinical trials to evaluate the efficacy of dehydroaripiprazole (*id.* at 64-65, 67-68 (Examples 6, 8)).

171.  WO    '682    discloses    clinical    trial    results—not    just    protocols—for

dehydroaripiprazole, indicating that dehydroaripiprazole (not any other metabolite) and aripiprazole have comparable clinical outcomes, as shown below.

| Example 5 | Example 6 |
|---|---|
| A 6-week double-blind, randomized, placebo- controlled trial is conducted to … . The ***results*** indicate that ***aripiprazole*** cotherapy improves patients' YMRS total scores more than monotherapy. Clinical response rates (> or = 50% improvement on YMRS) are higher with cotherapy. ***Aripiprazole*** cotherapy improves 21-item Hamilton Depression Rating Scale (HAMD-21) total scores more than monotherapy.  In patients with mixed-episodes with moderate to severe depressive symptoms (DSM-IV mixed episode; HAMD-21 score of > or = 20 at baseline), ***aripiprazole*** cotherapy improves HAMD-21 scores compared to monotherapy. | A 6-week double-blind, randomized, placebo- controlled trial is conducted … . The ***results*** indicate that ***dehydroaripiprazole*** cotherapy improves patients' YMRS total scores more than monotherapy. Clinical response rates (> or = 50% improvement on YMRS) are higher with cotherapy. ***Dehydroaripiprazole*** cotherapy improves 21-item Hamilton Depression Rating Scale (HAMD-21) total scores more than monotherapy.  In patients with mixed-episodes with moderate to severe depressive symptoms (DSM-IV mixed episode; HAMD-21 score of > or = 20 at baseline), ***dehydroaripiprazole*** cotherapy improves HAMD-21 scores compared to monotherapy. |
| Example 7 | Example 8 |
| The results indicate that ***aripiprazole*** in combination with DVP is more effective for the treatment of adolescent bipolar mania than DVP alone. | The results indicate that ***dehydroaripiprazole*** in combination with DVP is more effective for the treatment of adolescent bipolar mania than DVP alone. |

(WO '682 at Example 5-8 (emphasis added).)  A POSA reading WO '682 would have understood that the head-to-head comparison of clinical studies between dehydroaripiprazole and aripiprazole underscores that dehydroaripiprazole is at least comparable to aripiprazole, and is therefore a clear lead for further modification.

172.    WO '682 describes a pharmaceutical composition that "comprises a carbostyril derivative which is a dopamine-serotonin system stabilizer and a mood stabilizer in a pharmaceutically acceptable carrier.  The carbostyril derivative may be aripiprazole or a metabolite thereof."  (*Id*. at Abstract.)  WO '682 explicitly teaches that "[a]nother preferred carbostyril

derivative of the present invention that is a dopamine-serotonin system stabilizer is a metabolite of aripiprazole called dehydroaripiprazole, also known as OPC-14857." (*Id*. at 5:8-11.) WO '682 emphasizes dehydroaripiprazole over other metabolites throughout its disclosure. (*See, e.g.*, *id*. at 5:8-11, 6:6-9, 8:8-12, 15:16-18, 31:3-5.)   WO '682 states that compositions containing dehydroaripiprazole possess "excellent efficacy" with "fewer side-effects and an excellent safety profile." (*Id*. at 31:27-32:3.)

173.   Dr. Ward further opines that "dehydroaripiprazole was not further developed by Otsuka, as evidenced by Oshiro 1998."   A POSA reviewing the prior art would not have had that understanding.   Dr. Ward ignores that Otsuka filed WO '682 in 2003—five years after Oshiro 1998 was published—and that WO '682 clearly discloses that "[a]other preferred carbostyril derivative of [WO '682] is a metabolite of aripiprazole called dehydroaripiprazole, also known as OPC-14857." (WO '682 at 5:8-11.)   In addition, Kubo 2005—another reference (having Otsuka coauthors)   published   after   Oshiro   1998—discloses   that   "[dehydroaripiprazole]   has pharmacological activity equivalent to that of ARIPIPRAZOLE." (Kubo 2005 at 56.)   Abilify PI, the labeling for Otsuka's aripiprazole drug product, discloses that aripiprazole's pharmacological profile is in part due to dehydroaripiprazole. (Ability PI at 2.)   All these disclosures contradict Dr. Ward's assertions that Otsuka did not further develop or otherwise consider the promise of dehydroaripiprazole.

174.   Additionally, the Abilify PI disclosed significant details about the main metabolite for aripiprazole—dehydroaripiprazole.   For example, under "Pharmacokinetics," the Abilify PI states as follows:

> ABILIFY activity is presumably primarily due to the parent drug, aripiprazole, and to a lesser extent, to its major metabolite, dehydro-aripiprazole, which has been shown to have affinities for $D_2$ receptors similar to the parent drug and represents 40% of the parent

> drug exposure in plasma. The mean elimination half-lives are about 75 hours and 94 hours for aripiprazole and dehydro-aripiprazole, respectively. Steady-state concentrations are attained within 14 days of dosing for both active moieties. . . . .  Elimination of aripiprazole is mainly through hepatic metabolism involving two P450 isozymes, CYP2D6 and CYP3A4.

(Abilify PI at 2.)

175.    Under "Absorption," the Abilify PI further teaches that "[a]dministration of a 15-mg ABILIFY tablet with a standard high-fat meal did not significantly affect the $C_{max}$ or AUC of aripiprazole or its active metabolite, dehydro-aripiprazole, but delayed $T_{max}$ by 3 hours for aripiprazole and 12 hours for dehydro-aripiprazole." (*Id.*)  Further, the Abilify PI states that at steady state dehydroaripiprazole represents about 40% of aripiprazole AUC in plasma.  (*Id.* at 3.)

176.    The Abilify PI also notes that co-administration of quinidine "a potent inhibitor of CYP2D6, increased the AUC of aripiprazole by 112% but decreased the AUC of its active metabolite, dehydro-aripiprazole, by 35%.  Aripiprazole dose should be reduced to one-half of its normal dose when concomitant administration of quinidine with aripiprazole occurs." (*Id.* at 17.)  A 112% increase in the AUC of aripiprazole when co-administered with a CYP2D6 inhibitor such as quinidine presents a risk to patient safety because it effectively results in giving the patient more of the recommended safe and efficacious dose.   The 35% decrease in AUC for dehydroaripiprazole, on the other hand, does not risk patient safety because it effectively results in giving the patient less of the drug than is recommended.  While this may result in lower efficacy, it also results in much lower risk of unsafe side effects compared to aripiprazole.  This desire for safety when co-administering an antipsychotic with an inhibitor of CYP2D6 would have motivated a POSA to investigate analogs of dehydroaripiprazole.

177.    In 2004, it was known that dehydroaripiprazole had affinity for the $D_2$ receptor and displayed pharmacological activity similar to aripiprazole with a less variable pK profile.  It was

also known that dehydroaripiprazole had a longer half-life than aripiprazole. The mean terminal elimination half-life was found to be about 75 hours for a single dose of aripiprazole and about 94 hours for dehydroaripiprazole. A POSA would have recognized that the longer half-life could be beneficial in terms of extending the active period of a given dose of a composition. This is particularly important when treating schizophrenia because compliance and missing doses is a substantial problem.

178.   Moreover, a POSA would have known that the discovery of drugs through biological transformation can be an integral part of the drug discovery process and that active metabolites of marketed drugs that show superior pharmacology, pharmacokinetics, and safety profiles in comparison to their parent molecules can become lead compounds themselves.

179.   Plaintiffs criticize Defendants' position that dehydroaripiprazole was a lead compound for allegedly providing "no reason for a POSA to select the active metabolite of just one approved drug product, ABILIFY® (aripiprazole), over the many other then-available approved antipsychotics and/or their metabolites." However, Plaintiffs ignore all of the reasons provided above for why aripiprazole was a lead compound. Once a POSA identifies aripiprazole as a lead compound, a POSA would immediately be led to dehydroaripiprazole because it is the major metabolite of aripiprazole and it had advantages relative to aripiprazole.

180.   Plaintiffs also criticize Defendants reliance on data regarding dehydroaripiprazole because that data results from the administration of aripiprazole rather than dehydroaripiprazole. However, a POSA would find the data regarding dehydroaripiprazole helpful and informative because it provides information regarding how dehydroaripiprazole behaves in the body, regardless of how it got there (i.e. direct administration or metabolized from aripiprazole).

181.   Plaintiffs argue that the longer half-life of dehydroaripiprazole is a double-edged

sword because it would also necessarily extend the active period of any unwanted side effects. This is not a concern that would dissuade a POSA from considering dehydroaripiprazole. A POSA looking to develop an improved antipsychotic would expect that the new drug would have an improved side-effect profile, and the benefits of a longer half-life would outweigh any concerns with side effects lasting for a longer time.

182. Furthermore, Oshiro 1998 would not have led a POSA away from dehydroaripiprazole. (Oshiro et al., *Novel Antipsychotic Agents with Dopamine Autoreceptor Agonist Properties: Synthesis and Pharmacology of 7-[4-(4-Phenyl-1-piperzinyl)butoxy]-3,4-dihydro-2(1H)-quinolinone Derivatives*, 41 J. Med. Chem. 658-67 (1998).) The subsequent comments regarding dehydroaripiprazole in Kubo 2005 and the Abilify PI trump the earlier statements in Oshiro 1998. Based on these more recent references, a POSA at the time of the alleged invention would have considered dehydroaripiprazole to be a promising lead compound. Moreover, Defendants disagree that postsynaptic DA receptor activity is not relevant or important when assessing candidates for a lead compound for the treatment of schizophrenia. It was known at the time of the alleged invention that postsynaptic DA receptor activity was important to the pharmacology of aripiprazole.

183. Defendants also disagree with Plaintiffs' dismissal of WO '682's assertion that compositions comprising certain aripiprazole metabolites have "excellent efficacy," or "fewer side effects and an excellent safety profile." (WO '682 at 30:18-32:3).) WO '682 repeats a preference for dehydroaripiprazole throughout its disclosure and it discloses several formulations for the oral administration of dehydroaripiprazole. (WO '682 at 5:8-11, 31:3-5, 52-60.) It also describes clinical trials to evaluate the efficacy of dehydroaripiprazole. (WO '682 at 64-65, 67-68 (Examples 6, 8).)

79

184.    Defendants further disagree with Plaintiffs' opinion that WO '682 only discloses clinical trial protocols administering dehydroaripiprazole and provides no data from such trials. WO '682 discloses the clinical trial results—not just protocols—indicating that dehydroaripiprazole (not any other metabolite) and aripiprazole have comparable clinical outcomes.  (WO '682 at 63-68 (Examples 5-8).)

185.    Plaintiffs also contend that dehydroaripiprazole was not further developed by Otsuka, as evidenced by Oshiro 1998.  Plaintiffs ignore that, in addition to the clinical studies discussed above, Otsuka filed WO '682 in 2003—five years after Oshiro 1998 was published— and that WO '682 discloses that "[a]other preferred carbostyril derivative of [WO '682] that is a dopamine-serotonin system stabilizer is a metabolite of aripiprazole called dehydroaripiprazole, also known as OPC-14857."  (WO '682 at 5:8-11.)   In addition, Kubo 2005 discloses that "[dehydroaripiprazole] has pharmacological activity equivalent to that of ARIPIPRAZOLE." (Kubo et al., *Influence of Itraconazole Co-Administration and CYP2D6 Genotype on the Pharmacokinetics of the New Antipsychotic Aripiprazole*, 20 DRUG METAB. PHARMACOKINET. 55-64, at 56 (2005) ("Kubo 2005").)  These references undermine Plaintiffs' argument that Otsuka did not conduct further work on dehydroaripiprazole.

186.    Plaintiffs identify examples of active metabolites leading to failures in drug development.  However, Plaintiffs fail to mention that there are also examples of active metabolites leading to successes in drug development.  For example, a POSA would have known the following active metabolites, among others, were marketed as individual drug products: nortriptyline, desipramine, oxazepam, temazepam.

187.    Thus, because dehydroaripiprazole had a similar efficacy to aripiprazole, as well as the advantages discussed above, a POSA also would have pursued dehydroaripiprazole as a lead

compound in order to develop an antipsychotic with an optimized side effect profile.

**B. The Prior Art Motivated a POSA          T                           to Aripiprazole and Dehydroaripiprazole at the Time of the Alleged Invention**

**1. The Prior Art Taught a POSA to Optimize the Activity of Aripiprazole and/or Dehydroaripiprazole with Respect to Specific Receptor Targets**

188. Aripiprazole's status as "'the first next generation atypical antipsychotic' because of its unique pharmacologic profile" (Davies 2004 at 318) and the complexity of its pharmacological profile would have led to the selection of aripiprazole, or its active metabolite dehydroaripiprazole, as a lead compound. These same factors would have led a POSA to consider minor modifications to aripiprazole/dehydroaripiprazole with the goal of optimizing the complex profile of aripiprazole/dehydroaripiprazole.

189. A POSA would have understood that, compared to other atypical antipsychotics, aripiprazole and dehydroaripiprazole had a higher affinity for the human dopamine $D_2$ receptor (where they are known to act as partial agonists), but a lower affinity for the $5\text{-}HT_{2A}$ receptors, and they were shown to be low-potency partial agonists at the $5\text{-}HT_{1A}$ receptor. Based on what was known from the prior art about the receptor activity of the atypical antipsychotics, a POSA would have appreciated that $5\text{-}HT_{1A}$ partial agonism and $5\text{-}HT_{2A}$ antagonism had been recognized as important to reducing the negative symptoms of schizophrenia and EPS-related events, and, therefore, a POSA would have looked to modify aripiprazole or dehydroaripiprazole to increase activity as a partial agonist toward $5\text{-}HT_{1A}$ and/or increase antagonist activity toward $5\text{-}HT_{2A}$. In doing so, a POSA would have sought generally to maintain aripiprazole's activity at $D_2$. Based on these goals, in order to identify potential modifications to a lead compound, a POSA would have considered prior art discussing aripiprazole, dehydroaripiprazole, compounds similar to aripiprazole/dehydroaripiprazole, and the activity of any of the foregoing at any of the $D_2$, $5\text{-}HT_{1A}$,

and 5-HT$_{2A}$ receptors.  A POSA would not have required any single reference to discuss all receptors.  While a POSA may not have known with absolute certainty the effect of any particular modification, such prior art, along with standard concepts in medicinal chemistry, would have provided a POSA with sufficient guidance to propose certain modifications with the reasonable expectation that those modifications would achieve the stated goals.  Even if a POSA would not have had these exact pharmacological goals, a POSA would have understood the D$_2$, 5-HT$_{1A}$, and/or 5-HT$_{2A}$ receptors to be relevant.  Based on that alone, a POSA would have had the motivation to propose particular modifications.

190.    A POSA looking to improve upon the therapeutic benefits of aripiprazole and dehydroaripiprazole would have examined their pharmacology.  In 2004, it was known that antipsychotic drug activity was correlated with a drug's D$_2$ receptor binding affinity and that aripiprazole's and dehydroaripiprazole's efficacy were attributable, at least in part, to their partial agonism of the D$_2$ receptor.

191.    A POSA would have also known that part of aripiprazole's and dehydroaripiprazole's efficacy was attributable to its partial agonism of the 5-HT$_{1A}$ receptor.  Moreover, a POSA would have known that serotonergic activity was associated with the control of mood, cognition, and motor behavior, and partial agonist activity at the 5-HT$_{1A}$ receptor had been associated with improvements in the cognitive and negative symptoms of schizophrenia and a decrease in anxiety, depression, and other EPS-related events.

192.    It was also known in 2004 that the serotonin system inhibits dopaminergic pathways, and that modulating the serotonin system could disinhibit dopaminergic function, which would in turn help alleviate the negative symptoms of schizophrenia and EPS.  These effects had already been recognized for Pfizer's approved atypical antipsychotic ziprasidone, a 5-HT$_{1A}$

agonist/$D_2$ antagonist with a high affinity for 5-HT$_{1A}$ receptors ($K_i$ = 3.4 nM). A POSA would have known that the 5-HT$_{1A}$ agonist activity of ziprasidone contributes to all of the cardinal features of an ideal antipsychotic—low EPS liability, efficacy against negative symptoms, and relief from associated depression.

193.    In 2004, a POSA understood that the benefits of aripiprazole and dehydroaripiprazole, including the reduction in the negative symptoms of schizophrenia and EPS, were the result, at least in part, of the partial agonist properties of aripiprazole with respect to the 5-HT$_{1A}$ receptor. A POSA would have known that the 5-HT$_{1A}$ receptor was an important therapeutic target for the development of improved antipsychotic drugs.

194.    A POSA would have sought to optimize the functional activity of aripiprazole and dehydroaripiprazole at the 5-HT$_{1A}$ receptor and 5-HT$_{2A}$ receptor. A POSA would have known that, while aripiprazole has a much higher affinity for the human dopamine $D_2$ receptor (0.74 nM) than other atypical antipsychotics, it possessed a lower affinity for the 5-HT$_{2A}$ receptors and was shown to be a low-potency partial agonist at the 5-HT$_{1A}$ receptor (EC$_{50}$ = 329 nM) in cell assays (as compared with serotonin itself (EC$_{50}$ = 4.5 nM)). Given that 5-HT$_{1A}$ partial agonism and 5-HT$_{2A}$ antagonism had already been recognized as important to disinhibiting dopaminergic function so as to reduce the negative symptoms of schizophrenia and EPS-related events, a POSA would have looked to modify aripiprazole to improve its affinity towards 5-HT$_{2A}$ receptors and potency toward 5-HT$_{1A}$ receptors. Specifically, a POSA would have investigated modifications that would increase aripiprazole's partial agonist activity toward 5-HT$_{1A}$ and antagonist activity toward 5-HT$_{2A}$.

195.    A POSA would have further appreciated, however, that an ideal modification to aripiprazole to improve its serotonin function should not reduce its $D_2$ antagonism below the level

necessary to treat the positive symptoms of schizophrenia.

196.    Plaintiffs argue that the prior art cautioned against modulating $5\text{-HT}_{1A}$ activity, citing Marona-Lewicka, but Marona-Lewicka does no such thing.  Instead, Marona-Lewicka acknowledges the "increased interest in $5\text{-HT}_{1A}$ receptors in antipsychotic research" and then goes on to state:

> Although efficacy of aripiprazole against the positive symptoms of schizophrenia may be related to its dopamine receptor interactions, it seems possible that its atypical profile may derive, at least in part, from its $5\text{-HT}_{1A}$ agonist effect, rather than from unusual $D_2$ receptor properties. **We therefore wish to emphasize the potential importance of $5\text{-HT}_{1A}$ receptor stimulation in the pharmacological profile of atypical antipsychotics** such as aripiprazole, clozapine, ziprasidone, and olanzapine and suggest that more extensive studies appear warranted.

(Marona-Lewicka et al., *Aripiprazole (OPC-14597) Fully Substitutes for the $5\text{-HT}_{1A}$ Receptor Agonist LY293284 in the Drug Discrimination Assay in Rats*, 172 PSYCHOPHARMACOLOGY 415-21, at 419 (2004) ("Marona-Lewicka") (emphasis added).)  Thus, Marona-Lewicka reinforces the importance of the $5\text{-HT}_{1A}$ receptor in the pharmacology of antipsychotics.

197.    Plaintiffs also cite Shapiro 2003 to suggest that there was uncertainty with respect to the role of the serotonin receptors, but Shapiro 2003 did not express uncertainty when stating as follows: "our results support the hypothesis that the unique actions of aripiprazole in humans are likely a combination of 'functionally selective' activation of $D_2$ (and possibly $D_3$) dopamine receptors, coupled with important interactions with selected other biogenic amine receptors – particularly 5-HT receptor subtypes ($5\text{-HT}_{1A}$, $5\text{-HT}_{2A}$)."  (Shapiro et al., *Aripiprazole, A Novel Atypical Antipsychotic Drug with a Unique and Robust Pharmacology*, 28 NEUROPSYCHOPHARMACOLOGY 1400-11, at Abstract (2003) ("Shapiro 2003").)  Sprouse 1999 reached a similar conclusion: "The $5\text{-HT}_{1A}$ agonist activity reported here clearly distinguishes

ziprasidone from currently available antipsychotic agents and suggests that this property may play a significant role in its pharmacologic actions." (Sprouse et al., *Comparison of the Novel Antipsychotic Ziprasidone with Clozapine and Olanzapine: Inhibition of Dorsal Raphe Cell Firing and the Role of 5-HT$_{1A}$ Receptor Activation*, 21 NEUROPSYCHOPHARMACOLOGY 622-31, at Abstract (1999) ("Sprouse 1999"); *see also* Marona-Lewicka at 419 ("A growing number of studies show that stimulation of 5-HT$_{1A}$ receptors attenuates the extrapyramidal side effects of antipsychotics.").)

198. Plaintiffs also cite Millan 2000 for the proposition that the implications of targeting 5-HT$_{1A}$ and 5-HT$_{2A}$ on antipsychotic effects were just beginning. Defendants agree that Millan 2000 teaches that aripiprazole's efficacy was attributable to its partial agonism of the 5-HT$_{1A}$ receptor and that serotonergic activity was associated with the control of mood, cognition, and motor behavior; however, Plaintiffs ignore the fact that Millan 2000 was authored five years before the date of the alleged invention and two and a half years before Otsuka launched Abilify in November 2002. (Millan et al., *Improving the Treatment of Schizophrenia: Focus on Serotonin (5-HT)$_{1A}$ Receptors*, 295 J. PHARMACOLOGY & EXPERIMENTAL THERAPEUTICS 853-61 (2000) ("Millan 2000").) As such, there is additional information after Millan 2000 that expands upon what was taught in Millan 2000. For example, Marona-Lewicka and Shapiro 2003 discussed aripiprazole's behavior at the 5-HT$_{1A}$ and 5-HT$_{2A}$ receptors, were published after Millan 2000, and must also be considered when assessing what a POSA knew at the time of the alleged invention. The proposed "strategies" in Millan 2000 were not current at the time of the alleged invention in 2005, when a substantial amount of information had been learned through the commercial and wide-spread study of aripiprazole.

199. Lawler 1999, also cited by Plaintiffs, suffers from the same problem as Millan

2000. (Lawler et al., *Interactions of the Novel Antipsychotic Aripiprazole (OPC-14597) with Dopamine and Serotonin Receptor Subtypes*, 20 NEUROPSYCHOPHARMACOLOGY 612-27 (1999) ("Lawler 1999").) Plaintiffs cite Lawler 1999 for the proposition that there was no consensus regarding the biological mechanisms that might impart clinical atypicality. Whether this was true in 1999 is irrelevant because by 2005 there was a clear consensus that the pharmacological profile of the leading atypical antipsychotic—aripiprazole—was attributable to partial agonism at the $D_2$ and 5-$HT_{1A}$ receptors and antagonism at the 5-$HT_{2A}$ receptor.

200.    Plaintiffs further contend that the role of serotonin and the involvement of its specific receptors for therapeutic benefit in schizophrenia was not well understood. Defendants disagree that the role of serotonin and the involvement of its specific receptors for therapeutic benefit in schizophrenia has to be "well understood" in order to motivate a POSA to optimize an antipsychotic's behavior at those receptors. Even if the precise mechanism of action of every serotonin receptor with respect to schizophrenia was not known, there was an overwhelming amount of evidence and expert opinion pointing to the importance of optimizing antipsychotic activity at the 5-$HT_{1A}$ and 5-$HT_{2A}$ receptors.

201.    With respect to the 5-$HT_{1A}$ receptor, there were multiple references at the time of the alleged invention that point to the 5-$HT_{1A}$ receptor as an area of great interest for improving antipsychotics. For example, Hirose 2004 states that "[a]gonism of 5-$HT_{1A}$ receptors can reduce the extent of EPS induced by $D_2$ antagonists." (Hirose 2004 at 381 (citing Wadenberg et al., *Evidence for Specific Interactions Between 5-$HT_{1A}$ and Dopamine $D_2$ Receptor Mechanisms in the Mediation of Extrapyramidal Motor Functions in the Rat*, 47 PHARMACOL. BIOCHEM. BEHAV. 509-13 (1994); Andersen et al., *Prevention by (+/-)-8-hydroxy-2-(di-n-propylamino)tetralin of Both Catalepsy and the Rises in Rat Striatal Dopamine Metabolism Caused by Haloperidol*, 118 BR. J.

86

PHARMACOL. 421-27 (1996); Prinssen et al., *Interactions Between Neuroleptics and 5-HT$_{1A}$ Ligands in Preclinical Behavioral Models for Antipsychotic and Extrapyramidal Effects*, 144 PSYCHOPHARMACOLOGY 20-29 (1999)).)  Similarly, Jordan 2002 states that "recent attention has focused on the 5-HT$_{1A}$ receptor as a therapeutic target for the development of improved antipsychotic drugs."  (Jordan et al., *The Antipsychotic Aripiprazole is a Potent, Partial Agonist at the Human 5-HT$_{1A}$ Receptor*, 441 EUR. J. PHARMACOLOGY 137-40, at 137 (2002) (citing Meltzer, *The Role of Serotonin in Antipsychotic Drug Action*, 21 NEUROPSYCHOPHARMACOLOGY (Suppl. 2) 106S-115S (1999); Millan 2000); *see also* Jordan 2002 at 139 ("A variety of preclinical data has suggested that the 5-HT$_{1A}$ receptor is a therapeutic target for the development of improved psychotic drugs.").)

202.    Multiple references also note the importance of the 5-HT$_{1A}$ receptor to an improved side-effect profile for antipsychotics.  Winans 2003 states that it "has been postulated that partial agonist activity at the 5-HT$_{1A}$ receptor may contribute to improvement in anxiety, depression, negative symptoms, and fewer EPSs."  (Winans, *Aripiprazole*, 60 AM. J. HEALTH-SYST PHARM. 2437-45, at 2438 (2003) ("Winans 2003").)  Likewise, Keltner 2002 states that it "is thought that agonist activity at [the 5-HT$_{1A}$] receptor is associated with improvement in anxiety, depression, negative, and cognitive symptoms."  (Keltner, *Aripiprazole: A Third Generation of Antipsychotics Begins?*, 38 PERSPECTIVES IN PSYCHIATRIC CARE 157-59, at 159 (2002) ("Keltner 2002"); *see also id.* at 157, Table 2.)

203.    Plaintiffs also rely on Miyamoto 2005, which presents a broad overview of schizophrenia treatments and strives to cover many different theories and leave no stone unturned. (Miyamoto et al., *Treatments for Schizophrenia: A Critical Review of Pharmacology and Mechanisms of Action of Antipsychotic Drugs*, 10 MOL. PSYCHIATRY 79-104 (2005) ("Miyamoto

2005").)  However, at the time of the alleged invention, a POSA would not have sought to investigate every possible lead compound and every possible receptor theory.  Instead, a POSA would have focused on compounds and receptor theories that were the most promising, as of the time of the alleged invention.  Nothing in Miyamoto 2005 changes the fact that at the time of the alleged invention aripiprazole was the most promising lead compound and those skilled in the art were focused on serotonergic activity at the $5\text{-}HT_{1A}$ and $5\text{-}HT_{2A}$ receptors.

204.    The fact that some references refer to aripiprazole as an "intermediate" partial agonist at the $5\text{-}HT_{1A}$ receptor does not matter.  None of the references Plaintiffs rely on indicate that activity at the $5\text{-}HT_{1A}$ receptor had been optimized and there was no room for improvement.  To the contrary, those references indicate that optimizing activity at the $5\text{-}HT_{1A}$ receptor remained of great interest to those skilled in the art at that time.

205.    Defendants disagree that aripiprazole was effective against negative symptoms of schizophrenia and had low levels of EPS-related events.  It was known at the time of the alleged invention that aripiprazole, while having an improved side effective profile relative to other antipsychotics medications available at the time, nevertheless had side effects, including EPS-related events.  For example, akathisia is an EPS-related event that occurs in approximately 15% of patients taking aripiprazole.  It would have been highly desirable by patients and clinicians to reduce the incidence of this extremely troubling side effect.  At the time of the alleged invention, it was believed that partial agonist activity at the $5\text{-}HT_{1A}$ receptor may contribute to improvement in anxiety, depression, negative symptoms, and fewer EPS-related events.  It was also known that aripiprazole's different mechanism of action, that includes $5\text{-}HT_{2A}$ receptor antagonism and partial agonism at $5\text{-}HT_{1A}$ receptors, distinguish aripiprazole from other atypical agents.  The fact that aripiprazole's unique mechanism of action resulted in an improved side effect profile would have

motivated a POSA to focus on that unique mechanism of action, including activity at the 5-HT$_{1A}$ and 5-HT$_{2A}$ receptors, in order to further improve those side effects.

206.     Plaintiffs appear to suggest that information about a particular antipsychotic is of no value unless every detail regarding the clinical effects, mechanism of action, and receptor binding profile is known.  The fact that there may be information about an antipsychotic that is *unknown* does not render the *known* information any less useful or informative, and at the time of the alleged invention there was a substantial amount of information available regarding aripiprazole.

### 2.     The Prior Art Taught a POSA Where to Modify Aripiprazole and/or Dehydroaripiprazole

207.     It has been known since at least 1991 that carbostyril derivates such as aripiprazole can be optimized by modifying the substituents at the 2,3-phenyl position.  Prior to the invention date, this was taught, alone or in combination, at least by the '528 patent, Oshiro 1998, and WO '215.

208.     The '528 patent disclosed tests on thirteen compounds having different substituents at the 2,3-phenyl positions; the compounds tests included including aripiprazole (Example 1/Test Compound 1) and dehydroaripiprazole (Example 10/Test Compound 10).  ('528 patent at Tables 2-3.)  Those tests showed that the pharmacological activity varied based on the substituents at the 2- and 3-phenyl positions.  (*Id*. at Table 3 (disclosing the anti-apomorphine and anti-epinephrine activity for 13 compounds).)  Thus, the '528 patent teaches a POSA to focus on the 2,3-phenyl position when seeking to optimize the properties of aripiprazole and/or dehydroaripiprazole.  In addition, the core structure of preferred WO '215 examples is similar to the core structure disclosed in the '528 patent, substituting a carbon for a nitrogen in a single location.  (*See* '528 patent at abstract (formula I); WO '215 at 294:28-34; 316:25.)  Such an N-to-CH (e.g., naphthyridine-to-

carbostyril) substitution is a common, classical, bioisosteric substitution. (*See* Patani 1996 at 3159; Thornber 1978 at 564, Table 1.) Thus, given the teachings of the '528 patent to modify aripiprazole/dehydroaripiprazole at the 2,3-phenyl positions, a natural place for the POSA to look for suggested modifications would have been WO '215.

209. The inventor of the '528 patent, Yasuo Oshiro, reiterated the teachings of the '528 patent in Oshiro 1998 about the promise of modifications at the 2,3-phenyl region, and additionally provided motivation to explore both 3,4-dihydro-2(1H)-quinolinone and 2(1H)-quinolinone derivatives, and taught away from modifications in other regions of the molecule. More specifically, Oshiro 1998 taught that, to achieve post-synaptic DA antagonism, (i) a butoxy linking chain is preferred, (ii) substituents on the aromatic ring in the phenylpiperazinyl moiety are necessary, (iii) the substituted (phenylpiperazinyl)butoxy side chain at the 7-position in the 3,4-dihydro-2(1H)quinolinone nucleus is essential for activity, and (iv) the 3,4-dihydro-2(1H)-quinolinone and 2(1H)-quinolinone derivatives with the same (phenylpiperazinyl) butoxy moiety are equipotent to each other.

210. With respect to Oshiro 1998's point (i), Oshiro 1998 further taught that "[r]eplacement of the side chain … from propoxy to butoxy increased the potency of the resulting compound," but that "with a pentoxy side chain the activity was much reduced." (*Id.* at 660 (teaching "a superiority of butoxy side chain to propoxy and pentoxy side chains in producing potent DA antagonist activity in the 3,4-dihydro-2(1H)-quinolinone series").) Thus, a POSA would have kept the butoxy ($C_4H_9O$) side chain of aripiprazole/dehydroaripiprazole.

211. With respect to Oshiro 1998's point (ii), a POSA would have understood that the substituents on the aromatic ring in the phenylpiperazinyl moiety of aripiprazole were ripe for further experimentation, with aripiprazole's 2,3-dichlorophenyl to be used a base of comparison.

(*Id.* at 660-61.)  In particular, a POSA would have been motivated to try modifications not already disclosed in Oshiro 1998 that might be as good as, or better than, the dichlorophenyl substitution. A POSA therefore would have considered various other references suggesting modifications applicable to this region of the molecule.  (*See* '254 patent; '246 patent; '528 patent; '306 publication; WO '215; Lowe 1991; Kuipers 1995.)  More specifically, a POSA would have investigated modifications to this region to provide the increased 5-HT$_{1A}$ agonism that Dr. Rothschild opines a POSA would seek.

212.    With respect to point (iii), Oshiro 1998 further taught that "[c]hange in the 4-[4-(2,3-dichlorophenyl)-1-piperazinyl]butoxy side chain from the 7-position [] to the 5-, 6-, and 8-positions in the 3,4-dihydro-2(1*H*)-quinolinone nucleus produced [certain identified] inactive compounds."  (Oshiro 1998 at 661.)  Thus, a POSA would have kept the side chain at the 7-position.

213.    With respect to point (iv), Oshiro 1998 teaches that, with respect to post-synaptic DA antagonism, "the 2(1*H*)-quinolinone derivatives … were equipotent to their corresponding 3,4-dihydro-2(1*H*)-quinolinone analogues."  (*Id.* at 661, 662, Table 2.)  Thus, a POSA would have tried both alternatives.

214.    Based on Oshiro 1998, a POSA would view the 2,3-dichlorophenyl substituent as being the main area of aripiprazole/dehydroaripiprazole that can be modified to obtain a compound that would have overall biological activity similar to or better than the lead compounds.  A POSA would be aware of the SAR reported in Oshiro 1998 and therefore prefer mono- or disubstituted phenyl rings with changes at the 2- and 3-positions of the phenyl group.  A POSA would also have considered Lowe 1991 showing that incorporation of a 1-naphthyl group onto a piperazine-containing molecule is consistent with potent binding to DA2, 5HT1A, and 5HT2 receptors.

Likewise, Kuipers 1995 found that "[s]ubstitution with annelated rings at the 2,3-positions [of an arylpiperazine moiety] was highly favorable [with respect to 5-HT$_{1A}$ affinity] for all investigated compounds, with the exception of a pyrrole ring."  (Kuipers 1995 at Abstract.)

215.    WO '215 confirms focusing on the 2,3-dichlorophenyl region.  The SAR studies in WO '215 focused on modifying the left side of the "preferred" formula 1 structure (below), with the right side largely kept constant (Q=N for all of the preferred structures and Z=N, C or CH).  (WO '215 at Tables 1-2.)  Additionally, the POSA would have noted that most of the modifications to the left side of the "preferred" formula 1 involved modifications of the G group (where dichlorophenyl would be in aripiprazole).  Lastly, the POSA would have noted that some of the "preferred" G-group substitutions were alternatives to dichlorophenyl that Oshiro 1998 did not try, and that some of these novel substitutions appeared to give activity that was as good as dichlorophenyl.



wherein G is



216.    Based on the '528 patent, Oshiro 1998, and/or WO '215 a POSA would have viewed the 2,3-dichlorophenyl substituent as being the area of aripiprazole/dehydroaripiprazole

that should be modified in order to optimize its properties.   In addition, based on the teachings of WO '864, a POSA would have had a reasonable expectation of success that replacements to the 2,3-dichlorophenyl substituent would have led to molecules that also have strong antagonism for the $5HT_{2A}$ receptor.   A POSA also would have been motivated to try both aripiprazole's dihydrocarbostyril (i.e., 3,4-dihydro-2(1H)-quinolinone) moiety and dehydroaripiprazole's carbostyril (i.e., 2(1H)-quinolinone) moiety.  (*See, e.g.*, Oshiro 1998; WO '215; Abilify PI; Fura 2004; Kubo 2005.)

217.   Looking at the prior art as a whole, a POSA starting with aripiprazole or dehydroaripiprazole would have focused on the 2,3-dichlorophenyl as a primary region for modification.  The '528 patent, Oshiro 1998, and WO '215 individually and together teach a POSA seeking to optimize aripiprazole/dehydroaripiprazole to modify the 2,3-dichlorophenyl substituent.  A POSA would have understood from WO '215 that it was possible to modify the dichlorophenyl piperazine portion without significantly affecting $D_2$ activity.  A POSA would have considered such modifications for the primary purpose of imparting beneficial serotonergic activity but also with the understanding that improvement in $D_2$ activity was still possible.  A POSA, with such a motivation would have understood that piperazines containing fused aromatic rings (e.g., benzothiophene) have much stronger binding affinity at $5\text{-}HT_{1A}$ receptors than unfused substituents (e.g., dimethoxyphenyl).  (*See* Kuipers 1995 at 1946.)

218.   In regard to the '528 patent, the disclosed tests on thirteen compounds having different substituents at the 2,3-diphenyl positions would have motivated a POSA to focus on the 2,3-phenyl position.

219.   In regard to Oshiro 1998, both Dr. Roth and Dr. Ward narrowly focus on compounds with modified 2,3-dichlorophenyl regions that showed poor DA receptor/autoreceptor

agonist/antagonist activity.  A POSA would not have been surprised or discouraged by an SAR study yielding some compounds that showed good activity and others that did not.  From Oshiro 1998 as a whole, a POSA would have understood that the 2,3-dichlorophenyl moiety of aripiprazole was ripe for further modification.  Contrary to the narrow analysis of Drs. Ward and Roth, Oshiro 1998 shows that optimization of the 2,3-dichlorophenyl group could result in good activity as evidenced by compounds 13, 16, 26, 48, and 55, which have DA agonist values as good as, or better than, aripiprazole.  (Oshiro 1998 at Table 3.)  A POSA would also have noted that none of the compounds in Oshiro 1998 is directed to a substituent with a fused aromatic ring attached to the piperazine, while other references, such as Kuipers 1995, disclose that piperazines containing fused aromatic rings (e.g., benzothiophene) have much stronger binding affinity at 5-$HT_{1A}$ receptors than unfused substituents (e.g., dimethoxyphenyl).  (*See, e.g.*, Kuipers 1995 at 1946.)  The data in Table 1 and 3 of Oshiro 1998 show that the selection of structural substituents on the phenyl ring can impact DA receptor binding and/or activity, informing a POSA that there would have been a reasonable expectation that the correct substituent could provide a compound that is as good as, or better than, aripiprazole.  Moreover, Oshiro 1998 discourages modifications to various other portions of the molecule.

220.    Oshiro 1998 and the '528 patent provide a reasonable expectation of success for modifications of the 2,3-dichlorophenyl region.  Moreover, a POSA routinely would have sought to optimize common groups such as phenyl; a POSA would have considered such groups to be low-hanging fruit for potential improvement.

221.    Even if WO '215 is silent regarding any serotonergic binding affinity or serotonergic functional activity of its disclosed compounds, a POSA working on developing new compounds based on aripiprazole would have been particularly attracted to WO '215 for a simpler

94

and compelling reason: the close structural similarity of the compounds disclosed therein with aripiprazole/dehydroaripiprazole.  A POSA looking to modify aripiprazole would have looked to prior art disclosing similar molecules.  Indeed, as a general matter, a POSA looking to modify a molecule will look at art disclosing similar compounds.  Thus, even assuming WO '215 does not inform a POSA of serotonergic activity, a POSA would have been motivated to propose modifications to aripiprazole/dehydroaripiprazole based on WO '215 and, along with the development team, measure the serotonergic binding affinity and function activity of the new compounds.  Further, 30 of the 34 left-hand fragments that appear in WO '215 compounds having $Ki \leq 1$ nM and intrinsic activity between 20-60% represent 2,3-disubstituted aryl groups.  In addition, Kuipers 1995 discloses that piperazines containing fused aromatic rings (e.g., benzothiophene) have much stronger binding affinity at 5-HT$_{1A}$ receptors than unfused substituents (e.g., dimethoxyphenyl).  (*See* Kuipers 1995 at 1946.)

222.   Even assuming that WO '215 suggests the existence of several potential modifications, WO '215 discloses a targeted series of compounds where the right side of formula (1) is kept constant and only the left side substituent is altered (WO '215 compounds A1 to A85, and A1′ to A49′ where the right-hand structure is a constant naphthyridine-2-one with a butoxypiperazine linker; compounds B1 to B67, B1′ to B41′, where the right hand structure is a constant dehydronaphthyridine-2-one with a butoxypiperazine linker).  These groups of compounds, and their reported $K_i$ and intrinsic activity provide reasonable expectation for a POSA to further explore replacements for the 2,3-dichlorophenyl substituents of formula I.

223.   Because the modifications made in WO '864, at the phenyl ring area, including in the "preferred" and "specifically called out" compounds, resulted in 5-HT$_{2A}$ antagonistic activity, a POSA would have had a reasonable expectation that similar modifications to the corresponding

phenyl area in aripiprazole or dehydroaripiprazole might contribute to such activity. Drs. Ward and Roth do not seem to dispute this possibility; instead, they assert that "[a] POSA seeking to develop a compound that maintains the $D_2$ partial agonist activity of aripiprazole would not have looked to the disclosure of WO '864, which relates to $D_2$ antagonists." Here, Dr. Ward and Dr. Roth fail to consider the totality of the references and prior art as a whole, at least because a POSA would not have assumed that modifying the phenyl region of aripiprazole/dehydroaripiprazole would necessarily result in $D_2$ antagonistic activity. A POSA would have understood that the lead molecules (aripiprazole/dehydroaripiprazole) had $D_2$ functional activity, and the WO '864 compounds used as inspiration for modifications to aripiprazole/dehydroaripiprazole also had $D_2$ functional activity, thereby providing a POSA with a reasonable expectation that the resulting compounds would also have $D_2$ functional activity. Given that aripiprazole/dehydroaripiprazole are partial agonists, a POSA would have had a reasonable expectation that the resulting compounds could also be partial agonists. A POSA therefore would have been motivated to synthesize such modified compounds and, along with the development team, test them.

### 3. The Prior Art Taught a POSA to Replace the 2,3-Dichlorophenyl Substituent of Aripiprazole/Dehydroaripiprazole with a 4-Benzothiophene Substituent

224.    A POSA seeking to optimize aripiprazole or dehydroaripiprazole through a modification at the 2,3-dichlorophenyl position would have strongly considered a benzothiophene substituent in this position. This substitution was taught by WO '215 (with respect to $D_2$) as well as the long history of successful benzothiophenes in molecules that bind to 5-HT$_{1A}$ receptors.

a.    WO '215 Taught a POSA to Replace the 2,3-Dichlorophenyl Substituent of Aripiprazole/Dehydroaripiprazole with a 4-Benzothiophene Substituent

225.    WO '215 (March 2005) disclosed 4-piperazinyl-substituted-benzothiophene compounds for treating "major depressive disorders," "schizophrenia," "bipolar disorders or manic

depression," and other CNS disorders.  (WO '215 at 3:27-5:2; 45:24-46:34.)

226.    WO '215 disclosed two compounds, Examples A28' and B25', which are very similar to aripiprazole and dehydroaripiprazole, respectively.  The only differences are (1) a 4-benzothiophene ring instead of the 2,3-dichlorophenyl ring in aripiprazole/dehydroaripiprazole; and (2) a [1,8]naphthyridin-2-one ring system instead of the dihydrocarbostyril/carbostyril ring in aripiprazole/dehydroaripiprazole, as shown below.



| | |
|---|---|
| **WO '215, Example A28'** | **aripiprazole** |
| **WO '215, Example B25'** | **dehydroaripiprazole** |

227.    Taking the second difference first, an N-to-CH (e.g., naphthyridine-to-carbostyril) substitution is a common, classical, bioisosteric substitution.  (Patani 1996, Thornber 1978.)  In the context of ring substitution, Patani 1996 states that "The trivalent substitution of —CH= with —N= is commonly used in modern drug design."  (Patani 1996 at 3159.)  Likewise, Thornber 1978 discloses this substitution in its table of "classical" bioisosteres.  (Thornber 1978 at 564, Table 1.)

228.    As for the first difference, the 4-benzothiophene compounds (WO '215, compounds A28' and B25') were shown to have a strong affinity as well as partial agonist activity toward the

$D_2$ receptor similar to the affinity/intrinsic activity of their 2,3-dichloro-substituted analogs (WO '215, compounds A1 and B1, respectively (shown below)).  WO '215 teaches 2,3-dichloro-substituted compounds A1 and B1 differ from aripiprazole and its major metabolite (dehydroaripiprazole), respectively, only by the presence of a second nitrogen in the 3,4-dihydro-1H-[1,8]naphthyridin-2-one moiety (for compound A1) and the 1H-[l,8]naphthyridin-2-one moiety (for compound B1).  Both the 2,3-dichlorophenyl of compounds A1 and B1 and the 4-benzothiophene group of compounds A28' and B25' are characterized as preferred groups in WO '215, and both resulted in compounds having high $D_2$ affinity but moderate $D_2$ intrinsic activity.



**Example A1**



**Example B1**

The results of the $D_2$ receptor binding assays for 2,3-dichloro compounds A1 and B1, and 4-benzothiophene compounds A28' and B25', are provided below and demonstrate all four compounds have high affinity and a preferred intrinsic activity for $D_2$ receptors.

| WO '215 Example | $D_2$ Ki (nM) | $D_2$ Intrinsic Activity (%) |
|---|---|---|
| A1 | 1.0 | 30 |
| B1 | 1.0 | 19 |
| A28' | 0.3 | 21 |
| B25' | 1.0 | 21 |

(*Id.* at 73:30-84.)  As a reference, aripiprazole has a $D_2$ Ki of 0.34 nM.  (Abilify PI at 1.)  Thus, the 4-benzothiophene-containing compounds also have comparable activity at $D_2$ to aripiprazole.

229.   Through these examples, WO '215 teaches a POSA to replace the 2,3-dichlorophenyl substituent of aripiprazole/dehydroaripiprazole with a 4-benzothiophene substituent.

230.   Dr. Ward and Dr. Roth opine that WO '215 discloses over 300 compounds as supposed preferred compounds with several structural variations, such that a POSA would not have focused specifically on the benzothiophene compounds (Examples A28′ and B25′).  However, Drs. Ward and Roth ignore express teachings of WO '215 that would have directed a POSA to a benzothiophene substituent.  WO '215 is directed to a compound of formula (1):



**1**

(WO '215 at 1:24.)  G of formula (1) is defined by formula (i) or (ii) below:



(*Id.* at 2:1-3.)  WO '215 discloses that in certain preferred embodiments, G is a group of the

formula (ii) and ring AA is a benzo ring.  (*Id.* at 8:1-4.)  In other preferred embodiments, G is

disclosed as naphthyl, and $R^{13}$ and $R^{14}$ are independently hydrogen or fluoro.  (*Id.* at 8:18-20.)  In

other preferred embodiments, G is a group of formula selected from: 2,3-dihydro-1H-indene, 4-

benzothiophene, 2-methoxyquinoline (as shown below in the same order):



(*Id.* at 8:14-17.)  In other preferred embodiments, G is 2,3-dichlorophenyl.  (*Id.* at 9:1-3.)  Thus,

WO '215 teaches only five classes of core moieties as preferred embodiments of the G substituent

of  formula  (1):  4-benzothiophene,  2,3-dihydro-1H-indene,  2-methoxyquinoline,  2,3-

dichlorophenyl, and naphthyl/substituted naphthyl moieties.  (*Id.* at 8:14-9:3.)  Of these, it is

notable that aripiprazole already contains a 2,3-dichlorophenyl substituent, so that WO '215 only

discloses four new preferred core moieties.  Dr. Ward recognizes four of these five embodiments

for G as preferred by WO '215, failing to recognize only WO '215's preference for the 4-benzothiophene substituent.   Dr. Ward recognizes WO '215's identification of naphthyl substituents but ignores that benzothiophene substituents are not only also identified as preferred by WO '215, but that benzothiophene is a bioisostere of naphthyl.  In addition, the four categories of substituents other than 2,3-dichloro all represent aromatic substituents with an additional ring used in what were originally the 2,3-carbons of the phenyl group in Oshiro 1998.

231.    Dr. Ward states that there are only two benzothiophene compounds in WO '215 – A28′ and B25′ – neither of which is identified as "one of the nine particularly preferred compounds."  However, a POSA would have looked to what WO '215 teaches as preferred classes of G-substituents and understood that 4-benzothiophene was one of only four other preferred classes, when not counting 2,3-dichlorophenyl, the fifth preferred G-substituent.  A POSA also would have identified that a compound containing a 4-benzothiophene attached to a piperazine (A28′) is one of 29 specific compounds claimed in claim 8 out of the "400 specific compounds" mentioned by Dr. Ward.  And those 29 claimed compounds encompass only six classes of G-substituents, i.e., naphthalenyl/substituted naphthalenyl, 2-methoxyquinoline, 2,3-dihydro-1H-indene, 2,3-dichlorophenyl, 4-benzothiophene, and benzothiadiazole, five of which happen to be the same preferred G-substituent classes that WO '215 identified.  Thus, of the substituents disclosed in WO '215, a POSA looking to modify the 2,3-dichloro moiety of aripiprazole or dehydroaripiprazole would have strongly considered the 4-benzothiophene substituent among a limited group of five other classes of G-substituents that WO '215 specifically claims.  In addition, WO '215 is not the only reference that would have motivated a POSA to consider the 4-benzothiophene substituent.

232.    In addition, a POSA would have looked to compounds A28′ and B25′ that have 4-

benzothiophene substituents because that substituent was one of four preferred G-substituents, and would have understood that both A28′ and B25′ have strong binding $K_i$ values and moderate intrinsic activity.  Thus, a POSA would have considered 4-benzothiophene as a preferred modification for aripiprazole/dehydroaripiprazole's 2,3-dichlorophenyl group based on comprehensive teachings of WO '215.

233.    Dr. Ward opines that a POSA would not focus on the benzothiophene compounds (A28′ and B25′) because they are not one of the nine compounds that Dr. Ward considers to be the most preferred embodiment of WO '215, i.e., compounds [that] exhibit no more than 10 nM binding at the $D_2$ receptor and at least 30% to up to 50% intrinsic activity.  Drs. Roth's and Ward's analyses ignore the more general structural preferences taught by WO '215.  A POSA would have strongly considered the five classes of G-substituents, including 4-benzothiophene, identified by WO '215 as preferred embodiments.  A POSA would not have limited the consideration only to Dr. Ward's nine "particularly preferred compounds" (which include only two of the five classes of preferred G-substituents, naphthyl/substituted naphthyl and 2-methoxyquinoline).  And a POSA would have understood that claim 8 recites Dr. Ward's nine compounds along with 20 other compounds, including A28′.  Thus, a POSA would have strongly considered 4-benzothiophene, along with the three other non-2,3-dichlorophenyl G-substituents, as a substitute for the 2,3-dichlorophenyl of aripiprazole/dehydroaripiprazole.

234.    Limiting himself to the same $D_2$ binding and intrinsic activity preferences, Dr. Ward notes that 4-benzothiophene-substituted compounds A28′ and B25′ exhibit intrinsic activity of 21%, which is outside the most preferred range of 30% to 50%, although within the next preferred range of 20% to 60%.  On this basis, Dr. Ward would exclude them from consideration or consider them, but only along with even more compounds and alternative substituents.

However, one of the nine most preferred compounds of WO '215 that Dr. Ward highlights, B50, exhibits intrinsic activity of 51%—outside the most preferred range of 30% to 50%.  Moreover, Dr. Ward again ignores that A28′ is recited in claim 8 among only 29 compounds.  Thus, a POSA would have been motivated to look specifically at compounds A28′ and B25′.

235.    Dr. Ward's rigid "funneling" approach treats the preferred ranges for $D_2$ binding and intrinsic activity as equal.  A POSA would not have done so.  Dr. Ward concedes that it was well understood that a compound's intrinsic activity could not be unambiguously determined.  As an example, he notes that aripiprazole's intrinsic activity was reported to be 25% to 90% depending on the assay used.  Given this, a POSA would have permitted some leeway with respect to WO '215's preferred intrinsic-activity ranges, particularly if a compound was especially strong with respect to binding affinity.  Indeed, that is the case for A28′ and B25′, whose binding affinities of 0.3 and 1.0 nM, respectively, are not only well within WO '215's most preferred range of no more than 10 nM but even within Dr. Ward's assumed more preferable and even tighter binding of no more than 1 nM.  (WO '215 at 71-89 (Tables 1-2).)  Taking these factors into consideration, along with WO '215's preference for 4-benzothiophenes among four other G-substituents, and WO '215's inclusion of a 4-benzothiophen in claim 8, A25′ and B28′ are not merely two of some unspecified number of—but presumably, to him, numerous number of—compounds.

236.    Dr. Ward's "funneling" discussion has additional problems.  Among the 118 compounds he identified as having a $D_2$ binding affinity of no more than 1 nM, he identifies 62 discrete left-hand side structures.  Dr. Ward's analysis suffers from the fact that he puts no limit at all on intrinsic activity; thus, his 118 compounds encompass various compounds that are clearly not preferred by WO '215.  Using WO '215's 20-60% preferred range for intrinsic activity and a $D_2$ binding affinity of no more than 1 nM yields 59 total compounds (as opposed to 118) and 34

discrete left-hand side structures (instead of 62), two of which were disclosed in Oshiro 1998. Moreover, the 34 discrete structures can be grouped into only 12 substituent classes.

237.   Similarly, among the 132 compounds Dr. Ward identifies as having the most preferred intrinsic activity (30-50%), he identifies 63 discrete left-hand side fragments.  This time, Dr. Ward completely ignores binding affinity.  Thus, his analysis yields little value.  Also, he again fails to observe that separate allegedly discrete fragments fall within substituent classes. Regardless, a POSA would have cared more about being within the most preferred range for binding affinity than intrinsic activity.

238.   Contrary to Drs. Roth and Ward, it is not the case that a comparison between compounds A1 and A28′, and between B1 and B25′, shows that when the benzothiophene replaced a 2,3-dichlorophenyl group, it resulted in compounds that did not have the preferred level of partial agonist activity.  Below are compounds A1, A28′, B1, and B25′, along with their $D_2$ Ki and intrinsic activity measurements:

| Example | $D_2$ Ki (nM) | $D_2$ Intrinsic Activity (%) | Compound Name | Compound Structure |
|---|---|---|---|---|
| A1 | 1.0 | 30 | 7-{4-[4-(2,3-Dichloro-phenyl)-piperazin-1-yl]butoxy}-3,4-dihydro-1H-[1,8]naphthyridin-2-one |  |
| A28′ | 0.3 | 21 | 7-[4-(4-Benzo[b]thiophen-4-yl-piperazin-1-yl)-butoxy]-3,4-dihydro-1H-[1,8]naphthyridin-2-one |  |
| B1 | 1.0 | 19 | 7-{4-[4-(2,3-Dichloro-phenyl)-piperazin-1-yl]butoxy}-1H-[1,8]naphthyridin-2-one |  |
| B25′ | 1.0 | 21 | 7-[4-(4-Benzo[b]thiophen-4-yl-piperazin-1-yl)-butoxy]-1H-[1,8]naphthyridin-2-one |  |

Between A1 (2,3-dichloro) and A28′ (4-benzothiophene), $D_2$ binding affinity is somewhat stronger for A28′ ($K_i = 0.3$ nM) than A1 ($K_i = 1.0$ nM), while intrinsic activity is generally similar or slightly reduced (30% for A1 versus 21% for A28′).  As pointed out by Dr. Ward, intrinsic activity measurements can vary significantly, so a POSA would not have understood a change from 30% to 21% to be particularly meaningful, especially since the POSA's intention is to incorporate these groups in place of the 2,3-dichlorophenyl group in aripiprazole/dehydroaripiprazole, which has a dihydrocarbostyril/carbostyril moiety in place of the 1,8-naphthyridin-2(1$H$)-one in compounds A1, A28′, B1, and B25′.  Similarly, comparing B1 and B25′, both binding activity ($Ki = 1.0$ nM for both) and intrinsic activity (19% for B1 versus 21% for B25′) are essentially the same.  Thus, these comparisons do not change the fact that it would have been obvious for a POSA to replace the 2,3-dichloro substituent with a 4-benzothiophene substituent.  In addition, an intrinsic activity of 21% is hardly akin to full antagonistic activity.

239.    An N-to-CH substitution, i.e., going from the (dihydro)napththyridine of A28′/B25′ to the (dihydro)carbostyril of aripiprazole/dehydroaripiprazole, is a common, classical, bioisosteric substitution.  Dr. Roth compares the compounds in Oshiro 1998 and WO '215 with and without the nitrogen.  From this, Dr. Roth concludes that both aripiprazole (Oshiro 1998 compound **28**) and its N-containing analogue (WO '215 compound A1) appear to be partial agonists.  In the other two compound pairs compared, the CH-containing analogues (Oshiro 1998 compounds **25** and **54**) are characterized as full antagonists, whereas the N-containing analogues (WO '215 compounds A2 and B1, respectively) "impart[ed] minimal partial agonist activity."  As conceded by Dr. Roth, a bioisosteric modification of –N-to-CH, from N-containing analogue of aripiprazole to aripiprazole, resulted in conservation of partial agonism.  From this, a POSA would have found it reasonable to consider the data of A28′ or B25′ from WO '215 in forming an

expectation of the behavior of carbostyril derivatives of A28′ or B25′.

      b.    <u>The History of Benzothiophene Compounds Taught a POSA to Replace the 2,3-Dichlorophenyl Substituent of Aripiprazole/Dehydroaripiprazole with a 4-Benzothiophene Substituent</u>

240.    A POSA looking to modify aripiprazole or dehydroaripiprazole to develop an improved antipsychotic would have also appreciated the history of benzothiophene-substituted compounds, their impact on serotonin and dopamine receptor function, and the growing realization over time of the promise of such compounds in treating schizophrenia and depression. By 1989, benzothiophenes had been recognized as useful for the treatment of schizophrenia and depression. ('254 patent at Abstract, 1:6-12, 1:26-41, 2:4-8 (confirming that the benzothiophenes were capable of stimulating dopamine autoreceptors indicating usefulness in treating CNS disorders such as schizophrenia and depression).)

241.    The '246 patent, issued in 1995, disclosed a series of 4-piperazinyl substituted benzothiophenes with low nanomolar and even sub-nanomolar affinity for 5-HT$_{1A}$. (*See* '246 patent at cols. 19-53 (examples 1-57).) The following examples are illustrative of this important recognition in the prior art.



EXAMPLE 9        EXAMPLE 10        EXAMPLE 15

(*Id.* at 25:1-15; 25:41-55; 29:17-30.) The reported data for 5-HT$_{1A}$ indicated that these specific compounds had high "Binding Affinity" (reported as "IC$_{50}$" values), and a POSA would have

therefore looked to the 4-benzothiophenes as a modification that could improve aripiprazole's potency toward serotonin receptors. (*See, e.g., id.* at Example 9 ($IC_{50} = 0.5$ nM); Example 10 ($IC_{50} = 1$ nM); Example 10 ($IC_{50} = 1$ nM).) The '246 patent disclosed these compounds for "treatment of anxiety, depression, migraine, stroke, angina and hypertension." (*Id.* at 1:8-53.)

242.    Dr. Ward criticizes that none of the examples of benzothiophene compounds in the '246 patent is unsubstituted. But Dr. Ward ignores that a POSA would have known that many SAR studies start with unsubstituted structures, even if they are not disclosed, and the fact that the '246 patent discloses the evaluation of forty-six specific benzothiophene compounds underscores the importance of benzothiophene compounds as constituents of serotonin 5-HT$_{1A}$ binding agents.

243.    Around the same time period, Kuipers 1995 disclosed testing on various targeted compounds that were "either commercially available (6-9 and 17) or known in the literature (10, 11, 13-16, 18…)." (Kuipers 1995 at 1943.) Importantly, many of these targets shared the following backbones:



**Figure 1.** Structures of 5-HT$_{1A}$ receptor ligands.

Kuipers 1995 found that "[s]ubstitution with annulated rings at the 2,3-positions [compounds 11 to 18] was highly favorable for all investigated compounds, with the exception of a pyrrole ring [compound 16]" (*id.*) and had stronger 5-HT$_{1A}$ receptor affinity (as measured by $K_i$) than substitutions made with non-ring substituents (compounds 6 to 10). (*Id.* at Table 2 (reproduced below).) In fact, the compound with a benzothiophene substituent (compound 15) had one of the highest affinities at the 5-HT$_{1A}$ receptor:

**Table 2.** $K_i$ Values for the Displacement of [$^3$H]-2-(Di-$n$-propylamino)-8-hydroxytetralin (2) from Central 5-HT$_{1A}$ Recognition Sites in Rat Frontal Cortex Homogenates with $N^4$-Unsubstituted 2-, 3-, and 4-Substituted $N^1$-Phenylpiperazines



| R | no. | $K_i \pm$ SEM (nM)$^a$ | | | (n=) |
|---|---|---|---|---|---|
| H | 6 | 500 | ± | 20 | (3) |
| 2-OCH$_3$ | 7 | 170 | ± | 20 | (3) |
| 3-OCH$_3$ | 8 | 320 | ± | 40 | (4) |
| 4-OCH$_3$ | 9 | 20,000 | ± | 5,000 | (2) |
| 2,3-OCH$_3$ | 10 | 1,000 | ± | 100 | (4) |
|  | 11 | 40 | ± | 5 | (5) |
|  | 12 | 12 | ± | 3 | (3) |
|  | 13 | 5.2 | ± | 1.2 | (3) |
|  | 14 | 13 | ± | 2 | (3) |
|  | 15 | 9.9 | | | (1) |
|  | 16 | 200 | ± | 10 | (3) |
|  | 17 | 18 | ± | 2 | (3) |
|  | 18 | 84 | ± | 11 | (3) |

Thus, Kuipers 1995 would have guided a POSA to utilize a phenylpiperazinyl substituent at the 2,3-position with a thiophene residue so as to create a benzothiophene-substituted piperazine.

244.   Dr. Ward emphasizes that the '254 patent discloses dihydrobenzothiophene, not benzothiophene.  Dr. Ward, however, ignores that Kuipers 1995 discloses that introducing a double bond increases 5-HT$_{1A}$ receptor affinity (*see* Kuipers 1995 at 1946 (comparing compounds 11 and 12)) and WO '215 discloses that an unsaturated fused ring provides better D$_2$ binding activity (*see* WO '215 at Table 1 (e.g., comparing compounds A48 and A49)).

245.   The '306 publication (2003) reported that 4-piperazinyl-substituted benzothiophenes behaved as potent 5-HT$_{1A}$ agonists and could be useful in the treatment of

108

depression and anxiety.  ('306 publication at [0002], [0006], [0262]-[0498] (compounds 2e, 5ad, 5ao, 5bt, and 5ci).)

246.    Dr. Ward opines that the '306 publication fails to teach that 4-piperazinyl-susbtituted benzothiophenes behave as potent $5\text{-HT}_{1A}$ agonists.  Although the '306 publication provides binding data with respect to the $5\text{-HT}_{1A}$ receptor but limited data regarding functional activity, it is incorrect that the '306 publication discloses that its compounds antagonize, rather than agonize, the $5\text{-HT}_{1A}$ receptors.  (*Id.*)  The '306 publication does not inform a POSA either way because it appears that the studies in '306 publication tested only "some of the compounds" in a test that measures only the $5\text{-HT}_{1A}$ antagonism.  ('306 publication at ¶ [0510].)   More specifically, nothing in '306 publication confirms the agonistic, partial agonistic, or antagonistic activity of benzothiophene compounds 2e, 5ad, 5ao, 5bt, and 5ci.  Further, the '306 publication teaches:

> [C]ompounds of the invention show affinity for the $5\text{-HT}_{1A}$ receptors … .  Furthermore, many of the compounds of the present invention possess valuable activity as serotonin re-uptake inhibitors … .  Accordingly, the compounds are considered useful for the treatment of psychiatric and neurological disorders as mentioned previously.

(*Id.* at [0514].)   Thus, based on the binding affinity data of the identified benzothiophene compounds at the $5\text{-HT}_{1A}$ receptors, a POSA seeking to modify the 2,3-dichlorophenyl area of aripiprazole would have been motivated to try a benzothiophene substituent.  In particular, based on Oshiro 1998 and WO '215, a POSA would have been motivated to try a 4-benzothiophene substituent.  A POSA would have had a reasonable expectation that such a modification would produce a compound that has good binding affinity and activity at $D_2$ and $5\text{-HT}_{1A}$ receptors.

247.    As such, a POSA would have expected that a 4-benzothiophene would have provided an improvement in $5\text{-HT}_{1A}$ affinity (as compared to aripiprazole/dehydroaripiprazole)

based on teachings from, e.g., the '246 patent, Kuipers 1995, and/or '306 publication. Moreover, based on WO '215, a POSA would expect that such a change would essentially maintain aripiprazole/dehydroaripiprazole's $D_2$ partial agonist effect, which had been recognized as beneficial. The similarities in $D_2$ activity between WO '215's 2,3-dichloro compounds A1 and B1, and 4-benzothiophene compounds A28' and B25', show that modifications to replace the 2,3-dichloro-substitution with a 2,3-thiophenyl substituent (leading to a 4-benzothiophene), for the purposes of imparting beneficial 5-HT$_{1A}$ activity, could have been made without negatively impacting activity at the $D_2$ receptor.

248.    Thus, any one or more of the '254 patent, the '246 patent, Kuipers 1995, or the '306 publication, or WO '215 would have encouraged a POSA looking to develop an improved antipsychotic, with increased 5-HT$_{1A}$ agonism as compared to aripiprazole, and similar $D_2$ partial agonism, to consider benzothiophene-substituted compounds and, in particular, 4-piperazinyl-substituted benzothiophenes. (*See also* '528 patent.)

249.    Moreover, other properties of benzothiophene and dichlorophenyl moieties support substituting the former for the latter. The moieties have similar lipophilicity as well as other biophysical properties (size, shape, and electronic properties).

250.    A POSA would have modified aripiprazole or dehydroaripiprazole to replace its 2,3-dichlorophenyl substituent with a 2,3 thiophene substituent to provide a 4-benzothiophene substituted piperazinyl compound similar to compounds A28' and B25' from WO '215 for the purposes of increasing 5HT$_{1A}$ partial agonist activity. (*See* WO '215 at 73:30-86, Tables 1 and 2.) This modification to provide the 4-benzothiophene analogs of aripiprazole and dehydroaripiprazole would have been expected to improve the ability to treat the negative symptoms of schizophrenia (e.g., depression, apathy) through optimized activity at 5HT$_{1A}$. The

replacement of aripiprazole and dehydroaripiprazole's 2,3-dichloro substituent with a 2,3-thiophene substituent to provide 4-benzothiophene analogs is shown below. When starting with aripiprazole, the result is the compound now known as dihydrobrexpiprazole. When starting with dehydroaripiprazole, the result is the compound now known as brexpiprazole.



### 4. The Prior Art Motivated a POSA to Add a 3,4-Double Bond to the Dihydrocarbostyril Ring of Aripiprazole or Dihydrobrexpiprazole

251. To the extent the POSA started with the lead compound aripiprazole, such that the benzothiophene substituent would have resulted in dihydrobrexpiprazole, a POSA would also have been motivated to replace the 3,4-single bond in the dihydrocarbostyril ring of dihydro-brexpiprazole with a 3,4-double bond. This motivation would come, for example, from aripiprazole's known active metabolite, dehydroaripiprazole, which had that 3,4-double bond. The same motivation to choose dehydroaripiprazole as a lead compound would also motivate a POSA to replace the 3,4-single bond in the dihydrocarbostyril ring of dihydrobrexpiprazole with the 3,4-double bond found in dehydroaripiprazole. (*See*, *e.g.*, Fura 2004 at 4348 ("Active metabolites may show superior pharmacology, pharmacokinetics, and safety profiles in comparison to their parent

molecules, and the inherent benefits that metabolites often display make their study a worthwhile

endeavor.").)

252.    Abilify PI states as follows:

ABILIFY activity is presumably primarily due to the parent
drug, aripiprazole, and to a lesser extent, to its major metabolite,
dehydro-aripiprazole, which has been shown to have affinities for
$D_2$ receptors similar to the parent drug and represents 40% of the
parent drug exposure in plasma.  The mean elimination half-lives
are about 75 hours and 94 hours for aripiprazole and dehydro-
aripiprazole, respectively.  Steady-state concentrations are attained
within 14 days of dosing for both active moieties. … Elimination of
aripiprazole is mainly through hepatic metabolism involving two
P450 isozymes, CYP2D6 and CYP3A4.

(Abilify PI at 2.)  Dehydroaripiprazole's longer half-life would have motivated a POSA to

incorporate dehydroaripiprazole's 3,4-double bond.  The longer elimination half-life could be

beneficial in terms of extending the active period of a given dose of a composition.

253.    Abilify PI also states that during co-administration of quinidine, "a potent inhibitor

of CYP2D6, increased the AUC of aripiprazole by 112% but decreased the AUC of its active

metabolite, dehydroaripiprazole, by 35%.  Aripiprazole dose should be reduced to one-half of its

normal dose when concomitant administration of quinidine with aripiprazole occurs."  (Abilify PI

at 12; *see also* '528 patent, Examples 1 and 10, 10:65-11:8, Table 2, Table 3.)  This disclosure

teaches a POSA that aripiprazole may be associated with certain effects related to CYP2D6

metabolism, but dehydroaripiprazole may not be.

254.    Others recognized the benefits of dehydroaripiprazole.  For example, WO '682

describes a pharmaceutical composition that "comprises a carbostyril derivative which is a

dopamine-serotonin system stabilizer and a mood stabilizer in a pharmaceutically acceptable

carrier.  The carbostyril derivative may be aripiprazole or a metabolite thereof."  (WO '682 at

Abstract.)  WO '682 teaches that "[a]nother preferred carbostyril derivative of the present

invention that is a dopamine-serotonin system stabilizer is a metabolite of aripiprazole called dehydroaripiprazole, also known as OPC-14857." (*Id.* at 5:8-11.)  WO '682 states that "[d]ehydroaripiprazole (also called OPC-14857 in Figure 8) is a preferred metabolite of aripiprazole." (*Id.* at 31:3-5.)  WO '682 also explains that compositions containing aripiprazole and dehydroaripiprazole with other mood-stabilizing drugs possess "excellent efficacy" with "fewer side-effects and an excellent safety profile." (*Id.* at 31:27-32:3.)

255.     The fact that dehydroaripiprazole had a similar efficacy to aripiprazole, and certain advantages, would have taught a POSA to replace the 3,4-single bond in the dihydrocarbostyril ring of dihydrobrexpiprazole with a 3,4-double bond.  Indeed, a POSA would have understood that dihydrobrexpiprazole, if administered, would have been converted in vivo into an active metabolite having a double bond at the 3,4-position.

256.     The prior art taught that replacing the 3,4-single bond in the dihydrocarbostyril ring with a 3,4-double bond in particular, was a desirable modification for this class of CNS compounds.  For example, WO '215 teaches that the single bond at the 3,4-position of a 1H-[1,8]naphthyridin-2-one structure can be changed to a double bond while maintaining $D_2$ activity of the compound.  (*Compare* WO '215, Example A1 *with* B1, and Example B25' *with* A28'; *see also id.* at 87-89.)  More generally, WO '215 discloses 131 compounds with the double bond, most of which were tested, and many of which were very potent at $D_2$ receptors.

257.     As a further example, the '416 patent discloses a number of compounds having the following general structure:



wherein the carbon-carbon bond at the 3,4 position is either a single or double bond. The compounds are disclosed as having central nervous controlling activity, such as antischizophrenia activity. For all of the respective compounds disclosed, the specification of the '416 patent provides examples of both a single and double bond at the 3,4 position of the carbostyril ring. The '416 patent thus provides evidence that it was obvious and routine to modify antischizophrenia quinolinone compounds in the aripiprazole class by providing either a single or double bond at the 3,4-position of the carbostyril.

258.    Indeed, Oshiro 1998 teaches that "the 2(1*H*)-quinolinone derivatives … were equipotent to their corresponding 3,4-dihydro-2(1*H*)-quinolinone analogues" with respect to post-synaptic DA antagonism. (*Id.* at 661, 662, Table 2.) Oshiro 1998 also describes the development of aripiprazole based on modifications of OPC-4392, a 2,3-dimethyl analog of dehydroaripiprazole. According to Oshiro 1998, 2(1*H*)-quinolinone derivatives of OPC-4392 having the requisite double bond (such as dehydroaripiprazole) were equipotent to their

corresponding 3,4-dihydro-2(1*H*)-quinolinone analogues (such as aripiprazole) in post-synaptic DA receptor antagonist activity.  (Oshiro 1998 at 660-64.)  As evidenced by Oshiro 1998, it was routine in the art to make 2(1*H*) analogues of 3,4-dihydro-2(1*H*)-quinolinone when searching for new antipsychotic drugs.  The '528 patent also teaches both aripiprazole and dehydroaripiprazole (compounds 1 and 10, respectively), directing a POSA to try both 3,4-single and 3,4-double bonds in the carbostyril ring.

259.    In arguing that it is equally likely a metabolite may have no or detrimental pharmacology, different pharmacokinetics and raise safety concerns, Dr. Ward and Dr. Roth concede that, even in the case where nothing is known about the metabolite (which is not the case here), there is a plausible likelihood the active metabolite might have similar properties to the parent molecule.  Moreover, a POSA in this situation would have had the additional knowledge that dehydroaripiprazole was known to be the active metabolite for aripiprazole, and would not have detrimental pharmacology or different pharmacokinetics or raise safety concerns as compared to aripiprazole.  Thus, a POSA's expectation that the double bond would be beneficial would have been higher than the ordinary case where a POSA may have limited or no information about a metabolite, and any concern that adding the double bond may pose safety issues would have been correspondingly less.  Thus, a POSA in this case would have had an especially strong motivation to try dehydroaripiprazole's double bond.

260.    Moreover, Oshiro 1998 would have added to the POSA's reasonable expectation of success for modified aripiprazole-based compounds incorporating the double bond.  The very fact that Oshiro 1998 experimented with and compared molecules having a single or double bond in the location at issue would have motivated a POSA to consider such a modification and try both analogues.  In addition, for one analogue pair, Oshiro 1998 discloses that the double-bond analogue

(compound 55) had higher DA autoreceptor agonistic activity than the single-bond analogue (compound 27). (Oshiro at 663 ("2(1H)-quinolinone 55 showed higher activity than the 3,4-dihydro-2(1H)-quinolinone 27 with the same (2,3-dimethylphenyl)piperazinyl moiety … .").) This would have provided a POSA with a reasonable expectation that the same would occur with respect to aripiprazole/dehydroaripiprazole-based compounds incorporating the double-bond.

261.     In addition, WO '215 provides many examples where single-bond and double-bond analogues both had $D_2$ intrinsic activity in the preferred range as well as $K_i$ values of no more than 1 nM (under Dr. Ward's "even tighter" range). This holds for seven of the nine "particularly preferred compounds" of WO '215 identified by Dr. Ward that can be paired as single/double-bond analogues. (*Compare* compounds A48 (without double bond, Ki 0.8 nM, IA 34%) and B47 (with double bond, Ki 0.3 nM, IA 44%); compounds A65 (without double bond, Ki 1.0 nM, IA 36%) and B49 (with double bond, Ki 0.9 nM, IA 50%); compounds A41′ (without double bond, Ki 1.0 nM, IA 32%) and B30′ (with double bond, Ki 1.0 nM, IA 42%).)

262.     Similarly, WO '215's double-bond benzothiophene-based naphthyridin-2-one (B25′) had similar binding affinity and intrinsic activity to its single-bond analogue (A28′). Thus, the data in WO '215 supports the fact that a POSA would have had a reasonable expectation that the active metabolite here, dehydroaripiprazole, would have similar binding affinity and/or intrinsic activity to aripiprazole or dihydrobrexpiprazole. In view of this, a POSA would have added a 3,4-double bond with a reasonable expectation of success.

263.     Dr. Ward at least seems to concede that introducing a double bond into some of the WO '215 compounds did not appear to affect the $D_2$ binding or intrinsic activity in those assays in that chemical scaffold. First, WO '215 shows similar $D_2$ binding (no more than 1 nM) and intrinsic activity (within most preferred range) in double-bond analogues as compared to single-bond

analogues.  Dr. Ward dismisses this data as pertaining to a different chemical scaffold.  However, this is the essence of medicinal chemistry—a POSA has a reasonable expectation that a modification would work and, therefore, tries that modification.  The fact that the analogues with double bonds showed similar binding and intrinsic activity, in a closely related scaffold, would have motivated the POSA to modify a single-bonded compound to form a double-bonded analogue.  WO '215 studied numerous compound pairs differing only by the presence of a single- or double-bond at the position of interest, including 58 such pairs within Table 1 alone.  (Exhibit 4 (listing compound pairs).)  Minimally, this shows that researchers in the relevant time frame considered compounds containing double bonds at the position of interest worth making and testing.  Moreover, the $K_i$ and IA results reported were comparable for most of these single/double bond pairs.

264.    The result of replacing the 3,4-single bond in the dihydrocarbostyril ring of dihydrobrexpiprazole with a 3,4-double bond would have been the compound now known as brexpiprazole and claimed in the Compound Patents.

**Dihydro-Brexpiprazole**

**Replace 3,4 Single Bond with 3,4 Double Bond**

**Brexpiprazole**

### 5. Reasonable Expectation of Success                I
### Antipsychotic

265.   4-piperazinyl substituted benzothiophenes were known in the art to possess low nanomolar and even sub-nanomolar affinity for the $5HT_{1A}$ receptor, and it had also been shown that 4-benzothiophene-substituted compounds structurally similar to aripiprazole (WO '215 compounds A28' and B25') possessed an activity toward the $D_2$ receptor similar to their 2,3-dichloro substituted counterparts.  Indeed, WO '215 discloses the relationship between 2,3-dichlorophenyl and 4-benzothiophenyl substituents on $D_2$ activity in structurally similar compounds, and establishes that both sets of compounds have high affinity and similar intrinsic activity.  As such, a POSA would have reasonably expected the resulting compound, which is now known as brexpiprazole, to provide a high affinity for the $5HT_{1A}$ receptor, while maintaining the requisite affinity and partial agonist activity for the $D_2$ receptor.  In addition, based on the teachings

of WO '864, a POSA would have had a reasonable expectation of success that the resulting compound would also have strong antagonism for the $5HT_{2A}$ receptor.

266.    A POSA would have reasonably expected that the resulting compound, now known as brexpiprazole, would have provided an improvement over aripiprazole in the treatment of schizophrenia based on its predicted ability to reduce the negative symptoms of schizophrenia and EPS-related events associated with the atypical antipsychotics known at the time of the alleged invention of the Compound Patents.

267.    Brexpiprazole therefore would have been obvious to a POSA over the prior art.

## V.    PRIOR-ART COMBINATIONS DIRECTING A POSA TO MAKE THE MODIFICATION(S) TO ARIPIPRAZOLE OR DEHYDROARIPIPRAZOLE

268.    Aripiprazole and dehydroaripiprazole were obvious lead compounds for development of a new antipsychotic/antidepressant/CNS-targeting compound.  In selecting lead compounds, a POSA would have been guided by a pharmacologist, clinician, and/or other team members.  In addition, a POSA would have agreed with the selection of aripiprazole and dehydroaripiprazole as lead compounds.  A POSA would have understood aripiprazole to be the latest generation of antipsychotic/antidepressant/CNS-targeting compound and the first member of a new class, making it a logical starting point.  Dr. Roth's opinion regarding the complexity of the pharmacology of aripiprazole reinforces starting with aripiprazole so as to maintain aspects of that pharmacology.  An obvious drug-discovery project would have been to start with aripiprazole and make minor modifications based on standard medicinal chemistry techniques and insights gained from prior art relating to antipsychotics.   Because the prior art discloses dehydroaripiprazole as an active metabolite of aripiprazole, with similar pharmacological activity, a POSA would have also considered dehydroaripiprazole as a lead compound and looked to dehydroaripiprazole as a template for potential modifications to aripiprazole.

269.    While understanding that the entire molecule is relevant to the molecule's pharmacological properties, a POSA necessarily identifies regions of the molecule for modification and focuses on such regions.    Here, the prior art, including aripiprazole/dehydroaripiprazole, WO '215, and Oshiro 1998, would have directed the POSA to consider alternatives to aripiprazole/dehydroaripirpazole's 2,3-dichlorophenyl moiety and to create both aripiprazole's 3,4-single bond and dehydroaripirpazole's 3,4-double bond in the compounds' carbostyril skeleton.  With respect to alternatives for the 2,3-dichlorophenyl moiety, WO '215 teaches only four classes of alternative substituents to the 2,3-dichlorophyenyl moiety, including a 4-benzothiophene.  And both Oshiro 1998 and WO '215 investigated pairs of compounds identical except for a 3,4-single or 3,4-double bond in the carbostyril skeleton, reinforcing that a POSA would have tried both.  And dehydroaripiprazole already has that double bond and is taught as being the active metabolite of aripiprazole and as having similar pharmacological properties.  Oshiro 1998 does *not* teach away from the double bond or from dehydroaripiprazole.  In any case, later Otsuka references Abilify 2004, Kubo 2005, and WO '682 all teach a POSA that dehydroaripiprazole is an active metabolite of and has a similar pharmacological profile to aripiprazole.  To the extent necessary, a POSA would have considered one or more of these references along with Oshiro 1998 and/or WO '215.

270.    The result of making these two simple modifications to aripiprazole—(1) a 4-benzothiophene in place of a 2,3-dichloro substituent; and (2)  a double-bond between the 3- and 4-positions in the carbostyril skeleton in place of a single bond—is brexpiprazole.  The result of making just one simple modification to dehydroaripiprazole—a 4-benzothiophene in place of a 2,3-dichloro substituent—is brexpiprazole.  Brexpiprazole is a close analog of aripiprazole and dehydroaripiprazole.  A POSA would not have needed to be able to predict the pharmacological

effect of these simple modifications to have tried them. Rather, they are modifications to aripiprazole/dehydroaripiprazole that would have been obvious for a POSA to try and for which a POSA would have had a reasonable expectation would lead to a new antipsychotic maintaining, and potentially improving upon, aripiprazole's favorable pharmacological profile. Brexpiprazole would have been obvious to a POSA.

271. Brexpiprazole having been obvious, it would have been obvious to formulate brexpiprazole in a composition along with a standard pharmaceutical carrier. Brexpiprazole, having been an obvious, close analog to aripiprazole, and having been developed as a potential alternative to aripiprazole, would have been obvious to use in compositions to treat schizophrenia and depression, conditions for which aripiprazole was used. Brexpiprazole, having been an obvious, close analog to aripiprazole, would have been obvious to manufacture by similar methods to aripiprazole.

### A.   Aripiprazole as Lead Compound

272. The following two modifications to aripiprazole would have been obvious to a POSA: (1) replacing aripiprazole's 2,3-dichlorophenyl substituent with a 4-benzothiophene substituent; and (2) converting the 3,4-dihydro in aripiprazole's dihydrocarbostyril ring to a double bond, yielding a quinoline group. The result of these obvious modifications is what is now known as brexpiprazole.

273. In each of the combinations discussed below, "aripiprazole" is disclosed, e.g., in Abilify PI.

### 1.   Aripiprazole in View of WO '215 and, optionally, Oshiro 1998

274. Brexpiprazole would have been obvious to a POSA over aripiprazole (e.g., as disclosed in Abilify PI) as lead compound in view of WO '215 and the general knowledge of a POSA.

a.      Replacing 2,3-dichlorophenyl with a 4-benzothiophene

275.    The prior art generally, including WO '215, taught a POSA to focus on the dichlorophenyl region of aripiprazole and to consider replacement substituents for aripiprazole's dichlorophenyl substituent.  In particular, WO '215 would have taught a POSA to replace aripiprazole's 2,3-dichlorophenyl substituent with a 4-benzothiophene substituent.

276.    WO '215 disclosed 4-piperazinyl-substituted-benzothiophene compounds for treating "major depressive disorders," "schizophrenia," "bipolar disorders or manic depression," and other CNS disorders.  (WO '215 at 3:27-5:2; 45:24-46:34.) Among these compounds are the following preferred [1,8]naphthyridin-2-one compounds, Examples A28' and B25', which have a similar structure to aripiprazole and its active metabolite, dehydroaripiprazole, respectively, with the key difference being a benzothiophene-substituted piperazine in A28' and B25' replacing aripiprazole/dehydroaripiprazole's 2,3-dichlorophene-substituted piperazine:



| | |
|---|---|
| **WO '215, Example A28'** | **aripiprazole** |
| **WO '215, Example B25'** | **dehydroaripiprazole** |

(*Id*. at 294:28-29; 316:25-26 (structures drawn based on compound names).)  WO '215 specifically states that disclosed compounds exhibit activity as partial agonists of $D_2$ receptors, and that compounds having an intrinsic activity for $D_2$ of at least 20% to up to 60% were especially

preferred.  (*Id.* at 73:20-24.)

277.    Importantly, compounds A28' and B25' were shown to have a strong affinity as well as partial agonist activity toward the $D_2$ receptor that was similar to the affinity/intrinsic activity of their 2,3-dichloro-substituted analogs (WO '215, compounds A1 and B1, respectively). Both the 2,3-dichlorophenyl of compounds A1 and B1 and the 4-benzothiophene group of compounds A28' and B25' are characterized as preferred groups in WO '215, and both resulted in compounds having high $D_2$ affinity but moderate $D_2$ intrinsic activity.  Since aripiprazole already contained the 2,3-dichlorophenyl group of A1 and B1, it would have been obvious to a POSA to substitute that group with the 4-benzothiophene group of A28' and B25'.  In addition, based on the teachings of WO '864, a POSA would have had a reasonable expectation of success that the compound, as modified in view of WO '215, would also have strong antagonism for the $5HT_{2A}$ receptor.

278.    A POSA would have "considered" references even if they did not address all relevant receptors or provide a holistic pharmacological discussion.  WO '215 discusses the $D_2$ activity of various antipsychotic/antidepressant/CNS-targeting compounds close in structure to aripiprazole/dehydroaripiprazole, and thus a POSA would have considered WO '215.

279.    Alone or in connection with Oshiro 1998, WO '215 would have directed a POSA to try alternatives to aripiprazole's 2,3-dichlorophenyl moiety, and WO '215 suggests only four alternative classes of substituents to that moiety, 4-benzothiophene being one of them.  Looking at the full disclosure of WO '215, a POSA would have been directed to only four alternative classes of substituent to aripiprazole's 2,3-dichlorophenyl, of which 4-benzothiophene is one.  Dr. Ward also overplays the distinction between an intrinsic activity of 21% versus 30%, and the distinction between WO '215's "more preferably" and "even more preferably" ranges for intrinsic activity.

(WO '215 at 73:20-24.)  Dr. Ward even admits that A28′ is a "preferred" compound.  (*See* WO '215 at 40.)  The disclosure of WO '215 as a whole, including compounds A28′ and B25′, would have directed a POSA to a 4-benzothiophene moiety as an alternative to a 2,3-dichlorophenyl moiety.

280.    A POSA may also optionally additionally have consulted one or more of the '246 patent, Kuipers 1995, or the '306 publication, each of which provides further motivation to replace aripiprazole's 2,3-dichlorophenyl substituent with a 4-benzothiophene substituent.    These additional references also evidence the general knowledge of a POSA.

### b.    Adding the double-bond to aripiprazole's dihydrocarbostyril ring

281.    WO '215 also would have directed a POSA to have replaced the 3,4-single bond in the dihydrocarbostyril ring of dihydrobrexpiprazole with a 3,4-double bond.  WO '215 preferred compounds A1 and B1 are identical, except that A1 has a single bond in the 3,4-position of the dihydrocarbostyril ring, and B1 has a double bond in that position.  Likewise, WO '215 preferred compounds A28' and B25' are identical, except that A28' has a single bond in the 3,4-position of the dihydrocarbostyril ring, and B25' has a double bond in that position.  Thus, WO '215 presents to a POSA the option of either a single or double bond in the 3,4-position.  Aripiprazole has the single bond.  A POSA would have been motivated by WO '215 to add the double bond.  Moreover, a POSA's general understanding of chemical analogs and active metabolites would have motivated the POSA to add the double bond.

282.    Although WO '216 discloses naphthyridine compounds, an N-to-CH (e.g., naphthyridine-to-carbostyril) substitution is a common, classical, bioisosteric substitution.  A POSA routinely considers bioisosterism.  A POSA would have needed to consider only a small number of standard bioisosteric replacements, particularly when focused on certain regions of the molecule, e.g., narrowed by the disclosures of WO '215 and/or Oshiro 1998.  Moreover,

aripiprazole (and dehydroaripiprazole), the lead compound(s), do **not** have the nitrogen at issue. Thus, no change to the lead compound(s) is necessary to remove the nitrogen.  Starting with aripiprazole/dehydroaripiprazole as the lead compound(s), WO '215 teaches that the single- and double-bonds between the 3- and 4-positions of the carbostyril or naphthyridine skeleton produce analogues with similar activity (as well as a narrow set of four alternative classes of substituents to aripiprazole/dehydroaripiprazole's 2,3-dichlorphenyl moiety).

283.    A POSA may also optionally have additionally consulted one or more of Abilify PI, the '416 patent, Oshiro 1998, Fura 2004, and Kubo 2005, each of which provides further motivation to replace the 3,4-single bond in the dihydrocarbostyril ring of dihydrobrexpiprazole with a 3,4-double bond.  Thus, the compound now known as brexpiprazole also would have been obvious over aripiprazole in view of WO '215 in further view of one or more of Abilify PI, the '416 patent, Oshiro 1998, Fura 2004, and Kubo 2005 (and in further view of one or more of the '246 patent, Kuipers 1995, or the '306 publication.  These additional references also evidence the general knowledge of a POSA.

## 2.    Aripiprazole in View of the '528 Patent and WO '215

284.    Brexpiprazole would have been obvious to a POSA over aripiprazole (e.g., as disclosed in Abilify PI) as lead compound in view of the '528 patent and WO '215 and the general knowledge of a POSA.

285.    A POSA looking to modify aripiprazole would look to the '528 patent because that patent discloses both aripiprazole and dehydroaripiprazole (compounds 1 and 10, respectively) and teaches that receptor activity can be optimized by modifying the substituents at the 2,3-phenyl position of the following core structure:

286.   The '528 patent tested thirteen compounds having that core structure, but with different substituents at the 2,3-phenyl positions.  ('528 patent at Table 2.)  The pharmacological activity of the compounds varied based on the substituents at those positions.  (*Id.* at Table 3.) These tests in the '528 patent taught a POSA that the substituents at the 2,3-phenyl positions have an impact on pharmacological activity, and they would have motivated a POSA who was seeking to optimize aripiprazole to focus on the substituents at the 2,3-phenyl positions.

287.   WO '215 teaches a POSA to replace aripiprazole's 2,3-dichlorophenyl substituent with a 4-benzothiophene substituent.  WO '215 also teaches a POSA to replace the 3,4 single bond in the dihydrocarbostyril ring of dihydro-brexpiprazole with a 3,4 double bond.  The end result is the compound now known as brexpiprazole.  In addition, based on the teachings of WO '864, a POSA would have had a reasonable expectation of success that the resulting compound, as modified in view of the '528 patent and WO '215, would also have strong antagonism for the 5HT$_{2A}$ receptor.

### 3.    Aripiprazole in View of '306 Publication and Oshiro 1998

288.   Brexpiprazole would have been obvious to a POSA over aripiprazole (e.g., as disclosed in Abilify PI) as lead compound in view of the '306 publication and Oshiro 1998 and the general knowledge of a POSA.

#### a.    Replacing 2,3-dichlorophenyl with a 4-benzothiophene

289.   The prior art generally, including the '306 publication and Oshiro 1998, taught a

126

POSA to focus on the dichlorophenyl region of aripiprazole and to consider replacement substituents for aripiprazole's dichlorophenyl substituent. In particular, the '306 publication would have taught a POSA to replace aripiprazole's 2,3-dichlorophenyl substituent with a 4-benzothiophene substituent. The '306 publication reported that 4-piperazinyl-substituted benzothiophenes behaved as potent $5\text{-HT}_{1A}$ agonists and could be useful in the treatment of depression and anxiety. ('306 publication at [0002], [0006], [0262]-[0498] (compounds 2e, 5ad, 5ao, 5bt, and 5ci).) Per Dr. Rothschild, one of the goals of a POSA working to improve aripiprazole was to increase $5\text{-HT}_{1A}$ receptor partial agonism. In addition, based on the teachings of WO '864, a POSA would have had a reasonable expectation of success that the compound, as modified in view of the '306 publication and Oshiro 1998, would also have strong antagonism for the $5\text{HT}_{2A}$ receptor.

290.    Regardless of any differences between the benzothiophenes in the '306 publication and brexpiprazole, a POSA would have considered the '306 publication's teaching that compounds containing benzothiophenes attached to a piperazine are active at the $5\text{-HT}_{1A}$ receptor in the context of the prior art's teaching as a whole. With respect to the attachment point for the benzothiophenes in the '306 publication, a POSA would have been familiar with WO '215, which discloses compounds having 4-benzothiophenes, the only other isomer adhering to Oshiro 1998's teaching of 2,3-disubstituted arylpiperazines.

291.    A POSA may also optionally have additionally consulted one or more of the '246 patent, Kuipers 1995, or WO '215, each of which provides further motivation to replace aripiprazole's 2,3-dichlorophenyl substituent with a 4-benzothiophene substituent. These additional references also evidence the general knowledge of a POSA.

    b.    Adding the double-bond to aripiprazole's dihydrocarbostyril ring

292.    Oshiro 1998 would have directed a POSA to have replaced the 3,4 single bond in

the dihydrocarbostyril ring of dihydrobrexpiprazole with a 3,4 double bond.  Oshiro 1998 describes the development of aripiprazole based on modifications of OPC-4392, a 2,3-dimethyl analog of dehydroaripiprazole.  According to Oshiro 1998, 2(1*H*)-quinolinone derivatives of OPC-4392 having the requisite double bond were equipotent to their corresponding 3,4-dihydro-2(1*H*)-quinolinone analogues (such as aripiprazole) in post-synaptic DA receptor antagonist activity.  (Oshiro 1998 at 660-64.)  This shows that it was routine in the art to make 2(1*H*) analogues of 3,4-dihydro-2(1*H*)-quinolinone when searching for new antipsychotic drugs.

293.    A POSA may also optionally have additionally consulted one or more of Abilify PI, the '416 patent, Oshiro 1998, WO '682, WO '215, Fura 2004, and Kubo 2005, each of which provides further motivation to replace the 3,4-single bond in the dihydrocarbostyril ring of dihydrobrexpiprazole with a 3,4-double bond.  Thus, the compound now known as brexpiprazole also would have been obvious over aripiprazole in view of the '306 publication in further view of one or more of Abilify PI, the '416 patent, Oshiro 1998, WO '682, WO '215, Fura 2004, and Kubo 2004 (and in further view of one or more of the '246 patent, Kuipers 1995, or WO '215).  These additional references also evidence the general knowledge of a POSA.

### 4.    Aripiprazole in View of POSA's Knowledge of Benzothiophenes and Active Metabolites

294.    Brexpiprazole would have been obvious to a POSA over aripiprazole as lead compound in view of a POSA's knowledge of benzothiophenes and active metabolites.

295.    The POSA's general knowledge of benzothiophenes, as exemplified by the '256 patent, the '246 patent, Kuipers 1995, WO '215, and/or the '306 publication, would have directed a POSA to replace aripiprazole's 2,3-dichlorophenyl substituent with a 4-benzothiophene substituent.  In addition, based on the teachings of WO '864, a POSA would have had a reasonable expectation of success that the compound, as modified in view of the POSA's knowledge of

benzothiophenes, would also have strong antagonism for the $5HT_{2A}$ receptor.

296.    The POSA's general knowledge of active metabolites, as exemplified by, e.g., Fura 2004, WO '215, and/or Oshiro 1998, and the POSA's particular knowledge of dehydroaripiprazole as aripiprazole's active metabolite, as exemplified by Abilify PI, Kubo 2005, and/or Oshiro 1998, would have directed a POSA to convert the 3,4-dihydro in aripiprazole's dihydrocarbostyril ring to a double bond, yielding a quinoline group.

297.    Thus, starting with aripiprazole, any one or more of the benzothiophene references ('256 patent, the '246 patent, Kuipers 1995, WO '215, and the '306 publication) in combination with any one or more of the active metabolite references (Fura 2004, WO '215, Oshiro 1998, Abilify PI, and Kubo 2005) would have directed a POSA to the compound now known as brexpiprazole.

### B.    Dehydroaripiprazole as Lead Compound

298.    Brexpiprazole would have been obvious to a POSA over dehydroaripiprazole as lead compound in view of any one or more of WO '215, the '246 patent, Kuipers 1995, or the '306 publication.  The following modification to dehydroaripiprazole would have been obvious to a POSA: replacing dehydroaripiprazole's 2,3-dichlorophenyl substituent with a 4-benzothiophene substituent.  The facts relating to that change for each proposed obviousness reference or combination with respect to lead compound aripiprazole apply equally to lead compound dehydroaripiprazole.  In summary, the compound now known as brexpiprazole would have been obvious to a POSA over dehydroaripiprazole as lead compound in view of any of the following references/combinations and the general knowledge of a POSA:

1.    WO '215

2.    the '528 patent and WO '215

3.    '306 publication

4.    POSA's knowledge of benzothiophenes (e.g., one or more of the '256 patent, the '246 patent, Kuipers 1995, WO '215, and the '306 publication)

299.    Any contention that Oshiro 1998 shows that dehydroaripiprazole's pharmacological profile was undesirable and dehydroaripiprazole already been set aside from further consideration is incorrect.  Later references, which, like Oshiro 1998, originated wholly or partially from Otsuka, taught that dehydroaripiprazole had a desirable pharmacological profile similar to aripiprazole.  (*See, e.g.*, Abilify 2004; Kubo 2005; WO '682.)

### C.    Pharmaceutical Compositions Comprising Brexpiprazole

300.    Given that the brexpiprazole API would have been obvious to a POSA, it would have been just as obvious for a POSA to include that API in pharmaceutical composition along with a pharmaceutically acceptable carrier.  Various references disclose including active ingredients having similar chemical structure to brexpiprazole in pharmaceutical compounds, including tablets, along with a pharmaceutically acceptable carrier.  ('306 publication at [0175], [0516], [0517], claims 14-15; WO '215 at 1:6-9, 5:3-7, 69:13-34, claim 9; Abilify PI; Davies 2004 at 32.)  In particular, aripiprazole was formulated along with pharmaceutically acceptable carriers into the Abilify tablet.  (*See generally* Abilify PI.)  Given the similarity between aripiprazole and brexpiprazole (i.e., the latter is a closer analog of the former), a POSA would have had a reasonable expectation of success that brexpiprazole could be similarly formulated.

### D.    Methods of Treatment Using Brexpiprazole

301.    Likewise, it would have been obvious to use brexpiprazole, or pharmaceutical compositions containing brexpiprazole, in methods of treating central nervous system disorders, e.g., major depression and schizophrenia in a human.  Similar prior-art compounds were used for these purposes, and the obviousness of brexpiprazole was based on obvious changes to such prior-art compounds with the goal of making a similar but improved compound for such purposes.

Various references disclose using active ingredients having similar chemical structure for treatment of such conditions. ('246 patent at 1:8-13, 1:50-54, 57:49-54 (depression); '254 patent at Abstract, 1:6-12, 1:26-41, 2:4-8 (schizophrenia, depression); '306 publication at [0002], [0006], [0010] (schizophrenia, depression); '528 patent at Abstract, 1:5-12, 1:51-60, 2:30-3:25 (schizophrenia); WO '215 at 1:6-9, 3:27-5:27 (schizophrenia, major depression); WO '682 (schizophrenia, major depression; aripiprazole for major depression); WO '864 at 1:6-8, 14:3-13 (schizophrenia, major depression); Abilify PI at 10 (schizophrenia); Davies 2004 at 318 (schizophrenia); Oshiro 1998 at 658, 663, 664 (schizophrenia).)  In particular, aripiprazole was known to be useful to treat schizophrenia and major depression.  (Abilify PI at 9 (schizophrenia); WO '682 at 5:24-28 ("Aripiprazole possesses 5-HT$_{1A}$ receptor agonist activity, and is known as a useful compound for treating types of depression and refractory depression, such as endogenous depression, major depression, melancholia and the like.").)   Given the similarity between aripiprazole and brexpiprazole (i.e., the latter is a closer analog of the former), a POSA would have had a reasonable expectation of success that brexpiprazole could be similarly be used to treat those conditions.  A POSA's goal in developing an improvement on aripiprazole targeting similar receptors would have been to develop a compound to treat the conditions treated by aripiprazole.

## VI.    THE PATENTS-IN-SUIT

302.    None of the asserted claims recites a specific level of safety or efficacy, requires the claimed compounds to be superior to existing compounds, nor requires the claimed compounds to be FDA approved.

303.    The method of treatment claims encompass administering brexpiprazole to treat schizophrenia or major depression without reciting any particular manner of administration.

### A.    The RE'059 Patent

304.    The RE'059 patent is a reissue of U.S. Patent No. 7,888,362 ("the '362 patent").

The RE'059 patent, entitled "Piperazine-Substituted Benzothiophenes for Treatment of Mental Disorders," issued on June 23, 2020, from U.S. Patent Application No. 15/815,650 ("the '650 application"), filed on November 16, 2017.  The '362 patent, bearing the same title, issued on February 15, 2011, from U.S. Patent Application No. 11/659,005 ("the '005 application"), filed on April 12, 2006, as International Application No. PCT/JP2006/308162 ("PCT '162") (designating the U.S.).  The '362 patent also claims priority to Japanese Patent Application No. 2005-116698 ("JP '698"), filed on April 14, 2005.  The face of the RE'059 patent identifies Hiroshi Yamashita, Nobuaki Ito, Shin Miyamura, Kunio Oshima, Jun Matsubara, Hideaki Kuroda, Haruka Takahashi, Satoshi Shimizu, Tatsuyoshi Tanaka, Yasuo Oshiro, and Shinichi Taira as inventors and Otsuka Pharmaceutical Co., Ltd. as the assignee.

### 1.      The Claims

305.    The RE'059 patent issued with 15 claims, of which claims 1 and 9 are independent. Plaintiffs assert claims 1-3, 7, 9, and 12-15.  Claims 1-3, 7, and 12-13 cover brexpiprazole (and, in some cases, additional compounds), and claims 9 and 14-15 cover a process for making brexpiprazole (and, in some cases, additional compounds).  The asserted claims read as follows:

1. A heterocyclic compound represented by the formula (1):



(1)

[wherein ring Q represented by

represents —NH—CH$_2$—, —N=CH—, —CH$_2$—NH— or—CH=N—; and

the carbon-carbon bond

- - - - -

between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond);

the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, a saturated 3- to 8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group;

R$_2$ represents a hydrogen atom or a lower alkyl group; and

A represents —O-A$_1$- (wherein A$_1$ represents an alkylene group which may be substituted with a hydroxy group (wherein one oxygen atom may replace a carbon of the alkylene chain) or a lower alkenylene group) or a lower alkylene group;

provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:

133



(wherein the carbon-carbon bond

- - - - -

represents a single bond or a double bond)] or a salt thereof.

2.  The heterocyclic compound of the formula (1) according to claim 1, wherein the ring Q represents a bicyclic group selected from the group consisting of:

-continued

(wherein the carbon-carbon bond

- - - - -

between the 3-position and 4-position of the bicyclic heterocyclic skeleton represents a single bond or a double bond);

the ring Q may have 1 to 3 substituents selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, a phenyl group, a phenyl lower alkyl group, a naphthyl lower alkyl group, a phenyl lower alkoxy group, a naphthyl lower alkoxy group, a benzoyl group, a lower alkenyloxy

group, a lower alkanoyl group, a lower alkanoyloxy group, a cyclo C3-C8 alkyl group, a cyclo C3-C8 alkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group and a saturated 5- to 6-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group; and

A represents —O-$A_1$- (wherein $A_1$ represents a C1-C6 alkylene group which may be substituted with a hydroxy group (wherein one oxygen atom may replace a carbon of the alkylene chain)), or a salt thereof.

3.   The heterocyclic compound of the formula (1) according to claim 2, wherein the ring Q represents a bicyclic group selected from the group consisting of:



the ring Q may have 1 to 3 substituents selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, a phenyl group, a phenyl lower alkyl group, a naphthyl lower alkyl group, a phenyl lower alkoxy group, a naphthyl lower alkoxy group, a benzoyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cyclo C3-C8 alkyl group, a cyclo C3-C8 alkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a phenyl group, a thienyl group and a pyrrolidinyl lower alkyl group; and

A represents —O-$A_1$- (wherein $A_1$ represents a C1-C6 alkylene group which may be substituted with a hydroxy group (wherein one oxygen atom may replace a carbon of the

alkylene chain)), or a salt thereof.

\*      \*      \*

7.  The heterocyclic compound of the formula (1) according to claim 3 selected from the group consisting of:

(1) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one,

(2) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxy]-1H-quinolin-2-one,

(3) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxy]-3,4-dihydro-1H-quinolin-2 one,

(4) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-3,4-dihydro-1H-quinolin-2-one,

(5) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1-methyl-3,4-dihydro-1H-quinolin-2-one and

(6) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxy]-3,4-dihydro-1H-quinolin-2-one;

or a salt thereof.

\*      \*      \*

9.   A process for producing a heterocyclic compound represented by the formula (1):

136

(1)

[wherein ring Q represented by



—Z═══Y

(wherein

represents —NH—CH₂—, —N═CH—, —CH₂—NH—
or —CH═N; and
the carbon-carbon bond

═══

between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond);

the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, a saturated 3- to 8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group;

$R_2$ represents a hydrogen atom or a lower alkyl group; and

A represents —O-$A_1$- (wherein $A_1$ represents an alkylene group which may be substituted with a hydroxy group (wherein the oxygen atom may replace a carbon of the alkylene chain) or a lower alkenylene group) or a lower

137

alkylene group;

provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:



(wherein the carbon-carbon bond

- - - - -

represents a single bond or a double bond)] or a salt thereof, characterized by comprising a reaction of a compound represented by the formula:



(wherein the ring Q and A are the same as defined above, and $X_1$ represents a halogen atom or a group which causes a substitution reaction the same as in a halogen atom) or a salt thereof with a compound represented by the formula:



(wherein $R_2$ is the same as defined above) or a salt thereof.

12.  The heterocyclic compound according to claim 7, which is 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof.

13.  The heterocyclic compound according to claim 12, which is 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-

138

quinolin-2-one.

14.   The process according to claim 9, wherein the process produces    7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof.

15.   The process according to claim 14, wherein the process produces    7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one.

## 2.    The Specification

306.   The RE'059 specification discusses a heterocyclic compound represented by the general formula (1)



(1)

said to have a wide treatment spectrum for mental disorders, including central nervous system disorders, no side effects, and high safety.  (RE'059 patent at Abstract.)  The "Background Art" section of the specification states that "[s]ince causal factor of schizophrenia as well as bipolar disorder, mood disorders and emotional disorders is heterogenous, it is desirable that a drug has multiple pharmacological effects so as to develop a wide treatment spectrum."  (*Id.* at 1:25-28.)

307.   More specifically, the RE'059 specification discloses compounds represented by the general formula (1),

[wherein ring Q represented by



—Z===Y—

represents —NH—CH$_2$—, —N=CH—, —CH$_2$—NH— or —CH=N—; and the carbon-carbon bond

- - - - -

between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond; the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, a saturated 3- to 8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group; $R_2$ represents a hydrogen atom or a lower alkyl group; and A represents —O-A$_1$- (wherein A$_1$ represents an alkylene group which may be substituted with a hydroxy group (wherein the alkylene group may contain one oxygen atom) or a lower alkenylene group) or a lower alkylene group; provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:

(wherein the carbon-carbon bond

- - - - -

represents a single bond or a double bond)] or a salt thereof.

(*Id.* at 2:35-3:32.)

308.   The specification states in part that "[t]he compound of the present invention has $D_2$ receptor partial agonist effect, serotonin 5-HT$_{2A}$ receptor antagonist effect and serotonin uptake inhibitory effect (or serotonin [re]uptake inhibitory effect)." (*Id.* at 18:31-34.)  Further, according to the specification: the $D_2$ receptor partial agonist effect functions to stabilize the dopamine neurotransmission to a normal state to develop "improving effect on positive and negative symptoms … without developing side effects"; the "5-HT$_{2A}$ receptor antagonist effect reduces extrapyramidal side effects"; and the serotonin uptake inhibitory effect "is effective for improving depressive symptoms." (*Id.* at 18:35-67.)

309.   The specification discloses test compounds represented by the general formula (1). (*Id.* at 30:32-81:20 (Examples 1-196).)  Values for inhibitor constants (Ki) for dopamine $D_2$ and serotonin 5HT$_{2A}$ are reported for some of these test compounds using standard *in vitro* assays known in the art.  (*Id.* at 82:17-84:44.)  The specification also describes a number of additional pharmacological tests (*id.* at 85:24-87:36 (Pharmacological Tests 2-5)) and, while not reporting data for a single compound, generally states that the "test compounds had partial agonistic activity for dopamine $D_2$ receptor" (*id.* at 86:4-6; *see generally id.* at 85:24-86:14 (Pharmacological Test

141

2)), "$D_2$ receptor antagonistic effect" (*id.* at 86:50-53; *see generally id.* at 86:15-53 (Pharmacological Test 3)), and "serotonin 5HT$_{2A}$ receptor antagonistic effect" (*id.* at 87:10-13; *see generally id.* at 86:54-87:13 (Pharmacological Test 4)).

310.    According to the specification, "[a]mong the heterocyclic compounds or salts thereof represented by the formula (1)," a "preferable" compound is 7-[4-(4-benzo[b]thiophene-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one, i.e., brexpiprazole, the preparation of which is discussed in Example 1.  (*Id.* at 6:9-13, 30:32-58 (Example 1).)  The specification reports that the "Compound of Example 1," i.e., brexpiprazole, has: a Ki value of 0.2 nM for dopamine $D_2$ receptor binding (*id.* at 82:20 (Table 22)); a Ki value of 2.3 nM for serotonin 5-HT$_{2A}$ receptor binding (*id.* at 83:56 (Table 23)); and 92.4% serotonin (5-HT) uptake inhibitory activity (*id.* at 88:18 (Table 24)).

311.    The specification acknowledges that prior-art WO '864 "discloses that a carbostyril derivative represented by the general formula:



(wherein A' represents —$(CH_2)_mCH_2$—, —$(CH_2)_mO$—, etc.;
m represents an integer of 1 to 4; and R$^4$ represents a hydro-
gen atom, a C$_{1-4}$ alkyl group which may be substituted with 1
to 3 fluorine atoms, etc.)

has $D_2$ receptor antagonist activity and serotonin 2A (5-HT$_{2A}$) receptor antagonist activity and it is effective for treatment of schizophrenia and other central nervous system disorders."  (*Id.* at 1:29-49.)

312.    The specification also acknowledges that prior-art WO '215 discloses the

compounds represented by the following formula:



(wherein A is —$(CH_2)_mCH_2$—, —$(CH_2)_mO$— or the like; m is an integer of 2 to 5; D is N, C or the like; Z and Q are independently N, C or CH, provided that at least one of Z and Q is N; X and Y are independently C, N or the like, and the bond between X and Y is a single or double bond; $R^1$ is hydrogen, $(C_1$-$C_3)$alkyl group or the like; $R^4$, $R^5$, $R^6$ and $R^7$ each represents hydrogen, alkyl group or the like; and G represents a group of monocyclic or bicyclic compound), which bind to dopamine $D_2$ receptors.

and that WO '215 "teaches that some compounds disclosed therein have an activity as partial agonists of $D_2$ receptors or an activity as antagonists of $D_2$ receptors, and may be effective for the treatment of schizophrenia and other central nervous system [disorders]."  (*Id.* at 1:56-2:13.)

### B.  The '840 Patent

313.    The '840 patent, entitled "Piperazine-Substituted Benzothiophenes for Treatment of Mental Disorders," issued on January 8, 2013, from U.S. Patent Application No. 12/970,690 ("the '690 application"), filed on December 16, 2010.  The '840 patent is a continuation of the '362 patent.  A certificate of correction to the '840 patent issued on April 30, 2019.

#### 1.    The Claims

314.    The '840 patent issued with 6 claims, of which asserted claims 1, 2, 4, and 5 cover pharmaceutical compositions comprising brexpiprazole (claims 1, 2) or methods of treatment comprising administering brexpiprazole (claims 4, 5).  Those claims (of which claims 1, 2, and 4 are independent) read as follows:

1.  A pharmaceutical composition comprising a heterocyclic compound of the formula (1) or a salt thereof as an active ingredient

and a pharmaceutically acceptable carrier:

(1)



wherein ring Q represented by

represents

wherein

——Z=Y——

represents —NH—CH$_2$—, —N=CH—, —CH$_2$—NH— or —CH=N—; and the carbon-carbon bond ------

between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond);

the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower

alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, a saturated 3- to 8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group;

$R_2$ represents a hydrogen atom or a lower alkyl group; and

A represents —O-$A_1$- (wherein $A_1$ represents an alkylene group which may be substituted with a hydroxy group (wherein the one oxygen atom may replace a carbon of alkylene chain) or a lower alkenylene group) or a lower alkylene group;

provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:



wherein the carbon-carbon-bond - - - - - - represents a single bond or a double bond.

2.   A pharmaceutical composition comprising a heterocyclic compound or a salt thereof selected from the group of:

(1) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)butoxy]-1H-quinolin-2-one,

(2) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)pro-poxy]-1H-quinolin-2-one,

(3) 7-[3-[3-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)propoxy]-3,4-

dihydro-1H -quinolin-2-one,

(4) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)butoxy]-,4-dihydro-1H-quinolin-2-one,

(5) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)butoxy]-I-methyl-3,4-dihydro-1H -quinolin-2-one and

(6)  6-[3-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)propoxy]-3,4-dihydro-1 H -quinolin-2-one;

or a salt thereof,

as an active ingredient and a pharmaceutically acceptable carrier.

\*        \*        \*

4.   A method for treating a central nervous system disorder selected from depression, endogenous depression, major depression, melancholy and refractory depression comprising administering a heterocyclic compound represented by the formula (1) or a salt thereof to a human or animal:

(1)



wherein ring Q represented by



represents



wherein

— Z ⹀ Y —

represents —NH—CH$_2$—, —N=CH—, —CH$_2$—NH—
or —CH=N—; and
the carbon-carbon bond $\dashleftarrow\dashrightarrow$

between the 3-position and 4-position of the heterocyclic
skeleton containing Z and Y represents a single bond or a
double bond;

the ring Q may have at least one substituent selected from
the group consisting of a lower alkyl group, a lower
alkenyl group, a lower alkynyl group, a hydroxy group,
a lower alkoxy group, a halogenated lower alkyl group,
an aryl group, an aryl lower alkyl group, an aryl lower
alkoxy group, an arylcarbonyl group, a lower alkenyloxy
group, a lower alkanoyl group, a lower alkanoyloxy
group, a cycloalkyl group, a cycloalkyl lower alkyl
group, a halogen atom, a carbamoyl group which may
have a lower alkyl group, a carboxy group, a lower
alkoxycarbonyl group, an amino group which may have
a lower alkanoyl group, a nitro group, a hydroxy lower
alkyl group, an amino lower alkyl group which may have
a lower alkyl group, a thienyl group, a saturated 3- to 8-
membered heteromonocyclic group containing 1 to 2
nitrogen atoms-substituted lower alkyl group and an oxo
group;

R$_2$ represents a hydrogen atom or a lower alkyl group; and

A represents —O-A$_1$ - (wherein A$_1$ represents an alkylene
group which may be substituted with a hydroxy group

147

(wherein the one oxygen atom may replace a carbon of the alkylene chain) or a lower alkenylene group) or a lower alkylene group;

provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:



wherein the carbon-carbon-bond ------ represents a single bond or a double bond.

5.   The method according to claim 4, wherein the heterocyclic compound or a salt thereof is selected from the group of:

(1)  7-[4-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)butoxy]-1H-quinolin-2-one,

(2)  7-[3-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)propoxy]-1H-quinolin-2-one,

(3)  7-[3-(4-benzo[b]thiophen-4-yl-piperazin-l-   yl)propoxy]-3,4-dihydro-1 H-quinolin-2-one,

(4)  7-[4-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)butoxy]-3,4-dihydro-1H-quinolin-2-one,

(5)  7-[4-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)butoxy]-1-methyl-3,4-dihydro-1H-quinolin-2-one and

(6)  6-[3-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)propoxy]-3,4-dihydro-1 H-quinolin-2-one;

or a salt thereof.

## 2.   The Specification

315.   The specification of the '840 patent is essentially the same as that of the RE'059 patent, which discussion is incorporated herein by reference.

148

### C.   The '109 Patent

316.   The '109 patent, entitled "Piperazine-Substituted Benzothiophenes for Treatment of Mental Disorders," issued on December 31, 2013, from U.S. Patent Application No. 13/688,108 ("the '108 application"), filed on November 28, 2012.  The '109 patent is a continuation of the '840 patent.  A certificate of correction to the '109 patent issued on April 30, 2019.

### 1.   The Claims

317.   The '109 patent issued with 3 claims, of which asserted claims 1 and 2 cover methods for treating schizophrenia comprising administering brexpiprazole.  Those claims (of which claim 1 is independent) read as follows:

> 1.   A method for treating schizophrenia comprising administering a heterocyclic compound represented by the formula (I) or a salt thereof to a human or animal:

(1)



> wherein ring Q represented by



> represents

wherein

———Z----Y———

represents —NH—CH$_2$—, —N=CH—, —CH$_2$—NH— or —CH=N—; and
the carbon-carbon bond

------

between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond;

the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, a saturated 3- to 8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group;

R$_2$ represents a hydrogen atom or a lower alkyl group; and

A represents ———O-A$_1$ - (wherein A$_1$ represents an alkylene group which may be substituted with a hydroxy group (wherein the one oxygen atom may replace a carbon of the alkylene chain) or a lower alkenylene group) or a lower alkylene group;

provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:



wherein the carbon-carbon-bond

------

represents a single bond or a double bond.

2.   The method according to claim 1, wherein the heterocyclic compound of the formula (I) is selected from the group of:

(1)  7-[4-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)butoxy]-1H-quinolin-2-one,

(2)  7-[3-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)propoxy]-1H-quinolin-2-one,

(3)  7[3-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)propoxy]-3,4-dihydro-1 H-quinolin-2-one,

(4)  7-[4-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)butoxy]-3,4-dihydro-1H-quinolin-2-one,

(5)  7-[4-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)butoxy]-I-methyl-3,4-dihydro-1H-quinolin-2-one and

(6)  6-[3-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)propoxy]-3,4-dihydro-1 H -quinolin-2-one;

or a salt thereof.

### 2.    The Specification

318.   The specification of the '109 patent is essentially the same as that of the RE'059 patent, which discussion is incorporated herein by reference.

### D.    The '637 Patent

319.   The '637 patent, entitled "Piperazine-Substituted Benzothiophenes for Treatment

151

of Mental Disorders," issued on December 12, 2017, from U.S. Patent Application No. 15/697,196

("the '196 application"), filed on September 6, 2017.  The '637 patent descends from the '109

patent through a series of continuations and divisionals.

### 1. The Claims

320.    The '637 patent issued with 18 claims, of which asserted claims 1 and 3-10 cover

pharmaceutical compositions comprising brexpiprazole (claims 1, 3-8) or methods of treatment

comprising administering such pharmaceutical compositions (claims 9, 10).  Those claims (of

which claims 1 and 3 are independent) read as follows:

> 1.   A pharmaceutical composition comprising a heterocyclic
> compound or a salt thereof represented by formula (1):



(1)

> wherein ring Q is a bicyclic group selected from the group
>     consisting of:



and

> wherein the ring Q may have 1 to 3 substituents selected from
>     the group consisting of a lower alkyl group, a lower alkenyl
>     group, a lower alkynyl group, a hydroxy group, a lower
>     alkoxy group, a halogenated lower alkyl group, a phenyl
>     group, a phenyl lower alkyl group, a naphthyl lower alkyl
>     group, a phenyl lower alkoxy group, a naphthyl lower alkoxy

group, a benzoyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cyclo $C_3$-$C_8$ alkyl group, a cyclo $C_3$ -$C_8$ alkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, and a pyrrolidinyl lower alkyl group;

$R_2$ represents a hydrogen atom or a lower alkyl group; and

A represents —O-$A_1$ -, wherein $A_1$ is a $C_1$ -$C_6$ alkylene group; and

a pharmaceutically acceptable carrier.

3.    A pharmaceutical composition comprising 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy  ]-1H-quinolin-2-one and a pharmaceutically acceptable carrier.

4.    The pharmaceutical composition according to claim 3, wherein the 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one is present in the pharmaceutical composition in an amount ranging from 1 % to 70% by weight.

5.    The pharmaceutical composition according to claim 3, wherein the 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one is present in the pharmaceutical composition in an amount ranging from 1 % to 30% by weight.

6.    The pharmaceutical composition according to claim 3, wherein the composition contains from 1 mg to 200 mg of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-I-yl)butoxy]-1H- quinolin-2-one.

7.    The pharmaceutical composition according to claim 3, wherein the composition contains about 1 mg of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-I-yl)butoxy]-1H-quinolin-2-one.

8.    The pharmaceutical composition according to claim 6, wherein the pharmaceutical composition is in the form of a tablet.

9.    A method for treating major depression comprising administering a pharmaceutical composition according to claim 3.

10.    A method for treating schizophrenia comprising administering a pharmaceutical composition according to claim 3.

### 2. The Specification

321. The specification of the '637 patent is essentially the same as that of the RE'059 patent, which discussion is incorporated herein by reference.

### VII. OBVIOUSNESS OF THE RE'059 PATENT (CLAIMS 1-3, 7, 9, 12-15)

322. Each asserted claim (claims 1-3, 7, 9, 12-15) of the RE'059 patent would have been obvious over the prior art. The asserted claims of the RE'059 patent are either compound claims that encompass the compound brexpiprazole (claims 1-3, 7, 12, 13) or process claims that encompass a process for making brexpiprazole (claims 9, 14, 15).

### A. Compound Claims 1-3, 7, 12, 13

323. Brexpiprazole would have been obvious in view of various combinations of prior art. Because compound claims 1-3, 7, 12, and 13 encompass brexpiprazole, those claims would have been obvious. Each such claim would have been obvious in view of the prior-art combinations identified as rendering brexpiprazole obvious, namely:

    a.    aripiprazole (e.g., as disclosed in Abilify PI) in view of WO '215;

    b.    aripiprazole (e.g., as disclosed in Abilify PI) in view of the '528 patent and WO '215;

    c.    aripiprazole (e.g., as disclosed in Abilify PI) in view of the '306 publication and Oshiro 1998;

    d.    aripiprazole (e.g., as disclosed in Abilify PI) in view of a POSA's knowledge of benzothiophenes (e.g., one or more of the '256 patent, the '246 patent, Kuipers 1995, WO '215, and the '306 publication) and a POSA's knowledge of active metabolites (e.g., one or more of Fura 2004, WO '215, the '416 patent, WO '682, Oshiro 1998, Abilify PI, and Kubo 2005);

    e.    dehydroaripiprazole (e.g., as disclosed in Abilify PI) in view of WO '215;

    f.    dehydroaripiprazole (e.g., as disclosed in Abilify PI) in view of the '528 patent and WO '215;

    g.    dehydroaripiprazole (e.g., as disclosed in Abilify PI) in view of the '306 publication; and

      h.     dehydroaripiprazole (e.g., as disclosed in Abilify PI) in view of a POSA's knowledge of benzothiophenes (e.g., one or more of the '256 patent, the '246 patent, Kuipers 1995, WO '215, and the '306 publication).

324.    Compound claims 1-3, 7, 12, and 13 have the following dependency relationship (where ">" is used in the sense of claim > dependent claim):

claim 1 > claim 2 > claim 3 > claim 7 > claim 12 > claim 13

Thus, claim 13 is the narrowest asserted compound claim of the RE'059 patent and depends, directly or indirectly, from all other asserted compound claims.  Claim 13 recites that the compound is "7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one," i.e., brexpiprazole.  Thus, the other claims must also encompass brexpiprazole.  Therefore, claims 1-3, 7, 12, and 13 all encompass brexpiprazole and all would have been obvious.

      **1.**     **Claim 1**

325.    Claim 1, which is independent, recites as follows (with certain optional structure omitted through use of ellipses):

1. A heterocyclic compound represented by the formula (1):



[wherein ring Q represented by



represents —NH—CH$_2$—, …; and

155

the carbon-carbon bond

- - - - -

between the 3-position and 4-position of the heterocyclic
skeleton containing Z and Y represents … a double bond);

the ring Q may have at least one substituent selected from
the group consisting of … an oxo group;

$R_2$ represents a hydrogen atom …; and

A represents —O-$A_1$- (wherein $A_1$ represents an alkylene
group … ) … .

326.   Claim 1 reads on brexpiprazole where:

- ⎯⎯Z - - - Y⎯⎯ is –NH-$CH_2$-;

- - - - - - between the 3-position and 4-position of the heterocyclic skeleton
containing Z and Y represents a double bond;

- the ring Q has an oxo group substituent;

- $R_2$ is hydrogen; and

- A represents –O-$A_1$, wherein $A_1$ is an alkylene group, in particular, $A_1$ is $C_4H_8$, and
A is, therefore, –O-$C_4H_8$

Combining the various requirements relating to the ring Q yields the following for Q:



### 2.   Claim 2

327.   Claim 2, which depends on claim 1, recites as follows (with certain optional

structure omitted through use of ellipses):

2.  The heterocyclic compound of the formula (1) according to
claim 1, wherein the ring Q represents a bicyclic group selected from

156

the group consisting of:



…                                    …

(wherein the carbon-carbon bond

- - - - -

between the 3-position and 4-position of the bicyclic heterocyclic skeleton represents … a double bond);

the ring Q may have 1 to 3 substituents selected from …; and

A represents —O-$A_1$- (wherein $A_1$ represents a C1-C6 alkylene group … .

328.   Claim 2 reads on brexpiprazole where:

- Q is



;

- ----- between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a double bond;

- Q has no additional substituents; and

- A represents –O-$A_1$, wherein $A_1$ is an unsubstituted C1-C6 alkylene group, i.e., $A_1$ is $C_4H_8$.

### 3.   Claim 3

329.   Claim 3, which depends on claim 2, recites as follows (with certain optional structure omitted through use of ellipses):

157

3.  The heterocyclic compound of the formula (1) according to claim 2, wherein the ring Q represents a bicyclic group selected from the group consisting of:



the ring Q may have 1 to 3 substituents selected from … ; and

A represents —O-$A_1$- (wherein $A_1$ represents a C1-C6 alkylene group … .

330.  Claim 3 reads on brexpiprazole where:

- Q is



- Q has no additional substituents; and

- A represents –O-$A_1$, wherein $A_1$ is an unsubstituted C1-C6 alkylene group, i.e., $A_1$ is $C_4H_8$.

### 4.  Claim 7

331.  Claim 7, which depends on claim 3, recites as follows:

7.  The heterocyclic compound of the formula (1) according to claim 3 selected from the group consisting of:

(1) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one,

(2) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxy]-1H-quinolin-2-one,

(3) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxy]-
3,4-dihydro-1H-quinolin-2 one,

(4) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-3,4-
dihydro-1H-quinolin-2-one,

(5) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1-
methyl-3,4-dihydro-1H-quinolin-2-one and

(6) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxy]-
3,4-dihydro-1H-quinolin-2-one;

or a salt thereof.

332.    Claim 7 specifically recites six compounds, including 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one (claim 7, compound (1)), i.e., brexpiprazole, and salts of those six compounds.  Thus, claim 7 encompasses brexpiprazole.

### 5.    Claim 12

333.    Claim 12, which depends on claim 7, recites as follows:

12.  The heterocyclic compound according to claim 7, which is
7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-
quinolin-2-one or a salt thereof.

334.    Claim 12 specifically recites brexpiprazole or a salt thereof and, therefore, encompasses brexpiprazole.

### 6.    Claim 13

335.    Claim 13, which depends on claim 12, recites as follows:

13.  The heterocyclic compound according to claim 12, which is
7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-
quinolin-2-one.

336.    Claim 13 specifically recites brexpiprazole.

### B.    <u>Process Claims 9, 14, and 15</u>

337.    Process claims 9, 14, and 15 are directed to processes of producing compounds, including brexpiprazole.  To the extent that these claims are not rendered obvious based on the

obviousness of brexpiprazole alone, process claims 9, 14, and 15 are obvious because they encompass an obvious process for preparing brexpiprazole.  More particular, claims 9, 14, and 15 would have been obvious for all the reasons the brexpiprazole compound would have been obvious in view of known processes for producing compounds similar to brexpiprazole, as described in the '528 patent, WO '215, and/or Oshiro 1998.  Thus, each such claim would have been obvious in view of the prior-art combinations identified as rendering brexpiprazole obvious as well as one or more of the '528 patent, WO '215, and/or Oshiro 1998 (to the extent not already part of the combination).

338.   Claims 9, 14, and 15 have the following dependency relationship (where ">" is used in the sense of claim > dependent claim):

<div align="center">claim 9 > claim 14 > claim 15</div>

Thus, claim 15 is the narrowest asserted process claim of the RE'059 patent and depends, directly or indirectly, from all other asserted compound claims.  Claim 15 recites that the compound produced is "7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one," i.e., brexpiprazole. Thus, the other claims must also encompass processes for producing brexpiprazole.

### 1.   Claim 9

339.   Claim 1, which is independent, recites as follows.  The initial portion of claim 9 recites the compounds that may be produced by the claimed process.  This portion is the same as compound claim 1 and, therefore, includes brexpiprazole, which would have been obvious in view of various combinations or prior art.

> 9.   A process for producing a heterocyclic compound represented by the formula (1):
>
> [*compound portion of claim, which includes the compound brexpiprazole*]
>
> characterized by comprising a reaction of a compound

represented by the formula:



(wherein the ring Q and A are the same as defined above, and $X_1$ represents a halogen atom or a group which causes a substitution reaction the same as in a halogen atom) or a salt thereof with a compound represented by the formula:



(wherein $R_2$ is the same as defined above) or a salt thereof.

340.   As discussed in connection with claim 1, to reach the compound brexpiprazole:

- Q is



- A is $-O-C_4H_8$; and

- $R_2$ is hydrogen.

341.   Thus, replacing the above Q, A, and $R_2$ into claim 9, one embodiment of claim 9 is the process of producing brexpiprazole by reacting:



161

with



Because this particular process of claim 9 would have been obvious, claim 9 would have been obvious.

a.     '528 Patent

342.    The above process for making brexpiprazole, which falls within claim 9, would have been obvious for all the reasons articulated with respect to the brexpiprazole compound in view of the '528 patent.  The '528 patent discloses Reaction Formula-1 (*see* below; '528 patent at cols. 3-4), which was specifically used to prepare aripiprazole in Example 1 ('528 patent at cols. 10-12 (suspension of 47 g of 7-(4-bromobutoxy)-3,4-dihydrocarbostyril, 35 g of sodium iodide with 600 ml of acetonitrile was refluxed for 30 minutes; to this suspension was added 40 g of 1-(2,3-dichlorophenyl)piperazine)).

In compound (4), R is an aromatic ring, and, in compound (3), the carbon-carbon bond between the 3- and 4-positions in the carbostyril skeleton may be a double bond and $X^1$ is a halogen atom or a group which can carry out a substitution reaction similar to a halogen atom.  (*Id.* at 3:44-4:6.) Thus, the '528 patent teaches the use of an *N*-substituted piperazine as a nucleophile in a substitution reaction with a halogen atom (or other acceptable motifs) as a leaving group.  (*Id.* (compound (3)).)  Furthermore, the '528 patent teaches that the electrophile in such a substitution reaction has the structure ⬭Q⬭—A—$X_1$, wherein Q is a carbostyril moiety having a double bond between the 3- and 4-positions in the carbostyril skeleton, A is an –oxybutyl group substituted at the 7-position of the carbostyril, and $X_1$ is a halogen atom or a group which causes a substitution reaction the same as in a halogen atom located at the terminus of the –oxybutyl group.  (*Id.* (compound 4).)

343.    This process from the '528 patent is the same type of process recited in the process of claim 9, except that the latter process calls for a 4-piperazinyl benzothiophene instead of, e.g., the 2,3-dichlorophenylpiperazine present on aripiprazole, as disclosed in Example 1 of the '528 patent.  Nonetheless, for all of the reasons that brexpiprazole would have been obvious over lead compounds aripiprazole or dehydroaripiprazole a POSA would have been motivated to prepare brexpiprazole by the same process as was disclosed for aripiprazole in the '528 patent and would have expected the synthesis to be successful.

b.    WO '215

344.    The above process for making brexpiprazole, which falls within claim 9, would have been obvious for all the reasons articulated with respect to the brexpiprazole compound in view of WO '215.  WO '215 discloses a method of synthesizing compound 1A using Scheme B:

-continued



(WO '215 at 51:1-15.)  Scheme B illustrates a reaction of a compound of Formula 4 (a carbostyril moiety having a double bond between the 3- and 4-positions in the carbostyril skeleton, an –alkoxy group substituted at the 7-position of the carbostyril, and a leaving group L, such as halogen atom or a group which causes a substitution reaction, located at the terminus of the –alkoxy group) with a G-substituted piperazine compound (wherein D can be nitrogen) in the presence of a base to yield the desired compound of formula 1A.  For example, compound A85 is prepared via Scheme B using the following starting materials:

Compound A85

(*Id.* at 145:30-147:30 (structures drawn).)  It would have been obvious for a POSA in view of

Scheme B and the examples of WO'215 to prepare brexpiprazole simply by picking alternate

starting materials, such as 7-(4-chlorobutoxy)-3,4-dihydrocarbostyril and 4-piperazinyl

benzothiophene, or a salt thereof:



Brexpiprazole

(*See id. at* 51:1-15; 145:30-147:30 (structures drawn).)  Compound of formula 4 encompasses a

compound such as 7-(4-bromobutoxy)-3,4-dihydrocarbostyril.  That is, compound 4 encompasses

a carbostyril moiety having a double bond between the 3- and 4-positions in the carbostyril skeleton, an –oxybutyl group substituted at the 7-position of the carbostyril, and a leaving group L, such as halogen atom or a group which causes a substitution reaction, located at the terminus of the –oxybutyl group.  (*Id*. at 51:1-10.)  The resulting process is the above process for making brexpiprazole within claim 9.

c.    Oshiro 1998

345.    The above process for making brexpiprazole, which falls within claim 9, would have also been obvious for all the reasons articulated with respect to the brexpiprazole compound in view of Oshiro 1998.  Oshiro 1998 also uses a nucleophilic substitution reaction to react a carbostyril derivative with an N-phenyl substituted piperazine.  (Oshiro 1998 at 659-60.)

346.    Oshiro 1998 teaches that quinolinone compounds such as 7-(4-(4-phenyl-piperazinyl)butoxy]-3,4-dihydro-2(1H)-quinolinone, including aripiprazole, can be synthesized by reacting a carbostyril or 3,4-dihydro carbostyril compounds, such as compounds 6-10 and 12, with an N-substituted piperazine to yield compounds 13-21, 25-49, and 52-56.  (*Id*.)



(*Id*. (Scheme 1).)  Compound 28 prepared using Scheme 1 is aripiprazole, which uses 2,3-dichloro phenyl piperazine and 3,4-dihydro carbostyril as starting materials.  (*Id.* at 661.)  In view of

Scheme 1 and the corresponding process described in Oshiro, it would have been obvious for a POSA seeking to synthesize brexpiprazole to select the N-substituted piperazine as a 4-piperazinyl benzothiophene and the carbostyril derivative to be a butoxyl-3,4-dihydro-2(1H)-quinolinone (n=4).



**Brexpiprazole**

(*See id.* (structures drawn)).  The resulting process would be the same as the process recited in the brexpiprazole process of claim 9.

347.    For all of the reasons that brexpiprazole would have been obvious over lead compounds aripiprazole or dehydroaripiprazole, a POSA would have been motivated to prepare brexpiprazole by the same process as was disclosed for aripiprazole in Oshiro 1998 and would have expected the synthesis to be successful.

## 2.    Claims 14 and 15

348.    Claim 14, which depends on claim 9, recites:

> 14.   The  process  according  to  claim  9,  wherein  the  process produces     7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof.

Thus, claim 14 recites that the process of claim 9 produces brexpiprazole or a salt thereof.

349.    Claim 15, which depends from claim 14, recites:

> 15.  The process according to claim 14, wherein the process produces    7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one.

Thus, claim 15 recites that the process of claim 14 (and, in turn, claim 9) produces brexpiprazole. For the reasons provided in connection with claim 9 and brexpiprazole, claims 14 and 15 also would have been obvious.

## VIII.   OBVIOUSNESS OF THE '840 PATENT (CLAIMS 1, 2, 4, 5)

350.    Each asserted claim (claims 1, 2, 4, 5) of the '840 patent would have been obvious over the prior art.  The asserted claims of the '840 patent are directed to either pharmaceutical compositions comprising a compound, where the compound can be brexpiprazole (claims 1, 2), or methods of treating CNS disorders (including depression) comprising administering a compound, where the compound can be brexpiprazole (claims 4, 5).

### A.    Composition Claims 1, 2

351.    Brexpiprazole would have been obvious in view of various combinations of prior art.  Pharmaceutical compositions comprising brexpiprazole and a pharmaceutically acceptable carrier would have been obvious in view of various combinations of prior art.  Because claims 1 and 2 encompass pharmaceutical compositions comprising brexpiprazole (including along with a pharmaceutically acceptable carrier), those claims would have been obvious.  In particular, those claims would have been obvious in view of the prior-art combinations that render brexpiprazole obvious as well as one or more of the references disclosing pharmaceutical formulations.  Moreover, it would have been within the general knowledge of a POSA to include an obvious pharmaceutical compound (i.e., brexpiprazole) in a pharmaceutical composition so that it could be delivered to a patient in need thereof.   Also, aripiprazole was formulated along with pharmaceutically acceptable carriers into the Abilify tablet.  (*See generally* Abilify PI.)  Given the

similarity between aripiprazole and brexpiprazole, a POSA would have had a reasonable expectation of success that brexpiprazole could be similarly formulated.

### 1. Claim 1

352.    Claim 1, which is independent, recites as follows.  Most of the text of claim 1 recites the compounds that may be included as the active ingredient in the claimed pharmaceutical composition.  Other than a difference in where the language "or a salt thereof" appears, this portion is the same as compound claim 1 of the RE'059 patent and, therefore, includes brexpiprazole for the reasons stated in connection with claim 1 of RE'059.  As explained, brexpiprazole would have been obvious in view of various combinations of prior art.

> A pharmaceutical composition comprising a heterocyclic compound of the formula (1) or a salt thereof as an active ingredient and a pharmaceutically acceptable carrier:
>
> [*compound portion of claim, which includes the compound brexpiprazole*]

Thus, claim 1 of the '840 patent encompasses a pharmaceutical compound comprising brexpiprazole and a pharmaceutically acceptable carrier and, therefore, would have been obvious.

### 2. Claim 2

353.    Claim 2, which is independent, recites as follows:

> 2.  A pharmaceutical composition comprising a heterocyclic compound or a salt thereof selected from the group of:
>
> (1) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)butoxy]-1H-quinolin-2-one,
>
> …
>
> as an active ingredient and a pharmaceutically acceptable carrier.

Thus, claim 2 of the '840 patent encompasses a pharmaceutical compound comprising brexpiprazole and a pharmaceutically acceptable carrier and, therefore, would have been obvious.

### B.   Method of Treatment Claims 4, 5

354.   Brexpiprazole would have been obvious in view of various combinations of prior art.   It would have been obvious to treat, e.g., depression in a human by administering brexpiprazole.   Because claims 4 and 5 encompass methods of treating depression in a human comprising administering brexpiprazole, those claims would have been obvious.   In particular, those claims would have been obvious in view of the prior-art combinations identified as rendering brexpiprazole obvious as well as one or more of the references identified as disclosing treatment of depression.   Moreover, it would have been within the general knowledge of a POSA to administer an obvious pharmaceutical compound with antidepressive properties (i.e., brexpiprazole) in a method of treating depression.   Also, aripiprazole was known to be useful to treat depression.   (WO '682 at 5:24-28 ("Aripiprazole possesses 5-HT$_{1A}$ receptor agonist activity, and is known as a useful compound for treating types of depression and refractory depression, such as endogenous depression, major depression, melancholia and the like.").)   Given the similarity between aripiprazole and brexpiprazole, a POSA would have had a reasonable expectation of success that brexpiprazole could similarly be used to treat that condition.

#### 1.   Claim 4

355.   Claim 4, which is independent, recites as follows.   Most of the text of claim 4 recites the compounds that may be administered for treatment of various CNS orders, including depression.   Other than a difference in where the language "or a salt thereof" appears, this portion is the same as compound claim 1 of the RE'059 patent and, therefore, includes brexpiprazole.

> A method for treating a central nervous system disorder selected from depression, endogenous depression, major depression, melancholy and refractory depression comprising administering a heterocyclic compound represented by the formula (1) or a salt thereof to a human or animal:
>
> [*compound portion of claim, which includes the compound*

*brexpiprazole*]

Thus, claim 4 of the '840 patent encompasses a method of treatment of depression comprising administering brexpiprazole to a human and, therefore, would have been obvious.

356.   The recited genus of claim 4 of the '840 patent, which is the same genus recited in claim 1 of the '109 patent, includes multiple structural options at multiple locations on the core structure.  The number of possible substituents at any one location of ring Q alone conservatively numbers over 9,000—and the genus permits substitutions at any one or more locations of Q.  When those combinations for Q are multiplied by all of the other structural combinations described in the genus, the end result is that the genus described in claim 4 of the '840 patent and claim 1 of the '109 patent covers millions of different compounds.

### 2.   Claim 5

357.   Claim 5, which depends on claim 4, recites as follows:

> The method according to claim 4, wherein the heterocyclic compound or a salt thereof is selected from the group of:

> (1) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)butoxy]-1H-quinolin-2-one,

> ….

Thus, claim 5 of the '840 patent encompasses a method of treatment of depression comprising administering brexpiprazole to a human and, therefore, would have been obvious.

## IX.   OBVIOUSNESS OF THE '109 PATENT (CLAIMS 1, 2)

358.   Each asserted claim (claims 1, 2) of the '109 patent would have been obvious over the prior art.  The asserted claims of the '109 patent are directed to methods of treating schizophrenia comprising administering a compound, where the compound can be brexpiprazole. Claims 1 and 2 of the '109 patent are the same as claims 4 and 5 of the '840 patent, except that the former recite methods of treating schizophrenia, whereas the latter recite methods of treating

various CNS disorders, such as depression.  Claims 1 and 2 of the '109 patent would have been obvious in view of any of the prior-art combinations rendering brexpiprazole obvious along with one or more of the references disclosing treatment of schizophrenia.  Moreover, it would have been within the general knowledge of a POSA to administer an obvious pharmaceutical compound with antischizophrenic properties (i.e., brexpiprazole) in a method of treating schizophrenia.  In particular, aripiprazole was known to be useful to treat schizophrenia.  (Abilify PI at 9 (schizophrenia.)  Given the similarity between aripiprazole and brexpiprazole, a POSA would have had a reasonable expectation of success that brexpiprazole could be similarly be used to treat that condition.

## X.   OBVIOUSNESS OF THE '637 PATENT (CLAIMS 1, 3-10)

359.   Each asserted claim (claims 1, 3-10) of the '637 patent would have been obvious over the prior art.  The asserted claims of the '637 patent are directed to either pharmaceutical compositions comprising a compound, where the compound can be brexpiprazole, with certain claims providing limitations on the amount of brexpiprazole or form of the composition (claims 1, 3-8), or methods of treating major depression or schizophrenia comprising administering a pharmaceutical composition comprising brexpiprazole (claims 9, 10).

### A.   Composition Claims 1, 3-8

360.   As explained, brexpiprazole would have been obvious in view of various combinations of prior art.  As explained, pharmaceutical compositions comprising brexpiprazole and a pharmaceutically acceptable carrier would have been obvious in view of various combinations of prior art.  Claims 1 and 3-8, which encompass pharmaceutical compositions comprising brexpiprazole (including along with a pharmaceutically acceptable carrier), therefore would have been obvious.  In particular, those claims would have been obvious in view of the prior-art combinations rendering brexpiprazole obvious as well as one or more of the references

disclosing pharmaceutical formulations.  Moreover, it would have been within the general knowledge of a POSA to include an obvious pharmaceutical compound (i.e., brexpiprazole) in a pharmaceutical composition so that it could be delivered to a patient in need thereof.  Also, aripiprazole was formulated along with pharmaceutically acceptable carriers into the Abilify tablet.  (*See generally* Abilify PI.)  Given the similarity between aripiprazole and brexpiprazole, a POSA would have had a reasonable expectation of success that brexpiprazole could be similarly formulated.

### 1.    Claim 1

361.    Claim 1, which is independent, recites as follows.  Most of the text of claim 1 recites the compounds that may be included as the active ingredient in the claimed pharmaceutical composition.  This portion is the same as compound claim 3 (as depending on claim 1) of the RE'059 patent (except that A is narrower here in a way that does not matter) and, therefore, includes brexpiprazole.

> 1.  A pharmaceutical composition comprising a heterocyclic compound or a salt thereof represented by formula (1):
>
> [*compound portion of claim, which includes the compound brexpiprazole*]
>
> and
>
> a pharmaceutically acceptable carrier.

Thus, claim 1 of the '637 patent encompasses a pharmaceutical compound comprising brexpiprazole and a pharmaceutically acceptable carrier and, therefore, would have been obvious over the prior-art combinations rendering brexpiprazole obvious as well as one or more of the references disclosing pharmaceutical formulations.

### 2.    Claim 3

362.    Claim 3, which depends on claim 2, recites:

> 3.    A pharmaceutical composition comprising 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy  ]-1H-quinolin-2-one and a pharmaceutically acceptable carrier.

Thus, claim 2 of the '637 patent encompasses a pharmaceutical compound comprising brexpiprazole and a pharmaceutically acceptable carrier and, therefore, would have been obvious over the same prior art as claim 1.

### 3.    Claim 4

363.    Claim 4, which depends on claim 3, recites:

> 4.    The pharmaceutical composition according to claim 3, wherein the 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one is present in the pharmaceutical composition in an amount ranging from 1 % to 70% by weight.

Thus, claim 4 adds to claim 3 that the brexpiprazole composition is present in the pharmaceutical composition in an amount ranging from 1-70% by weight.  This is a wide range of amounts of active ingredient that a POSA would understand encompasses typical amounts of active ingredients of pharmaceutical formulations.  For example, WO '215 discloses that, "[i]n general, the weight ratio of the novel compounds of this invention to the pharmaceutically acceptable carrier will be in the range from about 1:6 to about 2:1, and preferably from about 1:4 to about 1:1." (*Id.* at 69:13-34.)  As a percent, this translates to the active ingredient being in the range of about 14% to about 67%, preferably about 20% to about 50%, of the tablet—i.e., within the range claimed in claim 4.  As for a specific example within the claimed range, WO '682 Formulation Sample 17 contains 5 mg dehydroaripiprazole in a 450 mg tablet (i.e., about 1.1% active ingredient by weight).  (WO '682 at 58.)  The '637 patent specification does not attribute any unexpected or superior results to a composition of a particular dosage strength.  Thus, claim 4 would have been obvious over the same prior art as claim 3 in further view of WO '215, WO '682, and/or the general knowledge of a POSA.

### 4.   Claim 5

364.   Claim 5, which depends on claim 3, recites:

> 5.   The pharmaceutical composition according to claim 3, wherein the 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one is present in the pharmaceutical composition in an amount ranging from 1 % to 30% by weight.

Thus, claim 5 adds to claim 3 that the brexpiprazole composition is present in the pharmaceutical composition in an amount ranging from 1-30% by weight.  This is a wide range of amounts of active ingredient that a POSA would understand encompasses typical amounts of active ingredients of pharmaceutical formulations.  For example, WO '215 discloses that, "[i]n general, the weight ratio of the novel compounds of this invention to the pharmaceutically acceptable carrier will be in the range from about 1:6 to about 2:1, and preferably from about 1:4 to about 1:1."  (WO '215 at 69:13-34.)  As a percent, this translates to the active ingredient being in the range of about 14% to about 67%, preferably about 20% to about 50%, of the tablet—i.e., significantly overlapping the range claimed in claim 5.  As for a specific example within the claimed range, WO '682 Formulation Sample 17 contains 5 mg dehydroaripiprazole in a 450 mg tablet (i.e., about 1.1% active ingredient by weight).  (WO '682 at 58.)  The '637 patent specification does not attribute any unexpected or superior results to a composition of a particular dosage strength.  Thus, claim 5 would have been obvious over the same prior art as claim 3 in further view of WO '215, WO '682, and/or the general knowledge of a POSA.

### 5.   Claim 6

365.   Claim 6, which depends on claim 3, recites:

> 6.   The pharmaceutical composition according to claim 3, wherein the composition contains from 1 mg to 200 mg of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-I-yl)butoxy]-1H- quinolin-2-one.

Thus, claim 6 adds to claim 3 that the brexpiprazole composition contains from 1-200 mg of

brexpiprazole.  Given that aripiprazole was available in 5, 10, 15, 20, and 30 mg dosage strengths (Abilify PI at 1), and brexpiprazole was a compound having similar chemical structure designed with the goal of improving over aripiprazole's profile, it would have been obvious for a POSA to try doses of brexpiprazole of similar amounts, including lower amounts, than those for aripiprazole, and certainly dosage amounts within the range of 1-200 mg brexpiprazole. Moreover, it is within the general knowledge of a POSA to experiment with dosage amounts, and a POSA would have been motivated to use as little active ingredient as possible to minimize possible side effects.  The '637 patent specification does not attribute any unexpected or superior results to a composition of a particular dosage strength.  Thus, claim 6 would have been obvious over the same prior art as claim 3 in further view of Abilify and/or the general knowledge of a POSA.

### 6.   Claim 7

366.   Claim 7, which depends on claim 3, recites:

> 7.   The pharmaceutical composition according to claim 3, wherein the composition contains about 1 mg of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-I-yl)butoxy]-1H-quinolin-2-one.

Thus, claim 7 adds to claim 3 that the brexpiprazole composition contains about 1 mg of brexpiprazole.  Given that aripiprazole was available in dosage forms as low as 5 mg (Abilify PI at 1), and brexpiprazole was a compound having similar chemical structure designed with the goal of improving over aripiprazole's profile, it would have been obvious for a POSA to try doses of brexpiprazole of about 1 mg.  For example, the '306 publication discloses a total daily dose usually in the range of about 0.05 to 500 mg and most preferably about 0.1 to 50 mg of the active compound.  ('306 publication at [0518].)  In addition, Davies 1994 discloses dosing of aripiprazole at 1 mg.  (Davies 2004 at 321, 327.)  Moreover, it is within the general knowledge of a POSA to experiment with dosage amounts, and a POSA would have been motivated to use as little active

ingredient as possible to minimize possible side effects.  The '637 patent specification does not attribute any unexpected or superior results to a composition of a particular dosage strength.  Thus, claim 7 would have been obvious over the same prior art as claim 3 in further view of Abilify, the '306 publication, Davies 2004, and/or the general knowledge of a POSA.

### 7.   Claim 8

367.   Claim 8, which depends on claim 6, recites:

> 8.   The pharmaceutical composition according to claim 6, wherein the pharmaceutical composition is in the form of a tablet.

Thus, claim 8 adds to claim 6 that the brexpiprazole composition be in the form of a tablet.  As explained, it would have been obvious to formulate the brexpiprazole composition in the form of a tablet.  Thus, claim 8 would have been obvious over the same prior art as claim 3.  In addition, aripiprazole was formulated into tablets.  (Abilify PI at 35.)

### B.   Method of Treatment Claims 9, 10

368.   Claims 9 and 10 are directed to methods of treatment comprising administering the brexpiprazole composition of claim 3 for the treatment of major depression and schizophrenia, respectively:

> 9.   A method for treating major depression comprising administering a pharmaceutical composition according to claim 3.

> 10.   A method for treating schizophrenia comprising administering a pharmaceutical composition according to claim 3.

369.   Claim 9 would have been obvious over the same prior art as claim 3 in view of one or more of the references disclosing treatment of depression or major depression.  It would have been obvious for a POSA in view of a disclosure of the treatment of "depression" to treat the claimed "major depression" in the same fashion.  Regardless, WO '215 and WO '864 specifically disclose treatment of major depression.

370.     Claim 10 would have been obvious over the same prior art as claim 3 in view of one or more of the references disclosing treatment of schizophrenia.

## XI.     THERE IS NO OBJECTIVE EVIDENCE DEMONSTRATING THE NON-OBVIOUSNESS OF BREXPIPRAZOLE

371.     Plaintiffs asserted various secondary considerations factors, including failure of others and unpredictability in the art, long-felt but unmet needs, unexpected results, copying and commercial success.  Defendants disagree with Plaintiffs concerning purported objective indicia of non-obviousness.

### A.     There is No Nexus

372.     Plaintiffs offer no opinions concerning nexus other than unsupported statements that a nexus exists.

373.     Further, Plaintiffs obtained the patent on the aripiprazole compound years ago and the alleged novel aspect of the invention is not and cannot be attributable to aripiprazole, which is in the prior art.  Thus, to the extent that the alleged evidence of secondary considerations is attributable to the aripiprazole compound or other antipsychotic compounds, which are not a novel aspect of the invention, there is no nexus.

### B.     Failure of Others and Unpredictability in the Art

374.     Plaintiffs have not shown any nexus between the alleged evidence of purported failures of others and unpredictability in the art and the patent claims at issue here.  The purported objective evidence that Plaintiffs cite to is attributable to aripiprazole or other prior art compounds and thus does not support a nexus.

375.     For example, Plaintiffs' arguments that development in general is challenging or that some specific antipsychotic compounds may not have achieved FDA approval have no nexus to the purported invention as claimed.  As explained further herein, prior art antipsychotics were

approved by the FDA and already overcame the purported failures or unpredictability that Plaintiffs allege. As such, there is no purported failure of others or unpredictability in developing antipsychotics much less any that would be attributable to brexpiprazole.

376. Plaintiffs' assertions are overly broad in that they relate to pharmaceutical development in general and other examples that do not relate to the claims at issue in the Compound Patents. For example, Plaintiffs assert that drug development is an inherently unpredictable task. This general proposition is not in any way tied to the claims of the Compound Patents.

377. Plaintiffs also contend that the art is filled with failed drug candidates, which purportedly demonstrates the inherent unpredictability associated with developing antipsychotics. Plaintiffs argue that efforts to develop new antipsychotic treatments have failed. However, even prior to 2005, many antipsychotic drugs, including aripiprazole were successfully developed and demonstrated predictably in the art long before the development of brexpiprazole.

378. Plaintiffs cite to various antipsychotic drugs that the FDA did not approve. This is not evidence demonstrating that brexpiprazole overcame any purported failures or brought predictability to the development of antipsychotics because many prior art compounds, including aripiprazole, already existed and therefore there were no purported failures or unpredictability in the art.

379. For example, aripiprazole, like brexpiprazole, is indicated for the treatment of schizophrenia and is approved as adjunctive therapy (in combination with antidepressant medication) for the treatment of major depressive disorder. Both are known as "atypical antipsychotics" and as "adjunctive antidepressants." Further, there are many other available antipsychotics, such as lurasidone, asenapine, cariprazine, risperidone, quetiapine, aripiprazole,

olanzapine, and ziprasidone, that similarly were known antipsychotics approved by the FDA. Accordingly, Plaintiffs have no evidence that brexpiprazole overcame any purported failures or unpredictability that were not overcome by prior art antipsychotics, such as aripiprazole. As such, Plaintiffs' assertions about their own purported failures are similarly inapt in view of aripiprazole.

### C. Long-Felt but Unmet Need

380. Plaintiffs contend that the purported invention overcame several purportedly long-felt needs including a long-felt need to (1) reduce adverse side effects associated with antipsychotics; (2) that brexpiprazole shows improvement in cognitive functioning; and (3) that brexpiprazole solves a lack of therapies to treat conditions that are unrelated to schizophrenia, such as PTSD and agitation in Alzheimer's disease (AAD). "Long-felt need" is also assessed as of the filing date of the patent that purportedly satisfied said need. While, in theory, there may always be a universal need for improvements in therapies, the claimed technology at issue here did not solve any long-felt need for the following reasons.

381. ***First***, brexpiprazole did not overcome a long-felt need to reduce adverse side effects associated with antipsychotics. If there was any long-felt need, it was met by aripiprazole long before the filing date of the Compound Patents addressed. Specifically, the adverse side effect profiles of brexpiprazole and aripiprazole are substantially similar. For example, Plaintiffs believe that REXULTI® results in mild to moderate weight gain. However, a study that looked at the side effect of weight gain from Abilify® and Rexulti®, concluded that both drugs had a similar effect on body weight gain (an increase of about 5-10 pounds) after one year. Moreover, other FDA-approved antipsychotics, such as lurasidone (Latuda®), offer substantially similar side effects as brexpiprazole.

382. Plaintiffs also believe that patients experience less akathisia when taking brexpiprazole. But it is well known that older first-generation antipsychotics are more likely to be

associated with movement disorders, such as akathisia, and this is primarily true of medications that bind tightly to dopaminergic neuroreceptors, such as haloperidol.  It is generally less true of medications that bind weakly, such as brexpiprazole and chlorpromazine.  In any event, all drugs have varying side effects from patient to patient.

383.    In sum, Defendants disagree with Plaintiffs' position that brexpiprazole somehow has a side effect profile that solved an unmet need.  Other FDA-approved antipsychotics have substantially similar side effects.

384.    **Second**, brexpiprazole did not solve an unmet need for improving cognitive functioning and the literature cited by Plaintiffs does not support their position.  For example, Plaintiffs cite a short-term open-label study that was not powered for head-to-head comparisons to brexpiprazole.  Two other studies cited by Plaintiffs also were not comparative studies as against any other antipsychotic.  These studies are highly unreliable, and the short-term, open-label study shows patients taking aripiprazole also showed improvements in cognitive functioning.  Further, the authors of The Medical Letter published an article on August 17, 2015 that concluded "there is no reason to prescribe brexpiprazole over generic aripiprazole, which has a much longer record of efficacy and safety."

385.    **Third,** brexpiprazole does not solve an unmet need for therapies to treat conditions that are unrelated to schizophrenia, such as PTSD and agitation in Alzheimer's disease (AAD).  Notably, brexpiprazole is not FDA-approved for such indications and thus it does not solve any need for therapies to treat these conditions.  The only conditions brexpiprazole is approved to treat are MDD and schizophrenia and aripiprazole as well as other medications already solve a need for treating these illnesses.

386.    In sum, Defendants disagree that brexpiprazole solves any of the unmet needs that

Plaintiffs identify.

### D.    Unexpected Results and Industry Praise

387.    Plaintiffs next argue that brexpiprazole showed unexpected results and received industry praise for having a better clinical profile.  Defendants disagree that there were unexpected results by the year of the patents for the following reasons.

388.    To begin and as noted above, aripiprazole already showed a substantially similar clinical profile, any differences between brexpiprazole and aripiprazole are only in degree, and any such differences would have been expected in the art.  Plaintiffs' primary retort to this is that brexpiprazole is purportedly a "novel" compound; however, as Defendants' experts opine, brexpiprazole is obvious.  Further, the mechanism of action of brexpiprazole, such as binding affinity and functional effects that Plaintiffs note are all completely expected.  Brexpiprazole was formed as a result of small, conservative structural changes to aripiprazole based on what was known before the priority date.

389.    Defendants also disagree that brexpiprazole has a unique safety and efficacy profile.  As explained above, the safety profile of brexpiprazole is substantially the same as that of aripiprazole and, while Plaintiffs claim brexpiprazole has improved efficacy for the treatment of schizophrenia and the adjunctive treatment of MDD, they cite to no literature that substantiates their opinions in that regard.

390.    Notably, too, as mentioned above, the well-regarded Medical Letter article concerning the FDA's approval of brexpiprazole (Rexulti®) concluded that, while "Brexpiprazole (Rexulti®) was more effective than placebo in short-term trials . . . direct comparisons with other antipsychotics are lacking, and its long-term safety is unknown."  The authors ultimately found that "[t]here is no reason to prescribe brexpiprazole over generic aripiprazole, which has a much longer record of efficacy and safety."

391.    Plaintiffs next assert that the overall clinical profile of brexpiprazole has a real-world impact on public health costs, which have been recognized in the field.  Defendants address this argument as follows.

### 1.    Cognitive Effects and Functioning

392.     Plaintiffs first contend that brexpiprazole purportedly "unexpectedly" improves cognitive effects and functioning.  The data Plaintiffs that rely on does not support this.  Plaintiffs cite to one article that notes it was not conclusive (stating that the data merely "suggests" brexpiprazole may be promising as an antipsychotic).  Another article cited by Plaintiffs is not determinative, concluding only that there was no "meaningful" worsening in cognitive function for either brexpiprazole or aripiprazole.  Further, the Citrome study relied upon by Plaintiffs was also open label.

393.    Plaintiffs' arguments that brexpiprazole purportedly improves functioning are also flawed for the reasons stated above.  Further, the studies Plaintiffs rely on are not head-to-head studies, but rather they compare brexpiprazole to placebo and are open label.



### 3.      Side Effects

396.   Plaintiffs next contend that brexpiprazole has an unexpectedly better side effect profile.   Defendants disagree for the reasons stated above.   Further, Plaintiffs' argument that brexpiprazole has better side effects due to binding affinity for the α1b receptor has no nexus to the patent claims.

397.   Defendants also disagree with Plaintiffs' assertions that brexpiprazole has improved side effects for being neither activating nor sedating.   It is well known that aripiprazole has low sedative properties due to its modest antagonism at $H_1$ receptors.  Also, many other antipsychotics are not activating.   Plaintiffs must admit that at least one other antipsychotic is neither activating nor sedating, and as such brexpiprazole's side effects are not unique and do not support unexpected results.

398.   That brexpiprazole may be taken long-term, also does not support that brexpiprazole shows unexpected results because many other antipsychotics, including aripiprazole, may be taken long term.

### 4.      Real World Implications

399.   Finally, Plaintiffs assert that brexpiprazole provides cost savings for the healthcare industry.   Not so.   The only cost savings data Plaintiffs rely upon are cost savings relative to a patient not taking any antipsychotic medication.    But plenty of effective, well-tolerated antipsychotics were already on the market and providing cost savings relative to not taking any medication.   Plaintiffs' arguments thus are not supported by evidence.

400.   In sum, Defendants disagree that brexpiprazole has demonstrated unexpected clinical benefits.

### E.      Copying

401.   Defendants further disagree with Plaintiffs' contention that evidence of copying is

shown by Defendants' applying for FDA licensure.  Evidence of copying in the Hatch-Waxman context should not be considered because the relevant statutes anticipate and incentivize the copying of patented subject matter.  Further, copying is relevant only when there exists a nexus between the novel aspects of the claimed invention, which is not the case here.

402.   Plaintiffs' assertion that many companies may have sought patents on the brexpiprazole compound also has no nexus between the novel aspects of the claimed invention, because the patents that Plaintiffs cite do not copy the purported invention as claimed.

**F.**   **Commercial Success**

403.   Plaintiffs' contend there exists commercial success supporting nonobviousness of the claims at issue.  The Defendants disagree with this contention. Factors other than the claimed features drive marketplace performance of Rexulti®.

**1.**

404.   ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

### 2.      Detailing and sampling.

405.     Detailing is a form of marketing where pharmaceutical sales representatives visit or call on medical professionals to discuss products. Detailing expenses consist primarily of the detailing sales force and related costs of marketing materials. Plaintiffs engaged in detailing activities to promote Rexulti® in an effort to drive sales.  .



### 3.      D      T   C

409.     Plaintiffs implemented Direct To Consumer ("DTC") marketing tactics to drive

prescriptions and sales. DTC advertising is marketing that targets consumers (the individuals that will ultimately be using the product), utilizing mediums such as television, internet, and print advertisements. DTC advertising can impact a patient's preference and/or cause discussion with their physician regarding a particular medication. The primary goal of DTC advertising is to have patients ask physicians if that medication is appropriate for their treatment.

410. 

### 4.    Share Of Voice

411.    Plaintiffs have used and continue to use numerous marketing and promotional efforts to promote and drive the performance of Rexulti®.  Marketing efforts for Rexulti® and competing antipsychotic products can be compared by using a metric referred to as share of voice ("SOV").  SOV is generally described as a brand's advertising weight expressed as a percentage of a market in a given time period.  SOV is a function of the competitive landscape and analyzing SOV reflects how much prescribers are hearing (or not hearing) about competing products from a marketing perspective.

412.

████████████████████████████████████████████

████████████████████████████████████████████

413.    Plaintiffs contend that their promotional expenditures are purportedly in line with industry norms, comparing the sales and marketing expenditures for Rexulti® to the sales and marketing expenditures for entire companies.  Plaintiffs acknowledge that their comparison is not perfect and there could be meaningful differences between Rexulti® and the product portfolios of the pharmaceutical companies.  This includes comparison of large companies with very large revenues and small companies with much smaller revenues, making such comparisons misleading.

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

414.    Plaintiffs' assertions concerning marketing expenses for Rexulti® do not accurately reflect marketing expenses for Lundbeck, or for so-called shared expenses between Lundbeck and Otsuka.  . For example, Plaintiffs rely on the Wholesale Acquisition Cost ("WAC") of Rexulti® compared to other products, apparently ignoring that WAC represents a gross price and fails to reflect net price of a product, as well as failing to take into account discounts, rebates, and other incentives.

### 5.    Pricing and Copays

415.    ████████████████████████████████████████████

████████████████████████████████

416.    The formulary status of Rexulti®, which compares negatively with competitors Vraylar® and Latuda®, implies that the formularies do not find the purported benefits of Rexulti® sufficiently attractive to place Rexulti® in a better formulary position.

417.    Discounts can vary greatly among different pharmaceutical products.

418. 

### 6.    Attribution

419.    Plaintiffs' alleged marketplace success and nexus related to the asserted claims of the Patents-in-Suit fails to appropriately account for or attribute value among the asserted claims of the Patents-in-Suit. Plaintiff essentially attributes the entire value of the marketplace performance of Rexulti® to the asserted claims of the Patents-in-Suit collectively, without appropriately addressing any purported value among the asserted claims of the Patents-in-Suit.

420.    The asserted claims of the Patents-in-Suit are directed to a number of different subjects, including brexpiprazole (and, in some cases, additional compounds) (RE'059 Patent, claims 1-3, 7, and 12-13); a process for making brexpiprazole (and, in some cases, additional compounds) (RE'059 Patent, claims 9 and 14-15); pharmaceutical compositions comprising brexpiprazole ('637 Patent, claims 1 and 3-8; '840 Patent, claims 1 and 2); methods of treatment comprising administering such pharmaceutical compositions/brexpiprazole ('840 Patent, claims 4 and 5; '637 Patent, claim 9), and methods for treating schizophrenia comprising administering brexpiprazole ('109 Patent, claims 1-2 and '637 Patent, claim 10).

421.   Plaintiffs fail to appropriately analyze and determine if the marketplace performance of Rexulti® is attributable to these different types of claims and, if so, which ones. With the absence of any such analysis, Plaintiffs fail to apportion the marketplace performance of Rexulti® to any of these subjects, which are covered by different asserted claims in the Patents-in-Suit.

422.   The asserted claims of the '419 Patent relate to specific tablet dosage formulations of brexpiprazole, including tablet core elements (the uncoated tablets) and coating of the claimed tablet, as used in Rexulti®.  Multiple antipsychotics are indicated to be dosed once daily, and are available in tablet form, including at least Seroquel XR®, Latuda®, and Vraylar® as competitors of Rexulti®.  Seroquel XR® is an extended release tablet administered once-daily, Latuda® is a tablet that is administered once-daily, and Vraylar® is a capsule that is administered once-daily.

423.   Despite claiming that "convenience (i.e., once-daily dosing with oral tablets)" is a purported benefit of Rexulti® that derives from the asserted claims of the Patents-in-Suit, Plaintiffs fail to appropriately address how such attributes drive demand for Rexulti®, particularly when such features are not unique to Rexulti®.  From an economic perspective, being an oral tablet with once-daily dosing does not appear to differentiate Rexulti® from such competitors and therefore, these attributes are unlikely to drive demand for Rexulti® relative to such competition.

424.   Several companies have received tentative approval from FDA for brexpiprazole tablet products with Rexulti® as the reference listed drug.  Therefore, FDA has determined that these seven companies' ANDA products are bioequivalent to Rexulti®.Dr. Moreton and/or Dr. Muzzio have opined that six of these seven companies' ANDA products do not infringe the asserted claims of the '419 Patent.  To the extent that any of these companies' ANDA products do not practice the asserted claims of the '419 Patent, yet are determined to be substitutable for the

brand product, this provide further evidence that the asserted claims of the '419 Patent do not drive the performance of Rexulti®.

425.    From an economic perspective, Plaintiffs are essentially attributing the entire value of the marketplace performance of Rexulti® to the asserted claims of the Patents-in-Suit collectively, without apportioning any value among the asserted claims of the Patents-in-Suit. The failure to present an economic analysis that apportions the performance of Rexulti® among the asserted claims of the Patents-in-Suit is incomplete and unreliable.

### 7.    A                    lace Success

426.    Plaintiffs contend that responsible economic decision-makers should allocate resources to activities that are expected to generate the highest net return (i.e., benefits minus costs) that are available, given the opportunities and constraints facing the decision-makers.  And that the behavior and decisions of Plaintiffs and Defendants suggest that Plaintiffs and Defendants regard Rexulti® as a marketplace success.  Defendants disagree.

427.    Plaintiffs allege that because they have devoted time and resources to developing and commercializing Rexulti®, this provides evidence that Rexulti® has been, and will continue to be, a marketplace success.  Similarly, Plaintiffs assert that Defendants' costs associated with the submission of its ANDA and the costs Defendants will incur in this litigation are evidence that Defendants believe Rexulti® is a marketplace success.  Defendants disagree.

428.    Plaintiffs essentially argue that every brand product that undergoes clinical trials and is marketed and sold by a pharmaceutical company is purportedly a marketplace success, since the brand company devoted resources to developing, marketing, and selling the brand product. If that were the case, there would be no need for an analysis of marketplace success, because the simple fact that a product is marketed and sold would theoretically demonstrate that a product is purportedly successful in the market. Plaintiffs assert that essentially every product for which a

generic product is offered is a purported marketplace success since a generic company devoted resources into filing an ANDA and selling the generic product. Defendants do not agree with this simplistic argument.

429.    The decision by a generic company to file an ANDA with respect to a reference listed drug merely reflects the normal course of business for generic pharmaceutical companies and does not necessarily reflect the marketplace success of the reference listed drug. There are significant financial and economic differences between the business models of branded and generic pharmaceutical companies, including the role of R&D costs and sales and marketing costs, which result in the pursuit of a generic product and simply do not provide evidence of purported marketplace success.

## XII.    THE SPECIFICATION DOES NOT SUPPORT THE FULL SCOPE OF CLAIMS 4 AND 5 OF THE '804 PATENT, CLAIMS 1 AND 2 OF THE '109 PATENT, AND CLAIM 7 OF THE '637 PATENT

### A.    The Specification of the '840 and '109 Patents Includes Limited *In Vivo* and *In Vitro* Data, and No Clinical Data

430.    The '840 and '109 Patents share a common specification.  That specification does not include any clinical data, let alone any clinical data indicating that (a) the compounds covered by claims 4 and 5 of the '840 Patent are effective at treating each of the five claimed CNS disorders and (b) the compounds covered by claims 1 and 2 of the '109 Patent are effective at treating schizophrenia.

431.    The '840 and '109 Patents disclose six pharmacological tests.  Those tests are described below.

#### 1.    Pharmacological Test 1

##### a.    Dopamine D$_2$ receptor binding assay (in vitro)

432.    The specification discloses a binding assay for the dopamine D$_2$ receptor and

reports the results of the binding assay for 60 of the 197 compounds disclosed in the Compound Patents. (81:40-83:7.)[4] $K_i$ values for those 60 compounds are reported in Table 22. A compound with a lower $K_i$ value is generally considered to be more active.

433. The specification does not disclose the results of the dopamine $D_2$ binding assay for the other 137 disclosed compounds or the millions of compounds that are claimed but not expressly disclosed in the Compound Patents.

b.   Serotonin 5-HT$_{2A}$ receptor binding assay (in vitro)

**434.** The specification discloses a binding assay for the serotonin 5-HT$_{2A}$ receptor and reports the results of the binding assay for 62 of the 197 compounds disclosed in the Compound Patents. (83:7-84:44.) The $K_i$ values for those 62 examples are reported in Table 23.

435. There is a difference between the $K_i$ values of Example 11 ("dihydro-brexpiprazole", 5.7 nM) and Example 12 (the hydrochloride salt of "dihydro-brexpiprazole", 2.1 nM). Normally, a compound and its hydrochloride salt are expected to have similar (if not the same) $K_i$ values. The Compound Patents do not provide any explanation for this difference, and the absence of an explanation would lead a POSA to question the accuracy and reliability of this data.

436. The specification does not disclose the results of the binding assay for the serotonin 5-HT$_{2A}$ receptor for the other 137 disclosed compounds or the millions of compounds that are claimed but not expressly disclosed in the Compound Patents.[5]

---

[4] Each of the Compound Patents share a common specification. Defendants provide citations to the RE'059 Patent specification for ease of reference, but it should be understood that every Compound Patent contains the same disclosure and statements regarding the specification of the RE'059 Patent apply equally to each of the other Compound Patents.

[5] The specification also does not disclose the results of any binding assay for the serotonin 5-HT$_{1A}$ receptor.

c.  Adrenaline α1 receptor binding assay (in vitro)

**437.**  The specification describes a testing protocol for the "adrenalin (sic) α1 receptor binding assay."  (84:45-85:23.)  However, the specification does not disclose which compounds were tested using this assay nor does it disclose the test results for any compounds tested.

### 2.  Pharmacological Test 2 (In Vitro)

438.  The specification describes a test for "partial agonistic activity on dopamine $D_2$ receptor using $D_2$ receptor expression cells."  (85:24-86:13.)  The specification states that "[i]t was confirmed that test compounds had partial agonistic activity for dopamine $D_2$ receptor in the above-described test."  (86:4-6.)  However, the specification does not disclose which compounds were tested nor does it disclose the test results for any compounds tested.

### 3.  Pharmacological Test 3 (In Vivo)

439.  The specification describes a test for "inhibitory effect on apomorphine-induced stereotyped behavior in rats."  (86:14-54.)  The specification states that "[s]ince the test compounds showed inhibitory effect for apomorphine-induced stereotyped behavior, it was confirmed that the test compounds have $D_2$ receptor antagonist effect."  (86:50-53.)  However, the specification does not disclose which compounds were tested nor does it disclose the test results for any compounds tested.

### 4.  Pharmacological Test 4 (In Vivo)

440.  The specification describes a test for "inhibitory effect on (±) D-2,5-dimethoxy-4-iodoamphetamine (DOI) induced head twitch in rats."  (86:54-87:13.)  The specification states that "[s]ince the test compounds showed inhibitory effect for DOI-induced head twitch, it was confirmed that the test compounds have serotonin 5-$HT_{2A}$ receptor antagonistic effect."  (87:10-13.)  However, the specification does not disclose which compounds were tested nor does it disclose the test results for any compounds tested.

### 5.      Pharmacological Test 5 (In Vivo)

441.     The specification describes a test for "catalepsy inducing effect in rats." (87:14-36.) The specification states that "[a]s a result, catalepsy induction effect of a test compound was dissociated from inhibitory effect on apomorphine-induced stereotyped behavior, therefore it was suggested that apprehension for extrapyramidal side effect in clinic would be low." (87:32-36.) However, the specification does not disclose which compounds were tested nor does it disclose the test results for any compounds tested.

### 6.      Pharmacological Test 6 (In Vitro)

442.     The specification describes a test for "serotonin (5-HT) uptake inhibitory activity of a test compound by rat brain synaptosome." (87:37-89:2.) Serotonin uptake inhibitory ratios of 45 of the 197 examples are reported in Table 24. A compound of a higher inhibitory ratio is generally considered to be more active.

443.     The specification does not disclose the serotonin uptake inhibitory activity test results for the other 152 disclosed compounds or any of the millions of compounds that are claimed but not expressly disclosed in the Compound Patents.

### B.      The Claims Are Not Supported by the Specification

444.     As set forth above, the Compound Patents contain data for only approximately 60 of the millions of compounds covered by the claims. Plaintiffs acknowledge this fact but offer no explanation for why a POSA would understand that the named inventors were in possession of a method of using millions of different compounds, when they provide data for just a small fraction of those compounds. This is particularly problematic because Plaintiffs' experts contend that this is an "inherently unpredictable" field and that even minor modifications to a molecule can have a substantial impact on the safety and efficacy of that molecule. Indeed, Plaintiffs' experts opine that testing is required to determine if a drug candidate will be successful. If Plaintiffs' experts

are correct, then a POSA would not understand that the named inventors were in possession of the methods claimed in claims 4 and 5 of the '840 Patent and claim 1 of the '109 Patent.  In addition, claims 1 and 2 of the '109 Patent are invalid for lack of enablement, and claim 7 of the '637 Patent is invalid for lack of written description.

### 1.    C                         P       A   I          L Description

445.    Claim 4 of the '840 Patent is directed to a method of treating one of five CNS disorders (depression, endogenous depression, major depression, melancholy, and refractory depression) by administering a compound selected from a genus comprising millions of individual compounds.  Claim 5 is directed to a method of treating those same five CNS disorders using one of six different compounds.

446.    Claims 4 and 5 of the '840 Patent are invalid because they fail to satisfy the written description requirement.  As discussed above, the '840 Patent specification does not include data (*in vivo, in vitro,* or clinical data) for each and every one of compounds covered by claims 4 and 5.  There is no evidence in the '840 Patent specification that would have led a POSA to understand that (a) the named inventors possessed use of the full scope of the compounds covered by claim 4 for the treatment of the claimed CNS disorders or that (b) the named inventors had reason to believe that the compounds allegedly covered by claims 4 and 5 would be effective at treating each of the five claimed CNS disorders.

447.    First, claim 4 purports to cover millions of compounds, but the '840 Patent contains only non-clinical data for a small portion of the compounds covered by that claim.  There is no *in vivo* or *in vitro* data for the majority of the compounds within the full scope of claim 4 and the specification does not provide any explanation or scientific basis for imputing the results for the tested compounds to the untested compounds.  As a result, the specification does not provide

adequate detail describing how each and every compound covered by claim 4 is effective in treating the claimed types of depression.  As a result, a POSA would not understand that the named inventors had possession of the full scope of the method of claim 4.

448.     Second, claims 4 and 5 purport to cover five different CNS disorders: depression, endogenous depression, major depression, melancholy, and refractory depression.  The '840 Patent, however, does not contain any data or scientific explanation that any, let alone all, of the claimed compounds would be effective at treating each of the five claimed CNS disorders.  While the '840 Patent includes limited *in vivo* and *in vitro* data, there is nothing in the '840 Patent that explains how that data supports a conclusion that the claimed compounds would be effective at treating each of the five claimed CNS disorders.  As a result, the specification does not adequately describe that the compounds covered by claims 4 and 5 are effective in treating each of the five claimed CNS disorders.  As a result, a POSA would not understand that the inventors were in possession of the full scope of claims 4 and 5.

449.     For these reasons, claims 4 and 5 are invalid for lack of written description.

**2.     C                    P       I  I         L                D**

450.     Claim 1 of the '109 Patent is directed to a method for treating schizophrenia by administering a compound selected from a genus comprising millions of individual compounds.

451.     Claim 1 is invalid because it fails to satisfy the written description requirement.  As discussed above, the '109 Patent specification does not include data (*in vivo*, *in vitro*, or clinical data) for each and every one of the compounds covered by claim 1.  There is no evidence in the '109 Patent specification that would have led a POSA to understand that the named inventors possessed use of the full scope of the compounds covered by claim 1 for the treatment of schizophrenia.

452.   Claim 1 purports to cover millions of compounds, but the '109 Patent contains only limited non-clinical data for a small portion (approx. 69) of the compounds purportedly covered by that claim.  There is no *in vivo* or *in vitro* data for the majority of the compounds within the full scope of claim 1 and the specification does not provide any explanation or scientific basis for imputing the results for the tested compounds to the untested compounds.  As a result, the specification does not provide adequate detail describing how each and every compound covered by claim 1 is effective in treating schizophrenia.  As a result, a POSA would not understand that the named inventors had possession of the full scope of the method of claim 1.  For this reason, claim 1 is invalid for lack of written description.

### 3.   C          P   A  I       L       E

453.   Claims 1 and 2 involve treating schizophrenia by administering the compound or its salt to a human **or animal**.  Schizophrenia is not known to occur in animals (other than a human, which are the subject of other claims of the '109 Patent).  It is impossible to treat non-human animals for a condition that does not occur in them.  As a result, the specification does not enable a POSA to practice the full scope of claims 1 and 2 of the '109 Patent.

454.   Plaintiffs concede that a POSA does not diagnose schizophrenia in animals.  It is a logically and medically impossible to treat schizophrenia in an animal unless that animal has been diagnosed as having schizophrenia.  Given Plaintiffs' admission that a POSA does not diagnose schizophrenia in animals, it is therefore impossible to treat schizophrenia in an animal and it is likewise impossible to practice the full scope of the methods described in claims 1 and 2 of the '109 Patent.  Those claims are invalid for lack of enablement.

### 4.   C          P   I  I       L          D    iption

455.   Claim 7 of the '637 Patent is directed to a pharmaceutical composition that contains about 1 mg of brexpiprazole.

456.    The specification of the '637 Patent does not disclose any pharmaceutical compositions that contain about 1 mg of brexpiprazole.  While the '637 Patent discloses a desired range of 1-200 mg of an unnamed "active ingredient compound" ('637 Patent, 19:1-4), there is nothing in the '637 Patent to indicate that the named inventors had reason to believe that the very lowest end of that range—1 mg—was an appropriate amount for any "active ingredient," let alone brexpiprazole.  In particular, there are no examples and there is no test data to show that the inventors contemplated a pharmaceutical composition containing about 1 mg of brexpiprazole or knew that such a composition was possible or desirable.  For this reason, claim 7 of the '637 Patent is invalid for lack of written description.

## FACTS RELATED TO THE '419 PATENT

## I.     THE LEVEL OF ORDINARY SKILL IN THE ART FOR THE '419 PATENT

457.   A POSA to whom the '419 patent is directed would have (i) a Ph.D. in chemistry, biochemistry, medicinal chemistry, pharmacy, pharmaceutics, or a related field, and at least two years of relevant experience in drug development; (ii) a master's degree in the same fields with at least five years of the same relevant experience; or (iii) a bachelor's degree in the same fields with at least seven years of the same relevant experience. The POSA would have been familiar with oral dosage forms and excipients including film coatings. A POSA would have understood that drug formulation development requires a multidisciplinary approach, and would have drawn upon not only his or her own skills, but also could have taken advantage of certain specialized skills of others to solve any particular problem.

## II.    CLAIMS 1-7 OF THE '419 PATENT ARE INVALID

### A.     Claims 1-7 of the '419 Patent Are Invalid as Indefinite

458.   Claims 1-7 of the '419 patent are indefinite because, when viewed in light of the specification and prosecution history, the claims fail to inform a POSA about the scope of the invention within reasonable certainty. Specifically, the specification and prosecution histories fail to inform a POSA what amount, if any, of polyethylene glycol may be present in order to be a "coating [that] substantially does not contain polyethylene glycol." ('419 patent, claim 1.) Similarly, the specification and prosecution histories fail to inform a POSA as to what amount, if any, of polyethylene glycol may be present in a coating mixture in order to be a "coating mixture [that] substantially does not contain polyethylene glycol." ('419 patent, claim 6.)

459.   Claims 1 and 6 do not specify an amount of polyethylene glycol that may be included in the tablet coating and mixture used to apply the tablet coating, respectively. Neither the specification nor the prosecution history provides a POSA with a basis for understanding what

amount of polyethylene glycol, if any, may be present in the coating or coating mixture and still be within the scope of the claims. Thus, claims 1 and 6 fail to inform a POSA with reasonable certainty as to the scope of those claims and are invalid as indefinite. Claims 2-5, which depend from claim 1, and claim 7, which depends from claim 6, are similarly invalid for the same reasons.

**1.      The Specification Does Not Inform a POSA of the Claim Scope With Reasonable Certainty**

460.    The '419 patent specification discloses a coating layer that comprises pharmaceutical additives including for example, polyethylene glycol (macrogol). (See '419 patent at 6:32-43.) The specification goes on further to note that:

> [W]hen polyethylene glycol (macrogol) exists in the coating layer, the obtained tablet tends to have reduced photostability and storage stability. Therefore, it is more preferable if polyethylene glycol (macrogol) is substantially not contained.

('419 patent at 6:44-51 (emphasis added).)

461.    Other than the examples identified below, the above excerpt is the only statement in the specification about the presence (or absence) of polyethylene glycol in the coating layer. The plain meaning of "exists" requires a measurable amount of polyethylene glycol to be present. The specification provides no reason for a POSA to depart from the plain meaning of "exists." Additionally, in discussing the amount of polyethylene glycol that may be present, the specification fails to provide a POSA with any guidance as to what minimal amount of polyethylene glycol is considered to be "exist[ing]" as opposed to "substantially not contained."

462.    Further, the above excerpt is seemingly contradictory. It first states that where polyethylene glycol merely exists in the coating there can be reduced photostability and storage stability. However, the next sentence suggests that there is some non-zero amount of polyethylene glycol (i.e., an amount considered to be substantially not contained) that is acceptable that does not have reduced photostability and storage stability.

463.    The examples within the specification disclose only two possibilities—either 0% or 10% w/w polyethylene glycol. (*See* '419 patent at 12:13-19 (Table 3), 14:1-24 (Table 7).) A POSA would understand the specification to support that 0% w/w polyethylene glycol in the coating layer "substantially does not contain" PEG while 10% w/w polyethylene glycol in the coating layer would "exist" in the formulation and fall outside of "substantially . . . not contain[ing]" PEG. But there is no disclosure within the '419 patent of a tablet coating having an intermediate amount of polyethylene glycol between 0% and 10% w/w, let alone such an example that is described as "substantially does not contain" polyethylene glycol.

464.    This deficiency is not resolved by reading the claim as allowing polyethylene glycol in the claimed coating as long as the photostability of the tablet is maintained.

465.    For example, Table 3, depicted below, discloses three examples of coated tablets containing 10% w/w of polyethylene glycol (shown as Macrogol 6000 below).

TABLE 3

| Components (mg) | Example 2-1 | Example 2-2 | Example 2-3 |
|---|---|---|---|
| Uncoated tablet | Example 1-1 | Example 1-2 | Example 1-3 |
| Weight of uncoated tablet (mg) | 100.0 | 100.0 | 100.0 |
| Coating layer (mg) | | | |
| Hypromellose | 2.07 | 2.07 | 2.07 |
| Macrogol 6000 | 0.30 | 0.30 | 0.30 |
| Talc | 0.30 | 0.30 | 0.30 |
| Titanium oxide | 0.30 | 0.30 | 0.30 |
| Yellow ferric oxide | 0.03 | 0.03 | 0.03 |
| Weight of coating layer (mg) | 3.0 | 3.0 | 3.0 |
| Weight of coated tablet (mg) | 103.0 | 103.0 | 103.0 |

('419 patent at 12:13-29.)

466.    According to the specification, stability tests were performed on these coated tablets under "storage conditions of light irradiation (visible light; total illuminance of $1.8 \times 10^6$

lux·hr; ultraviolet light: total intensity of 300 W·hr/m$^2$) and a closed system at 40° C (sealed bottles for one month and three months)." ('419 patent at 12:56-64.) The results of those stability tests are depicted below in Table 5.

TABLE 5

| | Example No. | | | | | |
|---|---|---|---|---|---|---|
| | 1-1 | 1-2 | 1-3 | 2-1 | 2-2 | 2-3 |
| | Contents of Compound (I) (%, n = 3) | | | | | |
| Initial | 98.1 | 99.4 | 99.7 | 99.6 | 101.5 | 101.9 |
| Light irradiation | 98.3 | 99.3 | 99.8 | 100.0 | 101.7 | 102.3 |
| 40° C. - 1 month | 99.6 | 101.4 | 100.8 | 102.2 | 103.5 | 103.4 |
| 40° C. - 3 months | 98.0 | 100.5 | 100.0 | 100.1 | 102.8 | 103.5 |
| | Content of impurity (%, n = 1) | | | | | |
| Initial | 0.365 | 0.362 | 0.371 | 0.373 | 0.367 | 0.374 |
| Light irradiation | 0.662 | 0.634 | 0.592 | 0.477 | 0.500 | 0.463 |
| 40° C. - 1 month | 0.354 | 0.78 | 0.376 | 0.370 | 0.393 | 0.411 |
| 40° C. - 3 months | 0.409 | 0.373 | 0.401 | 0.385 | 0.409 | 0.419 |

('419 patent at 13:1-23.) As noted in Table 3, tablets of Example Nos. 2-1, 2-2, and 2-3 contain 10% w/w polyethylene glycol.

467. A POSA would understand the above Table 5 to be the Applicant's support for the specification's assertion that when polyethylene glycol exists in the coating, the tablets tend to have reduced photostability and storage stability. (See '419 patent at 6:46-49.) A POSA would further understand that the uncoated tablets (i.e., examples 1-1, 1-2, and 1-3) also tend to have reduced photostability and storage stability.

468. However, nothing in the above tables, or the specification more generally, informs a POSA of an acceptable amount between 0% and 10% w/w of polyethylene glycol to be included

in the coating. Nor is there any disclosure of what amount of impurity is acceptable such that there is no reduction in the desired photostability and storage stability. A POSA would thus not be able to ascertain what amount of polyethylene glycol, between 0% and 10% w/w, would not lead to a reduction in the desired photostability and storage stability. Accordingly, a POSA would not be able to ascertain what amount of polyethylene glycol, between 0% and 10% w/w, is considered to be "substantially not contained."

469.    The specification describes a second set of examples and stability testing similar to those seen in Tables 3 and 5 above. As shown below in Table 7, Example Nos. 3-2, 3-4, 3-6, and 3-8 contain 10% w/w of polyethylene glycol; while examples 3-3, 3-5, 3-7, and 3-9 include coatings that contain 0% w/w polyethylene glycol.

TABLE 7

| | Example No. | | | | | | | |
| | 3-2 | 3-3 | 3-4 | 3-5 | 3-6 | 3-7 | 3-8 | 3-9 |
|---|---|---|---|---|---|---|---|---|
| Uncoated tablet Weight of uncoated tablet (mg) Coating layer (mg) | | | | Example 3-1 90.0 | | | | |
| Hypromellose | 1.8 | 2.1 | 1.8 | 2.1 | 1.8 | 2.1 | 1.8 | 2.1 |
| Macrogol 6000 | 0.3 | — | 0.3 | — | 0.3 | — | 0.3 | — |
| Talc | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| Titanium oxide | 0.6 | 0.6 | 0.54 | 0.54 | 0.54 | 0.54 | 0.54 | 0.54 |
| red ferric oxide | — | — | 0.06 | 0.06 | — | — | — | — |
| Yellow ferric pride | — | — | — | — | 0.06 | 0.06 | — | — |
| Food blue No. 2 Aluminum lake (3-5%) | — | — | — | — | — | — | 0.06 | 0.06 |
| Weight of coat layer (mg) | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| Weight of coated tablet (mg) | 93.0 | 93.0 | 93.0 | 93.0 | 93.0 | 93.0 | 93.0 | 93.0 |

('419 patent at 14:1-24.)

470.    According to the specification, stability testing of the above examples was done

204

"under the storage conditions of light irradiation (visible light; total illuminance of $1.8 \times 10^6$ lux·hr;

ultraviolet light: total intensity of 300 W·hr/m$^2$) and an open system at 40° C/75% RH (three

months, six months)." ('419 patent at 14:25-34.) These stability tests differ from those reported in

Table 5 only in that an open system test was run as opposed to a closed system.[6] Table 8, shown

below, describes the results of this stability testing.

| | | Example No. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 | | 3-1 | 3-2 | 3-3 | 3-4 | 3-5 | 3-6 | 3-7 | 3-8 | 3-9 |
| | | (Content of Impurity: %, n = 1) | | | | | | | | |
| | Initial | 0.687 | 0.772 | 0.773 | 0.683 | 0.713 | 0.677 | 0.805 | 0.951 | 0.909 |
| | Light irradiation | 4.142 | 2.069 | 1.469 | 1.401 | 0.676 | 1.493 | 0.675 | 2.573 | 1.186 |
| 45 | 40° C./ 75% RH - 3 months | 0.980 | 1.820 | 0.900 | 1.613 | 1.093 | 1.483 | 1.112 | 2.055 | 1.393 |
| 50 | 40° C./ 75% RH - 6 months | 1.140 | 2.264 | 1.672 | 2.232 | 1.232 | 1.766 | 1.247 | 2.130 | 1.783 |

('419 patent at 14:37-52.)

471.    As with the first stability tests described above, a POSA would understand the

stability tests reported in Table 8 to support the specification's assertion that when polyethylene

glycol "exists" in the coating, for example in an amount of 10% w/w polyethylene glycol (i.e.,

examples 3-2, 3-4, 3-6, and 3-8), the tablets tend to have reduced photostability and storage

stability. And likewise, that the 0% w/w polyethylene glycol examples (i.e., 3-3, 3-5, 3-7, and 3-9)

avoid a reduction in photostability and storage stability, and therefore meet the objective of the

---

[6] A POSA would also note the wide range of initial impurities reported in Tables 5 and 8. For example, the initial impurities reported in Table 5 range from 0.365%-0.374%, while the initial impurities in Table 8 range from 0.683%-0.909%. Not only is there a stark difference between the initial impurities reported in each table, there is also a wide differential (about a 40% variation) between the initial impurities in Table 8.

claimed invention. However, similar to the first stability tests, the stability tests reported in Table 8 do not disclose whether there is any acceptable amount of polyethylene glycol between 0% and 10% w/w that can be included in a tablet coating that still "has excellent . . . storage stability and photostability." ('419 patent, Abstract.)

472.    Moreover, a POSA would have several concerns about the sufficiency of the disclosures concerning the stability tests.[7] First, a POSA would not know what impurity the Applicant of the '419 patent was investigating as the specification does not identify which impurity is observed during the test, or if there is more than one impurity. Second, there is no discussion of what amount of the unnamed impurity is acceptable so as to not reduce the desired photostability and storage stability. Third, a POSA would not know what test method, i.e., HPLC, was used to perform the analysis, nor if the method was validated (i.e., accurate and precise). Finally, in reviewing the results discussed above, a POSA would have concerns about making any conclusions about these results because the sample size is limited to 1 and fails to identify which impurity is being observed. Accordingly, a POSA would not be able to replicate the storage stability or photostability tests disclosed in the '419 patent.

473.    The examples disclosed in the specification do not provide a POSA with the information to ascertain what amount of polyethylene glycol, if any, that can be considered to be "substantially not contained" in the coating below 10% w/w. Ultimately, the specification fails to provide a POSA with any guidance as to what amount of polyethylene glycol, if above 0% w/w,

---

[7] For example, WO 2007/065448 ("WO '448") includes the types of information a POSA would expect to be disclosed with respect to stability tests, including identification of the impurities and information concerning the HPLC methodology. (WO '448 at 18.) WO '448 supports the POSA's expectation that there would be an unknown maximum amount of PEG between 0 and 10 % w/w in the claimed formulation of the '419 patent that does not result in reduced photostability and storage stability.

allows for "excellent disintegration ability, storage stability, and photostability"—the alleged object of the alleged invention, except that 10% w/w polyethylene glycol (or more) present in the coating does not do so. ('419 patent at 1:44-47.)

474.    Further, the specification's use of the terms "excellent" to describe the claimed disintegration ability, storage stability, and "high" to describe the claimed photostability of the alleged invention does not provide a POSA with any practical measurement as to either the storage stability or photostability of the alleged invention. ('419 patent at Abstract, 3:9-11, 15:23-25.) A POSA would look for a level of impurity that has been deemed acceptable. The '419 patent does not provide a POSA with that guidance. Rather, the '419 patent provides a POSA with the subjective terms "excellent" and "high" which do not quantify stability in a way that a POSA could use to ascertain the claim scope.

## 2.    The Prosecution History Does Not Inform the POSA of the Scope of the Claim with Reasonable Certainty

475.    The prosecution history also does not provide a POSA with any certainty as to the scope of the claims. During the prosecution of the '419 patent, the Applicant distinguished the 0% w/w polyethylene glycol coating from the 10% w/w polyethylene glycol coating identified in the specification to overcome a prior art rejection. (*See* '419 Pros. His., 4/3/2018 Amendment at 7-8; *see also id.*, 1/16/2019 Amendment at 8-12.) This information simply confirms what a POSA would have already known from the specification. Namely that while 0% w/w of polyethylene glycol in the coating is within the claims, 10% w/w of polyethylene glycol in the coating is not.

476.    The Applicant distinguished the claims from the '362 patent during prosecution. The '362 patent discloses a coating having approximately ~5.7% polyethylene glycol. (*See* '419 Pros. Hist., 1/16/2019 Amendment at 6-12.) In distinguishing the claims from the ~5.7% polyethylene glycol disclosed in the '362 patent, and therefore informing the Patent Office and public of their position

that ~5.7% polyethylene glycol is excluded from the claims, the Applicant did not provide any information to the Patent Office evidencing the effect that amount of polyethylene glycol (~5.7%) had on the photostability and storage stability of the prior-art tablets. Nor does the '362 patent provide a POSA with an understanding of how the ~5.7% polyethylene glycol affected photostability and storage stability. In other words, while a POSA would understand the Applicant considered ~5.7% w/w to be outside of the scope of its claimed coatings, a POSA would have no understanding of why. Accordingly, the prosecution history does not provide a POSA with any additional information to ascertain the scope of the claims, except Applicant's position that the amount of polyethylene glycol permitted is somewhere below ~5.7%.

477.    The term "substantially does not contain polyethylene glycol" would not have a "plain and ordinary meaning" to a POSA. Rather, a POSA would understand from the specification that the inventors of the '419 patent were concerned with the photostability and storage stability of the claimed invention. A POSA would then consider "substantially does not contain polyethylene glycol" to mean a specific amount of polyethylene glycol, i.e., a range consisting of no polyethylene glycol at all to some specific detectable amount below 10%. However, a POSA would not be able to ascertain what that amount of polyethylene glycol is because as described above, the '419 patent specification does not provide any definition as to what level of impurity is acceptable below 10% to maintain the desired photostability and storage stability, nor does it identify the impurity observed.

478.    The intrinsic record of the '419 patent is missing crucial information that is necessary for a POSA to ascertain the scope of the claims. A POSA would not have a reasonable certainty, because of the deficiencies described above, of what amount of polyethylene glycol in the coating is within the scope of the claims, other than the fact that Applicant believed the amounts

of ~5.7% are excluded.

**B.**     **Claims 1-          P        I        L              D          **

479.     As described above, the claims of the '419 patent recite or incorporate by claim dependency that "the coating substantially does not contain polyethylene glycol." However, as discussed above with respect to the claims being indefinite, the specification does not describe what amount of polyethylene glycol in the coating is considered to be "substantially not contained."

480.     As discussed above, the specification states only the following with respect to polyethylene glycol in the coating layer:

> when polyethylene glycol (macrogol) *exists* in the coating layer, the obtained tablet tends to have reduced photostability and storage stability. Therefore, it is more preferable if polyethylene glycol (macrogol) is *substantially not contained.*

('419 patent at 6:44-51 (emphasis added).)

481.     The specification therefore does not describe what "substantially does not contain" means, except to tie this vague, undefined quantity to photostability and storage stability. As discussed above, the specification fails to describe what amount of impurity is acceptable so as to not reduce the photostability and storage stability of the claimed invention.

482.     The examples in the specification only identify formulations with either 0% or 10% w/w of polyethylene glycol. The specification and prosecution history make clear that the Applicant did not consider 10% w/w of polyethylene glycol to be within the claimed invention as that amount of polyethylene glycol was seen to reduce the photostability and storage stability, but did consider 0% w/w of polyethylene glycol to be within the claimed invention as it did not reduce the photostability and storage stability. However, as described above with respect to the claims being indefinite, nothing in the examples, nor the specification at large, disclose a formulation that

"substantially does not contain polyethylene glycol." Therefore the specification of the '419 patent fails to reasonably convey to a POSA that the inventors were in possession of a tablet where the "coating substantially does not contain polyethylene glycol."

**EXHIBIT 5**

████████████████████

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD. and H. LUNDBECK A/S, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 19-cv-1938-LPS (consolidated) |
| ZENARA PHARMA PRIVATE LTD., et al. | ) ) | ████████████████████ |
| Defendants. | ) ) ) | |

**PLAINTIFFS' CONTESTED FACTS REGARDING VALIDITY**

# EXHIBIT 5

## Table of Contents

I.    The Brexpiprazole Patents Are Not Invalid........................................................ 2

    A.    The Level of Ordinary Skill in the Art........................................................ 2

    B.    Technical Background ................................................................................. 3

        1.    The Brexpiprazole Patents and Asserted Claims ........................... 3

        2.    Schizophrenia, Major Depressive Disorder, and the
            Neuropharmacology Associated with Them............................. 20

        3.    Atypical Antipsychotics and Treatments for Depression ........................ 26

        4.    Contemporaneous Drug Discovery Efforts.................................... 33

        5.    Overview of Medicinal Chemistry and Unpredictability of
            Chemical Modifications.............................................................. 37

    C.    REXULTI® and Its Development ........................................................ 43

    D.    The Asserted Documents .......................................................................... 46

        1.    Patents and Publications ............................................................... 46

        2.    Other Documents ......................................................................... 59

    E.    The Prior Art Does Not Render Any of the Asserted Claims of the
       Brexpiprazole Patents Obvious.................................................................. 68

        1.    The Focus on Aripiprazole Is Too Narrow ............................... 68

        2.    A POSA Would Not Have Selected Dehydroaripiprazole as a Lead
            Compound.................................................................................. 78

        3.    The Ideal Receptor Profile Was Not Known ........................... 87

        4.    A POSA Would Not Have Replaced the 2,3, Dichlorophenyl
            Piperazine Moiety of Aripiprazole and/or Dehydroaripiprazole
            with a 4-Benzothiophene Group .............................................. 97

        5.    WO '864 Does Not Support Replacing the 2,3-Dichlorophenyl of
            Aripiprazole and/or Dehydroaripiprazole with a 4-Benzothiophene
            Group ........................................................................................ 123

        6.    A POSA Would Not Have Been Motivated to Introduce a Double
            Bond in Aripiprazole................................................................. 126

**EXHIBIT 5**

7.   Bioisosterism Provides Neither Motivation Nor a Reasonable Expectation of Success to Arrive at Brexpiprazole ................................. 132

8.   A POSA Would Not Have Reasonably Expected to Make an Improved Antipsychotic Based on the Asserted Documents.................. 134

9.   Defendants' Combinations Would Not Have Directed a POSA to Arrive at Brexpiprazole.................................................................... 135

10.  The Process Claims 9, 14 and 15 of the RE'059 Patent Are Not Obvious ................................................................................................. 142

11.  Pharmaceuticals Composition Claims 1 and 2 of the '840 Patent and Claims 1 and 3-8 of the '637 Patent Are Not Obvious .................... 142

12.  Method of Treatment Claims 4 and 5 of the '840 Patent, 1 and 2 of the '109 Patent and 9 and 10 of the '637 Patent Are Non-Obvious ....... 143

F.   The Specifications Fully Support and Enable the Asserted Claims ................. 144

1.   Claims 4 and 5 of the '840 Patent Have Sufficient Written Description ............................................................................................ 144

2.   Claims 1 and 2 of the '109 Patent Have Sufficient Written Description and Are Fully Enabled.......................................................... 149

3.   Claim 7 of the '637 Patent Has Sufficient Written Description ............. 151

II.  The '419 Patent Is Not Invalid........................................................................ 151

A.   The '419 Patent ........................................................................................ 151

B.   The '419 Patent Prosecution History ....................................................... 155

C.   The '419 Patent Claims Are Not Indefinite .............................................. 171

D.   The '419 Patent Claims Do Not Lack Written Description Support ................. 175

III. Objective Evidence Demonstrates the Non-obviousness of Brexpiprazole ................... 176

A.   There is a Nexus Between REXULTI® and the Claimed Inventions ................. 176

B.   Failure of Others and Unpredictability in the Art ................................................ 181

C.   Brexpiprazole's Unique Clinical Profile Satisfied Multiple Long-Felt but Unmet Needs.......................................................................................... 193

1.   Need to Further Reduce Adverse Side Effects ....................................... 203

## EXHIBIT 5

2.     Cognitive Effects and Functioning ........................................ 205

3.     Potential to Treat Additional Major Mental Illnesses............................ 207

D.     Brexpiprazole's Unique Pharmacological Profile Led to Unexpected Clinical Benefits that Have Real-World Consequences and Have Received Industry Praise ...................................................................... 210

1.     Brexpiprazole unexpectedly improved cognitive effects and functioning ............................................................ 213

2.     Brexpiprazole results in a new effect:  brightening ................................ 217

3.     Brexpiprazole also has an unexpectedly better side effect profile.......... 222

4.     Brexpiprazole's unexpected clinical profile has real-world implications............................................................ 228

E.     Copying.................................................................... 231

F.     Commercial Success ...................................................... 234

1.     Marketplace Success ..................................................... 234

G.     Brexpiprazole is Not Substantially Similar to Aripiprazole ............................. 314

## EXHIBIT 5

1.      Pursuant to Local Rule 16.3(c)(4), Plaintiffs identify the following issues of fact that remain to be litigated and summarize what they intend to prove to support their claims and defenses.  The following statements are not exhaustive, and Plaintiffs reserve the right to prove any matters identified in its pleadings, interrogatory responses, and/or expert reports.

2.      Plaintiffs reserve the right to modify or amend this Statement to the extent necessary to reflect any future rulings by the Court and to supplement or amend this Statement to respond to any new issues that Defendants may raise.  To the extent Plaintiffs' Statement of Issues of Law, submitted as Exhibit 6, contains issues of act, those issues are incorporated herein by reference.  Moreover, if any issue of fact identified below should properly be considered an issue of law, then such statement shall be considered a part of Plaintiffs' Statement of Issues of Law.

3.      Plaintiffs' citations to the record are exemplary, and Plaintiffs reserve their right to introduce additional evidence in support of the facts set forth below.  Plaintiffs' further reserve the right to introduce evidence pertaining to any fact set forth in Defendants' Statement of Contested Facts, pertaining to any fact relating to the legal issues set forth in the parties' Statements of Legal Issues, or pertaining to any fact newly-raised at trial by Defendants.

4.      Plaintiffs object to Defendants' Statement of Contested Facts (Exhibits 2 and 3) to the extent it raises documents and arguments not previously presented in this litigation.

5.      Plaintiffs object to any attempt by Defendants to introduce any fact at trial not included in their Statement of Contested Facts and/or Issues of Law (Exhibits 2, 3 and 7).

6.      The present litigation concerns Plaintiffs' allegations of infringement by Defendants of the RE'059, '840, '109, '637, and '419 patents (collectively, "the asserted patents").  Each defendant submitted an ANDA seeking to market generic versions of Plaintiffs' REXULTI®

**EXHIBIT 5**

product prior to the expiration of the asserted patents.  Defendants cannot show by clear and convincing evidence that any of the asserted patent claims are invalid.

7.     Specifically, regarding the RE'059, '840, '109 and '637 patents (collectively, "the brexpiprazole patents") Defendants MSN, Optimus and Zenara have asserted that certain claims of these patents are allegedly invalid as obvious, as lacking written description support, and/or lacking enablement.  Defendants have not met their burden of proving invalidity as to any of these claims.

8.     Regarding the '419 patent, Defendants Apotex, MSN, Optimus and Zenara have asserted that the asserted claims of the '419 patent are allegedly invalid as indefinite and/or lacking written description support.  Defendants have not met their burden of proving invalidity as to any of these claims.

## I.     THE BREXPIPRAZOLE PATENTS ARE NOT INVALID

### A.     The Level of Ordinary Skill in the Art

9.     U.S. Patent Nos. RE48,059 ("the RE'059 patent"), 8,349,840 ("the '840 patent"), 8,618,109 ("the '109 patent"), and 9,839,637 ("the '637 patent"), collectively referred to as the "brexpiprazole patents," all belong to the same patent family and share a similar disclosure.  The priority date of the brexpiprazole patents is April 14, 2005.

10.     The brexpiprazole patents relate to novel heterocyclic compounds that have a wide treatment spectrum for mental disorders with few side effects and a favorable safety profile.  RE'059 patent at Abstract.  The claims of these patents are directed to compounds, pharmaceutical formulations, and methods of treatment.

11.     A POSA developing antipsychotic compounds as of April 14, 2005, would have had an advanced degree, at least an M.S. degree but more likely a Ph.D., in organic chemistry,

**EXHIBIT 5**

medicinal chemistry, pharmacy, medicine, pharmacology, or a related discipline.  The POSA also

would have had several years of post-doctoral experience and/or experience at a pharmaceutical

company or research institution developing drug candidates.  The POSA also would have had a

strong understanding of the complex pharmacology associated with central nervous system

("CNS") disorders.

       **B.**    **Technical Background**

            **1.**    **The Brexpiprazole Patents and Asserted Claims**

12.    The brexpiprazole patents include claims directed to heterocyclic compounds,

including brexpiprazole, pharmaceutical compositions comprising heterocyclic compounds,

including brexpiprazole, and methods of treating certain disorders by administering the

heterocyclic compounds, including brexpiprazole.[1]    The patents state that the disclosed

heterocyclic compounds were the result of "intensive studies" seeking an "antipsychotic drug

which has a wider treatment spectrum, less side effects and excellent tolerability and safety."

PTX0006, RE'059 patent at 2:19-24.

13.    The specification further states that "[t]he compound of the present invention has

$D_2$ receptor partial agonistic effect, $5\text{-}HT_{2A}$ receptor antagonistic effect and serotonin uptake

inhibitory effect." PTX0006, RE'059 patent at 18:31-34.  "The $D_2$ receptor partial agonist effect,"

the specification states, "suppresses dopaminergic (DA) neurotransmission when it is enhanced,

and accelerates the DA neurotransmission when it is lowered and thus has a function to stabilize

the DA neurotransmission to a normal state (dopamine system stabilizer)."  PTX0006, RE'059

patent at 18:35-39.  Accordingly, "improving effect on positive and negative symptoms, improving

---

[1] Because the patents belong to the same family and because their specifications are similar,
citations are only to the RE'059 patent in this section.

## EXHIBIT 5

effect on cognitive impairment, improving effect on depressive symptom, etc. are developed

without developing side effects."  PTX0006, RE'059 patent at 18:43-45.  The patents also explain

that "5-HT$_{2A}$ receptor antagonist effect reduces extrapyramidal side effects, develops superior

clinical effects, and is effective for improvement of negative symptoms, improvement of cognitive

impairment, improvement of depression condition, improvement of insomnia, for example."

PTX0006, RE'059 patent at 18:51-55.  The specification likewise notes that "[s]erotonin uptake

inhibitory effect (or serotonin reuptake inhibitory effect) is effective for improving depressive

symptoms, for example."  PTX0006, RE'059 patent at 18:63-65.  "Accordingly," the specification

explains, "the compounds of the present invention are extremely effective for the treatment or

prevention of central nervous system disorders including . . . schizophrenia . . . [and] . . . major

depression." PTX0006, RE'059 patent at 19:13-48.  The compounds of the invention may also

possess $\alpha_1$ receptor antagonist activity, which is identified as potentially having an effect on

positive symptoms of schizophrenia.  PTX0006, RE'059 patent at 7:19-24; 19:4-9.

14.     The specification discloses several preferred compounds and salts thereof, many

example compounds and salts thereof, syntheses of preferred and example compounds and

syntheses of salts of the preferred and example compounds across 197 examples.  PTX0006,

RE'059 patent at Examples 1-197.

15.     Otsuka and Lundbeck have asserted at least one of claims 1, 2, 3, 7, 9, 12, 13, 14

and 15 of the RE'059 patent against MSN, Optimus and Zenara.  These claims are listed below.

Claim 1: A heterocyclic compound represented by the formula (1):

**EXHIBIT 5**



[wherein ring Q represented by



represents –NH–CH$_2$–, –N=CH–, –CH$_2$–NH– or –CH=N–; and the carbon-carbon bond ┄┄ between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond); the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, a saturated 3- to

8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group; R$_2$ represents a hydrogen atom or a lower alkyl group; and A represents –O–A$_1$– (wherein A$_1$ represents an alkylene group which may be substituted with a hydroxy group (wherein one oxygen atom may replace a carbon of the alkylene chain) or a lower alkenylene group) or a lower alkylene group; provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:

**EXHIBIT 5**



(wherein the carbon-carbon bond ----- represents a single bond or a double bond)] or a salt thereof.

Claim 2: The heterocyclic compound of the formula (1) according to claim 1, wherein the ring Q represents a bicyclic group selected from the group consisting of:



(wherein the carbon-carbon bond ----- between the 3-position and 4-position of the bicyclic heterocyclic skeleton represents a single bond or a double bond); the ring Q may have 1 to 3 substituents selected from

the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, a phenyl group, a phenyl lower alkyl group, a naphthyl lower alkyl group, a phenyl lower alkoxy group, a naphthyl lower alkoxy group, a benzoyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cyclo $C_3$-$C_8$ alkyl group, a cyclo $C_3$-$C_8$ alkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy

6

**EXHIBIT 5**

lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group and a saturated 5- to 6-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group; and A represents –O–$A_1$– (wherein $A_1$ represents a $C_1$-$C_6$ alkylene group which may be substituted with a hydroxy group (wherein one oxygen atom may replace a carbon of the alkylene chain)), or a salt thereof.

Claim 3: The heterocyclic compound of the formula (1) according to claim 2, wherein the ring Q represents a bicyclic group selected from the group consisting of:



the ring Q may have 1 to 3 substituents selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, a phenyl group, a phenyl lower alkyl group, a naphthyl lower alkyl group, a phenyl lower alkoxy group, a naphthyl lower alkoxy group, a benzoyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cyclo $C_3$-$C_8$ alkyl group, a cyclo $C_3$-$C_8$ alkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a phenyl group, a thienyl group and a pyrrolidinyl lower alkyl group; and A represents –O–$A_1$– (wherein $A_1$ represents a $C_1$-$C_6$ alkylene group which may be substituted with a hydroxy group (wherein one oxygen atom may replace a carbon of the alkylene chain)), or a salt thereof.

Claim 7: The heterocyclic compound of the formula (1) according to claim 3 selected from the group consisting of: (1) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one, (2) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxyl-1H-quinolin-2-one, (3) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxy]-3;4-dihydro-lH-quinolin-2-one, (4) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-3,4-dihydro-1H-quinolin-2-one, (5) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-l-methyl-3,4-dihydro-lH-quinolin-2-one and (6) 6-[3-(4-

7

**EXHIBIT 5**

benzo[b]thiophen-4-yl-piperazin-1-yl)propoxy]-3,4-dihydro-1H-quinolin-2-one; or a salt thereof.

Claim 9: A process for producing a heterocyclic compound represented by the formula (1):



[wherein ring Q represented by



represents $-NH-CH_2-$, $-N=CH-$, $-CH_2-NH-$ or $-CH=N-$; and the carbon-carbon bond ----- between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond); the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, a saturated 3- to 8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group; $R_2$ represents a hydrogen atom or a lower alkyl group; and A represents $-O-A_1-$ (wherein $A_1$ represents an alkylene group which may be substituted with a hydroxy group (wherein one oxygen atom may replace a

8

### EXHIBIT 5

carbon of the alkylene chain) or a lower alkenylene group) or a lower alkylene group; provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:



(wherein the carbon-carbon bond ----- represents a single bond or a double bond)] or a salt thereof, characterized by comprising a reaction of a compound represented by the formula:



(wherein the ring Q and A are the same as defined above, and $X_1$ represents a halogen atom or a group which causes a substitution reaction the same as in a halogen atom) or a salt thereof with a compound represented by the formula:



(wherein $R_2$ is the same as defined above) or a salt thereof.

*Claim 12: The heterocyclic compound according to claim 7, which is 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-IH-quinolin-2-one or a salt thereof.*

9

# EXHIBIT 5

*Claim 13: The heterocyclic compound according to claim 12, which is      7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one.*

*Claim 14: The process according to claim 9, wherein the process produces     7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof.*

*Claim 15: The process according to claim 14, wherein the process produces     7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one.*

PTX0006, RE'059 patent at Claims 1, 2, 3, 7, 9, 12, 13, 14 and 15.

16.    Otsuka and Lundbeck have also asserted at least one of claims 1, 3, 4, 5, 6, 7, 8, 9 and 10 of the '637 patent against MSN, Optimus and Zenara.  These claims are listed below.

Claim 1: A pharmaceutical composition comprising a heterocyclic compound or a salt thereof represented by formula (1):



wherein ring Q is a bicyclic group selected from the group consisting of:



wherein the ring Q may have 1 to 3 substituents selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, a phenyl group, a phenyl lower alkyl group, a naphthyl lower alkyl group, a phenyl lower alkoxy group, a naphthyl lower alkoxy group, a benzoyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cyclo

10

**EXHIBIT 5**

$C_3$-$C_8$ alkyl group, a cyclo $C_3$-$C_8$ alkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, and a pyrrolidinyl lower alkyl group; $R_2$ represents a hydrogen atom or a lower alkyl group; and A represents –O–$A_1$–, wherein A1 is a $C_1$-$C_6$ alkylene group; and a pharmaceutically acceptable carrier.

Claim 3: A pharmaceutical composition comprising 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-  2-one and a pharmaceutically acceptable carrier.

Claim 4: The pharmaceutical composition according to claim 3, wherein the 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-lH-quinolin-2-one is present in the pharmaceutical composition in an amount ranging from 1% to 70% by weight.

Claim 5: The pharmaceutical composition according to claim 3, wherein the 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-lH-quinolin-2-one is present in the pharmaceutical composition in an amount ranging from 1% to 30% by weight.

Claim 6: The pharmaceutical composition according to claim 3, wherein the composition contains from 1 mg to 200 mg of 7-[4-( 4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy ]-lH- quinolin-2-one.

Claim 7: The pharmaceutical composition according to claim 3, wherein the composition contains about 1 mg of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]- lH-quinolin-2-one.

Claim 8: The pharmaceutical composition according to claim 6, wherein the pharmaceutical composition is in the form of a tablet.

Claim 9: A method for treating major depression comprising administering a pharmaceutical composition according to claim 3.

Claim 10: A method for treating schizophrenia comprising administering a pharmaceutical composition according to claim 3.

PTX0004, '637 Patent at Claims 1, 3, 4-10.

17.     Plaintiffs also assert claims 1, 2, 4 and 5 of the '840 patent against MSN, Optimus and Zenara.  These claims are reproduced below:

## EXHIBIT 5

Claim 1: A pharmaceutical composition comprising a heterocyclic compound of the formula (1) or a salt thereof as an active ingredient and a pharmaceutically acceptable carrier:

(1)



wherein ring Q represented by



represents



wherein



represents –NH–CH$_2$–, –N=CH–, –CH$_2$–NH– or –CH=N–; and the carbon-carbon bond $\overline{- - - - -}$ between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond; the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl

12

**EXHIBIT 5**

group which may have a lower alkyl group, a thienyl group, a saturated 3- to 8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group; $R_2$ represents a hydrogen atom or a lower alkyl group; and A represents –O–$A_1$– (wherein A1 represents an alkylene group which may be substituted with a hydroxy group (wherein the one oxygen atom may replace a carbon of the alkylene chain) or a lower alkenylene group) or a lower alkylene group; provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:



wherein the carbon-carbon-bond ------ represents a single bond or a double bond.

Claim 2: A pharmaceutical composition comprising a heterocyclic compound or a salt thereof selected from the group of: (1) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one, (2) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxy]-1H-quinolin-2-one, (3) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxy]-3,4-dihydro-lH-quinolin-2-one, (4) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-3,4-dihydro-lH-quinolin-2-one, (5) 7-[4-(4-benzo[b ]thiophen-4-yl-piperazin-1-yl)butoxy]-1-methyl-3,4-dihydro-lH-quinolin-2-one and (6) 6-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxy]-3,4-dihydro-lH-quinolin-2-one; or a salt thereof, as an active ingredient and a pharmaceutically acceptable carrier.

Claim 4: A method for treating a central nervous system disorder selected from depression, endogenous depression, major depression, melancholy and refractory depression comprising administering a heterocyclic compound represented by the formula (1) or a salt thereof to a human or animal:

## EXHIBIT 5

wherein ring Q represented by



represents

wherein

represents –NH–CH$_2$–, –N=CH–, –CH$_2$–NH– or –CH=N–; and the carbon-carbon bond ·····between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond; the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, a saturated 3- to 8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group; R$_2$ represents a hydrogen atom or a lower alkyl group; and A represents –O–A$_1$– (wherein A$_1$ represents an alkylene group which may be substituted with a hydroxy group (wherein the one oxygen atom may replace a carbon of the alkylene chain) or a lower alkenylene group) or a lower alkylene group; provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:

**EXHIBIT 5**



wherein the carbon-carbon-bond ‑‑‑‑ represents a single bond or a double bond.

Claim 5: The method according to claim 4, wherein the heterocyclic compound or a salt thereof is selected from the group of: (1) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one, (2) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)propoxy]-1H-quinolin-2-one, (3) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)propoxy]-3,4-dihydro-lH-quinolin-2-one, (4) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)butoxy]-3,4-dihydro-lH-quinolin-2-one, (5) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-l-yl)butoxy]-1-methyl-3,4-dihydro-lH-quinolin-2-one and (6) 6-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxy]-3,4-dihydro-1H-quinolin-2-one; or a salt thereof.

PTX0002, '840 Patent at Claims 1, 2, 4 and 5.

18.     Otsuka and Lundbeck have also asserted claims 1 and 2 the '109 patent against MSN, Optimus and Zenara.  These claims are listed below.

Claim 1: A method for treating schizophrenia comprising administering a heterocyclic compound represented by the formula (I) or a salt thereof to a human or animal:



wherein ring Q represented by

**EXHIBIT 5**



represents



wherein

represents –NH–CH$_2$–, –N=CH–, –CH$_2$–NH– or –CH=N–; and the carbon-carbon bond ┄┄ between the 3-position and 4-position of the heterocyclic skeleton containing Z and Y represents a single bond or a double bond; the ring Q may have at least one substituent selected from the group consisting of a lower alkyl group, a lower alkenyl group, a lower alkynyl group, a hydroxy group, a lower alkoxy group, a halogenated lower alkyl group, an aryl group, an aryl lower alkyl group, an aryl lower alkoxy group, an arylcarbonyl group, a lower alkenyloxy group, a lower alkanoyl group, a lower alkanoyloxy group, a cycloalkyl group, a cycloalkyl lower alkyl group, a halogen atom, a carbamoyl group which may have a lower alkyl group, a carboxy group, a lower alkoxycarbonyl group, an amino group which may have a lower alkanoyl group, a nitro group, a hydroxy lower alkyl group, an amino lower alkyl group which may have a lower alkyl group, a thienyl group, a saturated 3- to 8-membered heteromonocyclic group containing 1 to 2 nitrogen atoms-substituted lower alkyl group and an oxo group; R$_2$ represents a hydrogen atom or a lower alkyl group; and A represents –O–A$_1$– (wherein A$_1$ represents an alkylene group which may be substituted with a hydroxy group (wherein the one oxygen atom may replace a carbon of the alkylene chain) or a lower alkenylene group) or a lower alkylene group; provided that when A represents a lower alkylene group, the ring Q represents a bicyclic group selected from the group consisting of:

**EXHIBIT 5**



wherein the carbon-carbon-bond ----represents a single bond or a double bond.

Claim 2: The method according to claim 1, wherein the heterocyclic compound of the formula (I) is selected from the group of: (1) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one, (2) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxyl-1H-quinolin-2-one, (3) 7-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxy]-3;4-dihydro-lH-quinolin-2-one, (4) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-3,4-dihydro-1H-quinolin-2-one, (5) 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-l-methyl-3,4-dihydro-lH-quinolin-2-one and (6) 6-[3-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)propoxy]-3,4-dihydro-1H-quinolin-2-one; or a salt thereof.

PTX0003, '109 Patent at Claims 1 and 2.

19.     Brexpiprazole is a component of each of the asserted claims. Specifically, the heterocyclic compound of claim 1 of the RE'059 patent includes brexpiprazole when –Z-----Y– is –NH—CH$_2$–, the carbon-carbon ---- bond of ring Q between the 3-position and 4-position is a double bond, Q is substituted with an oxo group, $R_2$ is a hydrogen atom and A is –O–A$_1$– wherein A$_1$ is an alkylene group, specifically a butylene group. Brexpiprazole results from the synthetic process recited in claim 9 based on the same analysis.

20.     Claim 2 of the RE'059 patent is brexpiprazole when Q is:



,

17

**EXHIBIT 5**

and the carbon-carbon bond ===== of ring Q between the 3-position and 4-position is a double

bond, $R_2$ is a hydrogen atom and A is –O–$A_1$– wherein $A_1$ is an alkylene group, specifically

butylene.

21.    Claim 3 of the RE'059 patent is brexpiprazole when Q is:



,

and $R_2$ is a hydrogen atom and A is –O–$A_1$– wherein $A_1$ is an alkylene group, specifically

butylene.

22.    Claims 7 and 12-15 specifically recite brexpiprazole by its chemical name, 7-[4-(4-

benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one.    Accordingly, each of the

asserted claims of the RE'059 patent encompasses brexpiprazole.

23.    The asserted claims (1, 2, 4 and 5) of the '840 patent also encompass brexpiprazole.

Specifically, claims 1 and 4 cover brexpiprazole when the carbon-carbon bond ===== of ring Q

between the 3-position and 4-position is a double bond, –Z=====Y– is –NH—$CH_2$– substituted with

an oxo group, $R_2$ is a hydrogen atom and A is –O–$A_1$– wherein $A_1$ is an alkylene group, specifically

butylene.    Claims 2 and 5 specifically recite brexpiprazole by its chemical name, 7-[4-(4-

benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one.    Accordingly, each of the

asserted claims of the '840 patent encompasses brexpiprazole.

24.    The asserted claims (1 and 2) of the '109 patent also encompass brexpiprazole.

Specifically, claim 1 encompasses brexpiprazole when the carbon-carbon bond ===== of ring Q

between the 3-position and 4-position is a double bond, –Z=====Y– is –NH—$CH_2$– substituted with

an oxo group, $R_2$ is a hydrogen atom and A is –O–$A_1$– wherein $A_1$ is an alkylene group, specifically

18

**EXHIBIT 5**

butylene.    Claim 2 specifically recites brexpiprazole by its chemical name, 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one.    Accordingly, each of the asserted claims of the '109 patent encompasses brexpiprazole.

25.    The asserted claims (1, 3, 4, 5, 6, 7, 9 and 10) of the '637 patent also encompass brexpiprazole.  Specifically, claim 1 encompasses brexpiprazole when the carbon-carbon bond ----- of ring Q between the 3-position and 4-position is a double bond, –Z-----Y– is –NH—CH$_2$– substituted with an oxo group, R$_2$ is a hydrogen atom and A is –O–A$_1$– wherein A$_1$ is an alkylene group, specifically butylene.  Claims 3-7 specifically recite brexpiprazole by its chemical name, 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one.  Claims 8-10 depend from claims that specifically recite brexpiprazole by chemical name.  Accordingly, each of the asserted claims of the '637 patent encompasses brexpiprazole.

26.    Brexpiprazole and its use as REXULTI® is an embodiment of each of the asserted claims.  Brexpiprazole is the active ingredient in REXULTI® and the label for REXULTI® includes the following:

## 1 INDICATIONS AND USAGE

REXULTI is indicated for:
- Adjunctive treatment of major depressive disorder (MDD) *[see Clinical Studies (14.1)]*.
- Treatment of schizophrenia *[see Clinical Studies (14.2)]*.

PTX0966, REXULTI® Label at § 1.

27.    Accordingly, the brexpiprazole-containing REXULTI®, used according to its approved uses, meets all elements of asserted claims 1, 2, 3, 7, 9, 12, 13, 14 and 15 of the RE'059 patent; 1, 3, 4, 5, 6, 7, 8, 9 and 10 of the '637 patent; 1, 2, 4 and 5 of the '840 patent and 1 and 2 of the '109 patent.

19

**EXHIBIT 5**

28.     There is a nexus between brexpiprazole and REXULTI® and the elements of the

asserted claims.

<div align="center">

**2.      Schizophrenia, Major Depressive Disorder, and the
Neuropharmacology Associated with Them**

**a.      Schizophrenia**

</div>

29.     Schizophrenia is a severely debilitating mental illness.  It is considered the most

serious mental disorder and is also somewhat common, affecting approximately 1% of the

population.

30.     People who suffer from schizophrenia exhibit a variety of different symptoms that

may be generally classified into three categories.  The first category consists of the "positive"

symptoms of schizophrenia, which include hallucinations, delusions and thought disorders.  The

second category consists of "negative" symptoms, which include a loss of the ability to function

socially, blunted affect (the loss of the ability to fully experience emotions), emotional withdrawal,

reduced ability to experience pleasure and other diminutions in normal functions.  The third

category consists of "cognitive deficits," which include failure of memory and ability to maintain

attention.

31.     Schizophrenia is extremely burdensome for patients, their families and caregivers

and on society via indirect healthcare costs.  Patients with schizophrenia are often unable to

maintain employment or pursue educational opportunities and have limited social contacts outside

their families.  Many patients require near-daily support.  In a Global Burden of Disease Study,

schizophrenia ranked 9th in North America regarding Years Lived with Disability.  PTX0447,

Kane, J.M., et al., "A multicenter, randomized, double-blind, controlled phase 3 trial of fixed-dose

brexpiprazole for the treatment of adults with acute schizophrenia," *Schizophrenia Res.* (2015)

164(1-3):127-35 ("Kane 2015") at 127.  It had the highest disability weighting of almost 300

**EXHIBIT 5**

diseases studied.  PTX0447, Kane 2015 at 127.  As of 2002, researchers reported that over 20% of all Social Security benefit days in the U.S. were used for the care of schizophrenia patients. PTX0470, Stahl, S.M., *Essential Psychopharmacology of Antipsychotics and Mood Stabilizers* 4 (2002) Cambridge Univ. Press ("Stahl 2002").  Schizophrenia in the U.S. results in direct and indirect costs reaching tens of billions of dollars a year.  PTX0470, Stahl 2002 at 4; PTX430, Citrome, L., et al., "The effect of brexpiprazole (OPC-34712) and aripiprazole in adult patients with acute schizophrenia: results from a randomized, exploratory study," *Int'l Clinical. Psychopharmacology.* (2016) 31(4):192-201 ("Citrome 2016") at 192; PTX0469, Shapiro, D.A., et al., "Aripiprazole, A Novel Atypical Antipsychotic Drug with a Unique and Robust Pharmacology," *Neuropsychopharmacology* (2003) 28:1400-11 ("Shapiro 2003") at 1400 ($65 billion/year).

32.    Given the progressive nature of schizophrenia, patients often experience a loss of functionality over time.  Functional impairment, such as social withdrawal, poor self-care, lack of productivity and other socially aggressive or disturbing behaviors, can be a result of negative symptoms associated with the underlying disease itself or may result from antipsychotic treatment. Minimizing functional impairment is a key treatment objective both in the acute and long-term phases of schizophrenia and is an important indicator of recovery.  Many patients with schizophrenia, however, fail to achieve a remissive state.

33.    The cause and etiology of schizophrenia remain largely unknown.  There are no radiological or laboratory tests which reliably indicate its presence.  Both environmental and genetic factors appear to be implicated and has been estimated that 100's of genetic loci are involved in schizophrenia.  For many decades, researchers attributed schizophrenia to a disease of dopamine imbalance, although that particular hypothesis has been supplanted by the understanding

21

**EXHIBIT 5**

that schizophrenia is a complex disease of dysfunctional synaptic transmission across multiple neurotransmitter systems involving large numbers of genetic loci.

### b.    Major Depressive Disorder

34.    Major depressive disorder (or "MDD") is a common and serious medical illness that negatively affects how an individual feels, the way they think and how they act.  Symptoms of major depressive disorder include feelings of sadness and/a loss of interest in activities once enjoyed.  It can lead to a variety of emotional and physical problems and can decrease an individual's ability to function at work and at home.

35.    Symptoms of depressive disorders can vary from mild to severe and can include:

- Feeling sad or having a depressed mood

- Loss of interest or pleasure in activities once enjoyed

- Changes in appetite — weight loss or gain unrelated to dieting

- Trouble sleeping or sleeping too much

- Loss of energy or increased fatigue

- Increase in purposeless physical activity (e.g., inability to sit still, pacing, handwringing) or slowed movements or speech (these actions must be severe enough to be observable by others)

- Feeling worthless or guilty

- Difficulty thinking, concentrating or making decisions

- Thoughts of death or suicide.

36.    Symptoms must last at least two weeks and must represent a change in the previous level of functioning for a diagnosis of major depressive disorder.

**EXHIBIT 5**

37.    Major depressive disorder affects about 7.8% of the U.S. population over age 18, according to the National Institute of Mental Health.  It is an enormous public health burden, having one of the highest Years Lived with Disability.  PTX0473, Thase, M.E., et al., "Adjunctive Brexpiprazole 1 and 3 mg for Patients With Major Depressive Disorder Following Inadequate Response to Antidepressants: A Phase 3, Randomized, Double-Blind Study," *J. Clinical Psychiatry* (2015) 76(9):1232-40 ("Thase II 2015") at e1.  Depression also affects older adults, teens and children, but frequently goes undiagnosed and untreated in these populations.

<div align="center">

c.    **Neuropharmacology of Schizophrenia and Other Neuropsychiatric Disorders Is Complicated and Not Entirely Understood**

</div>

38.    The brain systems associated with schizophrenia and other psychiatric disorders are extremely complicated.  In the early 2000s, the cause of schizophrenia was unknown.  The same remains true today.  While the "dopamine hypothesis" of schizophrenia has driven antipsychotic drug development and has been used in the past to explain the positive symptoms of schizophrenia, it does not adequately explain its etiology and other symptoms.  There are multiple other hypotheses relating to the etiology of schizophrenia, including those implicating serotonin and glutamate and various other hypotheses.  *E.g.*, DTX-0831, Miyamoto, S., et al., "Treatments for schizophrenia: a critical review of pharmacology and mechanisms of action of antipsychotic drugs," *Molecular Psychiatry* (2005) 10:79-104 ("Miyamoto 2005").  As of 2004, it was widely accepted that major mental illnesses are polygenic with substantial environmental, genetic and, perhaps even epigenetic components.  PTX0467, Roth, B.L., "Magic shotguns versus magic bullets: selectively non-selective drugs for mood disorders and schizophrenia," *Nature Rev. Drug Disc.* (2004) 3:353-359 ("Roth Nature") at 353; *see also* Figure 1.  In 2005, the major challenge

**EXHIBIT 5**

associated with developing a new antipsychotic drug was the relative dearth of knowledge surrounding the underlying causes of schizophrenia and other psychiatric disorders.

39.     All of the currently marketed atypical antipsychotic drugs interact with multiple neurotransmitter receptors in the brain.  Neurotransmitters are biogenic amines and include, for example, dopamine and serotonin.  These neurotransmitters induce signaling in the brain by binding to their respective receptors, including dopaminergic, serotonergic, histaminergic, adrenergic and cholinergic receptors.  These receptors are located on nerve cells called neurons. Neurons communicate with one another by sending chemical signals across the space between the cells.  These spaces, or junctions, are referred to as synapses.  Receptors for neurotransmitters can be located at various positions on the neuron, including at presynaptic and postsynaptic sites. Many of these biogenic amine receptors are G-protein coupled receptors or GPCRs.  Several unique dopaminergic, serotonergic, histaminergic, adrenergic and cholinergic receptors and receptor subtypes exist.  Depending on many factors, including the neurotransmitter and its relative concentration, brain region and receptor location, the interaction between a neurotransmitter and its receptor can be either excitatory or inhibitory.   In addition, the interaction of one neurotransmitter and its receptors may indirectly impact the interaction of another neurotransmitter with its receptors.  The signaling pathways in the brain are extremely complex and finely balanced.

40.     Endogenous biogenic amines, such as dopamine, bind to their respective receptors and elicit downstream biochemical and, ultimately, neurophysiological effects following receptor binding.  When a neurotransmitter, or exogenous or endogenous ligand, binds to its receptor and elicits the full physiological response, the ligand is considered to be a full *agonist* at the receptor. Ligands that bind to a receptor but do not trigger any physiological response are called *receptor antagonists*.  Exogenous antagonists by definition inhibit endogenous ligands by a competitive

**EXHIBIT 5**

mechanism.  Antagonist function can be reported as an $IC_{50}$ value, which is the amount of antagonist required to elicit 50% of the physiological response of the system without the presence of the antagonist.  The lower the $IC_{50}$ value, the stronger the antagonist.  Antagonist activity can also be reported as a $K_i$ value using the Cheng-Prusoff approximation.  Conversely, agonist activity of non-natural ligands is typically reported as an $EC_{50}$ value, which is the amount of agonist required to elicit 50% of the maximum response.  Partial agonists are ligands that bind to a receptor but trigger only a portion of the physiological response that would occur with the endogenous ligand.  This partial agonist activity, or intrinsic activity, is frequently reported as a percentage of the effect of the full agonist.  The closer the percentage is to zero, the less agonism elicited by the compound.  The closer it is to 100%, the more the compound resembles a full agonist.  While binding is a prerequisite for an antagonist or agonist to exert its functional effect, the binding affinity of a ligand alone (frequently reported as a $K_i$ value) provides no information regarding whether a compound is an antagonist, agonist or partial agonist.  Functional assays are required to determine if a ligand is an agonist, antagonist or partial agonist.  The kinetics of receptor binding and ligand function are extremely complicated and depend on multiple factors, such as receptor type, concentration of the endogenous ligand and cellular reserve, to mention only a few.

41.     The kinetics of receptor binding and ligand function are extremely complicated and depend on multiple factors, such as receptor type, concentration of the endogenous ligand, and cellular reserve, to mention only a few.  *See, e.g.*, PTX0973, Tamminga, C.A., *Current Neuropharmacology* (2005) 3:3-8 ("Tamminga 2005") at 4.

42.     The receptor pharmacology and the function at each receptor of atypical antipsychotics is extremely complex.  Before the priority date, there were multiple competing hypotheses, each of which tried to explain the clinical effects of various antipsychotics.  For

**EXHIBIT 5**

example, some believed that aripiprazole's beneficial clinical profile was a result of its dual role as an antagonist at postsynaptic $D_2$ receptors and as an agonist at presynaptic $D_2$ receptors. PTX0467, Roth Nature at 356; *see generally* DTX-0034, Oshiro, et al., *J. Med. Chem.* (1998) 41:658-667 ("Oshiro 1998"). Other research groups rationalized aripiprazole's clinical profile as a result of its functional selectivity. Roth Nature at 356. For example, Roth and colleagues stated that aripiprazole's actions in schizophrenia are more likely a result of "the balance of partial agonism and antagonism at a multiplicity of receptors." Roth Nature at 356. What the ideal balance may be, however, was and still is unknown.

### 3. Atypical Antipsychotics and Treatments for Depression

#### a. A Brief History of Atypical Antipsychotic Development

43. The dopamine hypothesis arose based on the observation that compounds with antipsychotic activity appeared to block dopamine receptors. Given this effect, researchers hypothesized that excess dopamine in the brain led to schizophrenia's positive symptoms, such as delusions and hallucinations. Chlorpromazine, which was first used in the 1950s, was one of the earliest antipsychotics. It blocks the effects of endogenous dopamine, and thereby reduces positive symptoms of schizophrenia, e.g., hallucinations and delusions. Drawing on this observation that blocking dopamine reduces positive symptoms of schizophrenia, scientists developed other medications for schizophrenia that antagonized dopamine. These drugs became known as typical antipsychotics and included, for example, haloperidol, thiothixene, trifluoperazine, fluphenazine, thioridazine, mesoridazine, loxapine, loindone, perphenazine and pentoxide.

44. Typical antipsychotics treat positive symptoms of schizophrenia, but they also cause a number of undesirable side effects. For example, the dopamine-blocking effects of the typical antipsychotics also caused serious and often debilitating side effects known as

**EXHIBIT 5**

extrapyramidal side effects (EPS), which include Parkinsonism and acute dystonias, akathisia, as well as the potentially irreversible movement disorder, tardive dyskinesia.  Tardive dyskinesia generally occurs weeks, months or even years after treatment with typical antipsychotics and may be irreversible if the patient stays on a typical antipsychotic. Severe tardive dyskinesia is extremely disruptive and may even make it difficult for a patient to walk.

45.     An additional side effect of typical antipsychotics is elevated prolactin levels. Typical antipsychotic's blockade of the $D_2$ dopamine receptors causes elevated prolactin levels because prolactin is a hormone produced in the pituitary gland.  Elevated prolactin levels can cause expression of milk from breasts (galactorrhea) in women and the enlargement of breasts (gynecomastia) and impotence in men.  Typical antipsychotics also cause serious cardiovascular side effects, including ventricular arrhythmias (specifically an arrhythmia known as prolongation of the QT interval), cardiac arrest, orthostatic hypotension, tachycardia and frank hypotension. Another drawback to typical antipsychotics is that they have little effect on negative symptoms and may even exacerbate them over time.  PTX0435, Davies, M.A., et al., "Aripiprazole: A Novel Atypical Antipsychotic Drug With a Uniquely Robust Pharmacology," *CNS Drug Revs.* (2004) 10(4):317-336 ("Davies 2004") at 318.

46.     The side effects caused by typical antipsychotics are severe and often led patients to discontinue taking their antipsychotic medication.  Typical antipsychotics generally worsened negative symptoms of schizophrenia and have no effect on cognitive deficits.

47.     Although there were significant known side effects associated with typical antipsychotics, it took many years before researchers discovered viable alternatives.  Scientists engaged in extensive research efforts to address the deficiencies of typical antipsychotics.  An early success in these efforts was the discovery of clozapine roughly sixty years ago.  Although

**EXHIBIT 5**

clozapine has dopamine-blocking effects and is a powerful antipsychotic, it does not induce EPS associated with selective dopamine antagonism.  Clozapine is characterized as the first "atypical" antipsychotic because of this separation between clinical efficacy and detrimental side effects.

48.    Clozapine, however, is associated with a different set of side effects, including weight gain and diabetes as well as potentially life-threatening side effects including agranulocytosis and seizures.  Agranulocytosis is a potentially fatal side effect that causes reduced white blood cells in the body to fight bacterial infection. Because of the incidences of agranulocytosis, clozapine was only approved for treatment-resistant schizophrenia, or schizophrenia that is not effectively treated with a typical antipsychotic, and is subject to strict blood-monitoring requirements.  Accordingly, clozapine is reserved for the most difficult to treat patients.

49.    Scientists have sought to understand what aspects of clozapine's highly complex pharmacological profile contribute to its clinical profile in an effort to develop new drugs with similar or enhanced efficacy and reduced side effects.  Clozapine has high affinity for a number of serotoninergic, dopaminergic, adrenergic, muscarinic and other biogenic amine receptors. PTX0467, Roth Nature at 353, Figures 1 and 2.



Figure 1. Clozapine

50.    The receptor pharmacology driving clozapine's efficacy in treating positive and negative symptoms of schizophrenia without inducing EPS was not well-understood and is still

28

**EXHIBIT 5**

being elucidated even today.  Multiple hypotheses about its mechanism had been proposed.  For example, in 2005, it was understood that a threshold level of $D_2$ receptor occupancy in the striatum is generally necessary for efficacy, but clozapine exhibits low levels of $D_2$ occupancy at therapeutic doses, suggesting that its efficacy is not based on dopamine occupancy or antagonism alone.  *See* DTX-0831, Miyamoto 2005 at 82.  While 5-$HT_{2A}$ antagonism was thought to be associated with low EPS liability, the role of antagonism of that receptor "in the superior therapeutic responses to clozapine awaits further clarification."  DTX-0831, Miyamoto 2005 at 82.  Alternatively, a low-EPS liability could result from its low occupancy of striatal $D_2$ receptors.  DTX-0831, Miyamoto 2005 at 82.  Still other researchers have focused on clozapine's high affinity and functional activity at $D_4$ receptors to explain its clinical profile.  *See, e.g.*, PTX0467, Roth Nature at Fig. 2.

51.     Additionally, clozapine's relatively high affinity for the 5-$HT_{2A}$ receptor compared to its $D_2$ receptor affinity led to the 5-$HT_{2A}$/$D_2$ hypothesis that has driven the development of the majority of second generation antipsychotics in use today.  PTX0435, Davies 2004 at 318.  This hypothesis posits that clozapine's atypical profile, i.e., its efficacy to treat positive and negative symptoms of schizophrenia without inducing EPS, is a result of its combined effects on dopamine and 5-$HT_{2A}$ receptors with a relative preference for 5-$HT_{2A}$ receptors.  Accordingly, scores of compounds seeking to achieve a balance between 5-$HT_{2A}$ and $D_2$ with an emphasis on serotonin activity have been synthesized and tested.  Only a few of these synthesized advanced to clinical testing and even fewer have been FDA approved for the treatment of schizophrenia and other neuropsychiatric disorders.  PTX0967, Conn, J & Roth, BL, "Opportunities and Challenges of Psychiatric Drug Discovery: Roles for Scientists in Academic, Industry, and Government Settings," *Neuropsychopharmacology* (2008) 33:2048-2060 at 2049.

## EXHIBIT 5

52.     During the late 1980s and 1990s, additional atypical antipsychotics were developed.  Many of these drugs are dual $D_2$ and $5\text{-HT}_{2A}$ antagonists that exhibit a relatively higher affinity for the $5\text{-HT}_{2A}$ receptor compared to the $D_2$ receptor.  These atypical antipsychotics are generally referred to as serotonin dopamine antagonists ("SDAs"), but that name trivializes the complex, multi-receptor pharmacology that these agents possess.  For example, risperidone, approved by the FDA in 1996, targets multiple serotonin and dopamine receptors, as well as α-adrenergic receptors.  PTX0467, Roth Nature at 355, Fig. 2.  Like clozapine, risperidone has a high affinity at $5\text{-HT}_{2A}$ receptors and relatively lower affinity at $D_2$ receptors, where it acts as an antagonist.  PTX0467, Roth Nature at 355, Figure 2



Figure 2. Risperidone

53.     Additional SDAs have also been developed, including quetiapine (1997), olanzapine (2000), ziprasidone (2001), zotepine (not marketed in the U.S.), iloperidone (2009) and lurasidone (2011).  Each of these has an extensive receptor pharmacology, the clinical effects of which were not well-understood.  *E.g.,* PTX0467, Roth Nature at 355, Fig. 2.

**EXHIBIT 5**



Figure 3. Other SDAs

54.     The complex and specific receptor interactions of this class of drugs may cause both improved clinical efficacy as well as the range of particular side effects associated with these second-generation antipsychotics, including sedation, weight gain and metabolic changes.

**b.      The Dopamine System Stabilizer Aripiprazole**

55.     In 2002, the FDA approved a new antipsychotic, aripiprazole, which has a distinct pharmacological profile.  DTX-0019, ABILIFY® 2004 Prescribing Information ("ABILIFY PI

**EXHIBIT 5**

2004"); PTX0435, Davies, M.A., et al., *CNS Drug Rev.* (2004) 10(4):317-336 ("Davies") at Abstract.

56.     Aripiprazole appears to work by a different mechanism than other atypical antipsychotics. Specifically, aripiprazole has presynaptic agonist and postsynaptic antagonist properties at the dopamine $D_2$ receptor, resulting in "partial agonism" of dopamine and also binds to many other receptors, including serotonin receptors. Although the mechanism of action for its clinical effects is unknown, aripiprazole exhibits high affinity for multiple dopamine and serotonin receptors, moderate affinity for other receptors and moderate affinity for the serotonin reuptake site. DTX-0019, ABILIFY PI 2004 at 1. Aripiprazole was known to be a partial agonist at $D_2$ and $5\text{-HT}_{1A}$ receptors and an antagonist at $5\text{-HT}_{2A}$ receptors. DTX-0019, ABILIFY PI 2004 at 1. This complex pharmacology is believed to support aripiprazole's clinical profile—treatment of schizophrenia and depression, with lower levels of certain side effects.

### c.     Side Effects of Atypical Antipsychotics

57.     These atypical antipsychotic drugs have effectively transformed the treatment of schizophrenia. Atypical antipsychotic drugs treat positive and perhaps negative symptoms with a lower EPS liability than typical antipsychotic drugs like haloperidol. Their clinical profiles are believed to be linked to their pharmacological profiles, which differ significantly from the early dopamine antagonists. Thus, while typical antipsychotics were developed as $D_2$-dopamine receptor antagonists, these second generation antipsychotics have affinities for and functionally interact with a wide range of neurotransmitter systems in the brain. While there are some similarities among the second generation atypical antipsychotics, such as antagonism at $5\text{-HT}_{2A}$ and $D_2$ receptors, they also have unique profiles across multiple other receptors. PTX0467, Roth Nature at 355, Figure 2. These additional interactions may be driving the not insignificant

**EXHIBIT 5**

side effects that typically exist with these second generation antipsychotics, including sedation, weight gain, and metabolic changes.  For example, olanzapine use is linked to hyperglycemia and increased risk of diabetes.  PTX0970, Rosack, J., *FDA to Require Diabetes Warning on Antipsychotics*, Psychiatry Online (Oct. 17, 2003), available at https://psychnews.psychiatryonline.org/doi/full/10.1176/pn.38.20.0001a.  Similarly, olanzapine and quetiapine are also known to cause sedating side effects, including somnolence and sedation.  PTX0429, Citrome, L., "Activating and Sedating Adverse Effects of Second- Generation Antipsychotics in the Treatment of Schizophrenia and Major Depressive Disorder,"  J. *Clinical Psychopharmacology* (2017) 37(2):138-47 ("Citrome Activating and Sedating 2017") at 138, 143-44.  Many of these atypical antipsychotics also failed to treat cognitive dysfunction and negative symptoms of schizophrenia.  PTX0454, Marek, G. and Merchant, K., "Developing Therapeutics for Schizophrenia and Other Psychotic Disorders," *NeuroRx* (2005) 2(4):579-89 ("Marek 2005") at Abstract.  These side effects continued to cause patients to discontinue treatment with the antipsychotic or to not tolerate their medication.

58.     Although aripiprazole has a more favorable side effect profile than other atypical antipsychotics, some of its side effects may lead patients to discontinue therapy. These include activating side effects such as insomnia, akathisia, nausea and vomiting.  PTX0435, Davies 2004 at 331.  Other common side effects with aripiprazole were weight gain and headaches.  PTX0430, Citrome 2016 at 197.

### 4.     Contemporaneous Drug Discovery Efforts

59.     In the early 2000s, there were many open questions in the field of antipsychotic discovery.  The etiology and pathogenesis of schizophrenia was not well understood.  While the

**EXHIBIT 5**

pharmacological profiles of atypical antipsychotics were known, the effect of the specific receptor functions on their clinical profiles were not well understood. Researchers questioned whether, for example, aripiprazole's clinical benefits could be attributed solely to its $D_2$ partial agonism or a combination of its dopamine and serotonin activity, suggesting instead that it was a result of its complex polypharmacology. PTX0467, Roth Nature at 356 ("So although aripiprazole is clearly a functionally selective partial agonist, its complex pharmacology precludes us from concluding that its beneficial actions in schizophrenia are due solely to partial agonism of $D_2$ receptors. It is more likely that the balance of partial agonism and antagonism at a multiplicity of receptors is responsible for its efficacy in schizophrenia and related disorders."); PTX0435, Davies 2004 at 324 ("[M]ere partial agonism at $D_2$ and $5\text{-}HT_{1A}$ receptors and antagonism at $5\text{-}HT_{2A}$ receptors cannot explain the myriad actions of aripiprazole *in vitro* and *in vivo*."). Like aripiprazole, other atypical antipsychotics available at the time also had a rich polypharmacology. PTX0467, Roth Nature at Fig. 2.

60. Therefore, significant research was being conducted to discover new antipsychotics directed to various receptors and molecular targets. *See generally* PTX0486, Valentine, L. et al., *Neuro-degenerative Dis.* (2004) 1:269-322 ("Karger 2005"); PTX454, Marek 2005; DTX-0831, Miyamoto 2005. The extreme complexity in the field and the high rate of drug discovery failures, however, generated skepticism that traditional drug discovery programs would be successful or that any one compound would address the various symptoms of schizophrenia. For example, one group stated: "At a clinical level, cognitive dysfunction remains one of the most challenging areas for developing antipsychotic drugs. For the near term and given our poor understanding of the etiology of schizophrenia, it would appear unlikely that a single treatment would target psychotic, negative, and cognitive symptoms." PTX454, Marek 2005 at 585.

**EXHIBIT 5**

61.     Nevertheless, extensive research was underway for new drug candidates for treating schizophrenia and other CNS disorders, including major depressive disorder.  PTX0486, Karger 2005.  According to a contemporaneous list of "Drugs in Development for Neurodegenerative Diseases" updated one month before the priority date, 85 compounds were being developed for schizophrenia.  PTX0486, Karger 2005.  This list is exemplary of the work that was being done.  This list does not cover pre-clinical discovery candidates.  PTX0486, Karger 2005 at Glossary.  Despite its title, which references neurodegenerative diseases, this list includes multiple compounds in development for schizophrenia and may likely not include all of them because of the neurodegenerative focus.  Of the 85 being developed for schizophrenia, only about a quarter related to $D_2$ antagonists and/or 5-$HT_{2A}$ antagonists.  The strong majority targeted various other receptors and mechanisms of action, such as COX inhibitors, 5-$HT_6$ antagonists, $D_3$ antagonists, nicotinic ACh modulators, NMDA receptor partial agonists, AMPA receptor modulators, $D_1$ antagonists, muscarinic agents and others.  Karger 2005.  The field was not focused on $D_2$ partial agonism coupled with 5-$HT_{1A}$ partial agonism and/or 5-$HT_{2A}$ antagonism.  Rather, as this list shows, multiple different and divergent approaches were being explored by major pharmaceutical companies.

62.     This list also highlights the challenge of bringing a new antipsychotic through the clinic and onto the market.  Many of the drugs targeting schizophrenia have not been successful.  It was and still is exceedingly difficult to discover new antipsychotics via a hypothesis-based approach that lead to safe and efficacious treatments in the clinic.

63.     Moreover, the Karger list does not report on the extensive discovery efforts that led to each of the 85 candidates for schizophrenia on the list.  Behind each one, there are likely

**EXHIBIT 5**

hundreds of other potential candidate compounds that were synthesized, evaluated and cast aside in favor of the clinical candidate.

64.     One example of research surrounding a clinical candidate is exemplified by what is now called cariprazine.  This compound, *trans*-1-{4-[2-[4-(2,3-dichlorophenyl)-piperazin-1-yl]-ethyl]-cyclohexyl}-3,3-dimethyl-urea, was disclosed in WO 2005/012266 ("WO '266") (DTX-0886).  This published patent application states that, "[t]he present invention relates to new $D_3$ and $D_2$ dopamine receptor subtype preferring ligands of formula (I):



wherein $R_1$ and $R_2$ represent independently a substituent selected from hydrogen, alkyl, aryl, cycloalkyl, aroyl, or $R_1$ and $R_2$ may form a heterocyclic ring with the adjacent nitrogen atom; X represents an oxygen or sulphur atom; n is an integer of from 1 to 2, and/or geometric isomers and/or stereoisomers and/or diastereomers and/or salts and/or hydrates and/or solvates thereof, to the processes for producing the same, to pharmaceutical compositions containing the same and to their use in therapy and/or prevention of a condition which requires modulation of dopamine receptors."  DTX-0886, WO '266 at Abstract.

65.     DTX-0886, WO '266 discloses cariprazine as compound 1 in the examples, and as mentioned, its chemical name is *trans*-1-{4-[2-[4-(2,3-dichlorophenyl)-piperazin-1-yl]-ethyl]-cyclohexyl}-3,3-dimethyl-urea.  DTX-0886, WO '266 at 19.  WO '266 explains that cariprazine

**EXHIBIT 5**

and other compounds disclosed in the publication "have high or very high affinity for dopamine $D_3$ receptors and moderate to high affinity to dopamine $D_2$ receptors always in such a combination that the $D_3$ affinity is 5 to 200 fold higher than the $D_2$ affinity." DTX-0886, WO '266 at 1. WO '266 also states that "[t]he compounds have even higher selectivity over other receptors, such as alpha-1 receptors." DTX-0886, WO '266 at 1. WO '266 further states that, "[t]he dual (i.e. $D_3$ and $D_2$) receptor functional antagonism coupled in the above mentioned particular proportion is especially important as it allows the simultaneous manifestation of the beneficial effects of modulation of *both* the $D_3$ and $D_2$ receptors, however, *without* the appearance of the known disadvantages of each individual receptor action." DTX-0886, WO '266 at 1 (emphasis in original). This compound and document further highlight the breadth of research being done in the art before April 2005, including targeting different receptor profiles and different chemical structures and modifications.

### 5. Overview of Medicinal Chemistry and Unpredictability of Chemical Modifications

66. Drug development is a challenging and inherently unpredictable endeavor. It typically takes from 7-10 years, and sometimes more, from lead candidate selection to a marketed pharmaceutical product. For every successful drug brought to market, there are at least 400-1,000 compounds that fail. Only approximately 6% of drugs which enter phase I testing for psychiatric indications are ever brought to market, while perhaps 1 in 10,000 compounds which advance to the target indication stage of preclinical testing are eventually approved. PTX0969, Mullard, A, "Parsing clinical success rates," *Nature Revs. Drug Disc.* (2016) 15:447 at 447; PTX0446, Harrer, S., et al., "Artificial Intelligence for Clinical Trial Design," *Trends in Pharmacological Scis.* (2019) 40(8):577-591. Atypical antipsychotic drug development, which likely requires a polypharmacologic approach targeting many receptors, is especially difficult.

**EXHIBIT 5**

67.     Drug development requires a team of scientists from several disciplines—including but not limited to medicinal chemists, pharmacologists, biologists, toxicologists and formulation scientists.  Development of the drug candidate itself is frequently led by medicinal chemists with extensive input and guidance from various other team members, including pharmacologists and other biologists.

68.     The first step in any drug development program is to assess and understand the pathology of the targeted disease and to identify a molecular target (or targets) for therapeutic intervention.  Understanding of the pathophysiology of neuropsychiatric diseases and disorders continues to evolve and is deficient.  While all marketed drugs for schizophrenia antagonize $D_2$ receptors, including aripiprazole, which is a partial $D_2$ agonist, atypical antipsychotics exhibit rich and varied functional activity at multiple receptors beyond the $D_2$ dopamine receptor.  PTX0467, Roth Nature at 355.  As a consequence, before the priority date, the field of antipsychotic research had been largely transitioned from a "magic bullet" to a "magic shotgun" approach, meaning that the most effective and tolerable future antipsychotics would likely be those that balanced activity at multiple receptors in the brain.  PTX0467, Roth Nature at 353.

69.     This multi-receptor (or multi-target) focus significantly increases the complexity associated with developing a successful drug candidate and may require non-traditional approaches to drug discovery.  PTX0467, Roth Nature at 357-358.  In 2004, more traditional drug development techniques, such as high throughput screening and structure-based approaches, were not likely to be successful for drugs with such complex polypharmacologies.  PTX0467, Roth Nature at 357; PTX0435, Davies 2004 at 333.

70.     If one were seeking to discover a new antipsychotic drug with either an enhanced efficacy and/or a more tolerable safety profile, the medicinal chemist would need to formulate a

**EXHIBIT 5**

hypothesis as to what pharmacological and chemical features could potentially address the desired unmet clinical goal.  In other words, the medicinal chemistry team would have to say "what is the problem?" and then formulate a plan to solve it.  Because much was unknown as to why antipsychotics at the time were effective, this would not have been trivial.  Such multi-target optimization remains difficult even today.

71.     Once a pharmacological profile is chosen, there are several approaches for identifying a starting point for further development.  For example, a POSA may consider what chemotypes are already available that may exhibit certain desirable pharmacological properties. To do this, a POSA would extensively mine the scientific and patent literature to understand what chemotypes are in play.  At the relevant time, there were dozens and dozens of potential scaffolds with $D_2$ or serotonergic activity, including numerous $D_2$ partial agonists.

72.     A POSA may also rely on computational approaches to choose a starting compound that "fits" into the binding site of the target receptor or receptors.  This strategy, however, requires an understanding of the structure, amino acid residues and binding pockets of the target receptor's or receptors' binding site(s).  Molecular modelling was considered to be "cutting edge" in the early 2000s.  Although molecular modeling and computational docking were used in the early 2000s, this approach was not especially useful considering the relative lack of computational power and uncertainty regarding the molecular models used.  Before the priority date, there was also little information regarding the structure of neuronal GPCRs and the only crystal structure of a GPCR at the time was for rhodopsin, a GPCR found in the rod cells of the retina.  Rhodopsin has an amino acid sequence distinct from dopamine and serotonin receptors and, as a result, any assessment of what chemotypes may "fit" into and bind with the multiple neurotransmitter receptors in the brain was, at best, a guess.  For example, it is now known that aripiprazole binds to the 5-HT$_{1A}$ and 5-

**EXHIBIT 5**

$HT_{2A}$ receptors in a way that was completely unexpected and entirely different from the predictions made before the structures of these receptors had been elucidated, demonstrating that the use of molecular modeling approaches in the field of antipsychotic drug development at the relevant time was highly unpredictable.  Today, even with the crystal or cryogenic electron microscopic (cryo-EM) structures of these receptors in hand, significant computing power is required to effectively model the binding modes of target compounds.  For example, when using computational methods to assist in drug development efforts, models find the lowest energy conformation of, frequently, over thousands of unique binding positions.  Harnessing molecular modeling, even when the binding site is well-understood, is thus not a trivial task.

73.     As mentioned above, although not ideal for approaching a polypharmacologic target objective, medicinal chemists and pharmacologists could also conduct a random screen of available collections of compounds to see if any achieve the desired pharmacological profile to use as a starting point for further medicinal chemistry refinement.  And finally, a POSA may attempt to find a different chemotype since it is well known that different chemical structures may lead to a similar and dissimilar (though desired) pharmacological profile.

74.     After a POSA chooses a compound as a starting point, the next step is to devise a synthetic program to optimize the chosen starting compound in an effort to develop a viable drug candidate.  Lead optimization must account for the desired pharmacologic profile and many other considerations, such as bioavailability, toxicity and stability.  There are myriad options for modifying a lead compound in an attempt to enhance its pharmacological profile and address other drug development considerations.  These options include substituting one functional group for another, introducing new functional groups, expanding or contracting rings that may be present, lengthening or shortening chains that may be present, "ring walking" and numerous other chemical

**EXHIBIT 5**

modifications.  The effect of any of these possible modifications on the pharmacological profile of the resulting compound is unpredictable.   One cannot know *a priori* what a particular modification will do to the chemical, biological and physical properties of the resulting compound. This level of complexity is amplified when multiple receptor functionality is desired. Consequently, one must conduct extensive and unpredictable pharmacological and biological testing on the newly synthesized compound(s) in an effort to understand the relationship between the structure and function.   This is typically an iterative process where the results of pharmacological testing are fed back into the cycle, and a medicinal chemist then adapts and modifies the synthesis plan accordingly.  The below figure depicts this process.

**EXHIBIT 5**



DTX-0819, Drug Discovery, Development and Deployment Maps, U.S. NIH, *available at* https://ncats.nih.gov/translation/maps (accessed Feb. 27, 2022).

**EXHIBIT 5**

75.    The level of unpredictability, especially for antipsychotic drug development in particular and CNS drug discovery in general, cannot be underestimated.  Before the priority date, it was well established that it is very difficult, if not impossible, to predict the effect that a given chemical modification will ultimately have on the properties of the resulting molecule.  Little was known about the binding modes of compounds with dopamine, serotonin and other receptors in the brain, but they were expected to be complex and involve a wide range of interactions between the molecule (whether an agonist, partial agonist or antagonist) and the receptor.  Small changes in the chemical structure of the target compound could very well lead to large and unpredicted changes in binding affinities, efficacies, agonist potencies and many other pharmacological and pharmaceutical properties.    Such unpredictability is heightened when one is seeking a polypharmacologic agent.

76.    Moreover, achieving a certain pharmacological profile is only part of the drug development process.  The medicinal chemist also needs to consider toxicity issues and address absorption, distribution, metabolism and elimination considerations.  Even if the research team achieves success during the pre-clinical phase, there may not be success in the clinic  as less than 1% of so-called preclinical leads ever advance to approval.  Drug development is, thus, a complicated endeavor involving trial and error, at extreme cost, that all too often fails, especially for neuropsychiatric drugs.

## C.    REXULTI® and Its Development

77.    Drug development is an inherently complex and unpredictable endeavor.  In the context of antipsychotics specifically, this complexity is evidenced by the vast amount of work surrounding the drugs that actually made it to market.  Along the way, there are scores and scores of failed drug candidates.

<u>**EXHIBIT 5**</u>

**HIGHLY CONFIDENTIAL**

78.    Against this backdrop, Otsuka undertook an extensive discovery program to discover and develop a new antipsychotic.  REXULTI® (brexpiprazole) tablets is the result of this challenging development, which is an FDA-approved product indicated for the treatment of schizophrenia and adjunctive treatment of MDD.  PTX0966. REXULTI® Dec. 2021 Prescribing Information ("Rexulti® Label) at 1.

79.    Brexpiprazole is marketed in the U.S. under the trade name REXULTI®.  The active ingredient in REXULTI® is brexpiprazole.  PTX0966. REXULTI® Label at § 11.  The mechanism of action of brexpiprazole is unknown, but it has affinity for serotonin $5\text{-}HT_{1A}$, $5\text{-}HT_{2A}$, $5\text{-}HT_{2B}$ and $5\text{-}HT_7$ receptors, dopamine $D_2$ and $D_3$ receptors and noradrenergic $\alpha_{1A}$, $\alpha_{1B}$, $\alpha_{1D}$ and $\alpha_{2C}$ receptors.  PTX0966. REXULTI® Label at § 12.2; ███████████████████████████████ ███████████████████████████████████████  The efficacy of brexpiprazole may be mediated through a combination of partial agonist activity at serotonin $5\text{-}HT_{1A}$ and dopamine $D_2$ receptors, and antagonist activity at serotonin $5\text{-}HT_{2A}$ receptors.  PTX0966. REXULTI® Label at § 12.1.

80.    REXULTI® is approved for the treatment of schizophrenia and the adjunctive treatment of major depressive disorder.  *See* PTX0966. REXULTI® Label at § 1.  The safety and efficacy of REXULTI® for treating these indications is supported by several phase 3 clinical trials that the FDA considered when granting approval.  *See generally, e.g.*, PTX0443, Fleischhacker, W.W., et al., "Efficacy and Safety of Brexpiprazole (OPC-34712) as Maintenance Treatment in Adults with Schizophrenia: a Randomized, Double-Blind, Placebo-Controlled Study," *Int'l J. Neuropsychopharmacology* (2017) 20(1):11-21 ("Fleischhacker 2017"); PTX0433, Correll, C.U., et al., "Efficacy and Safety of Brexpiprazole for the Treatment of Acute Schizophrenia: A 6-Week Randomized, Double-Blind, Placebo-Controlled Trial" *Am J. Psychiatry* (2015) 172(9):870-880

**EXHIBIT 5**

("Correll 2015"); PTX0447, Kane 2015; PTX0472, Thase I 2015; PTX0473, Thase, M.E., et al., "Efficacy and Safety of Adjunctive Brexpiprazole 2 mg in Major Depressive Disorder," *J. Clinical Psychiatry* (2015) 76(9):1224-31 ("Thase II 2015").

81.     Brexpiprazole is the active ingredient in REXULTI®.  PTX0966. Rexulti® Label at 1.  It is a novel antipsychotic agent with a unique and unexpected pharmacological and preclinical profile.  *See generally* PTX0451, Maeda, K., et al., "Brexpiprazole I: In Vitro and In Vivo Characterization of a Novel Serotonin-Dopamine Activity Modulatory," *J. Pharmacology and Experimental Therapeutics* (2014) 350(3):589-604 ("Maeda I 2014"); PTX0452, Maeda, K., et al., "Brexpiprazole II: Antipsychotic-Like and Procognitive Effects of a Novel Serotonin-Dopamine Activity Modulator," *J. Pharmacology and Experimental Therapeutics* (2014) 350:605-614 ("Maeda II 2014").   Brexpiprazole binds to multiple monoaminergic receptors, including dopamine, serotonin and α-adrenergic receptors. PTX0451, Maeda I 2014 at 596, Table 2; PTX0966. Rexulti® Label at 20.  Brexpiprazole binds with high affinity to $5\text{-HT}_{1A}$ (0.12 Nm), $5\text{-HT}_{2A}$ (0.47 Nm), $5\text{-HT}_{2B}$ (1.9 Nm), $5\text{-HT}_7$ (3.7 Nm), D2 (0.3 Nm), $D_3$ (1.1 Nm), $\alpha_{1A}$-adrenergic (3.8 Nm), $\alpha_{1B}$-adrenergic (0.17 Nm), $\alpha_{1D}$-adrenergic (2.6 Nm), and $\alpha_{2C}$-adrenergic (0.59 Nm) receptors, while its affinity to the $H_1$ receptor and $M_1$ receptor is moderate (19 Nm) and very low (67% inhibition at 10 Mm), respectively.  PTX0451, Maeda I 2014 at 596, Table 2; PTX0966. Rexulti® Label at 20.

82.     Brexpiprazole is a partial agonist at the $5\text{-HT}_{1A}$, $D_2$ and $D_3$ receptors.  PTX0966. Rexulti® Label at 20; Maeda I 2014 at 596-597, Table 4, Fig. 3.  Its maximum inhibitory effect (43%) is "significantly [] lower than that of aripiprazole (61%)."  PTX0451, Maeda I 2014 at 596 & Table 4. Brexpiprazole is an antagonist at $5\text{-HT}_{2A}$, $5\text{-HT}_{2B}$, $\alpha_{1B}$-adrenergic and $\alpha_{2C}$-adrenergic receptors.  PTX0966. Rexulti® Label at 20; PTX0451, Maeda I 2014 at 596.

## EXHIBIT 5

83.     While brexpiprazole binds to similar receptors as other marketed antipsychotics, its binding affinities and functional effects at these receptors are unique, diverse and lead to its unexpected efficacy as a clinical treatment.  PTX0430, Citrome 2016 at 192-93.  Indeed, the safety and efficacy of brexpiprazole as a treatment for schizophrenia and the adjunctive treatment of MDD have been established through many clinical trials.  These studies additionally establish that brexpiprazole has an unexpectedly improved clinical profile compared to other marketed antipsychotics through both its efficacy and improved side-effect profile.

### D.     The Asserted Documents

84.     Below is a response to the documents set forth by Defendants' in their Statement of Contested Facts regarding Validity.  To the extent Defendants introduce additional documents or arguments, Plaintiffs reserve the right to respond.

85.     All but one of the below-discussed documents were considered by the United States Patent and Trademark Office (USPTO) during prosecution of claims related to the brexpiprazole compound.  *See* PTX0006, RE'059, cover pages.  The one that was not directly cited is cumulative is irrelevant.  Defendants' list of documents only scratches the surface of the filed of antipsychotic development before the priority date.  There were substantial research efforts that Defendants do not address.

#### 1.     Patents and Publications

##### a.     U.S. Patent No. 5,436,246

86.     U.S. Patent No. 5,436,246 ("the '246 patent") issued ten years before the priority date of the patents in suit.  The title of this patent is "Serotonin Receptor Agents" and it describes compounds of the following formula:

**EXHIBIT 5**



in which $R_1$ may be hydrogen, cycloalkyl, $C_{1-6}$ alkyl, phenyl optionally substituted, phenylalkyl or

phenyl]amindoalkyl; R may be H, $C_{1-4}$ alkyl, $C_{1-4}$ alkoxy, halogen, $-CF_3$, $-OCF_3$ and $-OH$; X may

be H, $-(CH_2)_nX_1$, $CH=CHX_1$ or $CHX_2-(CH_2)_q-CH_3$; and Y may be H or $C_{1-3}$ alkyl, where $X_1$ is

further defined as additional functional groups. DTX-0006, '246 patent at Abstract, 1:17-49. This

general formula encompasses thousands if not tens of thousands of compounds, all of which are

piperazinyl benzothiophene compounds substituted on the piperazine ring with simple alkyl,

cycloalkyl, or phenyl substituents.

87.     The disclosed compounds are reported to be "serotonin $5HT_{1A}$ and $5HT_{1D}$ receptor

agents," which either mimic or block the effects of serotonin, and are further reported to be useful

in the treatment of "anxiety, depression, migraine, stroke, angina, and hypertension." *E.g.*, DTX-

0006, '246 patent at 1:8-13. The '246 patent states that "$5-HT_2$ receptor antagonist activity may

be beneficial for the treatment of angina," but since "specific $5-HT_2$ receptor antagonists are

available already, this research focuses on $5-HT_{1D}$ receptor antagonists only." DTX-0006, '246

patent at 60:35-49. The '246 patent thus focuses on the serotonin $5HT_{1A}$ and $5HT_{1D}$ receptors and

does not discuss activity at any other receptor. The '246 patent does not indicate that any of the

compounds have potential antipsychotic activity. Moreover, the '246 patent is silent regarding

*partial* agonist activity at the $5-HT_{1A}$ receptor.

47

**EXHIBIT 5**

88.     Of the 46 specific compounds exemplified in the '246 patent, none of them relates to the particular situation where the benzothiophene is unsubstituted, i.e., where X and Y are both hydrogen.  DTX-0006, '246 patent at 3:38-5:2; Examples 1-63.  Therefore, all of the specifically exemplified compounds require substitution on the benzothiophene ring, particularly at the X-position, in addition to the piperazinyl group.  The '246 patent therefore does not disclose the hypothetical compound that Defendants' derive from the general formula.  In addition, when $R_1$ is a phenylalkyl group, the vast majority of the 46 specifically identified compounds possess a two-carbon alkyl linker.  DTX-0006, '246 patent at 3:38-5:2.  None of the 46 specifically disclosed compounds has a four-carbon chain.

89.     The binding affinity data that is provided does not reveal the functional activity of these compounds at the $5\text{-}HT_{1A}$ or $5\text{-}HT_{1D}$ receptors.  Significantly, some of the exemplified compounds have very low binding affinities (e.g., ethyl-4-[4-phenylmethyl]-1-piperazyinyl]benzo[b]thiophen-2-carboxylate monohydrochloride).  '246 patent at 18:1-48.  There are no data provided for any of the compounds for functional activity against brain $5\text{-}HT_{1A}$ receptors.  Importantly, even though this work was performed by a pharmaceutical company (Merrell Dow Pharmaceuticals Inc.), none of these compounds have ever received FDA approval for any indication.  Moreover, as dicussed in further detail below, the specific examples demonstrate that small changes in structure resulted in large pharmacological differences.

          **b.     U.S. Patent No. 4,847,254**

90.     U.S. Patent No. 4,847,254 ("the '254 patent"), titled "CNS Affecting 5-oxy-3-aminomethyl-dihydro-Benzofurans and Benzothiophenes," issued almost twenty years before the priority date.

**EXHIBIT 5**

91.     The '254 patent "relates to 3-aminomethyl derivatives of indane, dihydrobenzofurane, dihydrobenzothiophene, and indoline," methods of preparing such compounds, and their use in treating CNS disorders including schizophrenia and depression. DTX-0007, '254 patent at Abstract. This patent does not disclose any benzothiophene-containing drug candidates. The '254 patent instead discloses compounds having the following general formula:



wherein X may be $CH_2$, O, S or NR, with R being hydrogen or a lower alkyl (1-6 C atoms); $R^1$ may be hydrogen, lower alkyl or alkenyl groups and optionally substituted with a hydroxy group or aralkyl group, and the bond between positions 2- and 3- is a *single* bond. DTX-0007, '254 patent at 1:30-47. $R^2$ is hydrogen or a lower alkyl as long as $R^1$ and $R^2$ are not hydrogen and $R^3$ is a 5-hydroxy, which may be optionally substituted with various alkyl or phenyl groups. DTX-0007, '254 patent at 1:48-51. This formula does not include any benzothiophenes. Moreover, of the 47 specifically exemplified compounds, over half (24) are indanes, 22 are benzofurans, and only one is a *dihydro*benzothiophene. The only benzothiophene compounds disclosed in the '254 patent relate to synthetic intermediates used to prepare the dihydrobenzothiophene compound, Lu 24-100 (5-hydroxy-2,3-dihydro-N,N-dipropyl-3-benzothiophenmethylamine, hemifumarate).[2]     DTX-

---

[2] The '254 patent includes "2,3-dihydroxy" in the chemical name for Lu 24-100. This is a typographical error based on the synthetic details that are provided.

**EXHIBIT 5**

0007, '254 patent at Examples 19-23.  These synthetic intermediates were not tested in any of the pharmacological assays.  *See* DTX-0007, '254 patent at 17:48-18:60.

92.     The reported pharmacological data focus on dopaminergic effects and relate to *in vivo* testing.  One can only draw limited conclusions from such data, because it is difficult to conclude whether the observed results relate to the compounds' actions at dopamine receptors or instead are a result of effects at other receptors or other factors.  The '254 patent is silent as to any serotonergic activity of its compounds.  The '254 patent does not mention whether the disclosed compounds exhibit any serotonergic activity.  None of the compounds disclosed in the '254 patent has been approved by the FDA for any indication.

c.     **U.S. Publication No. 2003/0050306**

93.     U.S. Publication No. 2003/0050306 ("the '306 publication") is titled "Novel Heteroaryl Derivatives, Their Preparation and Use."

94.     The '306 publication is directed to a "heteroaryl derivative" of the following formula:



wherein X is wherein X is —O—, —S— or $CR^4R^5$—; and Y is —$CR^6R^7$; —$CR^6R^7$—$CR^8R^9$— or —$CR^6$—$CR^7$; or X and Y together form a group —$CR^4$=$R^5$—, or —$CR^4$=$CR^5$—$CR^6R^7$—; Z is —O—, or —S—; W is N, C or CH; n is 2, 3, 4, 5, 6, 7, 8, 9 or 10; m is 2 or 3; A is O or S, and the dotted line means an optional double bond.  DTX-0008, '306 publication at Abstract.  This general formula encompasses tens of thousands of compounds, and possibly more.  The '306 publication

**EXHIBIT 5**

specifically discloses approximately 120 compounds, but only a few of these compounds have a benzothiophene moiety. Moreover, all the compounds that include a benzothiophene have this moiety connected to the piperazine or piperidine ring at the 7-position (as opposed to the 4-position of brexpiprazole). And the vast majority of the specifically disclosed compounds relate to other bicyclic ring systems, including dihydrobenzodioxines, dihydrobenzofurans and dihydrobenzodioxines. The '306 publication states that the disclosed compounds show "potent[] binding to the 5-HT$_{1A}$ receptor," are "potent dopamine D$_4$ receptor ligands," and may also have "potent serotonin reuptake inhibition activity and/or effect at dopamine D$_3$ receptors." DTX-0008, '306 publication at [002-003]. These compounds thus exhibit a complex multifunctional pharmacology.

95. The '306 publication reports binding affinities for the 5-HT$_{1A}$ and D$_4$ receptors for certain compounds. DTX-0008, '306 publication at 18-19, Table 1. The '306 publication also discusses other testing relating to the functional activity at the 5-HT$_{1A}$ receptors, but does not disclose any data relating to any such functional testing at these or any other receptors.

### d.   U.S. Patent No. 4,734,416

96. U.S. Patent No. 4,734,416 ("the '416 patent"), titled "Pharmaceutically Useful Carbostyril Derivatives," issued almost two decades before the priority date.

97. The '416 patent describes "novel carbostyril derivatives" that may be useful "as antihistamic agents and central nervous system controlling agents." DTX-0011, '416 patent at 1:5-6, 1:57-60. It identifies a very broad genus of compounds, having the following general formula:

**EXHIBIT 5**



DTX-0011, '416 patent at Abstract. The above general formula permits multiple modifications and substitutions. Possible structures may include a piperazine or diazepine ring (*Q* may be 2 or 3), a carbostyril or dehydrocarbostyril, a linker of varying length that may be substituted and various attachment points of the linker to the carbostyril ring. Moreover, $R_5$ is a cycloalkyl group having 3 to 8 carbon atoms, a phenyl group (which may have 1 to 3 substituted groups selected from the group consisting of halogen atoms, alkyl groups having 1 to 4 carbon atoms and alkoxy groups having 1 to 4 carbon atoms), an alkyl group having 1 to 4 carbon atoms (having one substituted group such as a hydroxy group, a phenyl group or an alkanoyloxy group having 1 to 4 carbon atoms), an alkanoyl group having 1 to 4 carbon atoms or benzoyl group. The group cannot be a bicyclic ring. This general structure encompasses many thousands of compounds. The '416 patent also identifies over 200 specific compounds as "representative examples." DTX-0011, '416 patent at cols. 4-13.

98. The '416 patent is primarily directed to compounds that have potential antihistaminic activity for the treatment of allergic reactions. DTX-0011, '416 patent at 2:5-27, cols. 31-32. The '416 patent also discusses "central nervous controlling" effects, but these concern anesthetic and sedating properties such as those associated with the classical benzodiazepine, diazepam. DTX-0011, '416 patent at 2:53-67. The pharmacological testing thus relates to these properties, and not to any antipsychotic activity or even to binding or functional activity at

52

**EXHIBIT 5**

dopamine or serotonin receptors. DTX-0011, '416 patent at 31:1-36:10. The '416 patent instead reports testing for (1) antihistaminic activity (DTX-0011, '416 patent at cols. 31-32), (2) anesthesia and sleep increasing activity (DTX-0011, '416 patent at 33:1-34:37); (3) activity for inhibiting fighting behavior of mouse (DTX-0011, '416 patent at 34:38-35:15); (4) analgetic activity (DTX-0011, '416 patent at 35:17-44); and (5) acute toxicity (DTX-0011, '416 patent at 35:46-36:10).

<div align="center">

**e.      U.S. Patent No. 5,006,528**

</div>

99.      U.S. Patent No. 5,006,528 ("the '528 patent"), "Carbostyril Derivatives," issued more than a decade before the priority date.

100.      The '528 patent is directed to carbostyril derivatives for treating schizophrenia and having the following formula:



DTX-0012, '528 patent at Abstract, 1:13. R is defined as a substituted phenyl group, which includes phenyl groups substituted at the 2-position, 2-, 3- and 6-positions or at the 2-, 3-positions. DTX-0012, '528 patent at Abstract; 2:46-3:25. The '528 patent discloses the active pharmaceutical ingredient of ABILIFY®, aripiprazole.

101.      The disclosed compounds have "strong activity for blocking the neurotransmission effect of dopaminergic receptor, with a weak α-blocking activity." DTX-0012, '528 patent at 3:26-29. The '528 patent identifies thirteen exemplary compounds and reports pharmacological testing

<u>EXHIBIT 5</u>

of these compounds in two tests: (1) anti-apomorphine activity in mouse and (2) anti-epinephrine

lethality activity in mouse.  DTX-0012, '528 patent at 15:37-17:10.

<p style="text-align:center"><b>f.      WO 2005/019215</b></p>

102.    PCT   Publication   Number   WO   2005/019215   ("WO   '215)   is   titled

"[1,8]naphthyridin-2-ones and related compounds for the treatment of schizophrenia."

103.    WO '215 relates to compounds having the following general formula 1:



1

.

104.    *E.g.*, DTX-0016, WO '215 at Abstract.  In this formula, Z and Q are independently,

N, C or CH, provided that at least one of Z and Q is N.  DTX-0016, WO '215 at 2:13-14.  Therefore,

the bicyclic ring including Z and Q cannot be a carbostyril ring.  WO '215 therefore specifies that

the invention relates to "[1,8]naphthyridin-2-ones and related compounds."  DTX-0016, WO '215

at 1:6.

105.    WO '215 identifies approximately 400 exemplary compounds, only two of which

contain benzothiophenes.  WO '215 states that its disclosed compounds "bind to dopamine

$D_2$ receptors [and that] some exhibit activity as partial agonists of $D_2$ receptors, while others

exhibit activity as antagonists of such receptors."  DTX-0016, WO '215 at 1:10-12.  WO '215 does

not provide any information or testing relating to activity at any other receptors.  WO '215

therefore does not disclose any serotonergic activity.  WO '215 states that the disclosed compounds

may be used to treat any of a long list of disorders or conditions, including single episodic or

**EXHIBIT 5**

recurrent major depressive disorders, bipolar disorders, schizophrenia and other psychotic disorders.  DTX-0016, WO '215 at 3:27-5:2.

### g.      WO 2004/105682

106.      WO 2004/105682 ("WO '682") is titled "Carbostyril Derivatives and Mood Stabilizers for Treating Mood Disorders."

107.      WO '682 relates to pharmaceutical compositions and methods for using a combination of a carbostyril derivatives and a mood stabilizer for the treatment of mood disorders, including bipolar disorders.  DTX-0014, WO '682 at 1, 4:16-23.

108.      WO '682 states that a preferred carbostyril derivative is aripiprazole or a metabolite thereof.  It describes the complex metabolism of aripiprazole, identifying 13 metabolites, many of which have known biological activity.  DTX-0014, WO '682, Fig. 8.  WO '682 selects six of the 13 disclosed metabolites as "preferred," and one of these preferred metabolites is dehydroaripiprazole (also described as OPC-14857).  But WO '682 does not indicate any clear preference for any of these six compounds.  DTX-0014, WO '682 at 5:8-16, 15:12-18:4, Fig. 8, claims 4 and 14.  Rather, WO '682 states that "[i]t is to be understood that any one of DM-1458, DM-1451, DM-1452, DM-1454 or DCPP, as shown in Figure 8 could be substituted for dehydroaripiprazole in these disclosed formulations."  DTX-0014, WO '682 at 56:13-16.  As noted, several aripiprazole metabolites have known biological activity and, for example, DCPP is known to have pharmacological activity at a variety of receptors.  DTX-0014, WO '682 at 5:8-16, 15:12-18:4 and Fig. 8.

109.      Many examples relate solely to aripiprazole and not to any metabolites.  Example 1 relates to the preparation of aripiprazole anhydride crystals B.  DTX-0014, WO '682 at 46:10-47:18, Example 1.  Example 2, which is the only example disclosing pharmacological data, relates

EXHIBIT 5

to aripiprazole, not to any of its metabolites.  DTX-0014, WO '682 at 47-52, Example 2.  This example compares the 5-HT$_{1A}$ binding and agonistic activity of aripiprazole to that of serotonin. DTX-0014, WO '682 at 47-52, Example 2.  Aripiprazole is reported to have an EC$_{50}$ of 2.12 nM, whereas serotonin has an EC$_{50}$ of 3.67 nM.  DTX-0014, WO '682 at 52, Table 1.  The example states that aripiprazole has "high affinity" at the 5-HT$_{1A}$ receptor with a partial agonist activity in the range of 65-70%.  DTX-0014, WO '682 at 51:6-22.  The example does not report any pharmacological data for any metabolites of aripiprazole.  The formulation examples do not focus on any individual compound or metabolite and instead all include a mood stabilizer.  DTX-0014, WO '682 at 52-60, Example 3 (Formulation Examples 1-22).  Moreover, although WO '682 summarizes clinical trial protocols for either aripiprazole or a metabolite thereof in combination with a mood stabilizer, it does not report any actual clinical data.  DTX-0014, WO '682, 60-68, Examples 4-8.  There is therefore no data supporting the contention in WO '682 that the exemplary compositions—which may comprise aripiprazole or any one of the six aripiprazole metabolites combined with a mood stabilizer—"possess excellent efficacy" and "fewer side-effects and an excellent safety profile."  DTX-0014, WO '682 at 30:18-32:3.

### h.    WO 2004/026864

110.    WO 2004/026864 ("WO '864") is a patent application published April 1, 2004.  It identifies Warner-Lambert as the applicant and is titled "Heterocyclic Substituted Piperazines for the Treatment of Schizophrenia."   WO '864 discloses heterocyclic substituted piperazines, methods of preparing them, pharmaceutical compositions containing them and their use in the treatment of schizophrenia and other CNS disorders.  DTX-0015, WO '864 at 1:5-8.

111.    WO '864 relates to compounds having the following general formula 1:

**EXHIBIT 5**



.

wherein X is sulfur, oxygen, SO, $SO_2$, $CH_2$ or $NR^{10}$; Y is nitrogen or CH; Z is nitrogen or CH;

A is $-(CH_2)mCH_2-$, $-(CH_2)_mO-$, $-(CH_2)mNR^{11}-$ or $-(CH_2)_mC(R^{12}R^{13})-$; $R^4$, $R^9$, $R^{10}$ and $R^{11}$ are

independently selected from hydrogen or optionally-substituted alkyls; $W^1$ is $CR^5R^6$ and $W^2$ is

$CR^7R^8$ and the broken line extending from $W^1$ to $W^2$ represents an optional double bond, subject

to certain conditions.  DTX-0015, WO '864 at 1:25-4:15.

112.   This general formula encompasses many thousands of possible compounds

including benzothiophene-containing compounds, but such compounds are restricted to

benzothiophene-3-yl-piperazines as opposed to the benzothiophene-4-yl-piperazine structure

associated with brexpiprazole.

113.   WO '864 identifies 176 exemplary compounds, and only four possess a

benzothiophene ring.  DTX-0015, WO '864, Examples 45-48.   Moreover, two of these

benzothiophenes are fluorobenzothiophenes.  DTX-0015, WO '864, Examples 47 and 48.  The

remaining 172 exemplary compounds include 108 benzoisothiazoles (Examples 19-27, 30-32, 36,

38-44, 49, 51, 53, 56, 59, 62-63, 66-72, 74, 76, 78-90, 93-121, 131-136, 147-157, 161-165, 168-

170, 172-176), 53 benzoisoxazoles (Examples 1-12, 28-29, 33-35, 37, 52, 54, 57, 60, 64-65, 73,

75, 77, 91-92, 121-130, 137-146, 158-160, 166, 171) and 11 indazoles (Examples 13-18, 50, 55,

58, 61, 167).

**EXHIBIT 5**

114.    WO '864 further generally states that the claimed compounds are $D_2$ and 5-$HT_{2A}$

antagonists effective in treating CNS disorders.  WO '864 provides specific $D_2$ and 5-$HT_{2A}$ binding

affinities for only some of the disclosed compounds, Examples 1-36, none of which includes a

benzothiophene moiety.  DTX-0015, WO '864 at 34-35.  WO '864 highlights the results of only

three of the 36 tested compounds, Examples 8, 23 and 31.  DTX-0015, WO '864 at 34-35.  The

compounds of Examples 8, 23 and 31 have the following structures:



Example 8                    Example 23                    Example 31

115.    There is no specific assay data for the four benzothiophene compounds.  *See* DTX-

0015, WO '864 at 1:9-11, 34:23-35:23.  The following general statement is the only disclosure

regarding the binding affinities for the benzothiophene compounds:

All of the title compounds of the examples were tested and at least one stereoisomer
of each such compound exhibited a binding affinity for the D2 receptor, measured
as percent inhibition at a concentration of 0.1 μm, of no less than 14% and up to



Example 8                    Example 23                    Example 31

100%.  At least one stereoisomer of each such compound exhibited a binding
affinity for the 5HT2 receptor, measured as percent inhibition at a concentration of
0.1 μm, of no less than 80% and up to 100%.

58

**EXHIBIT 5**

DTX-0015, WO '864 at 34:8-14.

## 2.    Other Documents

### a.    ABILIFY® PI 2004

116.    The ABILIFY® PI 2004 concerns Otsuka's FDA-approved aripiprazole drug product, ABILIFY®.[3]

117.    Its states that ABILIFY® is indicated for the treatment of schizophrenia and bipolar mania.   DTX-0019, ABILIFY® PI 2004 at 9-10.   ABILIFY® PI 2004 describes the following chemical structure for ABILIFY® (aripiprazole):



DTX-0019, ABILIFY® PI 2004 at 1.

118.    ABILIFY® PI 2004 further states that "[t]he mechanism of action of aripiprazole, as with other drugs having efficacy in schizophrenia and bipolar disorder is unknown."   DTX-0019, ABILIFY® PI 2004 at 1.   Moreover, "ABILIFY activity is presumably primarily due to the parent drug, aripiprazole, and to a lesser extent, its major metabolite, dehydroaripiprazole, which has been shown to have affinities for $D_2$ receptors similar to the parent drug and represents 40% of the parent drug exposure in plasma."   DTX-0019, ABILIFY® PI 2004 at 2.   Dehydroaripiprazole does not have similar functional activity at $D_2$ receptors.

---

[3] Defendants cite to the ABILIFY® PI 2004, and reference other versions of this label in their Statement of Contested Facts Regarding Validity.  Any response with respect to this version of the label apply to other versions as well.  Plaintiffs reserve the right to address any other versions of this label to the extent Defendants proffer arguments regarding such other versions.

**EXHIBIT 5**

119.    ABILIFY® PI 2004 states that aripiprazole "exhibits high affinity for dopamine $D_2$ and $D_3$, serotonin 5-$HT_{1A}$ and 5-$HT_{2A}$ receptors ($K_i$ values of 0.34, 0.8, 1.7 and 3.4 nM, respectively), moderate affinity for dopamine $D_4$, serotonin 5-$HT_{2C}$ and 5-$HT_7$, alpha1-adrenergic and histamine $H_1$ receptors ($K_i$ values of 44, 15, 39, 57 and 61 nM, respectively), and moderate affinity for the serotonin reuptake site ($K_i$=98 nM). . . . Aripiprazole functions as a partial agonist at the dopamine $D_2$ and the serotonin 5-$HT_{1A}$ receptors, and as an antagonist at serotonin 5-$HT_{2A}$ receptor."  DTX-0019, ABILIFY® PI 2004 at 1.  ABILIFY® PI 2004 does not provide any information regarding the efficacy of dehydroaripiprazole.

**b.    Davies 2004**

120.    Davies 2004 is an article titled "Aripiprazole: A Novel Atypical Antipsychotic Drug with a Uniquely Robust Pharmacology."

121.    The authors report data from different sources relating to the dopamine receptor activity of aripiprazole and conclude that aripiprazole has a high affinity at $D_2$ and $D_3$, moderate affinity at $D_4$ and low affinity at $D_1$ and $D_5$ receptors.  PTX0435, Davies 2004 at 319-321.  Davies 2004 further reports that aripiprazole has a "highly complex serotonergic pharmacology with significant activity at a number of 5-HT receptors" and "modest affinity for the human $H_1$ histamine receptor."  PTX0435, Davies 2004 at 322 & Table 1.

122.    Davies 2004 also includes pharmacokinetic data as well as information regarding drug interactions and the clinical efficacy of aripiprazole.  PTX0435, Davies 2004 at 325-332.  The authors state that "[t]o date, available literature indicates that, aripiprazole demonstrates less risk of EPS, weight gain, raised prolactin levels and prolongation of the QTc interval."  PTX0435, Davies 2004 at 332.

**EXHIBIT 5**

123.    Davies 2004 further notes that, due to aripiprazole's complex pharmacological profile, "it will be difficult to replicate its actions via the sort of large-scale random screening approaches currently in vogue in pharmaceutical companies," and behavioral or genomic approaches will be more successful.  PTX0435, Davies 2004 at 331.

### c.    Fura 2004

124.    Fura 2004 is an article titled "Discovering Drugs through Biological Transformation: Role of Pharmacologically Active Metabolites in Drug Discovery."  DTX-0023, Fura, A., et al., "Discovering Drugs through Biological Transformation: Role of Pharmacologically Active Metabolites in Drug Discovery," *J. Med. Chem.* (2004) 47(18):4349-51 ("Fura 2004").  Fura 2004 discusses the potential use of active metabolites in drug development. It does not, however, state a general rule that metabolites should be used as lead compounds. Moreover, Fura 2004 does not discuss aripiprazole or its metabolites.  The authors further caution that "[i]t is also often difficult or impossible to predict a priori whether a certain compound could form a pharmacologically active metabolite."  DTX-0023, Fura 2004 at 4339.

### d.    Kubo 2005

125.    Kubo 2005 is an article titled "Influence of Itraconazole Co-administration and CYP2D6 Genotype on the Pharmacokinetics of the New Antipsychotic ARIPIPRAZOLE."  DTX-0026, Kubo, M., et al., "Influence of Itraconazole Co-Administration and CYP2D6 Genotype on the Pharmacokinetics of the New Antipsychotic," *Drug Metabolism and Pharmacokinetics* (2005) 20(1):55-64 ("Kubo 2005").  This article describes studies on the influence of itraconazole (ITZ) co-administration and CYP3A4 inhibition on the pharmacokinetics of aripiprazole and dehydroaripiprazole (OPC-14857).  DTX-0026, Kubo 2005.

**EXHIBIT 5**

126.     Kubo 2005 reports that the potent CPY3A4 inhibitor itraconazole inhibits CYP3A4 metabolic activity when co-administered with aripiprazole.  DTX-0026, Kubo 2005 at 62-63.  The authors further report, based on pharmacokinetic testing, that CYP2D6 and CYP3A4 are "approximately equally responsible" for the metabolism of aripiprazole and that dehydroaripiprazole is the primary metabolite.  DTX-0026, Kubo 2005 at 64.  Kubo 2005 also states that CYP3A4 is the main enzyme involved in the metabolism of dehydroaripiprazole,  DTX-0026, Kubo 2005 at 64.

127.     Kubo concludes there is no clinical significance to the influence of CYP3A4 inhibition on the pharmacokinetics of aripiprazole.  DTX-0026, Kubo 2005 at 55, 64 ("In conclusion, when administered at clinical doses, ITZ, which is known to strongly inhibit CYP3A4, would increase the AUC of ARIPIPRAZOLE by 50% at maximum, which is unlikely to cause clinically significant issues.").  Kubo 2005 therefore does not suggest any problematic issues with the metabolism of aripiprazole, or that the administration of dehydroaripiprazole in place of aripiprazole would not implicate metabolism in the liver.

### e.     Kuipers 1995

128.     Kuipers 1995 is an article titled "$N^4$-Unsubstituted $N^1$-Arylpiperazines as High-Affinity 5-$HT_{1A}$ Receptor Ligands."  Kuipers, W., et al., "N4-unsubstituted N1-arylpiperazines as high-affinity 5-HT1A receptor ligands," *J. Med. Chem.* (1995) 38(11):1942-1954 ("Kuipers 1995") (DTX-0027). In this article, the researchers tested a series of bicyclic aryl piperazines, and identified a methyl-substituted benzodioxane analog (compound, 13, below) as the "most potent compound."  DTX-0027, Kuipers 1995 at 1950.  Kuipers 1995 reports that this compound "has an affinity comparable to the selective $5HT_{1A}$ reference compound 8-OH-DPAT and the neurotransmitter 5-HT itself."  DTX-0027, Kuipers 1995 at 1950.  Only one tested compound,

**EXHIBIT 5**

compound 15, includes a benzothiophene moiety.  This moiety, however, is attached to the

piperazine ring at the 7-position on the benzothiophene, as opposed to the 4-position of

brexpiprazole.  DTX-0027, Kuipers 1995 at 1950.  Kuipers 1995 reports affinity data from

radioligand binding assays ($K_i$ values) for some of the tested compounds in Table 2:

**Table 2.** $K_i$ Values for the Displacement of
[$^3$H]-2-(Di-$n$-propylamino)-8-hydroxytetralin (**2**) from Central
5-HT$_{1A}$ Recognition Sites in Rat Frontal Cortex Homogenates
with $N^4$-Unsubstituted 2-, 3-, and 4-Substituted
$N^1$-Phenylpiperazines



| R | no. | $K_i \pm$ SEM (nM)[a] | | | (n=) |
|---|---|---|---|---|---|
| H | 6 | 500 | ± | 20 | (3) |
| 2-OCH$_3$ | 7 | 170 | ± | 20 | (3) |
| 3-OCH$_3$ | 8 | 320 | ± | 40 | (4) |
| 4-OCH$_3$ | 9 | 20,000 | ± | 5,000 | (2) |
| 2,3-OCH$_3$ | 10 | 1,000 | ± | 100 | (4) |
|  | 11 | 40 | ± | 5 | (5) |
|  | 12 | 12 | ± | 3 | (3) |
|  | 13 | 5.2 | ± | 1.2 | (3) |
|  | 14 | 13 | ± | 2 | (3) |
|  | 15 | 9.9 | | | (1) |
|  | 16 | 200 | ± | 10 | (3) |
|  | 17 | 18 | ± | 2 | (3) |
|  | 18 | 84 | ± | 11 | (3) |

[a] $K_i$ Values are based on $n$ determinations, each using four to
six concentrations in triplicate.

DTX-0027, Kuipers 1995 at 1946, Table 2.  Kuipers 1995 does not include any functional data for

its compounds.

129.    As noted in Table 2, compound 15 exhibited a $K_i$ of 9.9 in the single assay

conducted.  In contrast, all other tested compounds were tested in triplicate, which is crucial for

**EXHIBIT 5**

accurate $K_i$ determinations.  Compound 13 has a $K_i$ value of 5.2.  DTX-0027, Kuipers 1995 at

Table 2.  Compound 15 was not further studied.  *See* DTX-0027, Kuipers 1995 at Table 3.  The

authors concluded that aside from compound 13, their "data agree with a preference of the 5-HT$_{1A}$

receptor for a coplanar conformation of the arylpiperazine moiety of compounds 11, 12 and 14."

DTX-0027, Kuipers 1995 at 1950.

### f.       Lowe 1991

130.     Lowe 1991 is an article titled "1-Naphthylpiperazine Derivatives as Potential

Atypical Antipsychotic Agents."  Lowe, A., et al., "1-Naphthylpiperazine Derivatives as Potential

Atypical Antipsychotic Agents," *J. Med. Chem.* (1991) 34:1860-1866 ("Lowe 1991").  The authors

studied 1-naphthylpiperazine derivatives as possible atypical antipsychotics and hypothesized that

the naphthylpiperazine moiety would bind "at the accessory binding site" such that "an appropriate

hydrogen-bonding group could be held by a phenethyl side chain so as to reach the serine residues,

as shown in the depiction of the $D_2$ receptor of Scheme IV."  DTX-0032, Lowe 1991 at 1861.

Scheme VI depicts a model of the $D_2$ receptor illustrating the proposed agonist and antagonist

binding used in receptor antagonist design.  This schematic, however, was derived from a

published model of the β-adrenergic receptor—a completely different receptor—and was

analogized to the low-resolution X-ray structure from yet another GPCR, rhodopsin.  This is

therefore at best an approximation or guess as to the true structure of the dopamine receptor and

how ligands may bind to it.  At the time Lowe 1991 was published, in the early 1990s, there was

very limited information regarding the structure and composition of GPCRs in the brain.

131.     The authors report binding data for only the naphthylpiperazine derivatives, not

benzothiophenes.  DTX-0032, Lowe 1991 at Table 1.  Limited functional data is provided.

**EXHIBIT 5**

g.      **Oshiro 1998**

132.     Oshiro 1998 is an article titled "Novel Antipsychotic Agents with Dopamine Autoreceptor Agonist Properties: Synthesis and Pharmacology of 7-[4-(4-Phenyl-1-piperazinyl)butoxy]-3,4,-dihydro-2(1H)-quinolinone Derivatives."   Oshiro, Y., et al., *J. Med. Chem.* (1998) 41:658-667 ("Oshiro 1998").   It reports on the authors' efforts to develop an antipsychotic agent that acts as a dopamine (DA) autoreceptor agonist and as a post-synaptic DA receptor antagonist.  According to the authors, "[t]o find a more effective agent for treating both negative and positive symptoms in schizophrenia and with less side effects than the standard agents, we have searched for a compound which is an agonist of the DA autoreceptors and a potent antagonist of the postsynaptic DA receptors."   DTX-0034, Oshiro 1998 at 658-659.   The researchers designed and synthesized a number of 7-[4-(substituted phenyl)-1-piperazinyl)butoxy]-3,4-dihydro-2(1*H*)-quinolinone derivatives in the process of ultimately developing the clinical candidate, aripiprazole (also referred to as OPC-14597 or compound 28).  DTX-0034, Oshiro 1998 at Tables 1 and 2.  None of the compounds studied in this work includes a biaryl, let alone a benzothiophene, moiety.  DTX-0034, Oshiro 1998 at Tables 1 and 2.  The authors reported the pharmacological activity of the derivatives synthesized in this work.

133.     Oshiro 1998 initially examined the post-synaptic DA antagonist activity of the compounds by testing their ability to inhibit apomorphine (APO)-induced stereotypic behavior in mice.  DTX-0034, Oshiro 1998 at 660-661.  The most potent compound tested was the ethoxy-substituted compound 48, with an $ED_{50}$ value of 0.2 μmol/kg, followed by compounds 56 (the double bond analogue to compound 48), which had an $ED_{50}$ value of 0.24 μmol/kg (methoxy-substituted) and compound 28 (aripiprazole), with $ED_{50}$ value of 0.6 μmol/kg.  DTX-0034, Oshiro 1998 at 661-62, Tables 1 and 2.  These compounds, along with other compounds that showed

**EXHIBIT 5**

██████████████

potency in this anti-APO test greater than chlorpromazine were subjected to additional testing for their DA autoreceptor agonist activity.  DTX-0034, Oshiro 1998 at 662.

134.     The DA autoreceptor agonist activity was measured by the compound's ability to reverse the $\gamma$-butyrolactone (GBL)-induced increase in DOPA synthesis in mouse brain.  The compounds exhibited varying results in this testing.  DTX-0034, Oshiro 1998 at 662 and Table 3.  For example, compounds 28 ($EC_{50}$ 0.6 $\mu$mol/kg) and 48 ($EC_{50}$ 0.2 $\mu$mol/kg), exhibited better DA autoreceptor agonist activity than their corresponding 2(1H)-quinolinone derivatives, compounds 54 ($EC_{50} > 22$ $\mu$mol/kg) and 56 ($EC_{50} > 20$ $\mu$mol/kg).  DTX-0034, Oshiro 1998, Table 3.  Similarly, dehydroaripiprazole, which is compound 54, had no DA autoreceptor agonist activity.  In other words dehydroaripiprazole is not an agonist.  DTX-0034, Oshiro 1998, Table 3 ($>22$ $\mu$mol/kg). These results are reported in Table 3:

Table 3.  Pharmacology of the Selected Compounds

| compd | $ED_{50}$ (CL) DA receptor antagonist activity[a] (A) | DA autoreceptor agonist activity[b] | catalepsy[c] (B) | $\alpha_1$-adrenoceptor antagonist activity[d] | $ED_{50}$ ratio, B/A |
|---|---|---|---|---|---|
| 13 | 2.8 | 3.5 (1.4−7.2) | 5.6 (3.3−8.9) | >299 | 2.0 |
| 16 | 2.1 | 1.3 (0.1−4.0) | NT | NT | |
| 21 | 0.7 | >23 | 5.9 (3.2−8.9) | >146 | 8.7 |
| 25 | 0.9 | >23 | 1.4 (0.2−3.7) | >150 | 1.5 |
| 26 | 0.9 | >2.1 | NT | NT | |
| 27 | 3.4 | 9.1 (3.7−84.7) | 13.5 (10.8−18.4) | >314 | 3.9 |
| 28 | 0.6 | 5.1 (1.3−29.2) | 7.8 (7.1−8.7) | >286 | 13 |
| 33 | 1.1 | >22 | NT | >256 | |
| 37 | 0.8 | >21 | NT | >265 | |
| 48 | 0.2 | 0.65 (0.20−11.5) | 4.4 (3.9−5.2) | 7.0 (6.1−7.8) | 20 |
| 52 | 2.8 | 20.1 (11.2−94.4) | 12.6 (7.7−24.1) | >299 | 4.5 |
| 54 | 0.9 | >22 | NT | >287 | |
| 55 | 3.4 | 3.9 (0.7−18.6) | 10.5 (7.3−19.6) | >156 | 3.1 |
| 56 | 0.24 | >20 | NT | >127 | |
| 1 | 41.3 | 3.5 (1.6−5.6) | 73.2 (66.8−80.2) | 151 (96.1−236.0) | 1.8 |
| CPZ | 12.1 | IA | 24.5 (21.4−27.9) | 19.7 (19.1−22.0) | 2.0 |
| HAL | 0.24 | IA | 0.9 (0.88−0.98) | >341 | 3.7 |

[a] See Tables 1 and 2. $ED_{50}$ values are presented in $\mu$mol/kg po. [b] Inhibition of the GBL-induced increase in DOPA accumulation in mice. The $ED_{50}$ values and 95% confidence limits (CL) were calculated using the linear regression analysis and are presented in $\mu$mol/kg po. The compounds with $ED_{50}$ values indicated with a greater sign (>) were inactive at below the given dose. [c] Induction of catalepsy in mice. The $ED_{50}$ values and 95% confidence limits (CL) were calculated using the probit method and are presented in $\mu$mol/kg po. [d] Inhibition of the lethal effects of noradrenaline in mice. The $ED_{50}$ values and 95% confidence limits (CL) were calculated using the probit method and are presented in mmol/kg po The compounds with $ED_{50}$ values indicated with a greater sign (>) were inactive at below the given dose. IA, inactive up to 10 mg/kg po; NT, not tested.

135.     Oshiro 1998 reports that "the 2(1H)-quinolinone derivatives with the 3-chloro-2-methyl-, 2,3-dichloro- and 2-ethoxyphenyl piperazinyl moieties (**52**, **54** and **56**) were much less active than the 3,4-dihydro-2(1H)-quinolinone derivatives with the corresponding side chain (**13**,

**EXHIBIT 5**

**28** and **48**).”  DTX-0034, Oshiro 1998 at 663.  Oshiro and colleagues also noted the effect of other structural changes, including that “compounds that possess more electron-donating substituents such as amino (**22**), acetylamino (**23**) and hydroxy (**24**) groups showed much lower potency.” DTX-0034, Oshiro 1998 at 660.

136.    The compounds selected for testing for DA autoreceptor agonist activity were further tested for their EPS liability, via their ability to induce catalepsy and hypotensive activity as measured by $\alpha_1$-adrenoceptor antagonist activity.  DTX-0034, Oshiro 1998 at 662, Table 3. Compound 25 was the most potent compound in the induction of catalepsy testing.  DTX-0034, Oshiro 1998 at 663.  Several compounds, including dehydroaripiprazole, were not tested for induction of catalepsy.  Oshiro 1998 at Table 3.

137.    As a result of these studies, the authors selected aripiprazole (compound 28) for further development for use in treating schizophrenia.  DTX-0034, Oshiro 1998 at 663.

**h.    Patani 1996**

138.    Patani 1996 is an article titled “Bioisosterism: A Rational Approach in Drug Design.”  Patani, G & LaVoie, E., “Bioisosterism: A Rational Approach in Drug Design,” *Chem. Rev.* (1996) 96:3147-3176 (“Patani 1996”). This article provides a general overview of bioisosterism in medicinal chemistry and identifies a few examples of bioisosteres.  Patani 1996 does not indicate, however, whether any such bioisosteres could be expected to be successfully substituted for chemical structures in the development of antipsychotics.

**i.    Thornber 1978**

139.    Thornber 1978 is an article titled “Isosterism and Molecular Modification in Drug Design.”  This is a general paper regarding bioisosteres.  Thornber, C., et al., “Isoterism and Molecular Modification in Drug Design,” *Chem. Soc. Revs.* (1978) 7:563-580 (“Thornber 1978”).

**EXHIBIT 5**

Thornber 1978 provides a "flexible" definition of bioisosteres as "groups or molecules which have chemical and physical similarities producing broadly similar biological properties."  DTX-0040, Thornber 1978 at 563.

140.    Thornber 1978 states that bioisosteric replacements would likely allow some properties of the molecule to remain the same, but likely not all.  Thornber 1978 at 565-66. Thornber 1978 further recognizes the limits in bioisosteric replacement, noting that "a good bioisosteric replacement in one series of compounds will not necessarily be useful in another." DTX-0040, Thornber 1978 at 566.  Thornber 1978 provides no specific guidance for predicting how bioisosteric replacements would affect a drug molecule.

E.    **The Prior Art Does Not Render Any of the Asserted Claims of the Brexpiprazole Patents Obvious**

1.    **The Focus on Aripiprazole Is Too Narrow**

141.    Defendants assert that a POSA would have selected aripiprazole, the active ingredient of ABILIFY®, as a lead compound for further development due to its unique pharmacology, and its improved efficacy and tolerability over other approved antipsychotics. Defendants assert that a POSA would have been motivated to modify aripiprazole's chemical structure and had a reasonable expectation of success in doing so in order to reduce the EPS and other side effects associated with aripiprazole.  Defendants' arguments, however, ignore the full scope of the art associated with the development of antipsychotic drugs, including aripiprazole. Absent hindsight, Plaintiffs disagree that a POSA would have selected aripiprazole as a starting point for further development, and also disagree with Defendants' assertion that if a POSA had selected aripiprazole, the skilled artisan would have been motivated to make chemical modifications to its structure to make an improved antipsychotic with a reasonable expectation of success.

**EXHIBIT 5**

142.    Defendants' narrow focus on aripiprazole as a starting point for further development ignores the decades of research and corresponding drug development of antipsychotics.   Various atypical antipsychotics were known to be effective at treating schizophrenia and could have served as starting points for further development.   These other starting points include clozapine, risperidone, quetiapine, olanzapine, ziprasidone, zotepine, iloperidone and lurasidone, each with unique pharmacologic profiles.  *See* PTX0467, Roth Nature at 355, Fig. 2.  Indeed, one of these known atypical antipsychotics, ziprasidone, already exhibited the pharmacological profile—5-HT$_{1A}$ agonist/D$_2$ antagonist—that they assert a POSA would have wanted to attain.  It is thus unclear why a POSA would not have selected ziprasidone which was a marketed product as a lead compound given that it already possessed the target profile that Defendants say needed to be improved in aripiprazole.

143.    Defendants argue that the compounds Plaintiffs identified as other starting points— clozapine, risperidone, quetiapine, olanzapine, ziprasidone, zotepine, iloperidone and lurasidone— would not have served as lead compounds because each of those antipsychotics had substantial drawbacks relative to aripiprazole.   Defendants, however, arbitrarily select certain examples among their adverse side effects to purportedly support why a POSA would not have chosen them. While Defendants argue that a POSA would not have selected these other compounds due to their "drawbacks," they simultaneously argue that the side-effects of aripiprazole would have motivated a POSA to select it as a lead compound for further modification, without weighing the alleged drawbacks of each of these drugs or explaining how a POSA would have assessed, for example, weight gain compared to akathisia.  Accepting, for argument's sake, Defendants' assertion that a POSA would have selected aripiprazole as a lead compound and been motivated to modify its side effect profile, so too would a POSA have been motivated to improve upon the side effect profile

**EXHIBIT 5**

of other available antipsychotics.  To the extent Defendants rely on Hirose, et al., "Mechanism of Action of Aripiprazole Predicts Clinical Efficacy and a Favourable Side-Effect Profile," *J. Psychopharmacology* (2004) 18(3):375-83 at 376 ("Hirose 2004") (DTX-0845), it does not offer any support in this regard.  Hirose 2004 is simply another document that examines the mechanism of action and potential clinical profile of aripiprazole.  *See* DTX-0845, Hirose 2004.  Not only are its disclosures regarding aripiprazole cumulative of others that Defendants assert, but it also provides no motivation for a POSA to have selected aripiprazole as a lead compound over other compounds that already possessed a robust serotonin profile that Defendants say a POSA would have wanted to improve in aripiprazole.

144.    To the extent Defendants rely on the 2015 non-prior art article—Brexpiprazole (Rexulti) for Schizophrenia and Depression, *Med. Letter Drugs & Therapeutics* (2015) 57(1475):116-8 ("The Medical Letter") (DTX-0181)—to cite the "drawbacks" of other antipsychotics, The Medical Letter recognizes that "[p]atients who do not respond to one antipsychotic may respond to another."  DTX-0181, The Medical Letter at 1.  This recognition shows that a POSA could have chosen from a wide range of diverse starting points, depending on what pharmacological and clinical profile the POSA hoped to achieve.

145.    To the extent Defendants assert that a POSA would not have considered ziprasidone as a lead compound due to its high risk of QTC interval prolongation, and would have instead chosen aripiprazole because it has less serious side effects; Defendants fail to offer any reason why a POSA would not have selected ziprasidone and sought to modify it to decrease this side effect. The mechanism of action for ziprasidone's effects on QTc prolongation was known, so that to the extent a POSA would have been concerned about that potential side effect, any potential compounds could be tested against that mechanism, whereas much was unknown about

70

**EXHIBIT 5**

aripiprazole's clinical benefit and side effect profile.  For example, this is in contrast to akathisia, the side effect Defendants assert a POSA would have sought to avoid, the cause of which is still not completely understood even today.  Thus, ziprasidone would have offered a desirable pharmacological starting point based on Defendants' parameters with an understood side effect, whereas aripiprazole with its complex pharmacology and yet-to-be-understood effects was a moving target.  Additionally, one of Defendants' cited documents, Al-Khatib 2003, acknowledges there is no consensus about the likelihood of adverse events from administration of QTc-prolonging drugs, such as ziprasidone, and reports that less than half of prescribers measure the QTc baseline when administering ziprasidone.  DTX-0838, Al-Khatib 2003 at 2125.  Accordingly, Plaintiffs disagree that a POSA would have disregarded ziprasidone as a potential lead compound.

146.    To the extent Defendants also argue that a POSA would not have selected clozapine as a lead compound given its significant risks, it was and is still prescribed today due to its effectiveness in treating schizophrenia.  Even one of Defendants' cited documents, Alvir, et al., "Clozapine-Induced Agranulocytosis – Incidence and Risk Factors in the United States," *New Engl. J. Med.* (1993) 329(3):162-67  ("Alvir 1993"), recognizes that clozapine "was found to be superior to standard antipsychotic drugs in the treatment of refractory schizophrenia," and that, even with its side effect profile, "treatment with this drug can be managed in a less burdensome yet safe manner."  DTX-0839, Alvir 1993 at 162, 166.  Additionally, applying Defendants' own analysis to clozapine, Defendants have provided no reason why a POSA would not have selected clozapine as a lead compound due to its effectiveness, and been motivated to modify it in an effort to decrease its side effects.

147.    Defendants also assert that aripiprazole would have been selected as a lead compound due to its partial agonist activity at both the $D_2$ and $5\text{-}HT_{1A}$ receptors.  This narrow

71

## EXHIBIT 5

focus on only two receptors, however, ignores the wide range of research that was being investigated for other receptors at the time. Many receptors are implicated in the etiology of schizophrenia and other psychotic conditions, and as reported in 1999, there was "no consensus concerning the biological mechanisms that might impart clinical atypicality." DTX-0826, Lawler et al., "Interactions of the Novel Antipsychotic Aripiprazole (OPC-14597) with Dopamine and Serotonin Receptor Subtypes," *Neuropsychopharmacology* (1999) 20(6):612-627 ("Lawler 1999") at 613. As of 2003, Shapiro reported that "[a]ll atypical antipsychotic drugs have a relatively complex in vitro pharmacology with high affinities for a number of receptors . . . At $5\text{-}HT_{2A}$ and $5\text{-}HT_{2C}$ receptors, most atypical antipsychotic drugs are inverse agonists.[4] Atypical antipsychotic drugs also interact, to a greater or lesser extent, with various dopamine receptors including $D_3$-dopamine and $D_4$-dopamine receptors." PTX0469, Shapiro 2003 at 1406-1407. Consistent with this complex pharmacology, Shapiro 2003 explained that "it is unclear to what extent binding to receptors other than $D_2$-dopamine and $5\text{-}HT_{2A}$ serotonin receptors contributes to the actions of the atypical antipsychotic drugs." PTX0469, Shapiro 2003 at 1407. This uncertainty and complexity was still recognized in 2005 as it was reported that "the pharmacological mechanisms underlying [antipsychotic drugs'] various therapeutic properties remain to be identified." DTX-0831, Miyamoto 2005 at 79. The following table from Roth Nature highlights this complexity and breadth of research as it illustrates the multiple receptor targets implicated in antipsychotic drug actions:

---

[4] An "inverse agonist," binds to the same receptor as an agonist but induces a pharmacological response opposite of that of the agonist (it reduces the basal activity of the receptor). This is distinct from an antagonist (also known as a neutral antagonist), which blocks the natural agonist response without causing a change in receptor basal activity.

**EXHIBIT 5**



Figure 2 | **Screening the receptorome reveals multiple molecular targets implicated in antipsychotic drug actions.** The affinity ($K_i$) values for clozapine and a large number of other biologically active compounds at various receptors can be found at the PDSP $K_i$ Database (see Further Information); the database is part of the National Institute of Mental Health Psychoactive Drug Screening Program (see Further Information) and represents the largest database of its kind in the public domain. At present, the PDSP $K_i$ database has >26,000 $K_i$ values for more than 300 receptors.

PTX0467, Roth Nature at 355, Fig. 2.

148. Researchers were thus investigating various individual receptors and combinations of receptor activity, such as the 5-HT$_{2A}$/D$_2$ ratio (PTX0469, Shapiro 2003), D$_3$ or D$_4$ receptor selectivity (Lawler 1999 at 613), noradrenergic receptors (DTX-0826, Lawler 1999 at 622), NMDA or purine receptors (DTX-0826, Lawler 1999 at 622) and many other potential molecular targets. Even considering dopamine receptors as a target class (which includes 5 distinct receptor subtypes), Millan 2000 reported the following "strategies" for discovering an improved antipsychotic profile: "1) low affinity, rapidly dissociating and/or 'neutral' D$_2$ receptor antagonists

73

**EXHIBIT 5**

…; 2) partial $D_2/D_3$ receptor agonists permitting dual presynaptic (via autoreceptors) and postsynaptic attenuation of mesolimbic dopaminergic transmission; (3) preferential antagonists at $D_3$ versus $D_2$ receptors; and 4) . . . selective $D_4$ receptor antagonists or $D_1$ receptor agonists." Millan, M., "Improving the Treatment of Schizophrenia: Focus on Serotonin (5-HT)$_{1A}$ Receptors," *J. Pharmacology and Experimental Therapeutics* (2000) 295:853-61 ("Millan 2000") (DTX-0830) at 853-854. This research was ongoing through at least 2005, when Miyamoto 2005 reported numerous strategies for further drug development as including targeting dopamine $D_1$, $D_3$ and/or $D_4$ receptors; glutamatergic agents; noradrenergic agents; cholinergic agents and many others. DTX-0831, Miyamoto 2005 at 88-94. Researchers were thus exploring a large number of pharmacological targets and strategies when developing antipsychotics, and Defendants provide nothing more than hindsight to support their narrow focus on aripiprazole.

149.    Defendants' selection of aripiprazole also relies on its "robust pharmacology," and assumes that the mechanism of action of aripiprazole was fully elucidated, but the art indicates otherwise. Indeed, the ABILIFY® PI itself states that "[t]he mechanism of action of aripiprazole, as with other drugs having efficacy in schizophrenia, is unknown" and recognized that aripiprazole has affinity for many receptors:

> Aripiprazole exhibits high affinity for dopamine $D_2$ and $D_3$, serotonin 5-HT$_{1A}$ and 5-HT$_{2A}$ receptors ($K_i$ values of 0.34, 0.8, 1.7, and 3.4 nM, respectively), moderate affinity for dopamine $D_4$, serotonin 5-HT$_{2C}$ and 5-HT$_7$, alpha$_1$-adrenergic and histamine H$_1$ receptors ($K_i$ values of 44, 15, 39, 57, and 61 nM, respectively), and moderate affinity for the serotonin reuptake site ($K_i$=98 nM).

DTX-0019, ABILIFY® PI 2004 at 1.

150.    Studies of aripiprazole confirm it had a complex pharmacology that was not fully understood, and involved more than just the three receptors that are the focus of Defendants' alleged obviousness challenge. As an example, Davies 2004 characterizes aripiprazole as

**EXHIBIT 5**

functionally selective, meaning it "is not simply a partial agonist at the $D_2$ receptor, but a drug whose variable potencies and efficacies (at $D_2$ and other receptors) are determined by cellular location, expression level and relative complement of a variety of signaling proteins." PTX0435, Davies 2004 at 324. Davies 2004 also explains that "mere partial agonism at $D_2$ and $5-HT_{1A}$ receptors and antagonism at $5-HT_{2A}$ receptors cannot explain the myriad action of aripiprazole *in vitro* and *in vivo*." PTX0435, Davies 2004 at 324. Roth Nature recognizes that "considerable controversy exists regarding [aripiprazole's] mechanism of action" and similarly concludes that it "is clearly a functionally selective partial agonist," and "the balance of partial agonism and antagonism at a multiplicity of receptors is responsible for its efficacy in schizophrenia and related disorders." PTX0467, Roth Nature at 356. Although aripiprazole was understood to have a unique and robust pharmacological profile, exactly how that profile was exerting its effects in the clinic was not well understood (*e.g.*, PTX0467, Roth Nature at 353), thus undermining Defendants' simplistic suggestion that a POSA would have selected aripiprazole due to its unique pharmacology.

151.    Defendants' focus on the role for partial agonism of the $D_2$ and $5-HT_{1A}$ receptors also ignores the known unpredictability surrounding the $D_2$ receptors, which was reported as resulting in "inconsistent clinical effects to ameliorate the symptoms of schizophrenia." Inoue, A., et al., "Strategy for modulation of central dopamine transmission based on the partial agonist concept in schizophrenia therapy," *Japan J. Pharmacology* (2001) 86(4):376-80 ("Inoue 2001") (DTX-0821) at Abstract. Similarly, Defendants' focus on $5-HT_{1A}$ partial agonism was "not a common pharmacological characteristic of atypical antipsychotic drugs," such that "[i]t remains to be seen, then, whether $5-HT_{1A}$ selective agonism, alone or in combination with effective $5-HT_{2A}$ antagonism, will be efficacious in treating the various symptoms of schizophrenia." PTX0469,

**EXHIBIT 5**

Shapiro 2003 at 1409. The uncertainty surrounding these receptors underscores the backward-looking nature of Defendants' analysis.

152. Even accepting Defendants' argument that a POSA would have sought to target 5-$HT_{1A}$ agonism, as mentioned, it had already been recognized that ziprasidone was a potent 5-$HT_{1A}$ partial agonist. DTX-0823, Keltner, N. et al., "Aripiprazole: A Third Generation of Antipsychotics Begins?," *Perspectives Psychiatric Care* (2002) 38(4)157-159 ("Keltner 2002") at 157. Although aripiprazole was being studied for use in depression and MDD, which Defendants assert is tied to 5-$HT_{1A}$ activity, the results of these studies were not yet known. That Defendants wholly ignore the known 5-$HT_{1A}$ agonism of ziprasidone and their selective focus on aripiprazole further demonstrates the apparent hindsight nature of their analysis.

153. To the extent Defendants argue that a POSA would have been motivated and had a reasonable expectation of success in modifying aripiprazole's chemical structure to improve upon its side effect profile, such is unsupported. Defendants have only pointed to adverse events related to aripiprazole, ignoring that it was an FDA-approved effective and tolerated treatment for schizophrenia. Even assuming a POSA would have been motivated to decrease aripiprazole's side effect profile, Defendants provide no indication of what chemical modifications a POSA would have been motivated to make or how a POSA would have had a reasonable expectation of success that making them would result in an improved antipsychotic with fewer adverse effects. This generalized motivation highlights again the hindsight nature of Defendants' analysis.

154. To the extent Defendants argue that Plainitffs have not provided any reason why a POSA would not have chosen aripiprazole as a lead compound and merely cotend other candidates existed, Defendants misunderstand Plainitffs' argument. Plaintiffs' critique of the selection of aripiprazole is not just that it is one of many possible compounds that could serve as a lead

76

**EXHIBIT 5**

compound.  Defendants have failed to provide a reason for a POSA to have selected aripiprazole

as a starting point in the first place.  None of Defendants' cited documents provides a reason to

select aripiprazole as a lead compound.

155.    To the extent Defendants assert that the fact that Otsuka used aripiprazole as a lead

compound to support their arguments,  this argument is unpersuasive.  Defendants provide no

evidence that a POSA at the time of invention would have been aware of Otsuka's own internal

development efforts.

156.    To the extent Defendants point to sales of aripiprazole as suggesting that for this

reason it would have been selected as a lead compound, such argument is unpersuasive.  At the

time, physicians were routinely prescribing antipsychotics other than aripiprazole, demonstrating

that many potential compounds to select as a lead existed.

157.    To the extent Defendants argue that a POSA would have selected aripiprazole

because it was the only $D_2$ partial agonist that had been approved by a regulatory agency for the

treatment of schizophrenia, so if a POSA wanted to optimize the serotonergic activity of a partial

$D_2$ agonist, aripiprazole was not just a lead compound, it was the only compound in this category;

this argument is unsupported.  Defendants cite nothing to support this in their Contested Facts.  To

the extent they rely on Marek 2005, this reference provides no reason for why a POSA would have

been motivated to optimize the serotonergic activity of a partial $D_2$ agonist, let alone have a

reasonable expectation of success in doing so.  Aripiprazole was different from the serotonin-

dopamine antagonists (SDAs) at the time because it had a *lower* relative binding affinity at

serotonergic receptors.  For example, Shapiro states that "[w]ith the exception of quetiapine, the

atypicals have $5\text{-HT}_{2A}/D_2$ affinity ratios gr[e]ater than 10."  PTX0469, Shapiro 2003 at 1401.

Based on multiple *in vivo* experiments, the newly-cited Hirose 2004 document states "[t]hus, in

EXHIBIT 5

terms of relative affinity for $D_2$ and 5-$HT_{2A}$ receptors, aripiprazole does not appear to conform to the profile of other atypical antipsychotics."  DTX-0845, Hirose 2004 at 381.  Defendants do not explain why a POSA would have wanted to start with aripiprazole and shift the balance to something it was not designed to have.  As mentioned, given aripiprazole's unique $D_2$ partial agonist activity along with the rest of its rich pharmacology, it would have been a challenging compound to select as a lead compound for further development.

### 2.   A POSA Would Not Have Selected Dehydroaripiprazole as a Lead Compound

158.    To the extent Defendants alternatively assert that a POSA would have selected dehydroaripiprazole as a lead compound for an improved antipsychotic due to its alleged similar efficacy to aripiprazole but less variable pK profile, such assertions are conclusory and lack support.  A POSA would not have selected dehydroaripiprazole as a lead compound and none of the references cited by Defendants support their conclusion.

159.    Defendants provide no reason for a POSA to select an active metabolite of just one approved drug product, ABILIFY® (aripiprazole), over the many other then-available approved antipsychotics and/or their metabolites.  Aripiprazole was just one of many available atypical antipsychotics that could have been selected for further development.  Defendants provide no rationale to support their selection of dehydroaripiprazole, an unapproved compound with no reported pharmacological data or established *in vivo* data, over FDA-approved products with known efficacy, safety and tolerability information.  Defendants' narrow focus on aripiprazole and its major metabolite ignores these other possible starting points, and highlights the apparent hindsight bias of their argument.

**EXHIBIT 5**

160.    To the extent Defendants rely on ABILIFY® PI 2004 (DTX-0019), Harrison 2004

(DTX-0072),[5] and Kubo 2005 (DTX-0026) as disclosing allegedly beneficial pharmacokinetic

properties of dehydroaripiprazole as compared to aripiprazole, (such as metabolic pathways, half-

lives and AUC), all reported pharmacokinetic data from these references are based on the

administration of aripiprazole only, not dehydroaripiprazole and as such they do not provide

guidance regarding how dehydroaripiprazole would necessarily interact *in vivo* if administered

directly.

161.    To the extent Defendants assert that a POSA would have been motivated to

investigate analogs of dehydroaripiprazole to avoid the CYP2D6 metabolism of aripiprazole, such

an argument is based only on data regarding the metabolism of aripiprazole; Defendants point to

no data related to dehydroaripiprazole in support of this argument.  Additionally, this argument

ignores the fact that like aripiprazole, dehydroaripiprazole is also metabolized by CYP2D6 and

CYP3A4.  DTX-0014, WO '682 at Fig. 8; *see also* DTX-0019, ABILIFY® PI 2004 at 2 (reporting

that aripiprazole is mainly metabolized by both CYP2D6 and CYP3A4).  Specifically, as shown

in Figure 8 of WO '682, dehydroaripiprazole (labeled OPC-14857), is metabolized by CYP2D6

and CYP3A4.  DTX-0014, WO '682 at Fig. 8.  Because dehydroaripiprazole is also metabolized

by CYP2D6, it is not possible to know without testing whether administering an inhibitor of

CYP2D6 with dehydroaripiprazole would have increased the AUC of dehydroaripiprazole because

aripiprazole, and *not* dehydroaripiprazole, was administered in the studies to which Defendants

refer.  Additionally, that the AUC of dehydroaripiprazole decreased when aripiprazole was

---

[5] Throughout the pendency of this litigation, Defendants have referred to both "Harrison 2004" and "Swainston 2004."  These appear to be the same reference: Tracy Swainston Harrison & Caroline M. Perry, "Aripiprazole, A Review of its Use in Schizophrenia and Schizoaffective Disorder," *Drugs* 64:1715-36 (2004).  As used herein, this reference is referred to as "Harrison 2004."

**EXHIBIT 5**

administered with quinidine (a potent CYP2D6 inhibitor), is not surprising.   DTX-0019, ABILIFY® PI 2004 at 17.   This represents that CYP2D6 was inhibited and was not able to metabolize aripiprazole to dehydroaripiprazole as it typically would, which results in a pooling of aripiprazole and a corresponding 112% increase of the AUC of aripiprazole.   DTX-0019, ABILIFY® PI  2004 at 3, 17.   Since less aripiprazole was metabolized by CYP2D6, the formation of dehydroaripiprazole decreased just as the ABILIFY® PI 2004 reports.   This data does not indicate that the metabolism of dehydroaripiprazole was not also affected by the quinidine, and the ABILIFY® PI  2004 provides no data regarding this metabolism of dehydroaripiprazole.   One such product of dehydroaripiprazole's metabolism could be DSM-1459, which was understood to be formed via CYP2D6/CYP3A4 metabolism.   *See* DTX-0014, WO '682, Fig. 8.   There is thus no support for Defendants' statement that being able to safely administer a CYP2D6 inhibitor with dehydroaripiprazole safely would have motivated a POSA to start with it as a lead compound.

162.    Moreover, according to the ABILIFY® PI 2004, when ABILIFY® is coadministered with carbamazepine, a CYP3A4 inhibitor, there was an approximate 70% increase in $C_{max}$ and AUC values of both aripiprazole and dehydroaripiprazole.   DTX-0019, ABILIFY® PI 2004 at 18. Thus, pursuing dehydroaripiprazole would not eliminate all metabolic considerations.

163.    The longer half-life of dehydroaripiprazole as compared to aripiprazole is, at best, a double-edged sword, and not a clear benefit.   That the longer half-life could be beneficial in terms of extending the active period of a given dose for patient compliance, ignores that this same property would also necessarily extend the active period of any unwanted side effects. Dehydroaripiprazole was known to be an antagonist at the $D_2$ receptor without measurable agonist activity.   DTX-0034, Oshiro 1998 at 662, Table 3.   This property makes dehydroaripiprazole more like the typical antipsychotics, which were known to lead to undesirable EPS from $D_2$ dopamine

**EXHIBIT 5**

receptor antagonism.   Here, this is particularly notable given that as a DA antagonist, dehydroaripiprazole might be expected to cause EPS if administered alone, undermining any benefit of its longer half-life and counseling away from its use as a lead compound.

164.     Any assertion by Defendants that dehydroaripiprazole would have been a desirable lead compound since it allegedly has affinity for the $D_2$ receptor and displayed pharmacological activity similar to aripiprazole is unpersuasive.   Dehydroaripiprazole does not have the same pharmacological activity as aripiprazole.   For example, ABILIFY® PI 2004, which Harrison 2004 cites directly, only states that dehydroaripiprazole "has been shown to have affinities for $D_2$ receptors similar to [aripiprazole]," but is silent as to any other pharmacological activities of this metabolite and does not specify whether dehydroaripiprazole is an agonist, antagonist, inverse agonist or partial agonist at $D_2$ receptors.   DTX-0019, ABILIFY® PI 2004 at 2; DTX-0072, Harrison 2004 at 1720.

165.     In addition, Oshiro 1998's statement that "[t]he 3,4-dihydro-2(1*H*)-quinolinone and 2(1*H*)-quinolinone derivatives with the same (phenylpiperazinyl)butoxy moiety are equipotent to each other," was made in the context of *only* postsynaptic DA receptor antagonist activity.   DTX-0034, Oshiro 1998 at 661-62.   Oshiro 1998 also tested the DA autoreceptor agonist activity and EPS liability of various compounds.   For the DA autoreceptor activity, Oshiro 1998 reports an $ED_{50}$ value of 5.1 mg/kg for aripiprazole (compound 28) and ">22" mg/kg for dehydroaripiprazole (compound 54).   DTX-0034, Oshiro 1998 at 662, Table 3.   According to the authors, "compounds with $ED_{50}$ values indicated with a greater than sign (>) were ***inactive*** at below the given dose." DTX-0034, Oshiro 1998 at 662, Table 3, note a (emphasis added).   Regarding EPS liability, Oshiro 1998 is silent, because it did not test dehydroaripiprazole for this property.   DTX-0034, Oshiro 1998 at 662, Table 3.   Oshiro 1998 teaches that aripiprazole has the ability to serve as postsynaptic

**EXHIBIT 5**

DA receptor antagonist and autoreceptor agonist while dehydroaripiprazole was reported only to act as a postsynaptic DA receptor antagonist.  Thus, the two are not "equipotent."

166.    The reported activities from Oshiro 1998 are also notable given Defendants' argument that a POSA seeking to develop a new atypical antipsychotic would have sought to minimize DA receptor antagonism due to its potential for causing EPS.  Accepting Defendants' premise, Oshiro 1998 would have led a POSA away from dehydroaripiprazole, which was reported to have only postsynaptic receptor antagonist activity which was known to be a similar property of all approved typical antipsychotic drugs.

167.    That postsynaptic $D_2$ receptor activity may play a role in the pharmacology of aripiprazole provides no guidance as to whether dehydroaripiprazole would have been a suitable lead compound. There was a dearth of data regarding dehydroaripiprazole, and the documents Defendants cite would have taught away from selecting dehydroaripiprazole as a lead compound. Any reliance by Defendants on Kinghorn et al., "Aripiprazole: Pharmacology, Efficacy, Safety and Tolerability," Expert Rev. Neurotherapeutics 5(3):297-307 (2005) ("Kinghorn 2005") (DTX-0849), which is not prior art (*see* Ex. 16, Plaintiffs' Motion *in Limine*), does not supply this missing link, as Kinghorn 2005 describes the pharmacology, efficacy, safety and tolerability of aripiprazole, not dehydroaripiprazole. The only disclosures in Kinghorn 2005 regarding dehydroaripiprazole are the same pharmacokinetic properties that are also disclosed in the Abilify 2004 Prescribing Information, based on the administration of ***aripiprazole***. *Compare* DTX-0849, Kinghorn 2005 at 297-298 (reporting that Cmax, Tmax, AUC and half-life of dehydroaripiprazole by administration of aripiprazole), *with* DTX-0019, Abilify PI 2004 at 2-3 (same).  These disclosures would not have led a POSA to select dehydroaripiprazole as a lead compound. Moreover, to the extent Kinghorn 2005 can supply any understanding of the prior art since it

**EXHIBIT 5**

published after April 14, 2005, it reaffirms that aripiprazole's pharmacology is complex and includes aripiprazole's $D_2$ *presynaptic* receptor activity.  DTX-0849, Kinghorn 2005 at 297. Defendants ignore the importance of this activity both here and in Oshiro 1998, where the authors reported that dehydroaripiprazole was "inactive" in a presynaptic assay, whereas aripiprazole, the clinical candidate showed presynaptic $D_2$ agonist activity.DTX-0034,  Oshiro 1998 at Table 3.

168.   Defendants may also rely on WO '682 as allegedly emphasizing dehydroaripiprazole as a preferred compound for the treatment of schizophrenia and other psychotic disorders.   However, WO '682 is complex and teaches that the metabolism of aripiprazole is complex, with at least a dozen potential metabolites, many with potential activity at dopamine and serotonin receptors.  DTX-0014, WO '682 at Fig. 8.  WO '682 identifies dehydroaripiprazole as one of six potential preferred metabolites, but does not express any preference for dehydroaripiprazole as compared to these other metabolites.  DTX-0014, WO '682 at 5:8-16, 15:12-18:4, Fig. 8, claims 4 and 14.  When describing the "excellent efficacy" and beneficial side-effect profile of certain exemplified compositions, WO '682 is explicit that this property applies to "any one of" the six preferred aripiprazole metabolites, not just dehydroaripiprazole.  DTX-0014, WO '682 at 30:18-32:3.

169.   Despite the preferences expressed by WO '682, there is no support in the reference for the assertion that compositions comprising certain aripiprazole metabolites have "excellent efficacy," or "fewer side effects and an excellent safety profile."  DTX-0014, WO '682 at 30:18-32:3.   WO '682 reports no pharmacological data for any reported metabolite, including dehydroaripiprazole.   And the reference is directed to pharmaceutical compositions used in combination with a mood stabilizer to treat schizophrenia and other psychotic disorders: it does not disclose that dehydroaripiprazole or any other preferred aripiprazole metabolite alone is

## EXHIBIT 5

effective at treating such disorders.  *See* DTX-0014, WO '682 at 39:14-16.  Similarly, while WO

'682 discloses clinical trial protocols for either aripiprazole or a metabolite thereof in combination

with a mood stabilizer, it provides no reported data from such trials.  DTX-0014, WO '682 at 60-

68, Examples 4-8.  .

170.    Any reliance by Defendants on Fura 2004 and Lin 1997[6] for the general proposition

that active metabolites of marketed drugs can become lead compounds themselves and exhibit

superior properties as compared to their parent molecules is unsupported.  These references

provide only general information regarding drug discovery and development.  They do not teach

as a general rule that metabolites should be used as lead compounds, and are entirely silent as to

aripiprazole and its metabolites.  Indeed, both references acknowledge the unpredictability of drug

development and specifically, the unpredictability of the use of active metabolites.  DTX-0023,

Fura 2004 explains that it is generally difficult to characterize and detect metabolites and "often

difficult or impossible to predict a priori whether a certain compound could form a

pharmacologically active metabolite."  DTX-0023, Fura 2004 at 4339.  Lin 1997 likewise

recognizes that active metabolites may differ pharmacokinetically and pharmacologically from

their parent compounds and the role of drug metabolism in drug discovery requires not only *in*

*vitro* and *in vivo* screening, but also "a good understanding of the basic mechanisms of the events

involved in absorption, distribution, metabolism and excretion; the interaction of chemicals with

the drug-metabolizing enzymes, particularly cytochrome P-450; sources of pharmacokinetic and

pharmacodynamic interindividual variability; and the consequences of metabolism on potential

drug toxicities."  DTX-0827, Lin 1997 at 404, 405.

---

[6] Lin, J., et al., "Role of Pharmacokinetics and Metabolism in Drug Discovery and Development," *Pharmacological Revs.* (1997) 49(4):403-449 ("Lin 1997").

**EXHIBIT 5**

171.    Moreover, metabolites are not necessarily good starting points for further development.  In general, metabolites can have the same activity as the parent compound, be inactive, counter the parent drug itself, possess critical toxicities and/or have different pharmacokinetic or pharmacodynamic profiles compared to the parent compound.  One of Defendants' cited references, Lin 1997, confirms this as it describes that "[p]harmacokinetically, the active metabolites may differ in distribution and clearance from that of the parent drug. Pharmacologically, the parent drug and its metabolites may act by similar mechanisms, different mechanisms, or even by antagonism."  DTX-0827, Lin 1997 at 404.  To determine the existence and effects of such variabilities requires in depth *in vitro* and *in vivo* testing of the compound's properties, which was neither done nor reported in the prior art for dehydroaripiprazole.  Such considerations are not irrelevant.  The uncertainties associated with selecting a metabolite with the limited, and even contrary, information that existed for dehydroaripiprazole would have been compounded as modifications are made to the metabolite, as is the case in Defendants' argument regarding the development of brexpiprazole from dehydroaripiprazole.  A POSA therefore would not have been motivated to start with dehydroaripiprazole with any reasonable expectation of success.

172.    There is no expectation that active metabolites would be effective lead compounds especially without data specific to that metabolite.  In drug development, the success of an active metabolite serving as a lead compound is the exception rather than the rule, and a determination regarding an active metabolite's potential use as a lead compound is only made after evaluating the metabolite on its own since the presence of the parent compound can impact numerous actions of the metabolite itself.  Indeed, one of Defendants' cited documents, Lopez-Munoz 2013, which is not prior art, confirms this as it reports that "[a]ctive metabolites of some antipsychotic drugs

**EXHIBIT 5**

exhibit pharmacodynamic and pharmacokinetic properties *that may be similar to or differ from the original compound* and that can be translated by a *different profile of responses and interactions to clinical level*." Lopez-Munoz et al., "Active Metabolites as Antidepressant Drugs: The Role of Norquetiapine in the Mechanism of Action of Quetiapine in the Treatment of Mood Disorders," *Frontiers in Psychiatry* (2013) 4:1-8 ("Lopez-Munoz 2013") (DTX-0850) at Abstract (emphasis added). It continues that, "[a]n active metabolite can be entirely or only partially responsible for a drug's therapeutic effect. Others may be pharmacologically active in a way *not related* to the original molecule's main activity. Sometimes, a *metabolite reverses or deactivates the original molecule's pharmacological activity*." DTX-0850, Lopez-Munoz 2013 at 1 (emphasis added). Lopez-Munoz also describes the antidepressant properties of norquetiapine, the active metabolite of quetiapine. Norquetiapine is known to "exhibit[ a] distinct pharmacological activity from quetiapine." DTX-0850, Lopez-Munoz 2013 at Abstract. Defendants' own documents thus confirm that the use of active metabolites in drug development is unpredictable and there is no general rule that active metabolites could have served as successful lead compounds.

173. Indeed, there are several examples of active metabolites leading to failures in drug development. One example is fenfluramine, an FDA-approved drug that was previously used in combination with phentermine (known as "Fen-Phen") for obesity treatment. Fenfluramine promotes the rapid release of serotonin and inhibits its reuptake. The FDA ordered Fen-Phen to be removed from the market based on studies revealing that it led to valvular heart disease, which were attributed to fenfluramine's active metabolite, norfenfluramine. Another example is methysergide, which was previously indicated for migraine and cluster headaches, but was

**EXHIBIT 5**

withdrawn from the market due to adverse effects caused by its metabolism to methylergometrine, which is associated with cardiac valvopathy.

174.    Overall, there is nothing in the art cited by Defendants that would have led a POSA to select dehydroaripiprazole as a lead compound for developing an antipsychotic.

### 3.    The Ideal Receptor Profile Was Not Known

175.    Defendants assert that a POSA would have modified certain receptor activities of aripiprazole or dehydroaripiprazole to improve upon their therapeutic benefits while also decreasing their side effects.[7, 8]    Defendants have manufactured a motivation that lacks support in the art.  And even assuming a POSA would have been motivated to modify the pharmacology of aripiprazole, the clinical effects of such pharmacological changes were unknown and unpredictable.  This uncertainty would have been compounded given the complexity of the molecule at issue, which consists of a complex polypharmacology of various functional groups that interact with several receptors.  *See, e.g.*, PTX0467, Roth Nature at 356.  Indeed, the art cautioned against modulating 5-HT$_{1A}$ activity, thus pointing away from making any modifications to aripiprazole's pharmacological profile.

176.    Research regarding the potential of serotonergic targets for the treatment of schizophrenia was ongoing prior to the priority date, since second generation atypical antipsychotics possessed various sites of action that were thought to potentially be involved in their clinical effects.  DTX-0831, Miyamoto 2005 at 82; PTX0467, Roth Nature at 355, Fig. 2;

---

[7] The clinical efficacy and side-effect profile of dehydroaripiprazole was not known because it had never been separately tested in the clinic.

[8] Affinity, potency and functional efficacy are distinct concepts.  For example, a compound may be highly potent (meaning that its EC$_{50}$ is low), but also be a partial agonist incapable of ever achieving a maximum receptor response.  The affinity and potency of a compound does not predict the functional activity of that compound.  An antagonist could have a high affinity but will have zero intrinsic activity (i.e., no functional efficacy at that receptor).

## EXHIBIT 5

DTX-0837, Sprouse, J.S., et al., "Comparison of the Novel Antipsychotic Ziprasidone with Clozapine and Olanzapine: Inhibition of Dorsal Raphe Cell Firing and the Role of 5-HT$_{1A}$ Receptor Activation," *Neuropsychopharmacology* (1999) 21(5):622-631 ("Sprouse 1999") at 623. There are various serotonin receptors or receptor subtypes with different distribution profiles in the brain and with different pharmacological functions, and researchers were exploring the potential of these receptors. *E.g.*, DTX-0831, Miyamoto 2005 at 88-94.

177.    While the art recognized that schizophrenia may involve more than dopamine imbalance, understanding the role of serotonin, the involvement of its specific receptors and how to modulate its activity for therapeutic benefit was controversial.  The art expressly recognized that "the role of 5-HT$_{1A}$ receptors in antipsychotic drug efficacy remains speculative," and that "this relationship deserves further study to enhance our understanding of the mechanism underlying antipsychotic drug action."  DTX-0829, Marona-Lewicka, D., et al., "Aripiprazole (OPC-14597) fully substitutes for the 5-HT$_{1A}$ receptor agonist LY293284 in the drug discrimination assay in rats," *Psychopharmacology* (2004) 172:415-421 ("Marona-Lewicka 2004") at 416.  Other researchers explained that "5-HT$_{1A}$ partial agonism is not a common pharmacological characteristic of atypical antipsychotic drugs," and that "[i]t remains to be seen, then, whether 5-HT$_{1A}$ selective agonism, alone or in combination with effective 5-HT$_{2A}$ antagonism, will be efficacious in treating the various symptoms of schizophrenia."  PTX0469, Shapiro 2003 at 1409.  Sprouse 1999 reiterated this uncertainty: "[w]hile ziprasidone possesses 5-HT$_{1A}$ agonist activity in vitro, little is known of the relevance of this activity in vivo or of the comparative activities of clozapine and olanzapine."  DTX-0837, Sprouse 1999 at 623 (citations omitted).

**EXHIBIT 5**

178.    Echoing this uncertainty, Millan 2000 explained that "relative functional roles of pre- and postsynaptic 5-HT$_{1A}$ receptors require clarification."  DTX-0830, Millan 2000 at 858. Millan 2000 further states that:

> drug efficacy at specific populations of the 5-HT$_{1A}$ receptor in human brain in vivo depends critically upon a diversity of unknown variables, such as G-protein availability, receptor number and sensitivity, preexposure to 5-HT, and constitutive activity.

DTX-0830, Millan 2000 at 858.  Given this complexity, Millan 2000 continued that "it is virtually impossible to predict the precise actions of 5-HT$_{1A}$ receptor ligands at specific populations of 5-HT$_{1A}$ receptors in schizophrenia patients.  This assertion is—unfortunately!—particularly valid for partial agonists."  DTX-0830, Millan 2000 at 858-59.  Millan 2000 also states that "[a]s a corollary of this uncertainty, it is difficult to ascertain the optimal *degree* of efficacy at 5-HT$_{1A}$ receptors required for potential antipsychotic agents."  DTX-0830, Millan 2000 at 859.  Another "incompletely resolved conundrum" was "the relative *potency* of actions at 5-HT$_{1A}$ receptors versus D$_2$ receptor blockade."  DTX-0830, Millan 2000 at 859.

179.    Moreover, the role of 5-HT$_{2A}$ antagonism was also controversial and unsettled. Miyamoto 2005 reported that "it is unclear what clinical effects 5-HT$_{2A}$ antagonism confers, beyond mitigating the adverse effect of striatal D$_2$ antagonism and propensity to cause EPS." DTX-0831, Miyamoto 2005 at 82.

180.    In sum, before the priority date, the art recognized that the study of 5-HT$_{1A}$ and 5-HT$_{2A}$ receptor activities, and their potential role(s) in atypical antipsychotic drug actions, were incompletely understood and contentious:

- "[C]linical studies of antipsychotics interacting with 5-HT$_{1A}$ receptors are required to establish their genuine pertinence to the—hopefully improved—treatment of schizophrenia."  DTX-0830, Millan 2000 at Abstract.

**EXHIBIT 5**

- "Additional study is necessary to define the precise degree of potency and efficacy at $5\text{-HT}_{1A}$ receptors requisite for optimization of clinical benefit.  Antipsychotics interacting with $5\text{-HT}_{1A}$ receptors are unlikely to provide a panacea for the problem-free treatment of all schizophrenic patients, and well designed, thorough, and imaginative clinical trials are required to more precisely characterize the potential use of this mechanism of action in the management of psychotic disorders."  DTX-0830, Millan 2000 at 860.

- "[T]he role of $5\text{-HT}_{2A}$ antagonism in the superior therapeutic responses to clozapine awaits further clarification . . . [f]urther studies examining combination therapy with $D_2$ antagonist and M-100907 [a selective $5\text{-HT}_{2A}$ antagonist] are necessary to evaluate the potential role of $5\text{HT}_{2A}$ antagonism."  DTX-0831, Miyamoto 2005 at 82.

181.    Despite this controversial background, Defendants propose without support that a POSA would have been motivated to increase both the $5\text{-HT}_{1A}$ partial agonist activity and the $5\text{-HT}_{2A}$ antagonist activity of aripiprazole.  Defendants, however, offer no guide as to what level of partial agonism and/or antagonism one would select as a drug profile.  For example, while Defendants propose to increase the $5\text{-HT}_{1A}$ partial agonist activity, they ignore how little the art disclosed about the target $5\text{-HT}_{1A}$ profile and whether they are referring to either (or both) of the potency and efficacy of the $5\text{-HT}_{1A}$ partial agonist.

182.    For example, Millan 2000 teaches that a "modest" level of $5\text{-HT}_{1A}$ activity is optimal.  DTX-0830, Millan 2000 at Abstract ("A modest level of efficacy appears optimal, that is, sufficient to engage highly sensitive $5\text{-HT}_{1A}$ autoreceptors while blocking their low-sensitivity postsynaptic counterparts.").  Millan 2000 reiterates a desired "modest" activity, "[a]s exemplified

90

**EXHIBIT 5**

throughout this review, modest intrinsic activity permitting activation and blockade of pre- and postsynaptic 5-HT$_{1A}$ receptors, respectively, appears to be the most appropriate profile for improved management of schizophrenia."  DTX-0830, Millan 2000 at 858.  It is unclear how Defendants' goal of increasing the degree of 5-HT$_{1A}$ partial agonism of aripiprazole addresses this express teaching in the art.

183.    As of the priority date, aripiprazole was known to bind with "high affinity" to the 5-HT$_{1A}$ receptor and to be an "intermediate" 5-HT$_{1A}$ partial agonist.  DTX-0821, Jordan, S., et al., "The antipsychotic aripiprazole is a potent, partial agonist at the human 5-HT1A receptor," *Eur. J. Pharmacol*ogy (2002) 44:137-140 ("Jordan 2002") at 139 ("These data are consistent with the observation that aripiprazole binds with high affinity to the h5-HT$_{1A}$ receptor."); PTX0467, Roth Nature at 355, Fig. 2; ABILIFY® PI 2004 at 1; PTX0469, Shapiro 2003 at 1408 ("Aripiprazole was frequently found to be a partial agonist, with an intrinsic activity that could be low (D$_{2L}$, 5-HT$_{2A}$,5-HT$_7$), intermediate (5-HT$_{1A}$), or high (D$_4$, 5-HT$_{2C}$)."); PTX0435, Davies 2004 at 322 ("[A]ripiprazole has a highly complex serotonergic pharmacology with significant activity at a number of 5-HT receptors.").  In fact, at least one study reported that aripiprazole and ziprasidone were "potent" partial agonists, with higher levels of 5-HT$_{1A}$ potency than buspirone, risperidone and clozapine.  DTX-0821, Jordan 2002 at 139.  Other references also report aripiprazole as a "potent" partial agonist at 5-HT$_{1A}$.  DTX-0021, Burris, K.D., et al., "Aripiprazole, a Novel Antipsychotic, Is a High-Affinity Partial Agonist at Human Dopamine D2 Receptors," *J. Pharmacology and Experimental Therapeutics* (2002) 302(1):381-389 ("Burris 2002") at 381 ("evidence that aripiprazole … [has] potent partial agonist activity at .. 5-HT1A receptors"); PTX0435, Davies 2004 at 322 ("aripiprazole was a potent … partial agonist … of h5-HT$_{1A}$ receptors"); DTX-0829, Marona-Lewicka 2004 at 418.  Defendants may attempt to selectively rely

**EXHIBIT 5**

upon a single functional test where aripiprazole was characterized as a "low potency" partial agonist, while ignoring this other art.  The paper Defendants may attempt to rely on (Shapiro 2003), however, acknowledges the consensus that aripiprazole is an "intermediate" partial agonist in an art where it was well-understood that aripiprazole's effects at various receptors are highly dependent on cellular location, expression level and relative complement of a variety of signaling proteins.  PTX0469, Shapiro 2003 at 1408; PTX0435, Davies 2004 at 324.  It is unclear what Defendants expect could be improved upon when the art suggested the very pharmacological profile that Defendants assert aripiprazole appeared to have.

184.   To the extent Defendants rely on Hirose 2004 as providing evidence  that the 5-$HT_{1A}$ receptor was allegedly an area of great interest for improving antipsychotics, this characterization is an oversimplification of the teachings of Hirose 2004.  Additionally, this position also ignores the complex polypharmacological profile of aripiprazole that Hirose 2004 summarizes.  While Defendants suggest that the 5-$HT_{1A}$ partial agonism of aripiprazole was the area of interest, Hirose 2004 explains that the polypharmacologic profile of aripiprazole, including its antagonism of the 5-$HT_{2A}$ receptor combined with its "high affinity and partial agonist activity" at the $D_2$ and 5-$HT_{1A}$ receptors, all may contribute to its level of EPS.  DTX-0845, Hirose 2004 at 381.  In addition to ignoring the interplay among these three receptors, Defendants are silent as to what level of partial agonism activity at 5-$HT_{1A}$ would have been desirable.  And further, the documents cited in Hirose 2004 and in Defendants' Validity Contested Facts for this point— Wadenberg 1994 (DTX-0864); Andersen 1996 (DTX-0840), and Prinssen 1999 (DTX-0858)— provide, at best, a mixed picture of 5-$HT_{1A}$ activity, and provide no guidance as to the desired level of that receptor activity, especially when coupled with activity at other receptors.

**EXHIBIT 5**

185.    For example, Wadenberg 1994 showed only a transient effect of 8-OH-DPAT, a 5-HT$_{1A}$ agonist, on catalepsy when administered after the dopamine D$_2$ receptor antagonist raclopride.  DTX-0864, Wadenberg et al., "Evidence for Specific Interactions Between 5-HT$_{1A}$ and Dopamine D$_2$ Receptor Mechanisms in the Mediation of Extrapyramidal Motor Functions in the Rat," *Pharmacol. Biochem. Behav.* (1994) 47(3):509-13 ("Wadenberg 1994") at 510, Fig. 2. Wadenberg 1994 also reports that 8-OH-DPAT also has weak D$_2$ agonist properties.  DTX-0864, Wadenberg 1994 at 512.  This property could also contribute to the effects observed by Wadenberg and colleagues.  Wadenberg also has caveats regarding the non-selectivity of the test agents.  DTX-0864, Wadenberg 1994 at 512 (" . . . it can not be excluded that further studies will disclose complex interactions between 8-OH-DPAT and (*S*)-UH-301 on the one hand, and raclopride on the other.").

186.    Andersen 1996 also offers equivocal evidence of potential benefit of 5-HT$_{1A}$ activity for antipsychotic medications.  DTX-0840, Andersen et al., "Prevention by (+/-)-8-hydroxy-2-(di-*n*-propylamino)tetralin of Both Catalepsy and the Rises in Rat Striatal Dopamine Metabolism Caused by Haloperidol," *Br. J. Pharmacol.* (1996) 118:421-27 ("Anderson 1996"). Only at the highest dose was catalepsy prevented.  DTX-0840, Andersen 1996 at 422-423.  When a tenth of the dose was administered, the majority of test subjects (rats) "stayed immobile for an average of 44 ±20 s on the grid."  DTX-0840, Andersen 1996 at 423.  Andersen 1996 also reports that animals administered with the higher dose exhibited "a behavioural syndrome that is characteristic of many 5-HT agonists."  DTX-0840, Andersen at 422-423.  This syndrome, also referred to as serotonergic syndrome leads to motor abnormalities, including in this study, "forepaw treading, hind limb abduction, a flattened body posture and head weaving."  DTX-0840, Andersen 1996 at 423.  The forepaw treading and flat body posture components are specifically

**EXHIBIT 5**

attributed to 5-HT$_{1A}$ receptor activation, and this "'8-OH-DPAT syndrome' was also seen when" the high dose was administered with haloperidol.  DTX-0840, Andersen 1996 at 423.  This serotonergic syndrome would have been concerning to a POSA, and any positive results from Andersen 1996 would have been considered with caution.  Moreover, the authors states that "[f]urther investigation is therefore warranted to aid our understanding of how 8-OH-DPAT prevents catalepsy produced not only by haloperidol but by a range of [antipsychotic drugs]."  DTX-0840, Andersen 1996 at 426.

187.    Similarly, the effects of 5-HT$_{1A}$ agonists and partial agonists in the Prinssen 1999 publication are modest.  DTX-0858, Prinssen et al., "Interactions Between Neuroleptics and 5-HT$_{1A}$ Ligands in Preclinical Behavioral Models for Antipsychotic and Extrapyramidal Effects," *Psychopharmacology* (1999) 144:20-29 ("Prinssen 1999").  Only the highest dose of 8-OH-DPAT completely reversed the effect of haloperidol in the forelimb retraction time (FRT).  DTX-0858, Prinssen 1999 at 23; *see also* Fig. 1.  In the bar test, ipsapirone, a 5-HT$_{1A}$ partial agonist "did not significantly alter the effects of haloperidol."  DTX-0858, Prinssen 1999 at 23.  In addition, this article shows that ipsapirone at high doses may induce catalepsy alone.  DTX-0858, Prinssen 1999, Table 2.  The 5-HT$_{1A}$ agents also inhibited the therapeutic activity of the antipsychotic drugs tested. *E.g.*, DTX-0858, Prinssen 1999 at 27 ("Nevertheless, the present results suggest that a 5-HT$_{1A}$ agonist may especially attenuate the therapeutic effects of some neuroleptics, such as the substituted benzamide tropapride.").  These authors also identify the complicating factor when 5-HT$_{2A}$ antagonism is also present—the results with risperidone, a 5-HT$_{2A}$ antagonist, were highly variable.  DTX-0858, Prinssen 1999 at 27.  For example, ipsapirone did not have an anti-catalepsy effect when administered with risperidone, which is a 5-HT$_{2A}$ antagonist.  DTX-0858, Prinssen 1999 at 24-25.  The authors indicate that a possible explanation for this is that 5-HT$_{2A}$ receptor

**EXHIBIT 5**

antagonist properties actually "prevent some of the effects of 5-HT$_{1A}$ agonists." DTX-0858, Prinssen 1999 at 27.   The authors seem to use "conventional neuroleptics" and not second-generation antipsychotics as the comparator.   Neither it nor Wadenberg 1994 and Andersen 1996 provide any information about what level of 5-HT$_{1A}$ activity may be desirable compared to what aripiprazole already had.   Accordingly, Prinssen 1999 does not provide any support for Defendants' arguments.

188.    Additionally, these documents are from the 1990s, and acknowledge that "further investigation is . . . warranted" regarding the role of the serotonergic receptor's impact on certain side effects.   DTX-0840, Andersen 1996 at 426.

189.    Clinically, aripiprazole was reported to be effective against the two characteristics that Defendants assert a POSA would have wanted to improve by modifying aripiprazole's serotonergic properties—negative symptoms of schizophrenia and EPS-related events.   For example, in two four- and one six-week trials of ABILIFY® in schizophrenia, several doses of ABILIFY® were "superior to placebo" in the PANSS negative subscale, which "is a subset of items in the PANSS that rates seven negative symptoms of schizophrenia."   DTX-0019, ABILIFY® PI 2004 at 7-8.   Aripiprazole was also reported as having a very low EPS liability.   PTX0435, Davies 2004 at 331 ("suggested to be devoid of EPS"), 333 ("Across all published clinical trials, aripiprazole was determined to be safe and well tolerated with minimal side effects."); PTX0469, Shapiro 2003 at 1401 ("aripiprazole has been shown to be effective in treating the positive and negative symptoms of schizophrenia with a low incidence of side effects including minimal short-term weight gain, low liability for inducing movement disorders and reductions (rather than elevations) in plasma prolactin levels.").   Even more, aripiprazole was also expected to have

**EXHIBIT 5**

minimal cardiovascular and metabolic side effects.  PTX0435, Davies 2004 at 331.  It is thus unclear which particular clinical aspects of aripiprazole Defendants were was hoping to improve.

190.    Defendants notably ignore "the main side effects" of aripiprazole—insomnia, akathisia/activation, nausea and vomiting—which were believed to be a result of aripiprazole's dopaminergic, not serotonergic, activity.  PTX0435, Davies 2004 at 331.  Defendants provide no assertion that such side effects could or should be addressed by modifying aripiprazole's serotonergic activity or dopaminergic activity.  Instead, they repeat that the $D_2$ activity should either not be reduced below a certain threshold to preserve its efficacy against positive symptoms or be maintained.

191.    $5\text{-HT}_{1A}$ activation was understood to be "'activating' rather than sedative and/or motor-suppressant" and could lead to other side effects, including cardiovascular effects.  DTX-0830, Millan 2000 at 860.  According to Millan 2000, "the potential modification of cardiovascular parameters, particularly in associated with $\alpha_1$-AR and $5\text{-HT}_2$ receptor blockade, requires careful surveillance."  DTX-0830, Millan 2000 at 860.  Given aripiprazole's tendency for activating side effects (*e.g.*, PTX0435, Davies 2004 at 331) and already robust $5\text{-HT}_{1A}$ and $5\text{-HT}_{2A}$ receptor profiles (*e.g.*, PTX0467, Roth Nature at Fig. 2; PTX0435, Davies 2004 at 322; DTX-0021, Burris 2002 at 388), a POSA would not have been motivated to increase its partial agonism or antagonism, respectively, with a reasonable expectation of success.  To the contrary, the prior art taught away from such modifications.

**EXHIBIT 5**

4.    **A POSA Would Not Have Replaced the 2,3, Dichlorophenyl Piperazine Moiety of Aripiprazole and/or Dehydroaripiprazole with a 4-Benzothiophene Group**

a.    **Even assuming aripiprazole and/or dehydroaripiprazole would have been a lead compound, the 2,3,-dichlorophenylpiperazine moiety was not the only place to modify**

192.    Planitffs disagree with any assertion by Defendants that the prior art taught a POSA where to modify aripiprazole and/or dehydroaripiprazole; that making modifications at the proposed location might be as good as, or better than, the dichlorophenyl substitution; and that WO '215 was a natural place to look for suggested modifications.   Plaintiffs disagree that Oshiro 1998, the '528 patent, and WO '215 support these conclusions and address each of these points below.

193.    The '528 patent and Oshiro 1998 do not support Defendants' assertion that a POSA would have focused on the 2,3-dichlorophenyl position when seeking to optimize the properties of aripiprazole and/or dehydroaripiprazole.  If anything, they teach that modifying the dichlorophenyl piperazine portion of aripiprazole or dehydroaripiprazole would have been expected to impact the binding and functional activity at the $D_2$ receptor, counseling against making any modifications to that portion of aripiprazole or dehydroaripiprazole to maintain aripiprazole's activity at $D_2$ as Defendants assert would have been desired.  Various modifications to that portion led to no $D_2$ antagonist activity (compounds 15, 19, 22, 23, 31, 32, 45, 49, 50 and 51) and, in several cases, no $D_2$ autoreceptor agonist activity (compounds 21, 25, 33, 37, 54 and 56). DTX-0034, Oshiro 1998 at Tables 1, 3. There is thus no way to know in advance what manipulating the dichlorophenyl portion of aripiprazole or dehydroaripiprazole beyond the modifications reported in Oshiro 1998 would do, and there is certainly no way to know whether any modified compounds would be as

**EXHIBIT 5**

good as, or better than, or worse than, the dichlorophenyl substitution or would have overall biological activity similar to or better than the lead compounds.

194.    WO '215 does not confirm focusing on the 2,3-dichloro region.  As an initial point, a POSA would not have looked to WO '215 for potential modifications to increase activity as a partial agonist toward 5-HT$_{1A}$ and/or increase antagonist activity toward 5-HT$_{2A}$—Defendants' stated goal—because WO '215 is entirely silent regarding any serotonergic activity of the compounds it discloses.  Instead, WO '215 indicates that the [1,8]naphthyridin-2-ones and related compounds bind to D$_2$ receptors and that some exhibit activity as partial agonists and others exhibit antagonistic activity.  DTX-0016, WO '215 at 1.  The only biological data provided relate to D$_2$ binding affinity and D$_2$ intrinsic activity as measured by a [$^3$H]thymidine uptake assay.  DTX-0016, WO '215 at 72-73.  WO '215 does not report any binding affinity or functional information at serotonin receptors for any of its compounds.  In addition, it specifically states that "[s]uitable classes of anti-anxiety agents that can be used in combination with the active compounds of this invention include . . . serotonin 1A (5-HT$_{1A}$) agonists or antagonists, especially 5-HT$_{1A}$ partial agonists . . . ."  DTX-0016, WO '215 at 45.  A POSA would thus have understood that the compounds of WO '215 were not expected to have serotonergic activity themselves, and specifically not 5-HT$_{1A}$ partial agonist activity.  For this reason alone, WO '215 is of little relevance, and based on Defendants' rationale for improving aripiprazole, a POSA would not have considered it.

195.    Even if a POSA were to consider WO '215 without having any guidance about the serotonergic properties of its compounds, WO '215 demonstrates that numerous areas for modification are possible.  WO '215 discloses compounds having the following formula

98

**EXHIBIT 5**



where $R^1$, $R^4$, $R^5$, $R^6$, G, D, Z, X, Y and Z are all defined to be various functional groups. Literally, hundreds of thousands, if not millions of compounds are encompassed within this general structure. Contrary to Defendants' assertions, WO '215 does not hold the right side of the structure constant. As shown in the formula above, the right-hand side may be substituted with various substituents, and X and Y may be various carbon, nitrogen and oxygen groups, which can optionally be further substituted at any available bonding site, by one to four substituents $R^2$, $R^{2'}$, $R^3$ and $R^{3'}$. DTX-0016, WO '215 at 2, lines 15-17.

196.     Of the almost 400 specific compounds disclosed, almost 100 of them relate to substituted naphthyridines or otherwise modified right hand sides (e.g., Y is N or O). PTX1022, Ward Report, Exhibit C. There are almost three dozen discrete right-hand substructures among the specifically disclosed compounds. There are also 8 different linkers (A) specifically disclosed, whereas many others would be permitted under the general formula shown above. Nine of the 29 "preferred" and "particularly preferred" compounds possess modified right-hand portions and do not possess the "constant" naphthyridine that Defendants assert these compounds have. DTX-0016, WO '215 at 39-41 (compounds D16, E4, E9, E10, F2, F5, F8, G7, H10); PTX1022, Ward Report, Ex. C at 46, 49-54, 56, 59. WO '215 teaches making modifications in virtually every aspect of its compounds, including the linker (A) and right-hand side. WO '215 does not thus teach

**EXHIBIT 5**

that the 2,3-dichlorophenyl region should be modified in order to optimize aripiprazole and/or dehydroaripiprazole's properties as Defendants assert.

197.    There is also no support for Defendants' statement that a POSA would have had a reasonable expectation of success that replacements to the 2,3-dichlorophenyl substituent would have led to molecules that also have strong antagonism for the 5[-]HT$_{2A}$ receptor.  As noted, none of the '528 patent, Oshiro 1998 and WO '215 say anything about serotonergic activity of any kind. Plaintiffs specifically address Defendants' reliance on WO '864 below.  It does not, as Defendants suggest, provide any reasonable expectation of success.  Defendants appear to assume that pharmacological activity of a compound can be apportioned to specific parts of a compound and that one can simply plug a substructure from one compound into a scaffold from another and expect to maintain the pharmacological activity that one assumes is attributable to that sub-structure.  That is not how medicinal chemistry works.  The pharmacological activity of any given compound depends on the structure of the entire compound, and a similar portion of a structure from one compound will not necessarily lead to the same type of pharmacological activity if substituted into a different chemical scaffold. It was well known at the priority date that making even minor changes to a compound could lead to very big pharmacological differences.  Defendants' oversimplified analysis does not account for this unpredictability.

198.    For example, Defendants assert that keeping the butoxy chain in the 7-position of the carbostyril portion is essential for activity, but the data reported in Oshiro 1998 show that, depending on the compound as a whole, a butoxy linker may not yield the desired receptor profile. *See* DTX-0034, Oshiro 1998 at Table 1.  Specifically, compounds 15, 22, 23, 50 and 51, which all have a butoxy side chain appended to the 7-position of the carbostyril ring, did not exhibit any D$_2$ antagonist activity.  DTX-0034, Oshiro 1998 at Table 1.  This demonstrates that the chemical

**EXHIBIT 5**

structure *as a whole* affects a compound's pharmacological activity, further undermining any suggestion that any 5-HT$_{2A}$ activity reported for the compounds of WO '864 would have been expected to occur in altogether different compounds of, for example, WO '215.

199.    A POSA would not have been motivated to try both aripiprazole's dihydrocarbostyril moiety and the 2(1H)-quinoline of dehydroaripiprazole.    Here again, Defendants' own goal undermines any rationale for starting with dehydroaripiprazole.  Defendants assert that a POSA would have sought generally to maintain aripiprazole's activity at D$_2$. Aripiprazole is a partial agonist at D$_2$ receptors.  DTX-0019, ABILIFY PI 2004 at 1.  In contrast, Oshiro 1998 reports that dehydroaripiprazole (compound 54) is not an agonist at the presynaptic autoreceptor, undermining any reason to start with it.  DTX-0034, Oshiro 1998 at Table 3.

200.    In sum, the asserted documents do not provide motivation to modify the 2,3-dichlorophenyl substituent of aripiprazole/dehydroaripiprazole to optimize its properties.  None of these documents provides any support that even if modifications were made to that position that the resulting compound would have D$_2$ partial activity and the serotonergic activity that Defendants assert one would have wanted.   And Oshiro 1998 provides a strong reason *not* to use dehydroaripiprazole as a starting point.

> **b.      The prior art did not teach a POSA to replace aripiprazole and/or dehydroaripiprazole's 2,3-dichlorophenyl substituent with a 4-benzothiophene group**

201.    Defendants' position that a POSA seeking to optimize aripiprazole or dehydroaripiprazole would have strongly considered a benzothiophene substituent instead of a 2,3-dichlorophenyl group does not reflect what a POSA would have actually understood.    A comprehensive review makes clear that a POSA would not have been motivated to replace the 2,3-

**EXHIBIT 5**

dichlorophenyl group of aripiprazole or dehydroaripiprazole with a 4-benzothiophene group with a reasonable expectation of success of achieving the pharmacological profile Defendants propose.

<div align="center">

(a)    **WO '215 would not have led a POSA to a benzothiophene substituent**

</div>

202.    WO '215 teaches away from benzothiophene as a possible modification. First, WO '215 states that "[t]his invention relates to [1,8]naphthyridin-2-ones and related compounds, methods of making such compounds, pharmaceutical compositions containing them, and their use for the treatment of schizophrenia and other central nervous system (CNS)." DTX-0016, WO '215 at 1, lines 6-9. These [1,8]naphthyridin-2-ones are said to exhibit activity as partial $D_2$ agonists or full $D_2$ antagonists. DTX-0016, WO '215 at 1, lines 10-12. The focus of WO '215 is not directed to 4-piperazinyl-substituted-benzothiophenes.

203.    The general structure encompasses a vast number of compounds, which may have various left-hand sides. Several are identified as preferred, including where G is a naphthyl group (DTX-0016, WO '215 at 8, lines 8-10, 18-20), 2,3-dihydro-1$H$-indene (DTX-0016, WO '215 at 8, lines 15-17) and 2-methoxyquinoline (DTX-0016, WO '215 at 8, lines 15-17). In fact, a 2,3-dichlorophenyl itself is one of the preferred G groups. DTX-0016, WO '215 at 9, lines 1-3. Thirty-nine of the specifically disclosed compounds possess this group. DTX-0016, WO '215 at Tables 1 & 2; PTX1022, Ward Report, Ex. C at 1, 38-40, 43-46, 48-50, 52, 54-56, 60-63 (Compounds A1, C1, C4, C5, C7, C9, C20, D1, D2a, D2b, D3, D4, D5, D6a, D6b, D7, D8, D9, D12, D13, D14, D15, D17, E1, E3, E9, F1, F7, F9, G1, G3, H1, I1 I4, I8, I9, I13, I18, I19).

204.    As mentioned above, there are almost 400 specific compounds disclosed. Among those compounds, there are approximately 150 discrete left-hand sides, 8 different linkers and 35 diverse right-hand sides. DTX-0016, WO '215 at Tables 1 & 2; PTX1022, Ward Report, Ex. C. There are only two benzothiophene compounds, A28' and B25', neither of which is identified as

**EXHIBIT 5**

one of the nine particularly preferred compounds.  DTX-0016, WO '215 at 41.  This is not surprising because WO '215 explains that the most preferred compounds exhibit no more than 10 nM binding at the $D_2$ receptor and at least 30% to up to 50% intrinsic activity.  DTX-0016, WO '215 at 72-73.  Both A28' and B25' exhibit intrinsic activity, as measured in a particular assay, below this range.  *See* DTX-0016, WO '215 at 83-84 (reporting 21% intrinsic activity).

205.    WO '215 states that "[p]referred embodiments of compounds of the present invention preferably exhibit Ki values of no more than 100 nM, more preferably no more than 50 nM, even more preferably no more than 25 nM, most preferably no more than 10 nM."  DTX-0016, WO '215 at 72.  There are 334 specific compounds that fall within the most preferred binding affinity group.  DTX-0016, WO '215 at Tables 1 & 2; PTX1022, Ward Report, Ex. C.

206.    If one were to assume that even tighter binding was more preferable, there are 118 compounds that have a $D_2$ binding affinity of $\leq 1$ nM.  Among these 118 compounds, there are 62 discrete left-hand side structures and 16 discrete right-hand side structures.  DTX-0016, WO '215 at Tables 1 & 2; PTX1023, Ward Report, Ex. D.  There are 16 discrete right-hand side structures. DTX-0016, WO '215 at Tables 1 & 2; PTX1024, Ward Report, Ex. E.

207.    WO '215 also states that "[c]ompounds of the present invention preferably exhibit at least 1% to up to 90% intrinsic activity, more preferably at least 10% to up to 90% activity, more preferably at least 10% to up to 80% activity, more preferably at least 20% to up to 60% intrinsic activity, even more preferably at least 30% to up to 50% intrinsic activity."  DTX-0016, WO '215 at 73.  Binding affinity alone does not provide any information about the functional activity at a receptor, such as whether the compound acts as an agonist, antagonist, or partial agonist.  As a result, a POSA would have been most interested in the guidance provided relating to intrinsic activity because it identifies what functional activity, i.e., the level of partial agonist activity, was

**EXHIBIT 5**

desirable.  The most preferred intrinsic activity was identified as at least 30% and up to 50%.

DTX-0016, WO '215 at 73.

208.    For reference, as the percentage gets closer to 1%, the compounds become more

like full antagonists.  When they bind, they do not elicit any biological response.  As the percentage

increases to closer to 100%, the compounds become more like full agonists, for example, more

like dopamine itself.  While $D_2$ antagonists, like haloperidol, successfully treat positive symptoms

of schizophrenia, they also suffer from significant side effects thought to be related to their $D_2$

blocking activity, including EPS and tardive dyskinesia.  On the other hand, too much dopamine,

and thus a compound that acts like it, was thought to exacerbate schizophrenic symptoms.  For

example, prior art compound OPC-4392, which exhibits pre-synaptic agonism at much lower

doses than post-synaptic antagonism, exacerbated positive symptoms in schizophrenia patients.

DTX-0826, Lawler 1999 at 614; *see also* DTX-0034, Oshiro 1998 at Table 3 (Compound 1).  This

overactivation (agonism) led to termination of OPC-4392 early in clinical testing.  DTX-0826,

Lawler 1999 at 614.

209.    At the time, and even now, it was well understood that a compound's intrinsic

activity could not be unambiguously determined.  DTX-0021, Burris at 384 ("Given the level of

complexity, current techniques cannot unambiguously determine the intrinsic efficacy of an

agonist at a receptor."); PTX0973, Tamminga 2005 at 4.  The field recognized that the cellular

assay "may have an impact on both receptor recognition and functional characteristics."  DTX-

0826, Lawler 1999 at 623; PTX0435, Davies 2004 at 320 ("[T]he partial agonist actions of

aripiprazole vary widely depending upon the cellular milieu.  Thus, nearly full agonism, weak

partial agonism and frank antagonism have all been reported, depending upon the assay system

and cellular background.").  It is thus very difficult, if not impossible, to compare intrinsic activity

**EXHIBIT 5**

from one assay to another.  Indeed, aripiprazole's intrinsic activity was reported to be 25% to 90%

depending on the assay used.  DTX-0021, Burris at Abstract.  Given this level of complexity, a

POSA would have to have been guided by what WO '215 says about its desired level of intrinsic

activity, here from 30-50%.

210.    There are 135 specific compounds disclosed that fall within the most preferred

intrinsic activity range of from at least 30% to up to 50%.  DTX-0016, WO '215 at Tables 1 & 2;

Ward Report, Ex. C.  None of these compounds includes a benzothiophene group because, as

mentioned, A28' and B25' exhibit a reported intrinsic activity of 21%.  There are 63 discrete left-

hand side fragments and over 25 discrete right-hand side fragments (DTX-0016, WO '215 at

Tables 1 & 2; Ward Report, Exs. F and G), demonstrating a broad spectrum of preferred functional

groups according to the disclosure of WO '215.

211.    If one considers the funneling that WO '215 itself does, all nine of the particularly

preferred compounds fall within the most preferred binding affinity and intrinsic activity ranges

as shown in the table below.[9]

| WO '215 "Particularly Preferred" Compounds | Example No. | D2 Binding Affinity (nM) | D2 Intrinsic Activity (%) |
|---|---|---|---|
| <br>7-[4-(4-Naphthalen-1-yl-piperazin-1-yl)-butoxy]-3,4-dihydro-1H-[1,8]naphthyridin-2-one | A48 | 0.8 | 34 |

---

[9] The intrinsic activity of B50 falls just outside the preferred range.  A POSA would have
understood that 50% and 51% are extremely close in activity in this particular assay.

**EXHIBIT 5**

| WO '215 "Particularly Preferred" Compounds | Example No. | D2 Binding Affinity (nM) | D2 Intrinsic Activity (%) |
|---|---|---|---|
|  7-[4-(4-Naphthalen-1-yl-piperazin-1-yl)-butoxy]-1H-[1,8]naphthyridin-2-one | B47 | 0.3 | 44 |
|  7-{4-[4-(7-Fluoro-naphthalen-1-yl)-piperazin-1-yl]butoxy}-3,4-dihydro-1H-[1,8]naphthyridin-2-one | A65 | 1.0 | 36 |
|  7-{4-[4-(7-Fluoro-naphthalen-1-yl)-piperazin-1-yl]butoxy}-1H-[1,8]naphthyridin-2-one | B49 | 0.9 | 50 |
|  7-{4-[4-(8-Fluoro-naphthalen-1-yl)-piperazin-1-yl]butoxy}-3,4-dihydro-1H-[1,8]naphthyridin-2-one | A66 | 2.0 | 49 |
|  7-{4-[4-(8-Fluoro-naphthalen-1-yl)-piperazin-1-yl]butoxy}-1H-[1,8]naphthyridin-2-one | B50 | 1.0 | 51 |

**EXHIBIT 5**

| WO '215 "Particularly Preferred" Compounds | Example No. | D2 Binding Affinity (nM) | D2 Intrinsic Activity (%) |
|---|---|---|---|
|  7-{4-[4-(2-Methoxy-quinolin-8-yl)-piperazin-1-yl]butoxy}-3,4-dihydro-1H-[1,8]naphthyridin-2-one | A41' | 1.0 | 32 |
|  7-{4-[4-(2-Methoxy-quinolin-8-yl)-piperazin-1-yl]butoxy}-1H-[1,8]naphthyridin-2-one | B30' | 1.0 | 42 |
|  2-{4-[4-(7-Fluoro-naphthalen-1-yl)-piperazin-1-yl]-butoxy}-4-methyl-8H-pyrido[2,3-d]pyrimidin-7-one | H10 | 3.0 | 44 |

212.     Seven of these nine compounds possess a naphthalenyl-piperazine group.  None of them have a benzothiophene.  As a result, a POSA would have understood from the entirety of the WO '215 that naphthalenyl-piperazine [1,8]naphthyridin-2-ones were the most preferred compounds, undermining any reason to select the unpreferred benzothiophenes.

213.     Defendants fail to explain why the intrinsic activity of 21% for A28' and B25', which is outside the most preferred range, is desirable when all of the nine most preferred compounds have intrinsic activities well in excess of 21%.  By moving to a less preferred intrinsic activity of at least 20% to up to 60% (DTX-0016, WO '215 at 73) in an effort to include the intrinsic activity of the only two benzothiophene-containing compounds in WO '215, encompasses

**EXHIBIT 5**

235 specifically disclosed compounds, which is 100 more compounds than in the most preferred range.  There are thus even more compounds and alternative substituents to pick from.

214.    An N-to-CH substitution is not trivial and would have been expected to impact the compound's biological properties, not to mention other chemical and physical properties.  It was well-known at the time that it is not possible to generalize the biological effect of any given structural change.  DTX-0040, Thornber 1978 at 565-566.  Small structural changes often have big biological effects.  Thus, a POSA would not have thought that the right-hand structures of WO '215 are readily interchangeable with aripiprazole and/or dehydroaripiprazole to no effect.  Similarly, it is impossible to predict ahead of time what replacing any one of the left-hand side structures of WO '215 into aripiprazole or dehydroaripiprazole would do to their activity because it is the structure *as a whole* that drives a compound's biological activity.

215.    In sum, WO '215 would not have directed a POSA to replace the 2,3-dichlorophenyl group of aripiprazole and/or dehydroaripiprazole with a benzothiophene group.  WO '215 leads a POSA to naphthalenyl ring structures appended to the piperazine and away from the only two benzothiophene-containing compounds in that document.

     **(b)**   **There is no teaching in the art that would have motivated a POSA to replace the 2,3-dichlorophenyl substituent of aripiprazole and/or dehydroaripiprazole with a reasonable expectation of success**

216.    Relying on decades-old art and very different compounds from either aripiprazole and/or dehydroaripiprazole Defendants assert that a POSA would have allegedly been motivated to replace the 2,3-dichlorophenyl ring of aripiprazole and/or dehydroaripiprazole with a benzothiophene for the purpose of increasing 5-HT$_{1A}$ partial agonist activity.  Defendants further

**EXHIBIT 5**

assert that such a modification allegedly would have been expected to improve the ability to treat the negative symptoms of schizophrenia through optimized activity at $5HT_{1A}$.

217.    Before the priority date, aripiprazole was already known to exhibit a high binding affinity at $5\text{-}HT_{1A}$ (Ki (nM): $5.6 \pm 0.8$) with "intermediate" intrinsic activity at that receptor. PTX0469, Shapiro 2003 at Table 1, 1408.   It was also understood to have "a favorable pharmacological profile in being a $5\text{-}HT_{2A}$ antagonist and a $5\text{-}HT_{2C}$ partial agonist."   PTX0469, Shapiro 2003 at 1409.   At the time, the art expressly recognized that the effect of $5\text{-}HT_{1A}$ partial agonism for the treatment of schizophrenia was not well understood, and thus there was no way to know whether increasing aripiprazole's already intermediate $5\text{-}HT_{1A}$ partial agonist activity would have been effective in treating schizophrenia.   PTX0469, Shapiro 2003 at 1409 ("$5\text{-}HT_{1A}$ partial agonism is not a common pharmacological characteristic of atypical antipsychotic drugs.   It remains to be seen, then, whether $5\text{-}HT_{1A}$ selective agonism, alone or in combination with effective $5\text{-}HT_{2A}$ antagonism, will be efficacious in treating the various symptoms of schizophrenia.") There is thus no support that increasing aripiprazole's or dehydroaripiprazole's $5\text{-}HT_{1A}$ partial agonist activity would have been reasonably expected to treat the negative symptoms of schizophrenia.

### ii.    The '254 Patent

218.    Defendants' cited documents do not support their position.   For example, the '254 patent does not disclose benzothiophenes for the treatment of schiziphrenia and depression. Instead, it relates to *dihydro*benzothiophenes and other compounds, including indanes, indolines and dihydrobenzofurans.   The only benzothiophene-containing compounds that are disclosed are synthetic intermediates.   Specifically, Example 23 discloses the synthesis of 5-hydroxy-2,3-dihydro-*N,N*-dipropyl-3-benzothiophenmethylamine, hemifumarate.   The '254 patent includes a

109

## EXHIBIT 5

typographical error in the compound name referring to "2,3-dihydroxy" instead of the correct "2,3-dihydro" nomenclature.  A POSA would have readily recognized this discrepancy based on the synthetic reaction that is disclosed, including the fact that the starting material is correctly referred to as "5-hydroxy-2,3-*dihydro-N,N*-dipropyl-3-benzothiophencarboxamide," which was then reduced with lithium aluminum hydride to achieve the final dihydrobenzothiophene compound per the reaction scheme shown below.  DTX-0007, '254 Patent at Example 23 (emphasis added).



219.    Therefore, the '254 patent does not disclose any potential pharmaceutical compounds that have a benzothiophene functional group for the treatment of schizophrenia and other CNS disorders.  Further, these simple compounds are very different than the alleged lead compounds that Defendants propose.  They are more akin to the neurotransmitters themselves.

220.    Further, the only pharmacological data provided in the '254 patent relate to dopaminergic activity.  DTX-0007, '254 Patent at 17:48-18:60; *see also* 1:7-24 (discussing effects of dopamine in various disorders).  There is thus no indication in this document that any compound, let alone a benzothiophene-containing one, would have any activity at the $5\text{-HT}_{1A}$ or $5\text{-HT}_{2A}$ receptors.  This patent also demonstrates the unpredictability of chemical modifications on pharmacological effect.  Specifically, the '254 patent states that 1-aminomethylindanes of the general Formula I were previously disclosed in another patent.  Those compounds, however, including Lu 21-091 in Table 1, "are without any DA stimulating properties."  DTX-0007, '254 Patent at 2:19-20.  Further, additions of hydroxyl groups to those indanes led to adrenergic agents for the treatment of hypertension.  DTX-0007, '254 Patent at 2:21-24.  This document, then, does

## EXHIBIT 5

not support Defendants' positions and further demonstrates the unpredictability that chemical modifications will have on pharmacological properties.

### iii.    The '246 Patent

221.    To the extent Defendants rely on the '246 patent to assert that a POSA would have expected that a 4-benzothiophene would have provided an improvement in 5-HT$_{1A}$ affinity (as compared to aripiprazole/dehydroaripiprazole), such argument fails.

222.    The '246 Patent is entirely silent with respect to schizophrenia or any antipsychotic activity of its compounds.  Instead, the '246 patent states that it "is directed to a new class of serotonin 5HT$_{1A}$ and 5HT$_{1D}$ receptor agents, both agonists and antagonists" for "their use in the treatment of anxiety, depression, migraine, stroke, angina and hypertension."  DTX-0006, '246 Patent at 1:8-12.

223.    Aripiprazole was already known to have high affinity at the 5-HT$_{1A}$ receptor.  DTX-0019, ABILIFY PI 2004 at 1 (Ki = 1.7 nM); Roth Nature at 355 (Ki = ~1 nM); Shapiro 2003 at 1402 (Ki=5.6±0.8 nM).  Defendants offer no explanation why this level of potency, which is expressly referred to as "high" in the ABILIFY PI 2004, needed to be or could be improved.

224.    Aripiprazole was known to be a partial agonist at the 5-HT$_{1A}$ receptor.  DTX-0019, ABILIFY PI 2004 at 1; PTX0467, Roth Nature at 356; PTX0469, Shapiro 2003 at 1408.  While the mechanism of action of aripiprazole was and remains unknown, it had been postulated that its efficacy was in part "mediated through a combination of partial agonist activity at D$_2$ and 5-HT$_{1A}$ receptors."  DTX-0019, ABILIFY PI 2004 at 1-2.  Defendants do not explain why the '246 patent provides any motivation to improve that already-established partial agonist activity with a reasonable expectation of success.  Most of the 5-HT$_{1A}$ related data in the '246 patent are binding affinity data, which are summarized in Table 1 below.  Those binding affinity data provides no

**EXHIBIT 5**

information regarding the function of the compounds at the 5-HT$_{1A}$ receptor. They could be either

antagonists or agonists. The '246 patent expressly contemplates each of these possibilities, stating

"[t]hese benzothiophene derivatives mimic or block the effects of serotonin at the 5HT$_{1A}$ and

[5HT]$_{1D}$ receptors." DTX-0006, '246 Patent at 1:50-51. From the '246 patent, there is no

information about the level of partial agonism of the specifically disclosed compounds at the 5-

HT$_{1A}$ receptor, if any. Indeed, only one compound, compound 15, was subjected to an animal

behavioral model—the fear-potentiated startle model. DTX-0006, '246 Patent at 58:28-68. This

single compound reportedly "showed significant anxiolytic activity in the fear-potentiated startle

test." DTX-0006, '246 Patent at 58:57-58. Of note, the '246 patent states that this particular test

"is sensitive to anxiolytic properties of both 5-HT$_{1A}$ partial agonists and benzodiazepine agonists."

DTX-0006, '246 Patent at 58:61-64. It was well-known that this test is used to determine

anxiolytic properties generally and is not a measure of activity at any one receptor. Many other

antianxiety agents, including morphine, are active in this model. There is thus no way to tell from

the reported results whether compound 15 was a full agonist or partial agonist at the 5-HT$_{1A}$

receptor or whether its effect was related to a completely different mechanism altogether.

225.    Compound 15 and four additional compounds were tested in a mice writhing model

to assess analgesic properties. DTX-0006, '246 Patent at 59:53-60:24. Here again, it is unclear

whether the reported results are a function of *partial* 5-HT$_{1A}$ agonism or *full* agonism because the

comparator was 8-OH DPAT, which is a selective 5-HT$_{1A}$ *full* agonist. *E.g.*, DTX-0006, '246

patent at 57:43-45. Defendants provide no argument as to whether a POSA would have wanted to

improve aripiprazole and/or dehydroaripiprazole to possess full agonist activity at 5-HT$_{1A}$. These

do not support Defendants' arguments.

## EXHIBIT 5

226.    The only remaining pharmacological data relate to binding affinity at the $5\text{-HT}_{1D}$ receptor, as summarized in the table below,[10] and antagonist activity, which is attributed to that same receptor.  *See* DTX-0006, '246 Patent at 60:50-61:32. Defendants have not addressed this aspect of the disclosed compounds' pharmacological profile even though aripiprazole was known to possess affinity at this receptor.  PTX0467, Roth Nature at 355 (Ki=~10 nM); PTX0469, Shapiro 2003 at 1402 (Ki=68±11nM). The '246 Patent used the canine saphenous vein to study $5\text{-HT}_{1D}$ receptors.  DTX-0006, '246 Patent at 60:50-51.  Twelve of the 16 tested compounds were antagonists, not partial agonists.  These compounds are shown in the table below with intrinsic activities of 15 nM or below.  Several had 0% intrinsic activity.  These data thus provide no support for Defendants' assertion that a 4-benzothiophene would have been expected to improve the $5\text{-HT}_{1A}$ activity of aripiprazole and/or dehydroaripiprazole.

Table 1.  Summary of Pharmacological Data Reported in '246 Patent

| Example No. | Binding Affinity, $IC_{50}$ nM ($5HT_{1A}/5HT_{1D}$) | $pA_2$ (intrinsic activity) | Example No. | Binding Affinity, $IC_{50}$ nM ($5HT_{1A}/5HT_{1D}$) | $pA_2$ (intrinsic activity) |
|---|---|---|---|---|---|
| 1 | >1000 />1000 | NT | 24 | 10/21 | 8.17 (9%) |
| 2 | 35/760 | NT | 25 | 0.8/6 | NT |
| 3 | 180/1000 | NT | 27 | 3/1 | NT |
| 4 | 1.6/52 | NT | 28 | 4/56 | NT |
| 5 | 89/47 | NT | 29* | 1/3 | NT |
| 6 | 37/108 | NT | 30 | 74/73 | NT |
| 7* | 0.6/2.4 | NT | 31 | 1/2 | NT |
| 8 | 4/18 | NT | 33 | 9/31 | NT |
| 9* | 0.5/1.6 | 7.99 | 34 | 104/416 | 6.78 (12%) |
| 10 | 1/1 | 10.6 (25%) | 35 | 34/66 | NT |
| 11 | 2.3/3 | 9.01 (2%) | 37 | 5/9 | 8.03 (0%) |
| 12 | 85/220 | 7.74 (0%) | 39 | 16 ($5HT_{1D}$ only) | NT |
| 13 | 27/31 | 8.76 (0%) | 40 | 2.4/16 | 8.50 (3%) |
| 14 | 239/551 | NT | 41 | 4/16 | 7.44 (16%) |

[10]  Below, color is included in the table to show groups of compounds that have the same substituents but differ from one another only by the length of the linker.  For example, compounds 1, 6, and 14 all possess X= $-CO_2CH_2CH_3$ but have a 1-, 2-, and 3-carbon linker, respectively.

**EXHIBIT 5**

| Example No. | Binding Affinity, IC$_{50}$ nM (5HT$_{1A}$/5HT$_{1D}$) | pA$_2$ (intrinsic activity) | Example No. | Binding Affinity, IC$_{50}$ nM (5HT$_{1A}$/5HT$_{1D}$) | pA$_2$ (intrinsic activity) |
|---|---|---|---|---|---|
| 15* | 1.8/23 | NT | 42 | 22 (5HT$_{1D}$ only) | 7.87 (1%) |
| 16 | 21/173 | NT | 43 | 0.5/3 | NT |
| 17 | 1/4.5 | 7.78 | 45 | 4 (5HT$_{1D}$ only) | NT |
| 18 | 53/411 | 6.51 | 46 | 4/17 | 7.98 (5%) |
| 19 | 2/10 | NT | 50 | 1/6 | NT |
| 20 | 13/31 | 7.37 (34%) | 56 | 135 (5HT$_{1D}$ only) | 6.95 (2%) |
| 21* | 2/14 | NT | 57 | 25 (5HT$_{1D}$ only) | 8.37 (0%) |
| 22 | 7.4/120 | 7.53 (0%) | 59 | NT | 9.26 (0%) |
| 23 | 3/3 | NT | * These compounds exhibited analgesic effect in a mice writhing test. | | |

227.   Moreover, the structure-activity studies that were reported in the '246 patent demonstrate yet again how small changes in a chemical structure can have a large biological impact.   For example, in three series of compounds where everything except the length of the carbon chain between the piperazinyl group and phenyl group was held constant, the results were variable and depended on the compound as a whole.



| Example No. | n | X | 5-HT$_{1A}$ (IC$_{50}$ nM) | 5-HT$_{1D}$ (IC$_{50}$ nM) |
|---|---|---|---|---|
| 1 | 1 | $-CO_2CH_2CH_3$ | >1000 | >1000 |
| 6 | 2 | $-CO_2CH_2CH_3$ | 37 | 108 |
| 14 | 3 | $-CO_2CH_2CH_3$ | 239 | 551 |
| 2 | 1 | $-CH_2OH$ | 35 | 760 |
| 7 | 2 | $-CH_2OH$ | 0.6 | 24 |
| 15 | 3 | $-CH_2OH$ | 1.8 | 23 |
| 3 | 1 | $-CN$ | 180 | 1000 |
| 8 | 2 | $-CN$ | 4 | 18 |
| 16 | 3 | $-CN$ | 21 | 173 |

114

**EXHIBIT 5**

| Example No. | n | X | 5-HT$_{1A}$ (IC$_{50}$ nM) | 5-HT$_{1D}$ (IC$_{50}$ nM) |
|---|---|---|---|---|
| 4 | 1 | −CONH$_2$ | 1.6 | 52 |
| 9 | 2 | −CONH$_2$ | 0.5 | 1.6 |
| 17 | 3 | −CONH$_2$ | 1 | 4.5 |

228.    As shown in the table above, as the linker length and/or X substituent are changed, differences in binding affinities are observed.

229.    The specifically disclosed examples of the '246 patent also all have at least one substituent on the carbon atoms on the fused 5-membered ring thiophene.  The majority are substituted at the X position in the general formula shown above, and several have dual substitutions at the X and Y positions.  Defendants do not discuss what would have been the expected impact of removing those substitutions on 5-HT$_{1A}$ activity, let alone any other receptor effects.

230.    Defendants have also not explained why a POSA would have expected that inserting a completely different benzothiophene moiety with no substitution at the thiophene double bond into an entirely different chemical scaffold (i.e., aripiprazole and/or dehydroaripiprazole) would have been expected to improve 5-HT$_{1A}$ partial agonism when (1) aripiprazole was already known to have high affinity at the 5-HT$_{1A}$ receptor and exhibited partial agonism there; (2) the '246 Patent provides no pharmacological data demonstrating that the disclosed compounds were 5-HT$_{1A}$ partial agonists; and/or (3) the '246 patent itself shows that very small changes affect the resulting biological outcomes.  The '246 patent therefore provides no motivation to make any modifications to aripiprazole and/or dehydroaripiprazole with any reasonable expectation of success.

### iv.    Kuipers 1995

231.    Kuipers 1995 also fails to provide any support for Defendants' position that a POSA would have expected a 4-benzothiophene to provide an improved 5-HT$_{1A}$ binding affinity

## EXHIBIT 5

compared to aripiprazole and/or dehydroaripiprazole.  Of the 29 compounds shown with data, the

affinity of the only benzothiophene-containing compound in Kuipers 1995, compound 15, appears

to have approximately the same affinity that aripiprazole already had although it is hard to compare

affinities from one assay to another.  *Compare* DTX-0027, Kuipers 1995 at Table 2 (Ki=9.9 nM)

*with* PTX0469, Shapiro 2003 at Table 1 (Ki=5.6±0.8 nM).  Nevertheless, the ABILIFY PI 2004

characterized aripiprazole as having "high" affinity in low nanomolar ranges for the 5-HT$_{1A}$

receptor.  DTX-0019, ABILIFY PI 2004 at 1.  It is therefore unclear how compound 15 could have

improved the binding affinity of aripiprazole and/or dehydroaripiprazole.

232.     The benzothiophene of Kuipers 1995 also possesses a different point of attachment

to the piperazine ring compared to the benzothiophene in brexipiprazole:



Compound 15                                   Brexipiprazole

Kuipers does not suggest a change between the 7-position of Kuipers 1995, Compound 15 and the

4-position of brexipiprazole.  Defendants do not explain how making the additional required

modification to the benzothiophene of Kuipers 1995 would or would have not been expected to

impact the 5-HT$_{1A}$ activity.  There is nothing in Kuipers 1995 to support an expectation one way

or another.  Such a modification is simply unpredictable, especially when introduced into an

entirely different chemical backbone.

233.     Kuipers 1995 would not have guided a POSA to utilize a phenylpiperazinyl

substituent at the 2,3-position with a thiophene residue so as to create a benzothiophene-substituted

piperazine.  The binding affinity of compound 15 was measured only once, whereas other

116

<u>**EXHIBIT 5**</u>

compounds were tested in multiple runs.  DTX-0027, Kuipers 1995 at Table 2 (n=1 for compound 15).  This strongly suggests that the benzothiophene was not a particularly interesting compound to the researchers.  Other aspects of this article support this understanding.  The authors state that "[t]he most potent compound, 13, has an affinity comparable to the selective $5HT_{1A}$ reference compound 8-OH-DPAT (2) and the neurotransmitter 5-HT (1) itself," both of which are full agonists.  DTX-0027, Kuipers 1995 at 1950.  The researchers used compounds 14 and 11 as lead compounds to further investigate the effects of various substituents.  *See, e.g.*, DTX-0027, Kuipers 1995 at Table 3.  The benzothiophene compound is clearly not preferred.  The authors make no mention of it in their conclusions.  DTX-0027, Kuipers 1995 at 1950.

234.    In addition, Kuipers 1995 is entirely silent with respect to the functional activity of the compounds disclosed.  Only binding affinity data are provided.  There is thus no way to know whether such compounds are antagonists, full agonists, or partial agonists, further undermining any reason to look to them in the first place.

### v.    The '306 Publication

235.    The '306 publication also fails to teach that 4-piperazinyl-substituted benzothiophenes behave as potent $5\text{-}HT_{1A}$ agonists.  In contrast, the '306 publication discloses that its compounds antagonize, rather than agonize, the $5\text{-}HT_{1A}$ receptors.  DTX-0008, '306 Publication at ¶ [0181] ("Due to their combined *antagonism* of $5\text{-}HT_{1A}$ receptors and serotonin reuptake inhibiting effect . . . ."); *see also* DTX-0008, '306 Publication at ¶ [0510].  The only data relating to the $5\text{-}HT_{1A}$ receptor are binding data, and those data provide no indication as to functional activity.  DTX-0008, '306 Publication at Table 1.  There is thus no support for an allegation by Defendants' that the '306 publication describes potent $5\text{-}HT_{1A}$ agonists.  If anything, a POSA would have expected the compounds of the '306 Publication to have $5\text{-}HT_{1A}$ antagonist activity.

## EXHIBIT 5

Defendants also do not address the various other activities attributed to the compounds of the '306 publication, including activity at the $D_3$ and $D_4$ receptors.

236.    The four benzothiophene-containing compounds that Defendants point to, 2e, 5ad, 5ao, 5bt and 5ci, possess multiple additional structural components.[11]  Additionally, the point of attachment of the benzothiophene group in the '306 publication is the 7-position, as opposed to the 4-position of brexpiprazole.  Defendants have not explained how just the benzothiophene-piperazine portion of the below four compounds would have been expected to maintain their binding affinities, let alone have the requisite "improved" $5\text{-HT}_{1A}$ partial agonism when inserted into a different chemical scaffold.  The connection point between the benzothiophene and piperazine ring is not the same as that in brexpiprazole.  The '306 publication offers no guidance as to how changing the attachment point would affect the binding and pharmacological functional data one way or another, especially if inserted into a different chemical scaffold.  Of course, such effect cannot be predicted *a priori*.

---

[11] Compounds 2e and 5ad appear to be the same compound.

## EXHIBIT 5



2e, 5ad: 1-Benzo[b]thiophen-7-yl-4-[3-(2-chloro-4-fluoro-
phenylsulfanyl)-propyl]-piperazine



5ao: 1-Benzo[b]thiophen-7-yl-4-[3-(2,6-
dichloro-4-methanesulfonyl-phenoxy)-
propyl]-piperazine

5bt: 1-Benzo[b]thiophen-7-yl-4-[3-
(2-bromo-4,6-difluoro-phenoxy)-
propyl]-piperazine

5ci: 1-Benzo[b]thiophen-7-yl-4-[3-(2,4-
difluoro-phenoxy)-propyl]-piperazine

  **c. None of the documents that Defendants rely upon provides any
motivation to replace the 2,3-dichlorophenyl ring of
aripiprazole and/or dehydroaripiprazole with a reasonable
expectation of success**

237. None of WO '215, the '254 patent, the '246 patent, the '306 publication, or Kuipers

1995 provides any reasonable expectation that a 4-benzothiophene would have provided an

improvement in 5-HT$_{1A}$ affinity (as compared to aripiprazole/dehydroaripiprazole). Nor does WO

'215 show that a POSA would expect that such a change would essentially maintain

aripiprazole/dehydroaripiprazole's D$_2$ partial agonist effect.

238. The '254 patent, '246 patent, '306 publication and Kuipers 1995 do not disclose

any specific compounds with an unsubstituted 4-benzothiophene group like that of brexpiprazole.

119

**EXHIBIT 5**

Specifically, as mentioned, the '254 patent does not disclose *any* benzothiophenes as potential pharmaceutical agents.  The only benzothiophene compounds that are disclosed are synthetic intermediates, for which no pharmacological data are provided, in the context of a patent directed to other ring systems for which pharmacological data are provided:



Lu 24-100

239.     The '246 patent also fails to provide any motivation to improve the 5-HT$_{1A}$ affinity of aripiprazole and/or dehydroaripiprazole by introducing a 4-benzothiophene in place of the 2,3-dichlorophenyl substituent with a reasonable expectation of success.  The specific benzothiophenes of the '246 patent are each substituted at carbons C2 or C3 (i.e. the carbons on the 5-membered ring) by at least one substituent (shown in red):



Exs. 1-4, 6-9, 14-17

240.     Even if the '246 patent provided information about the 5-HT$_{1A}$ partial agonist activity of any of its compounds, which it does not, such compounds do not provide any

120

**EXHIBIT 5**

information about what affinity or activity one could expect if a 4-benzothiophene without any substitution across the double bond were introduced into an entirely different chemical scaffold. Defendants also have not explained why altering the groups shown in yellow and blue in the above structures, for example, would not impact the pharmacological properties of the disclosed compounds.

241.    The '306 publication is similarly deficient.  It fails to provide any support for why a POSA would expect that a 4-benzothiophene would have provided an improvement in 5-HT$_{1A}$ affinity as compared to aripiprazole and/or dehydroaripiprazole.  Although the '306 patent does not contain any functional pharmacological data, it generally discloses that its compounds are *antagonists* at the 5-HT$_{1A}$ receptor.  It thus teaches the exact opposite effect that Defendants assert a POSA would have sought.  Accordingly, it offers no reason to look to any of its compounds to improve 5-HT$_{1A}$ partial agonist activity.   Even if a POSA were to look to the specific benzothiophenes disclosed in the '306 patent, they possess multiple differences compared to a 4-benzothiophene moiety.

242.    Kuipers 1995 also fails to provide any motivation to arrive at a 4-benzothiophene to allegedly improve the 5-HT$_{1A}$ partial agonist activity of aripiprazole and/or dehydroaripiprazole with a reasonable expectation of success.  It includes only binding affinity data and no functional data at the 5-HT$_{1A}$ receptor.   The binding information for the benzothiophene-containing compound was lower than the preferred dioxine compound. DTX-0027, Kuipers 1995 at Table 2 (Compound 15 vs. Compound 13).  Even if a POSA were to ignore the express preference for Compound 13 (a benzodioxane derivative), the benzothiophene that is disclosed is different from that of brexpiprazole, and Defendants have not offered any explanation as to why a POSA would

**EXHIBIT 5**

have expected the binding affinity that is reported for Compound 15 to persist if the multiple

required modifications to arrive at brexpiprazole were made:



Compound 15

243.     There is simply no teaching from the '254 patent, the '246 patent, the '306

publication, or Kuipers 1995 to support Defednants' assertion that a POSA would have expected

a 4-benzothiophene to provide an improvement in 5-HT$_{1A}$ affinity as compared to aripiprazole

and/or dehydroaripiprazole, let alone improve the partial agonist activity at that receptor.

244.     Further, that WO '215 does not support Defendants' argument that a POSA would

expect that going from a 2,3-dichlorophenyl substituent in either of aripiprazole and/or

dehydroaripiprazole    to    a    4-benzothiophene    would    essentially    maintain

aripiprazole/dehydroaripiprazole's D$_2$ partial agonist effect.  First, the compounds of WO '215 are

different than aripiprazole and dehydroaripiprazole and modifications among the WO '215

compounds do not necessarily translate into the same effect if made to aripiprazole and/or

dehydroaripiprazole.  And second, even if one could graft the effects of the compounds of WO

'215 onto aripiprazole and/or dehydroaripiprazole, WO '215 shows that when the benzothiophene

replaced a 2,3-dichlorophenyl group, it led to compounds that did not have the preferred level of

partial agonist activity.  DTX-0016, WO '215 (*Compare* A1 with A28' and B1 with B25').  As a

consequence, WO '215 simply cannot and does not support Defendants' positions.

245.     To the extent Defendants assert that there are other properties of benzothiophenes

and a dichlorophenyl group that support substituting one for the other, they have provided no

**EXHIBIT 5**

support for this proposition.  They are different functional groups with different properties.  A POSA would not have been able to predict *a priori* what replacing the dichlorophenyl group with a 4-benzothiophene group would do pharmacologically irrespective of the ceratin properties such as lipophilicity, size, shape and electronic properties.

246.    For all of these reasons, these documents would not have specifically motivated a POSA to make benzothiophene-substituted compounds, and in particular, 4-piperazinyl-substituted benzothiophenes in an effort to increase $5\text{-HT}_{1A}$ partial agonism while maintaining similar $D_2$ partial agonism.  Moreover, this modification would not have been expected to improve the ability to treat negative symptoms of schizophrenia through optimized activity at $5\text{-HT}_{1A}$ receptors.

> **5.    WO '864 Does Not Support Replacing the 2,3-Dichlorophenyl of Aripiprazole and/or Dehydroaripiprazole with a 4-Benzothiophene Group**

247.    WO '864 would not have motivated a POSA to arrive at brexpiprazole with a reasonable expectation of success for multiple reasons.

248.    As the brexpiprazole patents point out, WO '864 relates to compounds that "exhibit activity as antagonists of dopamine D2 receptors and of serotonin 2A (5HT2A) receptors."  DTX-0015, WO '864 at 1:8-10; *see* PTX0006, RE'059 patent at 1:29-49.  The brexpiprazole patents further state "there is no description in WO2004/026864Al that carbostyril derivatives described in the document have $D_2$ receptor partial agonist activity, $5\text{-HT}_{2A}$ receptor antagonist activity, $\alpha_1$ receptor antagonist activity and serotonin uptake inhibitory activity together and have a wide treatment spectrum."  PTX0006, RE'059 patent at 1:49-59.  A POSA seeking to develop a compound that maintains the $D_2$ partial agonist activity of aripiprazole would not have looked to the disclosure of WO '864, which relates to $D_2$ antagonists.

123

**EXHIBIT 5**

249.    WO '864 also would not have led a POSA to a benzothiophene-containing compound.  The general formula 1 of WO '864 encompasses thousands of compounds and includes a dozen different fused aromatic rings attached to either a piperidine or piperazine ring. DTX-0015, WO '864 at 2-3 ("Z is nitrogen or CH").  Specifically, the ring containing X and Y may be a benzothiophene or benzoisothiazole in various states of oxidation at the sulfur atom (-S, SO, $SO_2$), as well as a benzofuran, indole, isoindole, indene, benzoisoxazole, or indazole.  DTX-0015, WO '864 at 2.  There is no specific focus on benzothiophenes.  Moreover, of the 176 specific compounds disclosed, only two are benzothiophene-containing compounds.  Examples 45 and 46 relate to the enantiomers of 6-[2-(4-benzo[b]thiophen-3-yl-piperazin-1-yl)-ethyl]-4-methyl-3,4-dihydro-1H-quinolin-2-one.    Examples 47 and 48 relate to the enantiomers of 6-{2-[4-(6-fluorobenzo[b]thiophen-3-yl)-piperazin-1-yl]-ethyl}-4-methyl-3,4-dihydro-1H-quinolin-2-one. All that is known about the binding affinities of these compounds is that "at least one stereoisomer of each such compound exhibited a binding affinity for the D2 receptor, measured as percent inhibition at a concentration of 0.1 μm, of no less than 14% and up to 100%."  DTX-0015, WO '864 at 34.  Similarly, WO '864 states that "[a]t least one stereoisomer of each such compound exhibited a binding affinity for the 5HT2 receptor, measured as percent inhibition at a concentration of 0.1 μm, of no less than 80% and up to 100%."  DTX-0015, WO '864 at 34. Although WO '864 indicates that all of the Examples 1-36 exhibited Ki values less than or equal to 1 μM for both the $D_2$ and $5HT_{2A}$ receptors, none of the benzothiophene-containing examples were tested in those assays.  DTX-0015, WO '864 at 35.  From reading these disclosures, a POSA would have understood that the Ki values were either not measured for all of the specifically disclosed compounds, including the benzothiophene-containing compounds, or that they were tested and the results were higher than 1 μM.  Either way, a POSA would have understood that

124

**EXHIBIT 5**

Examples 1-36 were preferred because they are specifically called out, and that compounds without Ki values, including the benzothiophene-containing compounds, were not preferred.

250.       Examples 8, 23 and 31 are specifically called out and possess either a benzoisothiazole or benzoisoxazole group, not a benzothiophene.  Defendants have not explained why a POSA would have ignored the teachings of these preferred compounds and instead homed in on only one of the benzothiophene-containing compounds.

Example 8                            Example 23                            Example 31

251.   Even if a POSA would have selected Example 45, as Defendants contend, there is no teaching in WO '864 or any other of the asserted documents that would have motivated a POSA to make the requisite modifications to arrive at the 4-benzothiophene of brexpiprazole with a reasonable expectation of success.



Example 45

252.   In sum, WO '864 does not provide a reasonable expectation that replacing the 2,3-dichlorophenyl group of aripiprazole and/or dehydroaripiprazole with a 4-benzothiophene—a moiety nowhere disclosed, suggested, or taught in WO '864—would have led to strong antagonism

125

**EXHIBIT 5**

for the 5-HT$_{2A}$ receptor.  As such, it fails to inform the obviousness analysis either alone or in combination with the other asserted documents.

**6.     A POSA Would Not Have Been Motivated to Introduce a Double Bond in Aripiprazole**

253.    Dehydroaripiprazole would not have motivated a POSA to introduce a double bond into aripiprazole's carbostyril ring.  Defendants may rely on Fura for teachings that are not specific to aripiprazole to assert that "[a]ctive metabolites may show superior pharmacology, pharmacokinetics, and safety profiles in comparison to their parent molecules."  DTX-0023, Fura 2004 at 4348.  However, as the art recognized, the opposite is equally likely—a metabolite may have no or detrimental pharmacology, different pharmacokinetics and raise safety concerns.  DTX-0827, Lin 1997 at 404 ("Pharmacokinetically, the active metabolites may differ in distribution and clearance from that of the parent drug.  Pharmacologically, the parent drug and its metabolites may act by similar mechanisms, different mechanisms, or even by antagonism.").  With respect to dehydroaripiprazole, none of the documents cited by Defendants demonstrate that dehydroaripiprazole was effective to treat schizophrenia.  The ABILIFY PI 2004 states that the mechanism of action of aripiprazole was unknown.  DTX-0019, ABILIFY PI 2004 at 1.  It also states that the proposed efficacy of aripiprazole is mediated through a combination of partial agonist activity a D$_2$ and 5-HT$_{1A}$ receptors and antagonist activity at 5-HT$_{2A}$ receptors.  DTX-0019, ABILIFY PI 2004 at 1.  It was also reported that dehydroaripiprazole, unlike aripiprazole, did not exhibit D$_2$ agonist activity.  DTX-0034, Oshiro 1998 at Table 3.  Oshiro 1998 states that "the 2(1$H$)-quinolinone derivatives with the 3-chloro-2-methyl-, 2,3-dichloro-, and 2-ethoxyphenyl-piperazinyl moieties (**52**, **54**, and **56**) were much less active than the 3,4-dihydro-2(1$H$)-quinolinone derivatives with the corresponding side chain (**13**, **28**, and **48**)."  DTX-0034, Oshiro 1998 at 663.  A POSA seeking to maintain the D$_2$ partial agonist activity of aripiprazole

**EXHIBIT 5**

would not have been motivated to make a modification to introduce a double bond that was known to undermine that activity.

254.    An extended the half-life similarly would not have motivated a POSA to modify aripiprazole to include a double bond.  The difference between a half-life of 75 hours and 94 hours is not particularly meaningful and certainly not a reason to tip a researcher in the direction of a double bond.    This is especially so where the compound with the double bond— dehydroaripiprazole—was reported to be inactive at the $D_2$ autoreceptor.  DTX-0034, Oshiro 1998 at Table 3, 663.  A POSA would not have wanted to modify aripiprazole in a way that would undercut its favorable pharmacological profile.

255.    The knowledge surrounding dehydroaripiprazole does not support the conclusion that dehydroaripiprazole may not be associated with certain side effects related to enzymatic metabolism.  Like aripiprazole, dehydroaripiprazole was known to be metabolized by cytochrome P450 enzymes, CYP2D6 and CYP3A4.  DTX-0014, WO '682 at Fig. 8.  WO '682 includes Fig. 8, which shows the complex metabolism of aripiprazole, including the breakdown of dehydroaripiprazole, which is labeled as OPC-14857 in the figure excerpted from WO '682 below. In the figure, the red boxes highlight the enzymes understood to be responsible for the metabolism of dehydroaripiprazole.   To understand dehydroaripiprazole's metabolism via these enzymes, without any impact from aripiprazole, it would have to be administered by itself.  Defendants have not pointed to any situation where dehydroaripiprazole was administered in a clinical setting to understand its metabolism.  *Cf.* DTX-0019, Abilify PI 2004 (administration of aripiprazole); DTX-0026, Kubo 2005 (p.o. administration of aripiprazole).

## EXHIBIT 5



256.   The fact that the AUC of dehydroaripiprazole decreased when aripiprazole was administered with a strong CYP2D6 inhibitor is not surprising because CYP2D6 was inhibited and was not able to metabolize aripiprazole to dehydroaripiprazole as it typically does in the absence of a strong CYP2D6 inhibitor.  This results in a 112% increase in AUC for aripiprazole compared to a circumstance without the CYP2D6 inhibitor.  DTX-0019, Abilify PI 2004 at 3, 16-17.  Because there was less aripiprazole being metabolized by CYP2D6, the *in situ* formation of

**EXHIBIT 5**

dehydroaripiprazole went down.   That does not mean, however, that the metabolism of dehydroaripiprazole was not also affected by the administration of a strong CYP2D6 inhibitor because the ABILIFY PI 2004 does not provide any data regarding the downstream products of the metabolism of dehydroaripiprazole, such as DM-1459, which was understood to be formed via CYP2D6/CYP3A4 metabolism.

257.    Moreover, it was not known whether the metabolism of dehydroaripiprazole would or would not be affected by coadministration of a CYP2D6 inhibitor because dehydroaripiprazole was not administered by itself, the only way to understand its particular pharmacokinetic and metabolic profile.   As a result, it is incorrect to assume that dehydroaripiprazole would not have the same metabolic considerations as aripiprazole and would not have served as a basis for motivating a POSA to introduce a double bond into aripiprazole.

258.    WO '682 does not suggest otherwise.   Dehydroaripiprazole is repeatedly identified as one among several preferred metabolites of aripiprazole.   *E.g.*, DTX-0014, WO '682 at 5:13-16 ("Preferred aripiprazole metabolites are shown in Figure 8 indicated by the following designations: OPC-14857, DM-1458, DM-1451, DM-1452, DM-1454 and DCPP."), 6:11-14 (same), 8:3-7, 10:5-8, 10:15-17.   WO '682 includes no pharmacological data regarding dehydroaripiprazole.   The only data provided relate to aripiprazole.   WO '682 at Example 2.   It also is devoid of any clinical results using dehydroaripiprazole.   There is thus no actual data to support the generalized characterization that the hypothetical combination products with dehydroaripiprazole or any one of various metabolites (DTX-0014, WO '682 at 56:11-16), possess "excellent efficacy . . . [with] fewer side-effects and an excellent safety profile."   DTX-0014, WO '682 at 31:28-32:3.   A POSA would not have selected dehydroaripiprazole as a lead compound, and a POSA would not have motivated to insert a double bond into aripiprazole.   A POSA would have understood that this

**EXHIBIT 5**

disclosure provides limited to no information regarding any of aripiprazole's metabolites. The pharmacological data that existed before the priority date for dehydroaripiprazole teach away from its use as a starting point or as a source of potential modification because it does not have the $D_2$ agonist activity of aripiprazole. DTX-0034, Oshiro 1998 at Table 3.

259.   Dehydroaripiprazole also was not understood to have a similar efficacy to aripiprazole. It was known to have different pharmacological activity, and no information regarding its clinical effects were known. DTX-0034, Oshiro 1998 at Table 3. The introduction of the double bond into aripiprazole resulted in a compound that that was "much less active" than aripiprazole in an *in vivo* dopamine autoreceptor assay. DTX-0034, Oshiro 1998 at 663. It did not possess agonist activity at the $D_2$ autoreceptor, part of aripiprazole's robust pharmacological profile. DTX-0034, Oshiro 1998 at Table 3; PTX0467, Roth Nature at 355. A POSA seeking to maintain aripiprazole's $D_2$ activity would not have introduced a change that would completely undermine it.

260.   Dihydrobrexpiprazole *did not exist* in the prior art. A POSA thus would not have known or expected how it would metabolize and whether any metabolites of it would be active.

261.   WO '215 also does not provide any motivation to replace the 3,4-single bond in aripiprazole with a double bond. As mentioned above, a change in one chemical scaffold does not inform one as to the effect of such a change in a different chemical scaffold. It is thus irrelevant that introducing a double bond into some of the WO '215 compounds did not appear to affect the $D_2$ binding or intrinsic activity in those assays in that chemical scaffold. Oshiro 1998 shows that the introduction of that double bond into aripiprazole's chemical scaffold (as well as other carbostyril derivatives) had an undesirable effect. DTX-0034, Oshiro 1998 at Table 3 (*compare* Compounds 13, 28 and 48 *with* Compounds 52, 54 and 56). Defendants have offered no rationale

**EXHIBIT 5**

for why a POSA would have ignored that information in favor of relying on changes in an altogether different chemical scaffold. Defendants' analysis also does not address any impact such a change would have had on 5-HT$_{1A}$ or 5-HT$_{2A}$ activity. There is simply no information in WO '215 or Oshiro 1998, for that matter, to suggest that such a change would have been favorable in that respect.

262.    The '416 patent also would have been of little relevance to a POSA seeking to develop a new antipsychotic drug. The '416 patent is directed to compounds that display antihistaminic action, and no information regarding its compounds' potential as antipsychotics is provided. Rather, the pharmacological data are directed to antihistamine activity, analgesic activity and sedating effects of the compounds. A POSA thus would have been unlikely to consider the '416 patent in an effort to develop an antipsychotic. Just because different compounds that possess double bonds retained certain antihistamine properties does not mean that introducing a double bond into aripiprazole would have no effect on its pharmacological profile. It was known in the prior art, that the double bond did affect aripiprazole's properties. DTX-0034, Oshiro 1998 at Table 3, 663. Even if single-to-double bond modifications may have been tried, the prior art provided no reasonable expectation that such a modification in aripiprazole's chemical scaffold would maintain its dopaminergic activity because the activity of dehydroaripiprazole was different than the parent compound. *See* DTX-0034, Oshiro 1998 at Table 3. That a modification may have been previously tried or is routine does not supply a reasonable expectation of success.

263.    Oshiro 1998 does not suggests that adding a double-bound is a routine modification. Oshiro and colleagues were interested in agonist activity at DA autoreceptors to address the negative symptoms of schizophrenia and EPS effects associated with D$_2$ antagonism, and several double bond analogues, including dehydroaripiprazole, did not possess that desired effect. DTX-

## EXHIBIT 5

0034, Oshiro at 658-659 ("To find a more effective agent for treating both negative and positive symptoms in schizophrenia and with less side effects than the standard agents, we have searched for a compound which is an agonist of the DA autoreceptors and a potent antagonist of the postsynaptic DA receptors . . . . Selected compounds which showed a potent postsynaptic DA receptor antagonist activity were evaluated for their DA autoreceptor agonist activity."), Table 3, 663.   The '528 patent also does not suggest that adding a double bond is simply a routine modification.   That patent does not provide any information regarding the partial agonist activity of any of its compounds.   Routine or not, a POSA would not have been motivated to introduce a double bond into aripiprazole in an effort to develop an improved antipsychotic with a reasonable expectation of success.   The developers of aripiprazole considered the pharmacological profile of dehydroaripiprazole and selected compound 28, now known as aripiprazole, "as a candidate for clinical evaluations in schizophrenic patients."   DTX-0034, Oshiro 1998 at 663.   They did not select dehydroaripiprazole for this purpose.

### 7. Bioisosterism Provides Neither Motivation Nor a Reasonable Expectation of Success to Arrive at Brexpiprazole

264.   Bioisosterism does not support defendants' proposed modifications.   Bioisosteric substitutions do not result in predictable results.   The very nature of bioisosteric substitutions will cause one or more of the following parameters to change: "size, shape, electronic distribution, lipid solubility, water solubility, $pK_a$, chemical reactivity, and hydrogen bonding."   DTX-0039, Silverman, R. B., *Drug Discovery, Design, and Development*, The Organic Chemistry of Drug Design and Drug Action, 2nd Ed., 4-51 (1992) ("Silverman 1992") at 21.   Additionally, these modifications can affect the resulting molecule in the following ways:

> 1. Structural. If the moiety that is replaced by a bioisostere has a structural role in holding other functionalities in a particular geometry, then size, shape, and hydrogen bonding will be important.

**EXHIBIT 5**

2. Receptor interactions. If the moiety replaced is involved in a specific interaction with a receptor or enzyme, then all of the parameters except lipid and water solubility will be important.

3. Pharmacokinetics. If the moiety replaced is necessary for absorption, transport, and excretion (collectively, with metabolism, termed pharmacokinetics) of the compound, then lipophilicity, hydrophilicity, pK., and hydrogen bonding will be important.

4. Metabolism. If the moiety replaced is involved in blocking or aiding metabolism, then the chemical reactivity will be important.

DTX-0039, Silverman 1992 at 21.

265.    When considering bioisosteric replacements, in addition to pharmacological effects, multiple other parameters must be considered, such as size, shape, electronics, lipid solubility, water solubility, $pK_a$, chemical reactivity and hydrogen bonding capacity.  DTX-0040, Thornber 1978 at 565-566.  Thornber highlights the unpredictability of bioisosterism stating "[i]t is unlikely that any bioisosteric replacement will leave all these parameters undisturbed. The extent to which the replacement is useful will depend upon which of these parameters is important and which ones the bioisostere can best mimic."  DTX-0040, Thornber 1978 at 565-566.  Thornber also states that the element being considered for bioisosteric replacement may have one of the following roles:  structural, receptor interactions, pharmacokinetics and/or metabolism.  DTX-0040, Thornber 1978 at 565.  As a result, "[u]sually, one will not know which role(s) the various parts of the molecule play(s) in its action and this determination will be part of the structure-activity study."  DTX-0040, Thornber 1978 at 565.  Given the unpredictability of bioisosteres, "[c]ompletely identical properties are rarely sought and will in any case be difficult if not impossible to achieve."  DTX-0040, Thornber 1978 at 566.  Thus, a bioisosteric change would necessarily alter properties of the underlying molecule, and there is no guarantee that such substitution would result in a pharmaceutically effective product.  This uncertainty is compounded

133

**EXHIBIT 5**

given the complexity of the molecule at issue, which consists of various functional groups that interact with several receptors.

266.    Defendants' other cited reference, Patani 1996, is a general overview on bioisosterism.  Neither Thornber 1978 nor Patani 1996 provide any guidance for how a bioisosteric substitution would affect a drug molecule, let alone whether such substitutions could be used to successfully develop antipsychotics.

267.    The art taught that bioisosterism would necessarily result in changes to a molecule, but such changes could not be predicted in drug development.  A POSA would thus not have been motivated to rely on bioisosterism with a reasonable expectation of success.

> **8.    A POSA Would Not Have Reasonably Expected to Make an Improved Antipsychotic Based on the Asserted Documents**

268.    For all reasons discussed herein, a POSA would not have started with aripiprazole and/or dehydroaripiprazole or made the modifications that Defendants assert a POSA would have made to arrive at brexpiprazole with a reasonable expectation of success.

269.    Specifically, Defendants have not substantiated why a POSA would have reasonably expected the resulting compound, which is now known as brexpiprazole, to provide a high affinity for the $5HT_{1A}$ receptor, while maintaining the requisite affinity and partial agonist activity for the $D_2$ receptor.  And WO '864 does not provide a reasonable expectation of success that the resulting compound would also have strong antagonism for the $5\text{-}HT_{2A}$ receptor.

270.    Moreover, even if a POSA could hope to arrive at a particular pharmacological profile, the art repeatedly demonstrates that any attendant clinical profile is unpredictable.  As a result, a POSA would not have reasonably expected to arrive at a compound that would have provided an improvement over aripiprazole in the treatment of schizophrenia based on its predicted ability to reduce the negative symptoms of schizophrenia and EPS-related events.

134

**EXHIBIT 5**

271.    Brexpiprazole therefore would not have been obvious.

> **9.    Defendants' Combinations Would Not Have Directed a POSA to
> Arrive at Brexpiprazole**

272.    Defendants appear to assert that 8 combinations of alleged asserted art render brexpiprazole obvious.  For all of the reasons discussed herein, these combinations fail to demonstrate that a POSA would have been motivated to start with and modify aripiprazole and/or dehydroaripiprazole to arrive at brexpiprazole with a reasonable expectation of success.  While Plainitffs address each of these combinations at a high-level, Plaintiffs reserve the right to rely on any of the discussion regarding the asserted documents discussed herein in response to whatever combination Defendants or their experts ultimately rely upon.

273.    Defendants' arguments regarding obviousness are directed solely to brexpiprazole and not any other compound(s) encompassed by the claims of the brexpiprazole patents.  The below responses are therefore focused on brexpiprazole but Plaintiffs reserve the right to address the obviousness of other compounds and supplement should Defendants present new arguments.

> **a.    Aripiprazole in view of WO '215 and , optionally, Oshiro 1998**

274.    To the extent Defendants assert that aripiprazole in view of WO '215, and optionally, Oshiro 1998 would render brexpiprazole obvious, Plainitffs object to this combination as not being set forth in Plaintiffs' expert reports.

275.    A POSA seeking to improve or increase the $5\text{-}HT_{1A}$ partial agonist activity (and antagonism at $5\text{-}HT_{2A}$) of aripiprazole while maintaining its partial agonist activity at the $D_2$ receptor would not have considered the disclosure of WO '215 because it provides *no* information about any serotonergic effects of its compounds.  It states that the [1,8]naphthyridin-2-ones "bind to dopamine $D_2$ receptors," where "[s]ome exhibit activity as partial agonists of $D_2$ receptors, while others exhibit activity as antagonists of such receptors."   DTX-0016, WO '215 at 1:10-12.

135

**EXHIBIT 5**

Consequently, a POSA would have had no reason to look to WO '215 to make any changes to the

pharmacological profile of aripiprazole, which was already known to be a partial agonist at the $D_2$

receptor.  *See generally* PTX0467, Roth Nature; PTX0469, Shapiro 2003; DTX-0040, Burris;

DTX-0826, Lawler 1999.

276.    Even if a POSA were to consider WO '215, its disclosure does not instruct one to

focus on aripiprazole's 2,3-dichlorophenyl group as a point of modification.  DTX-0016, WO '215

instead demonstrates that there were countless possible modifications encompassed within its

general formula 1 and numerous specific modifications were being considered at every portion of

the disclosed compounds, many of which had the desired binding affinity of less than 10 nM and

intrinsic activity of from 30% to up to 50%.  One modification, however, was maintaining a

nitrogen in the [1,8]naphthyridin-2-one ring.  The compounds of WO '215 require that at least one

of Z or Q must be a nitrogen.  DTX-0016, WO '215 at 2:13-14 ("provided that at least one of Z

and Q is N").  Defendants appear to rely on bioisosterism to avoid this requirement of the

compounds of WO '215, but, if bioisosterism is considered, the scope of possible modifications

that WO '215 teaches increases exponentially.

277.    Defendants focus on compounds A28' and B25', ignoring the vast majority of the

disclosure of WO '215.  These are the only two benzothiophene-containing compounds among

almost 400 specific compounds.  Neither has the most preferred intrinsic activity of from 30% to

up to 50% because their intrinsic activity is reported to be 21%, which contrary to Defendants'

position, is not reported to be "especially preferred."  *See* DTX-0016, WO '215 at 73, Tables 1

and 2.  Neither is identified as one of the 9 most preferred compounds.  DTX-0016, WO '215 at

41.  While A28' is mentioned as a "preferred" compound (WO '215 at 40), those 29 preferred

**EXHIBIT 5**

compounds include compounds for which no intrinsic activity was provided.  DTX-0016, WO

'215 (A72, B55 and G7).  It is thus not clear how those "preferred" compounds were selected.

278.    WO '215 does not describe A28' and B25' as having moderate $D_2$ intrinsic activity.

Instead, they possess activity that is outside the most preferred 30% to up to 50% range.  Going

from compound A1 and/or B1 to compound A28' and/or B25' is a step in the wrong direction.  It

leads to compounds that fall outside of what WO '215 has said is the most desirable activity.  It

would thus be counterintuitive, without knowing the structure of brexpiprazole, to choose A28'

and/or B25' as a source of potential modifications.  Further, assuming such modification if

incorporated into aripiprazole were to have the same effect, which one cannot predict *a priori*, that

too would lead to a compound that does not maintain its partial agonist activity that Defendants

assert a POSA would have wanted to do.

279.    Nor does WO '864 provide any support that such a modification would have led to

a reasonable expectation that "strong antagonism for the $5HT_{2A}$ receptor" would have resulted.  As

discussed above, it would not have provided such an expectation.

280.    For all of the reasons discussed above, a POSA would not have been motivated to

introduce a double bond into aripiprazole.

281.    Therefore, aripiprazole as disclosed in the ABILIFY PI 2004 in combination with

WO '215 does not render brexpiprazole obvious.  WO '215 would not have motivated a POSA to

replace the 2,3-dichlorophenyl group of aripiprazole with a 4-benzothiophene group or to

introduce a double bond into the carbostyril ring with a reasonable expectation of success.

> **b.     Aripiprazole in view of the '528 patent and WO '215**

282.    Brexpiprazole would not have been obvious over aripiprazole in view of the '528

patent and WO '215.  A POSA would not have been motivated to arrive at brexpiprazole with a

**EXHIBIT 5**

reasonable expectation of success in view of these references for the multiple reasons already expressed herein. Further, compared to Defendants' first exemplary combination, the '528 patent does not cure any of the deficiencies of that combination.

283.    Like WO '215, the '528 patent is entirely silent with respect to any serotonergic activity of the disclosed compounds. Nevertheless, before the priority date, a POSA would have known that aripiprazole had high affinity at $5\text{-HT}_{1A}$ and $5\text{-HT}_{2A}$ receptors, where it acts as a partial agonist and antagonist, respectively. DTX-0019, ABILIFY PI 2004 at 1. Although Defendants may attempt to assert that a POSA would have been motivated to improve the $5\text{-HT}_{1A}$ partial agonist activity of aripiprazole, Defendants offer no rationale why increased $5\text{-HT}_{1A}$ partial agonist activity would have been expected to improve the clinical properties of aripiprazole. Although the mechanism of action of aripiprazole was and remains unknown before the priority date "it had been proposed that the efficacy of aripiprazole is mediated through a combination of partial agonist activity $D_2$ and $5\text{-HT}_{1A}$ receptors and antagonist activity at $5\text{-HT}_{2A}$ receptors." DTX-0019, ABILIFY PI 2004 at 1-2. Given this, it is unclear how or why such receptor pharmacology needed to be improved, and if so, what the preferred balance of activities would be. As recognized by Roth Nature, it "is more likely that the *balance* of partial agonism and antagonism at a multiplicity of receptors is responsible for its efficacy in schizophrenia and related disorders." PTX0467, Roth Nature at 356 (emphasis added). Neither the '528 patent nor WO '215, which say nothing about serotonergic activity, provide an answer.

284.    The '528 patent would not have taught a POSA to focus on the 2,3-dichlorophenyl position to modify aripiprazole. The '528 patent discloses 2-substituted, 2,5-substituted and 2,3,5-substituted phenyl compounds, not just compounds substituted at the 2,3-phenyl position. DTX-0012, '528 Patent at Abstract, 2:45-3:1-5, Tables 2 and 3. Half of the compounds tested in Table

**EXHIBIT 5**

3 have one of these other substitution patterns.  DTX-0012, '528 Patent at Table 3 (Compounds 5-8 and 11-13).

285.    Therefore, brexpiprazole is not obvious over aripiprazole in view of the '528 patent and WO '215.

### c.    Aripiprazole in view of the '306 publication and Oshiro 1998

286.    Brexpiprazole would not have been obvious over aripiprazole in view of the '306 publication and Oshiro 1998.  For all of the reasons already discussed herein, a POSA would not have been motivated to arrive at brexpiprazole over aripiprazole in combination with the '306 publication and Oshiro 1998 with a reasonable expectation of success.

287.    The '306 publication discloses that its compounds antagonize, not agonize, the 5-$HT_{1A}$ receptors.  DTX-0008, '306 Publication at ¶ [0181] ("Due to their combined *antagonism* of 5-$HT_{1A}$ receptors and serotonin reuptake inhibiting effect . . . ."); *see also* ¶ [0510].  The only data relating to the 5-$HT_{1A}$ receptor are binding data, and those data provide no indication as to the functional activity of the disclosed compounds.  '306 Publication at Table 1.  There is thus no support for Defendants' contention that the '306 publication describes potent 5-$HT_{1A}$ agonists.  It does not.  A POSA seeking to improve 5-$HT_{1A}$ partial agonists would thus not have turned to the '306 publication at all.

288.    Even if a POSA would have combined aripiprazole with the disclosure of the '306 publication and Oshiro 1998, brexpiprazole would not have been the result.  The benzothiophenes in the '306 publication possess numerous differences from brexpiprazole as highlighted in the figure below.  Defendants offer no explanation why a POSA would have made the requisite modifications to those benzothiophenes to arrive at brexpiprazole.  They also do not address why those modifications would have been expected to (1) not affect the properties of the original '306

139

**EXHIBIT 5**

publication compounds or (2) why they would have led to improved properties.  And Oshiro 1998

teaches away from introducing a double bond into aripiprazole.[12]



289.    In sum, brexpiprazole would not have been obvious over aripiprazole in view of

the '306 publication and Oshiro 1998.

> **d.    Aripiprazole in view of a POSA's knowledge of benzothiophenes and active metabolites**

290.    Defendants' fourth exemplary combination is a catch-all argument that

encompasses at least 9 documents and incorporates their general arguments.   Because these

references and their general combination are addressed above. Plaintiffs' comments are

---

[12] The figure reflects only chemical modifications and does not address the added complexity of pharmacokinetic and formulation considerations.

**EXHIBIT 5**

incorporated herein.  In sum, no combination of the asserted documents presented by Defendants render brexpiprazole obvious for all of the reasons previously noted.

291.    Defendants also seek to incorporate all of the references that used in this combination (DTX-0006, '246 patent;  DTX-0027, Kuipers 1995; DTX-0016, WO '215, DTX-0008, '306 publication;  DTX-0015, WO '864; DTX-0023, Fura 2004;  DTX-0026, Kubo 2005; DTX-0019, ABILIFY PI 2004; and DTX-0034, Oshiro 1998) to each of the preceding three combinations.  It is thus unclear how, if at all, these exemplary combinations differ.  In any event, none of them demonstrates that a POSA would have been motivated to replace the 2,3-dichlorophenyl group of aripiprazole with a 4-benzothiophene ring and introduce a double bond in the quinoline ring for all of the reasons discussed herein.

**e.    Dehydroaripiprazole as a lead compound**

292.    Defendants' remaining combinations repeat the first four except they start with dehydroaripiprazole as a lead compound.   A POSA would not have started with dehydroaripiprazole as a lead compound for multiple reasons as discussed above.  There was no prior art information about its clinical efficacy, and the research reported in Oshiro 1998 shows that its pharmacological profile was undesirable and it had already been set aside from further consideration.   Accordingly, a POSA would not have chosen dehydroaripiprazole as a lead compound, and for that reason alone, Defendants' last four exemplary combinations fail at the first step.

293.    Moreover, even if dehydroaripiprazole were chosen as a lead compound, a POSA would not have replaced the 2,3-dichlorophenyl group with a 4-benzothiophene moiety for all of the reasons presented herein.   Therefore, brexpiprazole would not have been obvious over dehydroaripiprazole in view of any of the asserted documents alone and/or in combination.

**EXHIBIT 5**

**10.      The Process Claims 9, 14 and 15 of the RE'059 Patent Are Not Obvious**

294.    Claims 9, 14 and 15 of the RE'059 patent are not invalid as obvious.  Brexpiprazole itself was unknown in the prior art, and the invention of the brexpiprazole compound was non-obvious.  Because the brexpiprazole compound itself is novel, the process for synthesizing brexpiprazole is also novel and was not known in the prior art.  Accordingly, for all of the reasons provided in above, claims 9, 14 and 15 are non-obvious.

**11.      Pharmaceuticals Composition Claims 1 and 2 of the '840 Patent and Claims 1 and 3-8 of the '637 Patent Are Not Obvious**

295.    Claims 1 and 2 of the '840 patent and claims 1 and 3-8 of the '637 patent are directed to pharmaceutical compositions comprising brexpiprazole and a pharmaceutically acceptable carrier.  The asserted claims of these patents are non-obvious.

296.    Defendants' position regarding these compositions claims distills to two points:  (1) brexpiprazole was allegedly obvious and (2) because aripiprazole was formulated with pharmaceutically acceptable carriers, a POSA would have reasonably expected that brexpiprazole could be as well.  Regarding claims 4 and 5 of the '637 patent, Defendants also state that the weights referred to in these claims include typical amounts of active ingredients of pharmaceutical formulations.  For claims 7 and 8 of the '637 patent, which recite certain amounts of brexpiprazole in the pharmaceutical formulation, Defendants assert it would have been obvious for a POSA to try these dosages.

297.    As explained above, the brexpiprazole compound is novel, and the claims covering the brexpiprazole compound are valid and non-obvious.  For all of these reasons, claims 1 and 2 of the '840 patent and claims 1 and 3-8 of the '637 patent are also valid and non-obvious because they relate to pharmaceutical formulations of the novel and non-obvious brexpiprazole compound.

**EXHIBIT 5**

Moreover, a POSA would not have expected that a pharmaceutical formulation with one chemical compound, *e.g.*, aripiprazole, would necessarily have the same properties as another pharmaceutical formulation with a separate and distinct chemical compound, especially for one that was not known or suggested in the art.

> **12.    Method of Treatment Claims 4 and 5 of the '840 Patent, 1 and 2 of the '109 Patent and 9 and 10 of the '637 Patent Are Non-Obvious**

298.    Claims 4 and 5 of the '840 patent, 1 and 2 of the '109 patent and 9 and 10 of the '637 patent relate to methods for treating central nervous system disorders, including schizophrenia and major depressive disorder, with brexpiprazole.  Defendants assert that these claims are obvious for the same reasons the brexpiprazole compound claims are obvious and because a POSA would have had general knowledge to administer brexpiprazole to treat depression and schizophrenia.  Defendants also contend that aripiprazole was used to treat schizophrenia and depression, and this would have given a POSA a reasonable expectation of success that brexpiprazole could similarly treat depression.

299.    Defendants contend that these method of treatment claims are invalid as obvious. To make this argument, Defendants assume that brexpiprazole would have been obvious, and further assert that the method of treatment claims are obvious over the multiple documents. Defendants do not specify which references they are relying on for this argument.  To the extent Defendants further clarify these arguments, Plaintiffs reserve the right to respond.

300.    As discussed above, brexpiprazole is novel, and the claims directed to the brexpiprazole compound are valid and non-obvious.  For all of these reasons, claims 4 and 5 of the '840 patent, claims 1 and 2 of the '109 patent and claims 9 and 10 of the '637 patent are also valid and non-obvious because they cover methods of treating central nervous system disorders,

**EXHIBIT 5**

including schizophrenia and major depressive disorder, with the novel and non-obvious brexpiprazole compound.

301.    Any argument by Defendants that a POSA would have had general knowledge to administer brexpiprazole and that aripiprazole was administered to treat depression do not render these claims obvious.  As discussed above, chemical modifications and their corresponding biological and clinical effects are unpredictable.  Accordingly, a POSA would not have expected that a method of treatment with one chemical compound would necessarily have the same result as a method of treatment with a separate and distinct chemical compound, especially for one not known or suggested by the art.

302.    Defendants also fail to explain how the number of compounds in the genus of claim 4 of the '840 patent has any bearing on the obviousness of these claims.  To the extent Defendants clarify this position, Plaintiffs reserve the right to respond and supplement their response.

303.    Thus, claims 4 and 5 of the '840 patent, 1 and 2 of the '109 patent and 9 and 10 of the '637 are not invalid as obvious.

**F.    The Specifications Fully Support and Enable the Asserted Claims**

304.    Claims 4 and 5 of the '840 patent, claims 1 and 2 of the '109 patent and claim 7 of the '637 patent are not invalid for any alleged lack of written description and/or enablement.

**1.    Claims 4 and 5 of the '840 Patent Have Sufficient Written Description**

305.    Claims 4 and 5 of the '840 patent are directed to a method of treating depression, endogenous depression, major depression, melancholy and refractory depression.  Defendants may attempt to assert that claims 4 and 5 of the '840 patent are invalid for lack of written description because the specification does not include data (*in vivo*, *in vivo* or clinical data) for each and every one of compounds covered by claims 4 and 5, and does not contain any data or scientific

**EXHIBIT 5**

explanation that any, let alone all, of the claimed compounds would be effective at treating each of the five CNS disorders.  The specification conveys to a POSA that the inventors possessed the full scope of the inventions recited in claims 4 and 5 of the '840 patent and thus these claims do not lack written description.

306.    The brexpiprazole patents disclose and claim heterocyclic compounds, including brexpiprazole, processes for producing these compounds, pharmaceutical compositions comprising these compounds and methods of treating CNS disorders by administering these compounds.  The specification includes 235 specific examples of these compounds.  PTX0002, '840 patent at 19:45-81:18.  The specification[13] repeatedly discloses that it is an object of the invention that the compounds have "a wide treatment spectrum for mental disorders including central nervous system disorders."  PTX0002, '840 patent at Abstract, 2:12-15, 6:41-7:9, 7:24-27, 19:3-43.  The specification also explains that the disclosed compounds exhibit "dopamine $D_2$ receptor partial agonist activity ($D_2$ receptor partial agonist activity), serotonin 5-$HT_{2A}$ receptor antagonist activity (5-$HT_{2A}$ receptor antagonist activity) and adrenalin $\alpha_1$ receptor antagonist activity ($\alpha_1$ receptor antagonist activity) and further have serotonin uptake inhibitory effect (or serotonin reuptake inhibitory effect)."  PTX0002, '840 patent at 2:16-26; *see also* PTX0002, '840 patent at 7:18-23, 18:25-19:2.  The '840 patent also explains that because of this profile, including serotonin reuptake activity, the compounds of the invention are useful for the treatment of depressive disorders, including those recited in claims 4 and 5 of the '840 patent.  PTX0002, '840 Patent at 18:44-19:14.  The pharmacological activity is also evidenced through six different pharmacological tests, which include tests on over 60 distinct compounds.  PTX0002, '840 patent at 81:19-88:25.  These pharmacological tests are summarized below:

---

[13] The brexpiprazole patents share a common specification.

**EXHIBIT 5**

- <u>Pharmacological Test 1</u> reports: 1) dopamine $D_2$ receptor binding assay conducted on 60 example compounds, 2) serotonin 5-$HT_{2A}$ receptor binding assay for 62 of the example compounds and 3) adrenalin $\alpha1$ receptor binding assay.  PTX0002, '840 patent at 81:19- 84:67.

- <u>Pharmacological Test 2</u> reports the evaluation of the partial agonistic activity on dopamine $D_2$ receptor using $D_2$ receptor expression cells.  '840 patent at 85:1-54.  The specification reports "that test compounds had partial agonistic activity for dopamine $D_2$ receptor in the above-described test" meaning these compounds "can stabilize dopamine neurotransmission to a normal condition in a schizophrenia patient and as a result, exhibit, for example, positive and negative condition improving effect, cognitive impairment improving effect and the other symptom improving effects without causing side effects."  PTX0002, '840 patent at 85:46-54.

- <u>Pharmacological Test 3</u> evaluates the inhibitory effect on amphetamine-induced stereotyped behavior in rats.  PTX0002, '840 patent at 85:55-86:24.  The specification reports that the inhibitory effect for apomorphine-induced stereotyped behavior confirmed that the test compounds have $D_2$ receptor antagonistic effect.  PTX0002, '840 patent at 86:22-23.

- <u>Pharmacological Test 4</u> examined the inhibitory effect on (±) D-2,5-dimethoxy-4-iodoamphetamine (DOI) induced head twitch in rats.  PTX0002, '840 patent at 86:25-48.  The specification explains that "[s]ince the test compounds showed inhibitory effect for DOI-induced head twitch, it was confirmed that the test

**EXHIBIT 5**

compounds have serotonin $5HT_{2A}$ receptor antagonistic effect."  PTX0002, '840 patent at 86:46-48.

- Pharmacological Test 5 evaluates any catalepsy inducing effect in rats.  PTX0002, '840 patent at 86:49-87:3.   The specification reports that "apprehension for extrapyramidal side effect in clinic[al patients] would be low" because "catalepsy induction effect of a test compound was dissociated from inhibitory effect on apomorphine-induced stereotyped behavior."  PTX0002, '840 patent at 86:66-87:3.

- Pharmacological Test 6 measures serotonin (5-HT) uptake inhibitory activity of a test compound by rat brain synaptosome.  PTX0002, '840 patent at 87:4-88:25.  The serotonin uptake inhibitory activity was calculated and reported in table 24.  PTX0002, '840 patent at 87:45-88:25.  This test was conducted on 45 example compounds.  PTX0002, '840 patent at 87:45-88:25.

307.    A POSA reading the disclosure of the '840 patent, including the methodology and results of these pharmacological tests would understand that the inventors had possession of the full scope of the methods of claims 4 and 5.

308.    With respect to claim 4, Plaintiffs disagree with Defendants' to the extent they argue that because not all of the compounds that could be encompassed within the scope of claim 4 were subjected to the pharmacological tests described above, the inventors have not shown possession of the claimed subject matter.   The specification repeatedly explains that the compounds of the invention are useful in treating depressive disorders.  It provides exemplary synthetic methods to produce a representative number of examples, and it includes pharmacological testing for many of those examples.  Thus, a POSA would have understood that the inventors were in possession of the claimed subject matter at the time of the invention.

147

**EXHIBIT 5**

309.    To the extent Defendants also contend that claims 4 and 5 are not supported because the specification does not contain any data or scientific explanation that any of the claimed compounds would be effective at treating each of the five claimed CNS disorders, Plaintiffs again disagree.  The claimed CNS disorders are all depressive disorders:  depression, endogenous depression, major depression, melancholy and refractory depression.  PTX0002, '840 Patent at claims 4 and 5.  Each of these disorders encompasses many of the same symptoms but may vary in duration and severity.  Defendants fail to explain why—aside from simply asserting the conclusion—a POSA reading the specification's disclosures, including the six pharmacological tests, would not understand that the inventors were in possession of the full scope of claims 4 and 5.  In addition to disclosing the pharmacological tests, the specification repeatedly explains, for example, that "the compounds of the present invention are extremely effective for the treatment or prevention of central nervous system disorders including the group consisting of . . . depression; endogenous depression; major depression; melancholy and refractory depression."  PTX0002, '840 patent at 19:6-40.  The specification also explains, for example, that the disclosed compounds exhibit "$D_2$ receptor partial agonist effect, 5-HT$_{2A}$ receptor antagonist effect and serotonin update inhibitory effect" and that these effects improve "depressive symptoms."  PTX0002, '840 patent at 18:25-63.  Indeed, Defendants assert that a POSA would have known that compounds having antagonist activity at the serotonin 5-HT$_{2A}$ receptor are useful in the treatment of depression.  The patent provides a representative number of testing examples within the scope of claim 4, and all of the compounds in claim 5, i.e., Examples 1, 7, 10, 11, 18, 19, show high affinity to both $D_2$ and 5-HT$_{2A}$ receptors, demonstrated 5-HT$_{2A}$ antagonist activity and significantly inhibited the reuptake of serotonin, another known mechanism for treating depression.  PTX0002, '840 Patent at 18:44-60, Pharmacological Tests 1, 2, 4, tables 22, 23, 24.  Such disclosures would have informed a

148

<u>**EXHIBIT 5**</u>

POSA that the inventors invented and possessed the subject matter that is claimed.  Thus, claims

4 and 5 of the '840 patent are sufficiently supported by the written description.

> 2. **Claims 1 and 2 of the '109 Patent Have Sufficient Written Description and Are Fully Enabled**

> a. **Claim 1 of the '109 Patent Is Sufficiently Described**

310.    Claim 1 of the '109 patent is directed to a method of treating schizophrenia.

Plaintiffs disagree with Defendants to the extent they argue that this claim is invalid because the

specification does not include data (*in vivo*, *in vivo* or clinical data) for each and every one of the

compounds covered by claim 1, and does not provide adequate detail describing how each and

every compound covered by claim 1 is effective in treating schizophrenia.

311.    Plaintiffs' analysis with respect to claims 4 and 5 of the '840 patent applies for

similar reasons to claim 1 of the '109 patent.  While claims 4 and 5 of the '840 patent recite

methods of treating various forms of depression, claim 1 of the '109 patent is directed to treating

schizophrenia.  The specification contains ample disclosures establishing that the inventors were

in possession of the claimed invention as it relates to treating schizophrenia.  The specification

repeatedly describes how the claimed inventions "have a wide treatment spectrum for an[]

excellent clinical effect on schizophrenia and other central nervous system disorders."  PTX0003,

'109 patent at 19:7-9; *see also* PTX0003, '109 patent at 6:50-54, 19:10-13.  It also provides

pharmacological testing information for a representative number of compounds falling within the

scope of claim 1 of the '109 patent, including binding affinity information at both $D_2$ and $5\text{-HT}_{2A}$

receptors, as well as testing in models used to develop schizophrenia treatments, including the

apomorphine-induced stereotypy test and catalepsy test.  PTX0003, '109 Patent at 81:19-88:25.

312.    Therefore, claim 1 of the '109 patent is adequately supported by the written

description.

**EXHIBIT 5**

b.      **Claims 1 and 2 of the '109 Patent Are Enabled**

313.    Claims 1 and 2 of the '109 patent are directed to the treatment of schizophrenia "in a human or animal."  Defendants may attempt to contend that these claims are not fully enabled since allegedly schizophrenia is not known to occur in animals (other than a human) and, as such, they may attempt to allege it is impossible to treat non-human animals for a condition that does not occur in them.  Claims 1 and 2 of the '109 patent are fully enabled.

314.    Defendants' only potential support for their opinion that non-human animals do not suffer from schizophrenia is a 2022 article.  Defendants point to no other evidence, let alone prior art, to support this position.  While physicians do not diagnose schizophrenia in animals, there are symptoms in animals that are consistent with psychosis in humans that treatments can be directed toward and that are used in order to establish whether a certain compound might be useful for the treatment of schizophrenia in humans.  For this reason, non-human animals are often used to evaluate efficacy of drugs in humans, indicating that at the very least, the neurologic pathways between species can be related and that animals exhibit behaviors that mimic schizophrenic symptoms.  Notably, Missale 1998, a reference Defendants may attempt to rely upon confirms this, as it screens for dopamine $D_1$ and $D_2$ activities in anesthetized dogs.  DTX-0145, Missale, C., et al., "Dopamine Receptors: From Structure to Function," *Physiological Revs.* (1998) 78(1):189-225 ("Missale 1998") at 205-206.   Similarly, Davies 2004 reports preclinical studies of aripiprazole in dogs.  PTX0435, Davies 2004 at 331.  As a result, the specification of the '109 patent in view of the art allows those of skill in the art to practice the full scope of the invention without undue experimentation.

**EXHIBIT 5**

### 3.      Claim 7 of the '637 Patent Has Sufficient Written Description

315.      Defendants may attempt to contend that claim 7 of the '637 patent is invalid for lack of written description because it claims a pharmaceutical composition that contains about 1 mg of brexpiprazole and the specification purportedly does not disclose any pharmaceutical compositions that contain this amount of brexpiprazole.  But the specification states that the disclosed compounds, which preferably include brexpiprazole, are "desir[ably]" contained in the preparation of a dosage unit form in the range of about 1 to 200 mg.  PTX0004, '637 patent at 19:1-4.  The claimed range of "about 1 mg" falls within the desired range of about 1 to 200 mg.  Defendants' potential bare assertion that there is nothing in the '637 Patent to indicate that the named inventors had reason to believe the very lowest end of the range—1 mg—was an appropriate amount, ignores the plain language of the specification.

316.      Thus, Defendants have not demonstrated that the specification fails to show a POSA that the inventors were in possession of the claimed invention.  Claim 7 of the '637 patent has written description support.

## II.      THE '419 PATENT IS NOT INVALID

### A.      The '419 Patent

317.      Brexpiprazole is the active ingredient in Otsuka's Rexulti® drug product.  U.S. Patent No. 10,307,419 ("the '419 patent") is directed generally to tablet dosage forms of brexpiprazole.  The person of ordinary skill in the art ("POSA") to whom the '419 patent is addressed would have an advanced degree in chemistry, pharmacy, engineering or a related field, with 2-3 years of pharmaceutical formulation experience.  Alternatively, a POSA in this field would have an undergraduate degree in chemistry, pharmacy, engineering or a related field with 5-10 years of pharmaceutical formulation experience.  A POSA in this field often works with

**EXHIBIT 5**

others, including, for example, medicinal chemists, analytical chemists and others, in developing and analyzing pharmaceutical products.

318.    The '419 patent discloses pharmaceutical tablets that contain brexpiprazole as an active pharmaceutical ingredient.  (PTX0005, '419 Patent at 1:15-17 (BREX02073634).)  The disclosed tablets have "excellent disintegration ability, storage stability, and high photostability, so that [they] can be effectively used in the medical field."  (PTX0005, '419 Patent at 3:9-11 (BREX02073635); *see also* PTX0005, '419 Patent at Abstract (BREX02073631), 1:44-47 (BREX02073634), 15:23-27 (BREX02073641).)

319.    The specification explains that, following intensive research, the inventors determined that a tablet comprising brexpiprazole as "an active ingredient and further comprising lactose, corn starch, microcrystalline cellulose or like excipient; low-substituted hydroxypropyl cellulose, croscarmellose sodium, sodium carboxymethyl starch or like disintegrant; and hydroxypropyl cellulose or like binder exhibits excellent disintegration ability and storage stability."  (PTX0005, '419 Patent at 1:54-59 (BREX02073634).)  Moreover, the inventors determined that "higher photostability can be attained by applying a coating layer containing a colorant."  (PTX0005, '419 Patent at 1:59-62 (BREX02073634).)

320.    The specification discloses that the content of the brexpiprazole active ingredient or salt thereof is preferably "about 0.05 to 25% by weight, and more preferably about 0.1 to 15% by weight with respect to the weight of the . . . uncoated tablet."  (PTX0005, '419 Patent at 3:60-64 (BREX02073635).)  The specification also explains that, in addition to the active ingredient, the disclosed tablets comprise "additives such as an excipient (a), a binder (b), a disintegrant (c), and a lubricant (d)" and provides examples of these additives.  (PTX0005, '419 Patent at 3:65-6:4 (BREX02073635-6).)

152

**EXHIBIT 5**

321. The specification also explains that "coated tablet[s]" are "preferable to achieve long-term storage stability and prevent degradation due to light or the like." (PTX0005, '419 Patent at 6:29-31 (BREX02073636).) This coating layer may comprise pharmaceutical additives and "a combination of hydroxypropyl methyl cellulose (hypromellose), talc, and titanium dioxide . . . is preferable." (PTX0005, '419 Patent at 6:32-46 (BREX02073636).) Moreover, "by coloring the coating layer, photostability can be supplied to the coated tablet." (PTX0005, '419 Patent at 6:52-54 (BREX02073636).) The specification provides examples of such colorants, including "iron oxides such as red ferric oxide, yellow ferric oxide, and black iron oxide." (PTX0005, '419 Patent at 6:52-56 (BREX02073636).)

322. The coating additives may include a plasticizer, including polyethylene glycol ("PEG"), also known as macrogol. (PTX0005, '419 Patent at 6:32-41 (BREX02073636).) The specification notes, however, that "when polyethylene glycol (macrogol) exists in the coating layer, the obtained tablet tends to have reduced photostability and storage stability." (PTX0005, '419 Patent at 6:46-49 (BREX02073636).) Thus, "it is more preferable if polyethylene glycol (macrogol) is substantially not contained." (PTX0005, '419 Patent at 6:49-51 (BREX02073636).)

323. The specification further discloses methods for producing the disclosed tablets, including wet granulation methods. (PTX0005, '419 Patent at 9:62-10:33 (BREX02073638).) The specification additionally provides examples of uncoated and coated tablets, including details on their manufacture. (PTX0005, '419 Patent at 10:46-12:12 (BREX02073638-9); *see also* PTX0005, '419 Patent at 14:53-15:20 (BREX02073640-1).) The specification provides disintegration testing results for the uncoated and coated tablets and reports that the coated tablets did not exhibit any "delay in disintegration time." (PTX0005, '419 Patent at 11:65-12:35 and Table 2 and 4 (BREX02073639).) Dissolution testing of the example formulations further

## EXHIBIT 5

confirmed "excellent dissolution profiles" for the uncoated and coated tablets. (PTX0005, '419 Patent at 12:43-55 (BREX02073639).)

324. The specification further describes stability testing of the exemplary tablets. The tablets of Examples 1-1 to 1-3 and 2-1 to 2-3 were stored under light irradiation with visible light with a total luminance of $1.8 \times 10^6$ lux·hr and ultraviolet light with a total intensity of 300 W·hr/m2. (PTX0005, '419 Patent at 12:56-64 (BREX02073639).) The uncoated tablets of Examples 1-1 to 1-3 turned yellow following this light irradiation. (PTX0005, '419 Patent at 12:65-67 (BREX02073639).) The tablets were further subjected to storage in sealed bottles at 40° C for one month or three months. (PTX0005, '419 Patent at 12:65-67 (BREX02073639).) The tablets of Examples 3-1 were stored under light irradiation with visible light with a total luminance of $1.8 \times 10^6$ lux·hr and ultraviolet light with a total intensity of 300 W·hr/m2. (PTX0005, '419 Patent at 14:29-35 (BREX02073640).) The tablets were further subjected to storage in an "open system" at 40° C/75% RH for three month or six months. (PTX0005, '419 Patent at 14:25-34 (BREX02073640).)

325. Table 8 reports the results of this second stability study:

**EXHIBIT 5**

| | Example No. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 3-1 | 3-2 | 3-3 | 3-4 | 3-5 | 3-6 | 3-7 | 3-8 | 3-9 |
| | (Content of Impurity: %, n = 1) | | | | | | | | |
| Initial | 0.687 | 0.772 | 0.773 | 0.683 | 0.713 | 0.677 | 0.805 | 0.951 | 0.909 |
| Light irradiation | 4.142 | 2.069 | 1.469 | 1.401 | 0.676 | 1.493 | 0.675 | 2.573 | 1.186 |
| 40° C./ 75% RH - 3 months | 0.980 | 1.820 | 0.900 | 1.613 | 1.093 | 1.483 | 1.112 | 2.055 | 1.393 |
| 40° C./ 75% RH - 6 months | 1.140 | 2.264 | 1.672 | 2.232 | 1.232 | 1.766 | 1.247 | 2.130 | 1.783 |

As shown in this table, the specification reports that "[n]o increase in impurity was observed in the tablets of Examples 3-5 and 3-7, even after the light irradiation."  (PTX0005, '419 Patent at 14:34-52 (BREX02073640).)  Examples 3-5 and 3-7 did not include Macrogel 6000, a type of polyethylene glycol, but did include an iron oxide colorant.  (PTX0005, '419 Patent at Table 7 (BREX02073640).)

**B.     The '419 Patent Prosecution History**

326.    The '419 patent issued from U.S. Application No. 15/713,427, which was filed on September 22, 2017.  (PTX0011, '419 File History at BREX00004898.)  The examiner issued a non-final office action on November 3, 2017.  (PTX0011, '419 File History at BREX00004974-85.)  The examiner rejected claims 1-7 as obvious over Yamashita (the '362 patent), and Sako (U.S. Patent No. 6,562,375).  (PTX0011, '419 File History at BREX00004977-82.)  The examiner also relied on the Handbook of Pharmaceutical Excipients and Guitard (U.S. Publication No.

## EXHIBIT 5

2009/0187582).  (PTX0011, '419 File History at BREX00004977-82.)  The examiner rejected claims 1-9 over Yamashita in view of Sako and Bell (U.S. Publication No. 2005/0043325). (PTX0011, '419 File History at BREX00004982-85.)

327.    The applicant responded in an April 3, 2018, reply to the non-final office action. (PTX0011, '419 File History at BREX00005019-25.)  Among other things, the applicant noted in response that Yamashita does not teach the use of hydroxypropyl cellulose as a binder and that Yamashita and Guitard do not teach a restriction on the use of polyethylene glycol:

> The Examiner has argued that YAMASHITA broadly teaches a tablet that may comprise the recited active ingredient and may also include an excipient, a binder, a disintegrant and a lubricant. The Examiner acknowledges that YAMASHITA does not describe that hydroxypropyl cellulose (HPC) is a suitable binder, but relies on the Handbook of Pharmaceutical Excipients as showing that HPC has been used as a suspending agent or viscosity modifying agent in pharmaceutical formulations. However, the Examiner has cited no reason or motivation for selecting HPC over other binders known in the art, particularly one not described in YAMASHITA. The tablets of Examples 1-1 to 1-3 comprise HPC, and Table 2 shows that these tablets have excellent disintegration ability.
>
> The Examiner has further pointed out that YAMASHITA broadly suggests that the tablet may be coated and provides a specific example of such a coating at col. 89, lines 34-44 that does include polyethylene glycol (specifically substantially excluded by amended claim 1) and does not include a colorant containing iron oxide and titanium dioxide (both included in the coating of amended claim 1 ). The Examiner further relies on GUITARD as teaching a tablet containing an active ingredient different from that claimed that may be coated (paragraph 0077) with a binder or one or more dyes to impart an individual appearance (paragraph 0085) and to make them instantly recognizable. The dyes include iron oxides or titanium dioxide.
>
> Whi[l]e GUITARD does suggest adding one or more dyes to impart an individual appearance, the combination of titanium dioxide and iron oxide in the coating of the claimed tablet imparts photostability to the coated tablet as described on page 12, paragraph 0045 of the specification. Applicant has determined that when the coating layer contains iron oxide and titanium dioxide, and substantially does not

156

**EXHIBIT 5**

contain polyethylene glycol (suggested by both YAMASHITA and GUITARD), the increase in impurity content is suppressed even after light irradiation, and the tablet has excellent photostability. Such effects have been verified by Examples 3-5 and 3-7, as shown in Table 8 of the present specification. In contrast, the tablets of Example 3-4 and 3-6, which contain polyethylene glycol (macrogol), the impurity content is increased (stability is lower). Neither YAMASHITA nor GUITARD describe or suggest these features, nor is the resultant increase in stability predictable from these documents, alone or in combination. Accordingly, for all the reasons discussed above, this rejection should be withdrawn.

(PTX0011, '419 File History at BREX00005019-21.)

328.    The applicant also explained that Bell, and the other references relied upon by the examiner are not concerned with the problem of photostability and that the photostability features and effects are not predictable from these references.   (PTX0011, '419 File History at BREX00005021-22.)

329.    The applicant then amended the claims as follows:

## EXHIBIT 5

1. (Currently Amended)   A tablet comprising 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof as an active ingredient, an excipient (a), a binder (b), a disintegrant (c) and a lubricant (d),

wherein the excipient (a) is at least one member selected from the group consisting of lactose, corn starch, and microcrystalline cellulose;

the binder (b) is hydroxypropyl cellulose;

the disintegrant (c) is at least one member selected from the group consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch; and

the lubricant (d) is magnesium stearate;

the tablet further comprising a coating layer on the surface thereof,

wherein the coating layer contains a colorant (e),

the colorant (e) contains an iron oxide and titanium oxide, and

the coating layer substantially does not contain polyethylene glycol.


2. (Currently Amended)   The tablet according to claim 1, wherein the tablet is an uncoated tablet comprises comprising:

0.05 to 25% by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof;

## EXHIBIT 5

10 to 98.5% by weight of the excipient (a);

0.1 to 20% by weight of the binder (b);

1 to 25% by weight of the disintegrant (c); and

0.1 to 10% by weight of the lubricant (d), with respect to the weight of the

uncoated tablet; and

0.1 to 50% by weight of the colorant (e) with respect to the weight of the

coating layer.

3. (Original)  The tablet according to claim 1 or 2, wherein per 1 part by weight of

7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof,

the tablet comprises:

1 to 2000 parts by weight of the excipient (a);

0.01 to 100 parts by weight of the binder (b);

0.1 to 500 parts by weight of the disintegrant (c); and

0.01 to 50 parts by weight of the lubricant (d).

4-5.  (Canceled).

6.  (Original)  The tablet according to claim 1 or 2, which is obtained by forming,

into a tablet, a granulated substance obtained through wet granulation.

7. (Original)  The tablet according to claim 1 or 2, wherein the tablet does not

contain povidone or crospovidone.

159

**EXHIBIT 5**

8. (Currently Amended)  A method for producing a tablet, the method comprising the steps of:

(1) granulating a mixture containing 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof, an excipient (a), a binder (b), and a disintegrant (c), and further mixing thereto a lubricant (d); and

(2) forming the obtained mixture into a tablet; and

(3) mixing a coating agent, a colorant (e), and a liquid medium to obtain a coating mixture, and coating the surface of the tablet using the coating mixture,

wherein the excipient (a) is at least one member selected from the group consisting of lactose, corn starch, and microcrystalline cellulose;

the binder (b) is hydroxypropyl cellulose;

the disintegrant (c) is at least one member selected from the group consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch; and

the lubricant (d) is magnesium stearate;

the colorant (e) contains an iron oxide and titanium oxide; and

the coating mixture substantially does not contain polyethylene glycol.

9. (Canceled).

(PTX0011, '419 File History at BREX00005023-5.)

330.    The examiner then issued a final rejection on July 16, 2018.  (PTX0011, '419 File History at BREX00005093-108.)  The examiner withdrew the rejection over Yamashita and Sako. (PTX0011, '419 File History at BREX00005095.)  The examiner rejected claims 1-3 and 6-8 over Yamashita in view of Guitard and Bell while also relying on the Handbook of Pharmaceutical Excipients and Bell.  (PTX0011, '419 File History at BREX00005096-108.)

160

**EXHIBIT 5**

331.    The applicant filed an amendment with a request for continued examination on January 16, 2019.  (PTX0011, '419 File History at BREX00005115-27.)  The applicant reiterated that neither Yamashita nor Guitard teach a restriction on the amount of polyethylene glycol contained in the coating and that Yamashita does not teach a coating that contains hydroxypropyl methylcellulose, talc, and a colorant.  (PTX0011, '419 File History at BREX00005120-6.)  The applicant further explained that the examiner's purported motivation relating to polyethylene glycol improperly relies on hindsight.  (PTX0011, '419 File History at BREX00005124.)

332.    The applicant also amended the claims as follows:

161

## EXHIBIT 5

1.  (Currently Amended) A tablet comprising 7-[4-(4-benzo[b]thiophen-4-yl-

piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof as an active ingredient, an

excipient (a), a binder (b), a disintegrant (c) and a lubricant (d),

wherein the excipient (a) is at least one member selected from the group

consisting of lactose, corn starch, and microcrystalline cellulose;

the binder (b) is hydroxypropyl cellulose;

the disintegrant (c) is at least one member selected from the group

consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and

sodium carboxymethyl starch; and

the lubricant (d) is magnesium stearate;

the tablet further comprising a coating layer on the surface thereof,

wherein the coating layer contains hydroxypropyl methyl cellulose, talc,

and a colorant (e),

the colorant (e) contains an iron oxide and titanium oxide, and

the coating layer substantially does not contain polyethylene glycol.

2.  (Previously Amended) The tablet according to claim 1, wherein the tablet

tablet comprises:

0.05 to 25% by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-

yl)butoxy]-1H-quinolin-2-one or a salt thereof;

10 to 98.5% by weight of the excipient (a);

## EXHIBIT 5

0.1 to 20% by weight of the binder (b);

1 to 25% by weight of the disintegrant (c); and

0.1 to 10% by weight of the lubricant (d), with respect to the weight of the uncoated tablet; and

0.1 to 50% by weight of the colorant (e) with respect to the weight of the coating layer.

3. (Original)  The tablet according to claim 1 or 2, wherein per 1 part by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof, the tablet comprises:

1 to 2000 parts by weight of the excipient (a);

0.01 to 100 parts by weight of the binder (b);

0.1 to 500 parts by weight of the disintegrant (c); and

0.01 to 50 parts by weight of the lubricant (d).

Claims 4 and 5.   (Canceled).

6. (Original)  The tablet according to claim 1 or 2, which is obtained by forming, into a tablet, a granulated substance obtained through wet granulation.

7. (Original)  The tablet according to claim 1 or 2, wherein the tablet does not contain povidone or crospovidone.

8. (Currently Amended)  A method for producing a tablet, the method comprising the steps of:

(1) granulating a mixture containing 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof, an excipient (a), a binder (b), and a disintegrant (c), and further mixing thereto a lubricant (d); and

163

**EXHIBIT 5**

(2) forming the obtained mixture into a tablet; and

(3) mixing a coating agent, a colorant (e), and a liquid medium to obtain a coating mixture, and coating the surface of the tablet using the coating mixture,

wherein the excipient (a) is at least one member selected from the group consisting of lactose, corn starch, and microcrystalline cellulose;

the binder (b) is hydroxypropyl cellulose;

the disintegrant (c) is at least one member selected from the group consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch; and

the lubricant (d) is magnesium stearate;

the colorant (e) contains an iron oxide and titanium oxide;

the coating agent contains hydroxypropyl methyl cellulose and talc; and

the coating mixture substantially does not contain polyethylene glycol.

9.     (Canceled).

10.    (New)  The tablet according to claim 1, wherein the excipient (a) is lactose, corn starch, and microcrystalline cellulose; and the disintegrant (c) is low-substituted hydroxypropyl cellulose.

11.    (New)  The tablet according to claim 2, wherein the excipient (a) is lactose, corn starch, and microcrystalline cellulose; and the disintegrant (c) is low-substituted hydroxypropyl cellulose.

12.    (New)  The method for producing the tablet according to claim 8, wherein the excipient (a) is lactose, corn starch, and microcrystalline cellulose; and the disintegrant (c) is low-substituted hydroxypropyl cellulose.

(PTX0011, '419 File History at BREX00005116-9.)

333.    Following the amendment and request for continued examination, the examiner allowed the applicant's claims.  (PTX0011, '419 File History at BREX00005265-74.)  The

164

## EXHIBIT 5

examiner noted that the applicant overcame the previous rejection.  (PTX0011, '419 File History at BREX00005272.)  The examiner conducted a supplemental search and noted that the '617 publication relates to simvastatin and that the core tablet of the '617 publication does not include the claimed components (b) or (c).  (PTX0011, '419 File History at BREX00005272.)  The examiner also stated that Okamoto (U.S. Publication No. 2010/0130569) does not teach the claimed invention and that it relates to a different drug.  (PTX0011, '419 File History at BREX00005272.)  The examiner explained that he could "derive no motivation to combine [the '617 publication and the '569 publication] in order to arrive at the composition as amended above." (PTX0011, '419 File History at BREX00005273.)  The examiner then explained that the search "elicited no results which either anticipate or render obvious (e.g., by way of teaching or suggesting), the instantly amended invention.  This is to say that the instant pending claims are immediately free and clear of the prior art."  (PTX0011, '419 File History at BREX00005273 (emphasis in original).)

334.    The examiner entered an examiner's amendment, pursuant to a telephone interview with the applicant, which amended claim 1 as follows:

## EXHIBIT 5

1. **Please AMEND claim 1 to reads as follows:**

A tablet comprising 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof as an active ingredient, an excipient (a), a binder (b), a disintegrant (c), a lubricant (d), and a coating, wherein the uncoated tablet comprises:

0.05 to 25% by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof,

10 to 98.5% by weight of excipient (a), which is at least one member selected from the group consisting of lactose, corn starch, and microcrystalline cellulose;

0.1 to 20% by weight of binder (b), which is hydroxypropyl cellulose;

1 to 25% by weight of disintegrant (c), which is at least one member selected from the group consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch; and

0.1 to 10% by weight of lubricant (d), which is magnesium stearate;

wherein said coating comprises hydroxypropyl methylcellulose, talc, and a colorant (e);

wherein colorant (e) is present in an amount ranging from 0.1 to 50% by weight of the coating and comprises iron oxide and titanium oxide, and substantially contains no polyethylene glycol.

2. **Please CANCEL claims 2 and 11.**

3. **Please AMEND the preambles of each of claims 3, 6, and 7 to read as follows:**

   "The tablet according to claim 1,"

4. **Please AMEND the preamble of claim 8 to read as follows:**

   "A method for producing the tablet of claim 1, the method comprising the steps of:"

(PTX0011, '419 File History at BREX00005271-72.) The examiner provided the following summary of the interview:

**EXHIBIT 5**

Continuation of Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments: As indicated in the attached Notice of Allowance, the Examiner reconsidered the rejection of record in view of the filed amendments.  Upon withdrawing the rejection, an extended search was conducted from which resulted two references which have been made of record.  The Examiner presented these teachings and discussed narrowing the claims to comprise the amounts indicated in claim 2 as they could not be found in the art and placed in combination in such a manner as to convey a prima facie case of obviousness to the ordinarily skilled artisan.  The agreed upon amendments to the claims are attached.

(PTX0011, '419 File History at BREX00005276.)

335.    The applicant then filed an amendment after allowance that was in accordance with

the recommendation of the examiner:

## EXHIBIT 5

1.    (Currently Amended)  A tablet comprising 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof as an active ingredient, an excipient (a), a binder (b), a disintegrant (c), a lubricant (d), and a coating, wherein the uncoated tablet comprises:

0.05 to 25% by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof,

10 to 98.5% by weight of the excipient (a), which is at least one member selected from the group consisting of lactose, corn starch, and microcrystalline cellulose;

0.1 to 20% by weight of the binder (b), which is hydroxypropyl cellulose;

1 to 25% by weight of the disintegrant (c), which is at least one member selected from the group consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch; and

0.1 to 10% by weight of the lubricant (d), which is magnesium stearate;

the tablet further comprising a coating layer on the surface thereof,

wherein said coating comprises hydroxypropyl methyl cellulose, talc, and a colorant (e)[[.]], wherein the colorant (e) is present in an amount ranging from 0.1 to 50% by weight of the coating and comprises iron oxide and titanium oxide, and substantially contains no polyethylene glycol the coating substantially does not contain polyethylene glycol.

# EXHIBIT 5

2.    (Canceled)

3.    (Previously Amended)  The tablet according to claim 1, wherein per 1 part

by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a

salt thereof, the tablet comprises:

1 to 2000 parts by weight of the excipient (a);

0.01 to 100 parts by weight of the binder (b);

0.1 to 500 parts by weight of the disintegrant (c); and

0.01 to 50 parts by weight of the lubricant (d).

Claims 4 and 5.      (Canceled).

6.    (Previously Amended)  The tablet according to claim 1, which is obtained

by forming, into a tablet, a granulated substance obtained through wet granulation.

7.    (Previously Amended)  The tablet according to claim 1, wherein the tablet

does not contain povidone or crospovidone.

8.    (Currently Amended)  A method for producing a the tablet of claim 1, the

method comprising the steps of:

(1) granulating a mixture containing 7-[4-(4-benzo[b]thiophen-4-yl-

piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof, an excipient (a), a binder (b),

and a disintegrant (c), and further mixing thereto a lubricant (d); and

(2) forming the obtained mixture into a tablet form; and

(3) mixing a coating agent, a colorant (e), and a liquid medium to obtain a

coating mixture, and coating the surface of the tablet form using the coating mixture to

form the tablet,

wherein the tablet comprises:

169

## EXHIBIT 5

0.05 to 25% by weight of 7-[4-(4-benzo[b]thiophen-4-yl-piperazin-1-yl)butoxy]-1H-quinolin-2-one or a salt thereof,

10 to 98.5% by weight of the excipient (a), which is at least one member selected from the group consisting of lactose, corn starch, and microcrystalline cellulose;

0.1 to 20% by weight of the binder (b), which is hydroxypropyl cellulose;

1 to 25% by weight of the disintegrant (c), which is at least one member selected from the group consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch; and

0.1 to 10% by weight of the lubricant (d), which is magnesium stearate;

the tablet further comprising a coating layer on the surface thereof,

wherein said coating agent comprises hydroxypropyl methyl cellulose and talc, the colorant (e) is present in an amount ranging from 0.1 to 50% by weight of the coating mixture and comprises iron oxide and titanium oxide, and

wherein the excipient (a) is at least one member selected from the group consisting of lactose, corn starch, and microcrystalline cellulose;

the binder (b) is hydroxypropyl cellulose;

the disintegrant (c) is at least one member selected from the group consisting of low-substituted hydroxypropyl cellulose, croscarmellose sodium, and sodium carboxymethyl starch; and

**EXHIBIT 5**

the lubricant (d) is magnesium stearate;

the colorant (e) contains an iron oxide and titanium oxide;

the coating agent contains hydroxypropyl methyl cellulose and talc; and

the coating mixture substantially does not contain polyethylene glycol.

9.    (Canceled).

10.    (Previously Presented)  The tablet according to claim 1, wherein the excipient (a) is lactose, corn starch, and microcrystalline cellulose; and the disintegrant (c) is low-substituted hydroxypropyl cellulose.

11.    (Canceled)

12.    (Previously Presented)  The method for producing the tablet according to claim 8, wherein the excipient (a) is lactose, corn starch, and microcrystalline cellulose; and the disintegrant (c) is low-substituted hydroxypropyl cellulose.

(PTX0011, '419 File History at BREX00005293-6.)

**C.    T      P      C      Are Not Indefinite**

336.    The patent specification explains that:

> when polyethylene glycol (macrogel) exists in the coating layer, the obtained tablet tends to have reduced photostability and storage stability.  Therefore, it is more preferable if polyethylene glycol (macrogel) is substantially not contained.

(PTX0005, '419 patent at 6:44-51 (BREX02073636).)

337.    A POSA would understand that this passage explains that when polyethylene glycol exists in the coating there can be reduced photostability, but some coatings of the inventive formulations may include some amount of polyethylene glycol and not have reduced photostability.  Thus, the patent specification and claims use the language "substantially not contained" to account for these possibilities based on the tendency associated with polyethylene

**EXHIBIT 5**

glycol.   Certain levels of polyethylene glycol may impact the photostability of specific formulations while others may not.

338.   The specification is clear that certain aspects of the formulation, especially the coating and the colorants contained therein, lead to improved photostability.  (*See, e.g.*, PTX0005, '419 Patent at 6:29-31, 6:52-62 (BREX02073636).)   In contrast, the presence of polyethylene glycol tends to cause reduced photostability.   (PTX0005, '419 Patent at 6:47-49 (BREX02073636).)   Thus, a POSA would understand that the precise amount of polyethylene glycol that may be included, without yielding unacceptable reduced photostability, may depend on the other components of the formulation.

339.   The specification does not state that 10% of polyethylene glycol will always lead to unacceptable photostability.  Rather, the specification simply provides examples of specific formulations that exhibit photostability, i.e. Examples 3-5 and 3-7, and those that yield an increase in impurities upon exposure to light, i.e., Examples 3-4 and 3-6.  (PTX0005, '419 Patent at 14:1-50 (BREX02073640).)   And while the presence of polyethylene glycol in Examples 3-4 and 3-6 appears to cause the increase in impurities, the specification does not state that this level of polyethylene glycol will yield the same result in all formulations within the scope of the claims.  (PTX0005, '419 Patent at 14:1-50 (BREX02073640).)   Thus, the patent specification does not identify a precise amount of polyethylene glycol that would be unacceptable for all formulations and instead informs the POSA that the presence of polyethylene glycol in the inventive formulations tends to lead to reduced photostability, and provides specific examples illustrating that tendency and what types of testing may be used to assess it.  (PTX-0005, '419 Patent at 6:44-49; 14:1-50 (BREX02073636, 40).)

**EXHIBIT 5**

340.    A POSA would know to look to ICH guidelines such as those reflected in FDA

Guidance 1996 in assessing the photostability of a pharmaceutical formulation containing some

amount of polyethylene glycol and manufactured according to the teachings of the '419 patent,

which warn the reader that polyethylene glycol may negatively affect the photostability of the

formulation.  (PTX0005, '419 patent at 6:44-51 (BREX02073636).)  The guidance in, for example

FDA Guidance 1996, explains how to test the formulation and how to determine whether any

degradants formed during the testing indicate a lack of photostability.  (*See*, *generally*, PTX1029,

FDA Guidance 1996.)  FDA guidance 1996 makes clear that the photostability testing should

demonstrate that an API or drug product that is exposed to light 'does not result in an unacceptable

change.  Thus, a POSA would understand how to determine whether any included polyethylene

glycol was present in too large an amount so as to negatively affect the photostability.  Indeed,

testing a pharmaceutical dosage form for photostability is routine.  *See, e.g.*, Crowley Tr. at 85:4-

11; 87:17-91:19; 117:13-21.

341.    A POSA would understand that the '419 patent provides examples using

photostability testing consistent with that detailed in FDA Guidance 1996.  Specifically, the '419

patent employs a combination of a certain number of lux hours of overall visible light exposure as

well an ultraviolet exposure.  (*See* PTX0005, '419 patent at 12:56-64 (BREX02073639)

(disclosing exposing the samples to a total illumination by visible light of 1.8 x $10^6$ lux·hr and

ultraviolet light with a total intensity of 300 W·hr/m2).)  Moreover, the '419 patent discloses

testing using higher light intensities than those recommended in FDA Guidance 1996 and thus

clearly demonstrates the photostability of Examples 3-5 and 3-7.  A POSA would understand,

however, that the conditions described in FDA Guidance 1996 would be the standard conditions

**EXHIBIT 5**

for assessing whether tablets exhibit acceptable photostability. *See, e.g*., Crowley Tr. 87:17-91:19.

Such tablets would exhibit sufficient photostability to satisfy FDA requirements.

342.    Indeed, the specification's summary of the invention concludes, under the heading

"Advantageous Effects of Invention" that "[t]he tablet of the present invention exhibits excellent

disintegration ability, storage stability, and high photostability, so that it can be effectively used in

the medical field."  (PTX0005, '419 patent at 3:9-11 (BREX02073635).)  The specification ends

similarly. (PTX0005, '419 patent at 15:20-27 (BREX02073641).)   A POSA would understand

from these disclosures that a "coating substantially does not contain polyethylene glycol" under

the claimed invention when the coated tablet exhibits sufficient stability, including sufficient

photostability, to satisfy FDA requirements.

343.    The meaning of the '419 patent claims is clear from the claims and patent

specification and thus, a POSA would not need to look to the prosecution history to understand

the claims.  Nevertheless, the prosecution history is consistent with the clear meaning of the patent

claims.

344.    In the '419 Patent prosecution history the Applicant distinguished between

examples of a coating that "substantially does not contain polyethylene glycol" and therefore

"unexpectedly have 'no increase in impurity, even after light irradiation'" and those that "contain

polyethylene glycol and have increased impurity" and thus may exhibit reduced photostability.

(*See*, *e.g*., PTX0011, '419 Prosecution history, 1/16/2019 Amendment at 11-12 (BREX00005125-

26) (citing PTX0005, '419 patent specification at 14:34-35).)  Thus the prosecution history does

not indicate that 10% or any other specific percentage of polyethylene glycol is not within the

claims.

**EXHIBIT 5**

345.    In the response to a PTO rejection, the Applicant pointed to a number of reasons why the '362 patent (referred to as Yamashita) did not teach or suggest the claimed invention.  For example, the Applicant argued that "Yamashita's coating fails to teach and/or suggest the specific claimed coating of: hydroxypropyl methyl cellulose, talc, and a colorant (e)."  (PTX0011, '419 Prosecution history, 1/16/2019 Amendment at 10 (BREX00005124).)  Moreover, the Applicant did not argue that 5.7% w/w of polyethylene glycol is outside the scope of the claims.  Rather, the Applicant pointed out that the claims are directed to a coating that "substantially does not contain polyethylene" while Yamashita teaches the use of polyethylene with no restriction related to photostability.  (*See, e.g*., PTX0011, '419 Prosecution history, 1/16/2019 Amendment at 12 (BREX00005126) ("Here, both Yamashita and Guitard teach coatings with polyethylene glycol and fail to recognize the unpredictability of a coating layer that 'substantially does not contain polyethylene glycol' to result in 'no increase in impurity.'") (emphasis in original).)

**D.      T       P       C        Do Not Lack Written Description Support**

346.    The patent specification provides ample written description support for the claim limitation "substantially does not contain polyethylene glycol."  In fact, this same language is recited in the specification, which further elaborates on the meaning of the language:

> when polyethylene glycol (macrogel) exists in the coating layer, the obtained tablet tends to have reduced photostability and storage stability. Therefore, it is more preferable if polyethylene glycol (macrogel) is substantially not contained.

(PTX0005, '419 patent at 6:44-51 (BREX02073636).)  Moreover, the '419 patent specification provides examples illustrating the potential negative impact of polyethylene glycol and a POSA would be well aware of how to test for such a negative impact, especially in light of the guidance and examples in the specification.  A POSA would thus understand that the inventor of the '419 patent had adequately described, and thus had exhibited possession of, the claimed invention.

175

**EXHIBIT 5**

**III.    OBJECTIVE EVIDENCE DEMONSTRATES THE NON-OBVIOUSNESS OF BREXPIPRAZOLE**

**A.    There is a Nexus Between REXULTI® and the Claimed Inventions**

347.    There is a nexus between brexpiprazole, which is marketed as REXULTI®, and the elements of the asserted claims.  Specifically, each of the asserted claims encompass brexpiprazole marketed as REXULTI®, its synthesis, pharmaceutical formulations of brexpiprazole and methods of using brexpiprazole to treat schizophrenia and MDD.  Indeed, many of the asserted claims recite only brexpiprazole, its pharmaceutical formulations (i.e., REXULTI®) and its use to treat schizophrenia and MDD.

348.    The clinical properties of REXULTI® are a result of the unique pharmacological profile of brexpiprazole, which, according to the REXULTI® Label, includes affinity for and functional activity at multiple receptors.  Brexpiprazole is the only active pharmaceutical ingredient in REXULTI®, meaning brexpiprazole is solely responsible for REXULTI®'s clinical effect.  The brexpiprazole compound is therefore responsible for the reported efficacy and safety profile of REXULTI®.

349.    All of the objective indicia of non-obviousness is directly tied to brexpiprazole, marketed as the antipsychotic drug REXULTI®, and the therapeutic benefits from the brexpiprazole active ingredient in treating schizophrenia, MDD and other psychiatric diseases.  Accordingly, the objective indicia have a nexus with the merits of the claimed invention.  Defendants are therefore incorrect to the extent they attempt to argue that there is not a nexus between the claims and the objective indicia of non-obviousness.

350.    Brexpiprazole unexpectedly achieved a novel and unique pharmacological profile, including a level of dopamine partial agonism that provides antipsychotic efficacy without being activating or sedating.  *See, e.g.*, PTX0429, Citrome Activating and Sedating 2017.

176

**EXHIBIT 5**

Brexpiprazole's pharmacological profile provides a more balanced level of partial dopamine agonism, effectively stabilizing dopamine levels in patients and avoiding side effects caused by too much dopamine activation, as shown in clinical trial results. *See* PTX0453, Marder 2017 at 279 ("The intrinsic activity of brexpiprazole at $D_2$ receptors is higher than that of pure antagonists, potentially resulting in fewer $D_2$ antagonist-like AEs (e.g. EPS, hyperprolactinaemia, tardive dyskinesia), but lower than that of the first commercially available $D_2$ partial agonist, aripiprazole, which may translate into a reduced likelihood of inducing AEs potentially mediated by $D_2$ receptor agonism (e.g. akathisia, insomnia, restlessness, nausea)."); *see also* PTX0453, Marder 2017 at 287-88.  For example, one study comparing the activating side effect profiles of aripiprazole and brexpiprazole consistently reported higher activating side effects with aripiprazole in both schizophrenia and MDD as shown in the following chart:

| Activating Side Effect | Incidence Rate in Schizophrenia | | Incidence Rate in MDD | |
|:---:|:---:|:---:|:---:|:---:|
| | Aripiprazole | Brexpiprazole | Aripiprazole | Brexpiprazole |
| Agitation | 31.0% | 7.4% | N/A | N/A |
| Akathisia | 10.0% | 5.5% | 24.8% | 8.6% |
| Anxiety | 25.1% | N/A | N/A | 3.1% |
| Insomnia | 24.1% | 11.6% | 8.1% | 2.3% |
| Restlessness | N/A | N/A | 12.1% | 3.1% |

PTX0429, Citrome Activating and Sedating 2017 at 140-142; *see also* Davies 2004 at 331 (reporting high levels of activating side effects for aripiprazole, including patients experiencing these side effects at rates as high as 31.0% for agitation, 25.0% for anxiety, 24.1% for insomnia,

<u>**EXHIBIT 5**</u>

**HIGHLY CONFIDENTIAL**

14.0% for nausea and 12.0% for vomiting).  Clinical trials of brexpiprazole similarly found lower levels of activating side effects.

351.    Manipulation of a pharmacologic profile does not provide entirely predictable clinical effects and is why previous medications did not fulfill the purportedly expected promise. Nevertheless, as explained in previous research and clinical trials, the clinical profile of brexpiprazole is a result of its pharmacological profile.  Accordingly, Defendants' potential argument contesting any nexus is factually incorrect and does not establish a lack of nexus between the objective indicia and the merits of the claimed invention.

352.    The asserted claims of the asserted patents are embodied in the use of Rexulti®. Moreover, the inventions of the asserted claims generally enable the efficacy, low risk of adverse events, improvements in functioning and productivity, convenience and long-term adherence that are key to Rexulti®'s success in the U.S.

353.    The technologies covered by the asserted claims provide benefits that improve upon prior-art treatments.  At the time of Rexulti®'s launch, brexpiprazole was a new molecule with a unique mechanism of action.  The claimed inventions led to an antipsychotic drug with a favorable tolerability/safety profile relative to existing treatments.  Indeed, the benefits of Rexulti® that derive from the asserted claims include its efficacy, tolerability/safety (*i.e.*, low risk of sedating and activating side effects relative to existing treatments) and convenience (*i.e.*, once-daily dosing with oral tablets), along with enhanced patient adherence resulting from the favorable efficacy and tolerability/safety profile.[14]  Rexulti®'s relatively low propensity to induce activating and sedating side effects differentiated it from other treatments, especially for patients seeking an antipsychotic that would not impair their functioning or productivity.

---

[14] ████████████████████████████████████████████████████

**EXHIBIT 5**

**HIGHLY CONFIDENTIAL**

354.   These differentiating benefits of Rexulti® are directly related to the brexpiprazole molecule's unique properties.  The brexpiprazole molecule has an entirely unique and novel receptor binding and pharmacological profile and this profile minimizes side effects (*e.g.*, akathisia, restlessness, insomnia) compared with existing treatments such as aripiprazole and other antipsychotics.[15]  Clinical studies also confirmed that brexpiprazole's unique pharmacological profile reduces side effects, including having a "low potential to induce activating side effects" and "lower levels of sedation than other antipsychotic agents."[16]

355.   Defendants may attempt to argue that certain beneficial aspects of brexpiprazole are attributable to aripiprazole or other prior art compounds, and therefore no nexus exists.  But aripiprazole and brexpiprazole are different chemical compounds and therefore this argument cannot be correct.  Moreover, Defendants do not identify any aspects of brexpiprazole's pharmacological and clinical profile that are attributable to aripiprazole.

356.   Further, Defendants incorrectly rely on flawed opinions that certain beneficial aspects of brexpiprazole are not unexpected nor different than those of aripiprazole.  Defendants do not provide any details regarding these opinions or any opinion of their own regarding the discovery of brexpiprazole.  Instead, Defendants may attempt to broadly assert that the objective indicia of non-obviousness evidence is not attributable to any novel aspect of brexpiprazole.  For example, Defendants may attempt to allege that because aripiprazole and brexpiprazole are both indicated for treating schizophrenia and MDD and are both "atypical antipsychotics" and "adjunctive therapy," there can be nothing unexpected about brexpiprazole.  However, none of the objective indicia of non-obviousness relate solely to brexpiprazole as an "atypical antipsychotic"

**EXHIBIT 5**

or "adjunctive therapy."  Instead, the objective evidence is directly tied to the unexpected clinical benefits that stem from brexpiprazole's pharmacological profile.  *See* PTX0429, Citrome, L., "Activating and Sedating Adverse Effects of Second-Generation Antipsychotics in the Treatment of Schizophrenia and Major Depressive Disorder," *J. Clinical Psychopharmacology* (2017) 37(2):138-47 ("Citrome Activating and Sedating 2017") at 139-43; PTX0453, Marder, S.R., et al., "Brexpiprazole in patients with schizophrenia: overview of short- and long-term phase 3 controlled studies," *Acta Neuropsychiatrica* (2017) 29(5):278-90 ("Marder 2017") at 279; *see generally* PTX0431, Citrome, L., et al., "The preclinical profile of brexpiprazole: what is its clinical relevance for the treatment of psychiatric disorders?," *Expert Rev. Neurotherapeutics* (2015) 15(10):1219-29.

357.   There are multiple unexpected differences between brexpiprazole and aripiprazole and also other antipsychotics.  Defendants may attempt to argue that much of the objective evidence allegedly does not support the non-obviousness of brexpiprazole because these aspects can be attributed to aripiprazole, the first FDA-approved partial agonist.  However, at the time of the development of brexpiprazole, partial agonism, and specifically dopamine partial agonism, was just starting to be understood.  For example, Otsuka first discovered dopamine $D_2$ partial agonists with the discovery of compound OPC-4392.  However, during clinical testing Otsuka discovered that OPC-4392 exacerbated positive symptoms in patients with schizophrenia.  Otsuka hypothesized that these results were due to too much dopamine partial agonist intrinsic activity, leading to the increase in positive symptoms, and Otsuka terminated studies of OPC-4392 early in the clinical testing phase.  Bifeprunox is another example of a compound with partial agonist properties that failed to exhibit the proper balance of activity.  Like OPC-4392, bifeprunox exhibited a lack of efficacy and intolerable side effects, causing the FDA to deny approval of

**EXHIBIT 5**

bifeprunox.  Aripiprazole is another $D_2$ partial agonist.  Its dopamine partial agonist activity appears to have led to activating side effects, including insomnia, akathisia, nausea and vomiting. *See* PTX0435, Davies, M.A., et al., "Aripiprazole: A Novel Atypical Antipsychotic Drug With a Uniquely Robust Pharmacology," *CNS Drug Revs.* (2004) 10(4):317-36 ("Davies 2004") at 331-32; *see also* PTX0453, Marder 2017 at 279, 287.

### B.    Failure of Others and Unpredictability in the Art

358.    One indicator that a claimed invention would not have been obvious to a POSA is if the claimed invention was developed in the face of failures of others in the art.  The art is replete with failed drug candidates as of the priority date, demonstrating the inherent unpredictability associated with developing antipsychotics.

359.    Drug development, including the identification of a safe and efficacious active pharmaceutical ingredient and pharmaceutical dosage form, is an incredibly difficult and inherently unpredictable task.  It is so difficult that only approximately 6% of antipsychotic drugs that enter phase 1 clinical testing are ever brought to market, and further, perhaps 0.01% of compounds tested preclinically in the target indication phase are eventually approved.  PTX0457, Mullard, A., "Parsing clinical success rates," *Nature Revs. Drug Disc.* (July 2016) 15:447 at 447; PTX0446, Harrer, S., et al., "Artificial Intelligence for Clinical Trial Design," *Trends Pharmacological Scis.* (2019) 30(8):577-91 ("Harrer 2019").  This is due, at least in part, to the fact that schizophrenia and MDD and other neuropsychiatric diseases are complex and are likely polygenic in origin.  The cause of schizophrenia remains unknown today.

360.    Although there has been progress over the last half century in how physicians treat patients with schizophrenia and other neuropsychiatric disorders, progress has been incremental and the available antipsychotics before brexpiprazole come with their own risk-benefit profiles.

## EXHIBIT 5

Numerous efforts to discover and develop new antipsychotic treatments have failed.  Before the invention of brexpiprazole, the high rate of failures and difficulty in developing antipsychotics led individuals in the industry to be skeptical if a successful antipsychotic could be developed at all. *See, e.g.*, PTX0454, Marek 2005 at 585 ("At a clinical level, cognitive dysfunction remains one of the most challenging areas for developing antipsychotic drugs.  For the near term and given our poor understanding of the etiology of schizophrenia, it would appear unlikely that a single treatment would target psychotic, negative, and cognitive symptoms[.]"); PTX0467, Roth 2004 at 357 ("Structure-based drug design approaches in which ligands are designed to interact with the correct subset of molecular targets are also not likely to be successful.").

361.    Despite significant investment and research in the area, there are many examples of compounds that have been developed and tested in animals and humans but have never progressed to FDA approval.  There are countless other compounds that never advanced to the preclinical stage, failing after pharmacological or toxicity testing.

362.    Antipsychotic drugs fail for many reasons, including lack of necessary clinical efficacy, unacceptable side effect profile and toxicity.  The chart below provides examples of potential antipsychotic compounds that were developed and tested but never received FDA approval.  This table focuses on more recent failures.  Of course, there are myriad other examples from the 1980s and 1990s.  *See* PTX0460, *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, No. 3:07-01000, 2010 WL 11636594, at *22-*23 (D.N.J. Dec. 15, 2010) (noting that the FDA did not approve a single new antipsychotic drug from 1975 to 1990), aff'd, 678 F.3d 1280 (Fed. Cir. 2012).

**EXHIBIT 5**

| Compound | Developer | Approved by FDA? | Reason for Failure | Reference |
|---|---|---|---|---|
| (+)-UH 232 | AstraZeneca | No | Lack of efficacy and adverse side effects | Agid 2008[17] at 484; Natesan 2011[18] at 1166; Roth 2004 at 356 |
| ABT-126 | AbbVie | No | Lack of efficacy | AlzForum, Nelonicline[19] |
| ADX71149/JNJ-40411813 | Addex; Janssen Pharmaceuticals | No | Lack of efficacy | Addex Press Release[20] |
| AQW051 | Novartis | No | Lack of efficacy | Trenkwalder 2016[21] at 1051 |
| BI-409306 | Boehringer Ingelheim | No | Lack of efficacy | Brown 2019[22] at 355. |
| Bifeprunox | Solvay Pharmaceuticals | No | Lack of efficacy and adverse side effects (metolic concerns over trial subject death) | Natesan 2011 at 1166; PharmaTimes 2007[23] |

[17] PTX0418, Agid, O., et al., "Emerging drugs for schizophrenia," *Expert Op. Emerging Drugs* (2008) 13(3):479-95 ("Agid 2008").

[18] PTX0458, Natesan, S., et al., "Partial agonists in schizophrenia - why some work and others do not: insights from preclinical animal models", *Int'l J. Neuropsychopharmacology* (2011) 14:1165-78 ("Natesan 2011").

[19] PTX0420, AlzForum, Nelonicline, https://www.alzforum.org/therapeutics/nelonicline (last visited Mar. 1, 2022) ("AlzForum Nelonicline").

[20] PTX0417, Addex Therapeutics, Addex Reports Top-Line Data from ADX71149 Phase 2A Study in Patients with Major Depressive Disorder (MDD) with Significant Anxiety Symptoms (Feb. 7, 2014), https://www.addextherapeutics.com/en/investors/press-releases/addex-reports-top-line-data-adx71149-phase-2a-study-patients-major-depressive-disorder-mdd-significant-anxiety-symptoms (last visited Mar. 1, 2022) ("Addex Press Release").

[21] PTX0474, Trenkwalder, C., et al., "A Placebo-Controlled Trial of AQW051 in Patients with Moderate to Severe Levodopa-Induced Dyskinesia," *Movement Disorders* (2016) 31(7):1049-54 ("Trenkwalder 2016").

[22] PTX0428, Brown, D., et al., "Evaluation of the Efficacy, Safety, and Tolerability of BI 409306, a Novel Phosphodiesterase 9 Inhibitor, in Cognitive Impairment in Schizophrenia: A Randomized, Double-Blind, Placebo-Controlled, Phase II Trial," *Schizophrenia Bull.* (2018) 45(2):350-59 ("Brown 2019").

[23] PTX0462, PharmaTimes, Woe for Wyeth and Solvay as FDA rejects bifeprunox (Aug. 13, 2007), https://www.pharmatimes.com/news/woe_for_wyeth_and_solvay_as_fda_rejects_bifeprunox_990618 ("PharmaTimes 2007").

**EXHIBIT 5**

| Compound | Developer | Approved by FDA? | Reason for Failure | Reference |
|---|---|---|---|---|
| **Bitopertin** | Roche | No | Failed to improve negative symptoms of schizophrenia | FDA 2017[24] at 5 |
| **Encenicline** | FORUM Pharmaceuticals | No | Lack of efficacy and adverse side effects (serious gastrointestinal side effects) | BioSpace 2016[25] |
| **Flumezapine** | Eli Lilly | No | Adverse side effects (unacceptably high incidence of raised enzyme levels) | *Eli Lilly v. Zenith*[26] at 833-34 |
| **OPC-4392** | Otsuka | No | Lack of efficacy in positive symptoms and adverse side effects (activating side effects/EPS) | Natesan 2011 at 1166; *Otsuka v. Sandoz*[27] at *11 |
| **PF-02545920** | Pfizer | No | Lack of efficacy and adverse side effect discontinuations (somnolence, fatigue and weigh-decrease) | Delnomdedieu 2018[28] at A99-A100 |
| **Preclamol** | AstraZeneca | No | Lack of long-term efficacy | Natesan 2011 at 1166 |

---

[24] PTX0476, U.S. Food and Drug Administration, 22 Case Studies Where Phase 2 and Phase 3 Trials Had Divergent Results (January 2017) ("FDA 2017").

[25] PTX0425, Terry, M., BioSpace, In Light of Two Major Failed Trials, FORUM Pharma Closes Its Doors This Week (June 29, 2016), https://www.biospace.com/article/in-light-of-two-major-failed-trials-forum-pharma-closes-its-doors-this-week- ("BioSpace 2016").

[26] PTX0438, *Eli Lilly and Co. v. Zenith Goldline Pharmaceuticals, Inc.*, 364 F. Supp. 2d 820 (S.D. Ind. 2005).

[27] PTX0460, *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, No. 3:07-01000, 2010 WL 11636594 (D.N.J. Dec. 15, 2010), aff'd, 678 F.3d 1280 (Fed. Cir. 2012).

[28] PTX0436, Delnomdedieu, M., "A Randomized, Double-Blind, Placebo-Controlled Phase II Efficacy and Safety Study of the PDE10A Inhibitor PF-02545920 in Huntington Disease (Amaryllis),") *J. Neurology, Neurosurgery, and Psychiatry* (2018) 89(Suppl 1): A1-A112 ("Delnomdedieu 2018").

**EXHIBIT 5**

| Compound | Developer | Approved by FDA? | Reason for Failure | Reference |
|---|---|---|---|---|
| **Pomaglumetad** | Eli Lilly and Company | No | Lack of efficacy; no benefit for negative symptoms of schizophrenia compared to placebo | Stauffer 2013[29] at 436-37, 439-40 |
| **RG7203** | Roche | No | Worsened negative symptoms of schizophrenia | Umbricht 2021[30] at 70, 75-76 |
| **Roxindole** | Merck KGaA | No | Lack of efficacy on positive symptoms and worsening of positive symptoms at higher doses | Miyamoto 2012[31] at 1212; Natesan 2011 at 1166 |
| **Sonepiprazole** | Pfizer (USA) | No | Lack of efficacy | Marek 2005 at 584 |
| **SR141716 (rimonabant)** | Sanofi-Aventis | No | Lack of efficacy | Marek 2005 at 584 |
| **SR48692** | Sanofi-Aventis | No | Lack of efficacy | Marek 2005 at 584 |
| **SNAP-7941** | Synaptic Pharmaceuticals | No | Lack of efficacy | Basso 2006[32] at 119 |
| **Talipexole** | Boehringer Ingelheim International GmbH | No | Lack of efficacy on positive symptoms and worsening of positive symptoms at higher doses | Miyamoto 2012 at 1212; Natesan 2011 at 1166 |
| **Terguride** | Bayer Healthcare Pharmaceuticals | No | Lack of long-term efficacy | Natesan 2011 at 1166 |

[29] PTX1027, Stauffer, V.L., et al., "Pomaglumetad methionil: No significant difference as an adjunctive treatment for patients with prominent negative symptoms of schizophrenia compared to placebo" *Schizophrenia Research* (2013) 150(2-3):434-41.

[30] PTX0475, Umbricht, D., at al., "Proof-of-Mechanism Study of the Phosphodiesterase 10 Inhibitor RG7203 in Patients With Schizophrenia and Negative Symptoms," *Biological Psychiatry* (2021) 1(1):70-77 ("Umbricht 2021").

[31] PTX0455, Miyamoto, S., et al., "Pharmacological treatment of schizophrenia: a critical review of the pharmacology and clinical effects of current and future therapeutic agents," *Molecular Psychiatry* (2012) 17:1206-27 ("Miyamoto 2012").

[32] PTX0422, Basso, A.M., et al., "Lack of efficacy of melanin-concentrating hormone-1 receptor antagonists in models of depression and anxiety," *Eur. J. Pharmacology* (2006) 540(1-3):115-20 ("Basso 2006").

**EXHIBIT 5**

| Compound | Developer | Approved by FDA? | Reason for Failure | Reference |
|---|---|---|---|---|
| **Volinanserin (MDL-100,907 / M100907)** | Aventis Pharmaceuticals | No | Lack of efficacy and failure to treat negative symptoms | Marek 2005 at 583-84 |

363.     The compounds provided in the chart above are only examples of the vast number of compounds that fail to reach market.  For example, in March 2005, Novartis published a list of drugs in development for neurodegenerative diseases that included 731 total compounds in development.  *See generally*, PTX0486, Valentine, L., "List of Drugs in Development for Neurodegenerative Diseases: Update March 2005," ("Valentine").  These compounds were in various stages of development and sought to treat different kinds of neurodegenerative diseases through a wide variety of mechanisms of action and drug effect.

364.     Valentine describes exemplary compounds in development as of March 2005 but is not an exhaustive list.  Specifically, this list is directed to neurodegenerative drugs and may also represent only a subset of treatments that may be useful for neurodegenerative diseases and thus may not include all agents being developed for schizophrenia at the time.  This list also expressly does not include early discovery compounds.  *See* PTX0486, Valentine at 322 (stating discovery is "[l]ate research state, preparation for human testing").

365.     Even though as of March 2005 there were over 700 compounds in development for the treatment of neurodegenerative diseases, since 2005, only a total of 22 antipsychotics have been approved by the FDA.  Furthermore, this number includes brexpiprazole and different forms of already-approved compounds such as Abilify Maintena® and Invega Trinza®, meaning that the number of novel compounds approved by the FDA since 2005 is even smaller.  From the list provided in Valentine 2004, only 4 compounds gained FDA approval and subsequently launched (pimavanserin, lurasidone (SM-13496), iloperidone and blonanserin).

186

**EXHIBIT 5**

366.     The difficulty in developing a successful antipsychotic and the unpredictability in the art is further evidenced by the failed development of flumezapine as detailed in *Eli Lilly*, 364 F. Supp. 2d at 820.   In *Eli Lilly*, the court explained that after four years of development on flumezapine, and after making it all the way to human testing in schizophrenia patients, Eli Lilly discovered that flumezapine caused elevations in the muscle enzyme creatinine phosphokinase and a variety of liver enzymes.   PTX0438, 364 F. Supp. 2d at 833-34.   After these results were communicated to both the FDA and European regulatory authorities, both U.S. and European agencies immediately halted approval for the development of flumezapine, and the drug was never approved.  PTX0438, *Eli Lilly*, 364 F. Supp. 2d at 833-34.

367.     There are additional examples of failures or setbacks in antipsychotic studies for products currently in development.   For example, OMS 824 is an investigational atypical antipsychotic currently under development by Omeros.   However, upon reaching phase 2 in the development of this compound, Omeros had to place its research efforts on an almost 2-year hold due to safety concerns raised by an animal study.   PTX0442, Fagg, J., Therapy focus – One step forward but two steps back in Huntington's, *Evaluate Vantage* (Aug. 3, 2016), https://www.evaluate.com/vantage/articles/analysis/therapy-focus-one-step-forward-two-steps-back-huntingtons; PTX0466, Root, C., Omeros Suspends PDE10 Inhibitor Trial Due to High Free-Plasma Concentrations, *Clinical Leader* (Oct. 27, 2014), https://www.clinicalleader.com/doc/omeros-suspends-pde-inhibitor-trial-due-to-high-free-plasma-concentrations-0001.   Setbacks and failed trials in the development of antipsychotics further illustrate the difficulties with developing a successful antipsychotic.

368.     Otsuka and Lundbeck have both faced challenges in their respective antipsychotic programs.   For example, in the 1980s Otsuka sought to develop a compound labeled OPC-4392.

**EXHIBIT 5**

However, OPC-4392 failed to properly treat positive symptoms of schizophrenia and therefore Otsuka abandoned any further development of this compound. *See* PTX0458, Natesan 2011 at 1166; PTX0448, Kikuchi, T., et al., "7-{4-[4-(2,3-Dichlorophenyl)-1-Piperazinyl]Butyloxy}-3,4-Dihydro-2(1*H*)-Quinolinone (OPC-14597), a New Putative Antipsychotic Drug with Both Presynaptic Dopamine Autoreceptor Agonistic Activity and Postsynaptic $D_2$ Receptor Antagonistic Activity," *J. Pharmacology and Experimental Therapeutics*, (1995) 274(1):329-36 ("Kikuchi 1995") at 330. Further, OPC-4392 not only failed to treat positive symptoms, but it was found to aggravate positive symptoms of schizophrenia and caused tolerability issues due to the "activating action" of OPC-4392. PTX0458, Natesan 2011 at 1166; PTX0460, *Otsuka*, 2010 WL 11636594, at *19.

369. Lundbeck developed and commercialized an antipsychotic product compound called sertindole, marketed as SERDOLECT®, that was initially approved in 1997. However, SERDOLECT® was later withdrawn from the market due to concerns over cardiac dysrhythmias and sudden death and was re-approved in Europe only. PTX0456, Moore, N., "Higher cardiovascular mortality with sertindole in ADROIT: a signal not confirmed," *Int'l J. Psychiatry in Clinical Prac.* (2002) 6(1): 3-9 ("Moore 2002") at Abstract. Specifically, upon reapproval, the package leaflet for SERDOLECT® contains a warning to not take the drug if the patient has "a significant heart and blood circulation disease," "a severe heart disease," "prolonged heart ventricle activity" or a family member with this abnormal heart activity or if the patient is "taking medicines that prolong heart ventricle activity." *See* PTX0468, SERDOLECT® Package leaflet: Information for Patients at 1. The leaflet also warns patients that a doctor will conduct ECG evaluations of the patient's heart ventricle activity to check for QT interval prolongation before and during treatment with SERDOLECT®. PTX0468, SERDOLECT® Package leaflet:

**EXHIBIT 5**

Information for Patients at 2; *see also* PTX0439, European Medicines Agency, Sertindole

Overview[33] (stating that "[b]ased on re-evaluation of all available data . . . it has been concluded

that further clinical safety data, strong safeguards including extensive contraindications and

warnings for patients at risk of cardiac dysrhythmias, a recommended reduction in maximum dose

from 24 mg to 20 mg in all but exceptional cases, and extensive ECG monitoring requirement

before and during treatment would permit the re-introduction of sertindole").

370.    Bifeprunox represents another failed drug.  It exhibited a lack of efficacy, an

intolerable side-effect profile and resulted in at least one death, causing the FDA to deny approval

of bifeprunox.  PTX0464, Reuters Staff, UPDATE 2-Solvay Bifeprunox launch on ice after FDA

rejection *U.S. Regulatory News* (Aug. 10, 2007); PTX0423, Bifeprunox – Atypical Antipsychotic

Drug          *Clinical          Trials          Arena*          (Oct.          4,          2004),

https://www.clinicaltrialsarena.com/projects/bifeprunox.

371.    Moreover, clinical efficacy is only half the battle.   Finding an effective

antipsychotic that also has a favorable side effect profile is an extremely challenging endeavor.

Unanticipated side effects have been a particularly vexing problem limiting the successful

development of new antipsychotic drugs.  Many potentially promising drugs have failed due to

unacceptable side effects.  *See generally* PTX0458, Natesan 2011.

372.    Brexpiprazole, marketed as REXULTI®, effectively treats schizophrenia and

adjunctively treats MDD with markedly lower levels of side effects compared to antipsychotics

available before REXULTI®.  Brexpiprazole achieved these unexpected benefits in a field rife with

failures.  The numerous industry examples of failures to develop a safe and effective antipsychotic

---

[33] https://www.ema.europa.eu/en/medicines/human/referrals/sertindole

**EXHIBIT 5**

drug for the treatment of at least schizophrenia and MDD support the non-obviousness of brexpiprazole.

373.   The nexus requirement for failure of others does not require that others fail to specifically develop the claimed invention, and instead considers whether others in the industry failed to develop an invention that solved the problem the asserted patents purport to solve. Defendants may attempt to assert that the purported objective evidence of failure of others and unpredictability in the art Plaintiffs cite to is attributable to aripiprazole or other prior art compounds and thus does not support a nexus.  Defendants' opinion does not make sense.  In any event, there is ample evidence about the unexpected advantages of brexpiprazole over aripiprazole and other antipsychotics.  Brexpiprazole has lower levels of specific side effects that were, at least in part, thought to be due to aripiprazole's relatively stronger $D_2$ partial agonism.  *See* PTX0435, Davies 2004 at 331.  Brexpiprazole has also been reported to have a better impact on cognitive symptoms, key indicators of impaired functioning in patients with schizophrenia, than aripiprazole.  PTX0430, Citrome 2016 at 197, 199.  Therefore, this evidence establishes that brexpiprazole successfully achieved effective treatment of schizophrenia and adjunctive treatment of MDD with a unique and desirable side effect profile, something many compounds failed to do. Over the history of antipsychotic drug development, only about two dozen compounds have made it to market as atypical antipsychotics while many others have failed at various steps in the process. For those that have received FDA approval, several have failed to achieve low levels of side effects that would allow for specific patients and patient populations to take an antipsychotic drug long-term without adverse events, a significant achievement of brexpiprazole in the field of antipsychotics.

190

**EXHIBIT 5**

374.    Plaintiffs disagree with Defendants to the extent they argue that because some antipsychotic drugs were approved by the FDA before the invention of brexpiprazole, this somehow negates the significant evidence of all of the other failures in the art.  First, even though certain antipsychotics were FDA approved, many still failed to achieve the particular balance of efficacy and safety offered by brexpiprazole.  Second, all of the failures listed above still represent failures and support the non-obviousness of brexpiprazole even though other compounds were FDA approved.

375.    Defendants may attempt to contend that Plaintiffs' positions are overly broad in that they relate to pharmaceutical development in general and other examples that do not relate to the claims at issue in the brexpiprazole patents.  Again, Defendants' positions do not make sense. Moreover, Plaintiffs disagree that they have not provided evidence that brexpiprazole overcame any purported failures or unpredictability that were not overcome by prior art antipsychotics, such as aripiprazole.  Plaintiffs have shown this throughout the discussion herein.

376.    Moreover, brexpiprazole as REXULTI® achieved its success despite significant complexity and unpredictability in the art.   The discovery and development of potential antipsychotic agents and their successful use in the clinic to treat major mental illnesses is to a large and significant part unpredictable.  Defendants may attempt to spin Plaintiffs' statements into some argument that brexpiprazole added predictability to the field.  This is not Plaintiffs' position.  Instead, Plaintiffs' position is that brexpiprazole succeeded in spite of the relevant unpredictability in the field and that this lends support to the non-obviousness of brexpiprazole.

377.    Defendants may attempt to argue that Plaintiffs fail to present evidence of how brexpiprazole has unexpected clinical efficacy and an improved side-effect profile.  Defendants may similarly attempt to contend that brexpiprazole does not exhibit unexpectedly beneficial

**EXHIBIT 5**

properties to give rise to objective evidence of nonobviousness. The crux of Defendants' potential argument is that aripiprazole already showed substantially similar clinical profile and any differences between aripiprazole and brexpiprazole are only in degree and that any such differences would have been expected in the art. Defendants may also attempt to criticize Plaintiffs' positions on failures of others in developing an improved antipsychotic drug. Defendants may attempt to argue that the failures Plaintiffs have relied upon could have resulted from any number of reasons and are thus not relevant. To the extent Defendants make this argument, Plaintiffs disagree. The failures of others in developing an improved antipsychotic drug and the unexpected and unique pharmacological profile of brexpiprazole serve as evidence that brexpiprazole is nonobvious.

378.    Defendants may attempt to assert that the failures are not relevant evidence for nonobviousness because such failures could have resulted from any number of reasons, none of which related to the scope of the asserted claims. Defendants may attempt to argue such reasons could include: (a) the compounds were safe and efficacious but were not superior to existing treatments and therefore unlikely to be commercially successful, (b) the compounds were developed in the course of academic research and they were never intended to be commercialized, (c) a lack of financial resources for the company or university developing the compounds or (d) the compounds were dropped in favor of other, more favorable compounds. Defendants' potential positions are purely conjecture, and they provide no support for their critique.[34]

379.    In contrast to Defendants' unsupported hypothetical, Plaintiffs set forth nearly two dozen failed antipsychotic drugs, all of which are noted as failing for efficacy or tolerability issues.

---

[34] Additionally, Plaintiffs do not agree with Defendants that the four factors they identified should be entirely discounted in an obviousness analysis.

**EXHIBIT 5**

380.    Moreover, the Marek 2005 document identifies several $D_2$ partial agonists that never made it to market for reasons directly tied to efficacy.  For example, Marek 2005 identifies talipexole, roxindole and SDZ HDC 912 as $D_2$ partial agonists that "were not as effective as the current standard of care or they did not have sustained action at therapeutic doses."  PTX0454, Marek 2005 at 583.   Here again, this type of failure is directly relevant to the desired pharmacological profile Defendants' assert a POSA would have wanted to attain.

381.    The high rate of failure that Plaintiffs' refer to above is consistent with physician experience in drug development.  Psychiatric drug development is inherently difficult, often requiring complex polypharmacologic targeting with only approximately 6% of drugs that enter phase 1 testing ever brought to market.  It is within this context that Otsuka undertook an extensive drug discovery program to discover and develop a new antipsychotic, brexpiprazole.

### C.    Brexpiprazole's Unique Clinical Profile Satisfied Multiple Long-Felt but Unmet Needs

382.    Another indicator that a claimed invention would not have been obvious to a POSA is if the claimed invention satisfied or met a long-felt but unmet need in the art.  The unique and unexpected clinical profile of brexpiprazole, marketed as REXULTI®, met several critical needs in the area of neuropsychiatric treatment.

383.    Schizophrenia and MDD are debilitating diseases that take a toll on all involved and cost the healthcare system tens of billions of dollars a year.  These and other psychiatric disorders are extremely complex and vary in symptomology and response to treatment within a single patient over the course of the disease and from patient to patient.  Different patients experience and tolerate side effects differently.  For example, while sedation may be tolerable for a hospital-bound schizophrenia patient going through an acute episode, it may be completely intolerable to a high-functioning MDD patient who needs to be out and about in the world.  As a

**EXHIBIT 5**

consequence, treatment of these disorders is not straightforward, and there is an ongoing need to provide patients and treating physicians with a toolbox of antipsychotics, so that multiple beneficial—safe and effective—options are available for each patient.

384.     An article that published a year before the approval of brexpiprazole provided the following statements related to unmet need:  "[C]urrent antipsychotics show rather limited efficacy for negative and cognitive symptoms, which strongly influence functional outcome.  Furthermore, in a substantial subgroup, even positive symptoms are resistant to currently available drugs . . . . Therefore, there is an urgent need for new therapeutic agents that treats one or more components of the entire spectrum of symptomatology and functional impairments that are part of schizophrenia, without causing harmful side effects, especially in the neuromotor and cardiometabolic areas."  PTX0449, Köster, L.S., "Emerging drugs for schizophrenia: an update," *Expert Op. Emerging Drugs* (2014) 19(4):511-31 ("Köster 2014").

385.     Brexpiprazole met this need.  Several well-designed phase 2 and phase 3 trials established the safety and efficacy of REXULTI® to treat schizophrenia and as an adjunctive treatment for MDD.  Beyond its established efficacy, REXULTI® is well-tolerated and has a unique and minimal side effect profile.  For example, one phase 3 clinical study in MDD found weight gain and akathisia to be mild to moderate when reported at all: "[a]ctivating side effects such as restlessness, insomnia, and anxiety were reported by only a few patients," "somnolence, fatigue, and sedation were also uncommon" and "no suicide, attempted suicide, or deaths were reported during the study."  PTX0472, Thase I 2015 at e5-e6; *see also* PTX0473, Thase II 2015 at e5-e6.  Similarly, a phase 3 schizophrenia study found "[f]ewer brexpiprazole-treated patients . . . discontinued treatment due to [adverse events] than placebo-treated patients" and "[a]kathisia was reported less frequently in brexpiprazole treatment groups than in the placebo group."  PTX0447,

**EXHIBIT 5**

**HIGHLY CONFIDENTIAL**

Kane 2015 at 130-32.  Other schizophrenia studies and meta-analyses report small increases in side effects compared to placebo.  *See* PTX0453, Marder, S.R., et al., "Brexpiprazole in patients with schizophrenia: overview of short- and long-term phase 3 controlled studies," *Acta Neuropsychiatrica* (2017) 29(5):278-90 ("Marder 2017") at 281-82.  One analysis has specifically found that brexpiprazole had lower incidences of akathisia and other EPS-related side effects than aripiprazole.  PTX0430, Citrome 2016 at 197.  Accordingly, REXULTI® provides patients and physicians with another treatment option that, as discussed in more detail below, has an unexpectedly better clinical profile compared to other antipsychotics on the market.

386.    Before the priority date of RE'059, it was understood that, while well-tolerated overall, the most common side effects of aripiprazole were activating in nature.  Specifically, aripiprazole more frequently caused insomnia, akathisia, nausea and vomiting compared to other antipsychotics at the time.  PTX0435, Davies 2004 at 331.  These activating side effects, such as akathisia, can be unbearable for some patients.  There was thus a need in the art for an effective antipsychotic that did not cause these activating side effects.

387.    Brexpiprazole, marketed as REXULTI®, unexpectedly met this need. Brexpiprazole's unique clinical profile translates into a safe and effective antipsychotic with meaningfully lower levels of activating side effects.  PTX0429, Citrome Activating and Sedating 2017 at 139-43; *see also* ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████.  Brexpiprazole has a lower rate of activating side effects compared to aripiprazole.  *See* PTX0473, Thase II 2015 at e8; PTX0472, Thase I 2015 at e7; PTX0431, Citrome, L, et al., "The preclinical profile of brexpiprazole: what is its clinical relevance for the treatment of psychiatric disorders?," *Expert Rev. Neurotherapeutics* (2015)

**EXHIBIT 5**

15(10):1219-29 ("Citrome Preclinical Profile 2015") at 1224-25.  Specifically, one review found

that the rate of akathisia in patients treated with brexpiprazole was 9.4%, while the rate of akathisia

in aripiprazole was 21.2%, and all EPS-related adverse events were twice as high with aripiprazole

than with brexpiprazole (30.3% vs. 14.1%, respectively).  PTX0430, Citrome 2016 at 197-200.

While this report states that lower rates of EPS-related side effects could relate to higher affinity

at serotonin 5-HT$_{2A}$, it also states that "antagonism of the $\alpha_1$ adrenergic receptor has also been

implicated in reduced rates of akathisia[,] and the brexpiprazole affinity at the $\alpha_{1b}$ receptor is more

than 10 times higher than that observed with aripiprazole."  PTX0430, Citrome 2016 at 199-200.

It is surprising that the increased antagonism of the $\alpha_1$ adrenergic receptor contributed to meeting

the long-felt need for an antipsychotic with lower side effects because $\alpha_1$ antagonists were also

known to cause peripheral side effects, such as orthostatic hypertension.  The researchers conclude,

"Taken together, the lower intrinsic activity at the D$_2$ receptor of brexpiprazole compared with

aripiprazole and the unique serotonergic and noradrenergic receptor footprint of brexpiprazole may

partly explain the lower rates of EPS-related side effects."  PTX0430, Citrome 2016 at 200.

388.    According to another analysis, lurasidone, cariprazine, risperidone, olanzapine,

asenapine and aripiprazole had rates of akathisia that were statistically significant compared to

placebo, while brexpiprazole did not.  PTX0429, Citrome Activating and Sedating 2017 at 139-

42.  A separate study found that the rates of adverse events including headache, insomnia and

agitation and incidences of akathisia were *lower* in the group treated with brexpiprazole than the

placebo group.  PTX0447, Kane 2015 at 130.  Brexpiprazole therefore addressed the long-felt but

unmet need for an effective, non-activating antipsychotic that also had minimal other undesirable

side effects, such as minimal propensity for weight gain, little to no metabolic effects and sedating

effects as well as minimal effects on prolactin/sexual dysfunction.

**EXHIBIT 5**

389.    In schizophrenia, multiple antipsychotics are relatively effective against positive symptoms, but many do not adequately address cognitive issues and impaired functionality.  For successful long-term treatment, there was thus a need in the art for an antipsychotic that is effective against negative symptoms, including improving cognitive functioning, as well as promoting overall functioning—such as, for example, social interaction and self-care.  *See* PTX0454, Marek 2005 at 579 ("Although the second-generation or atypical antipsychotic drugs have been breakthrough medicines for the treatment of schizophrenia and other psychotic conditions, cognitive dysfunction and to some extent negative symptoms of the disease continue to be the main cause of poor vocational status of the patients.  Thus, the majority of investigational drug development efforts today target these unmet medical needs."), 586 ("[A] major focus for future drug discovery and development efforts is on the unmet medical need of cognitive deficits and disease modification.").

390.    Brexpiprazole also unexpectedly met this need.  Specifically, brexpiprazole has been shown in preclinical studies to have pro-cognitive effects.  Brexpiprazole has also been shown in clinical studies to promote improved functioning in schizophrenia patients.  For example, these effects of aripiprazole and brexpiprazole were explored in a 6-week, phase 3b, exploratory, open-label, multicenter, flexible-dose study in adult patients.  *See generally* PTX0430, Citrome 2016.  In this study, on a 30-item scale that evaluates everyday functioning, brexpiprazole showed improvements on all four domains tested:  interpersonal relationships, social acceptability, activities and work skill.  PTX0430, Citrome 2016 at 199.  In contrast, aripiprazole showed improvement in only two of these domains.  PTX0430, Citrome 2016 at 199.  The authors of this study concluded that "it is notable that the brexpiprazole group showed significant improvement compared with baseline on interpersonal relationships and social acceptability, whereas the

**EXHIBIT 5**

aripiprazole group did not."  PTX0430, Citrome 2016 at 199.  There was almost 50% better functioning in the brexpiprazole group compared to aripiprazole.  Although this study was not powered for head-to-head comparisons, these results suggest that there is an advantage for brexpiprazole.  Brexpiprazole also showed a reduction in score for the BIS-11, which measures impulsivity, whereas aripiprazole did not.  PTX0430, Citrome 2016 at 199.  As these authors noted, improved impulsivity is important for schizophrenia patients because it is associated with worse treatment outcomes and other risky behaviors.  PTX0430, Citrome 2016 at 199.  In this study, there was no worsening in cognitive function, and brexpiprazole was well-tolerated.  PTX0430, Citrome 2016 at 199.  Aripiprazole led to twice the EPS-related adverse events compared to brexpiprazole, mainly because of its activating side effects.  PTX0430, Citrome 2016 at 199 ("Here, the percentage of EPS-related AEs in the aripiprazole group was twice that of the brexpiprazole group . . . [t]he EPS-related difference was largely because of the rates of akathisia being two times higher in the aripiprazole group.").  This result is particularly relevant because flexible dosing was employed.  At approximately half of the maximum dose for aripiprazole, there was twice the rate of akathisia compared to brexpiprazole dosed at two-thirds its maximum dose.  Stated differently, these results give aripiprazole a little slack, and yet it still had twice the rate of akathisia as brexpiprazole.  This is thus a signal that brexpiprazole may be even better than these results fully convey.  Moreover, this study represents use in a real-world setting.

391.    A recently published *post hoc* analysis looked at the collective data from the phase 2 and phase 3 studies to assess brexpiprazole's effect on functioning in schizophrenic patients.  PTX0434, Correll, C.U., et al., "Effects of Brexpiprazole on Functioning in Patients With Schizophrenia: Post Hoc Analysis of Short- and Long-Term Studies," *J. Clinical Psychiatry* (2022) ("Correll 2022").  In addition to the study discussed above, in short-term studies, a

**EXHIBIT 5**

significantly greater proportion of patients receiving brexpiprazole achieved a functional response compared to placebo.  PTX0434, Correll 2022 at e4-e5.  In the maintenance study, brexpiprazole improved functioning during the acute phase and those functional improvements were maintained during the maintenance phase.  PTX0434, Correll 2022 at e5-e6.  In a long-term study, of the 177 patients who received brexpiprazole for 58 weeks, more than 4 in 5 had a functional response, and 2 in 5 achieved a functional remission.  PTX0434, Correll 2022 at e5.  The authors concluded that "[t]his finding suggests that continued treatment with brexpiprazole results in improved and sustained functioning over time, and benefits are not limited to an initial/acute improvement." PTX0434, Correll 2022 at e5.  Brexpiprazole was able to achieve these results while at the same time leading to less side effects, including activating side effects.

392.    Brexpiprazole's functional effects have also been demonstrated in MDD patients in a phase 3b open-label study in young adults who were in the work or school environment. PTX0489, Weisler, R.H., et al. "Brexpiprazole as an adjunctive treatment in young adults with major depressive disorder who are in a school or work environment," *J. Affective Disease* (2016) 204(1):40-47 ("Weisler 2016").  Improvements in depression were seen starting at week 1 of the study, and this rapid onset of effect was expected to lead to benefits in functioning and work productivity for patients with MDD.  PTX0489, Weisler 2016 at 45.  The study further found that there were marked improvements in patient-rated scales of functioning and consistent improvements were also observed in functional rating scales throughout the study.  PTX, 0489, Weisler 2016 at 45.  The authors noted that these effects are important and benefit not only the individual patient but also society as a whole, given the huge public health effect of MDD. PTX0489, Weisler 2016 at 45.  The authors further noted that positive effects on functioning are coupled with "[a] favorable tolerability and safety profile . . . with adjunctive brexpiprazole

**EXHIBIT 5**

treatment, with low occurrences of side effects that are deleterious for patients' functioning, such as sedation and somnolence, as well as activating side effects such as akathisia and restlessness." PTX0489, Weisler 2016 at 45.

393.   In sum, brexpiprazole has demonstrated clinical benefits in improving functioning, which was a clear need in the art. And it does so with one of the most desirable benefit-to-risk profiles of any antipsychotic available for clinical care. With respect to MDD, brexpiprazole is really the safest antipsychotic currently available for adjunctive treatment.

394.   Furthermore, there are many other complex and difficult-to-treat neuropsychiatric disorders for which there are inadequate or no approved treatments. For example, cognitive behavioral therapies for PTSD have a non-response rate as high as 50%. PTX0437, Ducourneau, E., et al., "Brexpiprazole blocks post-traumatic stress disorder-like memory while promoting normal fear memory," *Molecular Psychiatry* (2021) 26:3018–33 (BREX02073784-99) ("Ducourneau 2020") ("Such relatively low positive outcome calls for the development of pharmacological treatments that, in particular, could block the emotional hypermnesia while promoting the contextual memory of the trauma. Yet, so far such pharmacological therapy does not exist."). Moreover, selective serotonin reuptake inhibitors have an overall response rate of only 60% and achieve complete remission in only 20% to 30% of patients. Alexander, W., "Pharmacotherapy for Post-traumatic Stress Disorder in Combat Veterans: Focus on Antidepressants and Atypical Antipsychotic Agents" *Pharmacy and Therapeutics* (2012) 37(1):32-38 at 32. Furthermore, no atypical antipsychotics have been approved for the treatment of PTSD. There are also no treatments specifically approved for the treatment of agitation in Alzheimer's disease. There was thus a great need in the art for a safe and effective treatment for these disorders.

**EXHIBIT 5**

395.     Post-traumatic stress disorder is a disorder that follows a traumatic experience where there was a threat of injury or death, marked by severe stress and anxiety.  Symptoms of PTSD include persistent and intrusive memories, avoidance of reminders of the event, emotional numbing and a permanent state of hyperarousal, all of which may interfere with functioning.  *See generally* PTX0437, Ducourneau 2020.  The lifetime incidence of PTSD is about 6-8% in the general population but increases significantly certain populations.  PTX0437, Ducourneau 2020 at BREX02073784.  Like schizophrenia and MDD, it burdens not only the patient but also family and caregivers and creates a public health burden, especially for veterans of war.

396.     Brexpiprazole has shown positive effects in animal models of PTSD.  PTX0437, Ducourneau 2020; PTX0432, Cohen, H., et al., "Adjunctive treatment with brexpiprazole and escitalopram reduces behavioral stress responses and increases hypothalamic NPY immunoreactivity in a rat model of PTSD-like symptoms," *Eur. Neuropsychopharmacology* (2018) 28(1):63-74 ("Cohen 2018").  One research group concluded, "the present results show that brexpiprazole can persistently normalize traumatic memory [and] could thus represent a new pharmacological approach that, in combination with re-exposure behavioral treatment, could be beneficial for patients with PTSD."  PTX0437, Ducourneau 2020 at BREX02073798.  The combination of brexpiprazole and sertraline met its primary endpoint in a phase 2 study for the treatment of PTSD.  PTX0376, Lundbeck Corporate Release, Lundbeck and Otsuka report positive phase 2 data for the combination treatment of brexpiprazole and sertraline for the treatment of Post-Traumatic Stress Disorder (PTSD), https://news.cision.com/h--lundbeck-a-s/r/lundbeck-and-otsuka-report-positive-phase-ii-data-for-the-combination-treatment-of-brexpiprazole-and-sertraline-for-the-treatment-of-post-traumatic-stress-disorder--ptsd-,c2808594          ("Lundbeck Corporate Release").  Brexpiprazole was also well tolerated in this study.  The development of

**EXHIBIT 5**

brexpiprazole for this indication is ongoing.  FDA approval of brexpiprazole for the treatment or adjunctive treatment of PTSD would mark a significant step forward in an area where there is a high need for pharmacologic interventions.

397.    Agitation in Alzheimer's disease (AAD) is another area of incredible need.  The adult population is aging, and Alzheimer's disease and its attendant symptoms are a huge cost to society.  Often Alzheimer's patients are treated in a nursing home setting, which is in itself costly.  When these patients are agitated, they can often harm themselves or others.  Injured staff (and family in a home setting) may need time off, which is also a drain on the healthcare system and society as a whole.  There are currently no FDA-approved therapies for AAD.

398.    Brexpiprazole is currently being developed to treat AAD and has had positive results in phase 3 trials.  In one 12-week, randomized, double-blind, placebo-control trial, 2 mg/day of brexpiprazole resulted in a statistically significantly greater improvement in the Cohen-Mansfield Agitation Inventory (CMAI) than placebo.  PTX0445, Grossberg, G.T., et al., "Efficacy and Safety of Brexpiprazole for the Treatment of Agitation in Alzheimer's Dementia: Two 12-Week, Randomized, Double-Blind, Placebo-Controlled Trials," *Am. J. Geriatric Psychiatry* (2020) 28(4):383-400 ("Grossberg 2020").  In a second 12-week study, a flexible dose of 0.5-2 mg/day did not achieve statistical superiority, but a *post hoc* analysis showed that a benefit was observed among patients titrated to the maximum dose of 2 mg/day.  In these studies, brexpiprazole was safe and well-tolerated.  PTX0445, Grossberg 2020 at 395.  Notably, in the first study, no patients exhibited akathisia, and in the second, only 2.3% of patients reported that relevant side effect.  PTX0445, Grossberg 2020 at 395.  As mentioned previously, brexpiprazole's apparent absence of activating side effects makes it a preferred choice among antipsychotics that are often either too activating or too sedating.  Otsuka and Lundbeck have continued their phase 3

**EXHIBIT 5**

development of brexpiprazole in AAD.  PTX0376, Lundbeck Corporate Release; PTX0445, Grossberg 2020 at 395.  Here again, if brexpiprazole achieves FDA approval in AAD, it will be a first-in-class therapy for a serious ailment that drains public health resources.

399.     Rather than challenging the evidence demonstrating that there were multiple unmet needs in the art and that brexpiprazole met them, Defendants may attempt to simply assert that aripiprazole or other prior art compounds satisfied these long-felt but unmet needs.  Defendants are wrong and offer no support for this contrary opinion.

### 1.     Need to Further Reduce Adverse Side Effects

400.     Defendants may attempt to assert that if there was any long-felt need to reduce adverse side effects, it was met by aripiprazole before the filing date of the asserted patents.  In supporting this opinion, Defendants may attempt to refer to certain side effects associated with aripiprazole and ignore that brexpiprazole specifically solved a need that was not fully resolved by aripiprazole or other antipsychotic compounds available before brexpiprazole.

401.     The art progressed from typical antipsychotics with significant motor side effects and other worrisome disadvantages to atypical antipsychotics that exhibited different but still serious side effects that often limited long-term use or lowered patient compliance.  Aripiprazole, the first $D_2$ partial agonist to enter the market, while addressing many serious side effects of earlier drugs, nevertheless was "activating."  Activating effects, thought to be caused by over-stimulation of dopamine receptors, are side effects such as insomnia, akathisia, nausea and vomiting.  PTX0435, Davies 2004 at 333.  These side effects can be unbearable for some patients.  Indeed, Defendants have acknowledged that aripiprazole had high levels of activating side effects.  Given this, aripiprazole could not have solved the need it did not fully resolve.  Moreover, given the levels of adverse events associated with aripiprazole, it did not solve the need for additional

**EXHIBIT 5**

antipsychotics with a more tolerable safety profile, and many patients were still unable to find an antipsychotic that effectively treated their disease without resulting in side effects, many of which caused patients to discontinue treatment. This is highlighted in an article published about marketed products a year before approval of brexpiprazole: "[T]here is an urgent need for new therapeutic agents that treat one or more components of the entire spectrum of symptomology and functional impairments that are part of schizophrenia, *without causing harmful side effects, especially in the neuromotor and cardiometabolic areas*." PTX0449, Köster, L.S., "Emerging drugs for schizophrenia: an update," *Expert Op. Emerging Drugs* (2014) 19(4):511-31 at 512 (emphasis added). The authors of the article were aware of aripiprazole at this time and observed that aripiprazole had not fully satisfied the long-felt but unmet need for the effective treatment of schizophrenia with low levels of side effects.

402.     Rather than address aripiprazole's activating side effects, Defendants may attempt to point instead to one statement related to weight gain and further fail to address the significant overall decrease in both activating and sedating side effects associated with brexpiprazole as compared to other antipsychotics. Additionally, Latuda® is not associated with similar side effects as brexpiprazole. First, the Medical Letter does not show that lurasidone (the active ingredient in Latuda®) has a similar side effect profile to brexpiprazole. Table 3 provides a qualitative comparison of adverse effects of certain antipsychotics and illustrates differences between brexpiprazole and lurasidone in four of the five side effects evaluated (diabetes, weight gain, EPS and QTc interval prolongation). DTX-0181, Medical Letter at Table 3. Second, lurasidone had a higher risk of certain adverse effects, such as EPS. This risk is much lower in brexpiprazole than lurasidone. *See* PTX0429, Citrome Activating and Sedating 2017 at 139-41. Given that brexpiprazole has the lowest average levels of side effects compared to all antipsychotic

**EXHIBIT 5**

compounds available before brexpiprazole, including aripiprazole, brexpiprazole's side effect profile is not similar to any prior art compound and instead satisfied the long-felt but unmet need in the art for an antipsychotic with low levels of both activating and sedating side effects.

### 2.   Cognitive Effects and Functioning

403.   Treating the cognitive effects of functional impairment associated with schizophrenia is one of the most difficult challenges in the field and represents a significant need. Defendants do not dispute this.  Defendants only potential counter to Plaintiffs' discussion of functional improvement and the cognitive effects of brexpiprazole is to unfairly attack the legitimacy of data Plaintiffs discuss.

404.   To the extent Defendants assert that head-to-head comparisons and open-label studies are highly unreliable, they do not provide reasons why.  Indeed, Defendants fail to offer any other evidence to counter these points and merely critique the quality of the evidence that is available on these topics.  Defendants also fail to address in any way Plaintiffs' discussion of functional improvements in schizophrenia as shown in publications.  *See* PTX0434, Correll, C.U., et al., "Effects of Brexpiprazole on Functioning in Patients With Schizophrenia: Post Hoc Analysis of Short- and Long-Term Studies," *J. Clinical Psychiatry* (2022) among other publications.

405.   The studies that Plaintiffs rely upon are rigorous and peer-reviewed and have scientific value.  They inform clinicians of the benefits of various drugs and are used by clinicians to evaluate appropriate therapy for their patients.  In addition, Plaintiffs disagree with Defendants to the extent they argue that the study reported in PTX0430, Citrome 2016 is highly unreliable. Indeed, Plaintiffs acknowledge that the study was not adequately powered for head-to-head comparisons but nevertheless provides evidence that there is an advantage for brexpiprazole. Having data, even from open-label studies, that show cognitive functioning improvement rather

**EXHIBIT 5**

than neutral or even negative cognitive effects, as shown with various other antipsychotics, provides information useful to clinicians and patients alike.  Indeed, cognitive functioning is impaired in both schizophrenia and MDD, and functional capacity, which is a key goal in the management of individuals suffering from these disorders, is highly dependent on cognition and the lack of further impairment due to medication adverse effects.  In that context, this study demonstrates that brexpiprazole showed a better effect on cognition compared to baseline than aripiprazole compared to baseline in this critical target treatment area.

406.    Furthermore, Defendants may attempt to incorrectly argue that the PTX0430, Citrome 2016 short-term, open-label study shows patients taking aripiprazole also showed improvements in cognitive function.  Contrary to Defendants' characterization, PTX0430, Citrome 2016 reported that "[n]o worsening of cognitive function was observed for the brexpiprazole group on any of the cognitive tests, whereas the aripiprazole group worsened on the Two-Back Memory Task."  PTX0430, Citrome 2016 at 197.  Moreover, PTX0430, Citrome 2016 notes that brexpiprazole improved all four practical aspects of everyday functioning, while aripiprazole only improved two aspects, stating, "[I]t is notable that the brexpiprazole group showed significant improvements compared with baseline on interpersonal relationships and social acceptability, whereas the aripiprazole group did not."  PTX0430, Citrome 2016 at 199.  Accordingly, this is objective evidence that brexpiprazole performs better in terms of cognitive functioning than aripiprazole, when compared in a randomized controlled trial.  Defendants may attempt to provide some additional critiques to Plaintiffs' cognitive deficiency discussion and evidence when discussing unexpected results, and Plaintiffs address those in the relevant section below.

407.    A POSA would have afforded little to no weight to the DTX-0181, Medical Letter and would have consulted more recent, better respected publications for the most reliable data for

**EXHIBIT 5**

brexipiprazole. Therefore, the stated conclusion of the DTX-0181, Medical Letter was based on limited data and has since been further disproved due to publication of additional data. For example, after publication of the DTX-0181, Medical Letter, data on the cognitive effects of brexpiprazole have been published.

### 3. Potential to Treat Additional Major Mental Illnesses

408.    There is a significant need for therapies to treat post-traumatic stress disorder (PTSD) and agitation in Alzheimer's disease (AAD). Defendants do not dispute that this need exists.

409.    PTX0491, Caraci 2020 confirms the need for treatment of AAD and details clinical studies, including on-going studies, of brexpiprazole in this area. Caraci, F., et al., "New antipsychotic drugs for the treatment of agitation and psychosis in Alzheimer's disease: focus on brexpiprazole and pimavanserin," PTX0491, *F1000 Research* (2020) 9(Faculty Rev):686 ("Caraci 2020") at 3-5. The authors explain that the behavioral and psychological symptoms of dementia, including agitation and aggression, occur in up to 90% of patients diagnosed with dementia and "are associated with a high economic burden." PTX0491, Caraci 2020 at 3. Specifically, "Agitation is one of the most distressing neuropsychiatric symptoms in patients with dementia and it affects at least 50% of patients with [Alheimer's disease]." PTX0491, Caraci 2020 at 4. One of the major goals in this area is therefore to reduce agitation in Alzheimer's disease, including the inability to stay calm, motor and verbal hyperactivity and hyper-responsiveness until loss of control and aggressiveness. PTX0491, Caraci 2020 at 3. As such, "[N]ew antipsychotic drugs with improved efficacy and safety are needed in this area." PTX0491, Caraci 2020 at 6.

410.    Brexpiprazole has unexpectedly shown positive clinical results in the treatment of AAD. Indeed, "[T]wo distinct phase III clinical trials, with a total of nearly 700 adult participants

**EXHIBIT 5**

with [Alzheimer's disease], reported that brexpiprazole 2 mg/day had the potential to be an efficacious, safe, and well-tolerated treatment for [AAD]." PTX0491, Caraci 2020 at 4. Moreover, three different phase III studies are currently ongoing to evaluate the long-term safety and clinical efficacy of brexpiprazole in patients with AAD. PTX0491, Caraci 2020 at 5-6. Consistent with the findings in the two completed phase III AAD studies, these studies are designed to support FDA approval of brexpiprazole for the treatment of patients with AAD with an improved tolerability and safety profile. PTX0491, Caraci 2020 at 6.

411.     Clinical studies of brexpiprazole for the treatment of PTSD have also reported safe, effective and tolerable results. Due to mixed results from other antipsychotics, such as clonidine, prazosine, risperidone and olanzapine, "[t]here is a need to find more appropriate and effective treatments for PTSD." PTX0492, O'Connor, M., "Adjunctive therapy with brexpiprazole improves treatment resistant complex post traumatic stress disorder in domestic family violence victims," *Australasian Psychiatry* (2020) 28(3):264-266 ("O'Connor 2020") at 264. Clinical data supports that brexpiprazole is a safe, effective and tolerable adjunctive treatment for PTSD, and the author of O'Connor 2020 details two additional case studies of actual patients with severe treatment-resistant PTSD treated with adjunctive brexpiprazole. PTX0492, O'Connor 2020 at 264-66. This assessment evaluated the efficacy and safety of adjunctive brexpiprazole for treatment-resistant PTSD and used a PTSD check list 5 (PCL 5) and Global Assessment Scale (GAS) as measures for clinical improvement. O'Connor 2020 at 265-66.

412.     The first patient discussed in PTX0492, O'Connor 2020 "reported a significant improvement within a fortnight" of starting brexpiprazole. PTX0492, O'Connor 2020 at 265. For the second patient, a "significant improvement occurred within two weeks." PTX0492, O'Connor

## EXHIBIT 5

2020 at 266.  The following quotations from PTX0492, O'Connor 2020 summarize the successful

experiences of these patients after starting adjunctive treatment of brexpiprazole for PTSD:

> **Ms AB**:  She started sleeping well and nightmares stopped.  She said it was a relief to wake up rested.  Her anxiety level decreased and startle response nearly disappeared.  She was able to distance herself from her family's rejection.  Her thoughts became less fearful.  There were fewer flashbacks.  There was no further weight gain.  Her PCL 5 dropped down to 35/80 within two weeks.  Clinical GAS improved to 6/10 and no adverse events were reported.  Her treatment is ongoing.

> **Ms C**:  She reported ["]I realise that brexpiprazole produced almost instant clarity in my thinking[."]  She noted her thinking had been muddled due to intrusive memories.  She was no longer agitated and speech was no longer pressured.  She was able to concentrate.  Sleep returned to normal and nightmares stopped.  Culturally response trauma therapy started to take effect.  Her PCL 5 dropped to 32/80 and clinical GAS improved to 6/10.  There were no adverse effects except minor weight gain that stabilized with dieting and exercise regime.  Her treatment is ongoing.

PTX0492, O'Connor 2020 at 265-66.  As noted above, both patients are continuing to take

brexpiprazole due to these positive results.  PTX0492, O'Connor 2020 at 265-66.  As previously

discussed, the positive clinical results of brexpiprazole in AAD and PTSD further support the non-

obviousness of brexpiprazole.

413.    Defendants may attempt to critique Plaintiffs positions by arguing that REXULTI®

has not yet been approved to treat these indications.  However, brexpiprazole has shown promising

results in clinical trials for indications such as PTSD and AAD.  *See, generally,* PTX0491, Caraci

2020; PTX0492, O'Connor 2020.  This is objective evidence that brexpiprazole's potential use in

other indications that currently have no viable treatment options met a long-felt but unmet need.

The studies that Plaintiffs discuss show that brexpiprazole has made strides where other agents

have not.

**EXHIBIT 5**

D.      **Brexpiprazole's Unique Pharmacological Profile Led to Unexpected Clinical Benefits that Have Real-World Consequences and Have Received Industry Praise**

414.    Another indicator that a claimed invention would not have been obvious to a POSA is if the claimed invention demonstrated unexpected results.  Brexpiprazole, marketed as REXULTI®, has an unexpectedly better clinical profile than aripiprazole and other antipsychotics on the market.  This unexpectedly better profile has attracted clinical attention and led to real-world benefits for patients, caregivers and society.

415.    Defendants may attempt to assert that any potency and selectivity differences between brexpiprazole and aripiprazole are allegedly different only in degree and that any such differences would have been expected in the art.

416.    Brexpiprazole is a novel and distinct antipsychotic agent with a unique and unexpected pharmacological and preclinical profile.  *See generally* PTX0451, Maeda, K., et al., "Brexpiprazole I: In Vitro and In Vivo Characterization of a Novel Serotonin-Dopamine Activity Modulatory," *J. Pharmacology and Experimental Therapeutics* (2014) 350(3):589-604 ("Maeda I 2014"); PTX0452, Maeda, K., et al., "Brexpiprazole II: Antipsychotic-Like and Procognitive Effects of a Novel Serotonin-Dopamine Activity Modulator," *J. Pharmacology and Experimental Therapeutics* (2014) 350(3):605-14 ("Maeda II 2014").  Brexpiprazole binds in a highly individual way to a plethora of monoaminergic receptors, including dopamine, serotonin and α-adrenergic receptors.  PTX0451, Maeda I 2014 at 596, Table 2; PTX0966, REXULTI® Label at § 12.2. Brexpiprazole binds with high affinity to $D_2$ (0.3 nM), $D_3$ (1.1 nM), $5\text{-}HT_{1A}$ (0.12 nM), $5\text{-}HT_{2A}$ (0.47 nM), $5\text{-}HT_{2B}$ (1.9 nM), $5\text{-}HT_7$ (3.7 nM) $\alpha_{1A}$-adrenergic (3.8 nM), $\alpha_{1B}$-adrenergic (0.17 nM), $\alpha_{2C}$-adrenergic (0.59 nM) and $\alpha_{1D}$-adrenergic (2.6 nM).  PTX0966, REXULTI® Label at § 12.2.

**EXHIBIT 5**

HIGHLY CONFIDENTIAL

Its affinity to the $H_1$ receptor and $M_1$ receptor is moderate and very low, respectively.  PTX0451, Maeda I 2014 at 596, Table 2.

417.    Brexpiprazole is a partial agonist at $D_2$ and $D_3$ receptors.  PTX0451, Maeda I 2014 at 596-597, Table 4, Fig. 3; PTX0966, REXULTI® Label at § 12.1.  Its maximum inhibitory effect (43%) is significantly lower than aripiprazole's (61%).  PTX0451, Maeda I 2014 at 596, Table 4.  Brexpiprazole is also a partial agonist at $5\text{-}HT_{1A}$ receptors.  PTX0451, Maeda I 2014 at 596-597, Fig. 2, Table 4; PTX0966, REXULTI® Label at § 12.1.  Brexpiprazole is an antagonist at $5\text{-}HT_{2A}$ receptors, as well as at $5\text{-}HT_{2B}$, $\alpha_{1B}$-adrenergic and $\alpha_{2C}$-adrenergic receptors.  PTX0451, Maeda I 2014 at 596; PTX0966, REXULTI® Label at § 12.1.

418.    Although brexpiprazole binds to similar receptors as some other marketed antipsychotics, the binding affinity and functional effects of brexpiprazole at these receptors is entirely unique. ████████████████████████████████  And it is this difference in binding profile that is believed to result in its improved clinical profile.  PTX0430, Citrome 2016 at 193.  Specifically, as mentioned, brexpiprazole shows lower dopamine $D_2$ intrinsic activity than aripiprazole.  PTX0430, Citrome 2016 at 193.  Brexpiprazole also shows an approximately 10-times higher binding affinity than aripiprazole at serotonin $5\text{-}HT_{1A}$ and $5\text{-}HT_{2A}$ receptors.  PTX0431, Citrome Preclinical Profile 2015 at 1220.  Brexpiprazole also binds at a much higher affinity than aripiprazole to $\alpha_{1B}$ and $\alpha_{2C}$ adrenergic receptors.  PTX0451, Maeda I 2014 at 596; PTX0431, Citrome Preclinical Profile 2015 at 1220; PTX0430, Citrome 2016 at 193.

419.    Additional studies into the pharmacology of brexpiprazole further revealed its unique pharmacological profile may produce favorable unexpected results in the clinical setting, which were later confirmed by subsequent clinical trials.  *See, e.g.*, PTX0459, Oosterhof, C., et al., "Acute Effects of Brexpiprazole on Serotonin, Dopamine, and Norepinephrine Systems: An In

EXHIBIT 5

**HIGHLY CONFIDENTIAL**

Vivo Electrophysiologic Characterization," *J. Pharmacology and Experimental Therapeutics* (2014) 351(3):585-95 ("Oosterhof 2014").

420.     As mentioned above, the safety and efficacy of brexpiprazole for the treatment of schizophrenia and the adjunctive treatment of MDD was established in multiple well-designed clinical trials. *See generally, e.g.*, PTX0443, Fleischhacker 2017; PTX0433, Correll 2015; PTX0447, Kane 2015; PTX0472, Thase I 2015; PTX0473, Thase II 2015; ███████████████

████████████████████████████

421.     These and other studies further demonstrate that brexpiprazole has an unexpectedly improved clinical profile compared to aripiprazole and other antipsychotics available for clinical use.  Brexpiprazole improves functioning in both schizophrenia and MDD patients across multiple measures. ████████████████████████████████████

████████████████████████████████████████

█████████████████

422.     In addition to brexpiprazole's unexpected effectiveness, it also has an unexpectedly improved side effect profile.  Specifically, brexpiprazole is a neutral antipsychotic, meaning that it is neither activating nor sedating, both critical improvements compared to other agents.  It also has a very low tendency to cause EPS, weight gain and other metabolic changes, as well as minimal effects on prolactin/sexual dysfunction.

423.     The overall clinical profile of brexpiprazole has a real-world impact on public health costs that have been recognized in the field.  Each of these points is discussed in turn below.

424.     Defendants may attempt to contest unexpected results and industry praise by simply reiterating their positions relating to the other objective indicia.  And, as with their other arguments, Defendants similarly assume opinions as facts and may attempt to use those opinions to argue a

**EXHIBIT 5**

lack of nexus and/or criticize the evidence Plaintiffs rely upon.  Defendants may also attempt to argue that there are no unexpected properties of brexpiprazole that are indicative of non-obviousness.  Here again, Defendants overlook the entirely unique pharmacological and clinical profile of brexpiprazole that results in unexpected results and has garnered industry praise.

1. **Brexpiprazole unexpectedly improved cognitive effects and functioning**

425.    In preclinical studies, brexpiprazole demonstrated pro-cognitive effects whereas aripiprazole did not.  PTX0452, Maeda II 2014.  In the Novel Object Recognition (NOR) test, brexpiprazole fully reversed subPCP-induced impairments with good reproducibility.  PTX0452, Maeda II 2014 at 612; *see* also PTX0452 at 611.  In contrast, at clinically relevant doses of aripiprazole, no significant effect of aripiprazole was detected in the NOR test.  PTX0452, Maeda II 2014 at 612-613.  Brexpiprazole also exhibited significant pro-cognitive activity in the ID-ED test.  PTX0452, Maeda II 2014 at 613.  Specifically, brexpiprazole significantly reversed the subPCP-induced impairment in the ED tasks.  PTX0452, Maeda II 2014 at 612.  Aripiprazole did not alter the PCP-induced impairment.  PTX0452, Maeda II 2014 at 612-613.  Brexpiprazole also significantly increased the number of trials needed to reach criterion in EDR.  PTX0452, Maeda II 2014 at 612-613.  The authors of this study conclude that "the present study suggests that brexpiprazole is a promising novel antipsychotic drug with robust efficacy on positive symptoms and cognitive impairment, with a favorable CNS safety profile in animal models."  PTX0452, Maeda II 2014 at 613.

426.    Although antipsychotics can impair cognition via EPS, sedation or anticholinergic effects, brexpiprazole has not been shown to worsen cognition.  *See generally* PTX0430, Citrome 2016 at 197.  While the authors of this study concluded that there was no "meaningful" worsening in cognitive function for either brexpiprazole or aripiprazole, numerical differences were observed.

213

**EXHIBIT 5**

PTX0430, Citrome 2016 at 199.  In a series of cognitive tests, there was no worsening of cognitive function observed in the brexpiprazole group, whereas the aripiprazole group worsened on the Two-Back Memory Task.  PTX0430, Citrome 2016 at 197.  In addition, a greater improvement was observed in the brexpiprazole group for the One-Back Memory Task, and a numerical decline was observed in the aripiprazole group for the Two-Back Memory Task.  PTX0430, Citrome 2016 at 197.

427.    Brexpiprazole has also demonstrated an unexpectedly improved effect on functioning, which is a key target of treatment and a component of recovery for schizophrenia patients.  Brexpiprazole promotes improved functioning in schizophrenia patients.  For example, brexpiprazole showed improvements on all four functional domains tested:  interpersonal relationships, social acceptability, activities and work skill, whereas aripiprazole showed improvement in only two of these domains.  PTX0430, Citrome 2016 at 199.  The authors of this study concluded that "it is notable that the brexpiprazole group showed significant improvements compared with baseline on interpersonal relationships and social acceptability, whereas the aripiprazole group did not."  PTX0430, Citrome 2016 at 199.  There was almost 50% better functioning in the brexpiprazole group compared to aripiprazole.  Brexpiprazole also showed a reduction in score for the BIS-11, whereas aripiprazole did not.  PTX0430, Citrome 2016 at 199.  As mentioned, improved impulsivity is important for schizophrenia patients because it is associated with worse treatment outcomes and other risky behaviors.  PTX0430, Citrome 2016 at 199.  In this study, there was no worsening in cognitive function, and brexpiprazole was well-tolerated.  PTX0430, Citrome 2016 at 199.  This study represents use in a real world setting where brexpiprazole unexpectedly outperformed aripiprazole.

**EXHIBIT 5**

428.    A recently published *post hoc* analysis reported that a significantly greater proportion of patients receiving brexpiprazole achieved a functional response compared to placebo.  PTX0434, Correll 2022 at e5.  In the maintenance study, brexpiprazole improved functioning during the acute phase and those functional improvements were maintained during the maintenance phase.  PTX0434, Correll 2022 at e5-e6.  In a long-term study, of the 177 patients who received brexpiprazole for 58 weeks, more than 4 in 5 had a functional response and 2 in 5 achieved a functional remission.  PTX0434, Correll 2022 at e5.  The authors concluded that "[t]his finding suggests that continued treatment with brexpiprazole results in improved and sustained functioning over time, and benefits are not limited to an initial/acute improvement."  PTX0434, Correll 2022 at e7.  Brexpiprazole was able to achieve these results while at the same time leading to less side effects, including activating side effects.

429.    Brexpiprazole's functional effects have also been demonstrated in MDD patients in a Phase 3b open-label study in young adults who were in the work or school environment. Weisler 2016.  Improvements in depression were seen starting at week 1 of the study, and this rapid onset of effect was expected to lead to benefits in functioning and work productivity for patients with MDD.  PTX0489, Weisler 2016 at 45.  The study further found that there were marked improvements in patient-rated scales of functioning and consistent improvements were also observed in functional rating scales throughout the study.  PTX0489, Weisler 2016 at 45.  The authors noted that these effects are important and benefit not only the individual patient but also society as a whole, given the huge public health effect of MDD.  PTX0489, Weisler 2016 at 45. The authors further noted that positive effects on function are coupled with a "favorable tolerability and safety profile . . . with adjunctive brexpiprazole treatment, with low occurrences of side effects

**EXHIBIT 5**

that are deleterious for patients' functioning, such as sedation and somnolence, as well as activating side effects such as akathisia and restlessness."  PTX0489, Weisler 2016 at 45.

430.    In sum, brexpiprazole has demonstrated an unexpectedly better profile in cognitive measures and functioning in both schizophrenic and MDD patients.

431.    Brexpiprazole unexpectedly results in improvements in cognitive effects and functioning parameters—two major areas of treatment concern when treating patients with schizophrenia.  Defendants may attempt to dispute brexpiprazole's unexpected benefits in treating cognitive effects by again critiquing the sufficiency of the data Plaintiffs discuss.  However, Defendants fail to provide any evidence to the contrary, and that is because none exists.

432.    First, Defendants may attempt to argue that the PTX0452, Maeda II 2014 publication should, for some unknown reason, be discounted because it was not conclusive.  *See* PTX0452, Maeda, K., et al., "Brexpiprazole II: Antipsychotic-Like and Procognitive Effects of a Novel Serotonin-Dopamine Activity Modulator" *J. Pharmacology and Experimental Therapeutics* (2014) 350(3):605-14 ("Maeda II 2014")).  However, the PTX0452, Maeda II 2014 publication is a pre-clinical study of brexpiprazole, and therefore a POSA would have understood it does not provide clinical evidence but is nevertheless useful.  Therefore, Defendants' potential critique is meaningless and has no impact on Plaintiffs' position that this evidence is supportive of the benefits of brexpiprazole for cognitive functioning.

433.    Moreover, Plaintiffs provided other evidence of later research into the cognitive effects and improved functioning of brexpiprazole, marketed as REXULTI®, and Defendants similarly fail to explain how this information does not support brexpiprazole's unexpected cognitive effects and improved functioning.  Specifically, Defendants fail to explain why the fact that certain studies are not head-to-head or are open-label studies means they allegedly are not

EXHIBIT 5

**HIGHLY CONFIDENTIAL**

supportive of the cognitive effects of brexpiprazole and therefore the non-obviousness of brexpiprazole.  Each clinical study design is meant to provide useful information to clinicians and researchers.  There were open-label studies of brexpiprazole that signaled functional improvement of cognition, where many other antipsychotics, including aripiprazole, on which Defendants may focus, have shown either neutral or even negative effects on cognition.

434.    For example, the fact that the PTX0489, Weisler 2016 study was an open-label study does not negate its findings related to the function of young adults with MDD in a school or work environment.  *See generally* PTX0489, Weisler, R.H., et al., "Brexpiprazole as an adjunctive treatment in young adults with major depressive disorder who are in a school or work environment," *J. Affective Disease* (2016) 204(1):40-47 ("Weisler 2016").  An open-label study means that the patients know what medication they are taking, but it does not mean that the data associated with the trial should be discounted.  To the contrary, PTX0489, Weisler 2016 provides helpful data demonstrating that brexpiprazole improved the lives of the patients in the study long-term, and this data should not be discounted simply because the patients knew they were taking brexpiprazole.  If anything, this study more closely resembles real-world use of brexpiprazole and its benefits.  As pointed out above, the link between cognition and functioning and the importance of functioning as a key treatment goal increases the relevance of these findings.

**EXHIBIT 5**

HIGHLY CONFIDENTIAL

**EXHIBIT 5**

**HIGHLY CONFIDENTIAL**

## EXHIBIT 5

**HIGHLY CONFIDENTIAL**



EXHIBIT 5

**HIGHLY CONFIDENTIAL**

## EXHIBIT 5

HIGHLY CONFIDENTIAL



3.      **Brexpiprazole also has an unexpectedly better side effect profile**

444.    An unexpectedly improved side effect profile for brexpiprazole adds to its beneficial and easy-to-use clinical profile.  As mentioned above, brexpiprazole is well-tolerated and has an extremely low tendency to cause EPS and movement disorders associated with typical antipsychotics.  *See* PTX0472, Thase I 2015 at e7; PTX0473, Thase II 2015 e8; PTX0431, Citrome

EXHIBIT 5

**HIGHLY CONFIDENTIAL**

Preclinical Profile 2015 at 1224-25.  Specifically, one review found that the rate of akathisia in patients treated with brexpiprazole was 9.4%, while the rate of akathisia in aripiprazole was 21.2%, and all EPS-related adverse events were twice as high with aripiprazole than with brexpiprazole (30.3% vs. 14.1%, respectively).  PTX0430, Citrome 2016 at 197-200.  Brexpiprazole is fairly neutral on prolactin levels and sexual functioning.  Additionally, brexpiprazole is also fairly neutral on weight gain and does not significantly impact metabolic parameters, which are key considerations for schizophrenia patients, where diabetes and weight gain are known comorbidities.  PTX0430, Citrome 2016 at 198.

445.    Citrome 2016 states that EPS-related side effects could relate to higher affinity at serotonin 5-HT$_{2A}$, but also states that antagonism of the $\alpha_1$ adrenergic receptors has been implicated in reduced rates of akathisia, and brexpiprazole has more than 10 times higher affinity for the $\alpha_{1b}$ receptor than aripiprazole.  PTX0430, Citrome 2016 at 200 ("Taken together, the lower intrinsic activity at the D$_2$ receptor of brexpiprazole compared with aripiprazole and the unique serotonergic and noradrenergic receptor footprint of brexpiprazole may partly explain the lower rates of EPS-related side effects.").  The observations that higher affinity for $\alpha_{1b}$ reduces akathisia and other EPS-related side effects was an unexpected benefit of brexpiprazole because it was also known in the industry that $\alpha_1$ antagonists could cause peripheral side effects, such as orthostatic hypertension.

446.    Most notable, however, is that brexpiprazole is neither activating—a known disadvantage for aripiprazole—or sedating—a known disadvantage for many of the atypical antipsychotics.  PTX0429, Citrome Activating and Sedating 2017; ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████.

## EXHIBIT 5

In a study that sought to understand the activating and sedating side effects of various antipsychotics, unlike the majority of marketed products, including aripiprazole, brexpiprazole had a low level of both activating and sedating side effects.  PTX0429, Citrome Activating and Sedating 2017.  This leads to a high level of tolerability, which is important for long-term use and patient adherence.

447.    Specifically, looking at multiple sources of data, Citrome calculated the number needed to harm (NNH) for each drug studied and subsequently characterized the agents as predominantly activating, predominantly sedating, similarly activating and sedating or neither activating nor sedating.  PTX0429, Citrome Activating and Sedating 2017 at 145.  In the first group, lurasidone and cariprazine were found to be primarily activating.  PTX0429, Citrome Activating and Sedating 2017 at 145.  Primarily sedating agents included olanzapine, quetiapine, ziprasidone, asenapine and iloperidone.  Similarly activating and sedating included aripiprazole and risperidone.  PTX0429, Citrome Activating and Sedating 2017 at 145.  In the last group, only brexpiprazole and an older atypical antipsychotic, paliperidone, were found to be neither activating nor sedating.  PTX0429, Citrome Activating and Sedating 2017 at 145.

448.    The following charts excerpted from PTX0429, Citrome Activating and Sedating 2017 show brexpiprazole's "middle of the road" profile.  In Figures 1 and 2, attributable risk increase (ARI) and NNH are shown for akathisia in schizophrenia and MDD, respectively.

**EXHIBIT 5**



FIGURE 1. Akathisia (schizophrenia): ARI and NNH versus placebo.



FIGURE 2. Akathisia (major depressive disorder): ARI and NNH versus placebo.

PTX0429, Citrome Activating and Sedating 2017 at 143.

449.    Figures 3 and 4 show the ARI and NNH for somnolence in both schizophrenia and MDD.

225

**EXHIBIT 5**



FIGURE 3. Somnolence (schizophrenia): ARI and NNH versus placebo.



FIGURE 4. Somnolence (major depressive disorder): ARI and NNH versus placebo.

PTX0429, Citrome Activating and Sedating 2017 at 144.

450.    Citrome notes that these side effect tolerability profiles have implications in terms of selecting the optimal antipsychotic for a given patient.  PTX0429, Citrome Activating and Sedating 2017 at 145.  Unlike the vast majority of these agents, brexpiprazole is one of only two drugs that is neither activating nor sedating and that is otherwise well-tolerated.  This neutral

**EXHIBIT 5**

profile is unexpected among this class of compounds that collectively and individually suffer from disadvantageous side effects.

451.   Brexpiprazole's low levels of side effects allow patients to take and tolerate the drug long term.   PTX0488, Watanabe, Y., et al., "Brexpiprazole for the Treatment of Schizophrenia in Adults: An Overview of Its Clinical Efficacy and Safety and a Psychiatrist's Perspective," *Drug Design, Dev. and Therapy* (2020) 14:5559-74 ("Watanabe 2020") at 5572 ("Given that schizophrenia remains a disease presumably requiring lifelong pharmacotherapy, brexpiprazole appears to play a more significant role [in] the treatment of schizophrenia than other antipsychotics."); PTX0487, Ward, K. et al., "Brexpiprazole for the maintenance treatment of adults with schizophrenia: an evidence-based review and place in therapy," *Neuropsychiatric Disease and Treatment* (2019) 2019(15):247-57 ("Ward 2019") at 247, 254-55; PTX0489, Weisler 2016 at 44-45.   As explained in Watanabe 2020, this is particularly important for antipsychotics because the conditions often require life-long treatment.   PTX0488, Watanabe 2020 at 5572. Brexpiprazole's lower levels of adverse events, specifically EPS-related adverse events, provide patients with tolerable, long-term treatment for schizophrenia, many for the first time.

452.   The side effect profile of aripiprazole is not substantially similar to the side effect profile of brexpiprazole.   And compared to aripiprazole, brexpiprazole has an unexpectedly better profile, and not just in degree.   Moreover, brexpiprazole's complex and unique pharmacological profile, which includes binding affinity and functional activity at multiple receptors, leads to its clinical and side effect profile.   It thus has a nexus to the claimed invention.

453.   One of the advantageous and unexpected results of brexpiprazole related to side effects is that it is *neither* activating *nor* sedating.   Defendants' potential arguments that aripiprazole allegedly has low sedative properties does not account for aripiprazole's higher levels

227

**EXHIBIT 5**

of activating side effects compared to brexpiprazole, effects that Defendants acknowledge. Moreover, the only other atypical antipsychotics reported in PTX0429, Citrome Activating and Sedating 2017 to have neither activating nor sedating side effects is paliperidone, which has other drawbacks, including greater weight gain and metabolic dysfunction with paliperidone than with brexpiprazole, much greater prolactin elevation and related sexual adverse effects, as well as a greater tendency to cause neuromotor adverse effects than with brexpiprazole.

454.    Defendants also misunderstand Plaintiffs comments about the ability of patients to take brexpiprazole long-term.  The lower levels of side effects from brexpiprazole allow for a broader portion of the patient population to take REXULTI® long term because, for many of these patients, it is an antipsychotic that does not cause intolerable side effects leading to discontinuation.  The lower levels of both activating and sedating side effects associated with brexpiprazole therefore has the unexpected result of increased tolerability, allowing a significant proportion of patients to stay on it long-term.  This was an unexpected benefit.

### 4.    Brexpiprazole's unexpected clinical profile has real-world implications

455.    The effective and tolerable side effect profile of REXULTI® resulting in patients being able to take REXULTI® for long periods of time also leads to cost savings for the healthcare industry.  For example, one analysis of the cost-effectiveness of brexpiprazole in adults with schizophrenia "suggest[s] that treatment with brexpiprazole may lead to clinical benefits and medical costs saving" and "brexpiprazole offers a cost-effective treatment option."  PTX0419, Aigbogun, M., et al., "Relapse prevention: a cost-effectiveness analysis of brexpiprazole treatment in adult patients with schizophrenia in the USA," *ClinicoEconomics and Outcomes Res.* (2018) 2018(10):443-56 ("Aigbogun 2018") at 451.  Similarly, a separate analysis of costs for major depressive disorder found that while brexpiprazole has higher pharmacy costs, "treatment with

**EXHIBIT 5**

adjunctive brexpiprazole was associated with significantly lower medical costs, particularly hospitalization-associated costs." PTX0471, Seetasith, A., et al., "Real-World Economic Outcomes of Brexpiprazole and Extended-Release Quetiapine Adjunctive Use in Major Depressive Disorder," *ClinicoEconomics and Outcomes Res.* (2019) 2019(11):741-55 ("Seetasith 2019") at 753. This overall impact on the healthcare system cannot be underestimated. Emergency room visits for relapse are extremely costly. And the human cost of relapse is even higher. Accordingly, that brexpiprazole demonstrates a favorable total cost is compelling evidence of its unexpected benefits.

456. REXULTI® was also a 2016 Prix Galien nominee for Best Pharmaceutical Agent. PTX0444, Galien Foundation 2016.

457. In sum, brexpiprazole has demonstrated unexpected clinical benefits over aripiprazole and other antipsychotics available on the market.

458. The unique and unexpected clinical profile of brexpiprazole, marketed as REXULTI®, has real-world benefits that demonstrate its objective value. For example, Plaintiffs refer to various analyses that compare healthcare costs associated with brexpiprazole compared to other antipsychotic treatments. Defendants may attempt to argue that the data Plaintiffs rely upon in this section are cost savings relative to a patient not taking any antipsychotic medication. But the publications that Plaintiffs rely upon make clear that this potential argument by Defendants is incorrect. For example, PTX0419, Aigbogun 2018 states, "This study used a decision-analytic framework to *assess the cost-effectiveness of brexpiprazole vs comparator branded therapies* for reducing relapses and hospitalizations among adults with schizophrenia from a US payer perspective." PTX0419, Aigbogun, M., et al., "Relapse prevention: a cost-effectiveness analysis of brexpiprazole treatment in adult patients with schizophrenia in the USA," *ClinicoEconomics*

**EXHIBIT 5**

*and Outcomes Res.* (2018) 2018(10):443-56 ("Aigbogun 2018") at 443 (emphasis added).

Aigbogun concludes, "This analysis evaluated brexpiprazole treatment for the reduction of

schizophrenia relapses and hospitalizations over a 1-year period *compared to other recently*

*available branded antipsychotics . . . .* Brexpiprazole treatment may lead to clinical benefits and

medical cost savings, and provides a cost-effective treatment option for patients *relatively to other*

*branded second-generation antipsychotics.*" PTX0419, Aigbogun 2018 at 443 (emphasis added).

459.    To the extent that Defendants attempt to argue that the Aigbogun publication should

be afforded less weight because it analyzes costs associated with switching or discontinuation of

therapy, Plaintiffs disagree.  First, as discussed above, it is common for patients with schizophrenia

or MDD to have to discontinue treatment due to side effects or a lack of efficacy.  These costs are

therefore some of the most relevant costs associated with these disorders.  Moreover, the

publication assumes that patients that discontinued treatment due to a relapse of symptoms or

adverse events switched treatments instead of discontinuing treatment all together.  PTX0419,

Aigbogun 2018 at 443.  It is therefore Plaintiffs position that the real-world cost savings associated

with REXULTI® are a result of its novel clinical profile and support the non-obviousness of

brexpiprazole.

460.    Similarly, PTX0471, Seetasith 2019 states that the purpose of this research was to

"compare[] real-world healthcare utilization and costs in patients with MDD *treated with*

*brexpiprazole or extended-release (XR) quetiapine* as adjunctive treatment to [antidepressant

therapy]." PTX0471, Seetasith, A., et al., "Real-World Economic Outcomes of Brexpiprazole and

Extended-Release Quetiapine Adjunctive Use in Major Depressive Disorder," *ClinicoEconomics*

*and Outcomes Res.* (2019) 2019(11):741-55 ("Seetasith 2019") at 741 (emphasis added).  The

publication then concludes, "Significantly lower medical costs were observed in patients with

**EXHIBIT 5**

MDD treated with *brexpiprazole vs quetiapine XR*." PTX0471, Seetasith 2019 at 741 (emphasis added).

461.    Defendants' potential statements that this data is related to cost savings relative to not taking any medication is thus incorrect, and Defendants have failed to provide any reason that this real-world evidence does not support the non-obviousness of brexpiprazole.

### E.    Copying

462.    Evidence of copying also supports a finding of non-obviousness.

463.    Every Defendant in this litigation has sought to harness the benefits of brexpiprazole and its patented formulation by copying it and seeking FDA approval to sell generic brexpiprazole tablets.   Many have done this while already marketing a generic version of aripiprazole.  To me, this strongly suggests that these companies recognize the unexpected benefits of brexpiprazole, discussed above, compared to aripiprazole and other antipsychotics and wish to reap the financial benefits tied to its success in the market.

464.    Many companies have also sought patents on the brexpiprazole compound, processes for producing the brexpiprazole compound and pharmaceutical formulations of the brexpiprazole compound, further evidencing industry copying.

465.    The chart below provides examples of patenting efforts surrounding brexpiprazole in the industry.

| Publication Number | Title | Applicant |
|---|---|---|
| PTX0481, US 2019/0047994 | Anhydrate-Free Polymorphically Pure Micronized Crystalline Brexpiprazole Di-Hydrate for use in Intramuscular Injectable Sustained Release Formulations | Hexal AG |
| PTX0485, WO 2017/134038 | Anhydrate-Free Polymorphically Pure Micronized Crystalline Brexpiprazole Dihydrate for Use in Intramuscular Injectable Sustained Release Formulations | Hexal AG |

231

**EXHIBIT 5**

| | | |
|---|---|---|
| PTX0484, WO 2017/025987 | Process for the Preparation of Brexpiprazole | Mylan Laboratories Ltd. |
| PTX0478, US 2017/0276692 | Methods of Monitoring for Adherence to Brexpiprazole (Rexulti®) Therapy | Ameritox, LLC |
| PTX0482, US 2019/0070123 | Transdermal Preparation | Fujifilm Corporation |
| PTX0477, US 2017/0196855 | Long Acting Injectable Formulations | Abon Pharmaceuticals, LLC |
| PTX0480, US 2018/0369238 | Dopamine Agonists in Treating Alcohol Use Disorders Associated with Dopamine Receptor Activity | MUSC Foundation for Research Development |
| PTX0483, US 2019/0076425 | Methods of Treatment with CYP3A4 Substrate Drugs | Bow River LLC |
| PTX0479, US 2018/0333411 | Methods of Treatment | Bow River LLC |
| PTX440, EP 2,792,359 | Treatment of L-COPA-induced dyskinesia with OPC-14523 or OPC-34712 | Merz Pharma GmbH & Co. KGaA |
| PTX441, EP 3,444,248 | Crystal Form of Brexpiprazole and Preparation Method Therefor | Zhejiang Huahai Pharm. Co. Ltd. & Shanghai Aobo Pharmtech Inc. Ltd. |

The numerous patents related to brexpiprazole and brexpiprazole-containing pharmaceutical formulations shows that others in the industry have observed the benefits of brexpiprazole in treating psychiatric disorders and have sought to copy Otsuka and Lundbeck in commercializing brexpiprazole and brexpiprazole-containing compositions, further supporting the non-obviousness of the asserted patents.

466.    Defendants' may attempt to critique Plaintiffs' copying positions by arguing that copying in the Hatch-Waxman context should not be considered.  However, the fact that Defendants have chosen to pursue generic versions of brexpiprazole illustrates that they see value in brexpiprazole.  Indeed, if aripiprazole and brexpiprazole provided the same efficacy and a substantially similar side effect profile as Defendants allege, there would be no reason to pursue

## EXHIBIT 5

generic brexpiprazole products with aripiprazole, including generic aripiprazole, already in the market.

467.     Accordingly, Defendants' potential position that the benefits of aripiprazole and other prior art compounds are the same as the benefits of brexpiprazole is inconsistent with the Defendants' actions in this case.  Many generic companies market generic versions of aripiprazole and also file for FDA approval to market a generic version of brexpiprazole.  If there were no reason to prescribe brexpiprazole over aripiprazole, there would similarly be no reason to pursue a generic version of brexpiprazole if these companies already market generic aripiprazole. However, these generic companies that market generic aripiprazole are also seeking approval to market generic brexpiprazole, providing evidence that these companies see the unexpected advantages of brexpiprazole.

468.     Furthermore, the evidence that many companies sought to patent aspects related to brexpiprazole is further evidence of copying.  Defendants do not explain why there is allegedly no nexus between the copying demonstrated by these patent publications and the merits of the asserted claims, specifically the embodiments brexpiprazole and REXULTI®.  Plaintiffs reiterate that these patenting efforts show that others have observed the benefits of brexpiprazole in treating psychiatric disorders and have sought to copy brexpiprazole and brexpiprazole-containing compositions, and this evidence further supports the non-obviousness of brexpiprazole.

**EXHIBIT 5**

F.      **Commercial Success**

        1.      **Marketplace Success**

                a.      **Revealed Preference**

469.    In assessing whether a product has been successful, a useful starting point is considering whether the economic decisions and behavior of the participants in the business are consistent with a belief that the product has been a marketplace success.

470.    The foundation of such an inquiry is the fact that a decision to commit, and continue to commit, resources to the development and sale of any product is an economic/financial choice. No party is compelled to pursue or continue such activities, and all parties involved have the option to deploy or reallocate their resources to other, presumably higher-value, endeavors at any time, if such endeavors exist.  In fact, economic theory regarding rational economic decision-making and corporate profit-maximizing behavior suggests that responsible economic decision-makers should allocate resources to activities that are expected to generate the highest net return (*i.e.*, benefits minus costs) that are available, given the opportunities and constraints facing the decision-makers.[35]

                i.      **Plaintiffs**

471.    Plaintiffs have made significant investments to obtain, develop and commercialize Rexulti®.  In 2009, Otsuka began conducting clinical trials for brexpiprazole to test its safety and

---

[35]    The economics literature regards firms as profit maximizing entities that make decisions to maximize profits subject to constraints.  *See*, *e.g.*, PTX0542, Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization,* 2nd Edition, Addison-Wesley (1994), at p. 16.

**EXHIBIT 5**

**HIGHLY CONFIDENTIAL**

efficacy in the adjunctive treatment of MDD.[36]  In 2010, it began clinical trials for the treatment

of schizophrenia.[37]

472.    To gain initial FDA approval, "REXULTI was studied in more than 4,300 subjects

in phase II and III clinical trials, and the approval was supported by four completed placebo-

controlled clinical phase III studies in the now-approved indications – two studies as adjunctive

therapy to antidepressants in MDD and two studies in schizophrenia."[38]

473.    Following Rexulti®'s initial FDA approval in 2015, Otsuka submitted a

supplemental NDA in June 2021 for treatment of schizophrenia in pediatric patients ages 13 to 17

years.[39]  This NDA was approved in December 2021 "based on an extrapolation analysis that used

data from prior studies among adult patients, pharmacokinetic results from adult and pediatric

trials, and six-month data from the ongoing open-label, long-term trial among adolescent patients

with schizophrenia."[40]

474.    ████████████████████████████████████████████████

████████████████████████████████  ███████████████████████

---

[36]    PTX0584,
https://clinicaltrials.gov/ct2/results?cond=&term=Rexulti&cntry=&state=&city=&dist=  (viewed
February 14, 2022).
[37]    PTX0584,
https://clinicaltrials.gov/ct2/results?cond=&term=Rexulti&cntry=&state=&city=&dist=  (viewed
February 14, 2022).
[38]    PTX0864, https://www.otsuka-us.com/discover/fda-approves-otsukalundbecks-rexulti-as-
adjunctive-treatment-for-adults-with-mdd-and-schizophrenia (viewed February 10, 2022).
[39]    PTX0637,
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2021/205422Orig1s007ltr.pdf (viewed
January 31, 2022).
[40]    PTX0865,          https://www.otsuka-us.com/news/otsuka-and-lundbeck-announce-fda-
approval-supplemental-new-drug-application-rexultir (February 10, 2022).
[41]    PTX0934, Jarosz Tab 37. As shown in PTX0934, Jarosz Tab 37, LUBREX00094858
summarizes Lundbeck's promotional expenditures from 2015 to 2021, which correspond to 45
percent of Plaintiffs' total shared promotional expenditures.

### EXHIBIT 5

HIGHLY CONFIDENTIAL



476.    The decisions that have been made by Plaintiffs are consistent with the proposition that Rexulti® has been, and will continue to be, viewed by well-informed parties as a marketplace success.

### ii.    Defendants

477.    As reflected in the current proceeding, Defendants are interested in marketing generic versions of Rexulti®.  In fact, these companies have committed substantial resources to pursuing this opportunity, including not only the cost of submitting an ANDA and developing their generic products, but also the cost of litigating to secure the ability to introduce generic versions of Rexulti®.

478.    The potential pay-off to Defendants from introducing an AB-rated[44] generic version of Rexulti® flows from the fact that a generic manufacturer likely can expect to capture a

---

[42]

[43]

[44]    PTX0837,    https://www.fda.gov/drugs/developmentapprovalprocess/ucm079068.htm (viewed February 10, 2022) (explaining that the FDA rates a drug as "AB" if "a study is submitted that demonstrates bioequivalence" to another approved drug).

236

**EXHIBIT 5**

substantial portion of Rexulti® prescriptions at a discount to the prices charged for Rexulti®, and

still generate substantial profits.[45]

479.    From an economic perspective, the existence (and large number) of companies that

have demonstrated their desire and intent to offer generic versions of Rexulti® is very strong,

though not dispositive, evidence that they believe Rexulti® to be a marketplace success.   In

addition, documents produced by Defendants in this matter indicate their special interest in

brexpiprazole based on their consideration of its sales, sales growth, forecasted performance and/or

assessment of value relative to other potential products.   Plaintiffs will point to documents and

deposition testimony to support these positions.   Also, there has been patenting activity by others

relating to brexpiprazole, further demonstrating others' recognition of the importance of the

brexpiprazole molecule.   Plaintiffs will point to these patenting efforts.

480.    It would make little business sense for Defendants to invest substantial resources

into the development of generic versions of Rexulti®, as well as pursue regulatory approval, engage

in further patenting activities and participate in this litigation, unless they believed that the

underlying product has been, and will continue to be, a marketplace success.   If, in fact, Defendants

did *not* consider Rexulti® to be a successful product, one would not expect them to spend the time,

money and effort required to introduce generic versions, or introduce new patented versions, of

the product into a crowded marketplace.   Defendants' expected returns on generic Rexulti®

considering all their alternative investment opportunities must be positive in order for this decision

to be economically rational.   In addition, Defendants have extensive product portfolios covering a

---

[45]      *See*, *e.g.*, PTX0543, Caves, Richard E., et al., "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," *Brookings Papers on Economic Activity: Microeconomics,* Vol. 22 (1991):1-66, at pp. 44-45; PTX0558, Reiffen, David and Michael R. Ward, "Generic Drug Industry Dynamics," *The Review of Economics and Statistics*, Vol. 87, No. 1 (February 2005): 37-49, at pp. 37-38.

## EXHIBIT 5

wide range of therapeutic areas.  Defendants' decision to pursue generic versions of Rexulti®

makes economic sense only if they believe that this product would yield higher returns relative to

alternative options.

481.    The behavior and decisions of Plaintiffs, Defendants and third parties strongly

suggest that these companies regard Rexulti® as a marketplace success.

### b.      Importance to Otsuka and Lundbeck

482.    Rexulti® is an important contributor to Otsuka's and Lundbeck's product portfolios.

483.    In its 2020 Annual Report, Otsuka Holdings Co., Ltd., the parent company of

Otsuka Pharmaceutical Co., Ltd., noted that its growth drivers included Rexulti® and three other

global products.[46]  For the year ended December 31, 2020, Rexulti® accounted for 24 percent of

Otsuka Holdings Co., Ltd.'s global revenues from these four products.[47]

484.    The Lundbeck 2021 Annual Report noted that Lundbeck's financial performance

in 2022 is "expected to be driven by the continued strong growth" of four products, including

Rexulti®.[48]   For the year ended December 31, 2021, Rexulti® accounted for 17 percent of

Lundbeck's global revenues and 33 percent of Lundbeck's revenues in North America.[49]

### c.      Marketplace Performance

485.    Rexulti® has been successful in the marketplace in both absolute and relative terms.

---

[46]      PTX0896, Otsuka Holdings Co., Ltd. 2020 Integrated Report, at pp. 30, 77.
[47]      24 percent is calculated as 104.6 billion yen / 429.7 billion yen.  *See* PTX0896, Otsuka Holdings Co., Ltd. 2020 Integrated Report, at p. 30.
[48]      PTX0894, Lundbeck 2021 Annual Report, at p. 21.
[49]      17 percent is calculated as 2,849 million DKK / 16,299 million DKK.  33 percent is calculated as 2,725 million DKK / 8,245 million DKK.  *See* PTX0894, Lundbeck 2021 Annual Report, at pp. 16 and 18.

**EXHIBIT 5**

**HIGHLY CONFIDENTIAL**

i.      **Absolute Performance**

486.    According to data produced by Lundbeck, Rexulti®'s net revenues, units, prices and prescriptions since its August 2015 launch show that it has been a success in the marketplace.[50] As described below, U.S. sales of Rexulti® have grown substantially and steadily since its launch in August 2015.

(a)      **Net Revenues**

487.    Rexulti® received FDA approval in July 2015 and launched in the U.S. in August 2015.[51]



---

[50]      Rexulti®'s performance based on the Symphony Health data, described in the next section, shows similar results.

[51]      PTX0632, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/205422Orig1Orig2s000ltr.pdf (January 31, 2022); PTX0864, https://www.otsuka-us.com/discover/fda-approves-otsukalundbecks-rexulti-as-adjunctive-treatment-for-adults-with-mdd-and-schizophrenia (February 10, 2022).

239

**EXHIBIT 5**





## EXHIBIT 5

HIGHLY CONFIDENTIAL



## EXHIBIT 5

HIGHLY CONFIDENTIAL

(c)     Prices

**<u>EXHIBIT 5</u>**

**HIGHLY CONFIDENTIAL**

**(d)** **Prescriptions**





**EXHIBIT 5**

HIGHLY CONFIDENTIAL



494.    In sum, U.S. sales of Rexulti® have grown substantially and steadily since its launch in August 2015, and Rexulti®'s net revenues, units, prices and prescriptions reflect its success in the marketplace.  Generic entry can cause harm to each of these measures—revenues, units, prices and prescriptions—that is difficult to reverse.  The economics literature shows, for instance, that generic pharmaceutical entry almost always leads to an immediate reduction in the sales of the branded equivalent, as prescriptions that would have been written and filled with the branded drug

## EXHIBIT 5

HIGHLY CONFIDENTIAL

are switched to the generic product.[80]  Generic entry typically leads to an immediate impact, with

continued erosion of branded drugs' sales over time,[81] and the effects tend to be magnified with

additional generic time in the marketplace and additional generic entrants.[82]  Many losses

associated with generic entry, including long-term impacts on pricing as well as employment and

R&D impacts, may be exceptionally difficult to quantify with a reasonable degree of economic

certainty.

### (e)      REXULTI® Projections

495.    Pharmaceutical product performance rarely exceeds pre-launch expectations.  A

2014 McKinsey study found that two thirds of drug launches failed to meet initial sales projections,

---

[80]      *See*, *e.g.*, PTX0543, Caves, Richard E., et al., "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," *Brookings Papers on Economic Activity: Microeconomics,* Vol. 22 (1991): 1-66; PTX0538, Aitken, Murray, et al., "The Regulation of Prescription Drug Competition and Market Responses: Patterns in Prices and Sales Following Loss of Exclusivity," *National Bureau of Economic Research Working Paper,* No. 19487 (2013): 1-37; PTX0549, Grabowski, Henry, et al., "Updated Trends in US Brand-Name and Generic Drug Competition," *Journal of Medical Economics,* Vol. 19, No. 9 (2016): 1-9.

[81]      The economics literature shows that brand unit shares generally decline, on average, anywhere from 50 to 90 percent within one year of generic entry and, in some cases, can decline more than 90 percent within the *first six months* after generic entry. *See* PTX0548, Grabowski, Henry, "Are the Economics of Pharmaceutical Research and Development Changing? Productivity, Patents and Political Pressures," *Pharmacoeconomics,* Vol. 22, Suppl. 2 (2004): 15-24; PTX0561, Saha, Atanu, et al., "Generic Competition in the U.S. Pharmaceutical Industry," *International Journal of the Economics of Business,* Vol. 13, No. 1 (2006): 15-38; PTX0565, Silver, Richard, "A Wall Street Perspective on Generics," 2007 EGA Annual Conference, Lehman Brothers (June 14-16, 2007); PTX0546. Danzon, Patricia M. and Michael F. Furukawa, "Cross-National Evidence on Generic Pharmaceuticals: Pharmacy vs. Physician-Driven Markets," *National Bureau of Economic Research Working Paper,* No. 17226 (2011): 1-44, at p. 31; PTX0549, Grabowski, Henry, et al., "Updated Trends in US Brand-Name and Generic Drug Competition," *Journal of Medical Economics,* Vol. 19, No. 9 (2016): 1-9, at p. 8.

[82]      *See*, *e.g.*, PTX0561, Saha, Atanu, et al., "Generic Competition in the US Pharmaceutical Industry," *International Journal of the Economics of Business,* Vol. 13, No. 1 (2006): 15-38; PTX0560, Saha, Atanu, and Heather Roberts, "Pharmaceutical Industry's Changing Market Dynamics," *International Journal of the Economics of Business*, Vol. 27, No. 2 (2020): 159-175.

<u>**EXHIBIT 5**</u>

**HIGHLY CONFIDENTIAL**

and 78 percent of the drugs that failed to meet their first-year projections also failed to meet their second-year projections.[83]

496.    From a practical standpoint, individuals and companies generate projections based on a combination of various factors, considering both internal and external forces, such as macroeconomic performance and broad industry trends.  Thus, for various reasons, projections and assumptions can be, and often are, incorrect, with actual results that deviate widely from initial projections.

497.



---

[83]    PTX0850, https://www.mckinsey.com/~/media/McKinsey/Industries/Healthcare%20Systems%20and%20Services/Our%20Insights/The%20secret%20of%20successful%20drug%20launches/The_secret_of_successful_drug_launches.pdf (viewed February 16, 2022).
[84]



**EXHIBIT 5**



### ii.    Relative Performance

498.    As described further in the sections below, Rexulti® has accounted for a substantial and increasing share of revenues, units and prescriptions in the antipsychotic marketplace in the U.S.

499.    Rexulti® is a branded short-acting, atypical antipsychotic that received FDA approval in 2015.[89] ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

_____

[89]    PTX0901, Jarosz Tab 4.

**EXHIBIT 5**

HIGHLY CONFIDENTIAL

███████████████████████ ██ ███████████████████

████████████████ █ ████████████████████████ ██ These competitors are a subset of all branded short-acting, atypical antipsychotics and launched around the same time as Rexulti®.  It appears that Rexulti® competes most closely with these five branded competitors because they all are short-acting atypical antipsychotics and have faced relatively similar marketplace conditions due to the proximity of their launch dates.[92]

500.    To be conservative, Plaintiffs analyzed Rexulti®'s relative performance from multiple perspectives using data from Symphony Health[93] (a health care consulting firm) and

████████████████████████████
███
████████████████████████████████████████
████████████████████████████████████████

---

[92]      PTX0901, Jarosz Tab 4.

[93]      Symphony Health gathers data from a wide variety of claims resources, including medical, hospital and prescription claims, with data on demographics, point-of-sale prescriptions and institutional invoices.    PTX0619, https://symphonyhealth.com/what-we-do/view-health-data (viewed February 17, 2022).  Symphony Health data commonly are relied upon for research purposes.  *See*, *e.g.*, PTX0550, Hampp, Christian, et al., "Use of Antidiabetic Drugs in the U.S., 2003–2012," *Diabetes Care*, Vol. 37 (2014): 1367-1374; PTX0554, Maron, Martin S., et al., "Occurrence of Clinically Diagnosed Hypertrophic Cardiomyopathy in the United States," *The American Journal of Cardiology*, Vol. 117, No. 15 (2016): 1651-1654; PTX0556, Pinkerton, JoAnn V. and Nanette Santoro, "Compounded Bioidentical Hormone Therapy: Identifying Use Trends and Knowledge Gaps among US Women," *Menopause*, Vol. 22, No. 9 (2015): 926-936; PTX0568, Xu, Jing, et al., "State Naloxone Access Laws are Associated with an Increase in the Number of Naloxone Prescriptions Dispensed in Retail Pharmacies," *Drug and Alcohol Dependence*, Vol. 189 (2018): 37-41; PTX0555, McComsey, Grace A., "Real-World Adherence to Antiretroviral Therapy Among HIV-1 Patients Across the United States," *Advances in Therapy*, Vol. 38 (2021): 4961–4974; PTX0547, Fendrick, A. Mark, et al., "Higher Medication Adherence and Lower Opioid Use Among Individuals with Autoimmune Disease Enrolled in an Adalimumab Patient Support Program in the United States," *Rheumatology and Therapy*, Vol. 8 (2021): 889-901.  Furthermore, a number of investment banks, including J.P. Morgan, BMO, Morgan Stanley and Jeffries have all used Symphony Health data in their analyst coverage.  *See*, *e.g.*, PTX0534, Quigley, James P., et al., "Genmab A/S (GEN DC)," *J.P. Morgan*, September 20, 2017; PTX0533, Nachman, Gary, Nicole Germino, and Ann-Hunter Van Kirk*,* "August Exparel Sales Up From July, but Still Tracking Well Below 3Q Consensus," *BMO Capital Markets*, September 19, 2017; PTX0535, Smith, Thomas J., Andrew S. Berens, and Benjamin J. Adler*,* "Bullish on Intrarosa as

## EXHIBIT 5

**HIGHLY CONFIDENTIAL**

IQVIA,[94] 

From an economic

perspective, Rexulti® appears to compete most closely with this subset of branded short-acting,

atypical antipsychotics.  Nevertheless, Plaintiffs also analyzed Rexulti®'s performance relative to

all short-acting, atypical antipsychotics, including both branded and generic products.[96]  Finally,

Plaintiffs analyzed Rexulti®'s performance relative to all antipsychotics.[97]

---

the Next AMAG Value Driver Following Survey; Initiate OW, $26 PT," *Morgan Stanley*, September 8, 2017; PTX0898, Refinitiv StreetEvents, Edited Transcript Q3 2021 Halozyme Therapeutics Inc Earnings Call, November 2, 2021; PTX0899, Refinitiv StreetEvents, Edited Transcript Q3 2021 Kala Pharmaceuticals Inc Earnings Call, November 15, 2021.

[94]     IQVIA uses "data, technology, advanced analytics, and expertise to help customers drive healthcare forward."  *See* PTX0844, https://www.iqvia.com/about-us (viewed February 17, 2022).

[95]

[96]     This second marketplace basket includes generic and brand aripiprazole, olanzapine and quetiapine.    Around  the  time  of  Rexulti®'s  launch,  competing  FDA-approved  atypical antipsychotic treatments for MDD included aripiprazole, olanzapine and quetiapine.  *See also*, PTX0567, Wang, Sheng-Min, et al., "Second Generation Antipsychotics in the Treatment of Major Depressive Disorder: An Update," *Chonnam Medical Journal*, Vol. 52, No. 3 (2016): 159-172, at p. 160 ("Until recently, only 3 SGAs [second-generation antipsychotics] aripiprazole, quetipaine [sic] XR and olanzapine had a formal US FDA approval in the treatment of MDD. […]  As stated earlier, Brexpiprazole just recently received FDA approval not only for schizophrenia, but also for the treatment of MDD as an adjunctive therapy to antidepressants in July 2015, which is the biggest change since 2013.").

[97]     Comparing Rexulti®'s performance with a much broader set of all antipsychotics will understate its performance relative to a comparison with its key competitors, such as those captured in the first marketplace basket described above.  Many of the antipsychotic therapies are generic, were introduced at very different points in time, have different target populations and/or have

**EXHIBIT 5**

**HIGHLY CONFIDENTIAL**

501.    In all three of these marketplaces, the relative performance data may understate

Rexulti®'s performance relative to certain competitors that have broader indications, such as

Abilify or Seroquel XR.[98]    Moreover, some competitors have different indications (*e.g.*,

schizophrenia and bipolar I disorder, instead of schizophrenia and MDD) that could affect their

performance trajectories relative to Rexulti®.   For example, Latuda and Vraylar each experienced

substantial increases in revenues, units and prescriptions following an expansion of their

indications (in 2013 and 2019, respectively) for treatment of patients with depressive episodes

associated with bipolar I disorder (bipolar depression).[99]

### (a)    Revenues

502.    Estimated U.S. wholesale acquisition cost ("WAC") revenues from Symphony

Health data were utilized to analyze revenues for antipsychotics, which represents the gross

amount (*i.e.*, prior to any rebates, chargebacks or other discounts) a manufacturer receives from

wholesalers.[100]

---

different indications.  *See* PTX0901, Jarosz Tab 4.  This relative analysis, as a result, is much less
informative than the prior two relative analyses.

[98]      PTX0901, Jarosz Tab 4.

[99]      PTX0910, Jarosz Tab 13, PTX0917, Jarosz Tab 20.

[100]     Wholesale acquisition cost revenues are calculated as the price the wholesaler pays the
manufacturer multiplied by the number of pack units multiplied by the package size.  *See*
"Bloomberg Intelligence Symphony Health Monthly Retail Sales Data Releases," at tab 'Data
Metrics and API Codes.'  The Symphony Health data reports higher revenues for Rexulti®

From Q3 2015 to Q3 2021, Rexulti®'s sales totaled approximately $4.9 billion in the Symphony
Health data                                          .  $4.9 billion is calculated as $5.2327 billion -
$0.3588 billion.  *See* PTX0902, Jarosz Tab 5 and PTX090, Jarosz Tab 12.

**EXHIBIT 5**

503.　██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████.  These drugs are comparable to Rexulti® in the sense that they are

branded products that launched around the same time as Rexulti® and therefore face similar

marketplace conditions.  There are five drugs in this comparison set (listed in order of launch as

shown in the Symphony Health data): Seroquel XR, Saphris, Fanapt, Latuda and Vraylar.  As

captured in the data underlying Figure 6, below, Rexulti®'s quarterly share increased from 2.9

percent in Q4 2015, the first full quarter after launch, to 17.2 percent in Q4 2021.[101]

504.　Plaintiffs also analyzed Rexulti®'s relative performance from a product lifecycle

perspective prior to the comparator drugs' loss of exclusivity.  Brands experiencing generic entry

and generics have different business models and trajectories from a branded drug like Rexulti®

that has not yet experienced generic entry.[102]  Therefore, product lifecycle comparisons for

branded drugs *prior* to loss of exclusivity may be most relevant when analyzing Rexulti®'s relative

performance.  For its first full 19 quarters after launch, Rexulti®'s quarterly revenues increased at

a CAGR of 64.8 percent, which falls within the range of the drugs in this comparison set.[103]  During

the same stage in the product lifecycle, the CAGRs of the drugs in this comparison set were:

---

[101]　PTX0919, Jarosz Tab 22.
[102]　*See*, *e.g.*, PTX0549, Grabowski, Henry, et al., "Updated Trends in US Brand-Name and Generic Drug Competition," *Journal of Medical Economics*, Vol. 19, No. 9 (2016), at pp. 1-2 and 8; PTX0561, Saha, Atanu, et al., "Generic Competition in the US Pharmaceutical Industry," *International Journal of the Economics of Business*, Vol. 13, No. 1 (2006), at p. 16.
[103]　Comparing CAGRs for the first full 19 quarters after launch captures nearly 5 years of data for each drug and also roughly corresponds to the 5-year exclusivity period granted by the FDA for NDAs for "products containing chemical entities never previously approved by FDA either alone or in combination." *See* PTX0909, Jarosz Tab 12; PTX0836, https://www.fda.gov/drugs/cder-small-business-industry-assistance-sbia/small-business-assistance-frequently-asked-questions-new-drug-product-exclusivity (viewed February 21, 2022).

**EXHIBIT 5**

**HIGHLY CONFIDENTIAL**

Latuda, 120.8 percent; Vraylar, 113.6 percent; Saphris, 46.4 percent and Fanapt, 42.6 percent.[104]

This calculation for Seroquel XR could not be performed because it launched prior to 2009, the start of the Symphony Health data.[105]

**Figure 6[106]**



---

[104]   PTX0909, Jarosz Tab 12.  Latuda and Vraylar do not have the same indications as Rexulti®. Specifically, Latuda is indicated for "[s]chizophrenia in adults and adolescents (13 to 17 years)," "[d]epressive episode associated with Bipolar I Disorder (bipolar depression) in adults and pediatric patients (10 to 17 years) as monotherapy," and "[d]epressive episode associated with Bipolar I Disorder (bipolar depression) in adults as adjunctive therapy with lithium or valproate." Vraylar is indicated for "[t]reatment of schizophrenia in adults," "[a]cute treatment of manic or mixed episodes associated with bipolar I disorder in adults," and "[t]reatment of depressive episodes associated with bipolar I disorder (bipolar depression) in adults." *See* PTX0664, https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/200603s035lbl.pdf (viewed February 15, 2022); PTX0665, https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/204370s006lbl.pdf (viewed February 15, 2022).

[105]   PTX0909, Jarosz Tab 12; PTX0618, https://psychnews.psychiatryonline.org/doi/10.1176/pn.42.13.0033 (viewed February 24, 2022).

[106]   PTX0920, Jarosz Tab 23.

## EXHIBIT 5

505.    Plaintiffs next considered Rexulti®'s performance relative to all short-acting, atypical antipsychotic medications, including both branded and generic products.  As captured in the data underlying Figure 7, below, Rexulti®'s quarterly share increased from 0.6 percent in Q4 2015 to 5.1 percent in Q4 2021.[107]   From Q4 2015 to Q4 2021, Rexulti®'s CAGR of quarterly revenues (53.3 percent) exceeded that of this overall marketplace excluding Rexulti® (7.4 percent).[108]   From a product lifecycle perspective, Rexulti®'s performance relative to branded drugs that launched after the start of the Symphony Health data (*i.e.*, 2009) is identical to the discussion from above.[109]

### Figure 7[110]



---

[107]    PTX0923, Jarosz Tab 26.
[108]    PTX0909, Jarosz Tab 12.
[109]    PTX0909, Jarosz Tab 12.
[110]    PTX0924, Jarosz Tab 27.

**EXHIBIT 5**

506.   Plaintiffs next considered Rexulti®'s performance relative to all antipsychotic medications.  As described above, this analysis tends to understate Rexulti®'s relative performance because it includes a broader set of drugs than Rexulti®'s key competitors █████ ████████████████████████████████████████████████████████████████████████

Nonetheless, Rexulti®'s share in this marketplace grew over time, increasing from 0.5 percent in Q4 2015 to 4.0 percent in Q4 2021.[111]  In fact, Rexulti®'s CAGR of quarterly revenues from Q4 2015 to Q4 2021 (53.3 percent) exceeded that of the overall marketplace excluding Rexulti® (8.7 percent).[112]  From a product lifecycle perspective, Rexulti®'s performance relative to branded drugs that launched from 2009 onward is identical to the discussion from above, with the addition of a few long-acting treatments that have similar CAGRs to Rexulti®.[113]

### (b)   Units

507.   Drugs have differences in formulations and dosages, which make it challenging to directly compare unit levels and shares across drugs.  However, it can be helpful to analyze changes in units over time, as such trends can provide insight into the drugs' varying levels of acceptance in the marketplace.

508.   ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  For its first full 19 quarters after launch, Rexulti®'s quarterly units increased at a CAGR of 55.1 percent, which falls within the range of the drugs in this comparison

---

[111]   PTX0927, Jarosz Tab 30.

[112]   PTX0909, Jarosz Tab 12.

[113]   PTX0909, Jarosz Tab 12.  For its first full 19 quarters after launch, Rexulti®'s quarterly revenues increased at a CAGR of 64.8 percent, which is within the range of CAGRs for long-acting treatments.  Specifically, during the same stage in the product lifecycle, the CAGRs of the branded long-acting treatments that launched from 2009 onward were: Invega Sustenna, 83.8 percent; Abilify Maintena, 105.9 percent; Invega Trinza, 64.4 percent and Aristada, 73.9 percent.

**EXHIBIT 5**

set.[114]  During the same stage in the product lifecycle, the CAGRs of the drugs in this comparison set were:  Latuda, 87.0 percent; Vraylar, 103.7 percent; Saphris, 33.7 percent; Fanapt, 25.5 percent.[115]  Plaintiffs could not perform this calculation for Seroquel XR because it launched prior to 2009, the start of the Symphony Health data.[116]

509.    Plaintiffs next considered Rexulti®'s performance relative to all short-acting, atypical antipsychotic medications.  From Q4 2015 to Q4 2021, Rexulti®'s CAGR of quarterly units (43.9 percent) exceeded that of this overall marketplace excluding Rexulti® (5.3 percent).[117]  From a product lifecycle perspective, Rexulti®'s performance relative to branded drugs that launched from 2009 onward is identical to the discussion from above.[118]

510.    Plaintiffs next considered Rexulti®'s performance relative to all antipsychotics.  Despite competing in a highly crowded marketplace, Rexulti®'s units sold have increased over time as discussed above and at a higher CAGR (43.9 percent) than the overall marketplace excluding Rexulti® (4.3 percent).[119]  From a product lifecycle perspective, Rexulti®'s performance relative to branded drugs that launched from 2009 onward is identical to the discussion from above, with the addition of a few long-acting treatments that have similar CAGRs to Rexulti®.[120]

---

[114]    PTX0912, Jarosz Tab 15.
[115]    PTX0912, Jarosz Tab 15.
[116]    PTX0912, Jarosz Tab 15;
PTX0618, https://psychnews.psychiatryonline.org/doi/10.1176/pn.42.13.0033 (viewed February 24, 2022).
[117]    PTX0912, Jarosz Tab 15.
[118]    PTX0912, Jarosz Tab 15.
[119]    PTX0912, Jarosz Tab 15.
[120]    PTX0912, Jarosz Tab 15.  For its first full 19 quarters after launch, Rexulti®'s quarterly units increased at a CAGR of 55.1 percent.  During the same stage in the product lifecycle, the CAGRs of the branded long-acting treatments that launched from 2009 onward were: Invega Sustenna, 75.1 percent; Abilify Maintena, 91.0 percent; Invega Trinza, 53.6 percent and Aristada, 61.6 percent.

255

**EXHIBIT 5**

**HIGHLY CONFIDENTIAL**

(c)     **Prices**

511.     To analyze prices, Plaintiffs divided U.S. wholesale acquisition cost revenues by units to estimate wholesale acquisition cost per unit (or WAC). It is difficult to directly compare WAC across drugs because WAC is calculated based on units, which reflect differences in drug formulations and dosages.  However, it can be helpful to compare WAC for drugs with similar dosage frequency and units per dose, and to compare changes in WAC over time across drugs.

512.     ████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████  This focuses on the subset of the antipsychotics that, like Rexulti®, are indicated to be dosed once daily, are available in tablet form, and are sold in a dosage strength that falls within the FDA-approved range for recommended daily maintenance dosage of that drug. Simplifying assumption were made that one unit is equivalent to one daily dose for Rexulti®, Latuda, Seroquel XR and Vraylar.[121]  For the Q1 2009 to Q4 2021 period, Rexulti®'s average

---

[121]     Specifically, Rexulti®'s recommended daily dosage is between 2 mg to 4 mg, and it is sold in 2 mg, 3 mg and 4 mg dosage strengths.  Latuda's recommended daily dosage is between 20 mg to 160 mg, and it is sold in 20 mg, 40 mg, 60 mg, 80 mg and 120 mg dosage strengths.  Seroquel XR's recommended daily dosage is between 150 mg to 800 mg, and it is sold in 150 mg, 200 mg, 300 mg and 400 mg dosage strengths.  Vraylar's recommended daily dosage is between 1.5 mg to 6 mg, and it is sold in 1.5 mg, 3 mg, 4.5 mg and 6 mg dosage strengths.  Saphris and Fanapt are dosed twice daily and are not included in the above comparison.  However, assuming that a patient takes two units (tablets) of Saphris or Fanapt versus one unit (tablet) of Rexulti® per day, then the estimated daily WAC (based on, *e.g.*, 2021 Q4 WAC per unit) of Rexulti® ($38.50) would be similar to Saphris ($19.97 x 2 = $39.94) and lower than Fanapt ($37.08 x 2 = $74.16, the highest estimated daily WAC of the six branded short-acting, atypical antipsychotic medications in this marketplace                    basket).                    *See* PTX0683, https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/205422s007lbl.pdf (January             31,             2022);             PTX0664, https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/200603s035lbl.pdf (February   15, 2022);   PTX0845,   https://www.latuda.com/   (viewed   February   15,   2022); PTX0687, https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/022047s046lbl.pdf (February                    15,                    2022); PTX0665, https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/204370s006lbl.pdf

**EXHIBIT 5**

quarterly WAC ($34.21) is comparable to Latuda ($34.78) and Vraylar ($37.57) and higher than Seroquel XR ($12.08).[122]  In addition, for its first full 19 quarters after launch, Rexulti®'s quarterly price increased at a CAGR of 6.2 percent, which falls within the range of the comparator drugs. During the same stage in the product lifecycle, Latuda's and Vraylar's quarterly price increased at a CAGR of 18.1 percent and 4.9 percent, respectively.[123]  Plaintiffs could not perform this calculation for Seroquel XR because it launched prior to 2009, the start of the Symphony Health data.[124]

513.     Plaintiffs next considered Rexulti®'s prices relative to all short-acting, atypical antipsychotic medications.  From a product lifecycle perspective, Rexulti®'s performance relative to branded drugs that launched from 2009 onward is identical to the discussion from above.[125]

514.     Plaintiffs next considered Rexulti®'s prices relative to all antipsychotics.  When limiting to branded antipsychotics with more than $1 billion in total revenues for the Q1 2009 to Q4 2021 period, Rexulti®'s average WAC ($34.21) is on the high end of the short-acting antipsychotics (which ranges from $6.23 to $37.57) but lower than the long-acting antipsychotics (which ranges from $513.13 to $2,574.20).[126]  However, short-acting treatments like Rexulti® are administered more frequently than long-acting treatments, and this difference in administration

---

(February                                          15,                                          2022); PTX0656, https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/022117s022lbl.pdf (February                                          15,                                          2022); PTX0657, https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/022192s018s021lbl.pdf (February 15, 2022); PTX0915, Jarosz Tab 18.
[122]      PTX0915, Jarosz Tab 18.
[123]      PTX0915, Jarosz Tab 18.
[124]      PTX0915, Jarosz Tab 18; PTX0618, https://psychnews.psychiatryonline.org/doi/10.1176/pn.42.13.0033  (viewed  February 24, 2022).
[125]      PTX0915, Jarosz Tab 18.
[126]      PTX0915, Jarosz Tab 18.

**EXHIBIT 5**

**HIGHLY CONFIDENTIAL**

interval is not accounted for in a calculation of price that simply divides wholesale acquisition cost revenues by units.[127]   From a product lifecycle perspective, Rexulti®'s performance relative to branded drugs that launched from 2009 onward is identical to the discussion from above, with the addition of a few long-acting treatments that have similar CAGRs to Rexulti®.[128]

<p align="center">(d)   <b>Prescriptions</b></p>

515.    As a complement to the unit analyses, Plaintiffs also compared total prescriptions for Rexulti® to its competitors using both the Symphony Health and IQVIA data.   Total prescriptions provide a useful comparison as they normalize for differences in formulations and dosages across drugs.

516.      As captured in the data underlying

Figure 8, below, Rexulti®'s quarterly share of total prescriptions increased from 3.0 percent in Q4 2015 to 18.2 percent in Q4 2021.[129]  For its first full 19 quarters after launch, Rexulti®'s quarterly units increased at a CAGR of 53.6 percent, which falls within the range of the drugs in this comparison set.[130]  During the same stage in the product lifecycle, the CAGRs of the drugs in this comparison set were: Latuda, 94.0 percent; Vraylar, 100.6 percent; Saphris, 37.6 percent and

---

[127]    *See*, *e.g.*, PTX0564, Scarff, Jonathan R., and David A Casey, "Newer Oral Atypical Antipsychotic Agents: A Review," *Pharmacy and Therapeutics*, Vol. 36, No. 12 (2011): 832-838, at p. 836; PTX0882, https://www.webmd.com/schizophrenia/schizophrenia-long-lasting-drugs (viewed February 14, 2022).

[128]    PTX0915, Jarosz Tab 18.  For its first full 19 quarters after launch, Rexulti®'s quarterly price increased at a CAGR of 6.2 percent.  During the same stage in the product lifecycle, the CAGRs of the branded long-acting treatments that launched from 2009 onward were: Invega Sustenna, 5.0 percent; Abilify Maintena, 7.8 percent; Invega Trinza, 7.1 percent; and Aristada, 7.6 percent.

[129]    PTX0921, Jarosz Tab 24.

[130]    PTX0916, Jarosz Tab 19.

<u>**EXHIBIT 5**</u>

**HIGHLY CONFIDENTIAL**

Fanapt, 25.7 percent.[131]  Plaintiffs could not perform this calculation for Seroquel XR because it launched prior to 2009, the start of the Symphony Health data.[132]

**Figure 8**[133]



517. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉



---

[131]     PTX0916, Jarosz Tab 19.

[132]     PTX0916, Jarosz Tab 19;
PTX0618, https://psychnews.psychiatryonline.org/doi/10.1176/pn.42.13.0033  (viewed  February 24, 2022).

[133]     PTX0922, Jarosz Tab 25.

[134]     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

**<u>EXHIBIT 5</u>**

**HIGHLY CONFIDENTIAL**



519.    Plaintiffs next considered Rexulti®'s performance relative to all short-acting, atypical antipsychotic medications using the Symphony Health data.  As captured in the data underlying Figure 10, below, Rexulti®'s quarterly share of total prescriptions increased from 0.3



## EXHIBIT 5

percent in Q4 2015 to 1.7 percent in Q4 2021.[137]  From Q4 2015 to Q4 2021, Rexulti®'s CAGR of quarterly total prescriptions (42.4 percent) exceeded that of the overall marketplace excluding Rexulti® (7.1 percent).[138]  In addition, Rexulti® continued to grow even with the entry of generic aripiprazole in Q2 2015.  Specifically, from Q4 2015 to Q4 2021, the CAGR of quarterly total prescriptions was 42.4 percent for Rexulti® compared with 8.6 percent for the aripiprazole molecule (including both the brand and the generic).[139]  From a product lifecycle perspective, Rexulti®'s performance relative to branded drugs that launched from 2009 onward is identical to the discussion from above.[140]

---

[137]    PTX0925, Jarosz Tab 28.
[138]    PTX0916, Jarosz Tab 19.
[139]    8.6 percent is calculated as $(((11{,}688 + 3{,}334{,}705) / (545{,}245 + 1{,}491{,}627))$ ^ $(1 / 6$ years)) $- 1$.  PTX0916, Jarosz Tab 19.
[140]    PTX0916, Jarosz Tab 19.

**EXHIBIT 5**



**Figure 10**[141]



520. Finally, Plaintiffs considered Rexulti®'s performance relative to all antipsychotics using the Symphony Health data. Rexulti®'s quarterly total prescription share increased from 0.3 percent in Q4 2015 to 1.5 percent in Q4 2021.[142] In addition, from Q4 2015 to Q4 2021, Rexulti®'s total prescriptions increased at a higher CAGR (42.4 percent) than the overall marketplace excluding Rexulti® (6.8 percent).[143] From a product lifecycle perspective, Rexulti®'s performance relative to branded drugs that launched from 2009 onward is identical to the discussion from above, with the addition of a few long-acting treatments that have similar CAGRs to Rexulti®.[144]

---

141    PTX0926, Jarosz Tab 29.
142    PTX0928, Jarosz Tab 31.
143    PTX0916, Jarosz Tab 19.
144    PTX0916, Jarosz Tab 19.  For its first full 19 quarters after launch, Rexulti®'s quarterly total prescriptions increased at a CAGR of 53.6 percent.  During the same stage in the product lifecycle, the CAGRs of the branded long-acting treatments that launched from 2009 onward were: Invega Sustenna, 77.2 percent; Abilify Maintena, 106.6 percent; Invega Trinza, 67.1 percent; and Aristada, 59.1 percent.

**EXHIBIT 5**

HIGHLY CONFIDENTIAL

521.



However, Seroquel XR has a broader indication than Rexulti®—Seroquel XR is not only indicated for schizophrenia and adjunctive treatment of MDD, but also for "[b]ipolar I disorder, manic, or mixed episodes" and "[b]ipolar disorder, depressive episodes."[147]

---

[147]    PTX0687, https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/022047s046lbl.pdf    (viewed February 15, 2022).

**EXHIBIT 5**



(e)     **Third-Party Perceptions**

522.    Third parties have noted and commented upon Rexulti®'s success.  In 2020, a

Pharma Japan article stated that "Otsuka Holdings' half-year pharma sales grew 7.6% year on year

thanks to buoyant revenues from four global brands including the antipsychotic agents Abilify

Maintena (aripiprazole) and Rexulti/Rxulti (brexpiprazole)."[150]  In addition, research articles have

highlighted Rexulti®'s success in lowering overall costs to patients and the healthcare system.  A

2018 research article evaluated brexpiprazole treatment in patients with schizophrenia and found

---

[150]     PTX0617, https://pj.jiho.jp/article/242676 (viewed February 18, 2022).

<u>**EXHIBIT 5**</u>

**HIGHLY CONFIDENTIAL**

that "[b]rexipiprazole treatment may lead to clinical benefits and medical cost savings, and provides a cost-effective treatment option for patients relative to other branded second-generation antipsychotics."[151] Similarly, a 2019 research article evaluated brexpiprazole treatment in patients with MDD and concluded, "Significantly lower medical costs were observed in patients with MDD treated with brexpiprazole vs quetiapine XR."[152]

### d.  Barriers to Adoption

523.  Rexulti® has succeeded in the marketplace despite facing several barriers to adoption.



---

[151]  PTX0419, Aigbogun, Myrlene S., et al., "Relapse Prevention: A Cost-Effectiveness Analysis of Brexpiprazole Treatment in Adult Patients with Schizophrenia in the USA," *ClinicoEconomics and Outcomes Research,* No. 10 (2018): 443-456, at 443.

[152]  PTX0471, BREX02073690-704, at 690.

[153]

[154]

PTX0585, https://clinicaltrials.gov/ct2/show/NCT02600494 (viewed February 14, 2022); PTX0825, https://www.caplytahcp.com/ (viewed February 14, 2022).

[155]  PTX0630, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/202101Orig1s000ltr.pdf (viewed March 4, 2022).

[156]  PTX0632, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/205422Orig1Orig2s000ltr.pdf (viewed January 31, 2022).

[157]

**EXHIBIT 5**

HIGHLY CONFIDENTIAL

e.      **Clinical Importance of the Patented Inventions**

524.    The benefits of pharmaceuticals are evaluated by patients and intermediaries.  One

important intermediary is the prescribing physician.[158]  Physicians consider attributes such as the

efficacy, safety and side effects of treatments when making their prescribing decisions, as well as

how the unique combination of those attributes for a given drug may address a particular patient's

needs.[159] ███████████████████████████████████████████

███████████████████████████████████ Moreover, physicians consider

the likelihood that patients will be willing and able to comply with the prescribed course of

treatment when making their prescribing decisions.[161]

525.    ████████████ ██ █████████████████████████

█████████████ ████ ███ █████████████ █ █████████████████

███████████████████████████████████████████

███████████████████████████████████████ █

---

[158]      *See* PTX0557, Pollock, Madelyn, Oralia V. Bazaldua and Alison E. Dobbie, "Appropriate prescribing of medications: an eight-step approach," *American Family Physician*, Vol. 75, No. 2 (2007): 231-236.

[159]      *See*, *e.g.*, PTX0557, Pollock, Madelyn, Oralia V. Bazaldua and Alison E. Dobbie, "Appropriate prescribing of medications: an eight-step approach," *American Family Physician*, Vol. 75, No. 2 (2007): 231-236. ████████████████████████████████.

[161]      *See* PTX0557, Pollock, Madelyn, Oralia V. Bazaldua and Alison E. Dobbie, "Appropriate prescribing of medications: an eight-step approach," *American Family Physician,* Vol. 75, No. 2 (2007): 231-236.

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

**EXHIBIT 5**



Further, those relative advantages flow from the brexpiprazole molecule.

526. ███████████████████████████████████████

███████████████████████████ Patient adherence is critical for treatment of MDD and schizophrenia.

527. Clinical studies of Rexulti® are consistent with the notion that Rexulti®'s efficacy, tolerability/safety profile and convenience are important for its success in the marketplace, especially for patients seeking an efficacious medication that minimizes the risk of both activating and sedating side effects. Phase 3 clinical studies have shown that adjunctive brexpiprazole therapy demonstrated efficacy and was well tolerated in patients with MDD and inadequate response to their existing antidepressant treatment.[166] Furthermore, a 2016 research study noted, "Although multiple treatment options currently exist for MDD, most patients with MDD do not achieve an adequate response or remission . . . . The serotonin-dopamine activity modulator, brexpiprazole, has demonstrated efficacy as an adjunctive treatment in patients with MDD with an inadequate response to treatment . . . . [Brexpiprazole's] unique pharmacological profile also suggests a low potential for activating or sedating adverse events . . . that may benefit patients who



[166]  PTX0473, BREX01600027-041; PTX0472, BREX01600042-058.

**EXHIBIT 5**

are working or in school."[167]  The same study found that brexpiprazole treatment resulted in

improvements in work/school functioning, indicating that brexpiprazole may be especially helpful

for young adults who are working or studying.[168]

528.   Numerous studies also have established the efficacy, tolerability, safety and

convenience of Rexulti® for the treatment of schizophrenia, finding that Rexulti® does not exhibit

significant rates of important adverse events (*e.g.*, akathisia, sedation) that are seen with other

antipsychotics and that Rexulti® is an efficacious and safe/tolerable option for long-term

maintenance treatment.[169]  A recently-published overview article of pooled/meta-analyses and

multiple short- and long-term clinical trials involving patients with schizophrenia concluded,

"while numerous studies show that an effective antipsychotic should be continued indefinitely to

prevent relapses or worsening, many patients appear to have difficulty remaining on any drug thus

initiated . . . . [Brexpiprazole] is potentially better suited for long-term use, with decreased risk of

extrapyramidal side effects, hyperprolactinemia, weight gain, psychosis, insomnia, akathisia,

nausea/vomiting, or restlessness, thus potentially facilitating patients' reintegration into society . .

---

[167]    PTX0489, BREX02073741-748, at 742.
[168]    PTX0489, BREX02073741-748, at 741.
[169]    PTX1015, BREX02073778-783, at 778 ("Second-generation antipsychotics have demonstrated efficacy for patients with schizophrenia but are associated with wide-ranging side effects. . . .  Collectively, these studies suggest that brexpiprazole was well tolerated, with a favorable safety profile that does not exhibit significant rates of important adverse events that can be seen with existing antipsychotics (akathisia, sedation, weight gain, or QTc prolongation), and therefore may provide a useful treatment option for patients with schizophrenia."); PTX0453, BREX02073705-717, at 705; PTX0487, BREX02073679-689, at 679 ("It can be difficult for patients with schizophrenia to find antipsychotic medications that work well for them and that cause few side effects.  Brexpiprazole is a newer antipsychotic that has been shown to be a safe and effective long-term medication for the treatment of schizophrenia.  Based on side-effect data from research studies, brexpiprazole may be particularly beneficial for patients who have struggled with restlessness or akathisia during past medication trials or those who are looking for an alternative medication that is not highly sedating."); PTX0430, LUBREX00075197-206, at 197 ("Brexpiprazole was well tolerated and the incidence of akathisia was lower in patients treated with brexpiprazole . . . than aripiprazole").

<u>**EXHIBIT 5**</u>

**HIGHLY CONFIDENTIAL**

. .  It is also suggested in both short- and long-term studies that brexpiprazole offers a favorable

safety and tolerability profile."[170]

529.    Many documents illustrate the importance of the patented features that resulted in

an improved combination of efficacy, side effects, tolerability and long-term use relative to

competitors and contributed to the marketplace success of Rexulti®, including Plaintiffs' pre-

launch goals, market research and marketing materials, as well as third-party perceptions.

**i.       Pre-Launch Goals**



---

[170]      PTX0488, BREX02073645-660, at 645.

**EXHIBIT 5**

HIGHLY CONFIDENTIAL

270

## <u>EXHIBIT 5</u>

**HIGHLY CONFIDENTIAL**



### ii.    Market Research

**EXHIBIT 5**

HIGHLY CONFIDENTIAL

**EXHIBIT 5**



**EXHIBIT 5**

HIGHLY CONFIDENTIAL

**EXHIBIT 5**

HIGHLY CONFIDENTIAL



### EXHIBIT 5

HIGHLY CONFIDENTIAL





## EXHIBIT 5

HIGHLY CONFIDENTIAL



**EXHIBIT 5**



**EXHIBIT 5**

HIGHLY CONFIDENTIAL



542. Taken together, Plaintiffs' market research confirms the importance of Rexulti®'s improved combination of efficacy, tolerability/safety profile and long-term use relative to competitors.

### iii.    Marketing Materials

543. The patented features also play an important role in Plaintiffs' marketing strategy for Rexulti® and are highlighted in sales and promotional materials for the product. Because the purpose of marketing is to emphasize features that are important to consumers and thereby drive sales, Plaintiffs' decision to highlight the patented features is evidence of the contribution of these features to Rexulti®'s marketplace success.

544. Specifically, Plaintiffs' marketing materials confirm the importance of Rexulti®'s improved tolerability/safety, efficacy and convenience relative to competitors. In seeking to launch successfully in a crowded marketplace, it would have been especially important to describe differentiating features such as Rexulti®'s tolerability, including its low propensity for inducing activating and sedating side effects.

545.



## <u>EXHIBIT 5</u>

**HIGHLY CONFIDENTIAL**



**EXHIBIT 5**



546.   Many marketing materials also emphasized Rexulti®'s improved combination of efficacy and tolerability/safety relative to competitors.

## EXHIBIT 5

HIGHLY CONFIDENTIAL



## EXHIBIT 5

HIGHLY CONFIDENTIAL





## EXHIBIT 5

HIGHLY CONFIDENTIAL



**EXHIBIT 5**

**HIGHLY CONFIDENTIAL**



551.    Consistent  with  strategies  expressed  in  the  marketing  materials,  Rexulti®'s

healthcare provider-facing website highlights the patented benefits.[228]  For the treatment of MDD,



[228]    PTX0874, https://www.rexultihcp.com/mdd (viewed March 3, 2022).

**EXHIBIT 5**

for example, the website provides information on efficacy (Figure 22), and the combination of safety, tolerability, and long-term use (Figure 23).  For the treatment of schizophrenia, the website states that Rexulti® "may provide a combination of efficacy and safety to help reach treatment goals" (Figure 24).

**Figure 22[229]**
**Rexulti®'s Healthcare Provider-Facing Website**
**MDD**
**Efficacy**



---

[229]    PTX0875, https://www.rexultihcp.com/mdd/efficacy (viewed February 21, 2022).

**EXHIBIT 5**

**Figure 23**[230]
**Rexulti®'s Healthcare Provider-Facing Website**
**MDD**
**Safety, Tolerability, and Long-term Use**



**REXULTI® (brexpiprazole) + antidepressants: few discontinuations due to adverse reactions over 6 weeks across all doses**

Discontinuation rates for antidepressant treatment + REXULTI vs antidepressant treatment + placebo

3% ADT + REXULTI (n=643)

1% ADT + Placebo (n=411)

Discontinuations due to most common adverse events

|  | ADT + REXULTI (all doses) (n=643) | ADT + Placebo (n=411) |
|---|---|---|
| Due to akathisia[2] | 0.9% | 0% |
| Due to weight increased[3] | 0% | 0% |

---

[230]    PTX0876, https://www.rexultihcp.com/mdd/safety (viewed February 25, 2022).

## EXHIBIT 5

**Figure 24[231]**
**Rexulti®'s Healthcare Provider-Facing Website**
**Schizophrenia**



#### iv.      Third-Party Perceptions

552.    Third parties have highlighted the importance of the patented benefits for Rexulti®

to differentiate itself from other antipsychotic drugs and succeed in the marketplace.

553.    For example, PMLive, a pharmaceutical news outlet, stated that Rexulti® "ha[d]

been tipped to become a blockbuster" and that its "eventual sales performance is expected to hinge

on how successfully Lundbeck and Otsuka can differentiate the new drug from Abilify."[232]

---

[231]      PTX0877, https://www.rexultihcp.com/sz (viewed February 25, 2022).

[232]      PTX0867, https://www.pmlive.com/pharma_news/allergan_and_gedeon_finally_get_antipsychotic_green_light_826171 (viewed      February      21,      2022);      PTX0868, https://www.pmlive.com/pharma_news/lundbeck_and_otsukas_rexulti_set_for_august_launch_in_us_778113 (viewed February 25, 2022).

**EXHIBIT 5**

Furthermore, PMLive recognized that Plaintiffs "positioned [Rexulti®] as having a better side effect profile than other antipsychotics,"[233] to allow Rexulti® to capture "the space between the antipsychotic drugs such as aripiprazole that have activating side effects - such as agitation and insomnia - and sedating drugs such as quetiapine."[234]

554.    In addition, in 2016, the Galien Foundation nominated Rexulti® for the Prix Galien USA 2016 Award for "Best Pharmaceutical Agent."[235]   Generally, the Prix Galien Award is "considered as the industry's equivalent of the Nobel prize and the highest accolade for pharmaceutical research and development."[236]   The qualification requirements for nomination to the Prix Galien USA 2016 Award included FDA approval within the previous five years and "demonstrat[ion] [of] tremendous potential to impact human health."[237]   Importantly, the nomination committee did not consider "sales data […] in their award nominee selection; only science and health impact," which could include product characteristics such as efficacy, side effects, and tolerability.[238]

### f.    Role of Pricing and Promotion

555.    The test for commercial success does not require that the patented benefits be the only reason for the product's success.   Instead, the patented benefits must be motivating (or important) factors.   Accordingly, the existence of other demand drivers does not negate a showing

---

[233]    PTX0867, https://www.pmlive.com/pharma_news/allergan_and_gedeon_finally_get_antipsychotic_green_light_826171 (viewed February 21, 2022).
[234]    PTX0868, https://www.pmlive.com/pharma_news/lundbeck_and_otsukas_rexulti_set_for_august_launch_in_us_778113 (viewed February 25, 2022).
[235]    PTX0444, BREX02053576-579.
[236]    PTX0839, https://www.galienfoundation.org/index.php/prix-galien/ (viewed February 21, 2022).
[237]    PTX0444, BREX02053576-579, at 576.
[238]    PTX0444, BREX02053576-579, at 576.

**EXHIBIT 5**

of commercial success. This makes eminent economic sense. Demand for a product, pharmaceutical or not, is driven by a host of factors, not just one.[239]

556. The pricing and marketing of Rexulti® matter. But they are not the primary drivers, to the exclusion of the patented benefits, of the marketplace success experienced by Rexulti®.

### i. Overview

557. The type and extent of advertising for any product or service varies depending on the nature of the promoted goods and/or services. Advertising can be either informative or persuasive. Informative advertising notifies consumers of a product's existence and its characteristics, while persuasive advertising seeks to create what economists refer to as "spurious product differentiation."[240] Research on pharmaceutical promotion has found that pharmaceutical promotion is primarily informative with respect to choices among differentiated drugs (*e.g.*, different chemical products), but it is persuasive with respect to undifferentiated drugs.[241]

558. These findings are consistent with the notion that prescription drugs are "experience goods" that must be tried in order to assess the quality of the product. Promotion for experience goods seeks to inform customers of the product's existence and to encourage them to try the product, but following trial, the physician's and consumer's own experience with the product will dictate future consumption decisions.

559. In other words, the goal of promotion in the pharmaceutical industry is to encourage physicians and patients to try a drug in order to experience the drug first-hand. Patients and

---

[239]   *See*, *e.g.*, PTX0562, Samuelson and Nordhaus (2001), at p. 49.
[240]   PTX0539, Bagwell, Kyle, "The Economic Analysis of Advertising," Discussion Paper No.: 0506-01, Department of Economics, Columbia University (August 2005): 1-176, at pp. 3-4.
[241]   PTX0544, Ching, Andrew and Masakazu Ishihara, "Measuring the Informative and Persuasive Roles of Detailing on Prescribing Decisions," *Management Science*, Vol. 58, No. 7 (2012): 1374-1387, at p. 1374.

## EXHIBIT 5

**HIGHLY CONFIDENTIAL**

prescribers must be made aware of the existence and benefits of a drug's advantages, and pharmaceutical promotion fulfills this role

### ii.     Pricing

560.     As a general matter, low net prices for a branded (or any) drug encourage usage of that drug.  Here, low pricing does not appear to be an advantage for Rexulti[®].  Data from Symphony Health indicate that Rexulti[®]'s WAC price is relatively high when considered from multiple perspectives.[242]  For example, for the Q1 2009 to Q4 2021 period, Rexulti[®]'s average quarterly WAC ($34.21) was comparable to Latuda ($34.78) and Vraylar ($37.57) and higher than Seroquel XR ($12.08).[243]



561.     In addition to relatively high WAC prices, Rexulti[®]'s discounts appear to be comparable to (and, if anything, smaller than) the discounts typically encountered in the pharmaceutical industry.

In

---

[242]     WAC prices do not account for rebates, discounts or chargebacks, while net prices do.

[243]     See PTX0915, Jarosz Tab 18.

[244]

[245]     For example, in April 2015, just prior to Rexulti[®]'s approval and launch, the FDA approved the first generic version of Abilify (aripiprazole).  PTX0630, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/202101Orig1s000ltr.pdf (viewed March 4, 2022).

<u>**EXHIBIT 5**</u>

**HIGHLY CONFIDENTIAL**

comparison, academic papers indicate that pharmaceutical drugs on average had similar, or higher,

discounts.  For example, though certainly not a perfect comparison here, a study comparing list

prices and net prices for "branded pharmaceutical products for which US sales are reported by

publicly traded companies" concluded that average discounts in 2018 were 51 percent (payers

excluding Medicaid) or higher.[247]

562.    Moreover, a drug's formulary status can affect access and affordability for patients.



563.

---

[247]    *See* PTX0551, Hernandez, Inmaculada, et al., "Changes in List Prices, Net Prices, and Discounts for Branded Drugs in the US, 2007-2018," *JAMA*, Vol. 323, No. 9 (2020): 854-862. Similarly, another study found that discounts in 2019 ranged from 32 percent to 47 percent (payers excluding Medicaid) and from 63 percent to 88 percent (Medicaid) for four biologic products.  *See* PTX0563, San-Juan-Rodriguez, Alvaro, et al., "Trends in list prices, net prices, and discounts of self-administered injectable tumor necrosis factor inhibitors," *Journal of Managed Care & Specialty Pharmacy*, Vol. 27, No. 1 (2021): 112-117.

**<u>EXHIBIT 5</u>**

**HIGHLY CONFIDENTIAL**



564.    Despite its similar or higher price relative to other treatments, Rexulti® has grown and maintained its share over time.  Compared with other branded short-acting, atypical antipsychotics that launched around the same time, Rexulti®'s quarterly WAC revenue share increased from 2.9 percent in Q4 2015, the first full quarter after launch, to 17.2 percent in Q4 2021.[256]

565.    Rexulti® has been able to achieve significant growth as a result of the treatment's patented features, rather than through buying marketplace share through pricing initiatives, such as an aggressive coupon or reimbursement policies.



[256]    PTX0919, Jarosz Tab 22.

**EXHIBIT 5**

**HIGHLY CONFIDENTIAL**

### iii.     Promotion

566.    The success of Rexulti® has not been driven by either aggressive or non-patent-oriented persuasive advertising.   In fact, Plaintiffs' promotional efforts have focused on highlighting the patented features to position Rexulti® in an antipsychotic marketplace with numerous competing differentiated products.

567.



568.

**EXHIBIT 5**

HIGHLY CONFIDENTIAL



---

[262]     PTX0935, Jarosz Tab 38 shows only companies with available financial data for 2010 through at least 2020.  Some companies, including Lundbeck and Otsuka, appear in Capital IQ but do not have any reported revenues or selling and marketing expenses for that time period.  The analysis in PTX0935, Jarosz Tab 38 shows aggregated information at the company level, so there could be meaningful differences between Rexulti® and the product portfolios of the pharmaceutical companies classified under SIC Code 2834 – Pharmaceutical Preparations.

263

264

265

<u>**EXHIBIT 5**</u>

**HIGHLY CONFIDENTIAL**

570.



571.    Pricing and promotion for Rexulti® matter, but they are not the primary drivers, to the exclusion of the patented benefits, of the marketplace success experienced by Rexulti®.

### g.    Marketing and Promotion

572.    In evaluating the marketing and promotion of Rexulti®, Defendants may attempt to argue that Plaintiffs acknowledged the importance of marketing to the marketplace performance of Rexulti® and devoted significant effort, human and capital resources, and expenditures to marketing efforts, which drive the marketplace performance of Rexulti®.  Defendants' potential analysis and conclusion are flawed and incomplete for several reasons

573.    First, Defendants failed to explain how marketing and promotion of Rexulti® would invalidate a nexus between Rexulti® and the patented technology.  Demand for pharmaceutical products is driven by a host of factors, not just one, and the existence of other demand drivers does not negate a showing of commercial success.



**EXHIBIT 5**

574.    Defendants may attempt to ascribe the word importance to Plaintiffs' views on marketing and promotion.  It should come as no surprise to Defendants, or anyone else, that companies, including pharmaceutical companies, engage in marketing and promotional efforts/expenditures and rationally expect those efforts/expenditures (such as detailing, sampling, and direct-to-consumer advertising) to impact demand for their products.  Companies would be ill-advised to not support their products using those tools.  For an analysis of commercial success, what is relevant to analyze is not whether Plaintiffs view marketing and promotion as important, but rather a) what the content of the marketing was, and b) whether marketing was the primary driver (to the exclusion of the patented benefits) of the marketplace success of the product.

575.    In fact, Defendants apparently failed to consider the *content* of the marketing and promotion for Rexulti®.  Research on pharmaceutical promotion has found that pharmaceutical promotion is primarily informative with respect to choices among differentiated products (*i.e.*, different chemical products, as is the case with Rexulti® and its competitors).  In addition, Plaintiffs' promotional efforts have focused on the benefits that are covered by the asserted patents, with an emphasis on efficacy, safety, tolerability and convenience, to differentiate Rexulti®. Therefore, an impact of marketing and promotion on sales would establish, if anything, a nexus between the patented benefits and marketplace success vis-à-vis marketing and promotion.

576.    Moreover, even if marketing content could be ignored (which it cannot), Defendants did not attempt to evaluate the actual effect of marketing and promotion on sales for Rexulti®, despite proclaiming its importance.  Instead, Defendants merely cited a Government Accountability Office report on prescription drug direct-to-consumer ("DTC") spending without further analysis or detailed discussion.  Defendants' potential analysis failed to properly compare Plaintiffs' marketing and promotional efforts to competitors and/or the wider industry.

297

EXHIBIT 5

**HIGHLY CONFIDENTIAL**

577.    Finally, putting aside these fundamental flaws in the Defendants' potential position,
Defendants may even attempt to overstated the importance of marketing and promotion, as they
may attempt to present certain misleading quotes from Rexulti® marketing documents.  Plaintiffs
discuss these flaws in more detail below, for each of the marketing and promotion sub-categories
Defendants may address.

### i.    Detailing and Sampling

578.    To the extent Defendants argue Plaintiffs engaged in detailing activities to promote
Rexulti® in an effort to drive sales, Defendants' own language illuminates the flaws in their
critique.  Again, Defendants failed to describe the content of Plaintiffs' detailing or to acknowledge
the informative nature of their marketing and promotional efforts, *i.e.*, Plaintiffs' marketing and
promotional efforts featured the patented benefits.[268]  In fact, Defendants pointed to no instances
in which detailing did *not* center around the patented inventions.

579.



## **EXHIBIT 5**

HIGHLY CONFIDENTIAL



580.

### ii.     Direct-to-Consumer ("DTC") Advertising

581.     Defendants may attempt to argue that Plaintiffs implemented various DTC marketing tactics to drive prescriptions and sales.  Plaintiffs' marketing and promotional efforts for Rexulti®, including DTC advertising, have focused on explaining the patented benefits, and DTC advertising encouraged patients to talk with their healthcare providers for further information about those benefits.  Again, Defendant have pointed to no instances in which DTC advertising did *not* center around the patented inventions.

582.     Defendants may also argue that the Government Accountability Office published a report on prescription drug DTC spending in May 2021, in which Rexulti® was ranked 18th of the



**EXHIBIT 5**

top 25 branded drugs advertised to consumers in 2018.  Defendants may further attempt to argue that within this document, the only other competing branded product to Rexulti® was Vraylar®, which ranked 24th.  By potentially citing this third-party publication from the Government Accountability Office, Defendants appear to have accepted a cross-sectional comparison of promotional spending, not unlike the PTX0935, Jarosz Tab 38, to help evaluate whether a company's spending is generally in line with or higher than comparison drugs or companies.  However, Defendants' potential approach is misleading here.  The rankings provided in the Government Accountability Office report are based on absolute levels of DTC spending, which obscure the relative importance of promotional expenditures compared with a drug's overall sales.  In fact, while Defendants may attempt to compare the DTC spending rankings for Rexulti® and Vraylar® ("Vraylar"), they failed to note that the DTC spending share of net revenues for Rexulti® (19.7 percent) and Vraylar (19.4 percent) were comparable in 2018.[271]  Moreover, the DTC spending as a share of net revenues was substantially higher than Rexulti®'s for many drugs on that list, including drugs with a lower absolute level of DTC spending: Ozempic (39.6 percent), Repatha (27.5 percent) and Anoro Ellipta (23.0 percent).[272]  Defendants also failed to note that

---

[271]    Calculated as 117.4 / 595.558 = 0.197 for Rexulti®, and 94.5 / 487.1 = 0.194 for Vraylar for the year of 2018.  DTX-0773, United States Government Accountability Office, Report to Committee on the Judiciary, U.S. Senate, "Prescription Drugs: Medicare Spending on Drugs with Direct-to-Consumer Advertising," May 2021, available at https://www.gao.gov/assets/gao-21-380.pdf ("US Government Accountability Office Report"), Appendix I (p. 23); PTX0902, Jarosz Tab 5; PTX0954, Allergan plc Form 10-K for the fiscal year ending December 31, 2018, p. 57.

[272]    Calculated as 99.4 / 250.7 = 0.396 for Ozempic; 98.5 / 358.0 = 0.275 for Repatha and 93.4 / 405.8 = 0.230 for Anoro Ellipta.  DTX-0773, US Government Accountability Office Report, Appendix I (p. 23); PTX0958, Novo Nordisk 2018 Annual Report, p. 68; PTX0955, Amgen Inc. SEC Form 10-K for the fiscal year ended December 31, 2018, p. 49; PTX0957, GSK 2018 Annual Report, p. 226.  As of December 31, 2018, Ozempic U.S. sales were reported to be 1,634 DKK million.  The exchange rate between Danish krones and USD was 6.517398 krones to 1 dollar.  1,634 DKK million × (1 / 6.517398) = $250.714 million.  PTX0952, https://www.x-rates.com/historical/?from=DKK&amount=1&date=2018-12-31 (viewed April 28, 2022).  As of December 31, 2018, Anoro Ellipta U.S. sales were reported to be 318 million GBP.  The exchange

## EXHIBIT 5

**HIGHLY CONFIDENTIAL**

while other competing branded products to REXULTI® had lower levels of DTC spending in 2018, this does *not* necessarily indicate that they had lower DTC spending as a share of net revenues in comparison with Rexulti®.[273]

583.    In addition, the rankings provided in the Government Accountability Office report ignored other types of marketing and promotion, including promotion to healthcare providers, which are substantial for many drugs.[274]   Indeed, according to academic research, while DTC advertising has increased its share of total marketing and promotional spending over time, more than two-thirds of total marketing and promotional spending in the pharmaceutical industry in 2016 supported marketing and promotional efforts *other than* DTC advertising.[275]

584.    Finally, the rankings Defendants may attempt to cite are for a single year, 2018.  In contrast, Plaintiffs analyzed total sales and marketing expenses for the 2010 to 2021 period.[276]

---

rate between British pounds and USD was 0.783686 pounds to 1 dollar.  318 GBP million × (1 / 0.783686) = $405.775 million.  PTX0953, https://www.x-rates.com/historical/?from=GBP&amount=1&date=2018-12-31 (viewed April 28, 2022).

[273] █████████████████████████████████████████████████

[274]    "Consistent with our finding that DTCA spending was concentrated on chronic medical conditions, officials from five drug manufacturers told us that they are generally more likely to focus consumer advertising on drugs that are used to treat and manage chronic medical conditions or that affect a large portion of the population.  In comparison, officials from three drug manufacturers stated that they would typically advertise drugs that treat rare or complex conditions directly to doctors and other health care providers."  DTX-0773, US Government Accountability Office Report, p. 11.

[275]    PTX0941, Schwartz Lisa M., and Steven Woloshin., "Medical Marketing in the United States, 1997-2016," *JAMA*, 2019, 321(1):80–96, available at https://jamanetwork.com/journals/jama/fullarticle/2720029, p. 82 ("Marketing to medical professionals accounted for the highest proportion of spending, increasing from $15.6 billion in 1997 (88% of total spending) to $20.3 billion in 2016 (68% of total spending)").

[276]    PTX0935, Jarosz Tab 38.

## EXHIBIT 5

**HIGHLY CONFIDENTIAL**

### iii.     Share of Voice ("SOV")

585.



### iv.     Promotional Expenditures

586.





## EXHIBIT 5

HIGHLY CONFIDENTIAL

587.



**EXHIBIT 5**

HIGHLY CONFIDENTIAL

**h.      Pricing**

588.      Defendants asserted that the Plaintiffs fail to appropriately address pricing, which also drives the marketplace performance of Rexulti®. The pricing of Rexulti® matters, but it is not the primary driver, to the exclusion of the patented benefits, of the marketplace success experienced by Rexulti®. Furthermore, around the time of Rexulti®'s launch, the marketplace for oral atypical antipsychotic medications was crowded and predominantly generic.[282] The fact that Rexulti® succeeded in the marketplace despite facing generic competition, including the entry of generic aripiprazole in Q2 2015, strongly indicates that pricing is not the only factor driving its success.[283]

589. 



[283] DTX-0181, JDG_BREX 008136-138.

## <u>EXHIBIT 5</u>

HIGHLY CONFIDENTIAL



590.

**EXHIBIT 5**

HIGHLY CONFIDENTIAL

591.    Defendants may also attempt to argue that Plaintiffs discuss formulary status, indicating that the formulary placement of Rexulti® compared negatively with Vraylar and Latuda. Defendants failed to address the variety of factors that impact formulary position, including negotiations between the plans and the pharmaceutical companies.[287] For example, plans negotiate discounts from pharmaceutical companies in return for preferred placement on formularies.[288] Moreover, Defendants failed to note that Rexulti® has succeeded in the marketplace in spite of having an unfavorable formulary status.

592.    In addition, Defendants may attempt to argue that Plaintiffs claim that vouchers were only available for HCPs that do not accept samples.  However, what Defendants fail to appropriately address is that if HCPs have sufficient samples and provide such samples to patients, there is little need for a voucher.  Indeed, Plaintiffs had a significant sampling program, to the point where Plaintiffs believed that they had over-sampled Rexulti®.  Defendants fail to address that while samples and vouchers may drive initiation, patients are unlikely to stay on a drug that is not efficacious and/or safe for them.  Drugs are "experience goods" that must be tried to assess the quality of the product.  Samples and vouchers may incentivize patients to try the drug, but patients will eventually run out of samples and will have to purchase the drug if they find the combination of experience and price sufficiently attractive.  Moreover, and again, Defendants pointed to no instances in which sampling did *not* center around the patented inventions.

---

[287]    PTX0940, *HealthAffairs*, "Prescription Drug Pricing: Formularies," Health Policy Brief Series, September 2017, at p. 1.
[288]    PTX0940, *HealthAffairs*, "Prescription Drug Pricing: Formularies," Health Policy Brief Series, September 2017, at p. 1.

**EXHIBIT 5**

**HIGHLY CONFIDENTIAL**

593.    Finally, Defendants may attempt to argue that Plaintiffs fail to appropriately address the patient benefits that Plaintiffs provide for both Rexulti® and a patient's generic antidepressant (as Rexulti® is approved as an adjunctive therapy to antidepressants for the treatment of MDD).  However, Defendants failed to acknowledge that other antipsychotic drugs have similar savings card programs.  ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████  The savings card discounts offered for Rexulti® are similar to competitors in terms of cost for initial prescription and refills, as well as the maximum number of fills allowed under the program.[290]  Specifically, for the initial cost, Rexulti® patients pay as little as $0 for two months, while Latuda and Vraylar patients pay as little as $0 for a 30-day supply and $0 for two 30-day supplies, respectively.[291]  For 30-day and 90-day refills, Rexulti® patients pay as little as $15, compared to $10 for Latuda patients and $5 for Vraylar patients.[292]  Discounts for

---

[289] ████████████████████████████████████████████████████████████████████████████████████████████

[290]    PTX0949, https://www.rexulti.com/savings (viewed April 26, 2022); PTX0950, https://www.rexulti.com/savings-card-terms-conditions (viewed April 26, 2022); PTX0942, https://m.seroquelxr.com/coupon.html (viewed April 26, 2022); PTX0951, https://www.seroquelxrtouchpoints.com/savings-coupon.html (viewed April 26, 2022);  PTX0943, https://saphris.copaysavingsprogram.com/ (viewed April 26, 2022); PTX0947, https://www.latuda.com/sz/latuda-copay-savings.html (viewed April 26, 2022); PTX0948, https://www.needymeds.org/CouponPDFs/6217.pdf (viewed April 26, 2022); PTX0946, https://www.allergansavingscard.com/vraylar (viewed April 26, 2022).
[291]    PTX0949, https://www.rexulti.com/savings (viewed April 26, 2022); PTX0950, https://www.rexulti.com/savings-card-terms-conditions (viewed April 26, 2022); PTX0947, https://www.latuda.com/sz/latuda-copay-savings.html (viewed April 26, 2022); PTX0946, https://www.allergansavingscard.com/vraylar (viewed April 26, 2022).
[292]    PTX0949, https://www.rexulti.com/savings (viewed April 26, 2022); PTX0950, https://www.rexulti.com/savings-card-terms-conditions (viewed April 26, 2022);

## EXHIBIT 5

Seroquel XR, Saphris and Fanapt are also similar to Rexulti®, with patients paying as little as $3

for a 30-day supply, $15 for an unspecified number of days of supply and $0 for a 1-month supply,

respectively.[293]  Furthermore, Rexulti® discounts are offered for up to 12 fills, which is consistent

with competitor drugs.[294]  Figures 26A, 26B and 26C, below, illustrate examples of these savings

card discount programs as shown on Rexulti®'s and its competitors' patient websites.

---

PTX0947, https://www.latuda.com/sz/latuda-copay-savings.html (viewed April 26, 2022); PTX0946, https://www.allergansavingscard.com/vraylar (viewed April 26, 2022).

[293]     PTX0942, https://m.seroquelxr.com/coupon.html (viewed April 26, 2022); PTX0951, https://www.seroquelxrtouchpoints.com/savings-coupon.html (viewed April 26, 2022); PTX0943, https://saphris.copaysavingsprogram.com/ (viewed April 26, 2022); PTX0948, https://www.needymeds.org/CouponPDFs/6217.pdf (viewed April 26, 2022.

[294]     Seroquel XR, Saphris and Fanapt offer discounts for up to 12 fills, while Latuda and Vraylar offer discounts for up to 12 30-day supply uses or four 90-day supply uses. PTX0949, https://www.rexulti.com/savings (viewed April 26, 2022); PTX0951, https://www.seroquelxrtouchpoints.com/savings-coupon.html (viewed April 26, 2022); PTX0943, https://saphris.copaysavingsprogram.com/ (viewed April 26, 2022); PTX0947, https://www.latuda.com/sz/latuda-copay-savings.html (viewed April 26, 2022); PTX0948, https://www.needymeds.org/CouponPDFs/6217.pdf (viewed April 26, 2022); PTX0946, https://www.allergansavingscard.com/vraylar (viewed April 26, 2022).

**EXHIBIT 5**

**Figure 26A**[295]
**Rexulti® Savings Card**



---

**EXHIBIT 5**

**Figure 26B[296]**
**Vraylar Savings Card**



**Figure 26C[297]**
**Saphris Savings Card**



310

<u>**EXHIBIT 5**</u>

**HIGHLY CONFIDENTIAL**

594.     Defendants did not explain why they considered Rexulti®'s savings card discounts to be an especially important driver of Rexulti®'s performance when competitors also offer similar discount programs.

### i.     Apportionment

595.     Defendants argue that Plaintiffs do not apportion the performance of Rexulti®. There is no case law requiring an apportionment analysis among the asserted patents, and no apportionment analysis is necessary.  Furthermore, the patents listed in the U.S. Food and Drug Administration's ("FDA's") Orange Book for brexpiprazole correspond exactly to the asserted patents.[298]  Moreover, there are no patented inventions here that drive any value above and beyond the value driven by the patented inventions asserted here.

596.     

---

[296]     PTX0946, https://www.allergansavingscard.com/vraylar (viewed April 26, 2022).
[297]     PTX0943, https://saphris.copaysavingsprogram.com/ (viewed April 26, 2022).
[298]     "7,888,362," "8,349,840", "8,618,109", "9,839,637", "10,307,419", and "48,059" entries found                                                                                                       at PTX0945, https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=001&Appl_No=205422&Appl_type=N (viewed April 27, 2022).

**EXHIBIT 5**

HIGHLY CONFIDENTIAL

████████████████████████████████████████

████████████████████████████████████████

████████████████.

### j.      Revealed Preference

597.    Defendants may attempt to argue that the actions of the Plaintiffs and Defendants related to Rexulti® do not provide evidence of marketplace success.  Defendants' potential assertion appears to ignore the abundance of evidence presented by Plaintiffs regarding the marketplace success of Rexulti®.  In other words, the discussion of revealed preference is one indication, *among many*, of marketplace success, and is not alone dispositive evidence of the marketplace success of Rexulti®.  Rather, it is a useful starting point, to be considered in conjunction with other evidence.  Based on the totality of the evidence, Rexulti® has been a marketplace success.  For example, Plaintiffs also considered the absolute and relative performance of Rexulti® in the antipsychotic marketplace.  Rexulti® outperformed pre-launch forecasts, its compound annual growth rate from a product lifecycle perspective was within range of competitors and its marketplace share increased over time.

598.    Defendants may attempt to argue that under the theory described by Plaintiffs, essentially every brand product that undergoes clinical trials and is marketed and sold by a pharmaceutical company is purportedly a marketplace success, since the brand company devoted resources to developing, marketing and selling the brand product.  However, Defendants failed to address Plaintiffs' *continued* investments in Rexulti® after launch.  For example, Plaintiffs submitted a supplemental New Drug Application for treatment of schizophrenia in pediatric patents, spent millions of dollars each year in sales and marketing for Rexulti® between 2015 and

**EXHIBIT 5**

2021 and conducted additional clinical studies to expand to other indications.  These investments

after launch are consistent with the belief that Rexulti® is a marketplace success.

599.    Defendants may further attempt to argue that the decision by a generic company to

file an ANDA with respect to a reference listed drug merely reflects the normal course of business

for generic pharmaceutical companies and does not necessarily reflect the marketplace success of

the reference listed drug.  Defendants have provided no evidence that any generic filer viewed the

drug as having a negative net present value.  Moreover, Defendants apparently failed to appreciate

that if there are other benefits to entering a business than just the product's direct profits and losses,

then these other benefits must be considered as well.[300]  Unlocking those secondary benefits

reflects value to entering a business.  Defendants' shareowners would not allow those companies

to invest in projects that are projected to be other than successful.

600.    In addition, Defendants apparently failed to recognize other behavior by the generic

companies that is consistent with Rexulti® being a marketplace success.  In particular, there were

16 generic companies who have submitted Abbreviated New Drug Applications for a generic

version of Rexulti®.  To date, seven of these companies have received tentative approval from the

FDA for generic Rexulti®.[301]  The large number of generic companies is a signal of the strength of

---

[300]    Furthermore, Defendants referred to alleged significant financial and economic differences
between the business models of branded and generic pharmaceutical companies.  However,
Defendants failed to acknowledge that generic pharmaceutical companies are nevertheless profit-
maximizing entities that pursue generic opportunities because of their expectations that those
opportunities will be profit-maximizing.  Moreover, while branded and generic companies have
different cost structures and business models, both sets of companies have found this a business
that they want to enter in the face of their specific (and different) cost structures and business
models.

[301]    The seven generic companies that received tentative approval for generic Rexulti® are:
Accord, Ajanta, Alkem, Amneal, Lupin, Optimus and Zydus.    PTX0944, Search for
"brexpiprazole"                                                                                    on
https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=BasicSearch.process    (viewed
April 21, 2022).

**EXHIBIT 5**

the returns in the marketplace, as it does not make economic sense for a large number of Defendants to compete over a small marketplace.  In other words, this is a business that many companies want to enter. It is unlikely that this is or is viewed to be a failing business.

### G.    Brexpiprazole is Not Substantially Similar to Aripiprazole

601.    Defendants may attempt to argue that the adverse effect profiles of brexpiprazole and aripiprazole are substantially similar.  Defendants, however, fail to support these statements and instead cherry pick specific side effects and specific antipsychotics to incorrectly argue that the side effect profiles are similar.  Defendants may attempt to then use this selective information to argue multiple times that there is allegedly no nexus between the objective indicia of non-obviousness and the merits of the claimed inventions.

602.    Defendants' main potential argument against objective indicia of non-obviousness therefore boils down in large part to unsupported statements that objective indicia of non-obviousness allegedly does not support the non-obviousness of brexpiprazole because aripiprazole existed in the prior art.  However, this cannot be the case given that  brexpiprazole and aripiprazole are different molecules, as well as the significant evidence of the advantages of brexpiprazole over aripiprazole and other antipsychotics.  In particular, brexpiprazole has lower levels of specific side effects because brexpiprazole has an improved pharmacological profile, and specifically improved partial dopamine agonism, as compared to aripiprazole.  *See* PTX0435, Davies 2004 at 331. Brexpiprazole has also been reported to have a better impact on cognitive symptoms and lower functional impairment than aripiprazole.  *See* PTX0430, Citrome, L., et al., "The effect of brexpiprazole (OPC-34712) and aripiprazole in adult patients with acute schizophrenia: results from a randomized, exploratory study," *Int'l Clinical Psychopharmacology* (2016) 31(4):192-201 ("Citrome 2016") at 197.  Therefore, Defendants potential conclusory statements that aspects of

314

## EXHIBIT 5

brexpiprazole are the same or substantially similar to aspects of aripiprazole are not supported by the significant evidence of objective indicia of non-obviousness.

603.   Moreover, Defendants' potential statements are undermined by their opinions relating to alleged obviousness, including opinions about a POSA's motivation to modify compounds before the invention of brexpiprazole.   Specifically, in Defendants' potential obviousness analysis, they disagree with Plaintiffs' that aripiprazole "had very low levels" of specific side effects.  Instead, Defendants asserted that it was known at the time of the alleged invention that aripiprazole, while having an improved side effect profile relatively to other antipsychotic medications available at the time, nevertheless had side effects, including EPS-related events.  These statements are contrary to Defendants' later potential positions that the side effect profiles of aripiprazole and brexpiprazole are substantially similar and therefore there can be no nexus between brexpiprazole and the objective indicia of non-obviousness.   These statements from Defendants also undermine their arguments about other antipsychotic compounds because Defendants admit that these compounds resulted in side effect profiles that were even worse than aripiprazole.

604.   While all drugs have the potential for specific downsides, REXULTI® is exceedingly safe.  Clinical trials have proven that REXULTI® has lower average levels of adverse events compared with other antipsychotics.  Defendants' potential statements that the beneficial properties of brexpiprazole are attributable to aripiprazole is factually incorrect.  Brexpiprazole causes neither activating nor sedating side effects and has significantly lower levels of side effects, specifically activating side effects, when compared with aripiprazole.  *See* PTX0429, Citrome Activating and Sedating 2017 at 140-142; PTX0430, Citrome 2016 at 197-200 (reporting that akathisia in patients treated with brexpiprazole was 9.4%, while the rate of akathisia in aripiprazole

**EXHIBIT 5**

was 21.2%, and all EPS-related adverse events were twice as high with aripiprazole than with brexpiprazole (30.3% vs. 14.1%, respectively)).  These activating side effects are the exact side effects Defendants highlight when responding to Plaintiffs non-obviousness positions.

605.    Other researchers have reported that brexpiprazole did not have a statistically significantly higher rate of akathisia than placebo, while aripiprazole, lurasidone, cariprazine, risperidone, olanzapine and asenapine did have rates of akathisia that were statistically significantly greater compared to placebo.  PTX0429, Citrome Activating and Sedating 2017 at 139-42.  Furthermore, Defendants acknowledge these high rates of side effects in prior art compounds when discussing their position that a POSA would have been motivated to improve prior art compounds.  Accordingly, brexpiprazole succeeded in solving the need for an effective and safer treatment for schizophrenia and the adjunctive treatment of MDD.

606.    Additionally, Defendants' potential reliance on the Medical Letter, one non-rigorously-peer-reviewed publication issued immediately after the launch of REXULTI®, does not reflect the current state of data surrounding the clinical use of brexpiprazole.  *See generally* DTX-0181, Brexpiprazole (Rexulti) for Schizophrenia and Depression, *The Medical Letter on Drugs and Therapeutics*, (2015) 57(1475):116-8 ("Medical Letter").  First, this publication publishes opinion pieces that are not rigorously peer-reviewed, and this magazine has no scientifically vetted impact factor.  Accordingly, this publication is not well-regarded, and a POSA would have ascribed little weight to such unreviewed opinions provided in this publication.

607.    Moreover, the Medical Letter's only critique of REXULTI® is that aripiprazole had more long-term efficacy and safety data than brexpiprazole at the time of the Medical Letter publication.  The Medical Letter was published very shortly after REXULTI® became available on the market and therefore it was impractical to have significant long-term data at that time.  Since

**EXHIBIT 5**

publication of the Medical Letter in 2015, however, there have been numerous studies on the long-term efficacy and safety of REXULTI®.  These studies found that brexpiprazole effectively treated psychiatric disorders and resulted in significantly lower levels of side effects compared with other antipsychotic drugs.  In light of this safety profile as well as the high levels of efficacy associated with brexpiprazole, these research publications advise using brexpiprazole over aripiprazole or other antipsychotics.  A skilled artisan would not have relied on an earlier opinion publication that was not rigorously peer-reviewed over later rigorously peer-reviewed and well-respected clinical trial publications, especially when the only downside noted in the earlier publication was a lack of additional long-term data.

608.    Defendants may attempt to criticize Plaintiffs' position as failing to present evidence of how brexpiprazole has an unexpectedly improved clinical profile, and further disagree that such is indicative of nonobviousness.  Defendants assert that any difference between aripiprazole and brexpiprazole is merely a difference in degree, not kind, and thus cannot be unexpected.  Plaintiffs disagree with Defendants' position.

609.    As an initial matter, Defendants are incorrect that Plaintiffs do not present evidence of brexpiprazole's unexpected pharmacologic and clinical profile.  As Plaintiffs explained, and supported by scientific articles, brexpiprazole has a unique pharmacological profile compared to other antipsychotics, which leads to its improved clinical profile.

610.    Brexpiprazole is the active ingredient in REXULTI® and is covered by the claims of the compound patents.  Brexpiprazole is a "novel serotonin-dopamine activity modulator, combining moderate-intrinsic activity at 5-HT$_{1A}$ receptor partial agonism and low-intrinsic activity D$_2$ partial agonism with antagonist activity on a variety of 5-HT and α-adrenergic receptor subtypes."  PTX0452, Maeda, K., et al., "Brexpiprazole II: Antipsychotic-Like and Procognitive

317

**EXHIBIT 5**

Effects of a Novel Serotonin-Dopamine Activity Modulator," *J. Pharmacology and Experimental Therapeutics* (2014) 350:605-614 at 606 ("Maeda II 2014"). Specifically, brexpiprazole binds with high affinity to 5-HT$_{1A}$ (0.12 nM), 5-HT$_{2A}$ (0.47 nM), 5-HT$_{2B}$ (1.9 nM), 5-HT$_7$ (3.7 nM), D$_2$ (0.3 nM), D$_3$ (1.1 nM), $\alpha_{1A}$-adrenergic (3.8 nM), $\alpha_{1B}$-adrenergic (0.17 nM), $\alpha_{1D}$-adrenergic (2.6 nM), and $\alpha_{2C}$-adrenergic (0.59 nM) receptors, while its affinity to the H$_1$ receptor and M$_1$ receptor is moderate (19nM) and very low (67% inhibition at 10 μM), respectively. PTX0451, Maeda, K., et al., "Brexpiprazole I: In Vitro and In Vivo Characterization of a Novel Serotonin-Dopamine Activity Modulatory," *J. Pharmacology and Experimental Therapeutics* (2014) 350(3):589-604 ("Maeda I 2014") at 596, Table 2; PTX0966, Rexulti® Label at 20.

611.    Despite the complex pharmacologic profile of brexpiprazole, Defendants may attempt to assert that the mechanism of action of brexpiprazole, such as binding affinity and functional effects are all expected alleging that brexpiprazole was formed as a result of small, conservative structural changes to aripiprazole based on what was known before the priority date. Defendants are notably silent as to what these alleged changes to aripiprazole were and how they were expected. Despite this, Defendants nevertheless may attempt to argue that any differences between brexpiprazole and aripiprazole are only in degree and any such differences would have been expected in the art. Defendants' potential position, however, ignores the pharmacologic differences between brexpiprazole and aripiprazole, which gives rise to brexpiprazole's unique clinical profile.

612.    For example, accepting Defendants' potential proposition that aripiprazole is the appropriate comparator, brexpiprazole exhibits a lower dopamine D$_2$ agonist intrinsic activity than aripiprazole. PTX0451, Maeda I 2014 at Abstract, 590; PTX0452, Maeda II 2014 at 612; PTX0430, Citrome, L., et al., "The effect of brexpiprazole (OPC-34712) and aripiprazole in adult

318

**EXHIBIT 5**

patients with acute schizophrenia: results from a randomized, exploratory study," *Int'l Clinical Psychopharmacology* (2016) 31(4):192-201 ("Citrome 2016") at 193.  Additionally, brexpiprazole has a nearly 10-time higher binding affinity than aripiprazole at serotonin 5-HT$_{1A}$ and 5-HT$_{2A}$ receptors. PTX0451, Maeda I 2014 at 596, Table 2.  Brexpiprazole also binds to α1B and α2C adrenergic receptors at a much higher affinity than aripiprazole.  PTX0451, Maeda I 2014 at 596, Table 2; PTX0430, Citrome 2016 at 193.  The below table highlights these differences in binding affinities:

TABLE 2
Binding affinities for cloned human receptors in vitro
Data are calculated by nonlinear regression analysis using data from three assays
performed in duplicate or triplicate and expressed as mean values.

| Human Receptor | Binding Affinity ($K_i$) | | | |
|---|---|---|---|---|
| | Brexpiprazole | Aripiprazole | Bifeprunox | Risperidone |
| | *nM* | | | |
| hD$_{2L}$ | 0.30 | 0.87 | 0.41 | 1.9 |
| hD$_3$ | 1.1 | 1.6 | 0.63 | 13 |
| h5-HT$_{1A}$ | 0.12 | 1.3 | 0.73 | 420[a] |
| h5-HT$_{2A}$ | 0.47 | 4.7 | NT | 0.22 |
| h5-HT$_{2B}$ | 1.9 | 0.36[b] | NT | 35[c] |
| hα$_{1B}$-adrenergic | 0.17 | 35[b] | NT | 9[d] |
| hα$_{2C}$-adrenergic | 0.59 | 38[b] | NT | 9.1[c] |
| hH$_1$ | 19 | 18 | NT | 27[a] |
| hM$_1$ | 67% at 10 μM | 6780[b] | NT | >10,000[d] |

NT, not tested.
[a]Data from Schotte et al., 1996.
[b]Data from Shapiro et al., 2003.
[c]Data from Kroeze et al., 2003.
[d]PDSP certified data (http://pdsp.med.unc.edu/pdsp).

PTX0451, Maeda I 2014 at 596, Table 2 (highlighting added).  These differences are more than a mere difference in degree.

613.    The unique pharmacological profile of brexpiprazole gives rise to its unexpectedly improved clinical profile compared to other antipsychotics.  Defendants may attempt to argue that any improvements in clinical efficacy or tolerability are irrelevant because such were already present for aripiprazole.  Defendants' potential argument, however, is undercut by the differences that exist between the clinical profiles of aripiprazole and brexpiprazole.  For example, PTX0430,

**EXHIBIT 5**

Citrome 2016 reports that the rate of akathisia brexpiprazole was only 9.4%, as compared to 21.2% in patients receiving aripiprazole.  PTX0430, Citrome 2016 at 199.  The Citrome 2016 authors also report that "the percentage of EPS-related AEs in the aripiprazole group was twice that of the brexpiprazole group [10 (30.3%) and nine (14.1%) patients, respectively.]"  PTX0430, Citrome 2016 at 199.  While Citrome 2016 states that the lower rates of EPS-related side effects for brexpiprazole "could relate to its higher affinity at serotonin 5-HT$_{2A}$ receptors, providing a potentially more balanced occupancy of brexpiprazole across D$_2$ and 5-HT$_{2A}$ receptors than aripiprazole," it also notes that "antagonism of the $\alpha_1$ adrenergic receptor has also been implicated in reduced rates of akathisia, and the brexpiprazole affinity at the $\alpha_{1b}$ receptor is more than 10 times higher than that observed with aripiprazole."  PTX0430, Citrome 2016 at 200 (internal citations omitted).  Overall, Citrome 2016 concludes that "[t]aken together, the lower intrinsic activity at the D$_2$ receptor of brexpiprazole compared with aripiprazole and the unique serotonergic and noradrenergic receptor footprint of brexpiprazole may partly explain the lower rates of EPS-related side effects."  PTX0430, Citrome 2016 at 200 (internal citations omitted).   That brexpiprazole achieved much lower levels of akathisia compared to aripiprazole, which was known to have that undesirable side effect, is a difference in kind.

**EXHIBIT 6**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD. and H. LUNDBECK A/S, ) ) ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 19-cv-1938-LPS (consolidated) |
| ZENARA PHARMA PRIVATE LTD., et al. ) ) | |
| Defendants. ) ) | |

**PLAINTIFFS' ISSUES OF LAW**

## EXHIBIT 6

## Table of Contents

I.    Summary of the Issues of Law that Remain to Be Litigated ............................................ 1

    A.    Infringement and Relief Requested ............................................................... 1

        1.    Apotex ............................................................................................... 1

        2.    MSN ................................................................................................... 2

        3.    Optimus ............................................................................................. 3

        4.    Zenara ............................................................................................... 4

    B.    Validity .......................................................................................................... 5

II.    Infringement and Request for Relief ...................................................................... 6

    A.    Infringement ................................................................................................... 6

    B.    Request for Relief ........................................................................................ 10

        1.    Injunctive Relief & Defendants' FDA Approval Date ................... 10

        2.    Exceptional Case ............................................................................ 10

        3.    Plaintiffs Are Entitled to the Requested Relief .............................. 11

III.    Validity ................................................................................................................ 11

    A.    Person of Ordinary Skill in the Art ............................................................. 12

    A.    Prior Art Considered by USPTO ................................................................ 12

    A.    Obviousness ................................................................................................ 13

    B.    Lead Compound Analysis ........................................................................... 15

    C.    Secondary Considerations of Nonobviousness ........................................... 16

        1.    Nexus ............................................................................................. 17

        2.    Failure of Others and Unpredictability in the Art ......................... 18

        3.    Long-Felt but Unmet Need ............................................................ 19

        4.    Unexpected Results ........................................................................ 20

        5.    Copying ......................................................................................... 20

        6.    Commercial Success ...................................................................... 21

**EXHIBIT 6**

D.      Indefiniteness .......................................................................................... 21

E.      Written Description.................................................................................. 22

F.      Enablement ............................................................................................. 23

**EXHIBIT 6**

1.     Pursuant to Local Rule 16.3(c)(5), Plaintiffs identify the following issues of law that remain to be litigated and summarize what they intend to prove to support their claims and defenses.  Plaintiffs reserve the right to modify or amend this Statement to the extent necessary to reflect any future rulings by the Court and to supplement or amend this Statement to respond to any new issues that Defendants may raise.  Plaintiffs do not intend the discussion of the overarching legal standards to be an exhaustive recitation of each legal point.  Plaintiffs reserve the right to address any and all legal issues in any post-trial briefing authorized by the Court. Further, Plaintiffs do not agree with or acquiesce to Defendants' statement of issues of law that remain to be litigated.

2.     If any issue of law identified below should properly be considered an issue of fact, then such statement shall be considered to be part of Plaintiffs' Contested Facts (**Exhibits 2 and 5**).

3.     Plaintiffs object to any attempt by Defendants to introduce any issue of law at trial not included in their Statement of Contested Facts and/or Issues of Law (**Exhibits 3, 4 and 7**).

## I.      SUMMARY OF THE ISSUES OF LAW THAT REMAIN TO BE LITIGATED

### A.      Infringement and Relief Requested

#### 1.      Apotex

4.     Whether Plaintiffs have proven by a preponderance of evidence that the generic brexpiprazole products that are the subject of Apotex's ANDA No. 213731 ("Apotex's ANDA Products") infringe, literally or under the doctrine of equivalents, the following claims under 35 U.S.C. § 271(e)(2)(A) and/or 35 U.S.C. § 271(a), (b), and/or (c):

- claims 1, 2, 4, 6 of the '419 patent.

5.     Whether Plaintiffs are entitled to an order under 35 U.S.C. § 271(e)(4)(A) and (B) that the effective date of an approval of Apotex's ANDA No. 213731 shall be no earlier than the expiration date of the '419 patent, including any additional regulatory exclusivity.

1

**EXHIBIT 6**

6.     Whether Plaintiffs are entitled to injunctive relief preventing Apotex and all persons acting in concert with Apotex from manufacturing, using, offering for sale or selling Apotex's ANDA Products within the United States, or importing Apotex's ANDA Products into the United States, until the expiration of the '419 patent, in accordance with 35 U.S.C. §§ 271(e)(4)(B) and 283.

7.     Whether Plaintiffs are entitled to injunctive relief preventing Apotex and all persons acting in concert with Apotex from seeking, obtaining or maintaining approval of Apotex's ANDA No. 213731 until the expiration of the '419 patent, in accordance with 35 U.S.C. §§ 271(e)(4)(B) and 283.

8.     Whether this is an exceptional case under 35 U.S.C. § 285.

       **2.     MSN**

9.     Whether Plaintiffs have proven by a preponderance of evidence that the generic brexpiprazole products that are the subject of MSN's ANDA No. 213740 ("MSN's ANDA Products") infringe, literally or under the doctrine of equivalents, the following claims under 35 U.S.C. § 271(e)(2)(A) and/or 35 U.S.C. § 271(a), (b), and/or (c):

- claims 1-3, 7, 12-13 of the RE'059 patent;

- claims 1-2, 4-5 of the '840 patent;

- claims 1-2 of the '109 patent;

- claims 1, 3-10 of the '637 patent; and

- claims 1-3, 5-7 of the '419 patent.

10.    Whether Plaintiffs are entitled to an order under 35 U.S.C. § 271(e)(4)(A) and (B) that the effective date of an approval of MSN's ANDA No. 213740 shall be no earlier than the expiration date of the asserted patents, including any additional regulatory exclusivity.

**EXHIBIT 6**

11.     Whether Plaintiffs are entitled to injunctive relief preventing MSN and all persons acting in concert with MSN from manufacturing, using, offering for sale or selling MSN's ANDA Products within the United States, or importing MSN's ANDA Products into the United States, until the expiration of the asserted patents, in accordance with 35 U.S.C. §§ 271(e)(4)(B) and 283.

12.     Whether Plaintiffs are entitled to injunctive relief preventing MSN and all persons acting in concert with MSN from seeking, obtaining or maintaining approval of MSN's ANDA No. 213740 until the expiration of asserted patents, in accordance with 35 U.S.C. §§ 271(e)(4)(B) and 283.

13.     Whether this is an exceptional case under 35 U.S.C. § 285.

### 3.     Optimus

14.     Whether Plaintiffs have proven by a preponderance of evidence that the generic brexpiprazole products that are the subject of Optimus' ANDA No. 213758 ("Optimus' ANDA Products") infringe, literally or under the doctrine of equivalents, the following claims under 35 U.S.C. § 271(e)(2)(A) and/or 35 U.S.C. § 271(a), (b), and/or (c):

- claims 1-3, 7, 9, 12-15 of the RE'059 patent;

- claims 1-2, 4-5 of the '840 patent;

- claims 1-2 of the '109 patent;

- claims 1, 3-10 of the '637 patent; and

- claims 1-7 of the '419 patent.

15.     Whether Plaintiffs are entitled to an order under 35 U.S.C. § 271(e)(4)(A) and (B) that the effective date of an approval of Optimus' ANDA No. 213758 shall be no earlier than the expiration date of the asserted patents, including any additional regulatory exclusivity.

## EXHIBIT 6

16.     Whether Plaintiffs are entitled to injunctive relief preventing Optimus and all persons acting in concert with Optimus from manufacturing, using, offering for sale or selling Optimus' ANDA Products within the United States, or importing Optimus' ANDA Products into the United States, until the expiration of the asserted patents, in accordance with 35 U.S.C. §§ 271(e)(4)(B) and 283.

17.     Whether Plaintiffs are entitled to injunctive relief preventing Optimus and all persons acting in concert with Optimus from seeking, obtaining or maintaining approval of Optimus' ANDA No. 213758 until the expiration of asserted patents, in accordance with 35 U.S.C. §§ 271(e)(4)(B) and 283.

18.     Whether this is an exceptional case under 35 U.S.C. § 285.

### 4.     Zenara

19.     Whether Plaintiffs have proven by a preponderance of evidence that the generic brexpiprazole products that are the subject of Zenara's ANDA No. 213477 ("Zenara's ANDA Products") infringe, literally or under the doctrine of equivalents, the following claims under 35 U.S.C. § 271(e)(2)(A) and/or 35 U.S.C. § 271(a), (b), and/or (c):

- claims 1-3, 7, 12-13 of the RE'059 patent;

- claims 1-2, 4-5 of the '840 patent;

- claims 1-2 of the '109 patent;

- claims 1, 3-10 of the '637 patent; and

- claims 1-3, 6 of the '419 patent.[1]

---

[1] Zenara stipulated to infringement of the asserted claims of the RE'059, '840, '109, and '637 patents.  *See* C.A. No. 19-cv-01938, D.I. 413 (D. Del.) (consolidated).

**EXHIBIT 6**

20.     Whether Plaintiffs are entitled to an order under 35 U.S.C. § 271(e)(4)(A) and (B) that the effective date of an approval of Zenara's ANDA No. 213477 shall be no earlier than the expiration date of the asserted patents, including any additional regulatory exclusivity.

21.     Whether Plaintiffs are entitled to injunctive relief preventing Zenara and all persons acting in concert with Zenara from manufacturing, using, offering for sale or selling Zenara's ANDA Products within the United States, or importing Zenara's ANDA Products into the United States, until the expiration of the asserted patents, in accordance with 35 U.S.C. §§ 271(e)(4)(B) and 283.

22.     Whether Plaintiffs are entitled to injunctive relief preventing Zenara and all persons acting in concert with Zenara from seeking, obtaining or maintaining approval of Zenara's ANDA No. 213477 until the expiration of asserted patents, in accordance with 35 U.S.C. §§ 271(e)(4)(B) and 283.

23.     Whether this is an exceptional case under 35 U.S.C. § 285.

**B.     Validity**

24.     Whether Defendants MSN, Optimus and Zenara have proven by clear and convincing evidence that claims 1-3, 7, 9 and 12-15 of the RE'059 patent; claims 1, 2, 4 and 5 of the '840 patent; claims 1 and 2 of the '109 patent; and claims 1 and 3-10 of the '637 patent are invalid based on obviousness under 35 U.S.C. § 103.

25.     Whether Defendants MSN, Optimus and Zenara have proven by clear and convincing evidence that claims 4 and 5 of the '840 patent; claim 1 of the '109 patent, and claim 7 of the '637 patent are invalid under 35 U.S.C. § 112 for lack of sufficient written description.

26.     Whether Defendants MSN, Optimus and Zenara have proven by clear and convincing evidence that claims 1 and 2 of the '109 patent are invalid under 35 U.S.C. § 112 for lack of enablement.

**EXHIBIT 6**

27.     Whether Defendants Apotex, MSN, Optimus and Zenara have proven by clear and convincing evidence that claims 1-7 of the '419 patent are invalid under 35 U.S.C. § 112 for lack of sufficient written description.[2]

28.     Whether Defendants Apotex, MSN, Optimus and Zenara have proven by clear and convincing evidence that claims 1-7 of the '419 patent are invalid under § 112 as indefinite.

## II.    INFRINGEMENT AND REQUEST FOR RELIEF

### A.    Infringement

29.     "[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). The act of submitting an Abbreviated New Drug Application ("ANDA") also constitutes an act of infringement. 35 U.S.C. § 271(e)(2)(A) ("It shall be an act of infringement to submit an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent."). The patentee bears the burden of proving infringement by a preponderance of the evidence. *Sanofi v. Glenmark Pharm. Inc.*, 204 F. Supp. 3d 665, 673 (D. Del. 2016).

30.     Infringement may also be found under the "doctrine of equivalents." Equivalence may be established by the function-way-result test or the insubstantial difference test. Such equivalence is demonstrated where, for example, "the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim

---

[2] Defendants' Statement of Issues of Law That Remain to Be Litigated purports to include alleged obviousness and 35 U.S.C. § 112, 4th Paragraph challenges to certain claims of the '419 patent. Exhibit 7, ¶¶ 60-61. Defendants, however, have not included any contested facts relating to either of these alleged challenges in their Statement of Issues of Fact That Remain to Be Litigated. Plaintiffs thus understand that this issues of law will not be presented at trial.

**EXHIBIT 6**

limitation." *Intendis GmbH v. Glenmark Pharm. Inc., USA*, 822 F.3d 1355, 1360-61 (Fed. Cir. 2016).

31.     The disclosure dedication doctrine may preclude a finding of infringement under the doctrine of equivalents, but this doctrine "does not mean that any generic reference in a written specification necessarily dedicates all members of that particular genus to the public." *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1378 (Fed. Cir. 2005) (quoting *PSC Compt. Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1360 (Fed. Cir. 2004)).  Instead, "the disclosure must be of such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed." *PSC Comput.*, 355 F.3d at 1360; *see also Eli Lilly v. Hospira*, 933 F.3d 1320 (Fed. Cir. 2019) (finding a "generic reference" insufficient to invoke the disclosure-dedication doctrine).

32.     Prosecution history estoppel is another doctrine that may preclude application of the doctrine of equivalents.  Estoppel can arise as either amendment-based or argument-based.  Notably, amendments and "arguments made in a related application do not automatically apply to different claims in a separate application." *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1323 (Fed. Cir. 2013) (declining to apply estoppel from parent application).

33.     Amendment-based estoppel arises "when an amendment is made to secure the patent and the amendment narrows the patent's scope." *Festo Corp.* v. *Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 736 (2002) ("*Festo I*").  Determining whether such estoppel applies requires a multi-part analysis where the Court must determine (1) whether the amendment was narrowing, (2) if the amendment was made for reasoning substantially related to patentability, and (3) if the first two requirements are met, then the court must determine the scope of the

**EXHIBIT 6**

surrender.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1366-67 (Fed. Cir. 2003) ("*Festo II*").

34.     Even where the court finds a narrowing amendment, such gives rise to a rebuttable presumption that the applicant surrendered the equivalent in question.  *Festo I*, 535 U.S. at 740-41.  The presumption can be rebutted, for example, by showing the amendment bore no more than a tangential relation to the accused equivalent.  *Id.*; *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1333-34 (Fed. Cir. 2019); *Regents of the Univ. of Cal. v. DakoCytomation, Inc.*, 517 F.3d 1364, 1378 (Fed. Cir. 2008); *see also United Services Automobile Ass'n v. PNC Bank, NA*, 2-20-cv-00319, D.I. 744 (EDTX Aug. 19, 2022).

35.     Argument-based estoppel requires a "clear and unmistakable" surrender.  *Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325–26 (Fed. Cir. 2003)).  Courts "do not presume a patentee's arguments to surrender an entire field of equivalents through simple arguments and explanations to the patent examiner."  *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1364 (Fed. Cir. 2006).

36.     Acts that induce others to infringe also constitute infringement.  35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer.").  Proving induced infringement requires the patentee to show "that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements."  *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1327 (Fed. Cir. 2021) (internal quotations and citation omitted).  "While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice."  *Id.*

**EXHIBIT 6**

37.      In Hatch-Waxman cases alleging that a proposed drug label will induce

infringement by physicians, "the label must merely 'encourage, recommend, or promote' an

infringing use." *Sanofi*, 204 F. Supp. 3d at 673 (quoting *Takeda Pharm USA, Inc. v. W-Ward

Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015); *GlaxoSmithKline*, 7 F.4th at 1327 (Fed. Cir.

2021).  The "contents of the label itself may permit the inference of specific intent to encourage,

recommend, or promote infringement." *Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*, 887 F.3d

1117, 1129 (Fed. Cir. 2018) (affirming the district court's finding of inducement).  Even where a

proposed drug label seeks to carve out a claimed indication, induced infringement may be found

where the Court can infer an intent to encourage infringement. *GlaxoSmithKline LLC*, 7 F.4th at

1327-38 (Fed. Cir. 2021); *see also Sanofi v. Glenmark Pharms. Inc., USA*, 204 F. Supp. 3d 665,

673-74 (D. Del. 2016) ("Even where a proposed label does not explicitly track the language of a

claimed method, a package insert containing directives that will 'inevitably lead some consumers

to practice the claimed method' provides sufficient evidence for a finding of specific intent.)

(quoting  *AstraZeneca LP v. Apotex*, 633 F.3d 1042, 1060 (Fed. Cir. 2010).

38.      Further, it is an act of contributory infringement to sell, offer to sell, or import a

generic drug product that the seller knows will be used to perform a patented method.  *See* 35

U.S.C. § 271(c) ("Whoever offers to sell or sells within the United States or imports into the United

States . . . a material or apparatus for use in practicing a patented process, constituting a material

part of the invention, knowing the same to be especially made or especially adapted for use in an

infringement of such patent, and not a staple article or commodity of commerce suitable for

substantial noninfringing use, shall be liable as a contributory infringer.")   To establish

contributory infringement, the patentee must prove: "1) that there is direct infringement, 2) that

the accused infringer had knowledge of the patent, 3) that the component has no substantial non-

## EXHIBIT 6

infringing uses, and 4) that the component is a material part of the invention." *Sanofi*, 204 F. Supp.

3d at 674 (D. Del. 2016) (quoting *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir.

2010)).

> B.     **Request for Relief**

> 1.     **Injunctive Relief & Defendants' FDA Approval Date**

39.     When infringement of an Orange Book-listed patent is found following a

submission of an ANDA, "the court shall order the effective date of any approval of the drug or

veterinary biological product involved in the infringement to be a date which is not earlier than the

date of the expiration of the patent which has been infringed." 35 U.S.C. § 271(e)(4)(A).

40.     Pursuant to 35 U.S.C. § 271(e)(4)(B), Plaintiffs are entitled to injunctive relief

"against an infringer to prevent the manufacture, use, offer to sell, or sale within the United States

or importation into the United States of an approved drug."

41.     The court may also award injunctive relief in a patent case based on its evaluation

of the following four factors: (1) whether the patent holder has (or will) suffer irreparable injury

or harm, (2) whether legal remedies are inadequate to compensate that injury, (3) a balance of

hardships, and (4) the public interest. *See* 35 U.S.C. § 283; *eBay Inc. v. MercExchange, L.L.C.*,

547 U.S. 388, 391 (2006).

> 2.     **Exceptional Case**

42.     Pursuant to 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable

attorney fees to the prevailing party."   "[A]n 'exceptional' case is simply one that stands out from

others with respect to the substantive strength of a party's litigating position (considering both the

governing law and the facts of the case) or the unreasonable manner in which the case was litigated.

District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their

<u>EXHIBIT 6</u>

discretion, considering the totality of the circumstances." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).

### 3.    Plaintiffs Are Entitled to the Requested Relief

43.    Plaintiffs have demonstrated, by a preponderance of evidence, that they are entitled to an injunction enjoining each of the Defendants from engaging in the manufacture, use, offer for sale, or sale of each of the Defendants' generic brexpiprazole tablet products within the United States, or importation into the United States, during the term of the asserted patents.

44.    Plaintiffs have also shown that they are entitled to an order setting an FDA approval date for Defendants' ANDAs no later than the expiration of the asserted patents, or a later expiration of regulatory exclusivity period.

45.    Plaintiffs have shown that this is an exceptional case, such that Plaintiffs are entitled to an award of attorney's fees, costs, and expenses.

## III.    VALIDITY

46.    "A patent shall be presumed valid.  Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims."   35 U.S.C. § 282; s*ee In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) ("[D]ependent claims are nonobvious if the independent claims from which they depend are nonobvious.").

47.    Defendants bear the burden of proving invalidity by clear and convincing evidence; this burden never shifts to Plaintiffs.  *See* 35 U.S.C. § 282 ("The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."); *St. Jude Medical Inc. v. Access Closure, Inc.*, 729 F.3d 1369, 1381-82 (Fed. Cir. 2013) ("[T]he patent challenger bears the burden of proving the factual elements of invalidity by clear and convincing evidence. . . . This burden of proof never shifts to the patentee.") (citation omitted); *Microsoft*

11

**EXHIBIT 6**

*Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 97 (2011) ("Under the Federal Circuit's reading of § 282, a defendant seeking to overcome this presumption must persuade the factfinder of its invalidity defense by clear and convincing evidence.").

A.     **Person of Ordinary Skill in the Art**

48.     The person of ordinary skill in the art is a hypothetical person who is presumed to have known the relevant art at the time of the invention.

49.     Factors to be considered in determining the ordinary level of skill in the art include: "[1] type of problems encountered in the art; [2] prior art solutions to those problems; [3] rapidity with which innovations are made; [4] sophistication of the technology; and [5] educational level of active workers in the field." *See In re GPAC Inc.*, 57 F.3d 1573,1579 (Fed. Cir. 1995).

50.     To provide testimony regarding the perspective of one of ordinary skill in the art, a proffered expert witness at least must have ordinary skill in the art. *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1377, 1376-77 (Fed. Cir. 2022) ("To offer expert testimony from the perspective of a skilled artisan in a patent case—like for claim construction, validity, or infringement—a witness must at least have ordinary skill in the art.  Without that skill, the witness' opinions are neither relevant nor reliable.").

A.     **Prior Art Considered by USPTO**

51.     "When the examiner considered the asserted prior art and basis for the validity challenge during patent prosecution, that burden becomes particularly heavy." *Impax Labs., Inc. v. Aventis Pharms. Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008).  Patent examiners are "deemed to have experience in the field of the invention[,]" and "[i]n finding the relevant facts, in assessing the significance of the prior art, and in making the ultimate determination of the issue of obviousness, the examiner . . . [is] presumed to act from this viewpoint." *In re Lee*, 277 F.3d 1338, 1345 (Fed. Cir. 2002).

**EXHIBIT 6**

A.    **Obviousness**

52.    A patent is invalid as obvious only "if the differences between the claimed

invention and the prior art are such that the claimed invention as a whole would have been obvious

before the effective filing date of the claimed invention to a person having ordinary skill in the art

to which the claimed invention pertains." 35 U.S.C. § 103.  Section 102 defines the scope of prior

art for the purposes of § 103.  *See also* Ex ##, Plaintiffs' Motion *in Limine*.

53.    Obviousness is assessed from the perspective of the hypothetical person of ordinary

skill in the art at the time the invention was made.  35 U.S.C. § 103; *Graham v. John Deere Co.*,

383 U.S. 1, 14 (1966).  Obviousness is ultimately a legal question, based on underlying factual

determinations: (1) the scope and content of the prior art, (2) the level of ordinary skill in the art,

(3) the differences between the claimed invention and the prior art, and (4) evidence of secondary

considerations or objective indicia of non-obviousness.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S.

398, 406 (2007);  *see also Eisai Co. Ltd. v. Dr. Reddy's Labs Ltd.*, 533 F.3d 1353, 1356 (Fed. Cir.

2008) (citing *Graham*, 383 U.S. at 17-18).

54.    "Patentability shall not be negatived by the manner in which the invention was

made." 35 U.S.C. § 103.  Accordingly, the inventors' own work and thought processes leading to

the invention are not prior art and cannot be evidence of obviousness.  *Life Techs., Inc. v. Clontech

Labs., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000); *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678

F.3d 1280, 1296 (Fed. Cir. 2012) ("The inventor's own path itself never leads to a conclusion of

obviousness; that is hindsight."); 35 U.S.C. § 103 (pre-AIA) ("Patentability shall not be negatived

by the manner in which the invention was made.").   "Patentability does not turn on how the

invention was made, but on whether it would have been obvious to a person of ordinary skill in

the field." *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm. Inc., USA*, 748 F.3d 1354,

1360 (Fed. Cir. 2014); *see also KSR*, 550 U.S. at 420 ("The question is not whether the combination

## EXHIBIT 6

was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art."); *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 619 F.3d 1329, 1340 (Fed. Cir. 2010) ("[T]he record will not allow this court to conflate Lilly scientists with those of ordinary skill in the art.").

55.     In determining what would have been obvious to one of ordinary skill in the art at the time of the invention, the use of hindsight is not permitted.  *KSR*, 550 U.S. at 421 (cautioning against "the distortion caused by hindsight bias" and "arguments reliant upon ex post reasoning"). Simply combining prior art elements after the fact, using hindsight, does not negate patentability. *Amerigen Pharms. v. UCB Pharm. GmbH*, 913 F.3d 1076, 1089 (Fed. Cir. 2019) ("Any compound may look obvious once someone has made it and found it to be useful, but working backwards from that compound, with the benefit of hindsight, once one is aware of it does not render it obvious."); *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1068 (Fed. Cir. 2018) (the "genius of invention is often a combination of known elements which in hindsight seems preordained."); *Merck Sharp & Dohme B.V. v. Warner Chilcott Co., LLC,* 711 F. App'x 633, 637 (Fed. Cir. 2017) (using patent-in-suit "as a roadmap . . . represents an improper reliance on hindsight"); *see also InTouch Techs., Inc. v. VGO  Commcn's, Inc.*, 751 F.3d 1327, 1351 (Fed. Cir. 2014).

56.     "Obviousness cannot be predicated on what is unknown."  *In re Spormann*, 363 F.2d 444, 448 (C.C.P.A. 1966); *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1307 (Fed. Cir. 2015).  "[I]n order to rely on inherency to establish the existence of a claim limitation in the prior art in an obviousness analysis—the limitation at issue necessarily must be present, or the natural result of the combination of elements explicitly disclosed by the prior art.")  *Par Pharm., Inc. v.*

**EXHIBIT 6**

*TWI Pharm., Inc.*, 773 F.3d 1186, 1195-96 (Fed. Cir. 2014).  That is, relying on inherency to prove

a claim element in the prior art requires more than probabilities and possibilities.  *Id.* at 1195-96.

> **B.**     **Lead Compound Analysis**

57.     When a patent claims a chemical compound, the obviousness analysis follows a

two-part inquiry: (1) whether a skilled artisan would have selected the asserted prior art compound

as a lead compound for further development and (2) whether the prior art would have provided a

POSA with a motivation to modify the lead compound with a reasonable expectation of success.

*Otsuka Pharm*, 678 F.3d at 1291.

58.     "It is the possession of promising useful properties in a lead compound that

motivates a chemist to make structurally similar compounds.  Yet the attribution of a compound

as a lead compound after the fact must avoid hindsight bias; it must look at the state of the art *at

the time the invention was made* to find a motivation to select and then modify a lead compound

to arrive at the claimed invention."  *Daiichi Sankyo Co., Ltd. v. Matrix Labs., Ltd.*, 619 F.3d 1346,

1354 (Fed. Cir. 2010) (emphasis in original).  Mere structural similarity is an insufficient

justification for selecting a lead compound.  *Id.*  ("[P]roving a reason to select a compound as a

lead compound depends on more than just structural similarity, but also knowledge in the art of

the functional properties and limitations of the prior art compounds.").  In fact, "negative side

effects could dissuade one of skill from using a particular compound as a starting point." *Eisai*,

533 F.3d at 1358.

59.     Following identification of a lead compound, it is "necessary to identify some

reason that would have led a chemist to modify a known compound in a particular manner to

establish *prima facie* obviousness of a new claimed compound."  *Takeda Chem. Indus., Ltd. v.

Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1357 (Fed. Cir. 2007).  As the chemical arts are often

unpredictable, establishing the predictability of a modification "may present a difficult hurdle

**EXHIBIT 6**

because potential solutions are less likely to be genuinely predictable." *Eisai*, 533 F.3d at 1359.

"The combination of 'several sequential modifications' is not obvious where there is no reason in

the prior art to make the subsequent modification." *AstraZeneca AB v. Aurobindo Pharm. Ltd.*,

232 F. Supp. 3d 636, 648 (D. Del. 2017) (citing *Pfizer Inc., v. Mylan Pharm. Inc.*, 71 F. Supp. 3d

458, 473 (D. Del. 2014), *aff'd*, 628 F. App'x 764 (Fed. Cir. 2016).

60.     Importantly, "a patent composed of several elements is not proved obvious merely

by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550

U.S. at 418. Instead, Defendants must establish a "'reason to attempt to make the

composition'…and 'reasonable expectation of success in doing so.'" *Procter & Gamble v. USA*,

566 F.3d 989, 995 (Fed. Cir. 2009) (citation omitted).

     **C.**    **Secondary Considerations of Nonobviousness**

61.     A proper obviousness analysis must include consideration of objective evidence of

non-obviousness. *Graham*, 383 U.S. at 14; *In re Cyclobenzaprine*, 676 F.3d 1063, 1075 (Fed. Cir.

2012) (reversing a district court for finding nonobviousness before considering secondary

considerations, explaining "a fact finder [must] consider all evidence relating to obviousness

before finding a patent invalid on [obviousness] grounds"). Evidence of objective indicia is "not

just a cumulative or confirmatory part of the obviousness calculus but constitutes independent

evidence of nonobviousness." *OrthoMcNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358,

1365 (Fed. Cir. 2008). A patentee can rely on secondary considerations arising after the time of

invention, indeed, "[r]elevant secondary considerations often are not manifest even until well after

the issuance of a patent." *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d

1291, 1307 (Fed. Cir. 2011).

62.     There must be a nexus between evidence of secondary considerations and the

claimed invention. *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011). A nexus between the claimed

**EXHIBIT 6**

invention and nonobviousness evidence exists where the evidence presented is reasonably commensurate with the scope of the claims. *Id*. A presumption of nexus is established where, as here, the commercially successful product is the claimed invention. *See Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310-11 (Fed. Cir. 2010).

63.     Typical evidence of secondary considerations includes long-felt but unmet need, the failure of others, commercial success, industry acclaim, unexpected results, industry skepticism, and copying. *See Graham*, 383 U.S. at 17-18 (explaining that "secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented") and *Apple Inc. v. Samsung Elecs. Co*., 839 F.3d 1034, 1052 (Fed. Cir. 2016) ("secondary considerations or objective indicia of non-obviousness [] include: commercial success enjoyed by devices practicing the patented invention, industry praise for the patented invention, copying by others, and the existence of a long-felt but unsatisfied need for the invention."); *see*, *e.g.*, *Glaxo Group Ltd. v. Apotex, Inc*., 376 F.3d 1339, 1349 (Fed. Cir. 2004) (prior-art patent directed to a form of a drug, and considered by the PTO during prosecution, did not render obvious claimed invention where the prior-art patent failed to teach or suggest that a different form of the drug would have a better bioavailability and stability, the inventor had relied on the surprising improvement in stability and bioavailabilty in prosecuting the patent, and the secondary considerations of commercial success, long-felt need, and unexpected results favored the finding of nonobviousness).

       **1.     Nexus**

64.     "For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the *claimed invention*." *In re Kao*, 639 F.3d at 1068 (citation omitted) (emphasis in original); *see also Ashland*

**EXHIBIT 6**

*Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 n.42 (Fed. Cir. 1985).  A nexus

between the claimed invention and nonobviousness evidence exists where the evidence presented

is reasonably commensurate with the scope of the claims.  *In re Kao*, 639 F.3d at 1068.  "A

presumption of nexus is established where, as here, the commercially successful product is the

claimed invention."  *See Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310-11 (Fed. Cir.

2010).  A nexus is presumed for claims directed to an active ingredient.  *Immunex Corp. v. Sandoz*

*Inc.*, 964 F.3d 1049, 1067 (Fed. Cir. 2020) ("'there is a presumption of nexus for objective

considerations when the patentee shows that the asserted objective evidence is tied to a specific

product and that product is the invention disclosed and claimed in the patent.");  *WBIP, LLC v.*

*Kohler Co,* 829 F.3d 1317, 1329 (Fed. Cir. 2016).  Secondary-consideration evidence does not

have to be exclusively linked to novel features recited in the claims; a nexus may exist if the

evidence is linked at least in part to some novel aspect of the claimed invention.  *Oren Techs., LLC*

*v. Proppant Express Invs. LLC*, No. 2019-1778, 2021 WL 3120819, at *6 (Fed. Cir. July 23, 2021)

(nonprecedential) (reversing finding of obviousness, explaining there is "a presumption of nexus

for objective considerations when the patentee shows that the asserted objective evidence is tied

to a specific product" which only requires "that the patentee demonstrate that the product is

essentially the claimed invention . . . even when the product has additional, unclaimed features.")

(internal citations omitted).  The patentee also need not show nexus based only on limitations that

allegedly are not shown in a primary prior art reference. *WBIP,* 829 F.3d at 1330-32 ("proof of

nexus is not limited to only when objective evidence is tied to the supposedly 'new' feature(s).").

### 2.    Failure of Others and Unpredictability in the Art

65.    "Evidence that others tried but failed to develop a claimed invention may carry

significant weight in an obviousness inquiry." *In re Cyclobenzaprine*, 676 F.3d 1063, 1081 (Fed.

Cir. 2012); *In re Piasecki*, 745 F.2d 1468, 1475 (Fed. Cir. 1984) (failure of others to provide a

**EXHIBIT 6**

feasible solution to a longstanding problem is probative of non-obviousness); *Heidelberger Druckmaschinen AG v. Hantscho Comm. Prods., Inc.*, 21 F.3d 1068, 1072 (Fed. Cir. 1994) ("[l]itigation argument that an innovation is really quite ordinary carries diminished weight when offered by those who had tried and failed to solve the same problem, and then promptly adopted the solution that they are now denigrating."). This is because the "failure of others to 'find a solution to the problem which the patent[s] purport[] to solve'" suggests "presence of a significant defect [in the prior art], while serving as a simulated laboratory test of the obviousness of the solution to a skilled artisan." *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578-79 (Fed. Cir. 1991); *Novartis Pharm. Corp. v. W.-Ward Pharm. Int'l Ltd.*, 287 F. Supp. 3d 505, 531 (D. Del. 2017) (finding "the failure of others to develop a treatment" supports finding claimed method of treatment nonobvious).

### 3. Long-Felt but Unmet Need

66. Evidence of a long-felt need is relevant to nonobviousness because, if "a desire existed for such a product, researchers, presumably, would have created one if they were able to do so." *In re Cyclobenzaprine*, 676 F.3d 1962, 1083 (Fed. Cir. 2012); *Apple Inc. v. Samsung Electronics Co., Ltd.*, 839 F.3d 1034, 1056 (Fed. Cir. 2016) (en banc) ("Evidence of a long-felt but unresolved need can weigh in favor of the non-obviousness of an invention because it is reasonable to infer the need would not have persisted had the solution been obvious."); *Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d 1353, 1361, 52 U.S.P.Q.2d 1294 (Fed. Cir. 1999) (evidence of "several unsatisfactory [] techniques before adopting the patented one" suggests "there was a long-felt but unmet need."). Whether a long-felt need is unmet is evaluated as of the date of efforts to solve the need, (e.g. a patent's filing date), not when the patented product first enters the market. *Procter & Gamble*, 566 F.3d at 998 (rejecting accused infringer's argument that long-felt need should be judged as of the time when the invention becomes available to the public);

**EXHIBIT 6**

*Texas Instruments Inc. v. Int'l. Trade Com'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993) ("long-felt need is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem."). And "recognition of a need does not render obvious the achievement that meets that need." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc*., 381 F.3d 1371, 1377 (Fed. Cir. 2004).

### 4.      Unexpected Results

67.      "One way for a patent applicant to rebut a *prima facie* case of obviousness is to make a showing of 'unexpected results,' *i.e.,* to show that the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected. *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995); *see also Procter & Gamble*, 566 F.3d at 994. This is because "that which would have been surprising to a person of ordinary skill in a particular art would not have been obvious." *In re Soni*, 54 F.3d at 750. This principle "applies most often to the less predictable fields, such as chemistry, where minor changes in a product or process may yield substantially different results." *Id.*; *see also Millennium Pharms., Inc. v. Sandoz Inc.,* 862 F.3d 1356, 1369 (Fed. Cir. 2017) ("The unexpected properties of an unexpectedly produced new compound, and the ensuing pharmaceutical efficacy and benefit, negate [a] ruling of obviousness.").

### 5.      Copying

68.      "[C]opying by a competitor may be a relevant consideration in the secondary factor analysis." *Merck Sharp & Dohme Corp. v. Hospira Inc.*, 221 F. Supp. 3d 497, 513 (D. Del. 2016) (quoting *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004)). Evidence of copying may be shown through "internal documents, direct evidence . . . or access to, and substantial similarity to, the patented product." *Id.* (internal citation omitted). Copying can be indicative of nonobviousness, even in Hatch-Waxman litigations. *Id.* at 513-514

**EXHIBIT 6**

("Defendants' decision to copy Plaintiffs['] formulation and process 'is an indicium of nonobviousness.'" ) (internal citation and quotation omitted).

### 6. Commercial Success

69.     "Commercial success of an invention is significant evidence that the invention would not have been obvious and it should be given great weight." *Mitsubishi Chem. Corp. v. Barr Labs., Inc.*, 718 F. Supp. 2d 382, 436 (S.D.N.Y. 2010), *aff'd*, 435 F. App'x 927 (Fed. Cir. 2011). Commercial success can be established by sales in a relevant market. *Neupak, Inc. v. Ideal Mfg. & Sales Corp.*, 41 Fed. App'x 435, 440 (Fed. Cir. 2002); *Ecolochem, Inc. v Southern California Edison Co.*, 227 F.3d 1361, 1377 (Fed. Cir. 2000).

70.     Evidence of commercial success that has a nexus to the claimed invention supports a finding of nonobviousness. *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1350 (Fed. Cir. 2012). A *prima facie* nexus is established if the patentee shows that the commercially successful product is the claimed invention. *See Crocs*, 598 F.3d at 1310-11. The patent need not be the only reason for the commercial success of a patented invention, and "a patentee is not required to prove as part of its prima facie case that the commercial success of the patented invention is not due to factors other than the patented invention." *Demaco Corp. v. F. Von Langsdorff Licensing, Ltd*, 851 F.2d 1387, 1392 (Fed. Cir. 1988); *see also Continental Can. Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991) ("[i]t is not necessary . . . that the patented invention be solely responsible for the commercial success, in order for this factor to be given weight appropriate to the evidence, along with other pertinent factors.")

### D. Indefiniteness

71.     A claim is indefinite only if "in light of the specification and prosecution history, [it fails to] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909-11 (2014). Issued patents

## EXHIBIT 6

are presumed valid and a party seeking to prove indefiniteness must do so by clear and convincing evidence. 35 U.S.C. § 282(a); *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

72.     When examining terms of degree, such as "substantially," the Federal Circuit has explained that "no . . . numerical precision is required when using such terms of degree. . . . All that is required is some standard for measuring the term of degree." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1346 (Fed. Cir. 2018).  Indeed, "relative terms such as 'substantially' do not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim[s]." *Tinnus Enters., LLC v. Telebrands Corp.*, 733 F. App'x 1011, 1018 (Fed. Cir. 2018) (internal quotations and citation omitted); *see also Elm 3DS Innovations, LLC v. Samsung Elecs. Co.*, C.A. No. 14-1430-LPS, 2020 WL 1850657, at * 6 (D. Del. Apr. 13, 2020) ("Terms of degree, such as 'substantially'. . . are not inherently indefinite.").

### E.     Written Description

73.     35 U.S.C. § 112 provides the statutory basis for the written description requirement: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention."

74.     The purpose of the written description requirement is to require an inventor to disclose his invention to the public in such a manner as to allow "a person of skill in the art to recognize that the patentee invented what is claimed." *Tobinick v. Olmarker*, 753 F.3d 1220, 1225 (Fed. Cir. 2014).  "[C]ompliance with the written description requirement is a question of fact." *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005).

**EXHIBIT 6**

75.    "The standard for satisfying the written description requirement is whether the disclosure allows one skilled in the art to visualize or recognize the identity of the subject matter purportedly described. There is no requirement that the disclosure contain either examples or an actual reduction to practice; rather, the critical inquiry is whether the patentee has provided a description that in a definite way identifies the claimed invention in sufficient detail that a person of ordinary skill would understand that the inventor was in possession of it at the time of filing. That assessment requires an objective inquiry into the four corners of the specification." *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1190-91 (Fed. Cir. 2014) (internal quotations omitted); *see also Ariad Pharm. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) ("The test for [written description] sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had 'possession of the claimed subject matter as of the filing date.").

     **F.**    **Enablement**

76.    Section § 112 requires the patent specification to provide sufficient information that would allow a POSA to make and use the claimed invention.  35 U.S.C. § 112, ¶ 1.  "Whether a claim satisfies the enablement requirement of 35 U.S.C. § 112 is a question of law . . . although the determination may be based on underlying factual findings."  *Alcon*, 745 F.3d at 1188.

77.    "To prove that a claim is invalid for lack of enablement, a challenger must show by clear and convincing evidence that a POSA would not be able to practice the claimed invention without 'undue experimentation.'" *Alcon*, 745 F.3d at 1188 (quoting *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1988)).  "Undue experimentation" is assessed under an analysis of the *Wands* factors, which include: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the

**EXHIBIT 6**

invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *See In re Wands*, 858 F.2d at 737.

78.     In pharmaceutical patents, "efficacy data are generally not required in a patent application.  Only a sufficient description enabling a person of ordinary skill in the art to carry out an invention is needed." *Allergan*, 796 F.3d at 1310.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

OTSUKA PHARMACEUTICAL CO., LTD.
and H. LUNDBECK A/S,

                Plaintiffs,

     v.

ZENARA PHARMA PRIVATE LTD., et al.

               Defendants.

Civ. Action No. 19-cv-1938 (LPS)
(Consolidated)

**EXHIBIT 7
DEFENDANTS' STATEMENT OF ISSUES OF
LAW THAT REMAIN TO BE LITIGATED**

1

1. Pursuant to Local Rule 16.3(c)(5), Defendants submit the following issues of law that remain to be litigated as it relates to infringement.

2. By setting forth specific information herein, Defendants do not intend to waive their right to prove information not specifically set forth herein. This statement is not intended to be exhaustive, and, in addition to what is set out herein, Defendants may prove any matters identified in the pleadings and discovery taken in this action to date.

3. Defendants' identification of the issues of law that remain to be litigated is based, in part, on their understanding of the arguments that Plaintiffs are likely to make in attempting to respond to Defendants' invalidity case and to establish infringement, based upon the pleadings and discovery in the action to date. To the extent that Plaintiffs intend or attempt to introduce different or additional legal arguments, Defendants reserve their rights to contest those legal arguments, and to present any and all rebuttal evidence in response to those arguments, and will not be bound by this summary of issues of law to be litigated. Moreover, nothing in this statement should be construed as Defendants' agreement or acquiescence to Plaintiffs' statement of issues of law that remain to be litigated. Defendants further reserve the right to amend or revise these issues in view of any amendments or revisions of Plaintiffs' statement of issues of fact and/or law remaining to be litigated.

4. To the extent that Defendants' Statement of Facts that Remain to be Litigated set forth in Exhibit 3 contain issues of law, those issues are incorporated herein by reference. Should the Court determine that any issue identified in this Exhibit as an

issue of law is more appropriately considered an issue of fact, it should be treated

as an issue of fact as if listed by Defendants in that Exhibit.

## I.      Non-Infringement of the Asserted Claims

### A.      Issues to be Litigated

#### 1.      Optimus

1.      Whether Plaintiffs have failed to carry their burden of proving by a preponderance

of the evidence that the products that are the subject of Optimus's ANDA No. 213758  infringe,

literally or under the doctrine of equivalents, the following claims under 35 U.S.C.

§ 271(e)(2)(A) and/or 35 U.S.C. § 271(a), (b), and/or (c): claims 1-3, 7, 12-15 of the RE'059

patent; claims 1-2, 4-5 of the '840 patent; claims 1-2 of the '109 patent; and claims 1, 3-10 of the

'637 patent.

2.      Whether Plaintiffs have failed to carry their burden of proving by a preponderance

of the evidence that the 0.25, 0.5, 1, 2, and 3 mg products that are the subject of Optimus's

ANDA No. 213758  infringe, literally or under the doctrine of equivalents, the following claims

under 35 U.S.C. § 271(e)(2)(A) and/or 35 U.S.C. 271(a), (b), and/or (c):claims 1-7 the '419

patent.

3.      Whether Plaintiffs are legally barred by the doctrine of prosecution history

estoppel, the disclosure-dedication doctrine, and/or ensnarement of the prior art from asserting

that the 0.25, 0.5, 1, 2, and 3 mg products that are the subject of Optimus's ANDA No. 213758

infringe claims 1-7 of the '419 patent.

#### 2.      MSN

4.      Whether Plaintiffs have failed to carry their burden of proving by a preponderance

of the evidence that the products that are the subject of MSN's ANDA No. 213740 infringe,

literally or under the doctrine of equivalents, the following claims: 1-3, 7, 12-13 of the RE'059 patent; claims 1-2, 4-5 of the '840 patent; claims 1-2 of the '109 patent; and claims 1, 3-10 of the '637 patent.

5.     Whether Plaintiffs have failed to carry their burden of proving by a preponderance of the evidence that the 0.25, 0.5, 1, 2, and 3 mg products that are the subject of MSN's ANDA No. 213740 literally infringe the following claims under 35 U.S.C. §§ 271(a), (b), or (c): 1-3 and/or 5-7 of the '419 patent.

6.     Whether Plaintiffs have failed to carry their burden of proving by a preponderance of the evidence that the 0.25, 0.5, 1, 2, and 3 mg products that are the subject of MSN's ANDA No. 213740 infringe claims 1-3 and/or 5-7 of the '419 patent under the doctrine of equivalents.

7.     Whether Plaintiffs are legally barred by the doctrine of prosecution history estoppel, the disclosure-dedication doctrine, and/or ensnarement of the prior art from asserting that the 0.25, 0.5, 1, 2, and 3 mg products that are the subject of MSN's ANDA No. 213740 infringe claims 1-3 and/or 5-7 of the '419 patent under the doctrine of equivalents.

**3.     Zenara**

8.     Whether Plaintiffs have failed to carry their burden of proving by a preponderance of the evidence that the products that are the subject of Zenara's ANDA No. 213477 infringe, literally or under the doctrine of equivalents, the following claims under 35 U.S.C. § 271(e)(2)(A) and/or 35 U.S.C. § 271(a), (b), and/or (c):claims 1-3, 7, 12-13 of the RE'059 patent; claims 1-2, 4-5 of the '840 patent; claims 1-2 of the '109 patent; and claims 1, 3-10 of the '637 patent.

9.     Whether Plaintiffs have failed to carry their burden of proving by a preponderance of the evidence that the 0.25, 0.5, 1, 2, and 3 mg products that are the subject of Zenara's ANDA

No. 213477 infringe, literally or under the doctrine of equivalents, the following claims under 35 U.S.C. § 271(e)(2)(A) and/or 35 U.S.C. 271(a), (b), and/or (c):claims 1-3, 6 of the '419 patent.

10.    Whether Plaintiffs are legally barred by the doctrine of prosecution history estoppel, the disclosure-dedication doctrine, and/or ensnarement of the prior art from asserting that the 0.25, 0.5, 1, 2, and 3 mg products that are the subject of Zenara's ANDA No. 213477 infringe claims 1-3 or 6 of the '419 patent.

### 4.    Apotex

11.    Whether Plaintiffs have failed to carry their burden of proving by a preponderance of the evidence that the generic brexpiprazole 0.25 mg, 0.5 mg, 1 mg, 2 mg, and 3 mg products that are the subject of Apotex's ANDA No. 213731 infringe claims 1, 2, 4, or 6 of the '419 patent under 35 U.S.C. § 271(e)(2)(A) literally or under the doctrine of equivalents, and whether the manufacture, importation, offer to sell, sale, and/or use of the brexpiprazole tablets described in Apotex's ANDA No. 213731, prior to the expiration of the '419 patent, will infringe claims 1, 2, 4, or 6 of the '419 patent under 35 U.S.C. §§ 271(a), (b) and/or (c) literally or under the doctrine of equivalents.

12.    Whether Plaintiffs are legally barred by the doctrine of prosecution history estoppel, the disclosure-dedication doctrine, and/or ensnarement of the prior art from asserting that the 0.25, 0.5, 1, 2, and 3 mg products that are the subject of Apotex's ANDA No. 213731 infringe claims 1, 2, 4, and/or 6 of the '419 patent under the doctrine of equivalents.

### B.    Applicable Law

#### 1.    Noninfringement

5.    "The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence." *Takeda Pharm. Co. v. Teva Pharm. USA, Inc.*, 668 F. Supp.

2d 614, 619 (D. Del. 2009); *see also Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1125 (Fed. Cir. 2018) ("The patentee bears the burden of proving infringement by a preponderance of the evidence."). This burden never shifts to the Defendants. *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008) (noting that "the burden to prove infringement" never shifts from the plaintiff(s) and that "the risk of decisional uncertainty stays on the proponent of the proposition"). "Speculative data… cannot sustain [patentee's] burden of proof." *Brigham & Women's Hosp., Inc. v. Perrigo Co.*, No. 2017-1950, 2019 WL 990816, at *15 (Fed. Cir. Feb. 28, 2019).

6.     An invalid claim cannot be infringed. *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580 (Fed. Cir. 1983) ("The claim being invalid there is nothing to be infringed.").

7.     Under 35 U.S.C. § 271(e)(2)(A), it shall be an act of infringement to submit an application under Section 505(j) of the Federal Food, Drug, and Cosmetic Act for a drug claimed in a patent or the use of which is claimed in a patent, if the purpose of such submission is to obtain approval to engage in the manufacture, use, or sale of the drug before the expiration of such patent. This "artificial" act of infringement creates jurisdiction to enable resolution of infringement disputes before the application has actually made or marketed the proposed product. *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003).

8.     "Once jurisdiction is established, however, the substantive determination whether actual infringement or inducement will take place is determined by traditional patent infringement analysis, just the same as it is in other infringement suits, including those in a non-ANDA context, the only difference being that the inquiries now are hypothetical because the allegedly infringing product has not yet been marketed." *Id.* "The infringement case is therefore limited to an analysis

of whether what the generic drug maker is requesting authorization for in the ANDA would be an act of infringement if performed." *Id.* at 1364.

9.      In the context of an allegation of infringement under 35 U.S.C. § 271(e)(2), which is premised on an artificial act of infringement (i.e., the filing of the ANDA), the infringement inquiry is hypothetical and requires the court to compare the claims with the product described in the ANDA. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1248-49 (Fed. Cir. 2000). However, a patentee cannot rely solely on the filing of an ANDA under § 271(e)(2)(A) to establish infringement: "[T]he patentee's burden of proving ultimate infringement is not met by the filing of the ANDA." *Glaxo Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1570 (Fed. Cir. 1997). The burden of proof does not shift to the ANDA filer merely by the filing of the ANDA. *Id.* ("The relevant inquiry is whether the patentee has proven by a preponderance of the evidence that the alleged infringer will likely market an infringing product.").

10.     To determine infringement under § 271(e)(2), courts must determine whether the probable ANDA product would infringe once it is made, used, or sold.  *Par Pharmaceutical, Inc. v. Eagle Pharmaceuticals, Inc.*, --- F.4th ---- , slip op. at 5 (Fed. Cir. Aug. 18, 2022) (citing *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997)).  "Because drug manufactures are bound by strict statutory provisions to sell only those products that comport with the ANDA, if the ANDA defines a proposed generic drug in a manner that directly addresses the issue of infringement, it controls the infringement inquiry."  *Id.* (cleaned up) (citing *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002)); *see also Ferring B.V. v. Watson Labs., Inc.-Fla.*, 764 F.3d 1401, 1409–10 (Fed. Cir. 2014).

11.     Under 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention within the United States, or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a).

12.     Determining direct infringement requires a two-step inquiry. Step one is to construe the disputed terms of the patent at issue; step two is to compare the accused product with the properly construed claims of the patent. *Alza Corp. v. Andrx Pharm., LLC*, 607 F. Supp. 2d 614, 623 (D. Del. 2009). Step one is a question of law; step two is a question of fact. *Id.*; *see also Wavetronix v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1354 (Fed. Cir. 2009).

13.     "Infringement may be proven under either of two theories: literal infringement or the doctrine of equivalents." *Id.* "Infringement, either literally or under the doctrine of equivalents, does not arise by comparing the accused product… with a commercialized embodiment of the patentee." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1327-28 (Fed. Cir. 2007).

14.     "Literal infringement occurs when each element of at least one claim of the patent is found in the alleged infringer's product." *Alza*, 607 F. Supp. 24 at 623 (citing *Panduit Corp. v. Dennison Mfg. Co.*, 836 F.2d 1329, 1330 (Fed. Cir. 1987)); *see also DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1331 (Fed. Cir. 2001).

15.     "If, however, even one claim limitation is missing or not met, there is no literal infringement." *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1352 (Fed. Cir. 2005); *see also Bayer*, 212 F.3d at 1247 ("If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law."); *Glaxo Inc.*, 110 F.3d at 1566 ("It is elementary patent law that all limitations are material," and plaintiffs are "required to establish the presence of each limitation of the asserted claims."). Similarly, if there is any deviation from any claim limitation,

there can be no literal infringement as a matter of law. *See, e.g.*, *DeMarini Sports*, 239 F.3d at 1331; *Wavetronix*, 573 F.3d at 1359.

16. "[B]ioequivalency and equivalent infringement are different inquiries." *Abbott Lab'ys*, 566 F.3d at 1298. "[W]hile potentially relevant, the bioequivalency of an accused product with a product produced from the patent at issue is not sufficient to establish infringement by equivalents." *Id.* "Bioequivalency is a regulatory and medical concern aimed at establishing that two compounds are effectively the same for pharmaceutical purposes. In contrast, equivalency for purposes of patent infringement requires an element-by-element comparison of the patent claim and the accused product, requiring not only equivalent function but also equivalent way and result." *Id.* Thus, "[d]ifferent attributes of a given product may thus be relevant to bioequivalency but not equivalent infringement, and vice versa." *Id.*

17. "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "In order to prevail on an inducement claim, the patentee must establish first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007) (internal quotation marks omitted).

18. "[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). "[S]pecific intent may be inferred from circumstantial evidence where a defendant has both knowledge of the patent and specific intent to cause the acts constituting infringement." *Ricoh Co. v. Quanta Comput. Inc.*, 550 F.3d 1325, 1342 (Fed. Cir. 2008). "Liability for induced infringement can only attach if the

defendant knew of the patent and knew as well that 'the induced acts constitute patent infringement.'" *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926 (2015) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011)).

19.     For Hatch-Waxman cases, "[t]he pertinent question is whether the proposed label instructs users to perform the patented method." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010). "The label must encourage, recommend, or promote infringement." *Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015). "The mere existence of direct infringement by physicians, while necessary to find liability for induced infringement, is not sufficient for inducement." *Id.* Rather, "specific intent and action to induce infringement must be proven." *Id.*  "This requirement of inducing acts is particularly important in the Hatch-Waxman Act context because the statute was designed to enable the sale of drugs for non-patented uses even though this would result in some off-label infringing uses." *Id.* at 631-32 (citing *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 414 (2012) ("Congress understood [that] a single drug may have multiple methods of use, only one or some of which a patent covers" and that the statute "contemplates that one patented use will not foreclose marketing a generic drug for other unpatented ones.")); *Warner-Lambert*, 316 F.3d at 1359 (the Hatch-Waxman Act was not intended "as a sword against any competitor's ANDA seeking approval to market an off-patent drug for an approved use not covered by the patent"). Here, "[t]he question is not … whether a user following the instructions may end up using the device in an infringing way. Rather, it is whether [the] instructions teach an infringing use of the device such that [the Court is] willing to infer from those instructions an affirmative intent to infringe the patent." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1329 n.2 (Fed. Cir. 2009). If an approved label includes an indication with a broader scope than the asserted claim, then there is not infringement

10

because the label specifically encourages non-patented uses. *Grunenthal GmbH v. Alkem Lab'ys Ltd.*, 919 F.3d 1333, 1339-40 (Fed. Cir. 2019) (holding that where a broad label indication does not induce infringement for a patent claim directed to a subset of that indication without further specific instructions or encouragement).

20.     To successfully prove divided infringement, a plaintiff must prove "that all steps of the claimed method are performed and either (1) one party exercises the requisite 'direction or control' over the others' performance or (2) the actors form a joint enterprise such that performance of every step is attributable to the controlling party." *Lyda v. CBS Corp.*, 838 F.3d 1331, 1339 (Fed. Cir. 2016) (citing *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015)).

13.     Proof that a defendant engaged in joint infringement by directing and controlling another party's infringing conduct can be shown where the defendant "(1) '*conditions* participation in an activity or receipt of a benefit' upon others' performance of one or more steps of a patented method, and (2) '*establishes the manner or timing* of that performance.'" *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1365 (quoting *Akamai*, 797 F.3d at 1023). Proof that a defendant was part of a joint enterprise with another party or group of parties requires a showing of "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Akamai*, 797 F.3d at 1023.

14.     "The patentee bears the burden of proving infringement by a preponderance of the evidence. If the patentee fails to meet that burden, the patentee loses regardless of whether the accused comes forward with any evidence to the contrary." *Creative Compounds, LLC v.*

*Starmark Labs.*, 651 F.3d 1303, 1314 (Fed. Cir. 2011) (quotation omitted). This is because it is "improper[] [to] shift the burden of proving noninfringement to [the defendant]." *Amgen Inc. v. Hospira, Inc.*, 336 F. Supp. 3d 333, 361 (D. Del. 2018). "Speculative data . . . cannot sustain [patentee's] burden of proof." *Brigham & Women's Hosp., Inc. v. Perrigo Co.*, 761 F. App'x 995, 1003-04 (Fed. Cir. 2019).

15.     Determining infringement is a two-step process. *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 n.15, 1342 (Fed. Cir. 2005). First, the court construes the claims as a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Second, the properly construed claims must be compared to the accused product or process. *See Warner-Lambert*, 418 F.3d at 1340.

16.     "Infringement, literal or by equivalence, is determined by comparing an accused product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit." *SRI Int'l. v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).

17.     As a general rule, "[i]t is error for the court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent." *Recro Gainesville LLC v. Actavis Lab. FL, Inc.*, No. CV 14-1118-GMS, 2017 WL 1064883, at *11 (D. Del. Feb. 24, 2017) (quoting *Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994)); *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1328 (Fed. Cir. 2007) (holding that infringement inquiry "leaves no room for consideration of the patentee's product"); *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed. Cir.

2002) (en banc) ("[T]he law of infringement compares the accused product with the claims as construed by the court. . . . [and not] 'with a commercialized embodiment of the patentee.'") (quoting *SRI*, 775 F.2d at 1121).

18.     While there is no "blanket prohibition against comparing [an] accused product to a commercial embodiment, *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1288 (Fed. Cir. 2010), in a few, limited circumstances, the Federal Circuit has not disapproved of testimony comparing an accused product to a commercial embodiment when the commercial embodiment was co-extensive with the claims." *Gillette Co. LLC v. Dollar Shave Club, Inc.*, No. CV 15-1158-LPS-CJB, 2019 WL 1254773, at *2 (D. Del. Mar. 19, 2019) (excluding expert testimony regarding Plaintiff's commercial embodiment because "because neither Defendants nor Dr. Haber have shown that Plaintiff's commercial embodiment is co-extensive with the claims"). *See also Glaxo Wellcome, Inc. v. Andrx Pharms., Inc.*, 344 F.3d 1226, 1234 (Fed. Cir. 2003); *Glaxo Grp., Ltd. v. TorPharm, Inc.*, 153 F.3d 1366, 1374 (Fed. Cir. 1998).

19.     "To prove infringement, the patentee must show that an accused product embodies all limitations of the claim." *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1340 (Fed. Cir. 2013). For example, "[t]o infringe a method claim, all steps of the claimed method must be performed." *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1358 (Fed. Cir. 2012). Similarly, "[i]f any claim limitation is absent from [an] accused [product], there is no literal infringement as a matter of law." *Cephalon*, 707 F.3d at 1340.

20.     "A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers." 35 U.S.C. § 112, ¶ 4.[1] "One who does not infringe an

---

[1] Because the Asserted Patents claim priority to applications that predate March 16, 2013, the applicable version of the Patent Act (35 U.S.C. § 100 *et seq.*) predates the amendments enacted by the Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011).

independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim." *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 798 (Fed. Cir. 1990) (quotation omitted).

21.     The Hatch-Waxman Act, 35 U.S.C. § 271(e)(2)(A), "provides an 'artificial' act of infringement that creates case-or-controversy jurisdiction to enable the resolution of an infringement dispute before the ANDA applicant has actually made or marketed the proposed product." *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1355-56 (Fed. Cir. 2003). "Once jurisdiction is established, however, the substantive determination whether actual infringement or inducement will take place is determined by traditional patent infringement analysis, just the same as it is in other infringement suits." *Id.*

22.     "The infringement analysis in an ANDA case is most straightforward when the ANDA's specification directly addresses the elements of the asserted claims that are at issue." *Par Pharm., Inc. v. Eagle Pharms. Inc.*, C.A. No. 18-0823-CFC-JLH, 2021 WL 3886418, *8 (D. Del. Aug. 31, 2021). "Because of [the] statutory and regulatory requirements [for ANDA filers] and the consequences that flow from failing to abide by them, courts 'cannot assume that an ANDA filer will not act in full compliance with its representations to the FDA." *Par Pharm.*, 2021 WL 3886418, at *22 (quoting *In re Brimonidine Patent Litig.*, 643 F.3d 1366, 1378 (Fed. Cir. 2011)).  Thus, "if the product that an ANDA applicant is asking the FDA to approve falls outside the scope of an asserted patent, a judgment of noninfringement must follow." *Id.* at *8; *see also Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002) (stating with respect to 271(e)(2)(A) that "an ANDA specification defining a proposed generic drug in a manner that directly addresses the issue of infringement will control the infringement inquiry" and thus a finding "of no literal infringement [is] properly granted where the ANDA

14

specification require[s] the proposed drug to . . . [be] outside [of the claims of] the patent is suit.").

23.    The infringement analysis centers on what "is likely to be sold should the FDA approve the application." *See, e.g., Purdue Pharma Prods. LP v. Par Pharm., Inc.*, 642 F. Supp. 2d 329, 362 (D. Del. 2009) (citing *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1248-49 (Fed. Cir. 2000)) ("Where the act of infringement is the filing of an ANDA, the analysis is a hypothetical one, comparing the asserted claims against the product that is likely to be sold should the FDA approve the application."). "Because drug manufacturers are bound by strict statutory provisions to sell only those products that comport with the ANDA's description of the drug," the infringement analysis hinges on the current product or process, as described in the DMF and ANDA. *Abbott*, 300 F.3d at 1373.

24.    For example, a development batch "is not representative of [an] ANDA Product that [the ANDA holder] seeks FDA permission to sell." *Lundbeck v. Lupin Ltd.*, C.A. No. 18-88-LPS, 2021 WL 4944963, *29 (D. Del. Sept. 30, 2021); *see also Bayer*, 212 F.3d at 1249 ("[T]he focus of the infringement inquiry under 35 U.S.C. § 271(e)(2)(A) is on the product that will be sold after the FDA's approval of the ANDA, not on the biobatch that is produced to facilitate FDA approval.") (internal citation omitted).

25.    Where an ANDA applicant has amended its ANDA in a noninfringing manner, the amended ANDA "is properly considered for the purposes of § 271(e)(2) infringement." *Ferring B.V. v. Watson Labs., Inc.-Fla.*, 764 F.3d 1382, 1390-91 (Fed. Cir. 2014) (explaining that "an amended ANDA that addresses the issue of infringement and precludes such infringement is generally dispositive"). Likewise, an amended ANDA controls the infringement inquiry should FDA approve the application, "given the restrictions that [the ANDA filer] has

placed on the amendment and the FDA's own governing statute" requiring compliance with the amended ANDA. *Id.* (holding that the amended ANDA "shows that [the ANDA filer] is not permitted to sell an infringing product"); *Bayer*, 212 F.3d at 1249-50 (holding that Elan's ANDA amendment describes "the only drug Elan can produce upon approval of the ANDA at issue").

26.     Similarly, products or samples that do not comport with the ANDA cannot serve as a basis for finding infringement. *Alcon Rsch. Ltd. v. Barr Labs. Inc*., 745 F.3d 1180, 1187 (Fed. Cir. 2014) (holding that testing on formulations that "were meaningfully different from the product described in Barr's ANDA" had "no bearing on whether Barr's proposed generic product infringed"); *Lundbeck*, 2021 WL 4944963, at *95 (finding "Plaintiffs' evidence involved testing that occurred under conditions – in terms of variables such as time, temperature, and pressure – that are unrealistic and/or that are well outside of what will be permitted with proper handling of the ANDA Products"); *Merck Sharp & Dohme Corp. v. Amneal Pharms. LLC*, 881 F.3d 1376, 1385 (Fed. Cir. 2018) ("The critical inquiry [in an 35 U.S.C. § 271(e)(2) infringement case] is whether [produced samples are] representative of what is likely to be approved and marketed"); *Ferring*, 764 F.3d at 1409 ("The infringement evaluation is concerned only with the final, [] commercial [product] for which [the ANDA filer] sought and was granted FDA approval to market as a generic version").

### 2.     Direct Infringement

27.     "Direct infringement requires a party to perform each and every step or element of a claimed method or product." *Forest Labs. Holdings Ltd. v. Mylan Inc.*, 206 F. Supp. 3d 957, 973 (D. Del. 2016) (quoting *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1320 (Fed. Cir. 2009)). "To prove infringement, the patentee must show that the accused device meets each

claim limitation, either literally or under the doctrine of equivalents." *Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003).

28.     "[L]imitations cannot be read into the claims from the specification or the prosecution history." *Burke, Inc. v. Bruno Indep. Living Aids, Inc*., 183 F.3d 1334, 1340 (Fed. Cir. 1999).

29.      "Infringement is a question of fact." *Sunovian Pharm., Inc. v. Teva Pharm. USA, Inc.*, 731 F.3d 1271, 1275 (Fed. Cir. 2013).

30.     "[D]irect infringement under § 271(a) of a process patent occurs only when a single party practices every step of the claimed process." *Syngenta Crop Protection, LLC v. Willowood, LLC*, 944 F.3d 1344, 1360 (Fed. Cir. 2019); s*ee also Int'l Business Machines Corp. v. Booking Holdings Inc.*, 775 Fed. App'x 674, 677 (Fed. Cir. 2019) ("Direct infringement requires that all the steps of a claimed method be performed by or attributable to a single entity.") (quotation omitted)). In other words, a "claim is directly infringed only by one practicing the [whole] patented [process]." *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed. Cir. 1993).

### 3.     Infringement Under Doctrine of Equivalents

31.     "[A] product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co.*, 520 U.S. at 21. What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. *Id.* at 24.

32.     A claim limitation's "equivalent" is found in an accused product only "where an 'equivalent' differs from the claimed limitation only insubstantially." *Enzo Biochem Inc. v.*

*Applera Corp.*, 702 F. App'x 971, 976 (Fed. Cir. 2017). "Whether a component in the accused subject matter performs substantially the same function as the claimed limitation in substantially the same way to achieve substantially the same result may be relevant to this determination." *Id.* (internal citation and quotation omitted). Equivalency must be proved "with 'particularized testimony and linking argument.'" *Texas Instruments Inc. v. Cypress Seminconductor Corp.*, 90 F.3d 1558, 1566 (Fed. Cir. 1996) (quoting *Lear Siegler, Inc. v. Sealy Mattress Co.*, 873 F.2d 1422 (Fed. Cir. 1989)).

33.     Infringement under the doctrine of equivalents is a question of fact. *Stryker Corp. v. Davol Inc.*, 234 F.3d 1252, 1258 (Fed. Cir. 2000). However, the Federal Circuit has held that "[i]f a theory of equivalence would vitiate a claim limitation,[] then there can be no infringement under the doctrine of equivalents as a matter of law." *Tronzo v. Biomet, Inc*., 156 F.3d 1154, 1160 (Fed. Cir. 1998) ("Such a result is impermissible under the all-elements rule of *Warner–Jenkinson*.'") (citation omitted). "Vitiation is not an exception to the doctrine of equivalents. . . . Rather, it is a legal determination 'that the evidence is such that no reasonable jury could determine two elements to be equivalent.'" *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1323 (Fed. Cir. 2014) (quoting *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356 (Fed.Cir.2012)). "Thus, the 'all-elements' rule generally is not met—and therefore a claim limitation can be said to be vitiated—if the theory or evidence is so legally insufficient as to warrant a holding of non-infringement as a matter of law.".*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1017 (Fed. Cir. 2006).

34.     "As a corollary to the 'all limitations' rule . . . , we have held that 'the concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims.'" *Athletic Alternatives, Inc. v. Prince Mfg. Inc*., 73 F.3d 1573, 1582 (Fed. Cir. 1996). As

such, "the doctrine of equivalents may not be applied" "[w]hen the substitution of one feature []

for another into an element of the accused product places it outside the scope of the recited claim

element." *Novartis Pharms. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1337-39 (Fed. Cir. 2004)

(affirming JMOL of noninfringement under DOE based on claim construction that excluded the

accused chemical composition); *see also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys.,

Inc.*, 242 F.3d 1337, 1347 (Fed. Cir. 2001) (affirming summary judgment of noninfringement

under DOE because claims requiring a 'non-metallic' device could not be asserted against a

metallic device). The principle of vitiation is particularly relevant where "[n]o subtlety of

language or complexity of the technology, nor any subsequent change in the state of the art, such

as later-developed technology, obfuscated the significance of this limitation at the time of its

incorporation into the claim." *Sage Prod., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1425 (Fed.

Cir. 1997) (affirming summary judgment of noninfringement under DOE because the presence

of hydroxyl groups in the accused infringing coating made it no longer an "oxide" under the

proper claim construction).

### 4.     Legal Limitations on the Doctrine of Equivalents

#### a.     Prosecution History Estoppel

35.     "Prosecution history estoppel applies as part of an infringement analysis to

prevent a patentee from using the doctrine of equivalents to recapture subject matter surrendered

from the literal scope of a claim during prosecution." *Amgen Inc. v. Coherus BioSciences Inc*.,

931 F.3d 1154, 1159 (Fed. Cir. 2019). "Prosecution history estoppel can extend from a parent

application to subsequent patents in the same lineage." *Trading Techs. Int'l, Inc. v. Open E Cry,

LLC*, 728 F.3d 1309, 1323 (Fed. Cir. 2013).

36.     Under the Supreme Court's formulation for amendment-based estoppel in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd*., 535 U.S. 722, 122 S. Ct. 1831, 152 L. Ed. 2d 944, 62 U.S.P.Q.2d 1705 (2002), a presumption exists that a narrowing amendment surrenders all subject matter between the original claim scope and the amended claim scope. As such, prosecution history estoppel presumably occurs where a patentee has made a narrowing claim amendment during prosecution. *Integrated Tech. Corp. v. Rudolph Techs., Inc*., 734 F.3d 1352, 1356-57 (Fed. Cir. 2013).

37.     A patentee has the opportunity to rebut the presumption of surrender by showing that "at the time of the amendment one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent." *Festo*, 535 U.S. at 741, 122 S. Ct. at 1842, 62 U.S.P.Q.2d at 1714. It can do this by showing that: i) the equivalent was unforeseeable at the time of the application; ii) the rationale underlying the amendment bears no more than a tangential relation to the equivalent in question; or iii) other reasons suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question. *See id*.

38.     Prosecution history estoppel is a question of law. *See Amgen Inc. v. Coherus Biosciences, Inc*., 2018 WL 1517689 at *4 (D. Del. March 26, 2018), aff'd, 931 F.3d at 1161. "Therefore, 'the determinations concerning whether the presumption of surrender has arisen and whether it has been rebutted are . . . for the court . . . to decide.' *Intellectual Ventures I LLC v. T-Mobile USA, Inc*., No. 13-1632-LPS, 2017 U.S. Dist. LEXIS 138342, at *14 (D. Del. Aug. 23, 2017) (internal citations omitted). "And though exceptions exist to prosecution history estoppel, "expert opinions cannot establish tangentiality or the reason for an amendment because '[o]nly

the public record of the patent's prosecution, i.e., the patent's prosecution history, can be a basis

for'" the amendment.'" *Id.*

### b.      The Disclosure-Dedication Doctrine

39.      The disclosure-dedication doctrine also bars application of the doctrine of

equivalents. *Johnson*, 285 F.3d at 1054. "'[W]hen a patent drafter discloses but declines to claim

subject matter, . . . this action dedicates the unclaimed subject matter to the public.'" *Eagle*

*Pharm. Inc. v. Slayback Pharm. LLC*, 958 F.3d 1171, 1175 (Fed. Cir. 2020) (quoting *Johnson*,

285 F.3d at 1054; *see also Maxwell v. J. Baker, Inc*., 83 F.3d 1098, 1106 (Fed. Cir. 1996). The

doctrine prevents a patentee from "narrowly claim[ing] an invention to avoid prosecution

scrutiny by the PTO, and then, after patent issuance, us[ing] the doctrine of equivalents to

establish infringement because the specification discloses equivalents." *Johnson*, 285 F.3d at

1055.

40.      By preventing a patentee from recapturing unclaimed subject matter, the

disclosure-dedication doctrine reinforces "the primacy of the claims in defining the scope of the

patentee's exclusive right." *Id*. To determine whether the disclosure-dedication doctrine applies

in a given case, we ask whether the specification discloses unclaimed subject matter with "such

specificity that one of ordinary skill in the art could identify the subject matter that had been

disclosed and not claimed." *PSC Comput. Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353,

1360 (Fed. Cir. 2004). If the court concludes that the inventor dedicated an alleged equivalent to

the public, the patent owner cannot prevail on its doctrine of equivalents infringement claim

based on that equivalent. *Maxwell v. J. Baker, Inc.,* 86 F.3d 1098, 1108 (Fed. Cir. 1996).

41.      The disclosure-dedication doctrine does not require the specification to disclose

the allegedly dedicated subject matter in an embodiment that exactly matches the claimed

21

embodiment. *Eagle Pharm. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1176 (Fed. Cir. 2020) (citing *Johnson*, 285 F.3d at 1052). The disclosure-dedication doctrine requires only that the specification disclose the unclaimed matter "as an alternative to the relevant claim limitation." *Id.* (citing *Pfizer, Inc. v. Teva Pharm. USA, Inc* ., 429 F.3d 1364, 1378 (Fed. Cir. 2005)).

### c. Ensnarement of the Prior Art

42.     "A patentee may not assert 'a scope of equivalency that would encompass, or ensnare, the prior art." *Intendis GmbH v. Glenmark Pharm. Inc., USA*, 822 F.3d 1355, 1363 (Fed. Cir. 2016) (quoting *DePuy Spine*, 567 F.3d at 1322). Therefore, even if equivalency is found between a claim limitation and an accused device, "there can be no infringement if the asserted scope of equivalency of what is literally claimed would encompass the prior art." *Pennwalt Corp. v. Durand-Wayland, Inc*., 833 F.2d 931, 934, 4 USPQ2d 1737, 1739 (Fed. Cir. 1987) (en banc), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426, 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988).

43.     "A helpful first step in an ensnarement analysis is to construct a hypothetical claim that literally covers the accused device." *DePuy Spine*, 567 F.3d at 1324. "Next, a court must assess the prior art introduced by the accused infringer and determine whether the patentee has carried its burden of persuading the court that the hypothetical claim is patentable over the prior art." *Id*. at 1325. "In short, [the court] ask[s] if a hypothetical claim can be crafted, which contains both the literal claim scope and the accused device, without ensnaring the prior art." *Intendis*, 822 F.3d at 1363.

44.     "[W]hether an asserted range of equivalents would cover what is already in the public domain" is a question of law. *Wilson Sporting Goods v. David Geoffrey*, 904 F.2d 677

(Fed. Cir. 1990) (citing *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870, 228 USPQ 90, 96

(Fed. Cir. 1985)).

## II.  Remedies

### A.  Issues to be Litigated

45.  Whether Plaintiffs are entitled to injunctive relief preventing Defendants' from

the manufacture, use, import, sale, or offer for sale of Defendants' proposed ANDA product until

the expiration of the Asserted Patents.

46.  Whether this is an exceptional case under 35 U.S.C. § 285.

### B.  Legal Principles

47.  Under 35 U.S.C. § 271(e)(4)(B), "injunctive relief may be granted against an

infringer to prevent the commercial manufacture, use, offer to sell, or sale within the United

States or importation into the United States of an approved drug, veterinary biological product,

or biological product." *See also Voda v. Cordis Corp.*, 536 F.3d 1311, 1329 (Fed. Cir. 2008)

(affirming the denial of a permanent injunction where generic drug manufacturer lost

infringement decision).

48.  In order to establish that an injunction is warranted, a plaintiff must demonstrate:

"(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary

damages, are inadequate to compensate for that injury; (3) that, considering the balance of

hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange,

L.L.C.*, 547 U.S. 388, 391 (2006); *Alcon, Inc. v. Teva Pharm. USA, Inc.*, Civ. No. 06-234-SLR,

2010 WL 3081327, at *2 (D. Del. Aug. 5, 2010) (denying request for permanent injunction).

49.     "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court . . . ." *eBay*, 547 U.S. at 391 (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311-13 (1982)).

50.     A patentee's "statutory right to exclude alone [does not justify] [a] general rule in favor of permanent injunctive relief," and "injunctive relief 'may' issue only 'in accordance with the principles of equity.'" *eBay*, 547 U.S. at 392; *Alcon*, 2010 WL 3081327, at *2.

51.     In exceptional cases, a court may award reasonable attorneys' fees to the prevailing party. *See* 35 U.S.C. § 285.

52.     In deciding whether to award attorney fees under Section 285, the court must undertake a two-step inquiry. *Wedgetail, Ltd. v. Huddleston Deluxe, Inc.*, 576 F.3d 1302, 1304 (Fed. Cir. 2009).

53.     First, the court must determine whether there is clear and convincing evidence that the case is exceptional. *Wedgetail*, 576 F.3d at 1304. In deciding whether a case is exceptional, the court must evaluate whether it "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). This determination is a "case-by-case exercise" to be made "considering the totality of the circumstances." *Id.* The burden of proof rests with the prevailing party. *See Otsuka Pharm. Co. v. Sandoz, Inc.*, Civil Action No. 07-1000 (MLC), 2015 WL 5921035, at *8 (D.N.J. Oct. 9, 2015).

54.     Second, the court must determine whether an award of attorneys' fees to the prevailing party is warranted. *Wedgetail*, 576 F.3d at 1304. Absent serious misconduct, courts have been reluctant to award fees to a prevailing party. *See Otsuka*, 2015 WL 5921035, at *6-7.

24

Examples of such serious misconduct include misleading statements "coupled with affirmative, false declarations submitted to the PTO in order to procure patents," filing of frivolous lawsuits, and re-litigation of issues already decided by the court. *Intellect Wireless, Inc. v. Sharp Corp.*, 45 F. Supp. 3d 839, 853 (N. D. Ill. 2014) (granting competitors' request for attorneys' fees); *see also Chalumeau Power Sys. LLC v. Alcatel–Lucent*, Civil Action No. 11-1175-RGA, 2014 WL 4675002, at *3 (D. Del. Sept. 12, 2014) (granting defendants' motion for attorneys' fees and costs), *aff'd*, 611 F. App'x 1008 (Fed. Cir. 2015). Such conduct is akin to the "'pattern of deceit' recognized by the Federal Circuit" in determining whether a case is exceptional under Section 285. *Intellect Wireless*, 45 F. Supp. 3d at 853; *see also Wedgetail*, 576 F.3d at 1304.

**III.    Invalidity of the Asserted Claims**

    **A.    Issues to be Litigated**

55.    Whether the asserted claims of the RE '059 patent, '840 Patent, '109 Patent, and the '637 Patent are invalid as obvious under 35 U.S.C. § 103.

56.    Whether the claims 4 and 5 of the '840 Patent, claims 1 and 2 of the '109 Patent, and claim 7 of the '637 Patent are invalid for lack of written description under 35 U.S.C. § 112.

57.    Whether the claims 4 and 5 of the '840 Patent and claims 1 and 2 of the '109 Patent are invalid for lack of enablement under 35 U.S.C. § 112.

58.    Whether the asserted claims of the '419 patent are invalid for lack of written description or enablement under 35 U.S.C. § 112.

59.    Whether the asserted claims of the '419 patent patents are indefinite.

60.    Whether the asserted claims of the '419 patent are invalid as obvious under 35 U.S.C. § 103.

61.     Whether the claim 2 of the '419 patent is invalid under 35 USC § 112, 4th Paragraph.

**B.      Obviousness**

62.     The determination of obviousness under 35 U.S.C. § 103(a) is a question of law based on underlying facts. *Bayer Schering Pharma AG v. Barr Lab'ys., Inc.*, 575 F.3d 1341, 1346 (Fed. Cir. 2009).

### 1.      General Principles

63.     "Section 103(a) forbids issuance of a patent 'when the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a [POSA] to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 406 (2007)*; *see also* 35 U.S.C. § 103.

64.     Obviousness is a question of law based on underlying facts including: (1) the scope and content of the prior art, (2) the level of ordinary skill in the pertinent art, (3) the differences between the prior art and the claims at issue, and (4) secondary considerations. *Prometheus Lab'ys, Inc. v. Roxane Lab'ys, Inc.*, 805 F.3d 1092, 1097-98 (Fed. Cir. 2015); *Bayer Schering Pharma AG v. Barr Lab'ys, Inc.*, 575 F.3d 1341, 1346-47 (Fed. Cir. 2009). Based on these factual inquiries, the Court must determine, as a matter of law, whether the claimed subject matter as a whole would have been obvious to one of ordinary skill in the art at the time the alleged invention was made. *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); see also *KSR Int'l*, 550 U.S. at 406. "[A]dvances that would occur in the ordinary course without real innovation" are not deserving of a patent. *KSR Int'l*, 550 U.S. at 419, 426-27.

65.     The clear and convincing evidence standard for the obviousness determination does not apply to the "ultimate legal conclusion of obviousness itself," but only to the disputed facts underlying the conclusion of obviousness. *Newell Cos., Inc. v. Kenney Mfg. Co.,* 864 F.2d 757, 767 (Fed. Cir. 1988); *see also Microsoft Corp.*, 564 U.S. at 95, 114.

66.     The Supreme Court has "set forth an expansive and flexible approach" to obviousness. *KSR Int'l*, 550 U.S. at 415. The Supreme Court has emphasized that an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 418. The Federal Circuit has stated that it "cannot, in the face of KSR, cling to formalistic rules for obviousness, customize its legal tests for specific scientific fields in ways that deem entire classes of prior art teaching irrelevant, or discount the significant abilities of artisans or ordinary skill in an advanced area of art." *In re Kubin*, 561 F.3d 1351, 1360-61 (Fed. Cir. 2009) (citing *In re Durden*, 763 F.2d 1406, 1411 (Fed. Cir. 1985)).

67.     "[I]nherency may supply a missing claim limitation in an obviousness analysis." *Par Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1194-95 (Fed. Cir. 2014); *see also, e.g., Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1294 n.1 (Fed. Cir. 2013). An element is inherent for purposes of the obviousness analysis "'when the limitation at issue is the "natural result" of the combination of prior art elements."' Par, 773 F.3d at 1995; see also In re Huai-Hung Kao, 639 F.3d 1057, 1070 (Fed. Cir. 2011) (finding that a "claimed 'food effect' [wa]s an inherent property" of the formulation covered by the asserted patent such that the claim element "add[ed] nothing of patentable consequence," and affirming obviousness where prior art reference did not teach the inherent element); *Santarus, Inc. v. Par Pharm., Inc*., 694 F.3d 1344, 1354 (Fed. Cir.

2012) ("An obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the resulting serum concentrations. To hold otherwise would allow any formulation—no matter how obvious—to become patentable merely by testing and claiming an inherent property."); *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1369 (Fed. Cir. 2012) (inherency appropriate in obviousness context where it concerns a "property that is necessarily present"); *In re Kubin*, 561 F.3d 1351, 1357 (Fed. Cir. 2009) ("Even if no prior art of record explicitly discusses the [limitation], the… application itself instructs that [the limitation] is not an additional requirement imposed by the claims on the [claimed invention], but rather a property necessarily present in the [claimed invention].").

68.     The fact that a reference was previously considered by the PTO merely goes to the weight of that reference's evidence and does not increase the burden of proof or preclude a finding of invalidity. *See Sciele Pharma*, 684 F.3d at 1259-60; *Surface Tech., Inc. v. U.S.I.T.C.*, 801 F.2d 1336, 1340-41 (Fed. Cir. 1986). A finding of invalidity may be appropriate where the reference was considered by the PTO, but the Examiner failed to give proper consideration to the teachings of that reference. *See Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1366 (Fed. Cir. 2007).

69.     "Whether a reference was previously considered by the PTO, the burden of proof is the same: clear and convincing evidence." *Sciele Pharma*, 684 F.3d at 1260 (citing Microsoft Corp., 91 U.S. at 108-09). "The burden does not suddenly change to something higher— 'extremely clear and convincing evidence' or 'crystal clear and convincing evidence'—simply because the prior art references were considered by the PTO." *Id*. "In short, there is no heightened or added burden that applies to invalidity defenses that are based upon references that were before the Patent Office." *Id.*

70.     The use of unpublished internal documents and post-priority-date publications to show the state of the art existing on the priority date of a patent application is permitted. *In re Epstein*, 32 F.3d 1559, 1563, 1567  (Fed. Cir. 1994) (finding "no clear error" in using post-priority-date publications to demonstrate public use and a POSA's understanding); *Thomas & Betts Corp. v. Litton Sys., Inc.*, 720 F.2d 1572, 1580-81 (Fed. Cir. 1983) (finding that unpublished internal documents "were, in effect, properly used" as indicators of a POSA's understanding of the state of art); *In re Copaxane*, 906 F.3d 1013, 1020, 1029-30 (Fed. Cir. 2018) (finding post-priority study was properly admitted as evidence of a POSA's "motivations and expectations when reading the prior art at the time of the invention.").

## 2.     Comity of Law

71.     Courts may apply comity where it is appropriate. "Comity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience, and expediency." *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3rd Cir. 1971). "Comity should be withheld ***only*** when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." *Id.* (emphasis added). When the foreign decision is fundamentally fair and the Defendants is present, the foreign judgement is recognized. *Cochran Consulting, Inc. v. Uwatec USA, Inc.*, 102 F.3d 1224, 1229 (Fed. Cir. 1996).

72.     When addressing comity, the Federal Circuit applies regional circuit law. *Int'l Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1328 (Fed. Cir. 2001).

73.     The "four requirements for preclusion of factual findings in foreign litigation [are]: (1) the issue must be identical; (2) the issue must be actually litigated; (3) the fact finding must have been necessary to the court's final decision; (4) the proceedings by the foreign

29

tribunal must be fundamentally fair." *Oneac Corp. v. Raychem Corp.*, 20 F. Supp. 2d 1233, 1243 (N.D. Ill. 1998); *see also Cochran Consulting*, 102 F.3d at 1229.

### 3.     Scope and Content of the Prior Art

74.     The scope of the prior art includes art which is "reasonably pertinent to the particular problem with which the inventor was involved." *In re GPAC Inc.*, 57 F.3d 1573, 1577 (Fed. Cir. 1995). In determining whether the claimed invention falls within the scope of the relevant prior art, a court first examines, "the field of the inventor's endeavor" and "the particular problem with which the inventor was involved" at the time the invention was made. *Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*, 411 F.3d 1332, 1339 (Fed. Cir. 2005). "A reference is reasonably pertinent if, even though it may be in a different field of endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem." *Id.* (quoting *In re GPAC*, 57 F.3d at 1578).

75.     Printed publications, patents, and patent applications, *inter alia*, all constitute prior art under 35 U.S.C. § 102. A reference is prior art under § 102(b) if it was "patented or described in a printed publication… one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). A published patent application is prior art under 35 U.S.C. § 102(e) if it was filed by another before the invention by the applicant for the patent. A patent granted on an application for patent by another filed in the United States before the invention by the applicant for the patent is also prior art under § 102(e).

76.     Prior art references in an obviousness analysis are considered as a whole and not limited to the particular invention described. *See, e.g.*, *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1076 (Fed. Cir. 2015) (citing *EWP Corp. v. Reliance Universal, Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985) ("A reference must be considered for everything it teaches by way of

technology and is not limited to the particular invention it is describing and attempting to protect."). This is also true even if a particular embodiment of the invention is not the preferred embodiment. *See, e.g.*, *In re Arora*, No. 2009–1506, 2010 WL 816569, at *2 (Fed. Cir. Mar. 10, 2010) ("Dr. Arora argues that Andersson should be understood as limited to the narrow teaching that a smaller amount of a drug is needed when delivered via Andersson's inventive dry powder inhaler instead of a metered dose inhaler. It is well-settled, however, that a prior art reference must be considered for all that it teaches to [POSAs], not just the embodiments disclosed therein. … Andersson teaches the broad principle that different drugs are equipotent at different dosages, and even provides an example of that principle."); *Purdue Pharma Prods., L.P. v. Par Pharm., Inc.*, Nos. 2009-1553, 2009-1592, 2010 WL 2203101, at *3 (Fed. Cir. June 3, 2010) ("[Prior art reference] renders the selection of tramadol obvious regardless of whether or not the patent lists tramadol as a preferred embodiment.").

77.     While the cited prior art as a whole must enable a POSA to make and use the apparatus or method, each individual prior art reference is prior art, regardless of whether it alone provides an enabling disclosure. *See ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1360 n.2 (Fed. Cir. 2015); *Geo M. Martin, Co. v. Alliance Mach. Sys. Int'l, LLC*, 618 F.3d 1294, 1302- 03 (Fed. Cir. 2010); *Therasense, Inc. v. Becton, Dickinson and Co.*, 593 F.3d 1289, 1297 (Fed. Cir. 2010) (vacated for en banc rehearing on inequitable conduct).

78.     Prior art may be combined with the knowledge and/or experience of a POSA to "fill in the gap when limitations of the claimed invention are not specifically found in the prior art." *Belden Techs., Inc. v. Superior Essex Commc'ns LP*, 802 F. Supp. 2d 555, 563 (D. Del. 2011) (citing *Purdue Pharma*, 642 F. Supp. 2d at 360; *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362-63 (Fed. Cir. 2013) ("[T]he knowledge of such an artisan is part of the store of public

knowledge that must be consulted when considering whether a claimed invention would have been obvious.").

79.     "What a reference teaches a [POSA] is not… limited to what a reference *specifically* 'talks about' or what is specifically 'mentioned 'or 'written' in the reference." *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005).

80.     Also, a determination that a claimed invention would be obvious, therefore "need *not* seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a [POSA] would employ." *KSR*, 550 U.S. at 418.

81.     Statements made by a party before a foreign patent office may have relevance and may be admitted, particularly concerning the same factual questions. *See In re Omeprazole Patent Litigation*, 483 F.3d 1364 (Fed. Cir. 2007) (finding obviousness and relying on factual admission regarding scientific fact regarding inherency that the suitability of one chemical for another chemical made by the patentee in a foreign proceeding is relevant and admissible); *Glaxo Grp. Ltd. v. Ranbaxy Pharma., Inc.*, 262 F.3d 1333, 1337 (Fed. Cir. 2001); *Ferring B.V. v. Serenity Pharm., LLC*, No. 17 Civ. 9922 (CM)**,** 2020 WL 1164700, at *5-6 (S.D.N.Y. Mar. 11, 2020) (denying patentee's motion in limine seeking to preclude Ferring from presenting evidence regarding the inventor's response in an EPO opposition proceeding and finding that the argument made by patentee in the EPO proceeding regarding prior art "would be relevant as an admission against interest"); *Pfizer Inc. v. Ranbaxy Lab'ys Ltd.*, No. Civ.A. 03–209–JJF, 2005 WL 3525681 (D. Del. Dec. 22, 2005) (denying patentee's motion seeking to exclude evidence of a determination by a foreign patent office that the claims in the foreign counterpart were invalid

because the evidence has relevance and the patentee failed to show sufficient prejudice under Fed. R. Evid. 403).

### 4.      Person of Ordinary Skill in the Art

82.      The person of ordinary skill in the art is a hypothetical person presumed to know all of the teachings of the prior art references in the field of the invention at the time the invention was made. *See Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1576 (Fed. Cir. 1984).

83.      In determining the level of ordinary skill in the art, a court should consider the following factors: "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007). However, "[n]ot all [of the factors listed above] may be present in every case, and one or more of these or other factors may predominate in a particular case." *Imperial Chem. Indus., PLC v. Danbury Pharm., Inc.*, 777 F. Supp. 330, 371 (D. Del. 1991) (citing *Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696-97 (Fed. Cir. 1983)).

84.      The actual inventor's skill or knowledge is not relevant. *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985).

### 5.      Lead Compound Analysis

85.      In determining the obviousness of a new chemical compound, the Federal Circuit applies a "lead compound" analysis. The Federal Circuit has instructed that

> When a patent claims a chemical compound, a prima facie case of obviousness under the third Graham factor frequently turns on the structural similarities and differences between the compounds claimed and those in the prior art. Proof of obviousness based on

> structural similarity requires clear and convincing evidence that a
> medicinal chemist of ordinary skill would have been motivated to
> select and then to modify a prior art compound (e.g., a lead
> compound) to arrive at a claimed compound with a reasonable
> expectation that the new compound would have similar or
> improvedproperties compared with the old.

*Daiichi Sankyo Co., Ltd. v. Matrix Labs., Ltd.*, 619 F.3d 1346, 1352 (Fed. Cir. 2010).

86.     The lead compound analysis "focuses on those proposed lead compounds that the

alleged infringer has attempted to prove, by clear and convincing evidence, that the skilled

artisan would have had a reason to select from the panoply of known compounds in the prior

art." *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc*., 678 F.3d 1280, 1291 (Fed. Cir. 2012). A lead

compound is a compound that is "a natural choice for further development efforts." *Altana*

*Pharma AG v. Teva Pharm. USA, Inc*., 566 F.3d 999, 1008 (Fed. Cir. 2009). In any particular

case, there may be more than one prior art compound that a chemist of ordinary skill would have

considered for further development. *See id*. (explaining that limiting lead compound test to single

compound "would present a rigid test similar to the teaching-suggestion-motivation test that the

Supreme Court explicitly rejected in KSR").

87.     In determining whether a chemist would have selected a prior art compound as a

lead, the analysis is guided by evidence of the compound's pertinent properties, such as activity,

potency, toxicity, and other relevant characteristics. *See Otsuka,* 678 F.3d at 1292. "Absent a

reason or motivation based on such prior art evidence, mere structural similarity between a prior

art compound and the claimed compound does not inform the lead compound selection." *Id*. A

lead compound is not limited to "a compound in the prior art that would be most promising to

modify in order to improve upon its . . . activity and obtain a compound with better activity."

*E.g., Otsuka Pharm. Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1291 (Fed. Cir. 2012). Such a limiting

definition of a lead compound, is not the law, and contradicts the statute, the controlling *en banc*

decision of the Federal Circuit, and the Supreme Court decision in KSR. The Federal Circuit

expressly rejected this requirement in *Altana*, 566 F.3d at 1008. The Federal Circuit stated that

"to the extent Altana suggests that the prior art must point to only a single lead compound for

further development efforts, that restrictive view of the lead compound test would present a rigid

test similar to the teaching-suggestion-motivation test that the Supreme Court explicitly rejected

in KSR." *Id*.

88.     The lead compound analysis need not "rigidly focus on the selection of a single,

best lead compound," but may include multiple lead compounds. *Daiichi*, 619 F.3d at 1354.

Additionally, to determine a lead compound, the analysis must examine "the state of the art at the

time the invention was made to find a motivation to select and then modify a lead compound to

arrive at the claimed invention." *Id*. (emphasis in original).

89.     . It is only necessary to identify some reason that would have led a chemist to

modify a known compound in a particular manner to establish obviousness. *Pfizer*, 480 F.3d at

1363 (patent obvious where there is "motivation to narrow the genus of 53 pharmaceutically-

acceptable anions . . . to a few."); *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough

Corp.,* 68 F. Supp. 2d 508, 535 (D.N.J. 1999) (rejecting argument "that to succeed on its

obviousness defense Schering must prove the prior art taught the exclusive use of MA-104 cells

or that MA-104 cells had a greater likelihood of success than other cells").

90.     The motivation to "modify the lead compound can come from any number of

sources and need not be explicit in the art." *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc*.,

752 F.3d 967, 973 (Fed. Cir. 2014). Moreover, for such motivation, "it is sufficient to show that

the claimed and prior art compounds possess a 'sufficiently close relationship . . . to create an

expectation,' in light of the totality of the prior art, that the new compound will have 'similar

properties' to the old." *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.,* 499 F.3d 1293, 1301 (Fed. Cir. 2007). The expected properties of a claimed compound may be sufficient to lead to a reasonable expectation of success in modifying a prior art compound to make the claimed compound. *Id.* at 976 (*citing Dillon*, 919 F.2d at 697).

91.     "In the chemical arts . . . 'structural similarity between claimed and prior art subject matter, proved by combining references or otherwise, where the prior art gives reason or motivation to make the claimed compositions, creates a prima facie case of obviousness.'" *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356 (Fed. Cir.2007) (quoting *In re Dillon,* 919 F.2d 688,692 (Fed. Cir.1990) (*en banc*)); *see also, e.g.*, *In re Papesch*, 50 C.C.P.A. 1084, 315 F.2d 381 (1963).

92.     "The 'reason or motivation' to make the claimed compound need not be an explicit teaching that the claimed compound will have a particular utility; it is sufficient to show that the claimed and prior art compounds possess a 'sufficiently close relationship . . . to create an expectation,' in light of the totality of the prior art, that the new compound will have 'similar properties' to the old." *In re Dillon*, 919 F.2d at 692; *see also, e.g.*, *In re Wilder,* 563 F.2d 457, 460 (C.C.PA. 1977) ("[O]ne who claims a compound, *per se*, which is structurally similar to a prior art compound must rebut the presumed expectation that the structurally similar compounds have similar properties.").

93.     Claims to a composition are obvious when that composition is the predictable result of using standard biochemical procedures. *See, e.g.*, *In re Kubin*, 561 F.3d 1351, 1359–60 (Fed. Cir. 2009). "Obviousness does not require absolute predictability of success[;] all that is required is a reasonable expectation of success." *In re Droge*, 695 F.3d 1334, 1338 (Fed. Cir. 2012) (quoting *Kubin*, 561 F.3d at 1360). A genus claim is invalid for obviousness if a single

embodiment—*i.e.*, a single species—within the scope of the claim would have been obvious.

*Aventis*, 499 F.3d at 1300. One consideration that is not relevant to the obviousness inquiry is

enablement, as even "[a] nonenabling reference may qualify as prior art for the purpose of

determining obviousness," *ABT*, 797 F.3d at 1360 n.2 (quoting *Symbol Techs., Inc. v. Opticon,

Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991)), "and even 'an inoperative device . . . is prior art for

all that it teaches,'" *id.* (quoting *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547,

1551(Fed. Cir. 1989)); *see also, e.g.*, *In re Antor Media Corp.*, 689 F.3d 1282, 1292 (Fed. Cir.

2012).

94.     "[T]he person of ordinary skill need only have a reasonable expectation of

success of developing the *claimed* invention." *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292

(Fed. Cir. 2013) (emphasis added). Where "safety[] and efficacy are not requirements of the

asserted claims," or the claims "contain no limitations regarding toxicity," a defendant does not

need to prove "a reasonable expectation of success . . . with regard to the safety and effectiveness

of the formulation," let alone of overcoming its "possible toxicity." *Aventis Pharma S.A. v.

Hospira, Inc.*, 743 F. Supp. 2d 305, 342-43 (D. Del. 2010), *aff'd*, 675 F.3d 1324 (Fed. Cir. 2012).

95.     Test results or data are not required to show a reasonable expectation of success.

Where the "prior art . . . predicted [that] the results" of such testing would be favorable, the fact

that a skilled artisan would have "had to verify through routine testing" a claimed drug's

"expected traits" "does not compel a conclusion of non-obviousness." *Pfizer*, 480 F.3d at 1367.

"To conclude" a claimed invention "would have been obvious," the prior art "merely ha[s] to

suggest" that it "would work for its intended purpose." *Id.* at 1368 (quotations omitted*); see also

In re Dillon*, 919 F.2d at 698 ("[I]t is not correct that similarity of structure and a suggestion of

the activity of an applicant's compounds in the prior art are necessary before a prima facie case

is established."); *Hoffmann-La Roche*, 748 F.3d 1331 ("Conclusive proof of efficacy is not necessary to show obviousness. All that is required is a reasonable expectation of success."); *PharmaStem*, 491 F.3d at 1363-64 (where "the inventors merely used routine research methods to prove what was already believed to be the case," "[s]cientific confirmation of what was already believed to be true … does not give rise to a patentableinvention"); *Ex Parte Zheng Xin Dong*, 2013 WL 5375700, at *4 (P.T.A.B. Jan. 28, 2013) ("We are not persuaded . . . that the only compounds useful for evaluating obviousness are those for which the prior art has provided specific comparative data.").

96.     Human testing data in particular are not required, especially when the patent-in-suit does not disclose human testing data either. *See Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1374 (Fed. Cir. 2005) ("The [patent-in-suit] sets forth no human clinical or laboratory data showing the safety and tolerability of the treatment methods claimed by the patent," and thus "adds nothing beyond the teachings of [prior art] articles."); *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1369 (Fed. Cir. 2012) (the "argu[ment] that [the prior art] would not give a skilled artisan an expectation of success because it does not teach that [the claimed drug] is safe for the human eye . .. [was] without merit," because "[w]hile it [wa]s true that [the prior art] d[id] not expressly disclose that [the drug] would be safe for use in human eyes, neither d[id] the [] patent" at issue, which was "not based on testing in humans; instead it report[ed] only *in vitro* tests" (citations omitted)).

97.     "From the standpoint of patent law a compound and all of its properties are inseparable. A finding of unobviousness in consequence depends on comparing the old and new compounds as wholes, inclusive of their properties." *Application of Albrecht*, 514 F.2d 1389, 1394 (C.C.P.A. 1975) (citations omitted); *see also Genetics Inst., LLC v. Novartis Vaccines &*

*Diagnostics, Inc.*, 655 F.3d 1291, 1307 (Fed. Cir. 2011) ("Our case law is clear that the structure

of a claimed compound and its properties are inseparable for purposes of § 103."); *Sanofi–*

*Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1086 (Fed. Cir. 2008) ("For chemical compounds, the

structure of the compound and its properties are inseparable considerations in the obviousness

determination."); *In re Dillon*, 919 F.2d at 692–93 ("Each situation must be considered on its

own facts, but it is not necessary in order to establish a *prima facie* case of obviousness that both

a structural similarity between a claimed and prior art compound (or a key component of a

composition) be shown and that there be a suggestion in or expectation from *the prior art* that

the claimed compound or composition will have the same or a similar utility *as one newly*

*discovered by applicant*. To the extent that *Wright* suggests or holds to the contrary, it is hereby

overruled."); *Geneva Pharm., Inc. v. Glaxosmithkline PLC.*, 213 F. Supp. 2d 597, 609–10 (E.D.

Va. 2002).

98.     A patent claim is invalid under § 103 when, absent a showing of unexpected

results, the patented subject matter differs from the prior art only in that the claim recites a range

of values for a variable different from the range disclosed in the prior art. *In re Peterson*, 315

F.3d 1325, 1330 (Fed. Cir. 2003).

99.     The particular inventor's motivation in selecting lead compound that ultimately

resulted in the selection of the claimed compound is irrelevant, because the hypothetical person

of ordinary skill in the art may have any motivation. *KSR*, 550 U.S. at 421–22.; *see also*

*Allergan*, 726 F.3d at 1292 ("Motivation to combine may be found in many different places and

forms.").

100.     An obvious modification of a compound that was disclosed to have a utility of

some kind in the prior art results in an obvious compound, even where that compound would not

have been selected as a starting point for the purpose of making a commercial pharmaceutical product, or where there are other choices for a starting point that appeared more likely to achieve a better result. *In re Dillon*, 919 F.2d 688 (Fed. Cir. 1990) (*en banc*) ("The claimed compound found to be obvious because it was an obvious modification of a compound that was known to have utility as a water scavenger, even though the inventor developed the compound to reduce pollutants in hydrocarbon fuels, a property that the 'lead' compound was not known to possess, and therefore could not have been selected as a promising lead for that purpose.").

101.    "When chemical compounds have 'very close' structural similarities and similar utilities, without more a *prima facie* case may be made." *E.g.*, *In re Wilder*, 563 F.2d 457 (C.C.P.A. 1977) (adjacent homologues and structural isomers); *see also, e.g.*, *In re May,* 574 F.2d 1082 (C.C.P.A. 1978) (stereoisomers); *In re Hoch,* 428 F.2d 1341 (C.C.P.A. 1970) (acid and ethyl ester); *In re Druey,* 319 F.2d 237, 240, 138 USPQ 39, 41 (CCPA 1963) (omission of methyl group from pyrazole ring).. When such "close" structural similarity to prior art compounds is shown, in accordance with these precedents the burden of coming forward shifts to the applicant, and evidence affirmatively supporting unobviousness is required." *In re Grabiak*, 769 F.2d 729 (Fed. Cir. 1985).

102.    When any compound in the prior art is modified in a way suggested by the prior art, or with a modification that results in a compound that is close in structure to the prior art compound, the resulting new compound is obvious. *In re Dillon*, 919 F.2d 688 (Fed. Cir. 1990) (*en banc*); *In re Grabiak*, 769 F.2d 729 (Fed. Cir. 1985).

103.    "Even if a document is not prior art, a Court may consider it for motivation to combine, at least to the extent that motivation to combine is treated flexibly under KSR." *Lucent Techs., Inc. v. Gateway, Inc*., 537 F. Supp. 2d 1095, 1102 (S.D. Cal. 2008) (holding that, inter

alia, a German thesis could be used for purposes of motivation despite the parties' dispute over whether the thesis was publicly available and accessible and thus whether it could constitute prior art); *see also Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1337–38 (Fed. Cir. 2004).

104.     The fact that a prior art discloses many possible obvious combinations does not render any particular one less obvious, particularly when each of those prior art combinations are used for the identical purpose as the claimed invention. *Merck*, 874 F.2d at 807; *see In re Corkill*, 771 F.2d at 1500; *see also In re Susi*, 440 F.2d at 445.

105.     Not all species are separately patentable from an earlier disclosed genus. Regardless of the size of the prior genus, a species is not patentable when the prior art narrows the genus to a few favorable species. *Abbvie, Inc. v. Matilda and Terrance Kenny Institute* 764 F.3d 1366, 1379 (Fed. Cir. 2014).

106.     A reference does not "teach away" if it merely expresses a general preference for an alternative invention, but does not "criticize, discredit, or otherwise discourage" investigation into the invention claimed. *In re Fulton,* 391 F.3d at 1201. In order for a prior art reference to teach away from a disclosed embodiment, it must provide clear discouragement from using a particular combination as opposed to a mere preference for another embodiment. *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005) ("A statement that a particular combination is not a preferred embodiment does not teach away absent clear discouragement of that combination").

107.     "[T]here is no rule that a single reference that teaches away will mandate a finding of nonobviousness. Likewise, a given course of action often has simultaneous advantages

41

and disadvantages, and this does not necessarily obviate motivation to combine." *Medichem, SA v. Rolabo, SL*, 437 F.3d 1157, 1165 (Fed. Cir. 2006).

### 6.     Differences Between the Claimed Invention and the Prior Art

108.     In determining the differences between the claimed invention and the prior art, obviousness is judged under "an expansive and flexible approach" driven by "common sense." *KSR*, 550 U.S. at 401, 403; *accord Senju Pharm. Co. v. Apotex Inc.*, 836 F. Supp. 2d 196, 208 (D. Del. 2011) ("The Supreme Court has emphasized the need for courts to value 'common sense' over 'rigid preventative rules'…").

109.     In making this determination, the court must consider both the claimed invention and the prior art as a whole in light of the court's construction of the claims at issue. *See Kahn*, 135 F.3d at 1479-80 ("In determining obviousness, the invention must be considered as a whole and the claims must be considered in their entirety.").

110.     "For obviousness, a single reference need not disclose every element of the claimed invention." *See, e.g.*, *Hospira, Inc. v. Amneal Pharm., LLC*, 285 F. Supp. 3d 776, 783 (D. Del. 2018) (citing *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)).

111.     "While it may be easier to prove obviousness if each limitation of the claimed invention is found in the prior art, the level of skill of one of ordinary skill in the art can, at times, fill in the gap when limitations of the claimed invention are not specifically found in the prior art." *Belden Techs., Inc. v. Superior Essex Commc'ns LP*, 802 F. Supp. 2d 555, 563 (D. Del. 2011).

112.     A conclusion of obviousness may be based on a single reference of a combination of prior art references. *See Senju Pharm.*, 836 F. Supp. 2d at 208 ("[A] defendant asserting obviousness in view of a combination of references has the burden to show that a person of

ordinary skill in the relevant field had a reason to combine the elements in the manner claimed."); *see also In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("We see no clear error in the Board's determination as to the teachings of the prior art references, in combination.").

113.    Where the issue of obviousness is based on a combination of elements, a patent challenger might demonstrate "that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention." *Pfizer*, 480 F.3d at 1361.

114.    "The combination of familiar elements according to known methods is ***likely*** to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. at 416 (emphasis added); *Q.I. Press Controls, B.V. v. Lee*, 752 F.3d 1371, 1379 (Fed. Cir. 2014). This is because "[g]ranting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility." *KSR*, 550 U.S. at 402.

115.    "[O]bviousness exists when 'a finite, and in the context of the art, small or easily traversed, number of options… would convince an ordinary skilled artisan of obviousness.'" *Purdue Pharma*, 642 F. Supp. 2d at 368 (quoting *Ortho-McNeil Pharm., Inc. v. Mylan Lab'ys, Inc.*, 520 F.3d 1358, 1564 (Fed. Cir. 2008)); *accord C.W. Zumbiel Co., Inc. v. Kappos*, 702 F.3d 1371, 1387 (Fed. Cir. 2012) (finding obviousness where the invention "involve[d] no more than the exercise of common sense in selecting one out of a finite—indeed very small—number of options"). In such a case, an invention is considered "obvious to try." *Hoffman-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1332 (Fed. Cir. 2014) (finding claimed dosage obvious to try). Further, "if a technique has been used improve one device, and a [POSA] would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual

application is beyond that person's skill." *KSR*, 550 U.S. at 401. "When the prior art provides the means of making the invention and predicts the results, and the patentee merely verifies the expectation through 'routine testing,' the claims are obvious. *Purdue Pharma*, 642 F. Supp. 2d at 368 (citing *Pfizer*, 480 F.3d at 1367).

116.    "One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claim." *KSR*, 550 U.S. at 419-20; *see also Norgren Inc. v. ITC*, 699 F.3d 1317, 1324-26 (Fed. Cir. 2012) (affirming invalidity of claims under § 103 where the claimed invention solved known problems by the use of an obvious solution). Even more, the discovery of a problem does not always result in a patentable invention. *Norgren*, 699 F.3d at 1327. For instance, an alleged invention is obvious in view of "evidence of known problems and an obvious solution." *Id.*

117.    "A [POSA] is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421. "[I]n many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id.* at 420.

118.    A POSA also understands and considers the design incentives and market forces in their area of expertise that would prompt one to seek variations of products known to have a particular utility. *KSR*, 550 U.S. at 417.

### 7.    Motivation to Combine Prior Art

119.    A claim may be proven obvious in view of a single prior art reference or in view of a combination of prior art references. When the prior art references are combined to invalidate a claim under 35 U.S.C. § 103, there must be some reason to do so. That reason need not be expressly stated in one or any of the references used to show obviousness, but rather "may be

found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself." *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1361 (Fed. Cir. 2006); *see also Alza Corp. v. Mylan Lab'ys, Inc.*, 464 F.3d 1286, 1291 (Fed. Cir. 2006).

120.    "The Supreme Court criticized a rigid approach to determining obviousness based on the disclosures of individual prior-art references, with little recourse to the knowledge, creativity, and common sense that an ordinarily skilled artisan would have brought to bear when considering combinations or modifications." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) ("By narrowly focusing on the four prior-art references cited by the Examiner and ignoring the additional record evidence Randall cited to demonstrate the knowledge and perspective of one of ordinary skill in the art, the Board failed to account for critical background information that could easily explain why an ordinarily skilled artisan would have been motivated to combine or modify the cited references to arrive at the claimed inventions. As *KSR* established, the knowledge of such an artisan is part of the store of public knowledge that must be consulted when considering whether a claimed invention would have been obvious.  In recognizing the role of common knowledge and common sense, we have emphasized the importance of a factual foundation to support a party's claim about what one of ordinary skill in the relevant art would have known.").

121.    The Supreme Court made clear that a § 103 analysis requires an "expansive and flexible approach" based on the principles laid down in Graham. *KSR*, 550 U.S. at 415; *see also Senju Pharm. Co. Ltd. v. Apotex Inc.*, 836 F. Supp. 2d 196, 208 (D. Del. 2011) ("The Supreme Court has emphasized the need for courts to value 'common sense' over 'rigid preventative rules.'").

45

122.    "In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls." *KSR*, 550 U.S. at 419; *see also In re Beattie*, 974 F.2d 1309, 1311-12 (Fed. Cir. 1992). "The question is not whether the combination was obvious to the patentee but whether the combination was obvious to a [POSA]." *KSR*, 550 U.S. at 420. "Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.*; *see also Perfect Web Tech., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) ("We therefore hold that… an analysis of obviousness… may include recourse to logic, judgment, and common sense available to the [POSA] that do not necessarily require explication in any reference or expert opinion.").

123.    Courts have sought to determine whether "a [POSA], before the time of invention and without knowledge of that invention, would have found the invention merely an easily predictable and achievable variation or combination of the prior art." *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1338 (Fed. Cir. 2010). If so, then the invention likely would have been obvious. *Id.* (citations omitted). "To preclude hindsight," the courts will take into account "evidence from before the time of the invention in the form of some teaching, suggestion, or even mere motivation… to make the variation or combination." *Id.* (citations omitted).

124.    "As the Supreme Court explained, 'The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.' The Supreme Court went on to state that 'when a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious.'" *DePuy Spine, Inc. v.*

*Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009) (quoting *KSR*, 550 U.S. at 417).

125.    A "claim to a product does not become nonobvious simply because the patent specification provides a more comprehensive explication of the known relationship between the variables and the affected properties." *In re Applied Materials, Inc.*, 692 F.3d at 1297.

126.    Even if a reference does not rise to the level of prior art, a court may consider it as motivation to combine. *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 537 F. Supp. 2d 1095, 1102 (S.D. Cal. 2008) (citing *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1337-38 (Fed. Cir. 2004)).

127.    As long as a POSA would have been motivated to combine references by the prior art as a whole, it is not necessary that the references be combined for the same reasons contemplated by the inventor. *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006).

128.    "In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim. If the claim extends to what is obvious, it is invalid under § 103." *Id.* "[T]he path that leads an inventor to the invention is expressly made irrelevant to patentability by statute." *Life Techs., Inc. v. Clontech Lab'y, Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000); *see also Std. Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985) ("[O]ne should not go about determining obviousness under § 103 by inquiring into what patentees … would have known or would likely have done"); *BTG v. Amneal*, 352 F. Supp. 3d 352, 379 (D.N.J. 2018) ("The combination therapy, it is true, is patented as a 'treatment.' But even prednisone's effects as a palliative and a side-effect minimizer would furnish a powerful motivation to combine it with abiraterone. And the idea for such a combination, even if initially

motivated only by those two effects, would have gotten the POSA to the same place. That road led straight to the practice of the patented method: the target condition would be prostate cancer; the target population would be the subset of patients who had mCRPC; the dosage would be 1000mg of abiraterone and 10mg of prednisone daily; the object would be to slow the spread of the disease by hormone deprivation; the clinical results would be the same, and would be measured by prolongation of life (or, in the interim, by proxy metrics such as reduction of PSA levels). In short, the anticipated combination therapy—irrespective of what was in the POSA's mind as to the exact mechanism—would have looked precisely the same. So understood, this begins to look less like serendipity and more like inevitability.").

129.    The inquiry into whether prior art teachings would have rendered the claimed invention obvious to one of ordinary skill in the art, is, as a matter of law, "independent of the motivations that led the inventors to the claimed invention." *Life Techs.*, 224 F.3d at 1325. The obviousness analysis is not limited to the problem that the patentee was trying to solve, but "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420. "*KSR* expanded the sources of information for a properly flexible obviousness inquiry to include market forces; design incentives; the 'interrelated teachings of multiple patents'; 'any need or problem known in the field of endeavor at the time of invention and addressed by the patent'; and the background knowledge, creativity, and common sense of the person of ordinary skill." *Perfect Web Techs., Inc.*, 587 F.3d at 1329  (quoting *KSR,* 550 U.S. at 418-21, 127 S. Ct. 1727); *see Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*, 36 F.4th 1354 (Fed. Cir. 2022) ("[S]everal years before the priority date of the patents in-suit, the FDA explicitly provided a motivation to formulate an intranasal naloxone product by identifying a 'need or problem known

in the [industry] . . . at the time of the invention,' *Plantronics*, 724 F.3d at 1354—the known drawbacks of the MAD Kit and the need for an intranasal naloxone product. A skilled artisan, therefore, would have been motivated to develop an intranasal naloxone product."); *Unigene Lab'ys, Inc. v. Apotex Inc.*, 655 F.3d 1352, 1361-1362 (Fed. Cir. 2011) ("In this case, the patent claims a new composition or formulation to deliver an FDA-approved active ingredient. ("Although claim 19 does not assign any particular functionality or property to its list of components, a person of ordinary skill, someone in the field of pharmaceutical liquid dosage form development, would have had reasons—specifically, design need and market demand—to create an FDA-approved liquid nasal composition that delivers salmon calcitonin. *See KSR,* 550 U.S. at 421, 127 S. Ct. 1727.  In this case, the design need is to achieve a bioequivalent composition. The market demand is to achieve a composition that treats the same symptoms as the reference formulation.").

130.    Rather than focus on the "particular motivation" or the "avowed purpose" of the patentee, what matters to a proper obviousness analysis is "the objective reach of the claim." *KSR*, 550 U.S. at 419. Simply put, "[i]f the claim extends to what is obvious, it is invalid under § 103." *Id.*

131.    Where a claim "simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious." *KSR*, 550 U.S. at 417 (quotation omitted).

132.    "When there is a design need or market pressure to solve a problem and there are a finite number or identified, predictable solutions, a person or ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that

instance the fact that a combination was obvious to try might show that it was obvious under § 103." *KSR*, 550 U.S. at 421.

133.     "When a work is available in one field of endeavor, design incentives and other market forces can prompt variation of it, either in the same field or a different one. If a person of ordinary skill in the art can implement a predictable variation, §103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a [POSA] would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *KSR*, 550 at 401.

134.     "When the prior art provides the means of making the invention and predicts the results, and the patentee merely verifies the expectation through 'routine testing,' the claims are obvious." *Purdue Pharma*, 642 F. Supp. 2d at 368 (citing *Pfizer*, 480 F.3d at 1367).

135.     The motivation to combine inquiry is not limited to what products are forthcoming or currently available on the market, particularly given the lengthy FDA approval process. *Bayer Pharma AG v. Watson Lab'ys, Inc.*, 874 F.3d 1316, 1324 (Fed. Cir. 2017); *see also id.* at 1326 ("'Motivation to combine may be found in many different places and forms; it cannot be limited to those reasons the FDA sees fit to consider in approving drug application.'") (quoting *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013). "Obviousness does not require that the motivation be the best option, only that it be a suitable option from which the prior art does not teach away." *Id.* at 1328 (emphasis in original).

136.     For a reference to teach away, it must state more than a general preference for an alternative invention. It must "criticize, discredit, or otherwise discourage" investigation into the invention claimed.  *In re Fulton,* 391 F.3d 1195, 1201 (Fed. Cir. 2004); *see also BTG v. Amneal*, 352 F. Supp. 3d at 352 ("Plaintiffs further suggest that there were other options and theories on

how to treat mCRPC, and that there were other anti-cancer agents, perhaps even more promising ones. Nevertheless, the prior art clearly pointed to coadministration of abiraterone with a glucocorticoid." (citing *In re Fulton,* 391 F.3d at 1200 0 ("a finding that the prior art as a whole suggests the desirability of a particular combination need not be supported by a finding that the prior art suggests that the combination claimed by the patent applicant is the preferred, or most desirable, combination."); *In re Gurley,* 27 F.3d 551, 552-53 (Fed. Cir. 1994) (upholding obviousness finding where patent was directed to one of two alternative resins disclosed in prior art reference, even though reference described claimed resin as "inferior.")))

### 8.     Reasonable Expectation of Success

137.     "Obviousness does not require absolute predictability of success;" rather, "[a]ll that is required is a reasonable expectation of success" in making the invention via the combination. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (citation omitted); *see also Duramed Pharm., Inc. v. Watson Lab'ys, Inc.*, 413 F. App'x 289, 294 (Fed. Cir. 2011) ("There is no requirement that a teaching in the prior art be scientifically tested or even guaranteed success before providing a reason to combine. Rather, it is sufficient that one of ordinary skill in the art would perceive from the prior art a reasonable likelihood of success.") (citations omitted).

138.     "[O]bviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer*, 480 F.3d at 1364; *see also In re O'Farrell*, 853 F.2d 894, 904 (Fed. Cir. 1988) ("For obviousness under § 103, all that is required is a reasonable expectation of success."); *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013).

139.    "While the definition of 'reasonable expectation' is somewhat vague, [Federal

Circuit] case law makes clear that it does not require a certainty of success." *Medichem*, 437 F.3d

at 1165. Requiring testing for every possible configuration or combination in the prior art

"improperly equates a reasonable expectation of success with absolute certainty." *See, e.g.*,

*Hospira, Inc. v. Amneal Pharm., LLC*, 285 F. Supp. 3d 776, 794 (D. Del. 2018) (citation

omitted). None of "the length, expense, [or] difficulty of the techniques used are dispositive

since many techniques that require extensive time, money, and effort to carry out may

nevertheless be arguably 'routine' to [a POSA]." *Pfizer*, 480 F.3d at 1367. Also, where a claim

limitation is inherent in the prior art, "there is no question of a reasonable expectation of success

in achieving it." *Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1332 (Fed. Cir.

2020).

### 9.    Secondary Considerations

140.    A *prima facie* case of invalidity based on obviousness can be rebutted by showing

secondary considerations of nonobviousness.  *Graham*, *v. John Deere Co.*, 383 U.S. 1, 17-18

(1966); *Geo M. Martin Co. v. Alliance Mach. Sys. Int'l*, 618 F.3d 1294, 1300, 1305 (Fed. Cir.

2010).

141.    To weigh against a finding of obviousness, such "objective evidence of non-

obviousness must be commensurate in scope with the claims which the evidence is offered to

support." *See, e.g.*, *Asyst Techs. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008).

Secondary considerations can also affirmatively support a finding of obviousness.  *Graham*, 383

U.S. at 17-18 ("As indicia of obviousness or nonobviousness, these inquiries may have

relevancy.")

142.     As the Supreme Court has noted, evidence of secondary considerations "are relevant only in a close case where all other proof leaves the question of invention in doubt." *Dow Chem. Co. v. Halliburton Oil Well Cementing Co.*, 324 U.S. 320, 330 (1945).  Evidence of objective indicia is not sufficient to overcome strong evidence of obviousness.  *Novo Nordisk A/S v. Caraco Pharm. Lab'ys, Ltd.*, 719 F.3d 1346, 1352 (Fed. Cir. 2013); *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013) ("Additionally, where a claimed invention represents no more than the predictable use of prior art elements according to established functions, as here, evidence of secondary indicia are frequently deemed inadequate to establish non-obviousness."); *Pfizer v. Apotex*, 480 F.3d 1348, 1372 (Fed. Cir. 2007) ("Although secondary considerations must be taken into account, they do not necessarily control the obviousness conclusion.").

143.     The patentee bears the burden of providing evidence to establish the existence of secondary considerations supporting non-obviousness.  *See Novo Nordisk*, 719 F.3d at 1353 ("The presumption of validity does not relieve the patentee of any responsibility to set forth evidence in opposition to a challenger's prima facie case which, if left unrebutted, would be sufficient to establish obviousness").  In this regard, "argument and conjecture are insufficient." *Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.*, 851 F.2d 1387, 1393 (Fed. Cir. 1988) (quotations and citation omitted).  "These legal inferences or subtests … focus attention on economic and motivational rather than technical issues and are, therefore, more susceptible of judicial treatment than are the highly technical facts often present in patent litigation." *Graham*, 383 U.S. at 35-36.

144.     A "nexus between the merits of the claimed invention and evidence of secondary considerations is required in order for the evidence to be given substantial weight in an

obviousness decision." *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327 (Fed. Cir. 2008) (citations omitted).  "Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention." *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (internal quotations omitted).

145.    "A patent has been called a 'blocking patent' where practice of a later invention would infringe the earlier patent. The existence of such a blocking patent may deter non-owners and non-licensees from investing the resources needed to make, develop, and market such a later, 'blocked' invention, because of the risk of infringement liability and associated monetary or injunctive remedies. If the later invention is eventually patented by an owner or licensee of the blocking patent, that potential deterrent effect is relevant to understanding why others had not made, developed, or marketed that 'blocked' invention and, hence, to evaluating objective indicia of the obviousness of the later patent." *Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*, 903 F.3d 1310, 1337-1339 (Fed. Cir. 2018) ("We conclude that the district court did not err in viewing the Elan patent, among other evidence, as evidence that discounted the weight of Acorda's evidence of commercial success, failure of others, and long-felt but unmet need so that 'the evidence as a whole' in the case 'prove[d] clearly and convincingly that the Acorda Patents are invalid due to obviousness.' *Dist. Ct. Op.* at *41") (citing Note, *Subtests of "Nonobviousness": A Nontechnical Approach to Patent Validity*, 112 U. Pa. L. Rev. 1169, 1177 (1964) (Regarding commercial success, "a court must be assured that the patentee's market domination is not attributable to monopoly power or other economic coercion, or to other factors unrelated to patent validity.") (cited in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 18, 36, 86 S. Ct. 684, 15 L. Ed. 2d 545 (1966))).

146.    Even "impressive" evidence of secondary considerations is not "entitled to weight" unless "it is relevant to the claims at issue."  *In re Paulsen*, 30 F.3d 1475, 1482 (Fed. Cir. 1994).

147.    While evidence of these factors must be considered, such secondary considerations will not overcome a strong showing that the claimed invention was *prima facie* obvious.  *See, e.g.*, *Leapfrog Enters., Inc. v. Fisher-Price, Inc*., 485 F.3d 1157, 1162 (Fed. Cir. 2007) ("[G]iven the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion that [the claim] would have been obvious."); *see also Agrizap, Inc. v. Woodstream Corp*., 520 F.3d 1337, 1344 (Fed. Cir. 2008) ("[O]bjective evidence of nonobviousness simply cannot overcome … a strong prima facie case of obviousness.").

### a.    Unexpected Results

148.    For a patentee to rely on unexpected results as secondary evidence of nonobviousness, "the results must be shown to be unexpected compared with the closest prior art."  *Abbott Laby's v. Andrx Pharms., Inc*., 452 F.3d 1331, 1345 (Fed. Cir. 2006) (citing *In re Baxter Travenol Lab'ys*, 952 F.2d 388, 392 (Fed. Cir. 1991)); *see also In re Geisler*, 116 F.3d 1465, 1469 (Fed. Cir. 1997) (stating that the patentee must "show that the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected"); *In re Merck & Co.*, 800 F.2d 1091, 1098-99 (Fed. Cir. 1986) (finding a slight difference in degree of effect to be "not truly unexpected results").  A party advancing evidence of unexpected results must, therefore, provide evidence of what would have been expected by a skilled artisan.  *Pfizer*, 480 F.3d at 1371.  Only by comparison to what

would have been expected can the patentee then show that the claimed invention has superior properties that were unexpected.  *Id.*

149.   "It is well settled that unexpected results must be established by factual evidence."  *In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984).  "Mere argument or conclusory statements" by the patentee "do[] not suffice."  *Id.*  To be successful on a claim of unexpected results, the patentee must offer evidence that the unexpected results bear a nexus to the novel aspects of the asserted claim.  *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1385 (Fed. Cir. 2015).

150.   In addition, unexpected results must be commensurate in scope with the claimed subject matter.  *See Kao*, 639 F.3d at 1066, 1068; *Hiniker*, 150 F.3d at 1369.  For example, that well-established rule means that, in claims involving a range, unexpected results are not established by showing that those results are obtained at only one point in a range.  *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) (rejecting claim of unexpected results for claim of 1-3% based on data showing improvement only at 2%); *In re Patel*, 566 F. App'x 1005, 1011–12 (Fed. Cir. 2014) ("Even if the single point of 0.915 g/cm$^3$ exhibited unexpected results, Appellants did not disclose sufficient evidence of unexpected results over the entire claimed range.  As such, Appellants cannot rely on a single point within a large range to prove unexpected results for the entire range.") (citations omitted).

151.   "[I]n order to properly evaluate whether a superior property was unexpected, the Court should … consider[] what properties were expected."  *Pfizer*, 480 F.3d at 1371.  "Unexpected results that are probative of non-obviousness are those that are different in kind and not merely in degree from the results of the prior art."  *Galderma Lab'ys, L.P. v. Tolmar*, 737 F.3d 731, 739 (Fed. Cir. 2013) (citations omitted).  Results that "differ by percentages are

differences in degree rather than kind," and therefore, are not relevant to the obviousness inquiry.

*Id.*; *see also Iron Grip Barbell Co. v. USA Sports, Inc*., 392 F.3d 1317, 1322-23 (Fed. Cir. 2004).

("[E]ven though [a] modification results in great improvement and utility over the prior art, it

may still not be patentable if the modification was within the capabilities of one skilled in the art,

unless the claimed [invention] produce[s] a new and unexpected result which is different in kind

and not merely in degree from the results of the prior art.") (quotation omitted); *Bristol-Myers*

*Squibb Co. v. Teva Pharm*., 752 F.3d 967, 977 (Fed. Cir. 2014) ("[A] 'mere difference in degree'

is insufficient."). Moreover, just as unexpected results may provide evidence of nonobviousness,

"[e]xpected beneficial results are evidence of obviousness of a claimed invention." *In re*

*Gershon*, 372 F.2d, 535, 537 (Fed. Cir. 1967).

### b.    Failure of Others

152.    Evidence showing that others in the field tried and failed to develop inventions

similar to the patentee's can support a finding of non-obviousness. *In re Cyclobenzaprine*, 676

F.3d 1063, 1082 (Fed. Cir. 2012).

153.    When asserted as a secondary consideration of nonobviousness, "[t]he purpose of

evidence of failure of others is to show 'indirectly the presence of a significant defect in the prior

art, while serving as a simulated laboratory test of the obviousness of the solution to a skilled

artisan.'" *Id.* (quoting *Symbol Techs., Inc. v. Opticon, Inc*., 935 F.2d 1569, 1578-79 (Fed. Cir.

1991)). "This is particularly true when the evidence indicates that others found development of

the claimed invention difficult and failed to achieve any success." *In re Cyclobenzaprine*, 676

F.3d at 1081; *see also Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp*., 320 F.3d

1339, 1354 (Fed. Cir. 2003) (finding "there can be little better evidence negating an expectation

of success than actual reports of failure").

154.     The "failure of others" analysis first requires the Court to define the problem that the patent purports to solve, because objective criteria such as this "help[s] turn back the clock and place the claim[] in the context that led to [its] invention." *Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 923 F. Supp. 2d 602, 680 (D. Del. 2013), *aff'd*, 752 F.3d 967 (Fed. Cir. 2014).

155.     In assessing the failure of others, the failure of the inventor is not relevant. *AstraZeneca LP v. Breath Ltd.*, 88 F. Supp. 3d 326, 390 (D.N.J. 2015) ("The Court agrees that the focus of this secondary consideration should be the failure of others and not the failure of the inventors." (citation omitted)), *aff'd*, 603 F. App'x 999, 1003 (Fed. Cir. 2015); *Ortho-McNeil Pharm., Inc. v. Mylan Lab'ys, Inc.*, 348 F. Supp. 2d 713, 759 (N.D.W. Va. 2004) ("In the context of secondary considerations, the Federal Circuit has generally focused on the prior failures of others in the industry, not the inventors."); *Knoll Pharm. Co., Inc. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004) (considering not the attempts of the patentee in seeking FDA approval, but rather the failed attempts of others in obtaining such approval); *Hospira, Inc. v. Sandoz Inc.*, No. 09-4591 (MLC), 2012 WL 1587688, at *28 (D.N.J. May 4, 2012) ("Plaintiffs' own failures in developing and commercializing dexmedetomidine for other indications are not evidence of the failure of *others* to develop an ICU sedative.  As such, Plaintiffs have submitted no evidence that others tried and failed to develop an ICU sedative.").

156.     Moreover, "an unsolved problem is not evidence of non-obviousness unless skilled workers in the art have tried and failed to solve the problem." *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1378 (Fed. Cir. 2000).  Actual evidence of failure of others must be shown, as "the mere passage of time without the claimed invention is not evidence of nonobviousness." *Iron Grip Barbell Co.*, 392 F.3d at 1325.

58

157.    In addition, the "failure of others" lacks any inference of nonobviousness when another patent legally bars others from testing or practicing the invention.  *See Sanofi-Synthelabo v. Apotex, Inc*., 488 F. Supp. 2d 317, 337-38 (S.D.N.Y. 2006) (citing *Merck & Co.*, 395 F.3d at 1377).  Finally, even if a plaintiff can meet its burden of proving that others have tried to solve the same problem but failed, the failure of others is probative only where the evidence shows that the prior failure occurred because "the devices lacked the claimed features.'"  *Ormco Corp. v. Align Tech., Inc*., 463 F.3d 1299, 1313 (Fed. Cir. 2006).

### c.    Long-Felt But-Unmet Need

158.    Evidence that an invention "satisfied a long-felt and unmet need that existed on the patent's filing date is a secondary consideration of nonobviousness."  *Perfect Web Techs., Inc. v. InfoUSA, Inc*., 587 F.3d 1324, 1332 (Fed. Cir. 2009); *see also KSR*, 550 U.S. at 398-399 (termed "long felt but unsolved need").  Establishing long-felt need requires evidence that an art-recognized problem existed for a long period of time without a solution.  *Markman v. Lehman,* 987 F. Supp. 25, 43 (D.D.C. 1997)*; Apple, Inc. v. Samsung Elecs. Co., Ltd*., 816 F.3d 788, 804-05 (Fed. Cir. 2016)*, vacated in part on reh'g en banc*, 2016 WL 5864573 (Fed. Cir. Oct. 7, 2016)*.* The need is "analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem."  *Texas Instruments Inc. v. U.S. Int'l Trade Comm'n,* 988 F.2d 1165, 1178 (Fed. Cir. 1993)*.*

159.    "[O]nce a long-felt need is established, evidence must show that the claimed invention satisfied that need."  *In re Gardner*, 449 F. App'x 914, 918 (Fed. Cir. 2011) (citing *In re Cavanagh*, 436 F.2d 491, 496 (C.C.P.A. 1971)).  It has also been recognized that "evidence of long-felt need can cut two ways: On the one hand, long-felt need might be considered evidence of nonobviousness, but on the other hand, to the extent that other factors support obviousness,

the existence of 'market pressure to solve a problem' can support a finding of obviousness … ."

*Shuffle Master, Inc. v. MP Games LLC*, 553 F. Supp. 2d 1202, 1225 (D. Nev. 2008) (citing *KSR*, 550 U.S. at 420-421).

160.    Federal Circuit precedent "requires that the applicant submit actual evidence of long-felt need, as opposed to argument."  *In re Kahn*, 441 F.3d 977, 990-991 (Fed. Cir. 2006).  A lack of demand because of general satisfaction with the prior art is contrary to a finding of long-felt need.  *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1340 (Fed. Cir. 2004) ("finding of no customer demand is flatly contradictory with [the district court's] conclusion that a long-felt need existed").  Further, where the difference between the prior art and the claimed invention are minimal, "it cannot be said that any long-felt need was unsolved."  *Geo. M. Martin*, 618 F.3d at 1304.

161.    "Longfelt need is closely related to the failure of others. Evidence is particularly probative of obviousness when it demonstrates both that a demand existed for the patented invention, and that others tried but failed to satisfy that demand."  *In re Cyclobenzaprine*, 676 F.3d at 1082; *see also Mitsubishi Chem. Corp. v. Barr Lab'ys, Inc*., 718 Supp. 2d 382, 442 (S.D.N.Y. 2010, *aff'd*, 435 F. App'x 927 (Fed. Cir. 2011) (finding long felt unmet need where "previous alternatives for treating HIT proved unsuccessful in view of the fact that thrombotic event rates remained high in these patients together with the various disadvantages associated with these agents").  "This is particularly true when the evidence indicates that others found development of the claimed invention difficult and failed to achieve any success."  *In re Cyclobenzaprine*, 676 F.3d at 1081.

162.    Long-felt need is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem."  *Texas Instruments Inc.*, 988 F.2d at 1178.  Evidence

of "long-felt need" is not probative in "a niche market," where "it is not surprising that it took a

few years for a company to expand on the prior art." *Tokyo Keiso Co., v. SMC Corp.*, 307 F.

App'x 446, 453 (Fed. Cir. 2009). "Where the differences between the prior art and the claimed

invention are … minimal," "it cannot be said that any long-felt need was unsolved." *Geo. M.*

*Martin*, 618 F.3d at 1304. An assertion of long-felt need must be rejected where the patentee

"provided no evidence to explain how long [any relevant] need was felt, … when the problem

first arose," or how the "need [was] alleviated by the patent." *Perfect Web Techs.*, 587 F.3d at

1332. Even if there is evidence that the "claimed [invention] may have been beneficial," that

evidence is not probative if "others had previously solved the long-felt need." *In re PepperBall*

*Techs., Inc.*, 469 F. App'x 878, 882-83 (Fed. Cir. 2012); *see also Newell Co. v. Kenney Mfg. Co.*,

864 F.2d 757, 768 (Fed. Cir. 1988) ("[O]nce another supplied the key element, there was no

long-felt need … .").

### d.  Industry Praise and Recognition

163.    Evidence of praise is probative evidence of non-obviousness where it is "linked to

the patented invention." *Geo. M. Martin*, 618 F.3d at 1305; *Power-One, Inc. v. Artesyn Techs.,*

*Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010); *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294,

1311 (Fed. Cir. 2010) (finding that "substantial industry praise for the claimed invention and the

products covered by the claimed invention" constitutes additional proof of nonobviousness);

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342,1370 (Fed. Cir. 2012),

(upholding jury's finding of "wide spread acceptance in the field" as evidence of

nonobviousness). However, "industry praise of what [is] clearly rendered obvious by [prior-art]

is not a persuasive secondary consideration." *Bayer Healthcare Pharm., Inc. v. Watson Pharm.,*

*Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013).

164.     Identified evidence of praise must be objective, and not self-serving statements by the patentee or related entities.  In *Geo M. Martin*, the Federal Circuit rejected evidence of industry praise when it was offered in the form of 1) "self-serving" statements made by the patentee's own president; and 2) an email, drafted by an employee of the plaintiff.  618 F.3d at 1305.  The court further found that the patentee's pre-existing market share "reduced the impact" of the purported industry praise.  *Id.*

165.     Similarly, the Federal Circuit in *Bayer Healthcare Pharms., Inc. v. Watson Pharms, Inc*., found the industry praise and evidence of other secondary indicia of nonobviousness "legally insufficient."  713 F.3d at 1377.  In *Bayer*, the patentee claimed that its invention "was widely praised by experts in the [relevant] field."  *Id.*  To support this statement, Bayer proffered journal citations that referenced information from Bayer's publications, and one article authored by the first-named inventor of the patent that described the claimed method as an "innovative strategy."  *Id.*  The court found that these "bare journal citations and self-referential commendation" fell well short of demonstrating true industry praise.  *Id.*

166.     For a patentee to rely on industry praise as secondary evidence of nonobviousness, the patentee "must establish a nexus between the industry praise and the patented technology."  *Cot'n Wash Inc. v. Henkel Corp*., 56 F. Supp. 3d 626, 650 (D. Del. 2014) (citing *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc*., 699 F.3d 1340, 1351 (Fed. Cir. 2012)).  Without such nexus, evidence of industry praise is accorded little weight.  *See Merck & CIE v. Gnosis S.P.A*., 808 F.3d 829, 838 (Fed. Cir. 2015).

167.     FDA approval, while not determinative, is relevant to objective indicia of nonobviousness.  *Leo Pharm. Prods. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013).

168.     A statement intended to generate interest in a product also is not evidence of industry praise.  *Richardson-Vicks, Inc. v. Upjohn, Co.*, 122 F.3d 1477, 1484 n.3 (Fed. Cir. 1997) ("This advertisement, according to RVI, represents 'industry acclaim' of the patented invention that constituted 'strong objective evidence of nonobviousness.'  We fail to appreciate the significance of this statement which is intended to generate interest in the product, not prove its superiority.").

### e.     Commercial Success

169.     "The mere fact that generic pharmaceutical companies seek approval to market a generic version of a drug, without more, is not evidence of commercial success that speaks to the non-obviousness of patent claims."  *Galderma Lab'ys, L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013).

170.     Evidence of commercial success can support a finding of non-obviousness "because the law presumes an idea would successfully have been brought to market sooner, in response to market forces, had the idea been obvious to persons skilled in the art." *Merck & Co. v. Teva Pharms. USA, Inc*., 395 F.3d 1364, 1376 (Fed. Cir. 2005).

171.     However, "[t]he commercial success of a product is relevant to the non-obviousness of a claim only insofar as the success of the product is due to the claimed invention." *Geo. M. Martin Co.*, 618 F.3d at 1304. Thus, there must be "some causal relation or 'nexus' between an invention and commercial success of a product embodying that invention." *Merck & Co.*, 395 F.3d at 1376 (Fed. Cir. 2005); *see NuVasive, Inc. v. Hirshfeld*, No. 2020-1708, 2021 WL 3661208, at *5 (Fed. Cir. 2021) (affirming the Board's finding that "revenue numbers were mainly due to sales of auxiliary products" and not the sale of claimed invention).

172.    To show a nexus between any evidence of commercial success and the claimed invention, "the proponent must offer proof 'that the sales were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter.'" *In re DBC*, 545 F.3d 1373, 1384 (Fed. Cir. 2008) (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)) (holding that evidence of mere sales, however substantial, "does not reveal in any way that the driving force behind those sales was the claimed combination"). For example, significant pre-existing market share can serve as the basis for rejecting evidence of commercial success. *See Boston Scientific SciMed, Inc. v. Iancu*, 811 Fed. App'x 628-29 (Fed. Cir. 2020) (holding that the patentees "commercial success was a result of . . . pre-existing, dominant market share" and provided only "minimal support" for non-obviousness); *see also Geo. M. Martin Co.*, 618 F.3d at 1304 (holding that commercial success carried "little weight" where pre-existing market share drove commercial success and not the claimed invention).

173.    Despite even strong evidence of commercial success, the existence of "a blocking patent may deter non-owners and non-licensees from investing the resources needed to make, develop, and market such a later, 'blocked' invention, because of the risk of infringement liability and associated monetary or injunctive remedies." *See Acorda Therapeutics, Inc*., 903 F.3d at 1337 (defining a patent as a "'blocking patent' where practice of a later invention would infringe the earlier patent."). A previously issued patent that precludes others from entering the market undermines evidence of commercial success. *See Merck & Co.*, 395 F.3d at 1376 (holding that "[b]ecause market entry by others was precluded on those bases, the inference of non-obviousness of weekly-dosing, from evidence of commercial success, is weak"); *Sanofi-Aventis Deutschland GMBH v. Mylan Pharms. Inc.*, 791 F. App'x 916, 928 (Fed. Cir. 2019)

64

(holding that the previously issued compound patents listed in the Orange Book would have

deterred competitors from commercializing the claimed formulations); *Galderma Lab'ys, L.P.*,

737 F.3d at 740-41 (holding that commercial success had "minimum probative value" because

the blocking patents precluded others from entering the market).

### C.      Enablement

174.     A patent specification must provide sufficient information to allow a POSA to

make and use the invention claimed. *See* 35 U.S.C. § 112, ¶ 1. A specification lacks enablement

if it fails to teach a POSA "hot to make and use the full scope of the claimed invention without

'undue experimentation.'" *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1370 (Fed.

Cir. 2013) (citations omitted), *judgment vacated on other grounds by* 135 S. Ct. 831 (2015); *see*

*also Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997) (citing *In re*

*Wright*, 999 F.2d 1557, 1561 (Fed. Cir. 1993)). Enablement is a question of law based on

underlying factual inquiries. *See ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 940 (Fed.

Cir. 2010).

175.     The enablement "doctrine prevents both inadequate disclosure of an invention and

overbroad claiming that might otherwise attempt to cover more than was actually invented. Thus,

a patentee chooses broad claim language at the peril of losing any claim that cannot be enabled

across its full scope of coverage." *See, e.g.*, *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*,

687 F.3d 1377, 1381 (Fed. Cir. 2012); *see also Janssen Pharm. N.V. v. Teva Pharms. USA, Inc.*,

583 F.3d 1317 (Fed. Cir. 2009) (invalidating method patent for treatment of Alzheimer's with

galanthamine for lack of enablement).

176.     Moreover, "the scope of the claims must bear a reasonable correlation to the

scope of enablement provided by the specification to persons of ordinary skill in the art." *In re*

*Fisher*, 427 F.2d 833, 839 (C.C.P.A. 1970); *see also Alza*, 603 F.3d at 943; *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012) ("'The scope of the claims must be less than or equal to the scope of the enablement to ensure that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims.'" (quoting *Sitrick v. Dreamworks, LLC,* 516 F.3d 993, 999 (Fed. Cir. 2008)) (invalidating claims where inventor's "aggressive view of the scope of [the] invention" was not supported by the scope of enablement of the patent's disclosure); *see also Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195-96 (Fed. Cir. 1999).

177.    "Whether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). A court may consider several factors, often called the *Wands* factors, in determining whether undue experimentation is needed to practice a claims invention. The factors include: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance disclosed in the patent; (3) the presence or absence of working examples in the patent; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (6) the predictability of the art; and (7) the breadth of the claims. *Id.*; *see also Amgen, Inc. v. Sanofi*, 987 F.3d 1080 (Fed. Cir. 2021) (finding claims describing LDL cholesterol lowering claims invalid for lack of enablement because a POSA would not be able to practice the full scope of the claims and undue experimentation is required to do so). A finding of undue experimentation may be appropriate where the experimentation required to practice the full scope of the claims is excessive, even if routine. *Wyeth and Cordis Corp. v. Abbott Laby's*, 720 F.3d 1380, 1385-1386 (Fed. Cir. 2013); *see also White Consol. Indus., Inc. v. Vega Servo-Control, Inc.*, 713 F.2d 788, 791 (Fed. Cir. 1983) (18 months to two years of effort is undue

experimentation); *In re Ghiron*, 442 F.2d 985, 992 (C.C.P.A. 1971) (period of "many months or years...does not bespeak of a routine operation but of extensive experimentation and development work").

178.    A court is only required to consider those factors relevant to the facts of the case. *See, e.g.*, *Enzo Biochem, Inc. v. Celgene, Inc.*, 188 F.3d 1362, 1371 (Fed. Cir. 1999) ("All of the factors need not be reviewed when determining whether a disclosure is enabling.").

179.    "[T]he chemical arts have long been acknowledged to be unpredictable." *Boston Sci. Corp. v. Johnson & Johnson, Inc.*, 679 F. Supp. 2d 539, 557 & n.36 (D. Del. 2010) (citing *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1533 (Fed. Cir. 1983), *aff'd*, 647 F.3d 1353 (Fed. Cir. 2011)). "[I]n cases involving unpredictable factors, including the chemical arts, courts have 'refused to find broad generic claims enabled by specifications that demonstrate the enablement of only one or a few embodiments and do not demonstrate with reasonable specificity how to make and use other potential embodiments across the full scope of the claim.'" *Glaxo Wellcome Inc. v. Eon Labs Mfg.*, No. 00 Civ. 9089 (LMM), 2002 U.S. Dist. LEXIS 14950, at *10 (S.D.N.Y. Aug. 13, 2002) (quoting *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1564 (Fed. Cir. 1996)); *see also Pharm. Resources, Inc. v. Roxane Lab'ys, Inc.*, Civ. No. 03–3357(DRD), 2006 WL 3231427, at *13 (D.N.J. Nov. 8, 2006) (invalidating claims for lack of enablement where claims encompassed numerous possible suspension formulations not supported by enabling disclosure of similar scope).

180.    "Enablement is determined as of the effective filing date of the patent" and "later generated data are irrelevant to the enablement inquiry." *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1339 (Fed. Cir. 2003). While working examples are not required,

the absence of working examples can weigh against a finding of enablement. *See Impax Laby's, Inc. v. Aventis Pharm., Inc.*, 545 F.3d 1312, 1315 (Fed. Cir. 2008).

181.    The use of unpublished internal documents and post-priority-date publications to show the state of the art existing on the priority date of a patent application is permitted. *In re Epstein*, 32 F.3d 1559, 1563, 1567  (Fed. Cir. 1994) (finding "no clear error" in using post-priority-date publications to demonstrate public use and a POSA's understanding); *Thomas & Betts Corp. v. Litton Sys., Inc.*, 720 F.2d 1572, 1580-81 (Fed. Cir. 1983) (finding that unpublished internal documents "were, in effect, properly used" as indicators of a POSA's understanding of the state of art); *In re Copaxane*, 906 F.3d 1013, 1020, 1029-30 (Fed. Cir. 2018) (finding post-priority study was properly admitted as evidence of a POSA's "motivations and expectations when reading the prior art at the time of the invention.").

182.    Claims that depend from independent claims lacking enablement are also invalid. *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1198 (Fed. Cir. 1999).

183.    The specification must enable the full scope of the claims, particularly where the claims encompass nascent technology. *Chiron Corp. v. Genentech*, *Inc.*, 363 F.3d 1247, 1254 (Fed. Cir. 2004). Nascent technology must be enabled with a "specific and useful teaching." *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1368 (Fed. Cir. 1997). The law requires an enabling disclosure for nascent technology because a person of ordinary skill in the art has little or no knowledge independent from the patentee's instruction. Thus, the public's end of the bargain struck by the patent system is a full enabling disclosure of the claimed technology. *See, e.g.*,  *J.E.M. AG Supply, Inc. v. Pioneer Hi–Bred Int'l, Inc.*, 534 U.S. 124, 142, 122 S. Ct. 593, 604, 151 L. Ed. 2d 508 (2001). Moreover, an inventor may not "claim what was specifically

desired but difficult to obtain at the time the application was filed, unless the patent discloses how to make and use it." *Plant Genetic Sys. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1340 (Fed. Cir. 2003). The use of post-filing date materials may provide evidence of the difficulty of practicing the invention at the time of filing. *Id.* at 1344.

### D. Indefiniteness

184.    A patentee must particularly point out and distinctly claim the subject matter that she regards as her invention. 35 U.S.C. § 112 ¶ 2. "The language of the claims must make it clear what subject matter they encompass." *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1562 (Fed. Cir. 1996). Generally, a claim is sufficiently definite if it "reasonably apprise[s] [POSAs] both of the utilization and scope of the invention." *Id.* at 1562-63.

185.    "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

186.    The Supreme Court has explained that there are several components to determining definiteness, including: (1) evaluating from the perspective of a POSA; (2) reading claims in light of the patent's specification and prosecution history; and (3) assessing the claims from the perspective of a POSA "*at the time the patent was filed*." *Id.* (emphasis in original).

187.    Additionally, a claim "can be indefinite if the construction remains insolubly ambiguous, meaning it fails to provide sufficient clarity about the bounds of the claim to [a POSA]." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1373 (Fed. Cir. 2011). However, absolute clarity is not required to find definiteness. *Id.*

188.    Importantly, it is not necessary that a challenger prove that a disputed term is not understandable to a POSA, rather the challenger need only prove that a POSA "cannot recognize the scope of a claim term with reasonable certainty." *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 2020 WL 5525021, *7 (Fed. Cir. 2020) (nonprecedential). "[A] claim term does not become reasonably certain simply because a skilled artisan, when pressed, managed to articulate a definition for it. 'Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope.'" *Id.* (quoting *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008)).

189.    One way a claim may be invalid as indefinite is when (1) different known methods exist for calculating a claimed parameter, (2) nothing in the record suggests using one method in particular, and (3) application of the different methods result in materially different outcomes for the claim's scope." *Ball Metal Beverage Container Corp. v. Crown Packaging Tech., Inc.*, 838 F. App'x 538, 542 (Fed. Cir. 2020).

### E.    Written Description

190.    A patent cannot claim more than it describes. *See* 35 U.S.C. § 112, ¶ 1 (2012) ("The specification shall contain a written description of the invention…"); *Ariad Pharm. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) ("The description must clearly allow [POSAs] to recognize that [the inventor] invented what is claimed.") (citation and internal quotation marks omitted); *Reiffen v. Microsoft*, 214 F.3d 1342, 1345-46 (Fed. Cir. 2000) (explaining the purpose of the written description requirement "is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification").

191.    Determining whether a patent is invalid for failure to meet the written description requirement is a question of fact. *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1243 (Fed. Cir. 2002).

192.    "The test for [written description] sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date … Possession as shown in the disclosure is a more complete formulation." *Ariad Pharm.*, 598 F.3d at 1351 (internal citations omitted). To fulfill the written description requirement, the patent owner must indicate his or her possession of the invention at the time of filing the patent application as indicated by "an objective inquiry into the four corners of the speculation." *Id.*

193.    Further, "[t]he description requirement of the patent statute requires a description of an invention, not an indication of a result that one might achieve if one made that invention." *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997). "To fulfill the written description requirement, a patent specification must describe an invention and do so in sufficient detail that one skilled in the art can clearly conclude that 'the inventor invented the claimed invention.'" *Id.* at 1566 (quoting *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997); *In re Gosteli*, 872 F.2d 1008, 1012 (Fed. Cir. 1989)). "Thus, an applicant complies with the written description requirement 'by describing the invention, with all its claimed limitations, not that which makes it obvious,' and by using 'such descriptive means as words, structures, figures, diagrams, formulas, etc., that set forth the claimed invention.'" *Id.* at 1566 (quoting *Lockwood*, 107 F.3d at 1572); *see also ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1379 (Fed. Cir. 2009) (explaining that to comply with the written description requirement of § 112, a patentee must describe "the invention, with all its claimed limitations");

*In re Curtis*, 354 F.3d 1347, 1355 (Fed. Cir. 2004) (affirming BPAI's finding of invalidity for lack of written description where there was "unpredictability in performance of certain species or subcombinations other than those specifically enumerated [in the disclosure]" (internal quotations omitted)).

194.     A specification provides adequate written description if it reasonably conveys to a POSA that the inventor had possession of the ***entire*** claimed subject matter as of the filing date. *See Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351-52 (Fed. Cir. 2010); *Boston Sci. Corp. v. Johnson & Johnson Inc.*, 647 F.3d 1353, 1366 (Fed. Cir. 2011). Ultimately, "it is in the patent specification where the written description requirement must be met." *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 927 (Fed. Cir. 2004); *FWP IP ApS v. Biogen MA, Inc.*, 749 Fed. Appx. 969, 973 (Fed. Cir. 2018) ("To demonstrate possession, the inventor must provide enough description in the specification…").

195.     "The purpose of the written description requirement is to ensure that the scope of the right to exclude, as set forth in the claims, does not over-reach the scope of the inventor's contribution to the field of art as described in the patent specification." *Ariad Pharm.*, 598 F.3d at 1353-54 (internal quotations omitted). It has also been said that "[t]he written description requirement exists to ensure that inventors do not attempt to preempt the future before it has arrived." *Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists, Inc.*, 642 F.3d 1031, 1036 (Fed. Cir. 2011) (citation and internal quotation marks omitted).

196.     The written description requirement is not necessarily met because the claim language appears in the patent specification. *See Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 968-69 (Fed. Cir. 2002). Nor is the written description a question of whether a POSA might be able to construct the patentee's invention from the teachings of the disclosure. Rather, it is a

question of whether the application "necessarily discloses" the particular invention. *See Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1327 (Fed. Cir. 2000) (quoting *Martin v. Mayer*, 823 F.2d 500, 505 (Fed. Cir. 1987)). "A description that merely renders the invention obvious does not satisfy the requirement." *Ariad*, 598 F.3d at 1352. "An inventor need not 'prove that a claimed pharmaceutical compound actually achieves a certain result. But when the inventor expressly claims that result, our case law provides that [such] result must be supported by adequate disclosure in the specification.'" *Biogen Int'l Gmbh v. Mylan Pharma. Inc.*, No. 2020-1933, 2021 WL 5571708 at *8 (Fed. Cir. 2021) (citing *Nuvo Pharm. (Ireland) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc.*, 923 F.3d 1368, 1384 (Fed. Cir. 2019)).

197.    Where a patentee seeks to satisfy the written description requirement by an inherent disclosure, the missing descriptive matter must necessarily be present in the patent's specification such that a person of skill in the art would recognize it. *See, e.g.*, *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) ("To establish inherency, the extrinsic evidence 'must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by [POSAs]. Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.") (citations omitted).

198.    A variety of factors are used to evaluate the adequacy of the disclosure, including: (1) the existing knowledge in the particular field, (2) the extent and content of the prior art, (3) the maturity of the science or technology, and (4) the predictability of the aspect at issue. *Ariad*, 598 F.3d at 1351 (quoting *Capon v. Eshhar*, 418 F.3d 1349, 1359 (Fed. Cir. 2005)). The level of detail required to satisfy the written description requirement varies depending on the nature and

scope of the claims and on the complexity and predictability of the relevant technology. *Ariad*, 598 F.3d at 1351.

199.     Sufficient description of a genus requires either "disclosure of a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus." *Ariad*, 598 F.3d at 1350 (citations omitted). More particularly, "adequate written description requires a precise definition, such as by structure, formula, chemical name, physical properties, or other properties, of species falling within the genus." *Id.* Additionally, to qualify as a representative number of species, the species described must be representative of the entire generic claim language, not merely representative of a portion of the claim scope. *See In re Alonso*, 545 F.3d 1015, 1020 (Fed. Cir. 2008) (single antibody described in specification was insufficiently representative of "densely populated genus" of antibodies to adequately describe full claim scope) (quoting *Noelle v. Lederman*, 355 F.3d 1343, 1350 (Fed. Cir. 2004)); *Carnegie Mellon Univ. v. Hoffmann-LaRoche Inc.*, 541 F.3d 1115, 1124-25 (Fed. Cir. 2008).

200.     Additionally, describing one embodiment of a claimed invention does not necessarily satisfy the written description requirement; rather, a description of a "single embodiment would support [] a generic claim only if the specification would reasonably convey to a [POSA] that [the inventor] had possession of the claimed subject matter at the time of filing." *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005) (citation and internal quotation marks omitted). Thus, a patentee "cannot always satisfy the requirements of section 112, in supporting expansive claim language, merely by clearly describing one embodiment of the thing claimed." *Id.* The specification itself must demonstrate

that the inventor was in possession of the ***entirety*** of the claimed invention. *See Ariad*, 598 F.3d at 1352.

201.    Because the specification must reasonably convey to a POSA that the inventor had possession of the entire claimed subject matter as of the filing date, the specification must contain adequate written description support for nascent technology falling within the scope of the claim. *See Chiron Corp.*, 363 F.3d at 1255-1258; *see also Schering Corp. v. Amgen, Inc.*, 222 F.3d 1347, 1353-1354 (Fed. Cir. 2000).

202.    The Federal Circuit has long recognized that describing only a single species typically fails to provide adequate written description. *See, e.g., Ariad*, 598 F.3d at 1354-55; *Capon*, 418 F.3d at 1358-59; *Boston Sci.*, 647 F.3d at 1365; *Billups-Rothenberg*, 642 F.3d at 1037.  Post-priority-date evidence  may be used to show that a patent does not disclose a representative number of species of a claimed genus.  *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1375 (Fed. Cir. 2017).  A party's internal documents and publications post-dating the priority date can be relevant in determining whether the written description requirement has been satisfied. *See Bd. of Trustees of Leland Stanford Junior Univ. v. Chinese Univ. of Hong Kong*, 860 F.3d 1367, 1378 (Fed. Cir. 2017).

<u>**EXHIBIT 8**</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD. and H. LUNDBECK A/S, <br><br> Plaintiffs, <br><br> v. <br><br> ZENARA PHARMA PRIVATE LTD., et al. <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 19-cv-1938-LPS <br> ) (consolidated) <br> ) <br> ) <br> ) <br> ) <br> ) |

<u>**PLAINTIFFS' LIST OF WITNESSES TO BE CALLED LIVE OR BY DEPOSITION**</u>

**I.     INTRODUCTION**

1.      Plaintiffs Otsuka Pharmaceutical Co., Ltd. and H. Lundbeck A/S (collectively, "Plaintiffs") expect to call some or all of the witnesses identified below either live or by deposition (transcript or video).

2.      By identifying these witnesses, Plaintiffs are not required to call them at trial, nor are Plaintiffs limited in the manner in which such testimony is presented at trial.

3.      Plaintiffs reserve the right to call substitute witnesses to the extent that a witness's circumstances change, or a witness otherwise becomes unavailable for trial.  Plaintiffs further reserve the right to call any witness for impeachment purposes.

4.      Plaintiffs reserve the right to call one or more witnesses not identified below whose testimony is necessary to establish the admissibility of a trial exhibit if the admissibility of the exhibit is challenged by Defendants.

5.      Plaintiffs reserve the right to call any witness listed on Defendants' Witness List or required to rebut Defendants' case.

**EXHIBIT 8**

6.      Plaintiffs reserve the right to call any additional witnesses necessitated by any of the Court's pretrial or trial rulings, or additional witnesses to respond to issues raised after the submission of this list.

II.      **IDENTIFICATION OF PLAINTIFFS' WITNESSES**

7.      Plaintiffs identify the following witnesses:

**Infringement Expert Witnesses**

| Witness | Form of Testimony |
| --- | --- |
| Stephen R. Byrn, Ph.D. | Live |
| Christoph U. Correll, M.D. | Live |

**Validity Expert Witnesses**

| Witness | Form of Testimony |
| --- | --- |
| Christoph U. Correll, M.D. | Live |
| Lisbeth Illum, Ph.D. | Live |
| John Jarosz | Live |
| Bryan Roth, Ph.D., M.D. | Live |
| Simon Ward, Ph.D. | Live |

**EXHIBIT 8**

**Fact Witnesses**

| Witness | Form of Testimony |
|---|---|
| John Arena | Live |
| Mary Hobart | Live |
| Tine Bryan Stenbøl | Live |
| Masafumi Toda | Live |
| Hiroshi Yamashita | Live |
| Maria de Lima (Apotex) | By Deposition |
| Bhupesh Singh (Apotex) | By Deposition |
| Navin Vaya (Apotex) | By Deposition |
| Rohit Ghan (Aurobindo) | By Deposition |
| Blessy Johns (Aurobindo) | By Deposition |
| Ravikumar Nitiyanandum (MSN) | By Deposition |
| Sarath Peddu (MSN) | By Deposition |
| Pasula Chowdary (Optimus) | By Deposition |
| Lijie Wang (Prinston) | By Deposition |
| Praveen Kumar (Zenara) | By Deposition |
| Venkatash Murugan (Zenara) | By Deposition |

III.    **OVERVIEW OF PLAINTIFFS' EXPERT WITNESSES ON INFRINGEMENT**

**Dr. Stephen R. Byrn, Ph.D.**

8.    Dr. Byrn is currently the Charles B. Jordan Professor of Medicinal Chemistry in the School of Pharmacy and Pharmaceutical Sciences at Purdue University, where he has taught

**EXHIBIT 8**

since 1972.  He was the Assistant Dean of the Graduate School from 1984 to 1988 and Head of

the Department of Medicinal Chemistry and Pharmacognosy from 1988 to 1994 and Head of the

Department of Industrial and Physical Pharmacy from 1994 to 2009.  He was the Founder and

Director of Purdue's Center for AIDS Research in 1988 and co-Founder of Purdue's Regulatory

and Quality Compliance program that is now the Biotechnology Innovation and Regulatory

Science Center where he is currently co-director.  He received his B.A. in Chemistry from DePauw

University in 1966 and his Ph.D. in Organic and Physical Chemistry and the University of Illinois

in 1970.  He also completed a postdoctoral position in Physical Chemistry at the University of

California in 1972.  Dr. Byrn has extensive experience in medicinal chemistry and pharmaceutical

formulation.

9.      Plaintiffs will ask the Court to recognize Dr. Byrn as an expert in pharmaceutical

formulation development, medicinal chemistry and chemistry.  Plaintiffs anticipate that Dr. Byrn

will offer testimony concerning infringement of asserted claims of the RE'059, the '419 patent,

the '637 patent and the '840 patent, as contained in his expert reports.

**Christoph U. Correll, M.D.**

10.      Dr. Correll is currently a Professor of Psychiatry and Molecular Medicine at the

Donald and Barbara Zucker School of Medicine at Hofstra/Northwell and a Staff Psychiatrist at

the Zucker Hillside Hospital Northwell Health, Division of Psychiatry Research, where he trained

since 1998 and has worked as a full staff member since 2003.  He was an Associate Professor of

Psychiatry and Behavioral Sciences at Albert Einstein College of Medicine from 2008 to 2010,

where he then became an Adjunct Associate Professor.  Since 2017, he has been appointed as

Professor and Chair of the Department of Child and Adolescent Psychiatry, Charite University

Medicine, Berlin, Germany.  He received his degree in Medical Studies at Free University of Berlin

<u>**EXHIBIT 8**</u>

in 1993.  He first received his license to practice medicine in the State of Indiana in 2002 and has been fully licensed to practice medicine in the State of New York since 2003.  He received his board certification in Psychiatry and Child and Adolescent Psychiatry from the American Board of Psychiatry and Neurology in 2002 and 2003, respectively.  He has over twenty years of experience in psychiatry, including conducting research, publishing over 700 scientific journal articles, lecturing extensively and teaching in the field of psychiatry.  He has also testified on central nervous system ("CNS")-related matters regarding aripiprazole, bipolar disorder and major depressive disorder ("MDD") before the European Medicines Agency and Food and Drug Administration.

11.     Plaintiffs will ask the Court to recognize Dr. Correll as an expert in the treatment of central nervous system disorders, specifically schizophrenia and MDD, and medications used in such treatment, including brexpiprazole.  Plaintiffs anticipate Dr. Correll will offer testimony concerning infringement of asserted claims of the '840 patent, the '109 patent and the '637 patent and the validity of the asserted claims of the patents in suit, as contained in his expert reports.

## IV.     OVERVIEW OF PLAINTIFFS' EXPERT WITNESSES ON VALIDITY

### <u>Lisbeth Illum, Ph.D.</u>

12.     Dr. Illum is currently a Director of Identity (now Eurocage Ltd), a consultancy company, whose services include advising pharmaceutical companies on delivery of drugs using transmucosal routes of delivery, where she has worked since 2002.  She gained her MPharm First Class Honor, Ph.D. and D. Sc. in Pharmaceutical Sciences in 1972, 1978 and 1987, respectively, from the Royal Danish School of Pharmacy.  She has approximately 50 years of experience in pharmaceutical sciences, in both the academic and private sectors.  She has extensive experience in the development of novel drug delivery systems, comprising administration via the nasal, pulmonary, buccal, oral and vaginal routes and comprising formulation to include microspheres,

**EXHIBIT 8**

nanoparticles, tablets, capsules, solutions, emulsions and suspensions working with a large range of drugs from small molecular weight poorly soluble drugs to peptides and proteins and other large molecular weight compounds.  She has worked on the development of novel systems for oral delivery of poorly soluble small molecular weight drugs, both in terms of development of immediate release tablet formulations and controlled/sustained release systems.  She has also worked in transmucosal absorption enhancers, used for improving transport of drugs across mucosal membranes.

13.      Plaintiffs will ask the Court to recognize Dr. Illum as an expert in pharmaceutical formulation development.  Plaintiffs anticipate Dr. Illum will offer testimony concerning the validity of the asserted claims of the '419 patent, as contained in her expert reports.

**John Jarosz**

14.      Mr. Jarosz is currently the Managing Principal of Analysis Group, Inc. ("AG") and Director of the firm's Washington, DC office.  AG is an economic, financial, strategy and health care consulting firm.  AG provides research and analysis in a variety of business, litigation and regulatory settings.   Mr. Jarosz received his B.A. in Economics and Organizational Communications, *summa cum laude*, from Creighton University in Omaha, NE.  He was awarded an M.A. in Economics from Washington University in St. Louis, MO, and he received his J.D. from the University of Wisconsin in Madison, Wisconsin.  He has expertise in evaluating the economics of intellectual property protection, including with issues of damages estimation, commercial success, FRAND compliance, injunctive relief and antitrust violations.

15.      Plaintiffs will ask the Court to recognize Mr. Jarosz as an expert in economics. Plaintiffs anticipate that Mr. Jarosz will offer testimony concerning the validity of the asserted claims of the patents in suit, as contained in his expert reports.

**EXHIBIT 8**

**Bryan Roth, Ph.D., M.D.**

16.      Dr. Roth is currently the Michael Hooker Distinguished Professor of Protein Therapeutics and Translational Proteomics in the Department of Pharmacology at the University of North Carolina ("UNC") at Chapel Hill Medical School, a position he has held since 2007. He has been a Professor of Pharmacology and Medicinal Chemistry at the UNC Medical School since 2006, and he is jointly appointed to the Division of Chemical Biology and Medicinal Chemistry with a secondary appointment in Psychiatry there. He has nearly 40 years of experience in psychiatry, pharmacology and antipsychotic development. He has practiced clinical psychiatry, conducted research related to CNS disorders, published over 490 scientific journal articles, been cited over 73,000 times, lectured extensively and taught in the fields of pharmacology and psychiatry. He received his bachelor's degree in Biology with a minor in Chemistry in 1977 from Carroll College, and he obtained a Ph.D. in Biochemistry and M.D. from the St. Louis University School of Medicine. He received his medical licenses in California and Ohio in 1988 and 1991, respectively. Dr. Roth has extensive experience with treating patients suffering from schizophrenia, schizoaffective disorder and MDD. In addition to his internship and residency, he served from 1991 to 2001 as Ward Psychiatrist for the schizophrenia service at the University Hospitals of Cleveland. Potential antipsychotics were tested at this site, and he evaluated several antipsychotics before they reached the market. He also evaluated many atypical antipsychotics, many of which failed and never reached market. He also has industry experience in drug discovery. Dr. Roth has broad research experience, including studying serotonin and dopamine receptors and their accessory proteins and has published more than 190 papers in the area of serotonin receptor research and more then 70 papers focused on dopamine and/or dopamine receptors.

**EXHIBIT 8**

17.     Plaintiffs will ask the Court to recognize Dr. Roth as an expert in medicinal chemistry, psychiatry, pharmacology and antipsychotic drug development.  Plaintiffs anticipate that Dr. Roth will offer testimony concerning the validity of RE'059, the '840 patent, the '109 patent and the '637 patent, as contained in his expert reports.

**Simon Ward, Ph.D.**

18.     Dr. Ward is currently the Sêr Cymru Professor in Translational Drug Discovery and Director of the Medicines Discovery Institute at Cardiff University, positions he has held since 2017 when he founded the Institute.  In this role, he is leading multiple drug discovery projects in neuroscience and oncology from initiation through Phase I trials.  He is also active in the industry, as he has served on advisory boards or consulting roles at several pharmaceutical companies.  He trained as a chemist at the University of Cambridge, where he received his degree in Natural Sciences in 1993 and his Ph.D. in Chemistry in 1997.  Dr. Ward has over 25 years of experience in drug development, with a focus on CNS indications.  He has conducted research, led drug discovery teams, published over 50 scientific journal articles, contributed sections of several books on medicinal chemistry, is an inventor of 40 patent applications claiming drug compounds and development and is a member of over a dozen professional associations.

19.     Plaintiffs will ask the Court to recognize Dr. Ward as an expert in chemistry, medicinal chemistry, pharmacology and antipsychotic drug development.  Plaintiffs anticipate that Dr. Ward will offer testimony concerning the validity of RE'059, the '840 patent, the '109 patent and the '637 patent, as contained in his expert reports.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD. AND H. LUNDBECK A/S, | |
| Plaintiffs, | Civ. Action No. 19-cv-1938 (LPS) (consolidated) |
| v. | |
| ZENARA PHARMA PRIVATE LTD., ET AL. | |
| Defendants. | |

**EXHIBIT 9:**

**DEFENDANTS' LIST OF WITNESSES TO BE CALLED AT TRIAL**

Pursuant to Local Rule 16.3(c)(7), Defendants submits this list of witnesses to be called  at trial. Subject to the availability of each witness at the time of trial, Defendants intend to call  the following witnesses at trial, either by live testimony or by deposition. Defendants reserve the right to revise, amend, supplement, or modify their List of Witnesses based on any pretrial rulings by the Court and/or to address any additional issues, arguments, evidence or other developments in the case, including edits to the draft pretrial order, any meet and confers or other negotiations between the parties, pending and anticipated motions, and similar developments.

Defendants reserve the right to amend its answering/rebuttal witness list, in view of events at trial or other developments, including evidentiary rulings or other rulings by the Court.

Defendants also reserve the right not to call any of the witnesses (either live or by deposition) set forth in the list below, or to call by deposition any witnesses listed as a live witness below, or vice versa. Defendants reserve its right to introduce deposition testimony in accordance with Fed. R. Civ. P. 32(a)(3). The identification of a witness on this list is not an admission that the witnesses' testimony is admissible if called by Plaintiffs, and Defendants reserves its right to object to any witness or testimony that is objectionable or inadmissible.

In addition to the witnesses identified below, Defendants reserve the right to call anyone appearing on Plaintiffs' witness list or as a corporate representative at trial. Defendants also reserve the right to elicit testimony concerning facts from Plaintiffs' expert witnesses, including any expert witness who has previously provided testimony on behalf of Plaintiffs but whom Plaintiffs do not call to testify. Defendants reserve the right to call any witness for impeachment purposes or whose testimony is necessary to establish the authenticity or admissibility of any trial exhibit if the admissibility of the exhibit is challenged by Plaintiffs. Defendants further reserve the right to offer

deposition testimony from any unavailable witness in lieu of live examination. Defendants

reserve the right to re-call witnesses for rebuttal purposes.

## I.    EXPECTS TO CALL WITNESS LIST

Defendants expect to call the following witnesses to testify, either live or by

prior  deposition, in this action.

| No. | Witness | Witness Type |
|-----|---------|--------------|
| 1 | Michael M. Crowley, Ph.D. (Live) | Expert |
| 2 | Fernando J. Muzzio, Ph.D. (Live) | Expert |
| 3 | Anthony J. Rothschild, M.D. (Live) | Expert |
| 4 | Richard C. Moreton, Ph.D. (Live) | Expert |
| 5 | Jeffrey Aube, Ph.D (Live) | Expert |
| 6 | Ivan T. Hofmann  (Live) | Expert |
| 7 | Victor L. Reus, M.D. (Live) | Expert |

## II.    MAY CALL WITNESS LIST

Defendants may the following witnesses to testify, either live or by prior deposition, in this

action.

| No. | Witness | Witness Type |
|-----|---------|--------------|
| 1 | Simon Ward, Ph.D.  (Live or Deposition) | Expert |
| 2 | Christopher Correll, M.D. (Live or Deposition) | Expert |
| 3 | Lisbeth Illum, Ph.D. (Live or Deposition) | Expert |
| 4 | Stephen R. Byrn, Ph.D. (Live or Deposition) | Expert |
| 5 | John C. Jarosz (Live or Deposition) | Expert |
| 6 | Victor I. Reus, M.D (Live or Deposition) | Expert |
| 7 | Masafumi Toda (Live or Deposition) | Fact |
| 8 | Mary Hobart(Live or Deposition) | Fact |
| 9 | Hiroshi Yamashita (Live or Deposition) | Fact |
| 10 | Tine Stensbol (Live or Deposition) | Fact |

## III.    Plaintiffs' Objections to Defendants' Witness List

Plaintiffs object to Defendants' witness list to the extent it does not comply with the

requirements of Judge Stark's form pretrial order because it fails to "indicate the precise subject

matter on which it will ask the Court to recognize the witness's expert."  LPS Patent Final Pretrial

Order.  To the extent Defendants supplement this witness list, Plaintiffs reserve the right to fully supplement and amend these objections.

Plaintiffs object to any testimony from Defendants' witnesses to the extent it violates Fed. R. Evid. 402, 403, 701, 702, 801 and/or 802, or Fed. R. Civ. P. 26, 32 and/or 37.  Plaintiffs also object to the testimony of Defendants' witnesses to the extent they do not have personal knowledge of the matter.  *See* Fed. R. Evid. 602.  Plaintiffs also object to the proposed testimony of Defendants' witnesses as cumulative to the extent that Defendants proffer multiple witnesses to testify with regard to the same subject matter.  Plaintiffs further object to the proposed testimony of Defendants' witnesses to the extent it is not relevant to the issues in the case.  Plaintiffs reserve the right to object to Defendants introducing any testimony regarding the validity of the patents in suit that relies on or refers to prior art references or other grounds not cited in Defendants' Invalidity Contentions.  Plaintiffs further object to Defendants' reservation of "the right to call anyone appearing on Plaintiffs' witness list or as a corporate representative at trial."  Additionally, Plaintiffs object to specific testimony from Defendants' non-fact witnesses, as will be outlined in Plaintiffs' pre-trial motions.  Other objections to the testimony of Defendants' witnesses, if any, are reserved for trial.

Plaintiffs also object to Defendants calling at trial any witness by deposition to the extent that such witness testifies live at trial.  Plaintiffs further incorporate by reference any objection to deposition testimony of any witness as set forth in Plaintiffs' objection to Defendants' deposition designations.  Plaintiffs further object to Defendants' reservation of the purported "right to elicit testimony concerning facts from Plaintiffs' expert witnesses, including any expert witness who has previously provided testimony on behalf of Plaintiffs but whom Plaintiffs do not call to testify."

Plaintiffs' lodge the following objections to Defendants non-fact witnesses.

**Michael M. Crowley, Ph.D.**

Plaintiffs object to Dr. Crowley's testimony to the extent he attempts to opine on matters outside the scope of his Rule 26(a)(2)(B) expert report, anything outside his experience or purported area of expertise, including, without limitation, any legal, claim construction, scientific or technical matters and to testimony objectionable under one or more of Fed. R. Evid. 702, 703, 401, 402 and 403. Plaintiffs reserve all rights to conduct any necessary *voir dire* of Dr. Crowley's qualifications and opinions at trial.

**Fernando J. Muzzio, Ph.D.**

Plaintiffs object to Dr. Muzzio's testimony to the extent he attempts to opine on matters outside the scope of his Rule 26(a)(2)(B) expert report, anything outside his experience or purported area of expertise, including, without limitation, any legal, claim construction, scientific or technical matters and to testimony objectionable under one or more of Fed. R. Evid. 702, 703, 401, 402 and 403. Plaintiffs reserve all rights to conduct any necessary *voir dire* of Dr. Muzzio's qualifications and opinions at trial.

**Anthony J. Rothschild, M.D.**

Plaintiffs object to Dr. Rothschild's testimony to the extent he attempts to rely on any opinions of Dr. Aubé. As Plaintiffs stated in support of the motion to preclude the testimony of Dr. Aubé (D.I. 554, 555, 568), Dr. Aubé is not a person of ordinary skill in the art and therefore must be precluded from providing testimony regarding the obviousness of the asserted patents. Accordingly, Dr. Rothschild should similarly be precluded from relying on any testimony of Dr. Aubé. Plaintiffs further object to any attempt by Defendants to offer any new opinions from Dr. Rothschild to compensate for Dr. Aubé's missing experience.

Plaintiffs object to Dr. Rothschild's testimony to the extent he attempts to opine on matters

outside the scope of his Rule 26(a)(2)(B) expert report, anything outside his experience or purported area of expertise, including without limitation, any legal, claim construction, scientific or technical matters and to testimony objectionable under one or more of Fed. R. Evid. 702, 703, 401, 402 and 403.   Plaintiffs reserve all rights to conduct any necessary *voir dire* of Dr. Rothschild's qualifications and opinions at trial.

**Richard C. Moreton, Ph.D.**

Plaintiffs object to Dr. Moreton's testimony to the extent he attempts to opine on matters outside the scope of his Rule 26(a)(2)(B) expert report, anything outside his experience or purported area of expertise, including, without limitation, any legal claim construction, scientific or technical matters and to testimony objectionable under one or more of Fed. R. Evid. 702, 703, 401, 402 and 403.  Plaintiffs reserve all rights to conduct any necessary *voir dire* of Dr. Moreton's qualifications and opinions at trial.

**Jeffrey Aubé, Ph.D.**

Plaintiffs' object to all testimony of Dr. Aubé because he is not a person of ordinary skill in the art and lacks the requisite experience to provide any expert testimony regarding alleged obviousness.  As Plaintiffs stated in support of the motion to preclude the testimony of Dr. Aubé (D.I. 554, 555, 568), Dr. Aubé is not a person of ordinary skill in the art, lacks the requisite expertise and therefore must be precluded from providing testimony regarding the obviousness of the asserted patents.  Accordingly, Plaintiffs' object to all testimony of Dr. Aubé.

Plaintiffs' object to Dr. Aubé's testimony to the extent he attempts to opine on matters outside the scope of his Rule 26(a)(2)(B) expert report, anything outside his experience or purported area of expertise, including, without limitation, any legal claim construction, scientific or technical matters and to testimony objectionable under one or more of Fed. R. Evid. 702, 703,

401, 402 and 403.  Plaintiffs reserve all rights to conduct any necessary *voir dire* of Dr. Aubé's qualifications and opinions at trial.

**Ivan T. Hoffman**

Plaintiffs object to Mr. Hoffman's testimony to the extent he attempts to opine on matters outside the scope of his Rule 26(a)(2)(B) expert report, anything outside his experience or purported area of expertise, including, without limitation, any legal, claim construction, scientific or technical matters and to testimony objectionable under one or more of Fed. R. Evid. 702, 703, 401, 402 and 403.  Plaintiffs reserve all rights to conduct any necessary *voir dire* of Mr. Hofmann's qualifications and opinions at trial.

**Victor L. Reus, M.D.**

Plaintiffs' object to Defendants' representation that Dr. Reus will be called live at trial. Defendants have represented to both Plaintiffs and the Court that Dr. Reus is at some greater-than-average risk of adverse health consequences were he to contract Covid, and therefore, Defendants refused to offer Dr. Reus for an in-person deposition.  (D.I. 546.)  Accordingly, Plaintiffs object to Defendants offering Dr. Reus live at trial.

Plaintiffs object to Dr. Reus's testimony to the extent he attempts to opine on matters outside the scope of his Rule 26(a)(2)(B) expert report, anything outside his experience or purported area of expertise, including, without limitation, any legal, claim construction, scientific or technical matters and to testimony objectionable under one or more of Fed. R. Evid. 702, 703, 401, 402 and 403.  Plaintiffs reserve all rights to conduct any necessary *voir dire* of Dr. Reus's qualification and opinions at trial.